IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA AT ANCHORAGE

TRAVELERS CASUALTY AND SURETY )
COMPANY OF AMERICA, a Connecticut )
corporation, )
)
Plaintiff, )
)
vs. )  No. A04-0105 CV (RRB)
)
RONALD GELBRICH; JERALD RENICH; )
BRAD FINNEY; JAN PAULSON; MICHAEL )
HOUTS; EDWIN JOHNSON; and )
PETERSON SULLIVAN, P.L.L.C., a )
Washington limited liability )
company, )
)
Defendants. )

Videotaped Deposition Upon Oral Examination

of

CHARLES W. LANGFITT

Taken at 1420 Fifth Avenue
Seattle, Washington

DATE:  February 28, 2005

REPORTED BY:  Patricia A. Blevins, CCR
CCR NO.: BL-EV-IP-A403LH

STARKOVICH REPORTING SERVICES
(206)323-0919

EXHIBIT 11 PAGE 1 OF 46

9bcc33f8-b7de-45e8-859c-8a7d5c96994f

EXHIBIT 5, Page 1 of 47

1    SEATTLE, WASHINGTON; MONDAY, FEBRUARY 28, 2005

2          1:15 P.M.

3          --oOo--

4

5    THE VIDEOGRAPHER:  Back on the record.  This is

6 the beginning of Tape No. 2 in the continuing deposition of

7 Charles W. Langfitt.  The time is now approximately

8 1:15 p.m.  Go ahead.

9

10      E X A M I N A T I O N

11 BY MR. WAGNER:

12   Q. Mr. Langfitt, my name is Jim Wagner.  I represent

13 Defendant Jerald Renich.  I'm going to ask you some followup

14 questions based on what you testified to this morning.

15    Let me go back to your background for just a

16 moment.  You said you're a law school graduate.  Where did

17 you go to law school?

18   A. Gonzaga.

19   Q. Gonzaga.  Okay.  And you're a member of the

20 Washington Bar; is that correct?

21   A. Yes.

22   Q. And you're not a member of the Alaska Bar?

23   A. No.

24   Q. And you're not a CPA, correct?

25   A. No.

Page 84

1    Q.    So you don't have any professional opinion one way

2    or another about the quality of the work papers or work that

3    were done by Peterson Sullivan with respect to the year-end

4    2000 audit?

5    A.    No.

6    Q.    You do not.  Okay.  You're the one who made the

7    decision to file the current lawsuit; is that correct?

8    A.    Yes.

9    Q.    On whom, if anyone, did you rely in deciding to

10   make a -- file a lawsuit against Peterson Sullivan, just for

11   example?

12   A.    Jordan Rosenfeld is someone that we have to look

13   at to date, and also based on the Sutor report and the

14   Peterson report.

15   Q.    You're saying you relied on the Peterson Sullivan

16   report as a basis for your suit against Peterson Sullivan?

17   A.    Yes.

18   Q.    What in the Peterson Sullivan report supports a

19   claim against Peterson Sullivan?

20   A.    When you look at it, they were pointing out that

21   there were system flaws and other difficulties that had

22   predated even October of the year that they looked at it.

23   So when you looked through the report, the overall flavor of

24   it was such that there were system flaws that existed at

25   South Coast.  And if -- And this _s what I'm getting for the

EXHIBIT H PAGE 3 OF 19

EXHIBIT 5 Page 3 of 47

9bcc33f8-b7de-45e8-859c-8a7d5c96994f

1  other part of it is that if the audit had been performed

2  properly, those system flaws would have been revealed during

3  the course of the 2000 audit and not when they came back in

4  with the later report.

5      Q.   Now, the October you're referring to is October of

6  2001, correct?

7      A.   Well, actually, when you go back and you look at

8  the report, the report is 2002, and you're talking about

9  that October of 2001, yes.

10      Q.   Right.  So that doesn't have anything to do with

11  the year-end 2000 financial statements.

12      A.   Except that they say that it's clear, even though

13  it was a rapid failure, where it, if you'll pardon the

14  expression, tanked relatively quickly.  And that's my word,

15  not theirs, but they said it failed relatively rapidly.

