1    wanted to go out, you had to go out -- down like the fire

2    escape, walk across the parking lot, go up into the adjacent

3    building, and go in and go look for the records.

4        Q.    But there was a room that had the documents?  They

5    weren't spread all over?

6        A.    They were between the two buildings.  It was the

7    one that you were sitting in, and it was the one across the

8    street.  So they were in two different buildings.

9        Q.    Is your impression the amount of records is

10    something that would fill an entire Conex, or is it

11    significantly less?  significantly more?

12        A.    I don't have a feel for it now.  It's been years

13    later.  I just know it's an awful lot of documents.  And

14    whether it's a Conex box or, you know, the size of this

15    room, I don't know.  I can't remember right now.

16        Q.    In regard to the repayment agreement, is there any

17    obligation on the part of Travelers to pursue this action

18    either against the directors or against Peterson Sullivan as

19    part of the repayment agreement?

20        A.    No.

21        Q.    As a followup to several of Mr. Jurca's questions,

22    there was discussion of the Sutor Consulting Report that

23    notes that South Coast management may have not been

24    reporting upwards to Klukwan losses or had been late in

25    reporting those.  Are you familiar with the allegation that

1   I'm speaking of?

2       A.   Yes.

3       Q.   Has there been any discussion as to what

4   management knew, that they weren't reporting?

5       A.   No.

6       Q.   Do you have any impression, either from speaking

7   with Rosenfeld or anyone at Sutor, what it is that they felt

8   that management was not timely in reporting?

9               MR. SOKOL:   Object to the form of the

10  question.

11      A.   In looking at the report, my understanding is that

12  Bob Sutor was opining that they knew or should have known

13  that there were losses on the jobs, and they were not being

14  reported to management because of how bad things were.  And

15  the impression was -- and again, that's what -- I'm just

16  going on what's in the report -- was that the information

17  was not being given to Klukwan.

18      Q.   Now, the Sutor report speaks of being late in

19  reporting these losses.  Has there been any discussion as to

20  when management should have been reporting those losses or

21  when management knew about those losses and weren't

22  reporting them upward?

23      A.   We'd have to have further discovery and try to

24  work through that process on our own, but no, based on Bob

25  did not put in his report -- in the Sutor report a date by

1  which he could pin down when that would happen.  I mean I

2  haven't talked to Bob about it, so I don't know whether he

3  has any other ideas about it.

4      Q.    Okay.  So we know it's somewhere prior to the

5  fourth quarter of 2001, but we don't know where?

6      A.    Exactly.

7      Q.    Has there been any discussions with Sutor or

8  anyone else as to what the cause or the basis of those

9  losses that weren't being reported up were?

10      A.    When you look at the report, you would see the

11  problems with controls, cost controls, bidding problems.

12  There's a number of issues.  But basically, when you look at

13  Sutor's report, it comes down to what's a systemic breakdown

14  at controls of South Coast as far as handling its business.

15      Q.    Was there any discussion with Sutor as to how long

16  this systematic breakdown had existed?

17      A.    No, I haven't had that discussion with Bob Sutor,

18  no.

19      Q.    Has anyone had that discussion?

20      A.    Not to my knowledge.

21      Q.    So those breakdowns occurred sometime prior to the

22  fourth quarter of 2001, but we don't know when?

23      A.    Exactly.

24      Q.    If South Coast had been following its own

25  procedures that fails management had put in place, or the

Travelers Casualty and Surety Company of America        Charlton W. Livingston

1  fails management programs, has there been any discussion as

2  to whether there would still be -- there still would have

3  been a problem with South Coast?

4          MR. SOKOL:   Object to the form of the

5  question.

6      A.   It looks like it failed, failure to follow the

7  fails report, if you will, as well as some other additional

8  problems.  And so when you look at it as a whole, I think

9  that they would have had a likelihood to have avoided a lot

10 of the problems if they'd followed it, going from what the

11 two reports say.  They probably would have had a better

12 chance of having better financial information.  But I mean

13 there's some other problems too.  I mean the reports speak

14 for themselves, but, you know, some of the processes with

15 the way they were handling the jobs and reporting them.

