# TAB 1

Deposition Testimony of Thomas L. Crandall

Attachment to Declaration of James T. Hopkins
Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

Travelers' Motion for Summary Judgment
Index of Deposition Testimony of Thomas Crandall

| Page | Line(s) |
|------|---------|
| 11 | 20-25 |
| 12 | 1-4 |
| 21 | 5-8 |
| 29 | 8-19 |
| 35 | 25 |
| 36 | 1-15 |
| 38 | 20-25 |
| 39 | 1-25 |
| 40 | 1-25 |
| 41 | 1-25 |
| 42 | 1-21 |
| 43 | 3-25 |
| 44 | 1-25 |
| 45 | 1-25 |
| 46 | 1-19 |
| 51 | 10-25 |
| 52 | 1-13, 18-22 |
| 53 | 4-13 |
| 54 | 25 |
| 55 | 1-2 |
| 57 | 6-25 |
| 58 | 1-25 |
| 60 | 20-25 |
| 61 | 1-25 |
| 62 | 1-25 |
| 73 | 22-25 |
| 74 | 1-25 |
| 75 | 1-15 |
| 86 | 25 |
| 87 | 1-10 |
| 102 | 3-15, 24-25 |
| 103 | 1-10 |
| 105 | 7-25 |
| 106 | 1-6 |
| 108 | 4-25 |
| 109 | 1-24 |
| 121 | 24-25 |
| 122 | 1-25 |
| 123 | 1-12, 24-25 |
| 124 | 1-19 |
| 127 | 1-20 |
| 128 | 3-20 |
| 129 | 23-25 |
| 130 | 1-19 |
| 134 | 17-25 |
| 135 | 1-18 |
| 138 | 11-25 |
| 139 | 1-16 |
| 140 | 2-25 |
| 147 | 6-24 |
| 165 | 2-11 |

Travelers' Motion for Summary Judgment
Index of Deposition Testimony of Thomas Crandall

| | |
|---|---|
| 169 | 18-25 |
| 170 | 1-11 |
| 174 | 5-25 |
| 175 | 1-6 |
| 179 | 4-16 |
| 219 | 24-25 |
| 220 | 1-3 |
| 243 | 25 |
| 244 | 1-2 |
| 251 | 22-25 |
| 252 | 1-4 |
| 270 | 13-17 |
| 275 | 14-25 |
| 276 | 1-21 |
| 291 | 8-17 |
| 295 | 19-25 |
| 296 | 1-9, 11-25 |
| 297 | 1-7 |
| 299 | 18-24 |
| 300 | 16-25 |
| 301 | 1-6 |
| 307 | 11-25 |
| 308 | 1-25 |
| 309 | 1-23 |
| 311 | 15-25 |
| 312 | 1-25 |
| 313 | 1-25 |
| 314 | 1-25 |
| 315 | 1-11 |
| 318 | 4-25 |
| 319 | 1-3, 14-25 |
| 320 | 1-25 |
| 321 | 1, 3-25 |
| 322 | 1-14 |
| 326 | 6-25 |
| 327 | 1-25 |
| 328 | 13, 15-24 |
| 333 | 2-8 |
| 335 | 19-25 |
| 336 | 1-18 |
| 349 | 10-25 |
| 350 | 1-10 |
| 363 | 12-25 |
| 364 | 1-8 |
| 378 | 11-13 |
| 378 | 8-20 |
| 382 | 11-14 |
| 389 | 2-22 |
| 411 | 16-25 |
| 412 | 1-23 |
| 430 | 19-25 |
| 431 | 1-25 |

Travelers' Motion for Summary Judgment
Index of Deposition Testimony of Thomas Crandall

| | |
|---|---|
| 432 | 1-7 |
| 434 | 18-25 |
| 435 | 1-4 |
| 468 | 3-25 |
| 469 | 1-25 |
| 470 | 1-3 |
| 471 | 24-25 |
| 472 | 1-9 |
| 473 | 25 |
| 474 | 1-25 |
| 481 | 10-23 |
| 483 | 6-15 |
| 487 | 18-25 |
| 488 | 1-25 |
| 489 | 1-25 |
| 490 | 1-25 |
| 518 | 10-25 |
| 519 | 1-18 |
| 521 | 5-25 |
| 522 | 1-25 |
| 523 | 1-19 |
| 524 | 16-25 |
| 525 | 1-12, 17-25 |
| 526 | 1 |
| 534 | 12-25 |
| 535 | 1-10 |
| 582 | 25 |
| 583 | 1-25 |
| 584 | 1-25 |
| 585 | 1-17 |
| 589 | 2-25 |
| 590 | 1-17 |
| 596 | 23-25 |
| 597 | 1-10 |
| 615 | 7-18 |
| 619 | 6-25 |
| 620 | 1-3 |

000004

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

TRAVELERS CASUALTY AND          . Case No. 3:06-CV-00063-TMB
SURETY COMPANY OF AMERICA,      .
a Connecticut corporation,      .
                                .
          Plaintiff,            .
                                .
vs.                             .
                                .
SOUTH COAST INC., an Alaska.    **DEPOSITION OF THOMAS L. CRANDALL**
corporation, KLUKWAN, INC.,.    **DAY 1**
Alaska Native Village           .
corporation, and CHILKATS' .
PORTAGE COVE DEVELOPMENT         .
COMPANY, an Alaska               .
corporation,                     .
                                .
          Defendants.            .
. . . . . . . . . . . . .        .
SOUTH COAST INC., et al,         .
                                .
     Counterclaim and            .
     Third-Party Plaintiff,.
                                .
vs.                             .
                                .
TRAVELERS CASUALTY AND           .
SURETY COMPANY OF AMERICAN,.
a Connecticut Corporation,       .
STEWART SOKOL & GRAY L.L.C..
and JAN D. SOKOL,                .
                                .
     Counterclaim and            .
     Third-Party Defendants.
. . . . . . . . . . . . .

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Travelers              James T. Hopkins, Esq.
Casualty and Surety        Schiffrin Olson Schlemlein
Company of America:         & Hopkins, P.L.L.C.
                           1601 Fifth Avenue, Suite 2500
                           Seattle, Washington 98101

20   Q    Let me get some of your background.  Can you give me a

21        sketch of your educational background?

22   A    I have a BS in business administration, a major in

23        accounting, from the University of Arizona, graduated

24        August 1981.  I have an MBA, University of Washington,

25        graduated June of 2001.

000006

Page 12

1    Q    Are you a certified public accountant?

2    A    Inactive, but yes.

3    Q    Where were you previously licensed?

4    A    It's only been Alaska.

5   Q    Let me go back to your initial hire in August of 2001.

6        What was the position you understood you were being hired

7        for?

8   A    It was CFO or VP finance, I forget.

8   Q   And one of the other assignments given to both Peterson &

9       Sullivan and Sutor Consulting was to evaluate the adequacy

10      of management and financial controls being implemented by

11      South Coast?

12  A   I don't know that that was specifically stated.

13  Q   That's certainly one of the things they did, correct?

14  A   Correct.

15  Q   And they reported back that those controls were not being

16      followed, correct?

