1        statements in the February 10, 2004, e-mail, which is

2        Exhibit 87, to be a statement by Klukwan that it's still

3        quite actively considering its own law suit against

4        Peterson Sullivan?

5        MR. SPRAKER:   Objection to form and foundation.

6    A   I think it would be reasonable for a person to interpret

7        that to mean Klukwan might go forward.

8    Q   There's certainly nothing in the February 10, 2004, e-mail

9        that tells Travelers that Klukwan intends to rely

10       exclusively on a law suit by Travelers, correct?

11   A   At this point no.

4    Q    Well, Mr. Sokol says quite clearly it's not consistent

5         with the prior arrangements, he goes on to say rather than

6         continuing to disagree, let's get the petition.  Doesn't

7         he make clear there's a continuing disagreement?

8    A    Yes.

9    Q    And at that point Klukwan had the option whether or not to

10        proceed with the working paper petition, didn't it?

11   A    It did.

12   Q    Klukwan could've told Mr. Sokol that's not acceptable, I

13        want clear agreement on Travelers' part that you're going

14        to apply the proceeds to the note, couldn't it?

15   A    They could have.

16   Q    Klukwan didn't do that, did it?

17   A    it did not.

18   Q    Klukwan voluntarily proceeded to provide the documents,

19        including your petition on the working papers?

20   A    We did provide the signature.

21                            DEPOSITION EXHIBIT 89 MARKED

22   Q    Can you identify Exhibit 89 as your fax of February 17,

23        2004, to Jan Sokol?

24   A    This is my fax dated 17 February '04.

25·  Q    And this contained a signed copy and verification of the

1       petition for the working papers signed and executed by you

2       on behalf of Klukwan, correct?

3   A   Yes, it was signed by me.

14  Q   Mr. Crandall, we're resuming your deposition after lunch.

15      And I'd like to show you another document which we've

16      marked as Exhibit.....

17      MR. HOPKINS:  89?

18      REPORTER:  90.

19  Q   .....90, Exhibit 90.  Can you identify this as your e-

20      mail of May 5, 2004, to Chuck Langfitt and his response to

21      you dated May 26, 2004?

22  A   Yes.

23  Q   You recall learning at some point that the petition by

24      Travelers and Klukwan for the working papers had been

25      denied, correct?

1   A    Yes.

2   Q    Am I right that your May 5 e-mail to Chuck Langfitt was

3        written to inquire about what Travelers intended to do

4        next?

5   A    That's what it states.

6   Q    You understood at this point in time it was up to

7        Travelers whether it not it proceeded with a law suit

8        against Peterson & Sullivan, correct?

9   A    From their independent point of view, yes.

10  Q    I mean, if they proceeded with their own claim against

11       Peterson Sullivan it was up to them whether they wanted to

12       do it, correct?

13  A    Their claim against Peterson Sullivan was their decision.

14  Q    And Mr. Langfitt in response to your e-mail says we --

15       quote, "we are reviewing filing suit, we will keep you

16       posted," end quote, see that?

17  A    I do.

18  Q    Am I right that the next thing you learned regarding the

19       law suit against Peterson Sullivan was that Travelers had

20       filed a complaint when you heard from the various former

21       South Coast officers?

22  A    I don't recall hearing anything prior to that.

23  Q    So there was no further communications that you recall

24       with Mr. Langfitt after his May 26 e-mail to you which is

25       Exhibit 90?

1    A    I don't recall any.

3    Q    Can you identify Exhibit 91 as your letter of June 29,

4         2004, to Cabot Christianson?

5    A    Yes, I can.

6    Q    This letter requested Mr. Christianson to provide a report

7         to Klukwan's auditors regarding certain pending and

8         threatened litigation?

9    A    That's the purpose, yes.

10   Q    Standard audit procedure?

11   A    It should be, from all I know it is.

12   Q    And you prepared and attached to this June 29, 2004,

13        letter to Mr. Christianson an Exhibit A that listed

14        current litigation and potential litigation that you

15        requested he report on, correct?

16   A    To the extent that they were with his firm, yes.

17   Q    So the items under the heading "Handled by Christianson,

18        Boutin & Spraker LLC" were the items you wanted Mr.

19        Christianson to report on, correct?

20   A    Yes, I would not expect him to report on things he wasn't

21        handling.

22   Q    And your purpose in preparing this Exhibit A was to be

23        specific about what you expected from him, correct?

24   A    Yes.

25   Q    And in the potential litigation category on Exhibit A to

1      your June 29, 2004, letter to Mr. Christianson you have an

2      entry that says Travelers and Klukwan, Inc. versus

3      Peterson Sullivan, do you see that?

4  A    I do.

5  Q    That reflected the fact that Klukwan was still considering

6      bringing its own action against Peterson & Sullivan at

7      this point, correct?

8  A    What's the date on this one?  It was reflective of Klukwan

9      bringing their own case.  I'm not sure why at this point I

10     had Travelers and Klukwan now.

11  Q   Well, it reflected the fact Klukwan was still considering

12     whether or not to bring an action against Peterson

13     Sullivan, isn't that correct?

14  A   That's what I just stated, yes.

6   Q   Can you identify Exhibit 93 as a letter dated January 31.

7       2002, to Peterson & Sullivan signed by yourself and Ron

8       Gelbrich on behalf of Klukwan and its subsidiaries?

9   A   I can.

10  Q   And is this a management letter as you use the term in

11      Exhibit 92?

12  A   Yes, this would be an example.

13  Q   In fact this is a management letter issued and signed by

14      you in connection with Peterson Sullivan's audits for the

15      year ending December 31, 2001, and 2000, correct?

