# TAB 2

Deposition Testimony of Cabot Christianson

Attachment to Declaration of James T. Hopkins
Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

Travelers' Motion for Summary Judgment
Index of Deposition Testimony of Cabot Christianson

| Page | Line(s) |
|------|---------|
| 13 | 7-22 |
| 15 | 13-25 |
| 16 | 1-16 |
| 33 | 25 |
| 34 | 1-25 |
| 35 | 1-25 |
| 36 | 1-22 |
| 40 | 10-25 |
| 41 | 1-15 |
| 44 | 23-25 |
| 45 | 1-24 |
| 76 | 15-25 |
| 77 | 1-5 |
| 84 | 22-25 |
| 85 | 1-25 |
| 86 | 1-7, 17-25 |
| 87 | 1-7 |
| 89 | 7-13, 14-20 |
| 113 | 10-23 |
| 114 | 25 |
| 115 | 1-21 |
| 125 | 19-25 |
| 126 | 1-4 |
| 128 | 2-25 |
| 129 | 1-24 |
| 132 | 5-9, 13-25 |
| 133 | 1-19 |
| 134 | 14-25 |
| 135 | 1-6 |
| 136 | 18-25 |
| 137 | 1-14 |
| 139 | 3-14 |
| 140 | 21-25 |
| 141 | 1-19 |
| 143 | 14-25 |
| 144 | 1-7 |
| 147 | 17-25 |
| 148 | 1-9 |
| 157 | 7-25 |
| 158 | 1-7, 16-25 |
| 159 | 1-13 |
| 173 | 13-25 |
| 174 | 1-21 |
| 182 | 21-25 |
| 183 | 1-8 |
| 184 | 24-25 |
| 185 | 1-6 |
| 189 | 14-19 |
| 191 | 17-25 |
| 192 | 1-25 |
| 193 | 1-25 |

Travelers' Motion for Summary Judgment

Index of Deposition Testimony of Cabot Christianson

| | |
|---|---|
| 194 | 1-14 |
| 195 | 22-25 |
| 196 | 5-7, 8-25 |
| 197 | 1-12 |
| 199 | 1-10 |
| 200 | 4-25 |
| 201 | 1-21 |
| 235 | 22-25 |
| 236 | 1-6 |
| 237 | 7-12 |
| 265 | 7-13 |
| 268 | 2-19 |
| 281 | 6-25 |
| 282 | 1-19 |
| 309 | 4-20 |
| 316 | 1-25 |
| 317 | 1-25 |
| 320 | 3-23 |
| 323 | 18-25 |
| 324 | 1-24 |
| 328 | 19-25 |
| 329 | 1-18 |
| 335 | 10-19 |
| 336 | 2-25 |
| 337 | 1-25 |

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

TRAVELERS CASUALTY AND          .    Case No. 3:06-CV-00063-TMB
SURETY COMPANY OF AMERICA,      .
a Connecticut corporation,      .

          Plaintiff,            .

vs.                             .

SOUTH COAST INC., an Alaska.         **DEPOSITION OF CABOT CHRISTIANSON**
corporation, KLUKWAN, INC.,.         **DAY 1**
Alaska Native Village
corporation, and CHILKATS' .
PORTAGE COVE DEVELOPMENT         .
COMPANY, an Alaska              .
corporation,                    .

          Defendants.           .
. . . . . . . . . . . .         .
SOUTH COAST INC., et al,        .

      Counterclaim and          .
      Third-Party Plaintiff,.

vs.                             .

TRAVELERS CASUALTY AND          .
SURETY COMPANY OF AMERICAN,.
a Connecticut Corporation, .
STEWART SOKOL & GRAY L.L.C..
and JAN D. SOKOL,               .

      Counterclaim and          .
      Third-Party Defendants.
. . . . . . . . . . . .

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Travelers              James T. Hopkins, Esq.
Casualty and Surety        Schiffrin Olson Schlemlein
Company of America:         & Hopkins, P.L.L.C.
                           1601 Fifth Avenue, Suite 2500
                           Seattle, Washington 98101

7   Q    Certainly from my review of the documents Mr. Spraker had

8         a limited and focused involvement on behalf of Klukwan

9         prior to the current litigation between the parties,

10        correct?

11   A    Correct.

12   Q    You were the primary attorney representing Klukwan,

13        correct?

14   A    Correct, right.

15   Q    You were the historical source of information and

16        knowledge, correct?

17   A    Yes.

18   Q    You were the individual who was involved in essentially

19        all the communications with Travelers and its

20        representatives at least as far as counsel for Klukwan is

21        concerned, correct?

22   A    I would say that's a fair statement.

13   Q   Are you aware that Klukwan has identified you as a witness

14        in its disclosures in this case?

15   A   No.  I'm not surprised, but I was not aware of that.

16   Q   But it is true that you personally were involved in

17        strategizing and developing Klukwan's defense and claims

18        in this litigation at the outset of the case, correct?

19        MR. SPRAKER:  Objection to the form and the foundation,

20   mischaracterizes witness's prior testimony.

21   A   I -- I think I've answered that.

22   Q   Well, let me -- I don't believe you answered it clearly,

23        Mr. Christianson, and so I'm trying to make sure the

24        record's clear.  Is it your testimony, then, that you were

25        not involved in any fashion in strategizing and developing

1        Klukwan's defenses and claims in this current litigation?

2    A    I think you're answering -- asking the same question.  If

3        this is an important subject to you we can take a break, I

4        can look at some documents and come back on record.

5        If.....

6    Q    I'm not asking you when, I'm just asking you if.  Is it

7        true that you were involved?

8    A    As I said I have a very heavy involvement up until a point

9        in time and after that point in time I became a bystander.

10       I believe that that point in time took place after the

11       answer was filed, and counterclaim.  I would have to

12       verify that to be sure that that's the case.

13   Q    And that heavy involvement prior to the point in time you

14       became a bystander involved strategizing Klukwan's

15       defenses and claims in this action?

16   A    I would say so.

25    Q      When you first became involved in this matter on behalf of

000155

1      Klukwan, and by that I mean Klukwan's issues with

2      Travelers, what did you do?  What do you recall doing to

3      educate yourself regarding the issues?

4  A    Well, when I first became involved with Klukwan it had a

5      number of issues, but Travelers was not one of them.  The

6      -- I think my involvement with the company began in May of

7      '02 at about the time that KeyBank pulled 13 million out

8      of the account.  And thereafter there were a whole

9      constellation of creditor issues that I addressed, one of

10     which was Travelers.

11  Q    Is it accurate that you maintained an on-going

12     relationship with Klukwan from May of 2002 through to

13     2005?

