Cabot Christianson, Esq.
Gary Spraker, Esq.
CHRISTIANSON & SPRAKER
911 W. 8th Avenue, Suite 201
Anchorage, AK 99501
Telephone: (907) 258-6016
Telefax: (907) 258-2026
Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

TRAVELERS CASUALTY AND SURETY )
COMPANY OF AMERICA, a Connecticut )
corporation, )
                               )
              Plaintiff, )
       v. )
                               )
SOUTH COAST, INC., an Alaska corporation, )    **Case No. A06-00063 (TMB)**
KLUKWAN, INC., and Alaska Native Village )
corporation, and CHILKATS' PORTAGE COVE )
DEVELOPMENT COMPANY, an Alaska )
corporation, )
                               )
            Defendants. )
_____ )
                               )
SOUTH COAST, INC., an Alaska corporation, )
KLUKWAN, INC., and Alaska Native Village )
corporation, and CHILKATS' PORTAGE COVE )
DEVELOPMENT COMPANY, an Alaska )
corporation, )
                               )
              Counter-Claim and )
              Third Party Plaintiff, )
                               )
       v. )
                               )
TRAVELERS CASUALTY AND SURETY )

COMPANY OF AMERICA, a Connecticut ) 
corporation, STEWART, SOKOL & GRAY ) 
L.L.C., THOMAS A LARKIN and ) 
JAN D. SOKOL, ) 
 ) 
              Counterclaimant and ) 
              Third Party Defendants. ) 
_____)

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT DISMISSING COUNTERCLAIM AND CROSS MOTION

Defendants Klukwan, Inc., South Coast, Inc., and Chilkat's Portage Cove Development Company (collectively, "Klukwan" or "Defendants") oppose Travelers Casualty & Surety Company of America's ("Travelers") *Motion for Summary Judgment Dismissing Defendants Counterclaims (Motion),* and cross move on the issue of duty, whether measured in tort or contract, and that the failure to timely file its action against Peterson Sullivan, P.L.L.C. (Peterson Sullivan) was a breach of that duty.

### INTRODUCTION

Travelers and Klukwan jointly pursued a negligence action against Defendants' accountants for millions in losses caused by the collapse of South Coast, Inc. (South Coast). Travelers had issued bonds on South Coast's construction projects, upon which it was called to pay and perform. Klukwan was South Coast's parent corporation, and had agreed to indemnify Travelers for those losses. Travelers finally sued the accountants knowing that Klukwan was relying upon it to do so in mitigation of its net losses. Based upon Travelers's action, Defendants chose to conserve its scarce resources and forebear from bringing an

independent action or joining Travelers' action against the accountants. Almost 14 months later, Judge Beistline dismissed Travelers' action as untimely. By that date, any action by Defendants against Peterson Sullivan was also time barred.

Given the obligation to mitigate its damages, the unity of interests in doing so, the joint pursuit of the accountants' workpapers, and Travelers' knowledge of Defendants' reliance, Travelers was under a duty to timely bring the action against Peterson Sullivan. Accordingly, summary judgment is appropriate to establish Travelers' duty to Defendants which it admittedly breached. Travelers' motion for summary judgment dismissing Klukwan's counterclaims against it must necessarily be denied.

## FACTS

According to the Sullivan's audited financial statements of South Coast prepared by Peterson Sullivan, the company had a net profit of $878,849 for the year ending December 31, 2000, based upon revenues of $44,792,471 (excluding its sales of explosives).[1] When Peterson Sullivan issued its financial statements for South Coast's 2001 operations, the accountants reported staggering net losses of $8,323,644.[2] In the interim Klukwan, Inc.[3],

---

[1]     A copy of South Coast's 2000 financial statements is attached as Deposition Exhibit (Dep. Ex.) 17. Copies of the deposition exhibits referenced in this cross-motion are attached at Tab E to the Declaration of Gary Spraker (Spraker Declaration) submitted herewith. Klukwan continues the practice adopted by Travelers of using the sequentially numbered deposition exhibits.

[2]     A copy of the South Coast's 2001 financial statement is attached as Exhibit A to the Declaration of Cabot Christianson (Christianson Declaration) submitted herewith.

[3]     Klukwan, Inc., is a native corporation created under the Alaska Native Claims Settlement Act, 43 U.S.C. § 1601 et seq., currently based in Haines, Alaska. Klukwan is a holding company, owning a number of subsidiaries including South Coast, a construction company in Southeast Alaska.

the sole shareholder of South Coast, continued to fund South Coast until one its lender

declared it in technical default of its own financial covenants and swept over $13 million

from its bank accounts in May 2002.[4]  The bank sweep left Klukwan without the ability to

subsidize South Coast's mounting losses.

　　　While considering its options in May 2002, South Coast notified its surety, Travelers,

of its situation.  Klukwan and South Coast had individually entered into *General Agreements*

*of Indemnity (Indemnity Agreements)* under which they agreed to indemnify Travelers for any

losses Travelers sustained on payment and performance bonds issued on South Coast's jobs.[5]

　　　In June 2002, Klukwan seriously considered bankruptcy.  The company went so far

as to obtain approval for the filing Chapter 11 bankrutpcy to provide the time necessary to

deal with South Coast's financial problems.[6]  Travelers was aware of this possibility.[7]  The

parties, however, preferred that South Coast and Klukwan not file for bankruptcy.  Based

upon assurances from Travelers that it would compromise Klukwan's total liability and

"work with it," South Coast voluntarily entered into *Acknowledgment of Default and*

*Indemnification Letters* for all of its outstanding jobs on June 13, 2002.[8]  This was critical

---

[4]　　Deposition of Thomas L. Crandall (Crandall Dep.), p. 34, lines 6-13. The pertinent pages of the Crandall Deposition are attached at Tab A of the Spraker Declaration, and are reference as "p. x, lines y."

[5]　　The *Indemnity Agreements* were actually executed in favor of Traveler's predecessor Reliance Surety Company.  Copies of the *General Agreements of Indemnity* have previously been attached as Dep. Ex. 32, to the *Declaration of James T. Hopkins* filed in support of Travelers' *Motion for Summary Judgment* (hereafter, "Travelers Ex. xx."). Klukwan has not reproduced Travelers' exhibits cited herein.

[6]　　Crandall Dep., pp. 35, 16-24; 41, 9-11; 121, 1-6.

[7]　　Deposition of Charles Langfitt (Langfitt Dep.), p. 280, 22 - 281, 7.  A copy of the pertinent pages of the Langfitt Deposition are attached at Tab C of the Spraker Declaration.

[8]　　Crandall Dep. p. 120, 17 - 121, 6; 469, 5-13.

to Kukwan as it did not have capacity to pay the anticipated total net loss.  If Travelers

insisted upon full payment, Klukwan would have had no choice but to file for bankruptcy.

Based upon the *Acknowledgments,* Travelers assumed South Coast's obligations on the

existing construction contracts (the "Bonded Projects"), and ran eight projects that remained

to be completed.  Travelers losses, net of all payments or receipts, are roughly $11.5 million.[9]

## A.    The Negotiation of the Repayment Agreement.

Almost immediately after Klukwan turned over the construction projects to Travelers,

the parties entered into settlement negotiations regarding Defendants' liability under the

*Indemnity Agreements.*[10]  On July 17, 2002, roughly a month after South Coast turned over

its jobs to Travelers, the parties met in Juneau to continue settlement discussions.[11]  As a

---

[9]      To date, Travelers total out of pocket loss on the South Coast bonds is $11,476,858.43
calculated as follows in Travelers' accounting:

| | | |
|---|---|---|
| Indemnity | $ | 26,784,694.45 |
| Misc Credits | $ | (11,955,696.02) |
| Expenses | $ | 395,206.41 |
| Salvage | $ | (1,708,085.98) |
| Net Paid | $ | 13,516,118.86 |
| | | |
| Payments from Klukwan | $ | (1,915280.95) |
| Royal Insurance Settlement | $ | (500,000.00) |
| Marsh & Brady Settlements | $ | (100,000.00) |
| Litigation Expenses | $ | 476,020.52 |
| Travelers Total Net Loss | $ | 11,476,858.43 |

This above information is taken primarily from Exhibits A, C, and D to Traveler's *Responses to Second
Discovery Request,* attached as Dep. Ex. 301 to the Spraker Declaration.  The "Payments from Klukwan" is
taken from an accounting provided from Travelers forwarded on June 6, 2006, attached as Dep. Ex. 58.

[10]      Langfitt Dep. 235, 20 - 24.  On June 22, 2002, Tom Crandall forwarded a written settlement
proposal to Charles Langfitt with Travelers.  Dep. Ex. 35.  On July 2, 2002, Langfitt responded with a
counterproposal.  Dep. Ex. 154.

[11]      Crandall Dep., pp. 137, 4-16; 138, 11-25; 139, 1 - 10.; Langfitt Dep., pp. 282, 23 - 283-286.

result of that meeting, the parties agreed to limit Klukwan's liabilities under the *Indemnity Agreements* to total payments of principal and interest in the amount of $8 million, to be paid over eight (8) years.[12]

The parties spent the next several months negotiating the provisions and language of agreement. On December 14, 2002, the Klukwan entities signed the *Repayment Agreement*. Thomas L. Crandall, as president of Klukwan, signed the associated *Promissory Note* in the principal amount of $5,388,306.48.[13]  Klukwan and Chilkat's Portage Cove Development Company executed a separate *Guaranty Agreement* to guaranty South Coast's obligation to pay the promissory note in the principal amount of $5,388,306.48.[14]  Both the promissory note and *Guaranty Agreement* were also signed on December 14, 2002.[15]  Travelers executed the *Repayment Agreement* on January 23, 2003.

The *Repayment Agreement* was premised upon Traveler's projected total losses, and its representations that net losses would exceed $8 million.[16] The intent of this provision was to reduce Klukwan's liability under the *Repayment Agreement* in the event that Travelers' total net loss was less than $8 million.[17]

---

[12]     Crandall Dep., p. 137, 15-18; 453, 18 - 454, 16; Christianson Dep., p. 62, 14-21.

[13]     Travelers Ex. 42.  The parties disagree as to the balance currently owing under the Promissory Note, and anticipate filing a separate motion to address those issues.