16          There was a reference in that that obviously there

17  were problems that preexisted October and some of the other

18  dates in it.  So to me that would mean that if they had done

19  what should have been done properly, and again, that's not

20  where I can offer the opinion, but something you look at

21  that they're saying this is not something that just happened

22  in October, this has been a problem for a period of time,

23  time period not stated, that would lead me to believe, as

24  reading it, that obviously these problems reasonably would

25  have predated '01.

EXHIBIT 11 PAGE 4 OF 46

EXHIBIT 5, Page 4 of 47.

9bcc33f8-b7de-45e8-859c-8a7d5c96994f

1    Q.    Because of what Peterson Sullivan said were

2    deficiencies that they identified in October of '01?

3    A.    Correct.

4    Q.    And what Peterson Sullivan talks about in their

5    report, is it not, are failures by South Coast management to

6    adhere to the fails management project control system that

7    had been developed?

8    A.    Yes.

9    Q.    And they were specifically referring to one

10   project on the Richardson Highway, correct?

11   A.    They looked at a number of other ones, but that

12   was offered as the example.

13   Q.    They didn't state, with respect to any of the

14   other projects that they examined, that there was this

15   problem, did they, in their report?

16   A.    Actually, what they did is -- and again, the

17   report is there, so we can pull it out and look at it.  But

18   my memory of what it says is that there were problems

19   throughout their organization.  And what is symptomatic of

20   them was Richardson, and they offered that up as an example

21   but symptomatic with the problem, and they looked at three

22   different geographical regions for what the problems were.

23   Q.    And the other two geographical regions being

24   Ketchikan and Arizona, they didn't note those problems,

25   correct, with respect to the projects that they looked at?

Page 92

1   A.   Well, I mean there was problems where Arizona was

2   underbid because they missed the privilege taxes in the

3   bids.

4   Q.   But that's not talking about the fails management

5   project control criteria, is it?  That was an omission that

6   the company had, that they didn't know about the gross

7   revenues tax.

8        MR. SOKOL:  I'm going to object to -- Go

9   ahead.  I'm sorry.  I interrupted you.

10  Q.   Let me ask the question differently.  The problem

11  with the tax in Arizona, as I understand it, and you tell me

12  if your understanding is the same or is different -- The

13  problem with respect to the tax in Arizona was that South

14  Coast was unaware of the fact that they would owe this tax

15  to the State of Arizona.  They believed that they were

16  exempt from that tax because they were doing native work on

17  a reservation, correct?

18  A.   I know that they missed it.  I'm not sure that

19  it's because they were doing work on an Indian reservation,

20  though that does strike a bell that maybe that was the

21  reason.

22  Q.   Do you have an understanding as to why South Coast

23  did not account for that tax?

24  A.   You know, Jim, I don't remember.  All I know is

25  they missed it, and they should have included it, and I

STARKOVICH REPORTING SERVICES
206 323-0919

EXHIBIT 5  Page 6 of 47    EXHIBIT H PAGE 6 OF 48

9bcc33f8-b7de-45e8-859c-8a7d5c96994f

Page 93

1   can't remember whether it was because -- because they were

2   working on reservations.  I mean -- But again, they also had

3   one job that was a DOT job.

4       Q.   So you don't -- I want to understand your

5.  testimony.  You don't know, as you sit here today, why South

6   Coast did not account for those taxes in their bids?

7       A.   I currently don't remember, but I'm sure there's a

8   note in one of the files that would say what it is.   I

9   currently don't remember.  I know that they missed it, it

10  was a mistake, and it was adverse.

11      Q.   Right.  Okay.  And that was the situation that

12  Peterson Sullivan discussed with respect to the Arizona

13  projects, correct?

14      A.   Yes.

15      Q.   And with respect to the Ketchikan projects, they

16  didn't identify any material deviations from the fails

17  management project controls?

18      A.   On the Ketchikan job, they said that it was in

19  better compliance, they seemed to be in relatively good

20  shape.  The problem was Ketchikan, Other, and Arizona.

21      Q.   The problem was Ketchikan --

22      A.   "Other" is what they called it.

23      Q.   Yeah.  In other words, the other areas of

24  Alaska --

25      A.   Correct.  They --

1      Q.    -- which they cited the Richardson Highway as the

2  example?