16     Q.   There's been a discovery response by Travelers in

17 this matter regarding what is wrong with the financial

18 reports, that essentially states that the underbillings in

19 the year 2000, at the end of Year 2000, should have been

20 assigned to Peterson Sullivan that there was something wrong

21 at South Coast.  Is that a problem with those underbillings?

22     A.   Yes.  It's my understanding there was a problem

23 with those underbillings.

24     Q.   But that those underbillings alone should have

25 been assigned for someone to investigate more, that they

EXHIBIT 5, Page 29 of 47  EXHIBIT H PAGE 30 OF 48        9bcc33f8-b7de-45e8-859c-8a7d5c96994f

1   were too extensive or something?

2       A.   No.  It's more the fact that if the process had

3   gone through and you'd, during the course of an audit, asked

4   a series of questions in regard to where the projects were

5   at, that the accountants should have undertaken additional

6   procedures to verify where the jobs were.  If they had

7   undertaken those additional procedures to test where the

8   jobs were, what would have happened is instead of being a

9   $2.8 million underbilling, which is an asset, you would have

10  had those flow through and not be considered an asset but a

11  loss.

12          So what would happen is that the balance sheet, if

13  the tests were properly performed, would have looked

14  different and would have shown an impaired condition earlier

15  than what they did, because an underbilling is considered a

16  current asset.  If the proper tests were performed, the

17  losses that were subsequently reflected in the '01 draft,

18  really those would have been caught earlier, at an earlier

19  stage in the prior 2000, and then what would have happened

20  is instead of showing a $2.8 million underbilling, you

21  wouldn't have had an underbilling as an asset.  You would

22  have had a liability or a loss that would have flowed

23  through the balance sheet.  And so it would have revealed

24  the impaired condition of South Coast at a much earlier

25  time.

Page 194

1    Q.   Okay.  And then my question is:  Would these

2    procedures have been part of the normal audit and were not

3    done, or is Travelers saying that the underbillings should

4    have triggered additional procedures that were not done?

5    A.   What we're saying is we want to look at the

6    working papers to see actually what was done, to determine

7    whether the proper steps were taken based on the information

8    given, what testing was performed.  Because it would seem,

9    looking at the information, that with the underbilling in

10    and of itself, you look at it, and you're going to say,

11    Okay, you've got a $2.8 million underbilling.  In and of

12    itself, you would factor that into your overall equation

13    about where you are with that particular financial

14    statement.

15         Where it gets problematical is if that you looked

16    at it, and it really was, let's say, a $3 million loss,

17    that's the question.  And what I'm suggesting is that from

18    what we can tell, based on what came out with these reports

19    and everything else, that if the audit had been performed,

20    then it would have revealed those losses earlier, and

21    instead of a $2.8 million underbilling, you would have seen

22    a loss.  So consequently, when you looked at the financial,

23    it would look differently, because it would be here as

24    presented, here as it should have been if the proper

25    procedures were undertaken.

EXHIBIT  5  Page  31  of  47  EXHIBIT  H  PAGE  32  OF  48

9bcc33f8-b7de-45e8-859c-8a7d5c96994f

Page 195

1    Q.    Okay.  My question is:  Does the fact that the

2    underbillings existed, that there was a large amount of

3    underbillings, as it's been termed in several of the Sutor

4    documents -- is that what would have triggered the

5    additional tests or the additional procedures, or is

6    Travelers saying Peterson Sullivan didn't do something that

7    they should have done as part of their normal audit,

8    regardless of what sort of underbillings there were?

9    A.    I'll turn to the first part of your question.

10   When you see an underbilling, you do take a look at it, and

11   you examine it.  But it is a current asset, and you just

12   want to verify where it sits.  So yes, you do take a look at

13   it.  It may or may not be a concern.  It may, in fact, be

14   something that's going to turn with time and become a true

15   receivable.  Because all an underbilling is is costs in

16   excess of billing, which is just a fancy term for saying

17   what that is is it's a receivable incubation, that under the

18   contract, you will eventually collect it.  So the question

19   is whether or not it's actually going to turn or not.