17  A   Correct.

18  Q   When did you first learn that?

19  A   Mid-January, if I remember right, of '02.

25    Q      Well, let me follow up.  First of all, South Coast had by

```
 1        2001 and 2002 approximately 30 million or more in losses,

 2        correct?

 3   A    That's correct.

 4   Q    The consolidated financial statement for Klukwan and all

 5        of its subsidiaries showed over a $10 million loss in

 6        2001?

 7   A    I believe that's correct, yes.

 8   Q    Over an $11 million loss in 2002?

 9   A    Yes.

10   Q    KeyBank seized over $13 million in investments and, as you

11        say, all of Klukwan's working capital?

12   A    Yes.

13   Q    South Coast ceased to do business and was wound down,

14        correct?

15   A    Yes.
```

20    Q    Travelers did not realize anything from the sale of those

21         various assets with the exception of approximately $18,000

22         that was left over from equipment sales?

23    A    I believe they also recognized 22,000 from the Juneau

24         office building.

25    Q    Anything else?

1    A    Not to my knowledge.

2    Q    It's fair to say Klukwan's business activities were

3         severely curtailed as a result of the South Coast losses

4         and financial impact you've just described, correct?

5         MR. SPRAKER:   Objection to form.

6    A    I would say that it has in essence crippled Klukwan, Inc.

7    Q    Aside from losing these assets and incurring these losses,

8         Klukwan's lost the ability to conduct business in a

9         significant scale?

10   A    Would you -- I'm not sure what you mean by significant

11        scale.

12   Q    Is the scope of Klukwan's business activities today

13        comparable to what it was engaged in in early 2001?

14   A    No.

15   Q    Is it fair to say it's much reduced?

16   A    It's much reduced, yes.

17   Q    And it has -- Klukwan's ability to earn income is also

18        much reduced, correct?

19   A    At this point Klukwan is not earning income.

20   Q    How long has that been the situation at Klukwan?

21   A    From an operational point of view -- Actually I think from

22        an operational point of view Klukwan on a consolidated

23        basis has not earned a positive return -- a positive net

24        income since 1996.  We did have a small -- from

25        operations.  We did have a small blip where it had a net

1       income in 2000, but that was from a life insurance policy

2       on Dennis Debolt. Had he not died we would've not

3       received those funds and they would have had a small net

4       loss that year. In 2004 and 2005 the income statement

5       will show income but it's basically renegotiating of debt

6       and debt forgiveness. If you took those out, 2005 would

7       have a -- maybe it was '4 -- would have some income from

8       operations due to K-Ply, but with the decrease in certain

9       things K-Ply is not doing well this year.

10  Q    The losses experienced by South Coast in 2001 and 2002 had

11       a severe financial impact on Klukwan, you agree?

12  A    I agree.

13  Q    Have you ever attempted to calculate the dollar amount of

14       those losses? Or that impact?

15  A    Not to -- not beyond the fact that I believe South Coast

16       cost about 32 million. I.....

17  Q    52?

18  A    32. I have not gone in and said what did the loss of

19       revenue from Atlas or Emrick or Northwest Energetics,

20       which is the one -- the small explosive company, what has

21       the loss of impact done as far as reducing the flexibility

22       of -- so we don't have the opportunity to grow or maintain

23       K-Ply because they don't have adequate working capital.

24       The tourism company is a break-even, regardless, so I

25       haven't done those.

Page 41

1    Q    Those were real impacts, nonetheless, correct?

2    A    They were real impacts, yes.

3    Q    Substantial impacts?

4    A    Correct.

5    Q    And you simply haven't quantified them at this point?

6    A    After I hit 32 million and saw that it left a negative net

7         worth on Klukwan's balance sheet, the rest of it was just

8         depressing, I never bothered going there.

9    Q    Back to the status in March, April, May of 2002.  At that

10        point Klukwan considered bankruptcy?

11   A    Yes.

12   Q    And has Klukwan continued to evaluate bankruptcy as an

13        option if it cannot pay or reduce its liabilities?

14   A    If it cannot pay or reduce its liabilities it will

15        reconsider.

16   Q    At this point is Travelers the major creditor of Klukwan?

17   A    Yes.

18   Q    So resolving Klukwan's issues with Travelers is essential

19        to getting Klukwan back on its financial feet without

20        bankruptcy?

21        MR. SPRAKER:  Objection, foundation.

22   A    I believe that's true.

23   Q    Are there any other creditors of even anywhere near the

24        same magnitude as Travelers in regard to Klukwan?

25   A    No.

000015

Page 42

1    Q    And when Klukwan entered the repayment agreement is that

2         what it hoped to accomplish, i.e. resolve its obligations

3         to Travelers without the necessity of bankruptcy?

4    A    It was -- yes, that was the primary reason.

5    Q    And was that your hope as well?

6    A    At the time that was my hope as well.

7    Q    When Klukwan executed the repayment agreement in

8         approximately mid-December 2002 were you confident Klukwan

9         could meets its obligations to Travelers under the

10        repayment agreement?

11        MR. SPRAKER:   Objection to form and foundation.

12   A    I was not.  I was confident that was the best agreement we

13        could get at the time.

14   Q    And in your view it was in Klukwan's interest to proceed

15        to enter the repayment agreement, correct?

16   A    That is correct.

17   Q    And Klukwan's board preferred doing so over filing

18        bankruptcy, correct?

19   A    Yes, at the time.

20   Q    Was that your preference as well?

21   A    It was.

Page 43

3   Q   Well, let's back up just a bit.  After August 2001 can you

4       summarize for me the positions that you assumed within

5       Klukwan and South Coast and what your responsibilities

6       were?

7   A   They all occurred at various times.  In May of -- late May

8       of '01 (sic) I assumed the role of Klukwan president.

9       In -- at that same time I assumed the role as South Coast

10      president.  I never did assume the role of president for

11      any of the explosive company, that was a guy in Denver

12      named John Adams.  Although now that we've sold and we

13      have no activity I'm in that role but there's nothing

14      going on.  Probably '03 I assumed the role of president of

15      CPC, that would've been probably in the fall of '03 but I

16      don't remember for sure.  And then that -- we ended up

17      hiring an individual for '05 and part of '06, and then I

18      reassumed the role in July 31st of '06 to present.  And K-

19      Ply, I assumed that role in November of '06 to the

20      present.

21  Q   And you've continued to be the chief financial officer for

22      Klukwan?

23  A   Yes.

24  Q   The fact that you have essentially become president of

25      virtually all of Klukwan's active subsidiaries -- is that

Page 44

1           correct?

2    A      With the exception of a company that we started called

3           Tinaa Services, and that we have a 51%, somebody else --

4           three different entities have the remaining 49%, and they

5           have an internal president separate from me.

6    Q      With the exception of that one entity, though, you've

7           become president of both Klukwan and all of its other

8           active subsidiaries?

9    A      Correct.

10   Q      And that reflects Klukwan's down-sizing of staff and

11          management?