16  A   That's correct.

17  Q   This is a representation made by you on behalf of Klukwan

18      and its subsidiaries that all material information was

19      disclosed, correct?

20  A   That's correct.

21  Q   But in fact you had attended a board meeting on January

22      26, 2002, where the South Coast officers were terminated,

23      correct?

24  A   I had.

25  Q   And at that meeting you understood that South Coast's

Page 327

1    management had not been following appropriate internal

2    controls and procedures and had not been making proper

3    financial disclosures, correct?

4  A  That they had not been following the FMI policies and

5    procedures that had been established.

6  Q  And you also believed they'd not made proper disclosures

7    of the financial status of South Coast?

8  A  I believe that there were -- that they -- I believe they

9    had not followed the procedures that were established.

10  Q  And those procedures would've required certain disclosures

11    regarding South Coast's financial status that weren't

12    made?

13  A  I believe they haven't followed the procedures.

14  Q  Well, I think your testimony actually on that subject's

15    fairly clear.  Did you have any concern that in connection

16    with an action -- strike that.  You testified yesterday as

17    to your view of the likely problems that Klukwan would

18    have in regard to an action on its part against Peterson

19    Sullivan, do you recall that testimony?

20  A  I do.

21  Q  And those problems primarily being the assertion by

22    Peterson Sullivan that South Coast management had not made

23    proper disclosures to it, correct?

24    MR. SPRAKER:  Objection to form.

25  A  I believed that one of their defenses would be basically

1      management letters.

2   Q   And Exhibit 93 was just such a management letter, correct?

3   A   Exhibit 93 is a management letter.

15  Q   You certainly believed that -- well, strike that.  Don't

16      you -- strike that.  The existence of a management letter

17      such as Exhibit 93 specifically you anticipated would

18      present a significant defense by Peterson Sullivan to any

19      direct action by Klukwan against it, correct?

20  A   I believe it would be part of a defense, yes.

21  Q   And the assertion of such a defense was one of the factors

22      Klukwan considered in determining whether or not to bring

23      its own action against Peterson Sullivan?

24  A   That's correct.

Page 333

2  Q    We've marked as Exhibit 95 a document dated September 12,

3       2004, which is a memorandum to the board of directors

4       titled board update.  Is this a document you're familiar

5       with?

6  A    Yes.

7  Q    Was it prepared by you?

8  A    Yes.

19   Q    Turning to Page 6, under the section at the bottom of Page

20        6 of Exhibit 95, your September 12, 2004, board update

21        memo, there's a heading that says "St. Paul Travelers

22        versus Peterson Sullivan et al.," you see that?

23   A    I do.

24   Q    And that reflected the fact Travelers had filed suit

25        against Peterson Sullivan?

Page 336

1    A    I believe the heading does, yes.

2    Q    And then the statement under that heading says, quote,

3         "This will be discussed at the board meeting Tuesday,

4         September 14, 2004, and should be in executive session,"

5         period. "Cabot Christianson will be available by phone at

6         10:00 a.m.  Basically the question is" colon "should

7         Klukwan, Inc., join the law suit," end quote.  You see

8         that?

9    A    I do.

10   Q    And that was written by you?

11   A    It was.

12   Q    That reflected the fact that Klukwan was still considering

13        whether or not it should proceed with its own law suit

14        against Peterson Sullivan, correct?

15   A    It was.

16   Q    In fact, the specific issue was going to be considered at

17        the upcoming board meeting, correct?

18   A    That was what was anticipated in this -- at this point.

10  Q    Can you identify Exhibit 98 as a series of e-mails

11       exchanged between you, Brandon Allen and Cabot

12       Christianson between -- on November 11, 2004?

13  A    Yes.

14  Q    And you understood the initial question asked by Brandon

15       Allen in the initial e-mail was how did Travelers come up

16       with the approximate $8 million it was seeking as damages

17       in the law suit against the South Coast officers and

18       Peterson Sullivan, correct?

19  A    Yes, that's my understanding.

20  Q    And that was a question you had in your mind as well,

21       correct?

22  A    That's correct.

23  Q    You didn't understand how that figure was calculated at

24       this time, November 2004, correct?

25  A    That's correct.

Page 350

1   Q   And you'd never discussed with Chuck Langfitt the amount

2       of any likely claim by Travelers or how Travelers would

3       calculate its damages, did you?

4   A   I don't recall having that conversation.

5   Q   So certainly as of November 2004 you were speculating as

6       to how Travelers calculated the amount of its claim,

7       correct?

8   A   I was trying to speculate, yes.

9   Q   And that's what this e-mail, Exhibit 98, reflects, right?

10  A   Just my thoughts.

12    Q    Do you recall learning from Cabot Christianson in late

13         September 2005 that Travelers' law suit against Peterson

14         Sullivan had been dismissed on a statute of limitations

15         basis?

16    A    I did hear that it was dismissed, I don't recall the date.

17         I did hear it from Cabot.

18    Q    Your journal records communications with Mr. Christianson

19         on September 28, 29, October 3, 2005.  Would that have

20         been at or about the time you learned that the case was

21         dismissed?

22    A    I don't recall.

23    Q    Do -- You do recall learning about it at or about the time

24         it happened?  Months didn't pass before you found out,

25         correct?

Page 364

1   A     It was approximately the time it happened.  May have been

2          the day it happened.  I just don't recall.