14  A    Well, yes.

15  Q    Am I correct that you also consulted with Klukwan over

16     that time period in regard to its issues with Travelers on

17     a regular basis?

18  A    Yes.

19  Q    Was there any other attorney providing advice to Klukwan

20     regarding its issues in relationship with Travelers other

21     than yourself?

22  A    Not that I know of.

23  Q    How about in regard to potential claims by Klukwan against

24     Peterson Sullivan; you were involved in providing advice

25     to Klukwan in that regard as well, correct?

1    A    That's correct.

2    Q    Any other attorney involved in that process?

3    A    No.

4    Q    Well, Mr. Spraker did some legal research for you in those

5         issues, did he not?

6    A    I'm sorry, outside the firm I thought you were asking.  I

7         understood your question to be outside the firm.  Yes, Mr.

8         Spraker did.  Nobody outside the firm.

9    Q    Did you understand, then, you were the primary outside

10        counsel for Klukwan in the period of time from mid-2002

11        through 2005?

12   A    Yes.

13   Q    And who was your primary contact at Klukwan in regard to

14        your on-going representation of it?

15   A    Mr. Crandall.

16   Q    And is it accurate you had frequent communications with

17        Mr. Crandall?

18   A    Yes.

19   Q    Those communications were both telephone calls, e-mails,

20        correct?

21   A    Yes.

22   Q    And it would not be surprising to you that a review of

23        your billing statements and the e-mails produced in this

24        litigation would reveal regular and frequent

25        communications with Mr. Crandall, correct?

1  A    Correct.

2  Q    Was there anyone other than Mr. Crandall that you

3       communicated with on a regular basis in regard to your

4       representation of Klukwan with the Klukwan or its

5       subsidiaries?

6  A    No, not really.  Not on a regular basis, certainly.

7  Q    Did Mr. Crandall become effectively the chief executive

8       officer of Klukwan and its subsidiaries shortly after you

9       became involved?

10  A   Yes, I think he became CEO of the subsidiaries, not all on

11      the same day but in a sequence, but that's basically

12      accurate.

13  Q   Did you at some point in time review the indemnity

14      agreements that Klukwan and South Coast executed in favor

15      of Travelers?

16  A   Yes, I did.

17  Q   Did you do that relatively early in your engagement?

18  A   Yes, I did.

19  Q   You were involved, were you not, in negotiations between

20      Klukwan and Travelers as to Klukwan's liability under

21      those indemnity agreements, correct?

22  A   Yes.

10    Q    Are you continuing, though, to represent Klukwan actively

11         on other matters.....

12    A    Yes.

13    Q    .....unrelated to this litigation?

14    A    Yes.

15    Q    How many matters are there?

16    A    It depends what you mean by a matter.  There are --

17         there's just a lot of day to day things that come up that

18         I -- you know, Tom calls me on and I help him out and then

19         we go away.

20    Q    Well, how many of those represent cases that are actively

21         in litigation?

22    A    I don't -- I met with -- part of my representation of the

23         Klukwan entities recently has involved some I would call

24         it minor representation of K-Ply, which is a subsidiary.

25         And there are a number of suits against K-Ply, collection

```
 1        actions, which I have been involved in settling and which

 2        are still pending.  The structure of the settlements is

 3        that there's a payment plan in place and those law suits

 4        are -- remain pending 'til the payments are finished.  I

 5        think there's -- if I'm not mistaken, I think there's two

 6        in that category right now.  But apart from that there's

 7        no other active litigation with any Klukwan entity besides

 8        Travelers, of course.

 9    Q   So in regard to these other litigation matters or other

10        day to day issues unrelated to this litigation you

11        continue to be the primary counsel for Klukwan on a day to

12        day basis.....

13    A   Correct.

14    Q   .....is that accurate?

15    A   Right.
```

23   Q      Would it be fair to say, then, that as negotiations moved

24          forward between Travelers and Klukwan, negotiations in

25          which you were involved, that an operating assumption of

1    those discussions was that Travelers' loss was likely to

2    be on the order of $12 million?

3  A    It was an operating assumption that Travelers projected a

4    loss in that range, yes.

5  Q    Would it be fair to say it was also an operating

6    assumption or certainly a position asserted by Klukwan

7    that Klukwan lacked the financial resources to repay a

8    loss of that magnitude?

9  A    Yes.

10  Q    And is it a fair characterization of the discussions and

11    negotiations then that they revolved around working out an

12    agreement to where Klukwan would pay some portion of the

13    Travelers loss as satisfaction of its indemnity

14    obligation?

15  A    Yes.

16  Q    And you were involved in those discussions?

17  A    Yes.

18  Q    Is it also true, though, that Mr. Crandall and Mr.

19    Langfitt were likely having communications and discussions

20    that you were not involve din?

21  A    Yes.

22  Q    That -- as you understood it, that happened on a fairly

23    regular basis?

24  A    Yes.

15  Q    Ultimately to the extent Travelers requested revisions to

16       your draft of the repayment agreement and note they were

17       ultimately acceptable to Klukwan and they found their way

18       into the final agreement, would that be an accurate

19       characterization?

20       MR. SPRAKER:  Objection, the repayment agreement speaks

21  for itself.

22  Q    Go ahead.

23  A    Well, I think the agreement speaks for itself.

24       Acceptable, you know, if they're -- if it's in the

25       agreement, then -- if it's in the written agreement, then

1   we signed the agreement, yes.

2 Q And you were involved in reviewing any of Mr. Langfitt's

3   requested revisions and providing legal advice to Klukwan

4   in regard to them, correct?

5 A Yes.

22  Q    And isn't it true that both -- well, strike that.  Isn't

23       it true that Klukwan was evaluating whatever claims it had

24       against third parties as a result of the South Coast

25       demise, as it were?

Page 85

1    MR. SPRAKER:  Objection, form.  What time frame?

2    MR. HOPKINS:  Well, at any time frame.

3  A    Evaluating claims against third parties?

4  Q    Yes.

5  A    Sure.

6  Q    I mean, that would be logical, correct?

7  A    Sure.

8  Q    You were involved in the evaluation of claims against

9        KeyBank, correct?

10 A    True.

11 Q    You were involved in evaluating for Klukwan claims against

12       the former South Coast officers, correct?

13 A    To some extent, yes, that's true.

14 Q    And you and your firm were involved in evaluating for

15       Klukwan claims against Peterson & Sullivan?

16 A    Yes.

17 Q    Were there any other third parties that you evaluated

18       possible claims against on behalf of Klukwan or its

19       subsidiaries?

20 A    I don't believe so.

21 Q    Klukwan, and South Coast particularly, had suffered pretty

22       serious financial losses as a result of the South Coast

23       collapse.....