[14]     A copy of the executed promissory note is attached as Exhibit B to Travelers' Exhibit 42.

[15]     Dep. Ex. 43.

[16]     Travelers' Ex. 42, ¶ 9.

[17]     Crandall Dep. p. 150, 15 - 151, 4; 514, 6-14.  See also Declaration of Thomas L. Crandall, Dep. Ex. 11, previously filed at Docket No. 31 in the instant case.

At Travelers' insistence, an additional provision was added to penalize Klukwan for filing bankruptcy. Throughout the negotiations, both parties realized that bankruptcy remained a realistic possibility for Klukwan despite its settlement with Travelers.[18] Travelers insisted that if the Klukwan entities ever voluntarily filed for bankruptcy, they would be liable for the full amount of Travelers' loss "according to the terms of the *Indemnity Agreement*."[19] As a result, Klukwan remains potentially liable for the entirety of Travelers' net loss and must reflect this possibility in its financial statements.

Travelers sets forth its interpretations of numerous additional provisions of the *Repayment Agreement* within its factual recitation in an attempt to demonstrate that the agreement definitively and exclusively governs the parties' pursuit of negligence claims against Klukwan's accountants, Peterson Sullivan. It is clear, however, that such claims were far from their minds when negotiating the agreement. As of the parties' July 17, 2002, meeting where the parties agreed to the principal terms of the settlement, there were simply more pressing matters requiring immediate attention from the parties.[20] The only claims or

---

[18]     Crandall Dep., p. 41, 13-15; 42, 7-13; Langfitt Dep., p. 281, 5-8.

[19]     *See* Letter dated August 30, 2002 from Langfitt to Christianson and revised *Repayment Agreement*, a copy of which is attached as Dep. Exhibits 41 and final *Repayment Agreement*, ¶ 11. *See also* Deposition of Cabot Christianson (Christianson Dep.), pp. 64, 4 - 65, 8. The pertinent pages of the Christianson Deposition are attached as Tab B to the Declaration of Gary Spraker. Klukwan does not agree that the penalty would be enforceable in bankruptcy. Regardless of the enforceability of the provision, Travelers maintains that Klukwan would be fully liable for the total net loss under this provision if Klukwan ever filed for bankruptcy.

[20]     Christianson Dep., pp. 80, 11 - 82, 15. In the underlying litigation, Travelers produced an e-mail exchange between Langfitt and David Hompach, in Travelers' surety department in June 2002, in which Langfitt stated that he had "Jordan looking at E &O claim against CPA's." In a subsequent affidavit, however, Langfitt confirmed, "I do not have a specific recollection of the exchange or of being on inquiry notice of and starting an inquiry into Peterson Sullivan's negligence in June of 2002. To the contrary, my recollection is as stated in my Affidavit on Sanctions. That is, my recollection is that I did not consider those items until after

causes of actions against third parties that had been discussed were Klukwan's separate potential claims against Key Bank for the sweep of Klukwan's bank accounts.[21] Understandably, Klukwan's, South Coast's, and Travelers' attention was fully occupied by the take over of South Coast's remaining projects, and the negotiation of the settlement.

After the July 17, 2002, meeting between Travelers and Klukwan, the parties quickly memorialized the substance of the settlement. Cabot Christianson, Klukwan's counsel, prepared the first draft of the *Repayment Agreement,* which was forwarded to Charles Langfitt on August 1, 2002.[22] That draft contained the amount of the note, the bankruptcy penalty, and the provision for reduction of Klukwan's liability in the event Travelers' total net loss fell below $8 million.[23] The draft simply states that the agreement "covers the Continuing Agreements of Indemnity Contractor's Forms dated March 1, 1999, December 18, 1995, and February 23, 1996 (collectively, "Indemnity Agreements") issued by SCI and its affiliates, in favor of Travelers, or its predecessors in interest, and the Payment and Performance Bonds (Bonds) issued by Travelers listed on Exhibit A, concerning the construction contracts (Bonded Projects) listed therein."[24]

---

October 1, 2002." A copy of the *Affidavit of Charles W. Langfitt in Support of Travelers' Opposition to Peterson Sullivan's Motion for Summary Judgment on Statute of Limitations* is attached as Dep. Ex. 133.

[21]    Crandall Dep., pp. 140, 2-7; 449, 17-23.

[22]    Dep. Ex. 40.

[23]    *Id.* at ¶¶ 4 and 6.

[24]    *Id.* at ¶ 1.

Langfitt responded on August 30, 2002, with numerous changes to the original draft prepared by Cabot Christianson, including a definition of Bonded Contracts.[25] Langfitt defined the term to "mean any contract that is referenced or described in any Bond issued on behalf of any Klukwan Entity."[26] Travelers now seizes on this definition to argue that any recovery from Peterson Sullivan, and now from cross-defendant Jan Sokol, would not reduce Klukwan's "total loss."[27] In essence, Travelers asserts that it has a right to collect $8 million from Klukwan under the Repayment Agreement, as well as an additional $8,876,788.68 sought in its *Complaint* filed against Peterson Sullivan (and now against Jan Sokol), for a total recovery of $16.7 million on its total net loss of $11.5 million. Langfitt never disclosed this interpretation to Klukwan during the negotiations.[28]

This is certainly contrary to Klukwan's understanding of the provision, the purpose of the *Repayment Agreement,* and the dealings of the parties.[29] It was also inconsistent with Langfitt's view of other provisions of the *Repayment Agreement* which he views to require Klukwan to cooperate to reduce Travelers' "exposure under the bonds," because the Peterson

---

[25]    Dep. Ex. 41.

[26]    *Id.* at ¶ 1.

[27]    Langfitt Dep., pp. 191, 8-25,;192-194, 195, 1-13; Christianson, 80, 15-21.

[28]    *Id.* at 241, 5-10.

[29]    From the time the parties began to focus on the Peterson Sullivan claims, the debate has always been whether the recovery should be applied to first reduce Klukwan's obligations under the Promissory Note or to the $11.5 million total net losses. *See* Dep. Ex. 67 ("Tom asked how $ from any such recovery would be credited? I told him not against the $8 mil. note, but against the total loss we have. Tom asked what would happen if $ recovered exceeded the "other loss" not part of $8 mil. PN? Told Tom then would have to credit over, but remote chance."); Crandall Dep., p. 514, lines 6-14; Christianson Dep., pp. 192, 1 - 193, 18.

Sullivan claims were part of the exposure under the bonds.[30] As explained above, a material part of the agreement was the potential reduction of Traveler's "total loss", if it fell below $8 million. As of the date Langfitt inserted this provision, the only source of repayment to Travelers were the receipts from the contracts themselves.

Another of Langfitt's changes added a sentence to what became ¶ 11, entitled *Satisfaction of Liability*.[31] Pursuant to Langfitt's changes, the revised paragraph dealing with the scope of the release between the parties ended with the sentence: "This Agreement and the preceding sentences do not impair or release Travelers' claims or causes of action against any person or entity other than the Klukwan entities."[32] Langfitt also inserted a new ¶ 18 entitled *Non-Waiver/Conduct* to restate that its remedies were cumulative and non-exclusive.[33] The new paragraph provided that "[n]o failure or exercise on the part of Travelers to exercise, and no delay in exercising any right, remedy or power hereunder or any other agreement, or any other documents document executed and delivered to Travelers in connection herewith, shall in any way release or reduce the liability of SCI, Klukwan or CPC to Travelers hereunder, or under the Note or Guaranty or in any way reduce, condition or limit the obligations of SCI, Klukwan or CPC hereunder to Travelers."[34]

---

[30]   Langfitt Dep., p. 229, 1-12.

[31]   *Id.* at 231, 12 - 232, 24.

[32]   *Id.*

[33]   Christianson Dep., p. 86, 17 - 89, 11.

[34]   Dep. Ex. 41.

Travelers now proceeds to argue that Klukwan was aware and understood during the negotiations that Langiftt's changes would govern Klukwan's reliance upon Travelers' pursuit of the Peterson Sullivan claims and how proceeds of such an action would be applied. This is contrary to the plain meaning of the agreement, and far from reality.[35] As explained above, the parties' focus was fixed upon the transition of the existing jobs and the settlement of Klukwan's liability.[36] Traveler's negotiator, Charles Langfitt, has previously admitted the same. In an affidavit filed in the underlying action against Peterson Sullivan, Langfitt candidly explained:

> ... Travelers' primary concerns during the May through October 2002 time frame were to determine South Coast and Klukwan's current financial position and the current status of South Coast's projects so that Travelers could minimize the loss on bonded projects consistent with its payment performance bond obligations to owners, subcontractors, and suppliers, and maximize Travelers' recovery of contract funds from owners and indemnity from South Coast and Klukwan.[37]

---

[35]    Christianson has testified at his deposition that:

> Well, my understanding of the meaning of the sentence, and my understanding of the reason the sentence was put in there, was to reaffirm that in entering into the settlement agreement we were not impairing Travelers' rights to collect, for example, on the bonded contracts or to pursue whatever claims related to the work - - on the work - - the work on the projects that might've been performed, for example, if there was some subcontractor who did a poor job. There was never any discussion at all that I'm aware of at all in the sense of Travelers having a claim against somebody that's outside of the construction contracts themselves. And I have never had a whiff of an inkling that Travelers had a thought about going after - - pursuing its own claim against Peterson Sullivan or anybody else apart from the direct contract-related people.

Christianson Dep. p. 87, 8 - 88, 1.

[36]    Crandall Dep., p. 8-25.

[37]    *Affidavit of Charles W. Langfitt in Support of Travelers' Opposition to Peterson Sullivan's Motion for Sanctions,* ¶ 5. A copy of the *Affidavit* filed in *Travelers Casualty and Surety Company v. Gelbrich, et al.,* Case No. A04-0165 (RRB) is attached as Dep. Ex 253. *See also* Langfitt Dep., p. 153, 5-25.

This led Langfitt to conclude, "as of October 1, I did not anticipate obtaining salvage from anyone other than Klukwan."[38]  To now say that the *Repayment Agreement* expressly governs Klukwan's claims against Travelers for failing to timely file the Peterson Sullivan action ignores both the language and intent of that agreement.