3      A.    She actually just asked me to slow down on my

4  answers, and so I'm going to try to do that so we don't end

5  up talking over each other.

6      Q.    Okay.

7      A.    So yeah.  What they did is -- if you'll look at

8  the report, it has three geographical slices that they took.

9  Basically, where it says Ketchikan, it has a situation that

10  says looks like it was better run than the other two.

11      Q.    Right.  And as you say, the report says what it

12  says, and we can all look at it.

13      A.    Exactly.

14      Q.    Same with the Sutor report, correct?  I mean it

15  says what it says, and we can all look at it?

16      A.    Yes.

17      Q.    And the Sutor report primarily dealt with what

18  it -- what Mr. Sutor deemed to be a poor project cost

19  control system that South Coast had, particularly in

20  Arizona, correct?

21           MR. SOKOL:  Object to the form of the

22  question.

23      A.    Actually, no, you're wrong, because what you need

24  to do is again you want to look at the report.  Remember the

25  example offered of Big Salt and the fact that what happened

Page 95

1   is that in that particular setting, they'd asked Jan Paulson

2   and I think Jerry Renich for a cost to complete with the

3   same time frame.  And what happened was they came back with

4   two different answers, both indicating losses on that job,

5   one substantial, one not quite as bad, and that was offered

6   as an example of why there was problems with the Costa

7   system, because it was not reliable.

8        Q.   Now, you're not making any claim in this lawsuit

9   against any of the defendants for any costs on Big Salt,

10   correct?

11        A.   No.  It's not one of the ones that's listed as a

12   loss.  However, when you look at the financial situation,

13   Big Salt is listed as one of the ones that had underbillings

14   that if it had been correctly identified, then they wouldn't

15   have -- they would have had a different presentation.

16        Q.   Have you ever talked to anybody in Travelers'

17   underwriting department about the year-end 2000 financial

18   statements of South Coast?

19        A.   In what context do you mean?

20        Q.   Any.

21        A.   Yeah.  I mean we've talked about it, some

22   discussions about the financials and some other things.

23        Q.   Has anybody within Travelers told you that they

24   believed that there were material misrepresentations in

25   those financial statements?

EXHIBIT 5 Page 9 of 47

EXHIBIT 11 PAGE 9 OF 46

9bcc33f8-b7de-45e8-859c-8a7d5c96994f

Page 96

1    A.    The concern is that when you look at them, they're

2    not as presented.

3         MR. WAGNER:  Could you read back my question,

4    please?  I'll move to strike as nonresponsive to the

5    question asked, and I'd ask you to answer my question.

6                        (The question on Page 95,

7                         Lines 23-25, was read.)

8    Q.    Answer the question.

9    A.    What happened is during the course of our review

10   of the financials, the Peterson reports, and everything

11   else, it appeared that there was a problem with it, and I

12   talked to Dave Hombach about it, about the nature of the

13   financials.

14   Q.    Okay.  Can you now answer my question, which is

15   whether anybody within Travelers ever told you that they

16   believed that there were material misrepresentations in the

17   year-end 2000 financial statements?

18   A.    Okay.  Let me put it back to you this way, Jim.

19   I'm the one who was doing the investigation, taking a look

20   at it to try to determine what was wrong with it.  And so

21   what happens is is then you go and you say, This is what

22   we've got with the reports.  This is what we're seeing based

23   on the course of our investigation, which the underwriters

24   weren't involved with.  So when you look at it, I'm the one

25   sitting there saying, Here's the information we've got.  It

1    looks like this is different.  What do you think?  They were

2    relying on the financials as presented.

3            So what happens, Jim, is that -- and that's why

4    I'm saying Dave didn't come to me, I think that they're

5    misrepresented, take a look at it.  What happened is I find

6    out looking at the Peterson report.  I find out looking at

7    all these.  And then the losses that we have, it looks like

8    there's a problem.  So I go back and say, This is the stuff

9    we're finding, what do you think, because you've got a

10   situation where you've got a financial that's saying "X,"

11   looking at a result that's saying "Y."  Here's the Peterson

12   report.  Here's this report.  This looks like it's a

13   problem.

14           So it's not him coming to me.  It's the other way

15   around, Jim.  It's me going to them, saying, I'm finding

16   this during the course of my claims workup.  This is what

17   the problem is.