20          So you may take a look at it, but then whatever

21   you're told, you may think, Okay, looking at the financial,

22   it's going to turn.  By "turn," I mean it actually becomes a

23   true receivable, and you collect it, and you're done.  The

24   question is is that if you look at that, you should examine

25   it.  And if you then find that there are problems that would

Travelers Casualty and Surety Company of America

Page 190

1  affect whether or not you're going to be able to turn that

2  otherwise -- by "turn," I mean have it converted into a

3  receivable -- there's problems with that because of it's

4  really a cost overrun, it's really a loss, or that the cost

5  system that you're relying on is sufficiently unreliable

6  that you can't count on what that is.

7          If you would find that piece out, then at that

8  point in time then, you should not treat it as an

9  underbilling, and you would be required to perform

10  additional procedures at that point in time to verify what

11  it is.  And if you did perform those additional procedures,

12  what you would have been able to determine is that it was

13  really a loss in incubation as opposed to a receivable that

14  was going to turn.  So that's the heart of that particular

15  discussion.

16          Q.    Other than these underbillings, has there been any

17  discussion as to what clues existed in December 2000 that

18  should have told someone of upcoming problems at South

19  Coast?

20          A.    In the discovery requests, there's disclosures

21  about examining inventory, some of the liquidity issues.  I

22  think there was four items that were mentioned, that looking

23  at the financial, that looked to be problematical areas that

24  would need study.

25          MR. WAGNER:   You're referring to the Jordan

Travelers Casualty and Surety Company of America

1   Rosenfeld memo?

2           THE WITNESS:  Well, I mean, you could see

3   that --

4           MR. WAGNER:  When you said they're in the

5   discovery, the four items, is that what you were referring

6   to?

7           MR. SOKOL:  No.  They're in the responses to

8   interrogatories, the supplemental responses.

9       Q.    I'm looking at Exhibit 17, which is the

10  handwritten notes from your conversation with Tom Crandall

11  on June 2, 2003.  In that, Mr. Crandall states that the

12  officers failed to follow internal controls at South Coast.

13          Was this the first discussion that the South Coast

14  problem was because of failure of the officers, other than

15  the prior Sutor and Peterson Sullivan reports?

16      A.    There were a couple of discussions face-to-face,

17  and I think I'd sent a letter out before this asking Tom for

18  the D & O policies and talking to him about that.  So it was

19  something that had been under consideration.  It had popped

20  up a couple of times between those dates.

21      Q.    One thing I am not clear on is:  Looking at

22  Exhibit 17, looking at some of the other statements and

23  discovery in this matter, there seems to be an allegation

24  that the officers did not follow the internal controls.  And

25  part of that is borne out in the Peterson Sullivan and Sutor



EXHIBIT 5 Page 34 of 47

EXHIBIT 11 PAGE 35 OF 48

9bcc33f8-b7de-45e8-859c-8a7d5c96994f

1   reports of 2002.  However, there also seems to be, in the

2   Sutor report of 2002, a criticism of the internal controls

3   themselves, that the fails management procedures or the WIP

4   program and other things were not adequate.

5         Is it Travelers' position that there should have

6   been additional procedures at South Coast, or is it simply

7   that the procedures in place were not followed?

8   A.    Pretty much the procedures in place weren't

9   followed.  I mean Bob was making a recommendation to try to

10  fix something by proposing a different monitoring system

11  rather than the traditional WIP, and he was suggesting

12  basically monitoring it by a labor basis for go ahead and

13  doing it.  What we're seeing -- and that would be a nice

14  thing.  I think that's -- you know, it's a nice procedure.

15        However, what we're saying is that the company

16  itself had put in place procedures.  It was these

17  gentlemen's obligation to make sure it got enforced, and

18  they didn't.  If they had, hopefully, the reporting up would

19  have been sufficient that we wouldn't have had as much of a

20  loss or a loss like we did.