12          MR. SPRAKER:   Objection, form and foundation.

13          MR. HOPKINS:   I'll rephrase the question.

14   Q      Why did that occur?

15   A      Well, multiple reasons.  Primarily one is no cash.  Two is

16          it's hard to recruit when you have no cash and you have a

17          negative balance sheet.  Three is that it's just -- in the

18          condition we're at it's just simpler, it's easier.

19   Q      So it's true, then, that as the result of the financial

20          difficulties Klukwan has experienced since 2001 Klukwan

21          has been forced to consolidate its upper management into a

22          relatively few number of individuals, correct?

23   A      That's correct.

24   Q      And that few number of individuals is you, is that right?

25   A      Yes.

000018

Page 45

1   Q   Is there anybody else with an active management role today

2       for Klukwan?

3   A   I have a comptroller that's like two weeks or three weeks

4       old, and other than that nobody else.

5   Q   That's been the circumstance for the past several years?

6   A   On again, off again, but generally yes.

7   Q   In terms of Klukwan's communications with and relationship

8       to Travelers, is it correct you've been the primary

9       individual involved?

10  A   Yes.

11  Q   Is there anyone else that's had a meaningful role in any

12      way in dealing with Travelers?

13  A   Not that I'm aware of.

14  Q   How about in regard to issues relating to former South

15      Coast directors and officers; is there anyone other than

16      yourself within Klukwan's management or the management of

17      its related entities that's had a meaningful role in

18      regard to those issues?

19  A   From what time period?

20  Q   Beginning of 2003.

21  A   No.

22  Q   Likewise in regard to potential issues or claims by or

23      against Peterson Sullivan since the beginning of 2003 is

24      there anyone other than yourself that's had a meaningful

25      role?

1   A    No.

2   Q    Is it true, then, that you're the primary individual

3         within the employe of Klukwan or its related entities who

4         has first-hand knowledge of the facts Klukwan alleges in

5         support of its counterclaim against Travelers in this

6         action?

7   A    Yes.

8   Q    Is there anyone else to your knowledge who'd have any

9         meaningful involvement or knowledge of those facts?

10  A    Not within the management, no.

11  Q    How about outside the management?

12  A    I keep the board of directors informed and I keep counsel

13        informed.

14  Q    So you've had communications with counsel, and that would

15        be Cabot Christianson, among others?

16  A    Would be Cabot Christianson.

17  Q    And you keep the board of directors informed in regard to

18        issues relating to Travelers, correct?

19  A    I attempt to.

10    Q    Let me back up to some of your earlier testimony.  I

11         believe you acknowledge that commencing at some point

12         after the repayment agreement was executed you realized

13         that Klukwan would have a difficult time meeting the

14         obligations to Travelers under that agreement?

15    A    Correct.

16    Q    Certainly by 2005 that was becoming increasingly clear to

17         you, true?

18    A    Correct.

19    Q    You requested on several occasions that Travelers

20         renegotiate the terms of the repayment agreement, didn't

21         you?

22    A    That's correct.

23    Q    You had meetings with Chuck Langfitt in approximately

24         February 2005, correct?

25    A    I don't remember the exact date, that sounds close if not

Page 52

```
 1        right.

 2   Q    Another meeting in approximately October 2005?

 3   A    I believe so.

 4   Q    These meetings were all initiated by you in an effort to

 5        persuade Travelers to renegotiate the terms of the

 6        repayment agreement, correct?

 7        MR. SPRAKER:  Objection, form.

 8   A    Correct.

 9   Q    Those discussions continued even into early 2006?

10   A    I don't know when those discussions last ceased.

11   Q    There was never any agreement reached to modify the

12        repayment agreement, was there?

13   A    No.



18   Q    Do you recognize Exhibit 13 as a employment contract

19        entered between you and Klukwan dated December 12, 2003?

20   A    Yes.

21   Q    Is this agreement still in effect?

22   A    Yes.
```

Page 53

```
 4   Q    Well, I'm interested more in the specific provisions of

 5        this agreement under subpart IV titled "Deferred/Incentive

 6        Compensation" on Page 2 of Exhibit 13.  Isn't it true that

 7        Subparagraph A on the next page provides for deferred

 8        compensation of 50,000 per calendar -- $50,000 per

 9        calendar year for each year of your employment but it's

10        not due and payable unless and until, quote, "Thomas

11        Crandall makes Klukwan profitable during the term of his

12        employment," end quote?

13   A    That's correct.
```

25   Q      But isn't it true under this agreement that if you reduce

1       Klukwan's debt you'll be eligible for a bonus?

2   A   That's what it says, yes.

6   Q   Were you involved in retaining Cabot Christianson and his

7       firm to provide advice to Klukwan in 2002?

8   A   I was.

9   Q   What was your role in that regard?

10  A   I think I made the decision.

11  Q   To retain him?

12  A   Uh-huh (affirmative).

13  Q   Did you have a prior relationship with Mr. Christianson?

14  A   No.

15  Q   How did you find him?

16  A   We had relationships with other attorneys and I asked them

17      who would they recommend if we needed to go into chapter,

18      and Cabot Christianson and his firm's name popped to the

19      top of the list more often than anybody else's.

20  Q   So you were looking for an attorney to provide you advice

21      that had bankruptcy expertise?

22  A   Correct.

23  Q   Because you viewed that as a potential or possible action

24      on Klukwan's part?

25  A   Correct.

1    Q    Am I right that Mr. Christianson and his firm have

2         continued to provide Klukwan and you legal advice on an

3         on-going basis since approximately May 2002?

4    A    They provide Klukwan and me as Klukwan's representative

5         advice, yes.  Nothing personal.

6    Q    I meant in your capacity.

7    A    Yeah.  I just wanted to make sure I clarified that.

8    Q    And you've had regular and on-going advice from Mr.

9         Christianson in regard to issues between Klukwan and

10        Travelers, correct?

11   A    Correct.

12   Q    You've consulted with Mr. Christianson on issues or

13        communications you felt were of significance or important?

14   A    I have.

15   Q    As a routine -- that was a routine practice for you from

16        2002 until early 2006?

17        MR. SPRAKER:  I'm going to object to the form and

18   foundation.

19   Q    Was that a routine practice for you?

20   A    I routinely communicate with any attorneys that we use on

21        those issues that are germane to what they're retained

22        for.

23   Q    Well, in regard to Klukwan's issues with Travelers has

24        there been any other attorney that's provided you advice?

25   A    Not vis a vis Travelers, no.

20   Q    Did Mr. Christianson relay to you communications that he

21        had with Jan Sokol as attorney for Travelers or other

22        communications that Mr. Christianson had with Chuck

23        Langfitt or other Travelers representatives in regard to

24        the issues between Klukwan and Travelers?

25        MR. SPRAKER:  I'm going to object to who -- just what

1    issues are you talking, just generally?

2         MR. HOPKINS:  At any time, yes.  Any issues.

3    A    I communicated often with -- with Cabot Christianson.

4    Q    And Cabot Christianson provided Klukwan regular litigation

5         status reports regarding the various legal issues or

6         litigation matters that Klukwan was involved in?