3   Q     Obviously it was a pretty significant development in the

4          case, right?

5   A     It was.

6   Q     It would've been the kind of thing you'd expect Cabot to

7          report to you fairly soon, correct?

8   A     It was.

8   Q    Mr. Langfitt never even discussed with you the amount of

9        Travelers' claim against Peterson Sullivan?

10  A    That's correct.

11  Q    Certainly Mr. Langfitt never did or said anything to

12       guarantee any sort of recovery against Peterson Sullivan?

13  A    No guarantee, no.

14  Q    And you understood Travelers was free to settle or resolve

15       its claim against Peterson & Sullivan whenever it wished?

16  A    They were pursuing the claim, yes.

17  Q    And because it was their claim which Travelers was

18       pursuing they could settle or resolve that claim as they

19       wished?

20  A    They could settle the claim if they chose to.

11   Q     There is no other specific document that Klukwan contends

12         specifically imposed an express condition other than this

13         Exhibit 87, the February 10, 2004.....

14   A     I don't remember any at this time.

2   Q     I have not found nor seen in any of the records in this

3          proceeding anything in written form from Klukwan that

4          states and tells Travelers that Klukwan was relying

5          exclusively on Travelers' action.  Are you aware of any

6          such document?

7   A     Not as a document, no.

8   Q     Did you make that statement to Chuck Langfitt?

9   A     I did talk to Chuck Langfitt on more than one occasion

10         that one of the issues out there is Klukwan basically is

11         broke, two, anything we -- that Travelers received as a --

12         on a settlement with P&S or as a direct result of the

13         claim against P&S would benefit Klukwan either to the

14         point of against the note or against the deficiency.

15   Q     Even assuming that statements to have been made, they are

16         not the equivalent of an assertion or statement by you to

17         Mr. Langfitt to the effect that Klukwan's decided not to

18         bring its own action or we're relying exclusively on you.

19         That statement was never made, was it?

20         MR. SPRAKER:  That exact statement?

21         MR. HOPKINS:  Yes.

22   A     That exact statement was never made.

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

TRAVELERS CASUALTY AND          . Case No. 3:06-CV-00063-TMB
SURETY COMPANY OF AMERICA, .
a Connecticut corporation, .
                                .
          Plaintiff,            .
                                .
vs.                             .
                                .
SOUTH COAST INC., an Alaska.    **DEPOSITION OF THOMAS L. CRANDALL**
corporation, KLUKWAN, INC.,.    **DAY 3**
Alaska Native Village           .
corporation, and CHILKATS' .
PORTAGE COVE DEVELOPMENT         .
COMPANY, an Alaska              .
corporation,                    .
                                .
          Defendants.           .
. . . . . . . . . . . .         .
SOUTH COAST INC., et al,        .
                                .
     Counterclaim and           .
     Third-Party Plaintiff,.
                                .
vs.                             .
                                .
TRAVELERS CASUALTY AND          .
SURETY COMPANY OF AMERICAN,.
a Connecticut Corporation, .
STEWART SOKOL & GRAY L.L.C..
and JAN D. SOKOL,               .
                                .
     Counterclaim and           .
     Third-Party Defendants.
. . . . . . . . . . . .

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Travelers          James T. Hopkins, Esq.
Casualty and Surety    Schiffrin Olson Schlemlein
Company of America:     & Hopkins, P.L.L.C.
                       1601 Fifth Avenue, Suite 2500
                       Seattle, Washington 98101

16  Q    If in this case the jury concludes that Klukwan would not

17       have benefitted from any recovery that Travelers made

18       against Peterson Sullivan, does your theory that Jan Sokol

19       somehow owed a duty to Klukwan in this law suit -- I mean,

20       do they -- can they then find that he's the -- Without a

21       benefit is he representing Klukwan here?

22       MR. SPRAKER:  In his opinion.

23  Q    In your opinion.

24       MR. SPRAKER:  Setting aside the legal.....

25       MR. GILMORE:  Right.  Whatever it is.

Page 412

1    A    Had it gone clear through case to a jury and the jury had

2         said there's no recovery here.....

3    Q    Yes.

4    A    .....we'd have been SOL.  Out of luck, excuse me.  We'd

5         have not recovered.  Part of the reason we had decide that

6         Travelers' claim was the one that should go forward

7         instead of us was if they found that Travelers had no

8         case, or no claim or no recovery, I should say, then we

9         also would have had no recovery because our claim was

10        pretty much mirroring theirs.

11   Q    Well, as I recall the e-mails we reviewed yesterday there

12        was an on-going sort of back and forth about whether any

13        dollars that Travelers might recover would be credited to

14        Klukwan, correct?  Klukwan's obligation.

15   A    Yes, there was.  I understood and intended that to mean

16        against the note payable.

17   Q    And that was never -- it was never -- At least in the

18        evidence we saw yesterday never any agreement to that --

19        with that by Travelers?

20   A    There was never any agreement that would go against the

21        note payable, which meant that it would go against the

22        difference between what they paid and the note payable

23        because that was their non-negotiated loss.

19  Q      Well, the first indication that we saw yesterday, I think,

20         in terms of the evidence of when you are expressing

21         concern about the Peterson Sullivan audit I think was that

22         June 2 telephone conversation with Langfitt as reflected

23         in his handwritten notes of that conversation?

24  A      June 2 of '02?

25  Q      '03.

Page 431

1   A    '03.  Actually I started voicing concerns in mid to late

2        '02.