24 A    Yes.

25 Q    .....is that accurate?

Page 86

1   A   Uh-huh (affirmative).

2   Q   And is it fair to say part of your duties as counsel for

3       Klukwan was to evaluate potential sources of recovery for

4       those losses?

5   A   Uh-huh (affirmative).

6   Q   Is that a yes?

7   A   Yes.  And to sort -- well, go ahead.

17  Q   Let me refer you to Paragraph 11 of the repayment

18      agreement, which is on Page 5 of Exhibit 42.

19  A   Okay.

20  Q   Would you read out loud the last sentence of Paragraph 11?

21  A   This agreement and the preceding sentences do not impair

22      or release Travelers' claims or causes of action against

23      any person or entity other than . . . Klukwan entities.

24  Q   Did you understand -- well, strike that.  Do you

25      understand or do you recall that that sentence was

1          included at the request of Chuck Langfitt?

2     A    I'm not surprised, but that sounds right.

3     Q    Did you understand by that provision Travelers was

4          preserving its claims against third parties?

5     A    I.....

6     Q    Other than the Klukwan entities.

7     A    That's what -- the sentence says what the sentence says.

Page 89

```
 7   Q    Take a look at Paragraph 18 of the repayment agreement.

 8   A    Okay.

 9   Q    You recall that that clause, Paragraph 18, was included in

10        the repayment agreement at the request of Chuck Langfitt?

11   A    I believe that's true.

12   Q    You reviewed it, correct?

13   A    Yes.

14   Q    Was -- strike that.  Was the repayment agreement ever

15        modified or amended, to your knowledge?

16   A    I don't believe so.

17   Q    It's true that Klukwan attempted to renegotiate the terms

18        of the repayment agreement on more than one occasion,

19        correct?

20   A    True.
```

| | | |
|---|---|---|
| 10 | Q | Do you recall having discussions with Mr. Crandall |
| 11 | | regarding a possible claim by Klukwan against Peterson |
| 12 | | Sullivan? |
| 13 | A | Yes. |
| 14 | Q | When do you first recall those discussions occurring? |
| 15 | A | I can't place an exact date on it, but it would've been |
| 16 | | fairly early on in the relationship and certainly was a |
| 17 | | topic of recurring conversation by the end of '02 if not |
| 18 | | sooner. |
| 19 | Q | And it's an issue that continued to come up in your |
| 20 | | communications and discussions with Mr. Crandall..... |
| 21 | A | Yes. |
| 22 | Q | .....after '02? |
| 23 | A | Yes. |

25   Q    It is true, though, your firm did what could be fairly

1       characterized as a thorough and comprehensive analysis of

2       a possible claim by Klukwan against Peterson Sullivan?

3       MR. SPRAKER:  Objection, form and foundation.

4  A   No, I wouldn't call it a thorough review, I would call it

5       a hard initial look would be probably a more accurate

6       statement.

7  Q   So you performed some analysis and it was something more

8       than a cursory analysis, correct?

9  A   Yes.

10  Q   And did your views as to the pros and cons of a claim by

11       Klukwan against Peterson Sullivan change as a result of

12       that analysis?

13  A   No.

14  Q   So you had an initial gut feel, so to speak, that wasn't

15       modified, is that correct?

16  A   True.

17  Q   And subsequent research or analysis that you or your firm

18       may have performed regarding a possible claim by Klukwan

19       against Peterson & Sullivan simply confirmed your gut

20       feel, is that fair to say?

21  A   Yes.

19   Q      I read Mr. Spraker's January 21, 2004, memo, Exhibit 176,

20          as essentially addressing four subject matters; whether or

21          not there was a duty by Peterson & Sullivan, the

22          requirements of issues relating to reliance, issues

23          relating to causation and damages and particular rules

24          that might be applicable to a shareholder action.

25          Generally speaking, do you think that's a fair

1      characterization?

2  A    Again, if you can -- that's -- that's fair enough.

3      There's other issues besides that raised here, but the

4      substance is pretty much as you've indicated.

2    Q    The next entry in your February 2004 billing statements to

3         Klukwan reflect a conversation between you and Mr.

4         Spraker?

5    A    Yes.

6    Q    Do you recall what you discussed with him at or about that

7         time?

8    A    Yeah, I do.

9    Q    What was that?

10   A    I'm trying to just answer your questions.

11   Q    Good.

12   A    By that time, of course, both Gary and I were pretty tuned

13        up on what the legal principles were and I think Gary's

14        knowledge of the facts derived entirely from what I told

15        him, and my knowledge of the facts derived largely from

16        what Tom had told me and what I had developed as my own

17        knowledge of the case.  And we talked about the liability

18        and the damages issues as well as, you know, other

19        considerations that would get into the issue of filing

20        suit against Peterson Sullivan.

21   Q    Well, can you tell me anything more specifically regarding

22        your conversations with Mr. Spraker on those subject

23        matters?

24   A    I would say that it's -- actually Tom Crandall's

25        deposition, I think, lays it out pretty -- as a pretty

Page 129

1       good description of what my opinion was. I don't know if

2       that's because he had the same view as I did or he was

3       just listening to me. I think that we agreed as a sort of

4       a -- Mr. Spraker and I agreed for discussion purposes that

5       we could show liability but that the damages problem would

6       be a much harder row to hoe. Could be potentially

7       extremely large damages but proving them would be

8       problematic.

9    Q  By extremely large damages you mean by a claim by Klukwan

10      could've encompassed all of the substantial losses, or a

11      very large portion of them, that Klukwan and South Coast

12      experienced as a result of South Coast's collapse,

13      correct?

14   A  Right, when Klukwan acquired South Coast Klukwan was a

15      financial powerhouse, it was a very solvent, well-financed

16      corporation, and the South Coast debacle brought Klukwan

17      down to here we're essentially on the bring of bankruptcy.

18      There's no other real single cause to Klukwan's problems

19      besides South Coast, so yeah, the damages could be quite

20      large.

21   Q  And those potential damages certainly exceeded the losses

22      Travelers incurred or was likely to incur on the South

23      Coast bonds, correct?

24   A  Well, potentially. Potentially. But.....

Page 132

5    Q    Did Mr. Spraker do a specific separate legal analysis and

6         research of Travelers' claims against Peterson Sullivan?

7    A    No, never.

8    Q    Did you?

9    A    No.

13   Q    Can you identify Exhibit 177 as your e-mail to Tom

14        Crandall dated February 6, 2004?

15   A    Yes, I see it here.

16   Q    And Mr. Spraker was in fact copied on this, correct?

17   A    Yes, uh-huh.

18   Q    And the first sentence says, Tom, I'm getting into the

19        Peterson Sullivan claim and would like to talk to you

20        Monday about the following issues, end quote.

21   A    True.

22   Q    Does that reflect that fact that you had just reviewed Mr.

23        Spraker's research memo dated January 21?

24   A    Yes, this is the e-mail that's referenced on that same

25        billing that we were looking at.