### B.  Pursuit of the Peterson Sullivan Claims.

On June 2, 2003, roughly a year after South Coast had voluntarily turned over its construction jobs to Travelers, Langfitt and Crandall had a substantive discussion about potential claims against South Coast's directors and officers and Peterson Sullivan.  Langfitt wanted to "get confirmation of what I understood to be the circumstances of what Tom [Crandall] was saying the wrongful acts were."[39]  Langfitt kept notes on that conversation. Even at this initial stage, Crandall was concerned about how the proceeds of any action would be applied:

> Tom asked how $ from any such recovery would be credited?  I told him not against the $8 mil. note, but against the loss we have. Tom asked what would happen if $ recovered exceeded the "other loss" not part of $ mil. PN?  Told Tom then would have to credit over, but remote chance. I explained we were out $22 mil. gross, net not sure, but may be $18 million....[40]

That same day Langfitt contacted Travelers' attorney, Jan Sokol, to advise him of a potential "malpractice claim against the CPA's.[41]

---

[38]     *Id.* at ¶ 6.  *See also* Langfitt Dep., p. 186, 1-12 ("I didn't actually start thinking that I had something or something further until, you know, October.")

[39]     Langfitt Dep., p. 187, 9-25; Dep. Ex. 67.

[40]     A copy of Langfitt's notes is attached as Dep. Ex. 67.

[41]     A copy of the June 3, 2003 email from Langfitt to Sokol is attached as Dep. Ex. 120.

Langfitt had Travelers' financial expert, Jordan Rosenfeld, review the financials for a possible cause of action.

Rosenfeld contacted Langfitt on June 16, 2003, informing him that he had conducted a preliminary look at South Coast's 1999 and 2000 financial statements.[42] Rosenfeld noted five items that "would warrant investigation;" (1) the early date of the financial statements, (2) the $2,800,078 in "underbillings" in the 2000 financials statements, (3) the high valuation for inventory, (4) the classification of the line of credit as a long term debt, and (5) including a "hung receivable" for $2,000,000 in accounts receivable.[43] Rosenfeld concluded by stating that he needed to review Peterson Sullivan's work papers "to determine the [sic] if the CPA did not meet the industry standard in the performance of the audit...."[44] He suspected, however, that upon review of the workpapers they would "find they did not review the status of projects as would be expected for an audit."[45]

The day after Rosenfeld forward his preliminary analysis to Langfitt, he emailed Tom Crandall a proposed letter for Klukwan to send to Peterson Sullivan asking for its workpapers.[46] Langfitt told Rosenfeld that Tom was interested in helping on the accountant action, and Klukwan was considering its own action.[47] Travelers contacted Crandall and

---

[42]    A copy of the June 16, 2003 email from Rosenfeld to Langfitt is attached as Dep. Ex. 143.

[43]    *Id.*

[44]    *Id.*

[45]    *Id.*

[46]    A copy of the Rosenfeld email to Crandall dated June 17, 2003, is attached as Dep. Ex. 80.

[47]    Langfitt Dep., p. 201, 2-12, Dep. Ex. 143.

asked that Klukwan request Peterson Sullivan's workpapers.[48]  Travelers confirmed it was "looking at their options to recover against Peterson & Sullivan for any loss."[49]

Klukwan was willing to request the work papers.  By that time, Klukwan understood that any action Travelers brought against Peterson Sullivan would inure to its benefit by either reducing its direct liability or the total loss.  Klukwan was wary of requesting the workpapers while Peterson Sullivan was in the process of preparing the 2002 consolidated audited financials for Klukwan.[50]

Langfitt talked with Crandall about the negligence claims and work papers in early September after Peterson Sullivan completed the 2002 consolidated financial statements.[51] Crandall informed Langfitt that Klukwan would send the request within the next two weeks, though he doubted Peterson Sullivan would comply.[52]  Crandall again indicated that Klukwan was interested in pursuing Peterson Sullivan.[53] Langfitt recognized the realities of Klukwan's economic situation and later told Sokol and Rosenfeld in a confidential communication that "I anticipate they [Klukwan] will want to ride our coattails."[54]

---

[48]     Dep. Ex. 184.

[49]     *Id.*

[50]     A copy of the email from Rosenfeld to Langfitt dated July 21, 2003, is attached as Dep. Ex. 145.

[51]     A copy of the email from Langfitt to Sokol and Rosenfeld dated September 9, 2002 is attached as Dep. Ex. 121.

[52]     *Id.*

[53]     Langfitt Dep., p. 220, 3 - 221, 21.

[54]     *Id.*

Travelers had Rosenfeld call Crandall about the Peterson Sullivan action and to follow up the request for the workpapers.[55] Crandall had not yet sent the request for the workpapers. Crandall told Rosenfeld that based upon two reports prepared in early 2002, including one by Peterson Sullivan, "stating there existed a lack of internal controls there is grounds for thinking the audits were not conducted properly."[56] Crandall remained willing to send the request, but both he and Rosenfeld agreed that Peterson Sullivan were not likely to voluntarily produce the work papers.

The end of September saw a flurry of effort to obtain the accountant's work papers. Langfitt called Crandall on September 25, 2003 to discuss the Peterson Sullivan action. As a result of that conversation, Crandall informed Christianson that "[t]hey are changing their approach and will send a letter they want us to sign. I asked Chuck to send you a copy as well. Then if we have a question, we need to call him, otherwise, upon your advise, I will just execute."[57] On September 29, 2003, Sokol requested Peterson Sullivan's work papers noting that Tom Crandall consented to the release of the papers.[58] Sokol copied Crandall and Christianson with the letter.

---

[55]     A copy of the email from Rosenfeld to Langfitt dated September 17, 2003, and Langfitt's forward to Sokol is attached as Dep. Ex. 122.

[56]     *Id.*

[57]     A copy of the email from Crandall to Christianson dated September 25, 2003 is attached as Exhibit B to the Christianson Declaration.

[58]     A copy of the letter from Jan Sokol to Peterson Sullivan dated September 29, 2003, is attached as Exhibit C to the Christianson Declaration.

Christianson called Sokol on October 6, 2003, to discuss the production request.[59] Christianson and Crandall met the next day for two (2) hours on a variety of matters, including Peterson Sullivan issues.[60]  On October 8, 2003, Peterson Sullivan declined to produce the work papers, in large part due to the absence of Klukwan's consent.[61]  In response, Crandall sent a letter to Peterson Sullivan giving Kluwkan's consent to the production of the papers, and directing the firm to provide Sokol with the papers.[62]

On October 17th, Langfitt, Crandall, Sokol, and Christianson exchanged several emails regarding a second letter from Crandall to Peterson Sullivan.  Langfitt provided a draft letter again directing the production of the work papers for Crandall to review and send.[63]  Sokol sent the Peterson Sullivan response to Christianson.[64]  Christianson replied that he did not understand the basis for Peterson Sullivan's refusal to produce the work papers.[65]  Sokol concurred.[66]  That Monday, October 20, 2008, Crandall sent the letter Travelers had

---

[59]    A copy of the pertinent pages of Christianson, Boutin & Spraker's billing statements is attached as Dep. Ex. 170.  Under an agreement with opposing counsel the parties have agreed to a limited waiver of the attorney client privilege regarding communications pertaining to claims against Peterson Sullivan.

[60]    *Id.*

[61]    A copy of the letter from Ray Homdahl dated October 8, 2003, is attached as Dep. Ex. 187.

[62]    A copy of the letter from Crandall to John Ferris with Peterson Sullivan dated October 10, 2003 is attached as Travelers Ex. 82.  The date on the exhibit is October 3, 2006, which was the date the letter was reprinted for production in the instant action.  The actual date of the letter is referenced in the footer of the document.  *See also* Crandall Dep., p 300, 16-25.

[63]    A copy of Langfitt's email to Crandall dated October 17, 2003, together with Crandall's froward of that email to Christianson, is attached as Exhibit D to the Christianson Declaration.

[64]    A copy of the Sokol email and fax to Christianson, both dated October 17, 2003, are attached as Exhibit E to the Christianson Declaration.

[65]    *Id.*

[66]    *Id.*

drafted to Peterson Sullivan again requesting production of the work papers.[67] This activity culminated with Sokol writing to Peterson Sullivan's counsel, Mary Ecklund, once more requesting the production of the work papers noting again Klukwan's consent.[68]

On December 8, 2003, Crandall presented a litigation update to Klukwan's board of directors. In it Crandall disclosed a potential litigation captioned "Travelers v. Peterson & Sullivan."[69] Crandall described the matter as involving "[e]rrors and omissions case. Still unfiled. Klukwan and/or South Coast may participate in this."[70]

On Christmas Eve, Sokol responded to an email from Langfitt telling him that Peterson Sullivan's counsel had rejected the request. Sokol wrote that he would "draft a petition to file in the Western District of Washington."[71] The petition was Sokol's idea to file a miscellaneous action to compel Peterson Sullivan to produce the work papers under Fed.R.Civ.P. 27(a).[72] Sokol believed that the federal rules permitted an action to compel production of documents without bringing a substantive action, and was moving towards filing such an action.

---

[67]    A copy of the Crandall letter to Ray Holmdahl dated October 20, 2003 is attached as Dep. Ex. 81; Crandall Dep., p. 299, lines 6-25, 300, 1-11.

[68]    A copy of Sokol's letter to Mary Ecklund dated December 15, 2003 is attached as Exhibit F to the Christianson Declaration.

[69]    A copy of the Klukwan board update dated December 8, 2003, is attached as Dep. Ex. 189.

[70]    Id.

[71]    A copy of Sokol's email to Langfitt dated December 24, 2003 is attached as Dep. Ex. 263.

[72]    Langfitt Dep., p. 224, 3-23.

In the beginning of the new year, Klukwan began to focus upon its claims against Peterson Sullivan, including examination of the legal elements of such a claim.[73] On January 9, 2004, Sokol emailed Christianson to tell him he wanted to file a federal action to compel Peterson Sullivan to produce its work papers prior to commencement of any substantive action.[74]    Sokol believed that the chances of success would increase if Klukwan participated.[75]

Klukwan told Travelers that it disagreed that the work papers were needed prior to bringing any substantive action.[76]    Nonetheless, Klukwan believed that such an action reflected further progress in getting Travelers to bring an action against Peterson Sullivan.[77] It was certainly willing to proceed with any action to continue towards that aim.  By this time, however, Klukwan continued to have financial problems.  Klukwan wanted to extract some concession from Travelers for its continued participation.  In particular, Klukwan wanted to remove the bankruptcy provisions and convince Travelers to apply proceeds from the substantive action to its note balance.[78]  Christianson and Sokol spoke on January 20, 2003 "regarding claims against accountants," in which Christianson asked why Travelers was

---

[73]    Christianson Dep., pp 114-134.