18       Q.   So in other words, your answer to my question is

19   no, nobody within the Travelers organization ever told you

20   that there were material misrepresentations in the year-end

21   2000 financial statements, correct?

22       A.   That's correct.  In fact, what happened is --

23       Q.   So you told --

24       A.   I've given you a complete answer.  It's the exact

25   opposite.

EXHIBIT 5  Page 11 of 47

EXHIBIT H PAGE 11 OF 46

9bcc33f8-b7de-45e8-859c-8a7d5c96994f

1    Q.    You told people within Travelers that there were

2  material misrepresentations in the year-end 2001 financial

3  statements; is that correct?

4    A.    No.  What it said is that looking at it, looks

5  like there is a problem with it.  And then you have a CPA

6  look at it, and he says, "Lookit."  This is what the problem

7  is.

8    Q.    Do you believe, as you sit here today, that there

9  were material misrepresentations in the year-end 2001

10 financial statements of South Coast, Inc.?

11    A.    Yes.

12    Q.    Okay.  Which ones?  What was misrepresented?

13    A.    The underbillings.  You've got some liquidity

14 issues.  Basically, if the costs -- if you'd gone and taken

15 a look and examined the costs, then the underbillings would

16 have been reflected differently.  And so what would have

17 happened is is that they would have shown up as a loss or

18 not qualified as an underbilling.  There would have been a

19 series of other events that would have impacted the balance

20 sheet.  And consequently, because of that, then, you would

21 have had a balance sheet that looked different than what it

22 did.

23    Q.    Have you created a version of the year-end 2000

24 balance sheet that you believe is the version that should

25 have been issued at the time by the company?

Page 99

1    A.    No.

2    Q.    Have you asked that that be done?

3    A.    Not yet.

4    Q.    And that's nothing that has ever been done on your

5    behalf at any time up to today?

6

7    A.    I've never asked for it to be done.

8    Q.    So you don't have an opinion, as you sit here

9    today, as to what specific number or numbers should have

10   been in the year-end 2000 financial statements?

11   A.    We haven't done a -- That's a different question.

12   We don't have a workup to go look at it, but we know that --

13   on a very rough basis, that you've got losses that have

14   resulted on the job, or different numbers, that when you

15   work them through, you would have ended up with a different

16   number, based on some of the other information you've

17   already got and that had been developed, even by Peterson

18   and Sullivan, that basically revenue losses on the job

19   that -- and I don't have the numbers in front of me -- that

20   would be like $3 million.

21   Q.    In other words, what you're saying is that you

22   went to the end of the job and saw what the actual financial

23   result of the job was, extrapolated back to year-end 2000,

24   and said, Based on the results that occurred at the end of

25   the job, this is what the year-end 2000 financial statements

should have said about that particular job; is that correct?

Page 100

1    A.    No, because what happens is if you go back and
2    look at Peterson Sullivan's own reports, what they say is
3    there's a certified loss in these jobs, of like about
4    $8.3 million.  If you run that through in and of itself, you
5    can then take a look at those numbers, and when you look at
6    them, you get a different financial feeling for where it's
7    at.

8    Q.    So in other words, you take the numbers that were
9    generated by Peterson Sullivan, extrapolate them back, and
10   say then, in your opinion, that's what the year-end 2000
11   financial statements should have looked like?  Is that what
12   you're saying?

13   A.    Well, again, we haven't done that exercise to a
14   complete financial statement, because we've been waiting for
15   some other information.  But when you look at -- yes.  When
16   we looked at some of the numbers -- and what you do is you
17   look at where that loss was, you roll those numbers back
18   that are Peterson Sullivan numbers, and you go back and you
19   look at it.  The result is you end up with a loss.  And
20   that's why counsel was advised that the actual losses were
21   greater.

22   Q.    Well, and again, I just want to try to get this
23   down into plain English, if possible.  It may not be
24   possible.  It seems difficult.  But what I'm trying to get
25   clear is:  Your view of what the year-end 2000 financial

Page 101

1  statements should have looked like at this point is based on

2  what Peterson Sullivan said in their report was the actual

3  projected loss on specific jobs, extrapolated back to where

4  the job was as of 12-31-00 --

5      A.    Let me --

6      Q.    -- is that correct?  Let just start with "yes" or

7  "no."