21  Q.    Has there been any discussion as to what portion

22  of the South Coast losses in 2001 were because of the

23  failure to follow the internal controls versus the failure

24  of the internal controls themselves?

25        MR. SOKOL:  I'll object to the form of the

Page 199

1    question.  Go ahead.

2        A.    We'll need to be able to conduct some more

3    discovery, because it gets back to the timing of it.  The

4    financial statements were a little bit easier to work out on

5    timing, simply because that's actually something that you

6    look at, saw, analyzed, as opposed to this particular type

7    of situation about when did they actually first start with

8    not following the reports, or the reporting requirements, I

9    should say, and that's a little bit harder to sort through.

10       Q.    Wouldn't that be present in the South Coast

11   documents themselves?

12       A.    You would hope they'd be able to find it in South

13   Coast documents and, in addition, try to find it in other

14   locations, if you could, I mean in the sense of I don't know

15   whether Tom may have had anything else additional.

16       Q.    Okay.  But if we're going to investigate, if we're

17   going to be detectives and find out how well South Coast was

18   following their internal controls and when that fell apart,

19   we would review the South Coast documents.  We wouldn't

20   review Peterson Sullivan documents, we wouldn't review

21   Travelers' documents, we wouldn't review anyone else's

22   documents.

23       A.    Yes, that's true.

24       Q.    And Travelers has had access to the South Coast

25   business records since 2002?

EXHIBIT _3_ Page _36_ of _47_    EXHIBIT _H_ PAGE _32 OF 48_    9bcc33f8-b7de-45e8-859c-8a7d5c96994f

Travelers Casualty and Surety Company of America

Page 200

1    A.   We did at that time, yes.  And Tom moving to

2  Haines, not quite as accessible at Haines.

3    Q.   I'm looking at Exhibit 18, which is the -- for

4  lack of a better description, the Rosenfeld initial report,

5  and he has apparently five criticisms of the 2000 audited

6  financial statements.  Have there been any criticisms of the

7  2000 audited financial statements, other than these five

8  criticisms that have been discussed?

9    A.   This is really it.

10    Q.   Okay.  Number one is that the audit report is

11  dated 1-19-01.  So this is --

12    A.   You know, I'm sorry, Will.  I'm trying to

13  remember.  I'm lagging, because I just looked at the

14  numbers.  I thought there was one other item.  You've got

15  underbillings, inventory, line of credit, and I think we had

16  in our disclosures one other thing that was a little bit

17  different, and I'd have to look at it.

18    Q.   What are you thinking the other thing was?

19    A.   I can't remember it.  I'd have to look at the

20  disclosure.  I thought we had four items that were listed.

21  And when I look at this, it's underbillings, inventory, line

22  of credit, and the AR for the Ketchikan Forest Products have

23  dropped off.  So but I thought that we had a disclosure of

24  four, and three of four I can see right here, and I can't

25  remember one being the criticism at that particular point in

EXHIBIT 5, Page 37 of 47

EXHIBIT H PAGE 38 OF 48

9bcc33f8-b7de-45e8-859c-8a7d5c96994f

1    time.

2         Q.    Okay.   The first criticism is that the audit

3    report was completed on January 19, 2001, and that's just a

4    suspicion.  It was done quickly.

5         A.    Yes.

6         Q.    It's not a criticism that it's wrong itself.   It's

7    just there may be something wrong.

8         A.    Seems pretty fast.

9         Q.    Okay.   There's not a whole lot of construction

10   work going on in January, is there?

11        A.    Not in Alaska, no.

12        Q.    Okay.   Number five, regarding Ketchikan Forest

13   Products, that was dropped off because that was --

14        A.    Based on -- Jim made the representation, and yeah,

15   my memory is that's -- it got dropped off.  They got it

16   paid, from what Jim had said.  So no, I don't think that's

17   an issue.