7    A    I would say more periodic rather than regular.

8    Q    What does periodic mean in your mind?

9    A    As asked versus as on schedule.

10   Q    But you still retain within Klukwan's files all of the

11        written communications that you exchanged with Mr.

12        Christianson, correct?

13   A    I believe that's correct, yes.

14   Q    And the litigation status reports that Mr. Christianson

15        provided also addressed Travelers' law suit against the

16        South Coast directors and officers and Peterson Sullivan

17        once it was commenced in August 2004?

18   A    I believe so.

19   Q    Is it correct that you -- Klukwan has never been without

20        legal representation in regard to its issues with

21        Traveler?

22        MR. SPRAKER:  Object as to form.

23        MR. HOPKINS:  I'll rephrase it.

24   Q    Has there ever been a time where you felt you were unable

25        to adequately consult or confer with legal counsel in

1    regard to any issues relating to Traveler?

2  A  I've had good communications, I don't recall any time

3     where I've felt ill at ease or ill advised or however you

4     want to put it.

5  Q  Have you reviewed the privilege log prepared by your

6     attorneys in this matter?

7  A  Actually I don't believe I have.

8                              DEPOSITION EXHIBIT 15 MARKED

9     MR. SPRAKER:  Do you have an extra one of these, Jim?

10 Q  I've marked as Exhibit 15 the edition of the Klukwan

11    privilege log provided to me by Mr. Spraker dated April 4,

12    2007.  Have you ever seen that document?

13 A  I don't recall seeing this one.

14 Q  You understand that documents records or reflects over 450

15    written communications?

16 A  It appears that it does.

17 Q  And that's -- is that consistent with your recollection of

18    the frequency of your contact and communication with Mr.

19    Christianson?

20    MR. SPRAKER:  Objection to foundation.

21 A  I don't have a basis to know if it's too many or too few,

22    I just know that I communicated lots.

23 Q  And in addition to written communications you had regular

24    oral communications with Mr. Christianson?

25 A  We had phone calls.

22  Q      What else do you recall being discussed at the meeting on

23         January 17, 2002, with Peterson Sullivan?

24  A      We would have asked -- would've been some discussion about

25         why, you know, was this -- where did this fail, and did

Page 74

1          you find any evidence of fraud or malfeasance.  The answer

2          was no, we didn't find any, although I personally leave

3          little credence to that because if there's no controls how

4          do you know.  And I believe at that meeting after they

5          left, or maybe they were still there, I don't recall, the

6          board made some decisions to terminate management at SCI.

7     Q    So the termination decision was a serious decision, wasn't

8          it?

9     A    Yes, it was.

10    Q    And did you believe the board had adequate information to

11         make that decision?

12    A    I do.  I did and I do.

13    Q    And by that time, by the time the board terminated the

14         employment of South Coast upper management information had

15         also come to light that the FMI procedures were not being

16         followed either, correct?

17    A    Yes, that's correct.

18    Q    And did you concur in the decision to terminate?

19    A    I did.

20    Q    Did you believe -- well, strike that.  In addition to

21         simply not following internal controls and procedures did

22         you believe the South Coast upper management had failed to

23         report information that they knew or should have known

24         regarding the financial circumstances of South Coast?

25    A    Would you rephrase that, please?

```
 1          MR. HOPKINS:  Can you read back?

 2          REPORTER:  Play back.

 3                      (OFF THE RECORD)

 4              Previous question played back off record

 5                      (ON THE RECORD)

 6   A      Thank you.  I actually believe that they failed to report

 7          things that they knew or should've  known.

 8   Q      Based on the information that because available to you, do

 9          you believe that failure was intentional on South Coast

10          management part?

11   A      That I don't know.

12   Q      But it is true you certainly believe they were negligent

13          in failing to implement proper management controls and

14          properly report financial circumstances?

15   A      I believe they were negligent, yes.
```

25    Q    Can you tell me what Exhibit 26 is?

1   A    This is a power point presentation that I prepared and

2         used at the 2002 annual meeting.

3   Q    This was a document prepared by you, then?

4   A    Prepared by me, yes.

5   Q    You'd earlier indicated one of the things you did for the

6         2002 meeting was to provide a history of South Coast,

7         correct?

8   A    I had attempted to, yes.

9   Q    Is that what's found on Pages 6 through 18 of Exhibit 26?

10  A    Yes, it is.

3   Q    Did you understand that in any claim Klukwan might assert

4        against Peterson Sullivan that the negligence of the South

5        Coast officers and management would be an issue?

6   A    Yes, I understood that.

7   Q    What did you understand in that regard?

8   A    That they would basically point fingers back at us, we'd

9        point fingers at them and we'd go around in a circle for a

10       long time.

11   Q   You earlier indicated you felt the claim by Klukwan

12      against Peterson Sullivan was problematic?

13   A   Yes.

14   Q   And was that the problematic aspect of the claim?

15   A   That's my opinion, yes.

24   Q   Did you get any legal advice regarding the -- a potential

25      action by Klukwan against Peterson Sullivan?

Page 103

1   A   Yes, we did.

2   Q   And did that advice come from Cabot Christianson?

3   A   It did.

4   Q   Any other attorneys?

5   A   No.

6   Q   Was that advice in written form?

7   A   I don't know, don't recall.

8   Q   Was that a subject you consulted with Mr. Christianson in

9       regard to on more than one occasion?

10  A   We would have multiple conversations on this subject, yes.

7  Q   And you further understood Travelers was suing Peterson

8      Sullivan in its own name and under its own right as

9      opposed to a derivative claim through Klukwan and South

10      Coast, correct?

11      MR. HOPKINS:  I'm going to object to the form.

12  Q   Do you understand the question?

13  A   I'm not sure what you mean by a derivative claim.

14  Q   Well, let's say hypothetically -- South Coast had a claim

15      on one of its construction projects that's called the

16      Chinle claim, correct?

17  A   It did, yes.

18  Q   The Chinle claim was South Coast's claim, it belonged to

19      South Coast, correct?

20  A   Correct.

21  Q   South Coast agreed that the proceeds of that claim would

22      go to Travelers, correct?

23  A   Correct.

24  Q   In contract, Travelers' action against Peterson & Sullivan

25      was a claim Travelers brought in its name and its own

1        right, it was not a claim it derived through South Coast.

2        Did you understand that to be the case?

3    A   Understand that Travelers had a reliance on the audit

4        independently of Klukwan or South Coast, and that to the

5        extent they relied on the audit they -- and suffered

6        damages, they have an independent claim.

Page 108

4   Q   Mr. Crandall, do you recognize Exhibit 31 as a June 12,

5       2002, letter agreement executed by you on behalf of South

6       Coast and Charles Langfitt for Travelers?

7   A   Give me a moment, please.  Yes, I do.

8   Q   And also included in Exhibit 31 is an acknowledgement of

9       default?

10  A   Yes, there is.

11  Q   And that was executed by you on behalf of both South Coast

12      and Klukwan, correct?

13  A   Yes, it was.

14  Q   And the acknowledgement of default references an Exhibit A

15      which has a list of bonds issued by Travelers, correct?