3   Q    Okay, and who did you voice those concerns to?

4   A    I voiced them to Mr. Langfitt.

5   Q    And what were those concerns?

6   A    Basically by then the Sutor report had already come out

7        and both it and the -- excuse me, the Peterson Sullivan

8        report had already come out, as well as the Sutor report.

9        And both of them said internal controls were problematic

10       or not being followed.  They said it in different ways,

11       but they both basically said that.  And my question

12       immediately -- and this is what I voiced -- was how do --

13       how could you do a 1999 or a -- really, a 2000 audit,

14       because the 2000 audit was -- for South Coast was issued

15       by -- the date on the engagement letter was mid-January

16       2001.  And approximately on year later you're doing

17       supplemental work, really three-quarters of a month -- of

18       a year later you're doing supplemental work, the report

19       comes out a year later, and it says the internal controls

20       are bad.  Internal controls -- if you have no internal

21       controls you cannot rely on management -- on the

22       financials.  A construction company, that's even more

23       truthful of because it's all estimates.  So if you have no

24       internal controls or the internal controls are not

25       working, how do you know -- how can you audit it?

1    Q    Well, why did you first consider the possibility that

2         Klukwan might have a claim against Peterson & Sullivan for

3         negligently conducting an audit?

4    A    Either late '02 or early '03, although I had been voicing

5         concerns prior to that.

6    Q    By late '02, what, January -- November of '02?

7    A    Probably October.

18  Q    Have you ever tried to establish when it was that you

19       first had enough suspicion that there was a problem with

20       the Peterson Sullivan audit that caused you to initiate an

21       inquiry into that?  Have you ever tried to establish that

22       date?

23  A    Not where I sat down and said when did I first think there

24       was a problem and what's the -- at that point, no.  At

25       this point I can tell you what I think it would've been.

1   Q      Why don't you tell me that?

2   A      I think it would've been at the -- when we received the

3          Sutor and the Peterson Sullivan reports.  I think that

4          would've been a good date.

Page 468

3    Q    As to that meeting that we were discussing in July 17,

4         2002, between you and Mr. Langfitt, Mr. Christianson and

5         Ms. Strong, did you have a belief as of that time that

6         there could be claims against Peterson Sullivan for

7         negligent preparation of financial statements?

8    A    At that time I believed there could've been.  Reasoning is

9         is we had received the Sutor and the Peterson Sullivan

10        report, we had received a default and an action by

11        KeyBank, we had received a takeover of the bonded jobs by

12        Travelers; basically South Coast was collapsing, and it

13        had happened in a relatively short time.  And when you

14        take that into account with the information in the

15        Peterson Sullivan and the Sutor report that processes were

16        not being followed or internal controls or the FMI

17        policies were not being followed, it basically led me to

18        wonder what had gone on.  Something -- this was not a

19        normal course of business to have a company that the year

20        before had booked about $800,000 worth of income to the

21        end of 2001 booking a $7.7 million loss on a -- well,

22        Klukwan, on a consolidated basis and South Coast in the

23        period of roughly two years losing about $32 million in

24        value for Klukwan in one way or another.  Just the

25        precipitous nature of the collapse combined with the

Page 469

```
 1        reports themselves led me to believe that something had

 2        been missed by Peterson Sullivan.

 3   Q    And as of that meeting in July 17, 2002, had you shared

 4        that opinion with Mr. Langfitt?

 5   A    When Mr. Langfitt first called when I talked to him in

 6        June of that year, in June of 2002, the conversation was

 7        they were taking over the jobs and I was concerned that,

 8        you know, there had to be -- I wanted to have something

 9        left for Klukwan because if there was nothing left Klukwan

10        just as well declare bankruptcy, close its door and be

11        done with it.  And I had reiterated -- and Mr. Langfitt

12        had basically assured me that he -- that there would be

13        something left for Klukwan to go forward on.  And at that

14        point I had reiterated, you know, various things that had

15        caused me concern, the reports from Sutor, the reports

16        from P&S, the -- you know, what happened with KeyBank, the

17        very precipitous drop in value and ability to go forward

18        that South Coast had had, basically from revenues --

19        basically from a company that had good revenues, not so

20        good net income, to a company that was -- had tanked.

21   Q    And in that discussed did you discuss Peterson Sullivan at

22        all?

23   A    Just in the general way that I think Peterson Sullivan

24        should be -- that there should be an investigation on

25        Peterson Sullivan to see if there was some liability
```

1       there, had they done their job.

2   Q   Do you recall Mr. Langfitt's response?

3   A   Not at that point I don't.

24    Q    Can you recall anything regarding any of the conversations

25        that you may have had with Mr. Langfitt -- or, let me

1       strike that.  Can you recall any of the specifics of any

2       conversations that you may have had with Mr. Langfitt or

3       Mr. Eckardt between July 2002 and June 2003?

4    A   Not specifically.  I can just recall that there were

5       conversations more of a prodding nature, or reminder

6       nature.  But the 2003, June I believe that one memo was,

7       one handwritten note from Mr. Langfitt, it was obvious

8       that they were now looking at it, and I felt that that was

9       a good -- a good thing.

25    Q        What was the purpose of you informing Mr. Langfitt that

Page 474

1      you were looking at Peterson Sullivan for possible claims?

2   A  The reason that I brought it up at this point and others

3      was trying to keep them looking at it.  I basically felt

4      that we had -- Klukwan had some weaknesses in their case

5      against Peterson Sullivan that Travelers did not have, and

6      so I was trying to remind them to keep looking at it

7      because if they were successful we benefitted.