Page 133

```
 1   Q    And the purpose of this e-mail was to outline a number of

 2        factual issues that you wanted to discuss with Mr.

 3        Crandall, correct?

 4   A    Uh-huh (affirmative).

 5   Q    And looking at the last -- the very last portion of this

 6        e-mail, it says, quote, as you can see, these issues group

 7        around two basic questions.  One, were the acts complained

 8        of within the scope of P&S's work.  Two, what were the

 9        damages caused by P&S's negligence.

10   A    Uh-huh (affirmative).

11   Q    I see issue two, dash, causation and damages, as

12        particular problematic.

13   A    Uh-huh (affirmative).

14   Q    Not unlike the cause of action we contemplated once upon a

15        time against KeyBank.....

16   A    Right.

17   Q    .....end quote.  Did that reflect your gut feel regarding

18        the claim?

19   A    Yes.  Yes, it did.
```

14    Q    Well, will you look at your entry for March 1, 2004.....

15    A    Uh-huh (affirmative).

16    Q    .....in your billing entries?

17    A    Okay.

18    Q    Now, that references a meeting with Tom Crandall?

19    A    Right.

20    Q    Says, quote, meet with Tom Crandall re Peterson Sullivan

21         law suit mainly.

22    A    Right.

23    Q    Two hours?

24    A    Yes.

25    Q    And that reflected a meeting and discussion with Mr.

1        Crandall regarding the possible claim against Peterson

2        Sullivan, correct?

3    A    Right.

4    Q    Did you discuss some of the subject matters that are

5        outlined by you in your e-mail, Exhibit 177?

6    A    Yes.

18   Q    We've marked as Exhibit 179 your e-mail to Gary Spraker

19        dated March 16, 2004, subject, quote, Peterson Sullivan

20        statute of limitations, end quote.

21   A    Yes.

22   Q    Did you ask Mr. Spraker to look at this issue?

23   A    I -- yes.

24   Q    Did he produce anything in writing in regard to the

25        statute of limitations?

Page 137

1    A    No.

2    Q    Do you understand he researched the statute of

3         limitations?

4    A    I don't know if he did or not.  I told him.....

5    Q    Would you take a look at.....

6    A    Yeah.

7    Q    Take a look at your billing statements for March of 2004.

8    A    Uh-huh, right.

9    Q    March 17, 2004, entry reflects activity by Mr. Spraker

10        that says, quote, legal research re.....

11   A    Right.

12   Q    .....accrual of cause of action for accountant

13        malpractice, end quote.

14   A    Right.

3    Q    What did you understand to be the applicable statute of

4         limitations?

5    A    The standard -- the period of limitations for professional

6         malpractice is generally two years, except that where the

7         claim is for primarily sums in economics damages, it's the

8         breach of contract standard, which at the time and now is

9         three years.  So that would be a -- since we had pure

10        economic damages as opposed to, let's say, you know, a

11        personal injury lawyer missing a statute -- missing a two-

12        year statute on a personal injury case.  But where you

13        have -- here, where you have economic damages, it would be

14        a three-year statute.

```
21    Q    Did you make a determine in your own mind when Klukwan's
22         cause of action against Peterson Sullivan accrued?
23    A    It seemed to me that the earliest time that it might've
24         accrued -- which of course that's what i'm looking for.
25         It's not so much when it really accrued but what's the
```

1       earliest, you know, reasonable time that it might accrue.

2       I felt that it -- that the earliest time was January of

3       '02.

4   Q   The earliest possible day?

5   A   Right.

6   Q   Could've accrued later?

7   A   Yes.  March of '02 would be the other candidate, and

8       actually seemed to me the better candidate.  But, you

9       know, for planning purposes I felt it was January of '02.

10  Q   Did you tell Tom Crandall that?

11  A   Yes, I think we've had the discussion that those -- if

12      those -- it's the day of those reports, it's -- that, you

13      know, that's the -- that's when the alarms start to sound.

14  Q   And by those reports you're referring to the Sutor report

15      that was dated March 2002 and the Peterson Sullivan report

16      that came out at or about the same time?

17  A   There's three documents.  There's the two Peterson

18      Sullivan and the one Sutor, and I'm -- by reports I mean

19      all three of those documents.

14  Q  Back to my initial question.  Did you ever analyze or

15      anyone in your firm analyze when a cause of action for

16      Travelers as opposed to Klukwan against Peterson Sullivan

17      might have accrued?

18  A  Up until the time that the -- that judge -- the district

19      court case was thrown out on statute of limitations it

20      never dawned on me to even think about the issue as to

21      when a Travelers cause of action would've accrued.

22  Q  So prior to the Judge Beistline's ruling dismissing

23      Travelers action claim on -- Travelers' claim against

24      Peterson Sullivan on the statute of limitations ground,

25      you hadn't considered it or analyzed the issue?

1    A    I hadn't paid any -- given it any attention whatsoever.

2    Q    And therefore you probably had not had any conversations

3         with either Mr. Sokol or Mr. Langfitt on the subject?

4    A    That's correct.

5    Q    Did you have any discussions with Tom Crandall on that

6         subject?

7    A    Not until the judge's ruling.

17  Q    Did Mr. Crandall explain to you that it was typical

18       practice of an outside accounting firm performing an audit

19       of a corporation's financial statements to prepare an

20       engagement letter, also known as a management letter,

21       outlining the scope of the audit and making certain

22       representations on management's part?

23  A    I think -- I don't know if he told me that.  I think that

24       I'm familiar that that's a common practice.  And, as I

25       say, it looks to me like there's some sort of question

1       that we talked about as to whether there was a management

2       letter for previous years or not, and if so what did it

3       say.

4   Q   And the answer to those questions would be part of the

5       analysis of the strengths or weaknesses of a claim by

6       Klukwan against Peterson Sullivan because the terms of

7       such a management letter would affect the question of

8       liability, correct?

9   A   Yes, and damages.  Yes, you bet.

```
 7   Q    Do you recall being involved in discussions with Mr.

 8        Crandall and Brandon Allen shortly after Travelers' law

 9        suit against Peterson Sullivan was filed?

10   A    Yes, I do.

11   Q    Part of those discussions related to the issue of whether

12        Klukwan's D&O insurance carriers had been given timely

13        notice, correct?

14   A    That's right.

15   Q    But you also discussed with Mr. Allen and Mr. Crandall the

16        amount of Travelers' claim as stated in its law suit,

17        correct?

18   A    Believe that's correct also, yeah.

19   Q    And you didn't understand at the time how that claim was

20        calculated, correct?

21   A    Right, I couldn't derive the number no matter what their

22        assumptions were.

23   Q    And in part the reason you couldn't do so is you'd never

24        discussed with Travelers how it might calculate its claim

25        against Peterson Sullivan, had you?
```

1   A    That's true.

2   Q    Nor had anyone at Travelers ever told you that Travelers

3        expected to recover any particular amount, correct?