[74]    A copy of Sokol's email to Christianson dated January 9, 2003, is attached as Dep. Ex. 83. Christianson, p. 182, 16-20.

[75]    Crandall Dep., p 306, 10 - 307, 9.

[76]    Crandall Dep., pp. 297, 20 - 298, 16; 303, 17-22; 377, 3-16; 444, 23 - 445, 25, 446, 1-25. Christianson Dep., pp. 180, 14 - 181, 17.

[77]    Christianson Dep., p. 190, 3-22.

[78]    *Id*. at pp. 192, 10 - 193, 25; 194, 1-12.

not bringing the substantive action and how proceeds of the substantive action would be applied.[79] Following the conversation with Christianson, Sokol spoke with Langfitt regarding "pursuit of claims, sharing arrangement and release of poison pill from settlement."[80] As a result of that conversation, Sokol wrote back to Christianson:

> I spoke to Chuck concerning our conversation yesterday regarding possible actions against the accountants. Chuck previously discussed some of these issues with Tom Crandall. Chuck may be willing to make some concessions in the settlement agreement, but it will take some cash payments to Travelers to do so. Please have Tom contact Chuck directly to discuss this issues.[81]

During these discussions Klukwan continued to evaluate its claims against Peterson Sullivan by examining both the law and facts. Christianson had legal research done on the elements of potential claims against Peterson Sullivan.[82]   Christianson and Crandall continued an ongoing discussion of potential claims against the accountants for failing to adequately prepare and state South Coast's financial statements for the year ending December 31, 2000.[83] This lead Christianson to send Crandall a detailed email on February 6, 2004, raising a number of items and concerns for any claims Klukwan might assert.[84]

---

[79]     Copies of the pertinent pages of Sokol's billing statements are attached as Dep. Ex. 209 (Bates No. 75668); *see also* Christianson Dep. pp. 190, 23 - 191, 25.

[80]     *Id.*

[81]     *Id.*

[82]     Christianson Dep. pp. 114, 25 - 115, 21; 121, 12 - 122,3; Travelers Ex. 170, 176, 178.

[83]     Christianson Dep., pp 145, 21 - 25; 146-147, 148, 1-15. Dep. E.xs. 177, 180, *see also* Travelers Exs. 176 and 178.

[84]     Travelers Ex. 177.

Klukwan was actively and seriously taking the steps necessary to prepare an action against Peterson Sullivan. By this time, however, Travelers had made it abundantly clear to Klukwan that it was seriously pursuing a suit against Peterson Sullivan.[85] Klukwan understood that Travelers' damages would be for the total net losses it sustained on South Coast's bonds.[86] At this point neither Travelers or Klukwan had any idea what assets or insurance Peterson Sullivan might have to satisfy any judgment that might be entered.[87] Given that Travelers' net losses were estimated to be approximately $12 million, it was highly unlikely that Peterson Sullivan would be able to satisfy any liability in excess of the Travelers' claims.

Klukwan continued to struggle financially after South Coast's collapse. This was known to Travelers and Klukwan was attempting to obtain concessions on the *Repayment Agreement* prior to agreeing to the action to compel the work papers.[88] It made no sense for Klukwan to waste its limited resources to pursue a claim against Peterson Sullivan when Travelers was pursuing essentially the same claim for the same losses.[89] Christianson told Sokol "that if he [Travelers] was going to go forward that there was very little chance that

---

[85]     Crandall Dep., pp. 480, 6 - 481, 23; Christianson Dep., p 198, 7-22; 199, lines 5-25.

[86]     Crandall Dep., p. 412, 4-10. Christianson Dep., p. 22-25.

[87]     Travelers discovered that Peterson Sullivan had a $10 insurance million policy on March 10, 2005. Dep. Ex. 244.

[88]     Klukwan continued to provide its financial statements to Travelers in 2003 and 2004. Crandall Dep., p. 355, 24 - 356, -2. *See also* Christianson Dep., p. 231, 24 - 232, 16.

[89]     Crandall Dep., p.389, 2-14, 481, 10 - 23; Christianson Dep., pp 196, 15-25; 198, 7-22.

we [Kluwkan] would go forward."[90]   Although Klukwan had entered into a settlement

agreement to cap its total obligation owed to Travelers, it was still obligated to pay a total

of $8 million to Travelers, and potentially the full amount of the net losses if it had to file

bankruptcy. The potential liability for the full losses had real consequences to Klukwan, and

it was required to report the potential liability in its consolidated financial statements.[91]

On February 9, 2004, Sokol emailed Christianson to ask whether Klukwan would

agree to proceed with the action to compel production of the work papers.[92]  As proposed,

Sokol would jointly represent both Travelers and Klukwan in the petition.  Christianson

wrote back the next day:

> Jan -
>
> These documents look good.  I am forwarding them to Tom Crandall, and he
> will fax you the signature page.
>
> This email will confirm our previous discussions that Travelers will bear all
> costs associated with bringing this suit and will indemnify Klukwan from any
> claims associated with the bringing or prosecution of this suit.
>
> If Travelers wishes to bring a substantive action against P&S, Klukwan's
> expectation is that the net litigation proceeds from that suit will be applied
> first to the Klukwan/SCI note to Travelers.  Also, as you are aware, Klukwan
> is considering its own action against P&S, and has developed some ideas
> about how to proceed.  You and I should discuss.[93]

---

[90]     Christianson Dep., p. 281, 14 - 282, 19; 285, 4-18.

[91]     Crandall Dep., pp. 176, 7 - 177, 19; 227, 14- 228,17; 516, 7-17; 569, 25 - 570, 8.

[92]     A copy of the email from Sokol to Christianson dated February 9, 2004, is attached as Dep.
Ex. 86.

[93]     A copy of the Christianson email to Sokol dated February 10, 2002 is attached as Dep. Ex.
88.

Sokol forwarded the email to Langfitt, asking "I never agreed to indemnify Klukwan. However, I don't see much risk. what do you think?"[94] Langfitt responded:

> We can indemnify them, but I am not agreeable to crediting any recovery against the note. We are paying the costs, they are getting a free ride and it was never a part of the deal. We will have a loss in excess of the note, and we should be able to apply any recovery there, not against the note. If they will not co-operate, let me know, and I will review the Agreement and determine if their failure to do so is a default.[95]

Langfitt acknowledges that the "free ride" reference applied to both the action to get the work papers and any subsequent action.[96]

Sokol's time records indicate that he did not speak with either Langfitt or Christianson regarding this matter. Instead, he sent an email to Christianson agreeing that Travelers would bear the costs of the suit and indemnify Klukwan for any claims that arose out of it. With regard to the application of the proceeds from the substantive action, Sokol wrote:

> ... I know Chuck and Tom have discussed this. While Travelers understands Klukwan's expectation, it is not consistent with the prior arrangement between Klukwan and Travelers. Rather than continuing to disagree at this point, let get the petition filed and review the documents received. We may be disagreeing about nothing if the documents do not yield viable claims.[97]

---

[94]    A copy of the Sokol email to Langfitt dated February 10, 2002, and Langfitt's response dated February 11, 2002, is attached as Dep. Ex. 149.

[95]    *Id.*

[96]    Langfitt Dep., p. 248, 2-18.

[97]    A copy of the Sokol email to Christianson dated February 13, 2002 is attached as Dep. Ex. 150; *see also* Crandall Dep., p. 317, 5- 318, 3.

Klukwan signed the revised petition and returned the document to Sokol on February 17, 2004. Sokol filed the action in the District Court for the Western District of Washington on February 20, 2004. Sokol proceeded to brief the petition in March 2004, providing Crandall and Christianson with copies of all the filings. Christianson and Sokol exchanged emails regarding the status of the action in early April. [98] On April 14, 2004, the District Court denied the petition. [99]

The same day the District Court denied the petition, Sokol sent an email to Langfitt suggesting that they talk when Langfitt returned to his office to "determine where we are headed."[100] He also advised that, "we should be mindful of the statute of limitations; however, it is unclear to me when we would have 'discovered' the wrongful acts because we are still trying to determine if there were wrongful acts."[101]

Concerned about the substantive action against Peterson Sullivan, Crandall emailed Langfitt: "I saw were [sic] we were unsuccessful in gaining access to the audit workpapers. Can you let me know what Travelers plan to do next?"[102] After Crandall had sent the email,

---

[98]    A copy of the Christianson email to Sokol dated April 5, 2004, and Sokol's reply, is attached as Exhibit G to the Christianson Declaration.

[99]    Dep. Ex. 123.

[100]   Dep Ex. 124.

[101]   *Id.*

[102]   A copy of the Crandall email to Langfitt dated May 5, 2004, and Langfitt's response dated May 26, 2004, is attached as Dep. Ex. 90. *See also* Crandall Dep. 319, 19 -320,25.

Langfitt directed Sokol to confer with Jordan Rosenfeld to determine whether there was
enough to bring an action against Peterson Sullivan.[103]

On May 29, 2004, Langfitt responded to Crandall that "[w]e are reviewing filing suit.
We will keep you posted."[104] Klukwan viewed the response as "conveying the message that
the ball was in Travelers' court to get back to us on the issue of what's going to happen with
Peterson & Sullivan."[105] Rosenfeld conducted another review of the information available,
and after an exchange with Sokol in early June, 2004, concluded that the information
available was sufficient to maintain an action for negligence against Peterson Sullivan.[106]
At the end of the email discussion, Sokol concluded "I assume we will need to contact
Crandall and Cabot once we have our plans finalized."[107] Although Sokol prepared a draft
complaint by June 21, 2004, the complaint was not filed until August 4, 2004.