8      A.    No.

9      Q.    Okay.  So then on what are you basing your view

10  that the numbers should have been different?

11      A.    There was a discovery request, and the information

12  was answered as to what we'd been looking at.  I don't

13  happen to have that in front of me.  But what it is is

14  you're looking at the Peterson Sullivan report.  You're

15  looking at the financials.  There was a draft 2001 financial

16  that was produced by Peterson and Sullivan.  And when you

17  pull all those numbers together, that's where those numbers

18  come from.  Your question was trying to limit it just to the

19  one report.

20      Q.    Is there anybody within or without the Travelers

21  organization, that you're aware of, that as of this date, is

22  able to state an opinion as to specific elements or items in

23  the year-end 2000 financial statements that were materially

24  misrepresented?

25      A.    Since we don't have the working papers, it's

STARKOVICH REPORTING SERVICES
206 323-0919

1   difficult to see what was done.

2        Q.   Let's do it the way that we did the other

3   question, because I think it worked better.  Let's start

4   with "yes" or "no."

5        A.   Okay.  No problem.

6             MR. WAGNER:  Could you read the question

7   back?

8             THE WITNESS:  No problem.

9                           (The question on Page 101,

10                          Lines 20-24, was read.)

11       Q.   Yes or no?

12       A.   Yes.  To me.

13       Q.   Okay.  Anybody else besides you?

14       A.   Currently, no.

15       Q.   Okay.  And again --

16       A.   Now, by the way --

17       Q.   No.  Since you've said that you can state that

18   there were elements of the financial statements that were

19   materially misrepresented, can you tell me which ones?

20       A.   Again, I've told you:  The underbillings.

21       Q.   Okay.

22       A.   And the rest of the information was listed in

23   discovery requests.  And I'm relying also on my expert.

24       Q.   Who is that?

25       A.   Jordan Rosenfeld.

1    Q.    Now, are you aware of the fact that Jordan

2    Rosenfeld has testified that he has not even begun that

3    analysis yet?

4    A.    There's some preliminary indication of information

5    that was given to us, that was given to counsel, that would

6    indicate that looking at it, that these are the problem

7    areas and that these are the misrepresentations.  As I

8    testified, it's hard to tell without the working papers.  So

9    my testimony was qualified by that.

10    Q.    And again, my question was:  Were you aware of the

11    fact that Jordan Rosenfeld has testified in this lawsuit

12    that he has not even begun any such analysis yet?

13                MR. SOKOL:    What analysis?

14    Q.    Of the fiscal year 2000 financial statements.

15    He's testified to that.

16    A.    I'd have to see the testimony.

17    Q.    So you were not aware of that?

18    A.    No.  Well, what I'm saying is that that fact --

19    Q.    Just a second.  I think we'll do a lot better if

20    you would just answer my questions.

21    A.    No problem.

22    Q.    You were not aware of that; is that correct?

23    A.    No.

24    Q.    Okay.  Thank you.

25                MR. JURCA:    You mean no, that's correct -- I

Page 104

1    mean no, that isn't correct?

2                    THE WITNESS:  No, I wasn't aware of that.

3                    MR. WAGNER:  He's not aware of that

4    testimony.

5                    MR. JURCA:  Thank you.

6        Q.    And you mentioned that you are able to state the

7    opinion here today that the underbillings number or numbers

8    on the year-end financial statements for 2001 were

9    materially misrepresented; is that correct?

10       A.    No, that's not what I said.

11       Q.    I thought that was what you said.  You mentioned

12   the underbillings in your answer.

13       A.    No.  What I'm saying is this:  I'm saying looking

14   at it, I have a workup by counsel -- or excuse me -- by

15   Jordan.  Preliminary one, he says -- even though it hasn't

16   begun, it says, These are the problems with -- and it was

17   disclosed in discovery -- These are the problems on this

18   balance sheet, the underbillings and these other items.

19   When you look at the Peterson and Sullivan financial, the

20   draft one from roll one, and you roll it forward, if they

21   were performing the correct analysis, they should have

22   turned it up.  We can't tell without the working papers,

23   again getting back to prior testimony.