18        Q.    Okay.   Criticism number two is that the

19   underbillings of $2,800,000 was a huge amount and should

20   warrant additional procedures.

21        A.    Yes.

22        Q.    That the amount of the underbillings themselves

23   were a warning sign.

24        A.    Yeah.  I mean when you look at it, you know, 2.8,

25   I can't remember what the working capital position of the

EXHIBIT 5 Page 38 of 47

EXHIBIT 11 PAGE 37 OF 48

9bcc33f8-b7de-45e8-859c-8a7d5c96994f

Travelers Casualty and Surety Company of America

1   company was, or the net worth at the particular time.  I

2   want to say just for South Coast, it was probably about

3   5.7 million.  So, you know, you would look at that

4   relationship, and you'd say that's a large component that's

5   wrapped up in the underbillings, that if they don't turn,

6   then you have an impaired position.

7        Q.    Primarily on Big Salt and Chinle?

8        A.    Yes.

9        Q.    But Chinle is where South Coast actually had made

10  a claim against the government that they were able to

11  recover on?

12       A.    Yes.

13       Q.    The third criticism is that inventory of the

14  subsidiary consolidated is extremely high.  Have there been

15  any further discussions as to what exactly that inventory

16  was or whether that figure was off?

17       A.    It was blasting material, and the question is is

18  that the value of it and whether it was actually turning or

19  not.  I mean because if you have inventory that sits, you've

20  got a question about whether or not it should be treated as

21  it was treated, because it's not something that's moving.

22  It's sitting there as dead wood.

23       Q.    Where is that inventory now?

24       A.    My memory is it was the blasting material.  And I

25  think a bunch of it related to Atlas, which was basically a

EXHIBIT 5, Page 39 of 47          EXHIBIT H PAGE 10 OF 18          9bcc33f8-b7de-45e8-859c-8a7d5c96994f

Page 203

1    blasting company that I thought it was Ron Gelbrich's

2    originally, but Atlas and Emrec [ph]. And that's where I

3    think a bunch of it was.

4        Q.   Okay. I understand what you're saying, where it

5    was. Where is it now?

6        A.   I'm not sure where all of it is. I think part of

7    it was sold off. Part of it was -- I can't remember whether

8    part of it went to the bank. Some of it was -- at least

9    what was left at one of the jobs, it was wet, damaged, and

10   not much use, because they tried to -- if you'll look at the

11   correspondence, there was an argument at one point in time

12   that they were trying to get us to pay Atlas' bill for

13   delivering blasting material for some of the Alaskan jobs.

14   And we rejected it and said that it wasn't appropriate use

15   in the job, and besides, we've got a claim against you. And

16   then we found out that there was problems with the blasting

17   material, that it basically was no -- a bunch of it was no

18   good.

19       Q.   Has anyone gone back and verified, double-checked,

20   these inventory figures?

21       A.   You mean did someone go and take an inventory of

22   the blasting material?

23       Q.   Yeah.

24       A.   Not to my knowledge.

25       Q.   Has anyone combed through the records, done

Page 204

1    whatever they can, to determine whether the inventory was

2    correct on the audited 2000 financial reports?

3        A.    If that checking was being done, it was being done

4    by Jordan.

5        Q.    But to Travelers' knowledge, that hasn't been

6    done?

7        A.    I mean I personally met with Tom, and

8    given this -- I have to look at it.   It's back --

9              THE COURT REPORTER:  Excuse me.   Slow down,

10   please.

11             THE WITNESS:  Sure.

12       A.    We had the argument over the inventory.  And so

13   consequently, he may have produced some documentation during

14   the course of that that indicated what he thought it was and

15   what it was worth and where it was.

16       Q.    Any idea what file that would appear in?

17       A.    I don't know whether we have a separate Atlas

18   subfile or not.  I'm not seeing one.  So I don't know

19   whether it would just be in "B" or where it would be

20   currently.  I'd have to search.

21       Q.    Okay.  So sitting here today, we don't know if

22   anyone has any idea whether this was a correct figure or

23   not?