16  A   It does.

17  Q   The June 12, 2002, letter agreement you understood as an

18      interim arrangement whereby Travelers would provide some

19      limited funding for South Coast's payroll, is that an

20      accurate characterization of your understanding of this

21      document?

22  A   That's part of what this document does, yes.

23  Q   What else did you understand it to reflect?

24  A   It reflects just in general the funding of some payroll,

25      which is in the first paragraph.  It also discussed in --

1      for instance, in the fifth -- well, in general it

2      describes what South Coast will do and what Travelers will

3      do, some of which is payroll, but some of it is having to

4      do with jobs in progress.

5    Q   And particularly resolving payment bond claims against the

6        Travelers bonds?

7    A   Yes.

8    Q   And the acknowledgement of default, did you understand

9        that to be an acknowledgement by South Coast and Klukwan

10       that they were unable to complete the bonded projects?

11   A   That's my understanding.

12   Q   And South Coast and Klukwan by executing the

13       acknowledgement of default also affirmed their obligations

14       to the surety under the indemnity agreements, correct?

15   A   Yes, I do.

16   Q   And that's specifically what Paragraph 3 of the

17       acknowledgement of default says, correct?

18       MR. SPRAKER:  It says what, Jim?

19       MR. HOPKINS:  That Klukwan and South Coast ratify and

20   affirm their obligations under the indemnity agreements that had

21   been executed in favor of the surety.

22   A   You're looking at the page 024045?

23   Q   Yes.  Very last line under Paragraph 3.

24   A   Yes, it does.

24   Q     Can you identify Exhibit 34 as Chuck Langfitt's June 10,

25         2002, letter to you?

Page 122

1    A    Yes.

2    Q    Do you recall receiving this letter?

3    A    This letter appears to be a follow-up to the conversation

4         I mentioned a minute ago.

5    Q    Do you recall receiving it?

6    A    It looks familiar.

7    Q    Did you respond in writing to this letter in any fashion?

8    A    I don't recall responding in writing.

9    Q    Did you understand the purpose of the letter was to

10        summarize the discussions between Travelers and Klukwan to

11        date as well as provide Mr. Langfitt's preliminary

12        analysis of the projected loss he believed the surety was

13        facing on the South Coast bonds?

14   A    Would you rephrase that?

15   Q    Did you understand the purpose of Exhibit 34, Mr.

16        Langfitt's June 10, 2002, letter, to first summarize

17        discussions that had occurred to date between Travelers

18        and Klukwan?

19   A    Yes.

20   Q    And secondly to provide Mr. Langfitt's preliminary

21        projection of the likely loss the surety faced on its

22        bonds?  And I refer you specifically to Page 4, the

23        section titled "Agenda for June 11, 2002, Meeting."  Do

24        you see that section?

25   A    I do.

Page 123

1   Q    Doesn't that project -- doesn't that indicate Mr.

2        Langfitt's preliminary projection of a $12 million loss

3        for the surety?

4   A    That's what he projects.

5   Q    And wasn't that the operating assumption between Travelers

6        and Klukwan as they moved forward in discussions and

7        ultimate negotiation of the repayment agreement, that the

8        likely losses were $12 million or greater?

9        MR. SPRAKER:   Objection, foundation.

10  Q    Asking you for what you recall.  Isn't that your

11       recollection?

12  A    At this point that's what I recall.

24  Q    And have you reviewed information that the surety has

25       provided in this litigation regarding its total actual

1        losses on the South Coast bonds?

2   A    Yes.

3   Q    And doesn't that information indicate total losses of,

4        before any repayments by Klukwan, exceeding $12 million?

5   A    Yes, it does.

6   Q    And do you have any reason to believe that information and

7        summary is inaccurate in any way?

8   A    There might be some line items that I would question, but

9        in gross no.

10  Q    So anything you might question is relatively minor in

11       dollar value?

12  A    I would think so.

13  Q    So you are satisfied as you sit here today that the

14       surety's total actual losses on the South Coast bonds

15       before any repayment by Klukwan for South Coast is at

16       least $12 million?

17       MR. SPRAKER:  Objection to foundation.

18  Q    Go ahead.

19  A    It's at least $12 million.

Page 127

1   Q   Am I right that by June 22, 2002, Travelers had made a

2       proposal to Klukwan as to the basic terms of a repayment

3       plan for Klukwan's obligations under the indemnity

4       agreements?

5   A   By June 20, '02, there was both a proposal from South --

6       or, from Travelers and then the 22nd there was a counter

7       from us.

8   Q   And Exhibit 35 is your letter of June 22, 2002, that you

9       prepared to summarize the parties' position at that point

10      in time, correct?

11  A   that's right.

12  Q   And part of what your letter of June 22, 2002, did was

13      also make a counter proposal by Klukwan, correct?

14  A   Correct.

15  Q   You were involved in developing that counter proposal,

16      correct?

17  A   Correct.

18  Q   You had primary responsibility for doing so, is that fair

19      to say?

20  A   I would say I'm the only one that put it together.

3   Q    Well, you had Cabot Christianson's involvement on a fairly

4         intimate basis in negotiating the ultimate repayment

5         agreement with Travelers, didn't you?

6   A    He was involved, yes.

7   Q    Well, he was more than just involved on an occasional

8         basis, he was extensively involved, wasn't he?

9   A    I don't know what you mean by extensively.

10  Q    Frequent communications between you and Mr. Christianson

11        regarding aspects of proposals or tentatively-agreed

12        terms?

13  A    I shared my thoughts with Cabot, he shared his thoughts

14        with me.

15  Q    On a regular basis?

16  A    On a regular on-going basis.

17  Q    And that's true in regard to the issues with Travelers

18        from June 2002 to the initiation of this litigation in

19        early 2006, correct?

20  A    Yes.

23   Q    Well, the context of the negotiations were that Klukwan

24        and its subsidiaries lacked the resources to fully repay

25        the surety, correct?

1    A    Yeah, they did not have the resources to repay.

2    Q    And that was a point you were emphasizing to the surety,

3         correct?

4    A    For several months, yes.

5    Q    And in fact what you were telling Mr. Langfitt is look,

6         you can't get blood out of a turnip, the best hope is to

7         negotiate something less than full repayment under the

8         repayment agreement?

9    A    That's correct.

10   Q    So from the outset the negotiations never contemplated

11        paying back the surety in full for its total loss, did it?

12   A    From my point of view, no.

13   Q    And your counter proposal here at the bottom of the second

14        page of Exhibit 35 reflects total proposed payments to the

15        surety of $7.55 million, right?

16   A    That's correct.

17   Q    And the surety's proposal at that point in time was total

18        payments to it of $9.66 million, correct?

19   A    That's correct.

17   Q    Do you identify Exhibit 37 as a July 12, 2002, e-mail from

18        Monica Stevenson which attaches a memorandum to the

19        Klukwan board of directors prepared by you dated July 10,

20        2002?

21   A    Yes.

22   Q    And you prepared the July 10, 2002, memorandum that's part

23        of Exhibit 37?