8   Q  Did you ever tell Mr. Langfitt what you perceived to be

9      the weaknesses in your case?

10  A  I did.

11  Q  Do you recall when you would have had that discussion?

12  A  Not specifically, no.

13  Q  What did you tell him?

14  A  Basically that if we sued Peterson Sullivan they would

15     come back and say they relied on management of South Coast

16     and management of Klukwan in preparing their financial

17     statements, but that if that suit came from Travelers, or

18     a third party but Travelers in this case, that they would

19     not have that same -- some issue.  I don't believe that

20     issue was -- meant that our case couldn't be fought and

21     maybe fought successfully, but having Travelers fight it

22     would be -- would get us to the same end result, we would

23     benefit, and they didn't have the weaknesses we had.

24  Q  What was the purpose of telling this to Mr. Langfitt?

25  A  To encourage him to take action.

Page 481

10  Q    Why didn't Klukwan sue Peterson Sullivan at that time?

11  A    Again, there was -- by then it was really two reasons.

12       The first is just a realization that we had other things

13       going on and we did not have the financial dollars to do

14       so, but more importantly Travelers was moving forward.

15       They were -- you know, they had tried to -- we had jointly

16       asked for production, we had asked for production, that'd

17       been turned down, they had sued, that had been turned down

18       at that point, but we were still working cooperatively for

19       the common good, and that would benefit Klukwan.  It would

20       either eliminate or reduce the need for a bankruptcy

21       provision in the repayment agreement or it would apply to

22       the repayment agreement itself, and possibly both,

23       depending on the amount.

6   Q    Let me set the time frame.  After the denial of the

7        working paper action to compel the working -- production

8        of the working paper, did you ever have any discussions

9        with Mr. Langfitt regarding Klukwan bringing an action

10       against Peterson Sullivan?

11       MR. GILMORE:   Same objection.

12       MR. HOPKINS:  Same objection.

13  A    We continue -- I continued on several occasions to let Mr.

14       Langfitt know that Klukwan was considering its own

15       independent action.

View me explain.

18  Q    After Peterson Sullivan -- I mean, after Travelers sued

19       Peterson Sullivan you discussed at length that there was a

20       board resolution drafted authorizing an action by Klukwan

21       against Peterson & Sullivan.  Do you recall that

22       testimony?

23  A    I do.

24  Q    And I believe -- you probably should pull out Exhibit 97

25       just so that we can confirm that that is the document

Page 488

1       we've been talking about.  And can you look at the back of

2       Exhibit 97.  Is that the resolution that we've been

3       talking about, draft resolution authorizing the initiation

4       of a law suit against Peterson Sullivan?

5       MR. HOPKINS:  Objection, vague.

6       MR. SPRAKER:  I'm trying to speed this along.  If you want

7  to.....

8  Q    Is that the draft resolution that you prepared?

9  A    This is a draft resolution that I prepared for a September

10      16, 2004, board meeting.

11  Q    Thank you.  What happened to that resolution?

12  A    Basically the board -- we went into executive session.  At

13      that point we -- the board discussed -- well, at some

14      point during this meeting the board discussed -- I don't

15      remember it was in executive session, but at some point

16      the board discussed where are we at on Peterson Sullivan.

17      I went to a white board that's in the conference room in

18      Haines, Alaska, and basically said here's where we're at.

19      We have a case potentially against Peterson Sullivan, I

20      don't like our case as much as I like Travelers has a case

21      against Peterson Sullivan.  Travelers also has a case,

22      that's the first premise.  Second, went through the

23      history, that in general the history was after the

24      collapse of South Coast it was obvious that there was some

25      problems, some reasons it was obvious, that we were

Page 489

1    working jointly with Travelers.  First there was a request

2    for production of work papers, informal by letter.  Second

3    there was a suit for production of work papers,

4    unsuccessful.  Third, Travelers has filed suit for actual

5    recovery of damages.  I then went in and said there's two

6    ways damages could be applied.  In either case it benefits

7    us.  First way, Travelers has spent approximately -- at

8    that point the balance that they had spent, less recovery

9    that they had received, was approximately 11 to 11.5

10    million.  For the discussion I used, I think, 11.  That

11    they had sued for recovery from Peterson Sullivan of

12    approximately 8.5.  It was actually a little more than

13    that but I'll use 8.5 here.  Actually I used 11.5 as the

14    amount of their expense.  The difference between 8 point -

15    - 11.5, you minus 8.5, assuming they had been completely

16    successful that would've left three million.  What that

17    would have done is that would've wiped out all need for

18    the bankruptcy provision and it would have gone into the

19    note itself.  Because at that point the note with future

20    interest, so not the -- not the face amount or the

21    principal amount of the note, but the total obligation

22    note, accrued interest and unearned interest, was about

23    six million and change, so three million was less six

24    million, so it would've -- some of the note would've been

25    paid off through recovery.  Second option would have been

000124

Page 490

1          it hits the note first, and recognize that Travelers did

2          not agree with that, but if it hit the note first it would

3          wipe out all of the note and there would be some return to

4          Travelers on the -- what I referred to earlier as the

5          delta, the difference between the 11.5 and the current

6          note with interest earned and unearned.  So in either case

7          it was going to benefit Klukwan.  We then continued the

8          discussion and said and we don't know that it's going to

9          be 8.8 million, it might be five million, and we ran

10         through the same numbers, it might be four.  We recognized

11         8.8 was just the balance.  We ended up with a discussion

12         that says let's let Travelers do the heavy lifting here,

13         in other words let's let them pay for the litigation,

14         let's see what happens.  If they're successful, great, we

15         benefit.  And they will have proven our claims against

16         them, and -- against Peterson Sullivan, and if they were

17         unsuccessful, then we probably didn't have a claim to

18         begin with.  Never during that period of time did we

19         discuss any of the statute of limitation issues that might

20         arise.