4   A    Right, I would assume that the amount in the complaint

5        would be their damage, their total exposure, but maybe

6        that's not a true -- a valid assumption.  So I don't know

7        how they came to their number.

16  Q    Do you -- You'd earlier mentioned the ruling in the

17       Peterson & Sullivan litigation dismissing Travelers' claim

18       against Peterson Sullivan on statute of limitations basis.

19       MR. SPRAKER:  Is that a question?

20  Q    Did you become aware at the time that motion was filed?

21  A    No.  No.

22  Q    And how did you learn of the ultimate ruling by the court?

23  A    I was trying to remember that preparing for the

24       deposition, and I believe that the Peterson Sullivan

25       lawyer, whose name escapes me right now, called me and

1          told me about it.

2    Q    That was Mr. Waggoner?

3    A    No.

4    Q    Earnhart.

5    A    Earnhart, Will Earnhart, yeah.

6    Q    And had you had prior discussions with Mr. Earnhart?

7    A    No, I didn't.  No.  I'm not even sure I knew he was in the

8          case.

9    Q    And did he call you at or about the time the court

10         rendered its ruling?

11   A    Shortly after, yes.

12   Q    And you relayed that information to Mr. Crandall?

13   A    Yes.

13    Q    Can you identify Exhibit 183 as your e-mail of January 19,

14         2006, to Tom Crandall which also includes his message to

15         you and a draft letter prepared by you to Mr. Earnhart?

16    A    Yes.

17    Q    So Mr. Crandall forwarded Mr. Earnhart's January 19, 2006,

18         letter to you in this e-mail and asked you to prepare a

19         response, correct?

20    A    Yes.

21    Q    And you prepared a draft response?

22    A    Yes.

23    Q    And was that draft letter ever sent?

24    A    I don't think so.  I would have to check my file but, as I

25         say, this is the kind of -- this is the kind of letter I'd

1    draft and I'd wait a few days or longer before sending it

2    out.

3  Q   Did you understand Mr. Crandall interpreted the January

4    19, 2006, letter from Mr. Earnhart as making allegations

5    against him personally?

6  A   Well, I think that's how Tom interpreted it.

7  Q   And did you discuss with him the draft letter you prepared

8    to Mr. Earnhart?

9  A   I don't know if I did.  It looks like I sent it out at

10   6:54 p.m. and probably went -- I'm sure I did.

11 Q   And do you recall one way or another whether or not the

12   letter to Earnhart was sent?

13 A   I don't think it was, or if it was it went out in a very

14   toned-down letter.  As I say, I do recall a very, you

15   know, substantive conversation with him, which may have

16   taken the place of that letter, but I -- as we sit here

17   today I can't recall if I did a written response also.

18 Q   Is it true that in this draft letter you were trying to

19   emphasize to Mr. Earnhart the relationship with Travelers

20   and Klukwan was an adversarial one?

21 A   Yes.

21    Q    Certainly you felt obtaining the working papers would be

22         of value in terms of evaluating and pursuing a claim

23         against Peterson Sullivan, correct?

24    A    Certainly in terms of pursuing a claim.  As I said before,

25         I didn't understand what -- how the working papers would

1    help in deciding whether they had a claim or not.  I mean,

2    they should have all the facts -- To me, the facts that

3    would go to the issue of whether they had a claim would be

4    the nature of their own reliance, which is entirely on --

5    within Travelers' knowledge, and the inaccuracy of the

6    statements, which Peterson Sullivan has basically conceded

7    in their letters.  So to me this whole working papers

8    thing was a waste of time.

24    Q      Did you understand that Klukwan had a desire for the

25           working papers to provide its new accountants because it

000197

1       had made the decision to obtain new auditors going

2       forward?

3   A    Right.

4   Q    And Klukwan felt obtaining those working papers would make

5       the job of the new auditors easier.....

6   A    Yes.

14  Q    Can you identify Exhibit 191 as your e-mail to Tom

15       Crandall dated January 15, 2004?

16  A    It is.

17  Q    And this forwards a January 9, 2004, e-mail from Jan

18       Sokol, correct?

19  A    Yes.

17  Q    Let's focus for a minute on your discussions regarding the

18       possibility of Travelers succeeding and obtaining a

19       recovery from Peterson Sullivan.

20  A    Right.

21  Q    Klukwan asked Travelers at this point how that recovery

22       would be applied, correct?

23  A    That had been a recurring subject of discussion, yes.

24  Q    And Travelers -- and in fact that issue'd come up earlier?

25  A    Oh, yes, that's what I'm saying.

1    Q    Travelers had told Klukwan that the proceeds of their

2         recovery from Peterson Sullivan, if they obtained one,

3         would not go against Klukwan's obligations under the note,

4         correct?

5    A    That's what Travelers was saying, they said that it would

6         be -- it would reduce the claim.....

7    Q    The loss?

8    A    The loss, if you would, obviously, but they were not

9         willing to go further than that.

10   Q    Mr. Sokol at or about this time, mid-January 2004,

11        reiterated that position to you, did he not?

12   A    Right, and we had a conversation that went something like,

13        Jan, you're asking us to help out on this law suit, what

14        do we get out of it, and we said -- he says, well, you're

15        required to cooperate under the contract, and I say, well,

16        we're willing to cooperate but we want some cooperation

17        back, I mean, this is something that's not -- you know, if

18        you want our cooperation we should get, you know, some

19        recognition for that, and the recognition would be in the

20        form of reducing our obligation under the note.

21   Q    Travelers never agreed to that proposition?

22   A    They never expressly agreed to it, no.

23                      DEPOSITION EXHIBIT 192 MARKED

24   Q    I've marked as Exhibit 192 your e-mail to Tom Crandall

25        dated January 21, 2004?

Page 193

1   A   Yes.

2   Q   And this forwards Jan Sokol's e-mail to you, see that?

3   A   Yes, I do.

4   Q   Mr. Sokol's e-mail's dated January 21, 2004, and it

5       references a conversation he had with you prior -- on the

6       previous day, correct?

7   A   Right.

8   Q   And that was a conversation where again Mr. Sokol

9       reiterated Travelers' position that any recovery would not

10      go against the note, correct?