During this period, Klukwan continued to understand that Travelers would pursue
Peterson Sullivan. Yet, it also remained prepared in the event Travelers elected not to sue.
On July 6, 2004, Christianson responded to an audit letter requesting a summary of all
existing and potential litigation. The response stated that "SCI and/or Klukwan have

---

[103]    A copy of the email from Langfitt to Sokol dated May 10, 2004 is attached as Dep. Ex. 144

[104]    *Id.*

[105]    Christianson Dep. pp. 275, 22-276,5; Crandall Dep. p 485, 4-20.

[106]    Dep. Ex. 235.

[107]    A copy of the email from Sokol to Langfitt dated June 10 , 2004, is attached as Dep. Ex.127.

potential litigation claims against Peterson Sullivan and also against SCI's former directors. SCI and Klukwan have not decided whether to pursue those motions."[108]

Travelers sued Peterson Sullivan together with directors of South Coast in *Travelers Casualty and Surety Company of America v. Gelbrich*, Case No. 04-0165 RRB (D. Alaska) (the, "Peterson Sullivan action"). Once the lawsuit was filed, Klukwan's attention was diverted to requests for defense and indemnification from the directors, and insurance questions.[109] On August 9, 2004, Christianson spoke with Crandall, regarding Travelers lawsuit and other issues for .7 of an hour.[110]

On September 29, 2004, however, Christianson, Crandall, and Langfitt spoke for roughly 1.3 hours on a variety of topics including the P&S claims. During this conference call, the parties discussed the discovery that Klukwan's insurance broker Brady & Company/Marsh did not properly provide notice of potential claims against South Coast's directors. Travelers inquired whether Klukwan would assign those claims to Travelers. Kluwkan again asked whether any proceeds from claims would be applied to the note. The parties also discussed outstanding indemnification matters. Christianson also advised Langfitt that Klukwan believed its claims against the directors were barred by the *Repayment*

---

[108]     A copy of the Christianson letter to KPMG, LLP dated July 6, 2004 is attached as Dep. Ex. 181.

[109]     Crandall Dep. p. 280, 9 - 281, 11; 284, 1 - 13;  Christianson Dep. p. 144, 8-20.

[110]     CB&S Billing Statement, Dep. Ex. 170.

*Agreement.* Christianson also advised Langfitt that Klukwan was considering joining the action against Peterson Sullivan.[111]

Klukwan held a special meeting of the board of directors to consider, among other things, whether to join the law suit. Because Travelers sought over $8 million in its lawsuit, and the damages Klukwan would seek would largely duplicate the same amounts, Klukwan again decided to forego its action and rely upon Travelers's action.[112]

Unfortunately, Klukwan's position with regard to the director claims soured the previously cooperative relationship between Klukwan and Travelers.[113] Christianson wrote to counsel for the directors to advise them of Klukwan's understanding regarding the relationship between the *Repayment Agreement* and Traveler's action against them.[114] Sokol responded by letter dated November 17, 2004, complaining that Klukwan's position was "a direct interference with Travelers' attempt to mitigate its losses caused by Klukwan and South Coast....."[115] Sokol also gave notice of Klukwan's failure to pay the November settlement payment. Sokol wrote again on December 16, 2004, complaining that Klukwan's

---

[111]    *Id.*

[112]    Crandall Dep. p. 407, 11 - 24.

[113]    Langfitt Dep. pp. 259, 5-7; 265, 11 - 266, 6; Deposition of Jan Sokol (Sokol Dep.), p 224, 15 - 225, 21. The pertinent pages of the Sokol Deposition are attached at Tab D of the Spraker Declaration.

[114]    A copy of the Christianson letter dated November 9, 2004 is attached as Dep. Ex. 196.

[115]    A copy of the Sokol letter dated November 17, 2004 is attached as Dep. Ex. 78.

position with regard to the directors "as a direct interference with Travelers' attempt to mitigate the losses caused by Klukwan and South Coast ...."[116]

Over the next 13 months Travelers proceeded to litigate its claims against Peterson Sullivan. In August 2004, Travelers was preparing to travel to Haines, Alaska to review documents at Klukwan's offices. Peterson Sullivan moved to dismiss Travelers claims as untimely. Judge Beistline granted the motion and dismissed the action as barred by the statute of limitations based upon "'the Sutor Report and Peterson Sullivan Report, Mr. Langfitt's deposition and affidavit, and [Plaintiff's] Large Loss Analysis,' as well as the 'June 19 and 20, 2002 emails submitted in the joinder to the motion filed by [D]efendant Jerald Renich,' further convince the Court that Plaintiff had 'sufficient information to prompt an inquiry in the cause of action.'"[117]

## C.   <u>Procedural History.</u>

By September 2005, Klukwan's finances had deteriorated to the point where it could no longer make the monthly payments required under the Promissory Note. Klukwan attempted to renegotiate its obligations to recognize its financial reality. Travelers chose to enforce its rights under the Promissory Note. In March 2006, Travelers brought the instant action seeking to recover the total remaining principal and all interest, present and future, under the Promissory Note.

---

[116]     A copy of the Sokol letter dated December 16, 2004 is attached as Dep. Ex. 79.

[117]     Order Granting Motion for Summary Judgment, *Travelers Casualty and Surety Company of America v. Gelbrich, et al.*, Case No. A04-0165 CV (RRB).

Klukwan contested Traveler's calculations of the amounts owed under the Promissory Note, and asserted counterclaims for Travelers' failure to timely bring the Peterson Sullivan action. Klukwan also sued Jan Sokol and his law firm for their failure to timely file the action. In August 2007, Travelers also sued Sokol for the failure to timely file the Peterson Sullivan action, claiming that the failure to timely file the lawsuit constituted negligence.

## ANALYSIS

Travelers seeks summary judgment to dismiss Klukwan's claims that it was negligent in filing the Peterson Sullivan action untimely. It argues that its relationship with Klukwan is strictly limited to contractual obligations, and that Alaska law does not permit tort actions for purely economic loss. Although arguing that Traveler's relationship with Klukwan is purely contractual, it also contends that it owes no duty to mitigate its losses. Travelers misstates both the material facts and Alaska law.

In response to Travelers's action under the Promissory Note, Klukwan has claimed that the amounts due under the note must be reduced by what Travelers would have recovered if it had timely filed the Peterson Sullivan action. The offset is required by the avoidable consequences rule under Alaska law:

> It is a cardinal rule in the law of damages that a plaintiff, with an otherwise valid right of action, is denied recovery for so much of the losses as are shown to have resulted from failure on his part to use reasonable efforts to prevent them. This rule applies whether the action is in tort or breach of contract .... The imposition of this rule is a recognition that legal rules are designed not only to prevent and repair individual loss and injustice, but to

protect and conserve the economic welfare and prosperity of the whole
community.

*Anchorage Independent School District v. Stephens*, 370 P.2d 531, 533 (Alaska 1962).

Klukwan's offsets are presented as a claim for negligence and an affirmative defense

for failure to mitigate damages.  As recognized by the Montana Supreme Court in *Town

Pump, Inc. v. Diteman*, 622 P.2d 212, 216 (Mont. 1981), while the names applied to the

concepts may differ in tort and contract, the substantive effect remains the same:

> Whether one regards it as a rule under indemnity, or as an application of the
> principal of proximate cause, or of the rule requiring mitigation of damages,
> there can be no recovery for damages which might have been prevented by
> reasonable efforts of the claimant. *Brown v. First Federal Sav. & L. Ass'n. of
> Great Falls* (1969), 154 Mont. 79, 88, 89, 460 P.2d 97, 102.

Travelers, through its agent Jan Sokol, acted unreasonably by filing the action against

Peterson Sullivan untimely.  As a result of that unreasonable action, the amount Klukwan

owes is increased.  Whether viewed as a breach of duty in negligence, or failure to mitigate

damages in contract, Travelers must accordingly reduce its claim against Klukwan.

## I. TRAVELERS OWED KLUKWAN A LEGAL DUTY TO TIMELY BRING THE PETERSON SULLIVAN ACTION.

Travelers contends that Klukwan cannot state a claim for negligence because it did

not owe Klukwan any legal duty to timely bring its action against Peterson Sullivan.  Duty

is the first of the four well recognized elements Klukwan must prove to state its claim for

negligence, the others being breach of that duty, proximate causation, and damages.  *Alvey*

*v. Pioneer Oilfield Servs.,* 648 P.2d 599, 600 (Alaska 1982).[118] The instant motions address only the first two elements, and leave causation and damages for another day. As Travelers notes, the "first step in determining whether a negligence action can be maintained is to determine whether the defendant owed the duty of care under the circumstances." *Hawks v. Dept. of Public Safety,* 908 P.2d 1013, 1016 (Alaska 1995). Because the imposition of a duty of care involves policy considerations of whether a particular plaintiff is entitled to protection, whether a duty exists is a question of law. *Kooly v. State,* 958 P.2d 1106, 1108 (Alaska 1998). However, if the circumstances surrounding the events giving rise to the duty are in genuine dispute, summary judgment is inappropriate. *See Arctic Tug & Barge v. Raleigh, Schwarz & Powell,* 956 P.2d 1199, 1203 (Alaska 1998); *Saddler v. Alaska Marine Lines, Inc.,* 856 P.2d 784, 787 (Alaska 1993).

A cognizable tort duty may arise from "statute, regulation, contract, undertaking, the parties' preexisting relationship, or existing case law." *North Star Terminal & Stevedore Co. v. Nugget Construction, Inc. et al.,* 445 F. Supp. 2d 1063, 1075 (D. Alaska 2006) (citing *McGrew v. State Dept. of Health and Social Services, Div. of Family and Youth Services,* 106 P.3d 319, 322 (Alaska 2005)). If no such duty is recognized, or rejected, under these sources, Alaska courts apply "a multi-factor approach to determine whether an actionable

---

[118]    In *Alvey,* the Court noted that "[i]n order to overcome Pioneer's motion for summary judgment, Alvey must set forth specific facts showing (1) that Pioneer owed him a duty of care, (2) that Pioneer breached that duty of care, (3) that he was injured, and (4) that his injury was the proximate result of Pioneer's breach." Travelers' instant motion only challenges whether Klukwan has stated facts that support a duty of care to timely file the Peterson Sullivan action.

duty of care exists." *Id.*  The factors are set forth in *D.S.W. v Fairbanks N. Star Borough School District,* 628 P.2d 554, 555 (Alaska 1981), and are:

> [1] The foreseeability of harm to the plaintiff, [2] the degree of certainty that the plaintiff suffered injury, [3] the closeness of the connection between the defendant's conduct and the injury suffered, [4] the moral blame attached to the defendant's conduct, [5] the policy of preventing future harm, [6] the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and [7] the availability, cost and prevalence of insurance for the risk involved.