24       Q.    I want to get back to -- It seems to me you're

25   changing your answer now.

Page 105

1    A.    No, because what happens --

2    Q.    Just a second.  Let me ask a question, and then

3    you can answer it.  I thought I heard you testify five

4    minutes ago that you were the one person who at this point

5    could state an opinion that there were material

6    misrepresentations in the year-end 2000 financial statement.

7    Isn't that what you said?

8    A.    No.

9    Q.    That's not what you said?  Let's go off the record

10   then, and let's find that and read it back.

11   A.    If you can.  Exactly.  Take a look at it.

12             THE VIDEOGRAPHER:  We're going off the

13   record.  The time is approximately 1:34 p.m.

14                         (Pause in the proceedings.)

15                         (The questions and answers from

16                         Page 101, Line 20, through

17                         Page 102, Line 20, were read.)

18             THE VIDEOGRAPHER:  We are back on the record.

19   The time is approximately 1:37 p.m.

20   Q.    We've just read back from Pages 84 and 85 of the

21   rough draft of the transcript of this deposition, where you,

22   Mr. Langfitt, testified that you believe that the

23   underbillings were materially misrepresented in the year-end

24   2000 financial statements.  Did you hear that testimony?

25   A.    Yes.

Page 106

1    Q.    Okay.    Now, I think my follow-on question to you

2    was -- Well, I'm going to ask you this follow-on question:

3    What was misstated?    What was materially misrepresented

4    about the underbillings?

5    A.    They should have been treated as losses and not as

6    a current asset.

7    Q.    And on what do you base that opinion?

8    A.    Preliminary -- just information given by

9    counsel -- or excuse me -- by Jordan, that was in the

10   information that was produced to counsel.    When you look at

11   it --

12   Q.    So you base this opinion on preliminary

13   information that was provided to you by Mr. Rosenfeld?

14   A.    Correct, basically saying looking at the

15   statements and without the working papers, that that's what

16   I was relying on, and looking at that particular one as a

17   problem.

18   Q.    And on the basis of that preliminary statement by

19   Mr. Rosenfeld, you concluded that there was a meritorious

20   D & O claim against my client?

21   A.    The D & O claim comes from Tom Crandall saying

22   that your client, amongst others, were responsible for not

23   revealing what the costs were.    Basically, it's a different

24   deal, Jim.    What it is is that Tom said he wanted to pursue

25   his own D & O action potentially, but he got advice that he

EXHIBIT H PAGE 21 OF 48

9bcc33f8-b7de-45e8-859c-8a7d5c96994f

EXHIBIT 5, Page 20 of 47

1   couldn't sue himself.  So consequently, what happened was I

2   started looking into it because Tom had mentioned it.

3          And so basically what it was is that it's because

4   they didn't properly carry out the cost, didn't report it up

5   to Klukwan management, that in that particular situation,

6   that's what caused the problem, and that if they'd known, it

7   would have been different.  And that's what Tom had advised

8   me.

9          Q.   Is that the claim that you've alleged against my

10  client in this lawsuit?

11         A.   I'd have to go back and read the complaint.

12         Q.   Well, let me ask you this before we get into the

13  complaint.  Does your complaint against my client relate to

14  anything other than the alleged misrepresentations in the

15  fiscal year 2000 year-end financial statements?

16         A.   It relates to the fact to what we know to date

17  would be based on the fact that the way the company was run,

18  that there was financial information that wasn't revealed,

19  and other things that were conducted in such a fashion that

20  if it had been known, would have resulted in a different

21  financial presentation.

22         Q.   Move to strike as nonresponsive to the question

23  asked, and I would ask that the question be read back and

24  answered.

25  ////

Travelers Casualty and Surety Company of America

Page 108

1                    (The question on Page 107,

2                    Lines 13-15, was read.)

3        Q.    Again, I believe that's a yes or no question.

4        A.    I said based on what I know to date, it was

5    related to the way they were handling the costs.  So I mean

6    I would say currently my knowledge would be, since you want

7    a yes or no answer -- would be other than that, I'm not

8    aware of anything currently.