24       A.    I'm sure that Tom would probably have some

25   information on that, because some of the inventory was moved

Page 205

1    off for Atlas.

2         Q.   Tom Crandall?

3         A.   Yes.

4         Q.   Have you ever asked Tom how much inventory there

5    was or what the value was?

6         A.   As I mentioned, there's -- when we had this

7    argument with him, there was some paperwork going back and

8    forth, Will, and I can't remember whether or not there's

9    something specifically on how much inventory or where it all

10   was.  But we had discussions that -- we argued about that

11   and said there's some material and there's some additional

12   material that was provided with the repayment agreement

13   that's on the backup, about what they had and what they

14   didn't have.  There may be some documentation in there.

15        Q.   The repayment agreement is well after the audited

16   financials of 2000.

17        A.   Right.  But what it required is a full financial

18   disclosure.  And so it's one of the reasons why the document

19   literally is fairly thick with the rest of the attachments,

20   because Tom put all that information in.  So there's some

21   financial disclosure information that's in there.

22             So, you know, not at the time of the 2000

23   financials, but there's subsequent documentation that

24   would -- and I'd have to go back and look, because I haven't

25   looked at all the backup for a long time on the repayment

EXHIBIT 5 Page 42 of 47        EXHIBIT 11 PAGE 43 OF 46   9bcc33f8-b7de-45e8-859c-8a7d5c96994f

1    agreement.  There was some financial disclosure information

2    that would have some effect on the inventory, and we had the

3    argument about the Atlas inventory somewhat early on.  When

4    they wanted us to pay for it, we told them to get lost.

5        Q.   When you're saying "somewhat early on," when was

6    the repayment agreement?  When were those disclosures done?

7        A.   Well, you know, it was signed -- I think the

8    disclosures predated it, and I'd have to look at the

9    document.  We started the negotiations in June.

10       Q.   Of?

11       A.   Of -- excuse me -- of 2000.  And I want to say it

12   was signed --

13              MR. SOKOL:  2.

14              THE WITNESS:  2002.  Thank you, Jim.  I keep

15   doing that.

16       A.   -- 2002, of 2002.  And then the agreement was

17   signed, I want to say, January of '03, 2003.  So

18   consequently, the disclosure documentation was between that

19   time frame, and I can't remember whether we had a specific

20   date to tie the disclosure to.

21       Q.   Other than possibly an inventory done between

22   June 2002 and January 2003, are there any documents out

23   there that would reflect what the inventory was in

24   January 2001, when the audited financials were done?

25       A.   I would have presumed that Peterson Sullivan may

EXHIBIT 5 Page 43 of 47

EXHIBIT H PAGE 14 of 48

9bcc33f8-b7de-45e8-859c-8a7d5c96994f

1   have one.  I mean I have not seen anything that would tie to

2   that particular time.  I don't have any inventory

3   documentation from that time.  South Coast may, in its

4   record, but I presume Peterson Sullivan had to be looking at

5   something at the time they conducted the audit.

6       Q.    Okay.  The fourth item is a criticism of the line

7   of credit debt being classified as long term.  It says in

8   the audited 2000 financials -- it explains why that's being

9   classified as a long-term debt, correct?

10      A.    I think there's a financial disclosure note in it.

11      Q.    It says it's classified as long term because

12   Klukwan, Inc., does not intend to call this line of credit

13   during the upcoming year.  To Travelers' knowledge, did

14   Klukwan, Inc., call that line of credit within the upcoming

15   year?

16      A.    No.

17      Q.    Has Klukwan, Inc., called that line of credit to

18   date?

19      A.    Not to my knowledge, no.

20       MR. EARNHART:  I don't have any further

21   questions at this point.

22       MR. JURCA:  I have a few questions.

23       F U R T H E R   E X A M I N A T I O N

24   BY MR. JURCA:

25      Q.    I think, Mr. Langfitt, that you may have explained

Travelers Casualty and Surety Company of America          Charles W. Langfitt

Page 208

1   this in the middle of sort of a lengthy answer.  But for my

2   benefit, could you please tell me:  What is an underbilling?