24   A    I did.

25   Q    And its purpose was to update the board of directors of

Page 135

1       Klukwan on the status of various issues, correct?

2   A   It was an update, yes.

3   Q   Turning to Page 3 under the section titled "Bonding

4       Company", see that?

5   A   I do.

6   Q   The end of the first full paragraph under that section, it

7       says, quote, "Their latest offer is," end quote, see that?

8   A   I do.

9   Q   And what you were attempting to do here was to relay to

10      the Klukwan board of directors your understanding of

11      Travelers' proposal dated July 2, 2002, that's part of

12      Exhibit 36, correct?

13   A   That is correct.

14   Q   And if we turn to Page 4 of Exhibit 37 you valued the

15      repayment amount required by Travelers under its July 2,

16      2002, proposal at $8.4 million if the surety's loss was

17      less than $14 million, correct?

18   A   Looks like I did.

11  Q    As a result of the July 17, 2002, meeting didn't Klukwan

12       agree to repay the surety total payments of $8 million?

13  A    We agreed to a total payment of eight million based upon

14       certain structure.

15  Q    So what was discussed and tentatively agreed to at the

16       July 17, 2002, meeting was the total payment amount of $8

17       million, correct?

18  A    There was a total payment of eight million.

19  Q    The schedule and amount of payments against that

20       obligation, correct?

21  A    I believe that's correct.

22  Q    But no other details and certainly no document was

23       executed at that point in time, correct?

24  A    There was no document.  There were some other details.

25       For instance, if you look early in some of the

Page 139

1    correspondence there was some discussion about needing to

2    use the second growth timber rights as collateral, and we

3    ended up basically here's why it can't happen, and that

4    disappeared from the list.  For instance, there was an

5    attempt -- we also talked about K-Ply as collateral, K-Ply

6    stock, and that never ended up in the final agreement.  So

7    there was not just a repayment term but there was also

8    some general discussions of collateral terms.

9  Q    It's fair to say that at the July 17, 2002, meeting

10   certain collateral was agreed to, other collateral was

11   discussed but no specific agreement reached?

12 A    No, I would say that at that -- we walked out of that

13   meeting with a general understanding that the repayment

14   amount, however it was classified, would be eight million,

15   and that the collateral would be the following, and

16   anything that was not in that list was not collateral.

```
 2   Q    And there was discussion regarding a possible claim by

 3        Klukwan against KeyBank, correct?

 4   A    There was discussion about it.

 5   Q    Klukwan was evaluating a potential claim against KeyBank,

 6        correct?

 7   A    We were.

 8   Q    And that was discussed in the time frame of the July 17,

 9        2002, meeting, correct?

10   A    That sounds correct.

11   Q    Wasn't Klukwan evaluating during this period of time

12        potential claims it might have against KeyBank or any

13        other third parties?

14   A    Yes, they were evaluating potential claims.

15   Q    And that was part of the fact that Klukwan was in rather

16        dire financial circumstances and was looking for assets or

17        recoveries wherever it could find them, correct?

18   A    I wouldn't couch it that way, no.

19   Q    You certainly had an interest in pursuing any claims that

20        you felt were valid or viable for Klukwan  to recover

21        money, correct?

22   A    We were -- we were -- I got distracted, I apologize.  We

23        were looking at limiting our losses.  To the extent that

24        we had a action against a third party, we were looking at

25        that action.
```

000054

6   Q    Now, between July 17, 2002, and mid-December 2002 the

7        specific terms of the repayment agreement were negotiated

8        between Travelers and Klukwan, correct?

9   A    That's correct.

10  Q    And various drafts of agreements were exchanged, correct?

11  A    Seemed like that much.

12  Q    By that much you mean quite a bit?

13  A    12 inches.

14  Q    So the negotiations as to the final agreement required an

15       additional several months and were fairly detailed,

16       correct?

17  A    I believe that's true, yeah.

18  Q    You were involved in that process?

19  A    Yes.

20  Q    So was Cabot Christianson, wasn't he?

21  A    Yes.

22  Q    And did Cabot Christianson prepare the initial draft of

23       the agreement, promissory note and guaranty?

24  A    I believe he did.

2   Q   The first definition is of a bonded contract, and it says,

3       quote, "Bonded contract", parentheses s, close

4       parentheses, "shall mean any contract that is referenced

5       or described in any bond issued on behalf of any Klukwan

6       entity," end quote.  See that?

7   A   I see that.

8   Q   You would agree with me that a claim by Travelers against

9       Peterson Sullivan is not a bonded contract as that term is

10      defined in the repayment agreement?

11  A   Yes.

18   Q    Looking at Page 6 of the repayment agreement, the very

19        last sentence says "This agreement" -- says it's -- strike

20        that.  The last sentence of Paragraph 11 of the repayment

21        agreement says, quote, "This agreement and the preceding

22        sentences do not impair or release Travelers' claims or

23        causes of action against any person or entity other than

24        the Klukwan Entities," end quote.  You see that?

25   A    I do.

1  Q    And did you understand that was one of the provisions that

2        had been specifically requested by Chuck Langfitt?

3  A    I don't recall where this came from, but it wouldn't

4        surprise me.

5  Q    It was certainly agreed to by Klukwan and South Coast,

6        right?

7  A    It was.

8  Q    Did you understand that by including that provision in the

9        repayment agreement Travelers intended to pursue whatever

10      claims it might have against third parties?

11  A    Against third parties, yes.

000058

5   Q   Did you review Paragraph 18 of the repayment agreement

6       before you signed the document?

7   A   I read through everything on the agreement.

8   Q   Did you understand Paragraph 18 of the repayment agreement

9       was specifically requested by Chuck Langfitt on behalf of

10      Travelers?

11  A   I don't remember where.....

12  Q   Do you recall receiving any legal advice from Cabot

13      Christianson regarding Paragraph 18?

14  A   I don't remember the genesis of Paragraph 18.

15  Q   The first sentence of Paragraph 18 provides, quote, "Each

16      and every right," comma, "remedy and power hereby granted

17      to Travelers or allowed it by law or other agreement shall

18      be cumulative and shall not be exclusive of any other

19      right, remedy and power, and may be exercised by Travelers

20      concurrently, consecutively or separately at any time and

21      from" -- "and from time to time in Travelers' sole

22      discretion," end quote.  See that provision?

23  A   I do.

24  Q   I think we've previously established that you agree

25      Travelers had a legal right to seek damages from Peterson

1          Sullivan, correct?

2    A     Yes.

3    Q     And didn't you understand this provision to say Travelers

4          could exercise or pursue that right or not pursue it in

5          any fashion it wanted to?

6    A     Correct.

4   Q   Turning to Paragraph 23 of the repayment agreement, you

5       understood that provision to provide that the repayment

6       agreement could not be modified except by a written

7       document executed by both parties?

8   A   That's my understanding.

9   Q   And no such documents have ever been executed, correct?

10  A   Correct.

11  Q   Now, Klukwan has proposed a first amendment to the

12      repayment agreement, hasn't it?

13  A   More than once.

14  Q   And that's never been accepted by Travelers, correct?

15  A   That's what I stated, it's not been -- there's been no

16      changes.