21  Q      So what happened?  Was the resolution that's attached to

22         Exhibit 97 approved?

23  A      Actually the resolution was never addressed, it was never

24         approve -- it was never brought up for a vote.  It was

25         never approved, it was never denied.

Page 518

10   Q    But the defense that you anticipated Peterson Sullivan

11         would raise was based upon the failure of the South Coast

12         management to follow the internal controls and the failure

13         of the South Coast management to provide accurate

14         information to the Peterson Sullivan auditors?

15   A    No, that's not exactly what the defense would've been.

16   Q    In Paragraph 30 of your May 26, 2006, declaration you

17         state in part, quote, "Travelers had a cleaner case

18         against the accountant because its action avoided

19         potential question regarding a client's" apostrophe-S

20         "ability to sue its own accountant for failing to catch

21         its errors," end quote.  Do you recall that?

22   A    I do.

23   Q    And by that you meant that South Coast management had not

24         provided -- had made errors in the financial statements

25         which Peterson Sullivan audited, correct?

Page 519

1        MR. SPRAKER:  Objection, foundation, form.

2    A    Yes.

3    Q    And that it is also true that South Coast management did

4         not provide -- or, you certainly believed there was

5         potential evidence that South Coast's management did not

6         provide accurate or complete information to the auditors?

7        MR. GILMORE:  Lack of foundation.

8    A    I believe that they did not -- that they did not follow --

9         that the information provided to the auditors may have

10        been incomplete.

11   Q    And certainly you anticipated that if Klukwan asserted a

12        claim against P&S P&S would raise a defense based on that

13        basis?

14   A    Yes.

15   Q    And that was one of the reasons you felt Travelers had a

16        cleaner case?  A, quote, "cleaner," end quote, case, to

17        use your terms, correct?

18   A    That's correct.

```
 5   Q    Now, if Klukwan had proceeded with its own law suit

 6        against Peterson Sullivan then any recovery by Klukwan

 7        would've clearly been a direct benefit, to use your

 8        terminology, do you agree?

 9   A    Yes, I agree.

10   Q    I mean, it would've gone directly to Klukwan, wouldn't

11        have gone through Travelers, be Klukwan's money, correct?

12   A    I stated I agree.

13   Q    And any law suit that Klukwan might've pursued against

14        Peterson Sullivan would seek damages incurred by Klukwan,

15        correct?

16   A    That's correct.

17   Q    And any law suit by Klukwan against Peterson Sullivan

18        would be seeking to recover any and all damages that would

19        have arguably been attributable to Peterson Sullivan's

20        failure to provide an accurate audit in the year 2000 or

21        conceivably earlier, correct?

22   A    I would not use the word accurate.  I would say an audit

23        performed with due diligent.

24   Q    Klukwan would've sought all damages that it could arguably

25        asserted were attributable to Peterson Sullivan's failure
```

Page 522

1         to perform a proper audit?

2    A    Yes.

3    Q    And those damages, I think as we've earlier covered,

4         would've been considerably greater than Travelers' losses

5         on the bonds it issued in 2001?

6         MR. SPRAKER:  Objection, form and foundation.

7    A    I don't know what the damages would've been.

8    Q    I'm not asking you for a number.  They would have been

9         greater and different than the damages Travelers was

10        asserting against Peterson Sullivan?

11        MR. SPRAKER:  Same objection.

12   A    They would've different, from a different basis.  I don't

13        know the amount.  I don't know if it'd be higher or lower

14        than the damages you would've recover -- Travelers

15        would've recovered.

16   Q    Well, I'm not talking about would have recovered, I'm

17        talking about damages that would've been asserted.

18        MR. SPRAKER:  Same objection.

19   Q    We've described and we've -- you've testified at some

20        detail as to the damages that Klukwan incurred as a result

21        of the South Coast collapse, do you recall that?

22   A    We had some discussions on that, yes.

23   Q    And isn't it true that if Klukwan had proceeded with its

24        own action against Peterson & Sullivan Klukwan would've

25        been claiming all those damages from Peterson Sullivan?

Page 523

1       MR. SPRAKER:  Objection, foundation.

2  Q   That would've been your expectation, wouldn't it?

3       MR. SPRAKER:  Same objection.

4  A   That would've been my expectation.

5  Q   So when the Klukwan board met in mid-September 2004 they

6       -- and you went through your white board exercise, the

7       factors that were considered were the potential -- well,

8       strike that.  When Klukwan went through its discussions in

9       mid-September 2004 and you did your white board exercise,

10      do you recall that?

11  A   I do.

12  Q   Did you consider the nature and type of damages that

13      Klukwan might assert in its own action against Peterson

14      Sullivan?

15  A   At that point we thought -- we considered that the nature

16      and type would be identical to what Travelers had.

17  Q   So that was an assumption as opposed to any sort of

18      specific analysis at that point?

19  A   That's what I used for the white board exercise.

16  Q    Let me ask you this question perhaps in a more simplified

17       format.  In response to questions by Mr. Spraker you

18       described the considerations and discussions that occurred

19       in the mid-September 2004 meeting regarding whether

20       Klukwan should proceed with its own action, do you recall

21       that testimony?