11  A   It would only go against the claim.

12  Q   The loss?

13  A   To me that's the -- the net loss -- yeah, their loss.  The

14      loss on these contracts.

15  Q   And.....

16  A   The number that we've been calling 12 million, or at least

17      that was the working number that we were talking about

18      previously.

19  Q   The gist of the conversation -- the other aspect of the

20      conversation you had with Mr. Sokol that you were relaying

21      to Tom Crandall here was that from Travelers' perspective

22      if Klukwan wanted to modify the repayment agreement it

23      would take some quid pro quo on their part as well?

24  A   Yes.

25  Q   And did Mr. Crandall have those discussions, as far as you

Page 194

1       knew?

2   A   Probably.

3   Q   But no agreement was reached in that record, correct?

4   A   That's correct.

5   Q   One other aspect where Klukwan wanted to modify the

6       repayment agreement was in regard to the bankruptcy

7       provisions, correct?

8   A   Yes.

9   Q   That request was made as well?

10  A   Yes.

11  Q   And rejected by Travelers?

12  A   Yes.

13  Q   I'm going to show you what we've previously marked as

14      Exhibit 87.  This is your e-mail of February 10, 2004, to

15      Jan Sokol, correct?

16  A   Yes.

```
22   Q    And you agree with me nowhere in this document do you

23        state or specifically use the word condition or

24        contingency or conditioned upon, correct?

25   A    I'll agree with that.
```

5    Q    Do you agree with me that the term expectation has a

6         considerably different meaning than condition?

7    A    Yes, I do.

8    Q    Looking at the last sentence in the third paragraph of

9         your February 10, 2004, e-mail, Exhibit 87, you stated,

10        quote, also, as you are aware, Klukwan is considering its

11        own action against P&S and has some -- has developed some

12        ideas about how to proceed.  You and I should discuss, end

13        quote.

14   A    Yes.

15   Q    And that reflected the fact Klukwan was continuing to

16        consider its own action against Peterson Sullivan,

17        correct?

18   A    It was, although the real thrust of that was Tom's desire,

19        pretty strong desire, to, you might say, drop the bread

20        crumbs in front of Travelers to lead Travelers to the

21        correct set of facts it would need to develop a case

22        against Peterson Sullivan.  There was also the possibility

23        of us bringing a suit, but I had told Jan that, you know,

24        if he brings a suit there's no real point in us bringing a

25        suit because it's the same dollars that are being chased

000205

1        and he's got a stronger case.

2    Q   Certainly the language of this February 10, 2004, e-mail

3        leads Travelers to believe that Klukwan is continuing to

4        consider its own action against Peterson Sullivan, doesn't

5        it?

6    A   Well, you'll have to ask -- yes, I can see that would be a

7        reading from that.  Jan never did call back and discuss to

8        talk about the suit.  I mean, he just never -- I never

9        really understood why he didn't take the opportunity to

10       get some good information.  And he spent all this time

11       going after the work papers but no -- he just ignored our

12       efforts to provide him with some live information.

000206

1   Q    And you understood Travelers wanted the working papers to

2        evaluate whether or not they had a claim against Peterson

3        Sullivan, correct?

4   A    That's what they said, yes.

5   Q    So you certainly had no assurance that Travelers was

6        proceeding with a substantive law suit as of February 10,

7        2004, did you?

8   A    I did not have an express statement from them that they

9        would do so.  However, I was of the strong opinion that

10       they would do so.

4    Q    Exhibit 193 is an e-mail to you from Tom Crandall that's

5         also sent to Jan Sokol, correct?

6    A    True.

7    Q    And it reflects Mr. Crandall's request to Jan Sokol to

8         correct his name on the working paper petitions, correct?

9    A    Yes.

10   Q    Did you have a discussion with Mr. Sokol regarding that

11        request?

12   A    I don't recall a discussion with him on that, no.

13   Q    This e-mail reflects the fact that Klukwan was not waiting

14        for any response from Travel -- by Travelers or Mr. Sokol

15        to your February 10, 2004, e-mail, correct?

16   A    Correct.

17   Q    You were prepared to execute -- or, Klukwan was prepared

18        to execute the petition promptly, correct?

19        MR. SPRAKER:   Objection, form and foundation, assumes

20   facts.

21   A    The document says what the document says.  You've asked

22        Tom Crandall about the same question and his testimony is

23        what the testimony is.

24   Q    Well, certainly that was your understanding, was it?

25   A    That what?

Page 201

1    Q    That Mr. Crandall was prepared to execute the petition on

2         February 11th?

3    A    Yes.

4    Q    I've handed you what we've previously marked as Exhibit

5         88, which is Jan Sokol's e-mail to you and Tom Crandall

6         dated February 13, 2004.

7    A    Yes.

8    Q    You understood this February 13, 2004, e-mail message from

9         Jan Sokol responded to your e-mail of February 10, 2004,

10        as well as Mr. Crandall's of February 11 regarding

11        correction of the petition, correct?

12   A    Correct.

13   Q    Did you understand Mr. Sokol to tell you that your stated

14        expectation on behalf of Klukwan was not consistent with

15        the agreement between the parties?

16   A    I see that's where it says that.

17   Q    And you understand that to be the same position that

18        you've earlier described where Travelers rejected any

19        application of recovery from Peterson Sullivan to the

20        Klukwan note?

21   A    Yes.

```
22   Q      I'm going to show you what we've previously marked as

23          Exhibit 108, which is a February 22, 2006, letter from Jan

24          Sokol to Tom Crandall.

25   A      Okay.
```

Page 236

1    Q    Do you recall receiving or reviewing this letter?

2    A    Yes.

3    Q    This was a demand by Travelers that Klukwan cure its

4         default under the repayment agreement, as you understood

5         it?

6    A    Uh-huh (affirmative).

```
 7   Q    Certainly Mr. Sokol indicated in Exhibit 108, his February

 8        22, 2006, letter, at least as you understood it, that

 9        litigation was likely imminent?

10   A    Yes.

11   Q    That's how you took it?

12   A    That's how I took it, yes.
```

```
 7    A    I don't think the statute of limitations starts for us at

 8         the same time as it starts for Travelers.

 9    Q    So you weren't concerned about when it started for

10         Travelers?

11    A    Right.  I'm sure it's a different time.  I don't know what

12         the time is but the analysis is -- does not translate or

13         transfer at all.
```

2  Q    You've told us what you think, but I don't know what you

3        did, and I don't see any evidence that you did anything in

4        terms of communicating to Jan Sokol your concern and your

5        anxiety about the delay that was being caused by this

6        exercise down in Seattle.  Am I wrong about that?  Is

7        there any evidence of that other than what you internally

8        think today about that?  Do we have any writing of any

9        description that evidences that back at the time?