In the instant case, Alaska law imposes a legal duty upon those who assume to act to do so reasonably.  Travelers' assumption of pursuit of the claims against Peterson Sullivan, with knowledge of Klukwan's reliance, created a duty to do so reasonably by timely filing the action.  Whether the duty is applied under the Alaska precedent that imposes a duty upon those who undertake an action, or tested under the *D.S.W.* multi-factored analysis set, there is no *genuine* dispute of material fact that Travelers' owed any duty to Klukwan to timely file the lawsuit.

### A.    Having Chosen to Act, Travelers Owed Klukwan a Duty to Timely File the Peterson Sullivan Action.

In this case, Travelers' duty arises pursuant to its undertaking.  Alaska has "long recognized that a duty of reasonable care generally arises when a person undertakes an action and that 'one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully.'"" *City of Seward v. Afognak Logging,* 31 P.3d 780 (Alaska 2001) (quoting *Moloso,* 644 P.2d at 212 (quoting *Hammond v. Bechtel, Inc.,* 606 P.2d 1269, 1277 n.15 (Alaska 1980)); *Kay v. Dandbar, Inc.,* 132 P.3d 262, 270 (Alaska 2006);

In *Adams v. State,* 555 P.2d 235, 240 (Alaska 1976) the Alaska Supreme Court noted that "[i]t is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully..." There, the State undertook to inspect a hotel for fire hazards and concluded that there were extreme fire hazards. The inspector had promised to identify the hazards in a letter that was never written. A fire occurred several months after the inspection killing several guests. The State argued that it owed no duty to either the hotel or its guests. The Alaska Supreme Court quickly rejected those arguments and found that "the state assumed a common law duty by its affirmative conduct." *Id.* The state officials had undertaken the inspection, promised notification of violations, and then took no further action. Under these circumstances, the court had "no difficulty in determining that the state fire officials had a duty to proceed further with regard to the recognized hazards." *Id.*

In *Moloso v. State of Alaska,* 644 P.2d 205 (Alaska 1982) two heavy equipment operators were killed while working for a subcontractor on a State project. The State obtained a directed verdict dismissing the plaintiffs' negligence claims for lack of duty. The Alaska Supreme Court reversed. Plaintiffs successfully argued that because the State had previously stopped work on the project due to safety concerns, a cognizable duty arose "by assuming affirmative duties with respect to safety." *Id.* at 214. The Court agreed that the trial court erred in directing a verdict where a jury could reasonably find a duty existed as to whether the State assumed a duty to safeguard the plaintiffs.

In *City of Seward v. Afognak Logging,* 31 P.3d 780 (Alaska 2001) the plaintiff was contractually obligated to provide heavy equipment to the City of Seward. During a heavy rainfall, the City called for equipment to work on flooding surrounding a bridge. The City directed the plaintiff to move a bulldozer to the other side of the bridge knowing that the rainfall had washed out the road pavement on that side. The bulldozer bogged down in loose gravel and could not be retrieved for several days. Plaintiff incurred over $100,000 in repair costs. *Id.* at 782. Plaintiff asserted both contract and negligence claims against the City to recover the repair costs. The superior court dismissed the contract claims, but allowed the negligence claims to go to trial, where the jury awarded $89,000 in damages. On appeal, the City argued that the negligence claims should have been dismissed "because it owed only contractual duties to Afognak ....it had no legal duty to warn Afognak of hazardous job-site conditions." *Id.* at 783. The Alaska Supreme Court disagreed and affirmed the negligence award after applying the *D.S.W.* factors.

The Court found tort duties arise, independent of any contractual obligations, "when a person undertakes an action and that 'one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully." *Id.* at 784. The Court found that the City had assumed a duty through its employee's "active presence at the scene of the flooding and the specific action that he undertook by directing Johnson's flood control efforts point to the same conclusion as the *D.S.W.* factors: the city, as Ainsworth's employer, owed a reasonable duty of care toward Johnson and his bulldozer; and this duty applied to the city

even though Johnson, as an 'independent contractor,' might not have been contractually bound to follow Ainsworth's directions." *Id.*

Travelers's actions are comparable to those previously found by the Alaska Supreme Court to impose a duty of care. Both Klukwan and Travelers identified causes of action against Peterson Sullivan for negligently preparing the 2000 financial statements. Travelers undertook to prosecute the claims against Peterson Sullivan after jointly pursuing the workpapers, and knowing that Klukwan was forbearing from bringing its own action based upon Travelers' action. Klukwan and Travelers had a community of interests in reducing the project losses, and Travelers remained under a legal duty to mitigate those losses.

The course of conduct among the parties establishes a clear pattern and understanding between the parties that the action was being pursued for their joint benefit. From the beginning, Travelers and Klukwan conferred regarding the Peterson Sullivan action. Crandall and Langfitt spoke in June 2003 when the parties were just beginning to focus their attention on actions against third parties. Klukwan understandably wanted to apply any proceeds recovered from such actions first to reduce its liability under the Promissory Note. Travelers wanted to apply any recovery first to the net losses in excess of the promissory note, and only then to reduce the amounts under the Promissory Note. The point remains, however, that parties knew any recovery would reduce the total losses, and understood that there was a mutuality of interest in reducing those losses.

Klukwan and Travelers started a journey to obtain Peterson Sullivan's workpapers per Travelers' requests. As was ultimately proven, Klukwan was adamant that the

workpapers were unnecessary to determine whether there was a good faith basis to assert negligence claims against Peterson Sullivan.[119] Still, Klukwan willingly participated with Travelers to facilitate their prosecution of the negligence claims so Klukwan would not be forced to do so.

As would be expected, Travelers and Kluwkan communicated frequently. Usually Langfitt or the project manager, Mark Eckardt, would speak with Crandall, almost on a daily basis regarding a number of issues pertaining to South Coast's jobs. The proposed Peterson Sullivan action came up regularly.[120] From this Langfitt was well aware that Kluwan wanted to 'ride [Travelers'] coattails" in pursuing Peterson Sullivan.[121]

Klukwan again asked that the proceeds from any action against Peterson Sullivan be applied to Klukwan's debt under the Promissory Note immediately before proceeding with Travelers in the action to compel the production of the workpapers. Once again, Klukwan did not agree that it was necessary to obtain the workpapers before suing Peterson Sullivan for negligence, and advised Travelers lawyers as much.[122] Klukwan sought to convince Travelers to apply the proceeds from any substantive recovery to its note and remove the

---

[119]    Judge Beistline denied Peterson Sullivan's motion for sanctions under Rule 11 against Travelers for bringing the lawsuit.

[120]    Crandall Dep., pp. 472, 1-24; Langfitt Dep., p. 208, 18 - 209, 3.

[121]    Dep. Ex. 121; Langfitt Dep., p. 209, 23 - 210, 15.

[122]    Crandall Dep., pp. 297, 20 - 298, 16; 303, 17-22; 377, 3-16; 444, 23-25, 445, 1-25. 446, 1-25. Christianson Dep., pp. 180, 14 - 181, 17.

bankruptcy penalty because that contingency was adversely affecting its finances.[123]  In response, Langfitt privately complained to Sokol that Klukwan was getting a "free ride", and any recovery had to be applied to the total loss.[124]  Sokol simply responded, however, that the issue was premature and should be put off until later.[125]  Sokol then proceeded to represent both Travelers and Klukwan in the federal action to obtain the workpapers.

After the District Court dismissed the action to compel the workpapers, Crandall again contacted Langfitt to discuss the Peterson Sullivan action.  Crandall asked what Travelers intended to do?  Langfitt responded that "[w]e are reviewing filing suit.  We will keep you posted."[126]  At some point, Crandall became concerned enough that he raised the statute of limitations issue to Langfitt.[127]  After conferring with Sokol and Rosenfeld, Travelers decided to bring the suit.  At this point, Sokol concluded that they "need to contact Crandall and Cabot one we have finalize our plans."[128]  Travelers finally filed its complaint against Peterson Sullivan on August 4, 2004.

After Travelers filed its lawsuit, Klukwan still considered whether or not to join the action.  It ultimately chose not to precisely because Travelers had done so, and any recovery

---

[123]    Crandall Dep., pp. 176, 7 - 177, 19, Christianson Dep., pp 193, 4 - 194, 12; Langfitt Dep., pp. 243, 5 - 244, 5.

[124]    Dep. Ex. 149.

[125]    Dep. Ex. 150; Christianson Dep., p. 202, 17-20.

[126]    Langfitt Dep., pp. 208, 25 - 209, 15; Dep. Ex. 144.

[127]    Crandall Dep., p. 525, lines 21 - 526, 1

[128]    Dep. Ex. 210; Sokol Dep. 222, 13 - 223, 25.

that Klukwan would obtain would be for the same losses Travelers sought.[129]  Moreover, by the fall of 2004, Klukwan was engaged in numerous other law suits and actions related to the collapse of South Coast.  These other actions caused considerable strain on Klukwan's already thin finances.  Since Travelers was actively pursuing recovery against Peterson Sullivan, Klukwan believed there was no reason for it to waste its scarce resources in pursuing an action that would directly benefit Travelers.

Travelers invited Klukwan's reliance upon it by jointly pursuing the Peterson Sullivan claims to reduce the net losses.  Travelers will never expressly acknowledge this fact, but its actions speak louder than its denials.  Those actions are comparable to the State of Alaska's inspection of the hotel in *Adams*, the suspension of the construction project in *Moloso*, or Seward's control of the land in *Afognak Logging*.  Based upon its actions, there is no material dispute of fact that Travelers owed Klukwan a duty to timely bring its action against Peterson Sullivan.