9        Q.    Beyond the year-end 2000 financial statements?

10       A.    I'm not aware of anything currently beyond that.

11       Q.    Beyond the year-end 2000 financial statements?

12       A.    Currently.

13       Q.    Okay.  I understand.  We're only asking you about

14   what you know currently.  We're not asking about anything

15   you don't yet know.  Okay?  Let's mark this as the next

16   exhibit so you don't have any confusion about what I'm

17   asking about.

18                   (Exhibit 4 marked for

19                   identification.)

20       Q.    You reviewed this complaint before it was filed?

21       A.    Yes.

22       Q.    And your first claim for relief, which is on the

23   fourth and fifth pages of Exhibit 4, is your claim for

24   relief against -- includes your claim for relief against my

25   client and Mr. Jurca's client, correct?

Travelers Casualty and Surety Company of America          Deposition of ...........

Page 109

1      A.   Yes.

2      Q.   And you're not aware of any allegations or claims

3  against either my client or Mr. Junca's client, as of this

4  date, that are not set forth in this claim for relief,

5  correct?

6      A.   Yes.

7      Q.   And then your claims against Mr. Earnhart's client

8  are set forth in your second claim for relief, which is on

9  the last two pages of the document, correct?

10     A.   Yes.

11     Q.   And you're not aware of any allegations or claims

12  or complaints against Mr. Earnhart s client, Peterson

13  Sullivan, today, other than those stated on those two pages,

14  correct?

15     A.   Correct.

16     Q.   And all of those claims relate to alleged

17  misrepresentations contained within the year-end 2000

18  financial statements, correct?

19              MR. SOKOL:   I'll object to the form of the

20  question.

21     A.   Yes.

22     Q.   In fact, your claim in this lawsuit, essentially,

23  Mr. Langfitt, is that if the year-end 2000 financial

24  statements had been, in your view, properly presented, then

25  Travelers would have terminated its bonding relationship by

Travelers Casualty and Surety Company of America

1    no later than I believe you said May 17, 2001, correct?

2                MR. SOKOL:   Object to the form of the

3    question.

4        Q.   Is that correct?

5        A.   Yes.

6        Q.   Help me understand again why you use that

7    particular date of May 17, 2001.

8        A.   There's an analysis that was done by our

9    underwriters of the financial statement at that particular

10   point in time.

11       Q.   And that's reflected in the underwriting file?

12       A.   Yes.

13       Q.   And have you reviewed the underwriting files prior

14   to today?

15       A.   Not for a long time.

16       Q.   You didn't do it as part of your preparation for

17   today's session?

18       A.   No.  I was getting through the claim files.

19       Q.   Me too.  I haven't had a chance to look at those

20   yet either.  And again, I'm just trying to get a handle on

21   this so that we can focus our discovery in this case.

22            Your understanding is that the universe of people

23   that we could talk to at this point in time concerning the

24   basis of your misrepresentation claims against the

25   defendants in this case would be yourself and Mr. Rosenfeld,

EXHIBIT 5 Page 24 of 47     EXHIBIT 4 PAG 23 OF 46    9bcc33f8-b7de-45e8-859c-8a7d5c96994f

1    correct?

2        A.    You mean so far as what the -- I want to make sure

3    I'm understanding your question.  You mean so far as the

4    misrepresentations that relate to it?

5        Q.    Yeah.

6        A.    So far as the procedures, yes.  I mean Dave may

7    have some other opinions about what he thought about the

8    statement when it went through the review process.

9        Q.    Dave --

10       A.    Hombach.

11       Q.    Hombach.  The underwriter?

12       A.    Correct.

13       Q.    Okay.  But in terms of Travelers' view of what the

14   problem was with those financial statements, the people to

15   talk to are yourself and Mr. Rosenfeld?

16       A.    Correct.

17                            (Exhibits 5 through 7 marked

18                             for identification.)

19       Q.    For the record, I have marked as Exhibit 5 what

20   appears to be a Reliance Insurance Company Continuing

21   Agreement of Indemnity, with an effective date of March 1,

22   1999.  I have marked as Exhibit 6 a UCC Financing Statement

23   with a Reliance Insurance Continuing Agreement of Indemnity

24   Contractors Form, dated February 23, 1996.  And as

25   Exhibit 7, I've identified and marked a UCC Financing

EXHIBIT 5, Page 25 of 47.

EXHIBIT H PAGE 22 OF 48