3   What does that term mean?

4        A.    An underbilling is -- for construction accounting,

5   there is a percentage of completion method of accounting,

6   and what it does is it measures up where you are in the

7   billing process, because you're not going to submit just one

8   bill and get paid.

9        And so what happens is is at certain points in

10  time, the costs that you actually incur will exceed the

11  amounts that you've been able to collect or what your costs

12  incurred are or what -- I should say your budgeted costs

13  are.  So what will happen is is, for example, you may have

14  spent $50,000, and yet you've only been able to bill

15  $25,000.  Out of that situation you're considered to be in

16  an underbilled situation, because your costs exceed your

17  billings by $25,000.

18       To be considered a proper underbilling, what

19  should happen is as you go through the billing process, you

20  should be able to make that up and collect that difference,

21  for it to qualify as an underbilling.  If it's something

22  where you cannot collect that additional $25,000 of costs in

23  excess of your billings, you should treat that as a loss.

24       An underbilling comes off of a work-in-progress

25  schedule, which then shows up on the balance sheet as a

Travelers Casualty and Surety Company of America                Marion G. Hampton

Page 209

1    current asset.  So it's actually deemed an asset on the
2    accounting presumption that it's going to turn into a
3    receivable.  And so you want to recognize it, because
4    otherwise you wouldn't be recognizing a potential current
5    asset.

6        Q.    Thank you.  Now a question about your claim
7    numbering system.  And if you look at Exhibit 1 and you turn
8    to the second page of the exhibit, some of the claim numbers
9    have an initial letter "W" or an "R" or "B," and then most
10   of the claim numbers have no letter at the front.  Can you
11   just describe the numbering system, what those letters mean,
12   if anything?

13       A.    Yes.  This is what happens when you have a merger.
14   Some of these -- The "W" number is an old Reliance file
15   number.  The "R" numbers are various Travelers ones, and the
16   numbering changed as time went on.  Because what happened is
17   on June 1, 2000, we merged.  So you may have some old files
18   that are around, and depending how they were set up, that's
19   what influences.  Because the "W" was for the western
20   region, and then it was the -- you know, and "'01" was --
21   they've set up an "'01."  And then it was -- so it's an old
22   file that was sitting around.  It's just probably a small
23   payment bond claim or a squawk that had kind of dropped off
24   and died.

25            And then so it was the western division set up in

EXHIBIT 5 Page 46 of 47

EXHIBIT 11 PAGE 47 OF 48                9bcc33f8-b7de-45e8-859c-8a7d5c96994f

Travelers Casualty and Surety Company of America

Page 241

LANGFITT

C E R T I F I C A T E

STATE OF WASHINGTON )
                     ) ss.
COUNTY OF KING       )


        I, the undersigned officer of the Court, under my
commission as a Notary Public in and for the State of
Washington, hereby certify that the foregoing deposition
upon oral examination of the witness named herein was taken
stenographically before me and thereafter transcribed under
my direction;

        That the witness before examination was first duly
sworn by me to testify truthfully; that the transcript of
the deposition is a full, true and correct transcript of the
testimony, including questions and answers and all
objections, motions, and exceptions of counsel made and
taken at the time of the foregoing examination;

        That I am neither attorney for, nor a relative or
employee of any of the parties to the action; further, that
I am not a relative or employee of any attorney or counsel
employed by the parties hereto, nor financially interested
in its outcome.

        IN WITNESS WHEREOF, I have hereunto set my hand
and seal this 17th day of March 2005.


                              _____
                              PATRICIA A. BLEVINS
                              NOTARY PUBLIC in and for the
                              State of Washington, residing
                              at Federal Way.
                              My commission expires 10/15/08.

STARKOVICH REPORTING SERVICES
206 323-0919

EXHIBIT 5, Page 47 of 47

EXHIBIT H PAGE 40 OF 48

9bcc33f8-b7de-45e8-859c-8a7d5c96994f