24   Q     And at this point in time, August of 2005, had you come to

25         the conclusion that Klukwan would not have the resources

Page 220

1          to make the payments required under the repayment

2          agreement and promissory note?

3    A    I did.

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

TRAVELERS CASUALTY AND          . Case No. 3:06-CV-00063-TMB
SURETY COMPANY OF AMERICA, .
a Connecticut corporation, .
                                .
          Plaintiff,            .
                                .
vs.                             .
                                .
SOUTH COAST INC., an Alaska.    **DEPOSITION OF THOMAS L. CRANDALL**
corporation, KLUKWAN, INC.,.    **DAY 2**
Alaska Native Village           .
corporation, and CHILKATS' .
PORTAGE COVE DEVELOPMENT    .
COMPANY, an Alaska              .
corporation,                    .
                                .
          Defendants.           .
. . . . . . . . . . . .  .
SOUTH COAST INC., et al,        .
                                .
     Counterclaim and           .
     Third-Party Plaintiff,.
                                .
vs.                             .
                                .
TRAVELERS CASUALTY AND          .
SURETY COMPANY OF AMERICAN,.
a Connecticut Corporation, .
STEWART SOKOL & GRAY L.L.C..
and JAN D. SOKOL,               .
                                .
     Counterclaim and           .
     Third-Party Defendants.
. . . . . . . . . . . .

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Travelers            James T. Hopkins, Esq.
Casualty and Surety      Schiffrin Olson Schlemlein
Company of America:       & Hopkins, P.L.L.C.
                         1601 Fifth Avenue, Suite 2500
                         Seattle, Washington 98101

25   Q      And why did you comply with that request?

```
1    A    Well, first off, I think we were required to provide any

2         information that Travelers asked for.
```

000066

22    Q    And.you certainly understood at this time that Travelers'

23          position was any recovery it might pursue on these third

24          party claims would not be applied to Klukwan's obligations

25          under the note, correct?

1    A    Correct.

2    Q    And you did not write or inform Mr. Langfitt that you had

3         any different view of the repayment agreement, did you?

4    A    Not of the repayment agreement, no.

13  Q    Can you identify Exhibit 72 as minutes of a special board

14       meeting of Klukwan, Inc., held on May 6, 2004?

15  A    I do.

16  Q    This was a meeting you participated in?

17  A    I did.

Page 275

14  Q    The fifth and sixth bullet points under the discussion

15       category on Exhibit 82 reference, quote, "Sutor Consulting

16       information," end quote, and, quote, "John Ferris/internal

17       controls," end quote.  See those?

18  A    I do.

19  Q    What was discussed in regard to those subject matters at

20       this meeting?

21  A    Very briefly, there was two reports that were commissioned

22       in late '01, delivered in early '02, that in essence both

23       reports came to the same conclusion, which was the

24       internal controls or what we sometimes referred to as the

25       FMI procedures were not being followed.

Page 276

1   Q   And why was that subject matter coming up at this point

2       two years later, May 6, 2004?

3   A   Just a general discussion of where we were at with various

4       claims we might have against third parties.

5   Q   So the possibility of a claim against Peterson Sullivan

6       was specifically discussed at this May 6, 2004, meeting,

7       correct?

8   A   The possibility of a claim against Peterson Sullivan may

9       have been discussed, it appears that it was.

10  Q   And that's why there's also a bullet point that's just

11      labeled tort claims, correct?

12  A   At this point I can't tell you what tort claims meant in

13      regards to this report.

14  Q   The next bullet point says losses.  Have any idea what was

15      discussed in regard to that item?

16  A   The history of losses that Klukwan consolidated and South

17      Coast specifically have suffered.

18  Q   And those losses would've been part of damages that

19      Klukwan might assert against KeyBank or Peterson Sullivan,

20      correct?

21  A   That they might assert against a third party.

```
 8   Q    You didn't indicate in this telephone conver -- strike
 9        that.  In this telephone conversation of September 29,
10        2004, you emphasized that you had no objection or belief
11        that Travelers had in any way released its claim against
12        Peterson Sullivan, correct?
13   A    No, we didn't believe that Travelers released a claim
14        against P&S.
15   Q    And in fact you told Travelers Klukwan was continuing to
16        discuss and consider joining the case, correct?
17   A    We did.
```

```
19   Q    And didn't you shortly after this letter, as we've earlier

20        identified, on February 2005 request Travelers to meet to

21        discuss renegotiation of the repayment agreement?

22   A    We did request to meet with Travelers to discuss the

23        repayment agreement.

24   Q    And in those discussions you proposed alternative

25        collateral and revised payment schemes in regard to the
```

Page 296

1          repayment agreement, correct?

2   A      We proposed alternative collateral and revised payment

3          schedules.

4   Q      None of Klukwan's proposals in an attempt to renegotiate

5          the repayment agreement asserted any sort of claim or

6          offset of Travel -- against Travelers in connection with

7          its law suit against the directors and officers or

8          Peterson & Sullivan?

9   A      That is correct.

11  Q      Can you identify Exhibit 80 as an e-mail from Jordan

12         Rosenfeld to you dated June 17, 2003?

13  A      Yes.

14  Q      And this e-mail shortly followed your telephone

15         conversation with Chuck Langfitt on June 2, 2003, in which

16         you and Mr. Langfitt discussed claims by Travelers against

17         Peterson Sullivan and the directors and officers, correct?

18  A      That seems to be correct, yes.

19  Q      And you understood by this e-mail that Travelers through

20         Jordan Rosenfeld was requesting Klukwan to send a letter

21         to Peterson & Sullivan asking it to provide its working

22         papers for the December 31, 2000, audit performed by

23         Peterson Sullivan on South Coast?

24  A      That's my understanding.

25  Q      And did you agree to provide that letter?

1    A    We did provide that letter.

2    Q    And why did you do so?

3    A    Well, two reasons.  First off, we thought that it was

4         beneficial to our relationship with Travelers, and,

5         second, it was required under the agreement.

6    Q    Meaning the repayment agreement?

7    A    Yes.

000075

18  Q    Mr. Crandall, do you recognize Exhibit 81 as your letter

19       of October 20, 2003, to Peterson Sullivan?

20  A    Yes.

21  Q    And this was the letter that Travelers had requested you

22       provide to Peterson Sullivan requesting working papers,

23       correct?

24  A    With some minor modifications that I had run by them.

| | | |
|---|---|---|
| 16 | Q | Is Exhibit 82 another letter from you to Peterson |
| 17 | | Sullivan? |
| 18 | A | Yes, it was. |
| 19 | Q | And looking at the lower left-hand corner I see a date of |
| 20 | | October 10, 2003. |
| 21 | A | It's October 2003, my copy has a smudge so I can't tell |
| 22 | | the date in between.  But it is in October '03 letter. |
| 23 | Q | And that's consistent with your recollection of when you |
| 24 | | sent it? |
| 25 | A | Yes, it would've been right about this same time frame. |

1   Q   This is a letter where you told him you're retaining new

2       accountants going forward for year-end 2003, correct?