22  A    I do.

23  Q    Did that testimony recount all the factors that were

24       considered at that meeting at that time?

25  A    I believe it did.

Page 525

1  Q    And the upshot of that meeting is Klukwan decided to table

2       the issue and didn't make a formal decision one way or the

3       other whether it should proceed with its own action?

4  A    That's correct.

5  Q    You -- Earlier you testified also that on at least one

6       occasion you told Chuck Langfitt that in your opinion

7       Travelers did not need the working papers to proceed with

8       an action against Peterson Sullivan?

9  A    That's correct.

10 Q    I assume you agree if Travelers didn't need those working

11      papers neither did Klukwan?

12 A    That's correct.

17 Q    You also testified you became concerned at some point as

18      to the delay and amount of time that it was taking to

19      pursue the working papers?

20 A    That's correct.

21 Q    But despite that concern Klukwan did not proceed with its

22      own action against P&S, did it?

23 A    No, they did not.

24 Q    And there was no reason they couldn't have filed a law

25      suit against P&S whenever it wasn't to, was there?

1    A    They could've filed.

12   Q   Exhibit 90 is the exchange of e-mails between you and Mr.

13       Langfitt, your e-mail of May 5, 2004, indicated you had

14       learned that the attempt to get the working papers was

15       unsuccessful, correct?

16   A   That's what I've previously testified.

17   Q   And your purpose in sending this e-mail was to find out

18       what Travelers planned to do next, correct?

19   A   And/or keep them on task or keep them reminded that

20       there's issues here.

21   Q   But you didn't, certainly, say anything more in the e-mail

22       which is part of Exhibit 90 other than tell me what

23       Travelers plans to do next, correct?

24   A   That's what it states here.

25   Q   And the answer you got back was Travelers was reviewing

1          filling suit, correct?

2     A    That's what it states here.

3     Q    And your testimony in response to Mr. Spraker's question

4          was that, well, that's what Travelers had been telling us

5          for some time, that they were considering a suit, correct?

6     A    That's correct.

7     Q    Travelers never made a specific promise or representation

8          to Klukwan that it would or would not file a law suit

9          against Peterson Sullivan, did it?

10    A    No specific promise.

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

TRAVELERS CASUALTY AND          .   Case No. 3:06-CV-00063-TMB
SURETY COMPANY OF AMERICA, .
a Connecticut corporation, .
                                .
        Plaintiff,              .
                                .
vs.                             .
                                .
SOUTH COAST INC., an Alaska.        **DEPOSITION OF THOMAS L. CRANDALL**
corporation, KLUKWAN, INC.,.        **DAY 4**
Alaska Native Village           .
corporation, and CHILKATS' .
PORTAGE COVE DEVELOPMENT         .
COMPANY, an Alaska              .
corporation,                    .
                                .
        Defendants.             .
. . . . . . . . . . . .         .
SOUTH COAST INC., et al,        .
                                .
        Counterclaim and        .
        Third-Party Plaintiff,.
                                .
vs.                             .
                                .
TRAVELERS CASUALTY AND          .
SURETY COMPANY OF AMERICAN,.
a Connecticut Corporation, .
STEWART SOKOL & GRAY L.L.C..
and JAN D. SOKOL,               .
                                .
        Counterclaim and        .
        Third-Party Defendants. .
. . . . . . . . . . . .

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Travelers            James T. Hopkins, Esq.
Casualty and Surety      Schiffrin Olson Schlemlein
Company of America:       & Hopkins, P.L.L.C.
                         1601 Fifth Avenue, Suite 2500
                         Seattle, Washington 98101

25    Q      Did you ever have any discussions with Mr. Christianson

Page 583

1          about the statute of limitations for a claim by Klukwan

2          against Peterson Sullivan?

3    A     We did have some conversation.

4    Q     What do you recall of those discussions?

5    A     My -- what I recall right now is just some general

6          discussions about statute of limitations and that we

7          needed to be aware that there are some statute of

8          limitations on various things.  They would've been -- most

9          likely they would've been part of a larger discussion

10         because we were -- had a multitude of financial issue --

11         or, financial and legal issues going on at the time.

12   Q     I think we addressed this in your prior testimony, but

13         you're aware as a general matter that if a claim is not

14         asserted at a certain point it can be barred by statute of

15         limitations, correct?

16   A     I am.

17   Q     And in fact you were analyzing that issue in regard to a

18         number of claims by South Coast creditors, correct?

19   A     I think that's what I've testified to, and yes.

20   Q     And you also, then, if I understand you correctly,

21         generally understood that statute of limitations would

22         apply to any claim by Klukwan against Peterson Sullivan?

23   A     I understand that there are statute of limitations on

24         various claims.

25   Q     And if I understood your testimony correctly, what you

Page 584

```
1          recall discussing with Mr. Christianson is generally that

2          subject matter and that you needed to be mindful of when

3          the statute of limitations would expire.

4          MR. SPRAKER:  Objection, the prior testimony's what it is.

5     A    Believe I've answered that.

6     Q    Well.....

7     A    And, yes, I believe that there -- we were mindful that

8          there was some statute of limitations.

9     Q    And did you ever get a date or approximate date from Mr.

10         Christianson as to when he believed the statute of

11         limitations for a claim by Klukwan against Peterson

12         Sullivan would expire?

13    A    Ever or prior to what date?

14    Q    Let's say prior to January 1, 2006.

15    A    I don't believe we actually discussed a date at that time,

16         no.

17    Q    So you didn't -- you were not aware in your own mind in

18         2004 or 2005 that -- of any specific date or deadline for

19         a claim by Klukwan against Peterson Sullivan?

20         MR. SPRAKER:  Objection, foundation.

21    A    I was only aware that there would be some dates, we never

22         sat down and came up with a date that it would be

23         definitive.

24    Q    Did you ever come up with an approximate range of date?

25         Like a year or second half of a certain year or the first
```

000139

1      half of a year?  Did you ever.....