10 A    There's nothing in writing and delay and anxiety is --

11       maybe puts the wrong spin on it.  I wasn't -- I had no

12       anxiety that he was going to miss the statute of

13       limitations.  It never dawned on me that that would be a

14       problem.  So I was not worried about missing a deadline at

15       all.  That was the furthest thing from my mind.  What I --

16       But impatient, perhaps, at the process of just messing

17       around with what seemed to me a preliminary step.  But --

18       as I say, the reason I didn't push it is, you know,

19       everybody's got their own style.  He's got his.

000214

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

TRAVELERS CASUALTY AND         .  Case No. 3:06-CV-00063-TMB
SURETY COMPANY OF AMERICA,     .
a Connecticut corporation,     .
                               .
          Plaintiff,           .
                               .
vs.                            .
                               .
SOUTH COAST INC., an Alaska    .  **DEPOSITION OF CABOT CHRISTIANSON**
corporation, KLUKWAN, INC.,    .  **DAY 2**
Alaska Native Village          .
corporation, and CHILKATS'     .
PORTAGE COVE DEVELOPMENT        .
COMPANY, an Alaska             .
corporation,                   .
                               .
          Defendants.          .
. . . . . . . . . . . . .       .
SOUTH COAST INC., et al,       .
                               .
     Counterclaim and          .
     Third-Party Plaintiff,    .
                               .
vs.                            .
                               .
TRAVELERS CASUALTY AND         .
SURETY COMPANY OF AMERICAN,    .
a Connecticut Corporation,     .
STEWART SOKOL & GRAY L.L.C.    .
and JAN D. SOKOL,              .
                               .
     Counterclaim and          .
     Third-Party Defendants.   .
. . . . . . . . . . . . .       .

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Travelers             James T. Hopkins, Esq.
Casualty and Surety       Schiffrin Olson Schlemlein
Company of America:        & Hopkins, P.L.L.C.
                          1601 Fifth Avenue, Suite 2500
                          Seattle, Washington 98101

```
 6   Q   Now, on February 10 in your e-mail to Jan you say

 7       Travelers -- you say Klukwan is considering its own cause

 8       of action against Peterson Sullivan, has developed some

 9       ideas.  And then I don't see where there's any time that

10       there's another follow-up e-mail or communication with Jan

11       Sokol telling him at what point in time, if ever, Klukwan

12       decided not to pursue its own cause of action.

13   A   That's true.

14   Q   So as far as you know Jan Sokol at least through -- up

15       through September of '04 as far as you know he still

16       assumed that Klukwan was considering bringing its own

17       cause of action or claim against Peterson Sullivan?

18   A   Well, I don't know what he knew.  I did tell him that if

19       he was going to go forward that there was very little

20       chance that we would go forward.  And -- but I -- you

21       know, you're right, I never told him after this e-mail

22       chain Jan, we have affirmatively decided not to go

23       forward.  And to go back to your -- the question you were

24       asking before, I kind of have a memory of participating --

25       and I may -- I don't know if it was this meeting or not.
```

1      But I think the fact that the Travelers suit against

2      officers and directors and Peterson Sullivan had been

3      filed kind of reinvigorated, you might say, the issue of

4      what we were going to do -- what Klukwan was going to do

5      vis a vis Peterson Sullivan because the directors were

6      making noises about wanting to have us indemnify and it

7      looked like there was a fair chance we might be brought

8      into the suit.  And then the question was, well, we're in

9      the suit, should we -- you know, should we file a claim

10     against Peterson Sullivan.  It was more -- it was more in

11     the nature of, well, we -- since we're going to be -- it

12     looks like we might be in the suit anyway, should we, you

13     know, take a second look at this issue against Peterson

14     Sullivan.  And of course we never were brought into the

15     suit formally, so that didn't have to happen.  But, you

16     know, I think the client decision was -- was the same as

17     before, which was, you know, if Travelers is going

18     forward, which they obviously are, then there's very

19     little point in us pursuing a parallel action.

4   Q     Did you then discuss with Mr. Spraker -- Did ultimately

5          make a recommendation to Klukwan, to Tom Crandall, not to

6          bring a claim just on its own merits against.....

7   A     Sure, I -- my advice.....

8   Q     .....Peterson Sullivan?

9   A     .....consistently to Tom and to the board was that -- is

10         that Travelers is much better situated to bring its claim.

11         It didn't -- it had a -- didn't suffer from the unclean

12         hands defense that we would have, it did not have the

13         damages problem that we would have, and they would be

14         financing the litigation.  And we're chasing the same

15         dollars.  I mean, the Travelers damages are the same as

16         our damages, the same -- or, at least the first let's say

17         12 million or whatever, it's the same claim.  So if

18         Travelers is going to go forward there was no point in us

19         going forward.  And that was my advice pretty much

20         consistently from day one.

Page 316

1   Q   You did understand Travelers was asserting tort theories

2       of recovery against both Peterson & Sullivan and the

3       former South Coast officers?

4   A   Yes.

5   Q   In other words Travelers was asserting they were both

6       negligent?

7   A   In a very broad sense those are both tort claims, yes.

8   Q   And as we earlier covered, Travelers was asserting the

9       same damages against both groups of defendants.

10  A   Okay.

11  Q   And would you have expected -- or, did you ever even

12      consider at the time you were providing advice to Klukwan

13      regarding whether Klukwan should pursue its own claim, did

14      you ever consider whether or not in Travelers' action

15      against Peterson & Sullivan there would've been an

16      allocation of fault between the South Coast officers and

17      Peterson Sullivan?

18  A   Anything's possible in litigation.

19  Q   Listen to my question.  My question is whether you ever

20      considered it at the time you were providing advice to

21      Klukwan regarding whether it should move forward with its

22      claim?

23  A   Yes, I did.

24  Q   And as part of that consideration did you recognize the

25      possibility that Travelers' recovery from Peterson &

1         Sullivan, assuming it proved its claim, would be reduced

2         to the extent fault was allocated to the South Coast

3         officers?

4   A     I felt that was certainly a possibility.  I think that the

5         -- that was a possibility.

6   Q     And given that possibility don't you agree that Travelers'

7         claim had the same problem as the Klukwan claim as you

8         perceived it in regard to the unclean hands defenses?

9   A     Well, no, not.....

10       MR. SPRAKER:  Objection to the extent it calls for a legal

11 conclusion.

12  A    You know, I saw them as very different.

13  Q    So you didn't perceive, then, or certainly it was not a

14       concern to you at the time you were providing advice to

15       Klukwan that Travelers' claim against Peterson & Sullivan

16       would be reduced because of an allocation of fault to the

17       officers?