**B.    Alaska Law Recognizes a Legal Duty Under the D.S.W.  Factors.**

In *Afognak Logging* the Alaska Supreme Court held that given the defendant's undertaking "virtually every *D.S.W.* factor points to the conclusion that the city owed an actionable duty to warn ...." 31 P.3d at 784. Because Alaska has previously recognized legal duties arising from undertakings, it is unnecessary to apply the *D.S.W.* multi-factor analysis. *See Karen L.,* 953 P.2d at 875 n. 9.  The same result, however, would apply if examined under the *D.S.W.* factors.

---

[129]    Crandall Dep., pp. 407, 18 - 408, 24; 412, lines 4-10.

The foreseeability and certainty of harm together with the direct connection and availability of insurance all weigh heavily in favor of imposition of a legal duty of care. Indeed, "the most important single *D.S.W.* factor is foreseeability...." *Department of Health & Social Services v. Sandsness*, 72 P.3d 299, 305 (Alaska 2003); *see also Mesiar v. Department of Fish and Game*, 964 P.2d 445, 450 (Alaska 1998).

Travelers was all too well aware that Klukwan expected the recovery from Peterson Sullivan to be applied to its debt, and if not then to the total net loss. It was clear that failure to timely sue Peterson Sullivan would damage both Travelers and Klukwan as they remained liable for the same loss. Moreover, Travelers cannot deny that Kluwkan was harmed because it now asserts the same harm against Jan Sokol and his law firm for failing to timely file the Peterson Sullivan action. Travelers originally sought roughly $8.9 million in damages in its Complaint. Shortly before dismissal Travelers had identified a damages theory under which Peterson Sullivan was liable for all of Travelers' losses.[130] Any recovery that reduced or eliminated Travelers' total net loss would have necessarily inured to Klukwan's benefit by reducing its total actual or potential liability. Travelers cannot argue now that it would not have been successful in the action against Peterson Sullivan. Accordingly, it was clearly foreseeable that the loss of the Peterson Sullivan lawsuit would certainly damage Klukwan.

There is also an obvious direct and immediate connection between Travelers' failure to timely file the Peterson Sullivan action and the injury suffered. As determined by Judge Beistline, Travelers failed to timely file the lawsuit, and as a result Travelers and Klukwan

---

[130] Dep. Ex. 219; Sokol Dep. 161, 17 - 163, 15.

were denied the ability to reduce the total losses incurred on the South Coast projects.

Again, Travelers is estopped to deny the connection as it is currently suing Sokol for the

same losses caused by the same failure to timely file the action.

Of the other *D.S.W.* factors, the burden upon Travelers to timely file its lawsuit was

inconsequential and imposed no additional obligations upon Travelers. Also, Travelers acted

through an attorney, Sokol. As a lawyer, insurance was clearly available and obtained,

further supporting the existence of a duty. *See generally Bolieu v. Sisters of Providence in*

*Washington,* 953 P.2d 1233, 1239 (Alaska 1998) (We take notice of the circumstance that

liability insurance is readily available to cover most personal claims alleging breach of a tort

duty of care.") As evidenced by the avoidable consequences rule, Alaska has already adopted

a strong policy against allowing persons that enlarge damages from recovering those

damages that could have been prevented. The only *D.S.W.* factor not present in this instance

is moral blame. *See Mesiar,* 964 P.2d at 451 (moral blame is not a "prominent factor" in

determining duty when the negligence creates a risk of economic harm only.")

In sum, as noted by the Court in *Afognak Logging,* applied to the defendant's

undertaking, virtually every D.S.W. factor points to the conclusion that Travelers owed

Klukwan an actionable duty. *Afognak Logging,* 31 P.3d at 784.

### C.    Travelers' Duty to Timely Bring the Peterson Sullivan Action Arises from the Parties' Conduct.

Based upon this Court's decision in *North Star Terminal & Stevedore Co. v. Nugget*

*Construction, Inc. et al.,* 445 F. Supp. 2d 1063 (D. Alaska 2006), Travelers argues that tort

duties are not actionable because the parties had previously entered the *Indemnity Agreements* and *Repayment Agreement*. Travelers misstates the holding of that case. In *North Star*, unpaid suppliers sued the subcontractor with whom they had provided services under a written contract. *Id.* at 1069 ("Plaintiffs contend that an express contractual relationship existed between them and Nuggett because of Nugget's alleged take-over of Spencer, with which Plaintiff contracted.") The suppliers also sued the general contractor for implied contract and negligence to recover monies owed based upon its alleged take over the subcontractor with whom the plaintiff had a direct contractual relationship.

In *North Star*, this Court concluded that' "liability to Plaintiff, if any, arises from Spencer's contracts with Plaintiffs." *Id.* at 1076. The Court denied summary judgment on the contract claims, based upon "hotly disputed issues of material fact." *Id.* at 1071. The Court did dismiss the negligence claims, but only because "[p]romises set forth in a contract must be enforced by an action on that contract." *Id.* at 1076. Because the plaintiff stated valid contract claims, the Court questioned whether "Alaska courts would impose a duty of care in the situation presented here. The relationships between the parties here are governed, at bottom by contract." *Id.* The existence of contractual claims between the parties differentiates *North Star* from the instant case where the contracts between the parties do not govern the conduct at issue.

Contrary to Travelers' argument, the mere existence of a contract between the parties does not automatically preclude a tort action. In *Jarvis v. Ensminger*, 134 P.3d 353 (2006), the plaintiff had an employment contract that provided an option to purchase shares in the

parent corporation if certain conditions were met. When denied the opportunity to purchase

those shares, the employee sued, asserting claims for breach of contract, negligent

misrepresentation, and promissory estoppel.

Judge Christian granted summary judgment that the defendants had not breached the

employment contract. She also dismissed the negligent misrepresentation and estoppel

claims. The Alaska Supreme Court reversed the superior court's dismissal of the negligent

misrepresentation claims. Pertinent to Klukwan's claims, the Alaska Supreme Court stated:

> We have recognized that "promises set forth in a contract must be enforced
> by an action on that contract. Only where the duty breached is one imposed
> by law, such as a traditional tort law duty furthering social policy, may an
> action between contracting parties sound in tort. As the New York Court of
> Appeals recognized in *NYU v. Continental Insurance Co., Inc.*:
>
> > A tort obligation is a duty imposed by law to avoid causing
> > injury to others. It is "apart from and independent of
> > promises made and therefore apart from the manifested
> > intention of the parties." Thus, [a] defendant may be liable in
> > tort when it has breached a duty of reasonable care distinct
> > from its contractual obligations, or when it has engaged in
> > tortious conduct separate and apart from its failure to fulfill its
> > contractual obligations.
>
> Thus a violation of a duty arising from contract - such as the duty to pay
> wages under an employment contract or tender payment for goods - does not
> give rise to a tort claim. However, when a party's actions violate a general
> duty of care, its actions may give rise to an action in tort, even if the violation
> also breaches a contract.

*Id.* at 363; *see also City of Seward v. Afognak Logging*, 31 P.3d 780 (Alaska 2001) *contrast*

*State of Alaska Department of Natural Resources v. Transamerica Premier Insurance*

*Company*, 856 P.2d 766, 772 (Alaska 1993) (Noting that tort damages are available against

design professional "because [in] such cases the duty of professional care is one that the law imposes, not the contract.")

Neither the *Indemnity Agreements*, nor the *Repayment Agreement*, impose any contractual obligations upon either party regarding pursuit of third party actions. Unlike *North Star*, the *Repayment Agreement* did not impose any contractual obligations upon Travelers to pursue Peterson Sullivan for which Klukwan might seek redress under a breach of contract claim.

## III.    ALASKA RECOGNIZES TORT CLAIMS FOR ECONOMIC LOSS.

Travelers also argues that the economic loss rule precludes Klukwan's tort claims because it seeks damages for economic loss only, as opposed to damages for personal injury or property damage. In support, it cites this Court's decision in *North Star* and Judge Singleton's decision in *St Denis v. Department of Housing and Urban Development*, 900 F. Supp. 1194 (D. Alaska 1995). Neither case supports the rule of law Travelers advances. Rather, Alaska has definitively rejected the *per se* application of the economic loss rule. Read in their proper context, *North Star* and *St. Denis* simply restate the proposition that actions arising from breaches of contract do not give rise to an independent duty that supports a tort claim.

The economic loss rule is a judicially created doctrine attempting to draw a line between the availability of contract and negligence claims where the only damages sought are economic. *Kennedy v. Columbia Lumber and Manufacturing Company*, 384 S.E. 2d 730, 736 (S.C. 1989). ("Where a purchaser's expectations in a sale are frustrated because the

product he bought is not working properly, his remedy is said to be in contract alone, for he

has suffered only economic losses.") In *St Denis,* Judge Singleton explained the economic

loss rule as follows:

> The majority rule is that a plaintiff complaining that she received
> consideration less valuable than what she expected, must sue on the contract.
> Even if the purchaser complains that defects actually rendered the property
> less valuable than she expected, she is still seeking damages for economic
> loss. In such cases, the purchaser is limited to the contract and has no
> separate tort action. [citations omitted] The majority rule excludes both strict
> liability and negligence claims where only economic loss is claimed and
> applies the principal generally to products liability cases, real property
> transactions and service contracts.

*Id.* at 1200.

In *St Denis* the plaintiff purchased a duplex from the Department of Housing and

Urban Development (HUD). Prior to the sale, HUD had inspected the property and

discovered latent defects in the roof. HUD did not disclose the problems to St. Denis.

Claiming reliance on the omission, St. Denis sued to recover the costs to repair those defects.

Judge Singleton specifically noted that St. Denis had claims for misrepresentation (under

Alaska law absent the Federal Tort Claims Act), breach of contract, and breach of the

implied warranty of habitability. St. Denis did not assert the contract claims, however,

because such claims could only be brought in the Court of Claims. *Id.* at 1198.

After reviewing Alaska common law, Judge Singleton noted that "... the Alaska rule

has solidified enough to the point that a plaintiff who claims that a product was defective and

seeks only damages for economic loss must sue on the contract and has no independent

action in tort unless she can show that the defect created a significant risk of personal injury

or property damage." *Id.* at 1200. The court concluded that "where contractual remedies exist, courts should hesitate to graft additional remedies in the absence of some good reason." *Id.* at 1206.