3   A   Yes.

4   Q   Did Peterson Sullivan respond to this letter with the

5       details that you'd requested?

6   A   No.

11    Q    Mr. Crandall, we've marked as Exhibit 86 another e-mail

12         from Jan Sokol to Cabot Christianson dated February 9,

13         2004.  You recall receiving a copy of this from Cabot

14         Christianson?

15    A    I don't recall either way.

16    Q    But again this is another request from Mr. Sokol regard --

17         for some response one way or another from Klukwan

18         regarding whether it would join in the petition for the

19         work papers, correct?

20    A    Yes, it was a request on -- for Klukwan's participation,

21         yes or no.

22    Q    And Mr. Sokol indicates in his February 9, 2004, e-mail

23         that Travelers will proceed without Klukwan if it doesn't

24         get a response in the next three days, correct?

25    A    I think the date was 2/12, that sounds right, three days,

Page 308

1   Q   Did you discuss with Mr. Christianson how he should

2       respond to Mr. Sokol's e-mail of February 9, Exhibit 86?

3   A   We had some discussions, yes.

4   Q   Did you give Mr. Christianson instructions as to Klukwan's

5       position and how Mr. Christianson should respond?

6   A   I think I expressed a concern more than anything.

7   Q   Expressing a concern is not the same thing as giving a

8       direction.  Is it your recollection that you simply

9       expressed a concern as opposed to directed Mr.

10      Christianson to take a specific position?

11  A   I don't recall how the conversation went.

12  Q   Well, you do recall you discussed a response by Mr.

13      Christianson to Jan Sokol's February 9, 2006 (sic), e-

14      mail, which is Exhibit 86?  You recall that much, correct?

15  A   We discussed that we wanted to be into the case because it

16      believed that it would improve the odds of success.

17  Q   And you discussed -- You recall discussing other general

18      concerns you may have had, correct?

19  A   Other concerns, yes.

20  Q   And do you recall what any of those concerns were that you

21      had at the time that you discussed with Mr. Christianson

22      at or about February 9, 2004?

23  A   The first concern would've been if we're joining the suit

24      we'll have potentially no direct input to it but we'll

25      have some expenses associated with it.  Although I didn't

000080

1          mind being part of it I didn't want expenses coming out of

2          it that would be accrued to us.

3     Q    So you wanted Travelers to pay for the cost of pursuing

4          the petition for the working papers?

5     A    Yes.

6     Q    What was the next concern?

7     A    And somewhere in the discussion there was a concern on

8          could Jan Sokol represent both parties, and is that the

9          appropriate way to go.  And a third issue that would've

10         been discussed was what happens if they're successful.

11    Q    Did you have any concern regarding claims back by Peterson

12         Sullivan against Klukwan as a result of the petition for

13         the working papers?

14    A    I don't recall any concerns on that, no.

15    Q    Aside from those concerns you don't recall giving Mr.

16         Christianson specific direction on how he should respond

17         to Jan Sokol's February 9, 2004, e-mail?

18    A    I don't recall it prior to the time, no.

19    Q    Well, did you tell Mr. Christianson in any specific

20         fashion how he should respond to Mr. Sokol's February 9,

21         2004, e-mail?

22    A    I don't recall giving him any do this, do this, do this.

23         I don't recall it being that specific.

15  Q    The third sentence states that "If Travelers wishes to

16       bring a substantive cause of action against P&S Klukwan's

17       expectation is that the net litigation proceeds from that

18       suit will be applied first to the Klukwan/SCI note to

19       Travelers," end quote.  Do you see that?

20  A    I do.

21  Q    That's a request that Klukwan had earlier made and had

22       been rejected by Mr. Langfitt, isn't it?

23  A    This request had been made on several occasions.

24  Q    And rejected by Mr. Langfitt?

25  A    And rejected.

Page 312

1    Q    And Klukwan was making that request again?

2    A    Yes.

3    Q    Well, in fact.....

4    A    I forgot that I can't gesture.

5    Q    In fact Klukwan wasn't even making a request in this

6         February 10, 2004, e-mail to that effect, were they?

7         MR. SPRAKER:   Objection, foundation and form.

8    Q    Do you believe that language reflects a request?

9    A    I believe that it reflects an expectation.

10   Q    Do you agree that expectation has a considerably different

11        meaning than the word condition under common ordinary

12        English language usage?

13   A    It would make sense.

14   Q    Is it your testimony here today that this e-mail imposed

15        an express condition upon Travelers?

16   A    I believe it did.

17   Q    What specific language in your mind imposed that

18        condition?

19   A    The general e-mail was we'll participate but we expect

20        something from it, and if you want to go forward with

21        that, please do.

22   Q    Mr. Crandall, I can go buy a lottery ticket and tell the

23        agent I expect to win.  Does that mean I'm going to?

24   A    Might in your head.

25   Q    Does that mean the lottery agent has guaranteed that I'm

000083

1          going to win or even agreed to that?

2    A     No.

3    Q     And that reflects the difference between an expectation

4          and a condition, they're two different concepts, aren't

5          they?

6          MR. SPRAKER:  Objection to form.

7          MR. HOPKINS:  I'm asking for this witness's understanding.

8          MR. SPRAKER:  You can answer, I'm just objecting to form.

9    A     They often have different meanings, yes.

10   Q     Well, tell me again the specific language in this February

11         10, 2004, e-mail that you believe imposed an express

12         condition on Travelers?

13   A     I believe the third paragraph down starting with "If

14         Travelers wishes" et cetera.

15   Q     Well, the next -- second sentence in that third paragraph

16         also states -- well, strike that.  Is there anywhere else

17         in this e-mail that you believe imposes an express

18         condition upon Travelers?

19   A     Vis a vis what?

20   Q     Proceeding with the working papers petition.

21   A     Yes, the paragraph above that basically would state that

22         they would bear costs associated therewith, and then the

23         next one would be that we would expect the proceeds to go

24         against the note.  And the rest -- rest of it I don't

25         believe does.

Page 314

1    Q    Well, the second sentence regarding the cost and the
2         indemnification of any claims coming back in the working
3         papers petition reflected subject matters that you believe
4         had been discussed and agreed upon, correct?
5    A    I believe they had been agreed upon, yes.
6    Q    However, the third paragraph which you contend imposed
7         this express condition had been discussed and disagreed
8         upon on numerous occasions, correct?
9    A    In the past, yes.
10   Q    The second full sentence of the third paragraph of the
11        February 10, 2004, e-mail states, quote, "Also" comma "as
12        you are aware" comma "Klukwan is considering its own
13        action against P&S" comma "and has developed some ideas
14        about how to proceed," end quote.  See that?
15   A    I do.
16   Q    That reflected Klukwan's continuing consideration at this
17        time of proceeding with its own action against P&S,
18        correct?
19   A    That's correct.
20   Q    Do you agree it was reasonable for Travelers to interpret
21        the statements in this February 10, 2004, e-mail to the
22        effect that Klukwan still thinking about bringing its own
23        action?
24   A    Would you restate?
25   Q    Certainly you agree Travelers reasonably understood these