2  A    We never went that specific.

3  Q    So you know that -- you knew there was a deadline out --

4      Is it fair to say, then, your understanding throughout

5      2004 and 2005, there was a deadline, you just didn't know

6      what it was?

7  A    No, that would not be fair to state.

8  Q    Well, then, what was your understanding of the deadline,

9      if you had one?

10  A    My understanding was we never addressed it specifically.

11  Q    Okay, you never addressed it.  Now, let me ask you a

12      different question.  Regardless of whether -- what you

13      addressed or didn't address with Mr.Christianson did you

14      ever have an understanding as to approximately when the

15      deadline was?

16  A    We never addressed it so I never had an understanding of a

17      deadline.

2   Q    Now, focusing on Exhibit 183, your e-mail to Mr.

3         Christianson, was it your purpose to explain to Mr.

4         Christianson where you believed Mr. Earnhart's letter was

5         in error?

6   A    I was just pointing out errors in his -- in Mr. Earnhart's

7         letter.

8   Q    Looking at the third paragraph of your e-mail to Mr.

9         Christianson, which is part of Exhibit 183, you state,

10        quote, William A. Earnhart also mischaracterizes my

11        relationship with Robert Sutor and Charles Langfitt.  He

12        characterizes them as friends and I would not.  Also I

13        would say that Mr. Langfitt made up his own mind to sue

14        Peterson Sullivan and any input I gave was just my

15        opinions, end quote, do you see that?

16   A    I do.

17   Q    Did that accurately reflect your sentiments at the time

18        you wrote this January 19, 2006, e-mail?

19   A    I believe it does.

20   Q    Did you review the draft letter that Cabot Christianson

21        prepared and sent back to you which is part of Exhibit

22        183?

23   A    I did.

24   Q    Do you believe -- let me just focus on the fourth

25        paragraph on the first page of the draft letter prepared

1    by Mr. Christianson that states, quote, your sarcastic

2    reference to Mr. Crandall's, quote, friends, end quote at

3    Travelers is uninformed.  The relationship between

4    Travelers and Klukwan has been, comma, and continues to

5    be, comma, a difficult and adversarial one, end quote.

6    You see that?

7  A    I do.

8  Q    Do you believe that was an accurate description by Mr.

9    Christianson?

10  A    At that point in time, I believe it was.

11  Q    Well, what Mr. Christianson actually says is the

12    relationship between Travelers and Klukwan has been and

13    continues to be a difficult and adversarial one.  Did that

14    accurately reflect your understanding of the relationship

15    with Travelers?

16  A    At that point in time and for a period of time that is

17    true.

23   Q      And did you understand Mr. Christianson's response to you

24          in Exhibit 191, his January 15, 2004, e-mail where he

25          says, quote, I assume our answer is, comma, hell yes, end

Page 597

1        quote.  Did you interpret that as a certain amount of

2        enthusiasm on Mr. Christianson's part for joining with

3        Travelers in the petition for the working papers?

4        MR. SPRAKER:  Objection, calls for speculation.

5  A    It never crossed my mind, I don't read emotion into e-

6        mails.

7  Q    You certainly interpreted Mr. Christianson's response as

8        indicating he believed Klukwan should join in that

9        petition, correct?

10  A    He indicated we should join in that petition.

```
 7   Q   Do you recall when there was consideration being given to

 8       whether Klukwan would pursue Peterson & Sullivan itself

 9       whether you received an estimate from Mr. Christianson

10       regarding what the cost of that litigation would be if

11       Klukwan had to pursue it?

12   A   The number 100 grand, 100,000, sticks to my head.

13   Q   Would that have been a prohibitive number, in your mind?

14       MR. SPRAKER:  Sorry, what number?

15   Q   A number that would prohibit you from engaging in such

16       expensive adventure.

17   A   It would've been hurtful.  I don't know that it would've

18       been prohibitive.
```

Page 619

6   Q   Mr. Gilmore asked you if you ever got an estimate from

7       Cabot Christianson of the cost of litigation of a claim by

8       Klukwan against Peterson Sullivan, you recall that?

9   A   I do.

10  Q   I believe you indicated $100,000 was what you recall now.

11  A   That -- I think that's what sticks in my brain -- or, in

12      my head is 100,000.

13  Q   And you said that that would be, quote, hurtful, but not

14      prohibitive, end quote, from.....

15  A   Correct.

16  Q   .....Klukwan's perspective.

17  A   Correct.

18  Q   And if the actual estimate of the litigation cost was more

19      on the order of four or $500,000, would that kind of cost

20      have been prohibitive, given Klukwan's financial status in

21      January 2004?

22      MR. SPRAKER:   Objection, calls for speculation.

23  A   It would've been more hurtful, I don't know that it

24      would've been prohibitive at that point.

25  Q   Certainly would've made the litigation cost a larger

1       factor in the decision-making process as to whether or not

2       to pursue the claim, correct?

3    A    Correct.

000147