18  A    Right, that was not a concern because no matter how you

19       viewed the contribution, if you will, of the officers and

20       directors towards the problem, Travelers was in a much

21       better position.  Both from the standpoint of legal

22       doctrine and from the standpoint of, you know, the flavor

23       of the litigation, that the Travelers claim would be much

24       stronger and would be much less susceptible to that kind

25       of defense.

3   Q    So the litigation expense was a meaningful factor as far

4         as Klukwan's evaluation of bringing a claim against

5         Peterson Sullivan.

6   A    It was a factor.

7   Q    Did you ever provide an estimate to Tom Crandall or the

8         Klukwan board of the likely cost of litigating a claim by

9         Klukwan against Peterson Sullivan?

10  A    I don't believe I gave them -- well, I think we spoke in

11       general terms of what the cost of that litigation might

12       be.

13  Q    You gave them ballpark numbers?

14  A    Yes.

15  Q    You didn't give them a piece of paper with a list of tasks

16       detailed by hours.....

17  A    No, that's.....

18  Q    .....and dollars?

19  A    It's not possible to be that precise, unfortunately.

20  Q    What did you tell them in terms of ballpark numbers as the

21       cost of litigation?

22  A    Several hundred thousand, half a million, something in

23       that range.  Possibly more.

18  Q    And it -- isn't it true that you understood that Klukwan's

19       substantial investments in South Coast had been largely

20       made prior to January 2001, isn't that true?

21       MR. SPRAKER:  Objection, assumes facts.....

22  A    No.....

23       MR. SPRAKER:  .....lack of foundation.

24  A    Not -- I -- no, that's not my understanding, and also, as

25       I said, it -- a claim against Peterson Sullivan is much

Page 324

1       broader than simply reliance on the 2000 financials.  So I

2       guess -- I mean, I looked at that part of the memo and

3       said, well, okay, the assumption that's in the first

4       sentence of that memo is not necessarily applicable.

5   Q   So by the statement that the claim was broader than the

6       2000 statements you meant that a claim by Klukwan against

7       Peterson & Sullivan as you envisioned it would look back

8       over a longer period of time of the relationship between

9       Peterson Sullivan and Klukwan?

10      MR. SPRAKER:  Objection, foundation, and also object to

11  the extent it calls for legal conclusion,

12  A   I'm sorry, ask your question again.

13  Q   No, you just testified that in your view the claim against

14      Peterson Sullivan was, quote, broader.....

15  A   Broader, right.

16  Q   .....than, end quote, simply the year-end 2000 statements

17      audited by.....

18  A   Right.

19  Q   .....Peterson & Sullivan, and I take it that you mean by

20      that statement that in your view Klukwan's claim against

21      Peterson & Sullivan would look at the whole relationship

22      between Peterson & Sullivan and actions that Peterson &

23      Sullivan did or did not take prior to the 2000 audit?

24  A   That's correct, yes, thank you.

19   Q    It is true, then, that both you and Mr. Crandall wanted

20        Travelers to initiate an action against Peterson Sullivan?

21   A    Yes.

22   Q    Because you believed that was preferable to Klukwan

23        undertaking the expense and risk of its own action.

24   A    Yes.

25   Q    And indeed you've used the term, quote, bread crumbs, end

Page 329

1       quote?

2   A   Uh-huh (affirmative).

3   Q   And prod or encourage Travelers?

4   A   My testimony is what it's been.

5   Q   The point being both you and Mr. Crandall were continually

6       trying to encourage Travelers to proceed with an action

7       against Peterson Sullivan, isn't that true?

8   A   We wanted Travelers to move forward with the action, yes.

9   Q   And you kept providing, quote, bread crumbs, end quote?

10  A   Well, I think most of the bread crumbs actually happened

11      -- were being provided by Tom Crandall, since it was a

12      factual bread crumb more than a legal bread crumb.

13  Q   And the purpose was to encourage Travelers to bring an

14      action against Peterson Sullivan?

15  A   Right, and to provide assistance to developing the facts

16      like the FMIs that we're talking about that Travelers

17      would have a difficult time developing on its own without

18      some inside help.

| | | |
|---|---|---|
| 10 | Q | Is it your view that the repayment agreement required any |
| 11 | | recovery that Travelers might've obtained from Peterson & |
| 12 | | Sullivan be applied in any particular fashion? |
| 13 | A | The repayment agreement itself? |
| 14 | Q | Yes. |
| 15 | A | No, it would reduce the loss, or at least the cap, if you |
| 16 | | will, that's in the repayment agreement, but apart from |
| 17 | | that there was nothing in the repayment agreement that |
| 18 | | provided any further direction as to how the -- how those |
| 19 | | monies would be applied. |

```
2   Q    And at the end of Exhibit 202 and Exhibit 109, the March

3        21 or March 27, 2006, letter, you also assert that Mr.

4        Sokol's alleged negligence will be asserted in any claim

5        brought by Travelers against Klukwan or South Coast.  Is

6        that -- that's what the letter.....

7   A    The letter.....

8   Q    .....says.....

9   A    Yes.

10  Q    .....correct?

11  A    Okay.

12  Q    And that's also true that was the first time Klukwan had

13       asserted such a position vis a vis Travelers.

14  A    True.

15  Q    And that's -- that assertion is now essentially Klukwan's

16       counterclaim, as you understand it, in this litigation?

17  A    True.

18  Q    And even though you were aware of Judge Beistline's order

19       dismissing Travelers' law suit against Peterson & Sullivan

20       shortly after it was issued in late September, 2005,

21       Klukwan never asserted a claim relating to Travelers' lack

22       of success in that action during the course of its various

23       attempts to renegotiate the repayment agreement prior to

24       your March 21, 2006, or March 27, 2006, letter?

25  A    True.
```

Page 337

1    Q    Mr. Gilmore yesterday asked you some questions regarding

2         both accrual of a cause of action and the statute of

3         limitations for a professional malpractice claim.

4    A    Yes.

5    Q    I am correct that your answers were from the perspective

6         of Klukwan who was a client of Peterson & Sullivan, is

7         that true?

8    A    True.

9    Q    You testified Travelers -- you testified your belief that

10        Travelers' cause of action against Peterson & Sullivan,

11        from your perspective, undoubtedly accrued at a different

12        time than Klukwan's action accrued.

13   A    I would say so, yes.

14   Q    And likewise is it your understanding or do you have any

15        knowledge or have you even considered the issue as to

16        whether or not Travelers had a different statute of

17        limitations?

18   A    You mean length of time as opposed to.....

19   Q    Yes.

20   A    .....starting date?  Yes, I think it does have a different

21        statute.

22   Q    And that's a two-year statute?

23   A    Yes.

24   Q    And that's what Judge Beistline's order is based upon.

25   A    Right.