Judge Singleton did note that "the Alaska Supreme Court was, at one time, critical of any distinction between claims for personal injury and property damage on the one hand and economic loss on the other. It seemed willing to allow one in privity with the defendant to nevertheless sue in tort for economic loss traceable to a "negligent" breach of contractual duties." *Id.* at 1200. Judge Singleton cites *Mattingly v. Sheldon Jackson College*, 743 P,2d 356, 359-61 (Alaska 1987) for this proposition, although the Court did not engage in any substantive analysis of the decision. *Mattingly* is dispositive, however, in the instant case.

In *Mattingly,* the plaintiff provided commercial drain cleaning services as Harbor Mechanical, and had contracted with Sheldon Jackson College for a job. Sheldon Jackson excavated a trench pipe to be cleaned. The pipe collapsed, injuring Harbor Mechanical's employees. Harbor Mechanical sued for lost business damages from the absence of its employees. *Id.* at 358. The Alaska Supreme Court reversed the lower court's dismissal of Harbor Mechanical's negligence claims. Rather, it adopted the Supreme Court of New Jersey's decision in *People Express Airlines, Inc. v. Consolidated Rail Corp.,* 495 A.2d 107) (N.J. 1985) that "economic loss damages are recoverable despite a lack of physical damages or injury if suffered by persons in business comprising an identifiable class whom the defendant knows or has reason to know are likely to suffer damages." *Mattingly,* 743 P.2d at 356.

Quoting from the New Jersey decision, the Alaska Supreme Court rejected the "virtually *per se* rule barring recovery for economic loss unless the negligent conduct also caused physical harm...." *Id.* at 359. While the Court acknowledged the valid concerns against unbridled liability, it cited with favor the New Jersey Supreme Court's remarks:

> The answer to the allegation of unchecked liability is not the judicial obstruction of a fairly grounded claim for redress. Rather, it must be a more sedulous application of traditional concepts of duty and proximate causation to the facts of each case.
>
> .... The physical harm requirement capriciously showers compensation along the path of physical destruction, regardless of the status or circumstances of individual claimants. Purely economic losses are borne by innocent victims, who may not be able to absorb their losses... In the end, the challenge is to fashion a rule that limits liability but permits adjudication of meritorious claims.

*Id.* at 359-60 (quoting *Peoples Express,* 495 A.2d at 111).

The Court concluded "that principles of duty and proximate cause are instrumental in limiting the amount of litigation and extent of liability in cases in which no physical harm occurs just as they are in cases involving physical injury." *Id.* at 360. As such, the Court was clear that "[i]n adopting a rule permitting recovery for purely economic losses, we emphasize the role of foreseeability as it relates both to the duty owed and to proximate cause." *Id.* The Alaska Supreme Court wrote:

> We agree with the foregoing and hold that
>
> [A] defendant owes a duty of care to take reasonable measures to avoid a risk of causing economic damages, aside from physical injury [or property damages], to particular plaintiffs or plaintiffs within an identifiable class with respect to whom defendant knows or has reason to know are likely to suffer such damages from its conduct. A defendant failing to adhere to this duty

may be found liable for such economic damages proximately caused by its breach of duty.

*Id.* This lead the Alaska Supreme Court to conclude:

> In cases where plaintiffs may successfully recover for purely economic harm, it must be shown that

> > the defendants knew or reasonably should have foreseen both that particular plaintiffs or an identifiable class of plaintiffs were at risk and that ascertainable economic damages would ensue from the conduct. Thus, knowledge or special reason to know of the consequences of the tortious conduct in terms of the persons likely to be victimized and the nature of the damages likely to be suffered will suffice to impose a duty upon the tortfeasor not to interfere with economic well-being of third parties.

*Id.* at 360.

*Mattingly* unequivocally rejects the *per se* prohibition Travelers seeks to apply to Klukwan's claims. Rather than blindly dismiss negligence claims for economic loss, Alaska law requires the Court consider such claims on the merits recognizing that the elements of duty and causation will ferret out those claims that should not be allowed. This Court recognized as much in its decision in *North Star*, in which it explained:

> *Mattingly,* however, stands for the proposition that a party that is only economically injured can nonetheless sue for negligence, so long as a duty exists. It defines the parameters of an existing duty and does not, as Plaintiffs imply, impose a new duty where there otherwise would be none.

*Star,* 445 F. Supp.2d 1076 n. 42.

## IV.     TRAVELERS HAS FAILED TO MITIGATE ITS DAMAGES.

Klukwan disagrees that the contractual relationship between the parties precludes a negligence action for Travelers' failure to timely file the Peterson Sullivan action. Yet, contract law also clearly required Travelers to mitigate its damages. Alaska recognizes the duty to mitigate (or the avoidable consequences rule) as a "cardinal rule in the law of damages...." *Anchorage Independent School District v. Stephens*, 370 P.2d 531, 533 (Alaska 1962); *Redman v. Department of Education*, 519 P.2d 760, 769 (Alaska 1974). This rule applies as a rule of damages whether the action sounds in tort or contract, and precludes recovery "for so much of the losses as are shown to have resulted from failure on [Travelers'] part to use reasonable efforts to avoid or prevent them." *Id.*

In this case, Travelers' failed to timely file the Peterson Sullivan action. Travelers sought to recover roughly $8.9 million based upon Peterson Sullivan's negligence. The failure to timely file the Peterson Sullivan action was patently unreasonable. Travelers' current cross-claim against Sokol Stewart & Gray admits this fact. Travelers' action against Sokol also admits that the failure to timely file the Peterson Sullivan action has increased its total net loss. Because Klukwan is liable for at least part, and potentially all, of that net loss, the failure to timely file the action have unreasonably increased its total liability. Travelers has failed to mitigate its loss, and cannot collect from Klukwan the amounts it would have received from the Peterson Sullivan action.

Travelers attempts to deflect the application of avoidable consequences rule by limiting it to factually inapposite situations. Travelers argues that mitigation does not require it to file a lawsuit and cites numerous cases. In particular it cites *Danzas, Ltd. v.*

*National Bank of Alaska*, 222 F. Supp 671, 677 (D. Alaska 1963), for the proposition that mitigation requires only those actions that can be taken "with reasonable effort or trifling expense." These cases do not aid Travelers because its own actions establish that filing the lawsuit was a "reasonable effort." It ***did*** file the Peterson Sullivan action. It cannot now argue that filing the suit was too costly to require it to timely file the action it actual undertook.

Travelers then proceeds to argue that it was not under any duty to avoid further losses because the sole obligation of a construction surety is to act reasonably in paying job claims. Because the untimely filing of the Peterson Sullivan action does not challenge the administration of the job claims or the losses under the claims, Travelers argues that Klukwan cannot maintain a mitigation defense. None of the cases cited by Travelers apply to the situation presented here where Travelers did act, but did so unreasonably.

Moreover, courts have not absolved sureties from their duties of mitigation. *See generally Continental Casualty Co. v. Bower*, 560 S.E.2d 885, 2002 WL 276467 (N.C. App. 2002); *Fidelity and Deposit Company of Maryland v. A-Mac Sales and Builders Co.*, 2006 WL 1555985 at 6 ("The Court agrees with the Indemnitors that the law requires a party to make reasonable effort to minimize the damages suffered [citation omitted], and the question of the adequacy of the mitigation of damages is a matter for the fact finder to determine."); *Town Pump, Inc. v. Diteman*, 622 P.2d 212, 216 (Mont. 1981) ("... all that is required of the nondefaulting party in a contractual arrangement is that he act reasonably under the circumstances so as not to unnecessarily enlarge damages caused by a default.") In fact, one

of the cases cited by Travelers recognized the duty of a surety to mitigate damages. *Four Seasons Environmental, Inc. v. West Field Company*, 638 N.E.2d 91, 93 (Ohio App. 1994) ("... under the general rule in Ohio that requires injured parties to a contract to mitigate their damages, we cannot say that indemnitees, as a matter of law, do not have a duty to mitigate.") In *Four Seasons,* the court held only that the surety had not breached its duty of mitigation under the facts presented.

Finally, Travelers seems to argue that mitigation is not an appropriate defense because the losses exist independent of the Peterson Sullivan lawsuit. This misses the point. Mitigation and the avoidable consequences rule "are designed not only to prevent and repair individual loss and injustice, but to protect and conserve the economic welfare and prosperity of the whole community." *Anchorage Independent School District*, 370 P.2d at 533. Thus, Travelers has failed to mitigate it damages because its unreasonable actions have enlarged the total net losses. In this regard, the situation is no different from the landlord who refuses to relet leased property or the employee or does not take another job. In both situations, the underlying wrong and damages exist independent from the measures of mitigation. Yet, failure to reasonably take those actions preclude the plaintiffs from recovering the total loss from the breaching party.

Having decided that suing Peterson Sullivan was reasonable under the circumstances, Travelers was required to do so reasonably. By its action against Sokol, Travelers admits that it acted unreasonably, and has lost at least $8 million that would have been applied to

South Coast's net losses. Accordingly, summary judgment is appropriate that Travelers has

failed to mitigate its damages.

## CONCLUSION

Given the mutuality of interest in reducing the losses on South Coast's construction

jobs, the joint pursuit of the accountant's work papers, and discussions between the parties,

Travelers was well aware of Klukwan's reliance upon it to timely pursue the negligence

action against Peterson Sullivan. Whether examined in tort or contract, Travelers owed a

duty to Klukwan to timely bring its action against Peterson Sullivan to minimize those

losses. Having undertaken to sue Peterson Sullivan and knowing that Klukwan was relying

upon it, Travelers owed Klukwan an actionable duty in tort. Alternatively, the avoidable

consequences rule precludes Travelers from recovering a judgment from Klukwan for those

amounts it would have recovered from Peterson Sullivan but for untimely filing its lawsuit.

Respectfully submitted in Anchorage, Alaska, this 4th day of January, 2008.

CHRISTIANSON & SPRAKER
Counsel for Defendants Klukwan, Inc., South
Coast, Inc. and Chilkat's Portage Cove
Development Company

By: /s/ Gary Spraker
Gary Spraker
CHRISTIANSON & SPRAKER
911 West 8th Avenue, Suite 201
Anchorage, AK 99501
Phone: (907) 258-6016
Fax: (907) 258-2026
Email: gary@cslawyers.net
Alaska Bar No. 9107066
Attorneys for Defendants