# Tab A

## Deposition Testimony of Thomas L. Crandall

Declaration of Gary Spraker
Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

Defendants' Opposition to Motion for Summary Judgment and Cross Motion

Index of Deposition Testimony of Thomas L. Crandall

| Page # |
| --- |
| 8 |
| 9 |
| 10 |
| 11 |
| 12 |
| 13 |
| 14 |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |
| 33 |
| 34 |
| 35 |
| 41 |
| 42 |
| 120 |
| 121 |
| 125 |
| 126 |
| 137 |
| 138 |
| 139 |
| 140 |
| 150 |
| 151 |
| 176 |
| 177 |
| 227 |
| 228 |
| 280 |
| 281 |

Defendants' Opposition to Motion for Summary Judgment and Cross Motion

Index of Deposition Testimony of Thomas L. Crandall

| |
|---|
| 284 |
| 297 |
| 298 |
| 299 |
| 300 |
| 303 |
| 306 |
| 307 |
| 317 |
| 318 |
| 319 |
| 320 |
| 355 |
| 356 |
| 377 |
| 389 |
| 407 |
| 408 |
| 412 |
| 444 |
| 445 |
| 446 |
| 449 |
| 453 |
| 454 |
| 469 |
| 472 |
| 480 |
| 481 |
| 485 |
| 514 |
| 516 |
| 525 |
| 526 |
| 569 |
| 570 |

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

TRAVELERS CASUALTY AND     .   Case No. 3:06-CV-00063-TMB
SURETY COMPANY OF AMERICA, .
a Connecticut corporation, .

       Plaintiff,       .

                 .

vs.                          .

SOUTH COAST INC., an Alaska. **DEPOSITION OF THOMAS L. CRANDALL**
corporation, KLUKWAN, INC.,. **DAY 1**
Alaska Native Village
corporation, and CHILKATS'  .
PORTAGE COVE DEVELOPMENT
COMPANY, an Alaska          .
corporation,

       Defendants.      .
. . . . . . . . . . . . .
SOUTH COAST INC., et al,    .

      Counterclaim and     .
      Third-Party Plaintiff,.

vs.                          .

TRAVELERS CASUALTY AND      .
SURETY COMPANY OF AMERICAN,.
a Connecticut Corporation, .
STEWART SOKOL & GRAY L.L.C..
and JAN D. SOKOL,           .

      Counterclaim and     .
      Third-Party Defendants.
. . . . . . . . . . . . .

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Travelers            James T. Hopkins, Esq.
Casualty and Surety      Schiffrin Olson Schlemlein
Company of America:       & Hopkins, P.L.L.C.
                         1601 Fifth Avenue, Suite 2500
                         Seattle, Washington 98101

APPEARANCES (Continued):

For South Coast, Inc.,          Gary A. Spraker, Esq.
et al.:                         Christianson & Spraker
                                911 West Eighth Avenue, Suite 201
                                Anchorage, Alaska  99501

For Stewart Sokol &             James D. Gilmore, Esq.
Gray, LLC:                      Clapp, Peterson, Van Flein,
                                 Tiemessen & Thorsness LLC
                                711 H Street, Suite 620
                                Anchorage, Alaska  99501


Also Present:                   Jan D. Sokol

                        *  *  *  *  *

    The of THOMAS L. CRANDALL was taken on behalf of the

Plaintiff and Third-Party Defendant Travelers Casualty and

Surety Company of America before Teresa E. Mielke, Notary

Public in and for the State of Alaska and Reporter for Gemini

Reporting Services, at 943 West Sixth Avenue, Suite 110,

Anchorage, Alaska, on the 30th day of July 2007, commencing at

the hour of 9:00 a.m.

                        *  *  *  *  *

                    INDEX TO PROCEEDINGS                 PAGES

EXAMINATION BY MR. HOPKINS:                             6-235

                    INDEX TO EXHIBITS              IDENTIFIED

Number:
MARKED:

11: 5/26/06 Declaration of Thomas L. Crandall            10

12: 4/11/07 Defendant's Revised Response to Plaintiffs'
    Third Request for Production of Documents and First
    Set of Interrogatories to defendants                 11

                                                          2

INDEX TO EXHIBITS (CONTINUED)    IDENTIFIED

13: 12/12/03 Employment Contract    52

14: 4/6/05 letter,  T. Crandall to Klukwan, Inc., Notice
    of intent to extend employment contract    55

15: Privilege log    62

16: 4/4/07 letter, G. Spraker to J. Coughlin    63

17: South Coast Inc 12/31/00 Consolidated Financial Report    65

18: Klukwan, Inc. and Subsidiaries 12/31/00 Consolidated
    Financial Report    69

19: 2/8/01 letters, R. Holmdahl to M. Houts and Dick
    Ransdell    70

20: Klukwan, Inc., Report on South Coast Inc, 2001
    Operations    72

21: 1/25/02 letter, Peterson Sullivan to South Coast    76

22: Report to Klukwan, Inc., Board of Directors on
    South Coast, Inc., 2001 operations    78

23: 4/2/02 letter, D. Lee to T. Crandall    79

24: 3/1/02 Sutor Consulting report on South Coast, Inc.    81

25: 1/26/02 South Coast Board of Directors meeting minutes    81

26: Klukwan, Inc., 2002 Annual Meeting power point
    presentation    87

27: 11/20/02 e-mail, C. Edgar to T. Crandall    89

28: 11/15/05 letter, T. Crandall to J. Ferris
    w/attachments    97

29: 1/19/06 letter, W. Earnhart to T. Crandall    101

30: 6/27/02 Klukwan, Inc. Board of Directors meeting
    minutes    106

31: 6/12/02 letter agreement, T. Crandall and C.
    Langfitt w/attached acknowledgement of default    108

3

INDEX TO EXHIBITS (CONTINUED)    IDENTIFIED

32: Indemnity agreements    111

33: 5/17/02 letter, C. Langfitt to T. Crandall and R.
    Glebrich (sic), w/attachments    116

34: 6/10/02 letter, C. Langfitt to T. Crandall    121

35: 6/22/02 letter, T. Crandall to C. Langfitt w/attached
    spreadsheet    127

36: 7/9/02 e-mail, T. Crandall to R. Mattoon w/attached
    7/2/02 letter, C. Langfitt to T. Crandall    132

37: 7/12/02 e-mail, M. Stevenson to R. Sparks, T.
    Blanton, T. Crandall w/attached 7/10/02 board update    134

38: 7/18/02 e-mail, T. Crandall to T. Crandall w/attached
    amortization schedule    144

39: 7/18/02 e-mail, T. Crandall to C. Langfitt w/attached
    amortization schedule    146

40: 8/2/02 e-mail, C. Christianson to C. Langfitt
    w/attached agreement, note and guaranty    148

41: 8/30/02 letter, C. Langfitt to C. Christianson
    w/attached agreement, note and guaranty    155

42: 12/14/02 Repayment Agreement    157

43: 12/14/02 Guaranty Agreement    181

44: 7/31/03 e-mail, T. Crandall to T. Blanton, w/attached
    12/31/02 Klukwan, Inc. and Subsidiaries Consolidated
    Financial Report    185

45: 7/23/03 P&S note    187

46: 8/30/03 Excerpt from power point presentation for
    Klukwan Inc. & Subsidiaries Annual Meeting    188

47: 7/13/04 audit request letter C. Langfitt    190

48: 8/6/04 letter, C. Langfitt to T. Crandall    191

49: 11/24/04 e-mail string, T. Crandall to M. Eckardt    193

INDEX TO EXHIBITS (CONTINUED)    IDENTIFIED

50: Accounting of note prepared first quarter, 2005    194

51: 12/31/03 and 2002, Klukwan, Inc. and Subsidiaries
    Consolidated Financial Statements and Supplementary
    Information    206

52: 12/04 South Coast annual meeting agenda w/ attached
    financial information    208

53: 4/6/05 facsimile, M. Eckardt to C. Bourne    210

54: 12/31/04 and 2003 Klukwan, Inc. and Subsidiaries
    Consolidated Financial Statements and Supplementary
    Information    212

55: 8/3/05 e-mail to G. French w/attached financial data    213

56: 6/24/05 Klukwan, Inc. Board of Directors' Meeting
    power point presentation    215

57: 8/7/05 e-mails, T. Crandall to (various) w/attached
    slides    217

58: 6/6/06 e-mail, J. Hopkins to G. Spraker/J. Gilmore,
    R. Olson w/attached accounting    223

59: 7/18/06 audit request letter to C. Langfitt    225

60: 7/12/06 e-mail, T. Crandall to B. Renfrew    226

61: 12/31/05 and 2004 Klukwan, Inc. and Subsidiaries
    Consolidated Financial Statements and Supplementary
    Information    228

62: 7/12/06 e-mail, T. Crandall to B. Renfrew w/attached
    5/15/06 Travelers Net Paid accounting    231

63: 7/25/06 e-mail, T. Crandall to G. French re:
    Troubled debt restructure    234

5

1      you precisely.

2 Q    Do you recall any documents that you've reviewed in

3      anticipation of the deposition?

4 A    Specifically I reviewed the settlement agreement and

5      related documents, related attachments.  I reviewed the

6      audit and the audit work papers from Peterson Sullivan,

7      and I reviewed some of the e-mail correspondence that went

8      back and forth from me or to me.

9 Q    When you say settlement agreement you mean the repayment

10     agreement?

11 A   I mean the repayment agreement, yes.

12 Q   And its associated exhibits?

13 A   Yes.

14 Q   Have you reviewed the declaration that you submitted in

15     this litigation in May of 2006?

16 A   I did read it, yes.

17 Q   In anticipation of this deposition?

18 A   Yes.

19 Q   How about the responses to discovery requests submitted by

20     Travelers to Klukwan which you verified, did you review

21     those?

22 A   Yes.

23 Q   Have you ever reviewed any of the pleadings in Travelers'

24     law suit against the South Coast directors and officers

25     and Peterson Sullivan?

1  A    No, the only thing I reviewed there was some of the

2       depositions that was taken prior to that.

3  Q    So you reviewed certain deposition transcripts from

4       depositions taken in the Peterson Sullivan action?

5  A    Yes.

6  Q    And by Peterson Sullivan action you understand I'm

7       referring to Travelers' law suit against Peterson Sullivan

8       and the former South Coast directors and officers?

9  A    That's my understanding.

10 Q    When did you last review the deposition transcripts?

11 A    I read everybody but Chuck Langfitt's on Friday, and Chuck

12      Langfitt's, it's been three or four months ago.

13 Q    Have you had any discussions with any of the Klukwan or

14      South Coast board of directors regarding your deposition?

15 A    Only that I would be in deposition today and tomorrow.

16 Q.   How about Kimberley Strong, have you discussed.....

17 A    No.

18 Q    .....her deposition?

19 A    No.

20 Q    Have you had any communications with Kimberley Strong in

21      the past three months?

22 A    I saw her in a local restaurant-slash-store in Haines and

23      said I'm going to be deposed, I suspect you will too.

24      That was the sum extent of our conversation.

25 Q    Are you under any sort of medical treatment or condition

1    that would prevent you from testifying here today and

2    tomorrow?

3 A  I am on some medication but none of which should prevent

4    me from testifying.

5 Q  Does it affect your memory or your ability to respond to

6    questions?

7 A  I don't believe it does.

8 Q  And it's a medication that you've been taking for some

9    time, I gather?

10 A  It's basically for cholesterol and diabetes.

11 Q  And you've cleared your calendar for today and tomorrow?

12 A  Yes.

13 Q  How about Wednesday morning?

14 A  Yes.

15 Q  Good.  Now, you mentioned you'd reviewed the declaration

16    you submitted in this litigation in May of 2006.

17    MR. HOPKINS:  Let's go off the record for a second.

18                        (OFF THE RECORD)

19                              DEPOSITION EXHIBIT 11 MARKED

20                        (ON THE RECORD)

21 Q  You mentioned that you had reviewed the declaration you

22    submitted in this litigation in May of 2006.  Is there

23    anything about that declaration you now feel is inaccurate

24    or you would correct?

25 A  No, it looks correct.

1 Q    Okay, and just for the record you've been reviewing what

2     we've marked as Exhibit 11, correct?

3 A    Correct.

4 Q    And Exhibit 11 is a copy of your declaration dated May 26,

5     2006?

6 A    Correct.

7                         DEPOSITION EXHIBIT 12 MARKED

8     MR. HOPKINS:  Sorry, Gary, I didn't have a copy of that.

9 Q    Do you recognize Exhibit 12 as interrogatory responses

10    provided by Klukwan to Travelers that were verified by you

11    on April 11, 2007?

12 A   Yes, I do.

13 Q   And these are the discovery responses you reviewed in

14    anticipation of this deposition?

15 A   I have, yes.

16 Q   Is there anything that you're aware of as a result of that

17    review in regard to the discovery responses reflected on

18    Exhibit 12 that you would revise or correct at this point?

19 A   No.

20 Q   Let me get some of your background.  Can you give me a

21    sketch of your educational background?

22 A   I have a BS in business administration, a major in

23    accounting, from the University of Arizona, graduated

24    August 1981.  I have an MBA, University of Washington,

25    graduated June of 2001.

Page 12

1  Q    Are you a certified public accountant?

2  A    Inactive, but yes.

3  Q    Where were you previously licensed?

4  A    It's only been Alaska.

5  Q    What years were you licensed as a CPA?  Approximately.

6  A    I don't really recall.

7  Q    What decade?

8  A    '80s.  I have had a license since then but I have not

9       practiced as public accounting since the '80s.

10 Q    How about a sketch of your employment history since you

11      graduated undergraduate school in 1981, correct?

12 A    Correct.

13 Q    Can you give me a sketch of your employment history since

14      that date?

15 A    I worked for approximately three years starting January of

16      '04 (sic) for a local CPA firm that started out with the

17      name of Payne Jackson Tinker, it ended up being just Terry

18      Jackson, CPAs.  In December 1980 -- excuse me.  On the one

19      with CPA, it was from January of '02 through November of

20      '04 (sic).  In November -- December of '04 (sic) I ended

21      up working with Ounalashka Corporation, which is the

22      Native corporation in Dutch Harbor, Unalaska/Dutch Harbor.

23      I worked there from December of '04 -- excuse me, '84

24      through approximately spring of '93 or '94, I forget.  I

25      went from there and worked for a company as CFO out of

| | |
|---|---|
| 1 | Seattle, Washington, Western Pioneer.  I left there, came |
| 2 | back to Alaska, worked for about two and a half years for |
| 3 | a company called Klukwan Forest Products, which was a |
| 4 | joint venture of three Alaska Native corporations.  In |
| 5 | 2000 I did both that and went back to graduate school.  In |
| 6 | 2001 I was not working for -- I was doing -- I was self |
| 7 | employed mostly doing computer consulting.  Finished up my |
| 8 | graduate degree in August of '01, joined Klukwan, Inc., |
| 9 | first as their CFO for August through May, and then as |
| 10 | president from then on until present. |
| 11 Q | So the initial three years of your professional career you |
| 12 | worked for an accounting firm? |
| 13 A | Yes. |
| 14 Q | Were you involved in conducting audits of corporate |
| 15 | entities? |
| 16 A | I worked with some audits, yes. |
| 17 Q | How would you describe your position with Payne Jackson? |
| 18 | Is that their name? |
| 19 A | Payne Jackson Tinker.  Staff accountant. |
| 20 Q | And you were involved in conducting audits? |
| 21 A | I worked with audit -- on audits, yes. |
| 22 Q | Your next position was with the Native corporation located |
| 23 | in where? |
| 24 A | Unalaska. |
| 25 Q | What was the name of that corporation? |

1  A      Ounalashka Corporation.

2  Q      You were there approximately 10 years?

3  A      About nine years.

4  Q      What was your position?

5  A      Started out as comptroller, ended up VP finance.

6  Q      Is that roughly the same thing as a CFO?

7  A      Just different words, same position.

8  Q      Is that comparable in terms of job duties and tasks to

9         your initial position at Klukwan in August 2001?

10 A      At the end it was, not at the beginning.

11 Q      So at the beginning with the Unalaska corporation you were

12        younger and more junior, correct?

13 A      I was younger and more junior.

14 Q      What did Western Pioneer do?

15 A      Western Pioneer had a multitude of businesses, the primary

16        business was fuel distribution.  They owned tank farms,

17        Dutch Harbor, St. Paul, St. George, Kenai -- or, yeah,

18        Seldovia, I mean, Haines, Juneau, Wrangell, Naknek,

19        Dillingham, a small one in Sedro-Woolly, Washington state.

20        In addition to tank farms and fuel distribution they ran

21        freight, both break bulk and barges, for fuel.

22 Q      What was your position with Western Pioneer?

23 A      CFO.

24 Q      Roughly comparable to the position you initially were

25        hired for at Klukwan in August 2001?

1  A     It had more duties than what I was with Klukwan.

2  Q     What does a CFO generally do?  I recognize I'm talking in

3        broad terms, but based on your experience.

4  A     Anything that operations doesn't want, it's -- really, in

5        a very broad term.  Generally they're in charge of the

6        accounting department, maybe the IT department, maybe the

7        human resources department.  Basically they do anything

8        that's back office.

9  Q     Certainly for corporate entities that have audited

10       financial statements one of the CFO's duties would be to

11       work with the auditors when the statements are audited on

12       an annual basis, correct?

13 A     Correct.

14 Q     And that was actually a role that you fulfilled for

15       Klukwan from August 2001 forward?

16 A     Yes.

17 Q     And you worked pretty carefully with Peterson & Sullivan

18       and then KPMG in connection with audits prepared for

19       Klukwan and its various related entities for years ending

20       2001 to the present?

21 A     Correct.

22 Q     You'd be the primary source of information for the

23       auditors?

24 A     At this point, yes.

25 Q     You'd respond to any questions they might have?

1  A    Or assign those questions to a junior.

2  Q    You'd present the audit or any issues relating to the

3       audit to the Klukwan board of directors?

4  A    Correct.

5  Q    You'd explain the audit to the board of directors?

6  A    Normally I would have the prepare -- KPMG in the current

7       case do an explanation, but I would be there as well to

8       fill in the gaps.  If they were unable to be there then I

9       would do the presentation.

10 Q    Has an audit been performed for Klukwan and its related

11      entities for the year ending 2006?

12 A    It's not complete yet.

13 Q    Is it in process?

14 A    It's in process.

15 Q    When did it start?

16 A    The field work started the week before the 4th of July,

17      field work ended two weeks ago, I expect a draft this

18      week.

19 Q    Was there a delay in initiating the 2006 audit for Klukwan

20      and its related entities?

21 A    There wasn't a delay.  Just fit everybody's -- my schedule

22      better.

23 Q    Has Klukwan paid KPMG for the 2005 audit?

24 A    Not completely.

25 Q    Do you have a payment plan with KPMG?

1 A    Yes.

2 Q    Did the delayed payment hold up the start of the 2006

3      audit?

4 A    No.

5 Q    That was never an issue that came up with KPMG then?

6 A    They never raised it.

7 Q    So how long were you with Western Pioneer?

8 A    Approximately two and a half, three years.

9 Q    So approximately 1996 you went to work for Klukwan Forest

10     Products?

11 A   That would be Koncor Forest Products and that would've

12     been in '07.

13 Q   I'm sorry?

14     MR. SPRAKER:  '07?

15 A   '07 and it was Koncor Forest Products, not Klukwan Forest

16     Products.

17 Q   Oh, Koncor.  How do you spell that?

18 A   K-O-N-C-O-R.

19 Q   And you say '07.  That's the present year.

20     MR. SPRAKER:  Yeah, do you mean.....

21 A   Excuse me, 1997.

22 Q   '97.  And did Koncor Forest Products have any relationship

23     to Klukwan or any of its related entities?

24 A   No, not an ownership relation.  They may have had some

25     contractual relationships at one point in time, I can't

1       tell you all the history.

2 Q     Was Koncor owned by a Native corporation?

3 A     It was a partnership of three Native corporations,

4       although the number of corporations grew and shrunk over

5       the number of years it was in existence.

6 Q     Was Klukwan one of those partners?

7 A     No.

8 Q     Where was it based?  Where were you physically based?

9 A     In Anchorage.

10 Q    And what was your position with Koncor?

11 A    I think it was VP finance.

12 Q    CFO, more or less?

13 A    Same.  From my point of view they're the same position.

14 Q    What led to your being hired by Klukwan in August 2001?

15      How did that come about?

16 A    A headhunter approached me.

17 Q    I'm sorry?

18 A    A headhunter approached me.

19 Q    So Klukwan was looking to fill the position and a

20      headhunter contacted you?

21 A    Correct.

22 Q    Had you had any prior contact with any of the management

23      personnel at Klukwan or its related entities or any of the

24      members of the boards of directors of Klukwan and its

25      related entities?

1 A    Back in approximately 1991 I had had one or more

2      conversations with Ralph Strong in regards to -- excuse

3      me.  Only in regards to at that point Klukwan was doing

4      well and Ounalashka, who I was employed for there, was

5      trying to build its expertise.

6 Q    Who was Ralph Strong?

7 A    Ralph Strong is currently a director, he -- sometime

8      during that period of time he was either chairman or

9      president or both.

10 Q   He's been a director of Klukwan and other Klukwan entities

11     for a number of years?

12 A   For a number of years.

13 Q   Who did you first interview with or speak to at Klukwan in

14     the context of being hired by them in August 2001?

15 A   For clarification, you mean other than the headhunter?

16 Q   Yes.

17 A   It would've probably been Ralph -- excuse me.  Ron

18     Gelbrich to begin with, would've been a guy named Dick

19     Ransdell.  I think that's his last name.  It would have

20     proceeded on to an on-site interview, which would've

21     basically met all of Klukwan's internal staff, not the

22     staff from subsidiaries but just Klukwan, Inc., staff.

23     Would've continued on -- and I don't remember if the staff

24     interview was prior or subsequent, but there would've been

25     a board interview in that period of time.

1 Q     How long did that process take?

2 A     From approximately March of '01 to the first time I did

3       something for them would've been in July of '01, which was

4       to take a trip with them to Seattle to meet with their

5       outgoing banker, or bank, which was Bank of America, and

6       meet with a potential bank that they were looking at,

7       which was U. S. Bank.

8 Q     And that would typically be another duty of the CFO is to

9       manage the relationship of the company with lenders?

10 A    Lenders, auditors, insurance agents.....

11 Q    And that's a role you fulfill for Klukwan from 2001

12      forward?

13 A    Yes.

14 Q    Have you ever been involved in an accounting malpractice

15      claim in any fashion?

16 A    No.

17 Q    How about a lender liability law suit?

18 A    What do you mean involved in that sense?

19 Q    Sued by a borrower against its lender.

20 A    I have not personally.  Other than this case I recall none

21      from business.

22 Q    And by this case you mean -- you're referring to the fact

23      that Klukwan considered a law suit against KeyBank,

24      correct?

25 A    No, I was referring to the case against -- from Travelers

1       versus Klukwan et al.

2 Q     But in fact Klukwan did consider at various points in time

3       an action against KeyBank, correct?

4 A     There was a consideration, correct.

5 Q     Let me go back to your initial hire in August of 2001.

6       What was the position you understood you were being hired

7       for?

8 A     It was CFO or VP finance, I forget.

9 Q     What did you understand the reason to be that or why

10      Klukwan was looking to fill that position?

11 A    They had had a individual named Dennis Debolt (ph) that

12      had been in that position, he had died in '99 or 2000, I

13      forget.  They had had an interim replacement, Dick

14      Ransdell, who I had mentioned earlier, that had filled

15      that position, but it was meant to be a temporary

16      position, he was retiring, again, and so they were looking

17      at replacing it so that he could do that.

18 Q    Who was your initial superior after you were first hired

19      by Klukwan in August 2001?  Who did you report to?

20 A    Directly it would've been Ron Gelbrich, indirectly it

21      would've been the board of directors.

22 Q    At the time you were hired were you aware or was there any

23      indication from anyone at Klukwan or its related entities

24      that you spoke to that there were potential financial

25      problems with South Coast?

1  A    Not prior to my hiring, no.

2  Q    Shortly after you were hired you began -- you became aware

3       of those potential problems?

4  A    Within two weeks after hiring I became aware that Klukwan

5       had financial problems.  At that point I was not sure what

6       the relation -- what the financial issues were with South

7       Coast but I could tell definitely that their financial

8       projections and their financial reality were divergent.

9  Q    What information led you to that conclusion?

10  A    I took six months of internal financials, doubled them,

11       saying that's going to be approximately one year of

12       operations.  Looked at their projections and said -- the

13       projections said they're going to make a million dollars

14       net profit, but by doubling six months, which would give

15       me approximately a year, I came in that they would have

16       between two and a half and three million loss, three and a

17       half million loss.  And at that point I was -- had assumed

18       that South Coast would do what they had said they would

19       do.  And at that point there was a significant investment

20       in the stock and equity market, and I had assumed that

21       that would stay even because it's not something that we

22       could manage internally directly.  So it was very

23       unsophisticated.

24  Q    So one of the first things you did when you came to work

25       in August 2001 is you basically looked at the current

1       financial data for South Coast?

2 A     For Klukwan, and all of Klukwan, not just South Coast.

3 Q     All of its subsidiaries?

4 A     Yes.

5 Q     And in regard to South Coast particularly you made some

6       rough projections based on the data you had to date?

7 A     On South Coast in August of '01 I actually just assumed

8       that their data was correct.

9 Q     But you still saw a potential financial problem for

10      Klukwan based on the totality of its operations?

11 A    Correct.

12 Q    The data that South Coast was presenting in August of '01

13      still showed it turning a profit that year, correct?

14 A    Correct.

15 Q    What else did you do within the first month or two of your

16      arrival at Klukwan to educate yourself about the financial

17      status of Klukwan and its related entities?

18 A    Within the first month most of my time was -- actually

19      ended up dealing with lenders and -- current and proposed,

20      and board preparation, that type of thing.  But between

21      August and October what I had done -- and I'm expanding a

22      little bit on your question because that takes it to three

23      or four months.  I basically was looking at the

24      financials, talking to the individual comptrollers, or

25      vice presidents in South Coast's case, trying to

1    understand why there was a -- that every month their

2    projections said we're going to hit this for the remainder

3    of the year, a number -- decided I'd better not gesture

4    because she can't record gestures.

5  Q    That's correct.

6  A    And it was a nice gesture.  But their projection would say

7    a number and the next month it would be less than that

8    number.  The second -- third month, it would be less than

9    that number.  The fourth month it would be less than that

10    number.  So what I saw was a continuing erosion of the

11    information that was being provided to Klukwan internally.

12    At that point we were sending out that same information to

13    Peterson Sullivan and we were sending it out periodically

14    to Travelers.  So my concern was a continual erosion of

15    what had occurred.  Some of it was explainable, such as

16    9/11 hit, we had an explosives distributor, explosives

17    after 9/11 were difficult to sell, the regulations were

18    changing, so that was explainable.  But South Coast was

19    not explainable in the normal macroeconomic point of view

20    because it was not -- should not have been adversely

21    affected by a short-term jolt to the economy.

22  Q    And at that point in time, the second half of 2001, South

23    Coast had $60 million in contracts outstanding?

24  A    I didn't look at the second half.  I looked at what they

25    had on the books at January 1st, '00 and '01, and at both

1    of those years it was approximately 31,000 in backlog.   It

2    had grown during the year but I can't tell you the number.

3  Q   But in any event, South Coast had many millions of dollars

4    of contracts under way in 2001 in various locations,

5    correct?

6  A   That is correct.

7  Q   And Travelers had issued bonds in connection with all

8    those projects, correct?

9  A   I would say the majority, they may have had some private

10    contracts as well.

11  Q   Some contracts didn't have bonds, but where a bond was

12    required Travelers had issued it?

13  A   Travelers was the only bonding agency we were dealing

14    with.

15  Q   Who was your first contact at Travelers?   Did you have any

16    contact with anyone at Travelers in 2001?

17  A   Late two -- like November or December of 2001, if my

18    memory is -- if I remember correctly, we did talk to --

19    and the only name that stands out would be a David

20    Hombach.

21  Q   You understood he was with the underwriting department?

22  A   That's correct.

23  Q   So that was not the claims department of Travelers,

24    correct?

25  A   I had no conversation with the claims department that I'm

1    '02 and by June, I believe, of '02 Travelers ended up

2    taking over the responsibility to complete the jobs.

3    There was some interim work to help mitigate losses that

4    occurred between there and -- approximately there and

5    October of same year.  I spent the second and third

6    quarter of '02 basically terminating staff and -- and

7    starting the process to liquidate assets.

8 Q  So South Coast ceased to do business and was basically

9    wound down and wound up, correct?

10 A  In late '02 it was wound down and -- and assets sold.

11 Q  And South Coast incurred losses exceeding $32 million in

12   total in 2001 and 2002?

13 A  And possibly into 2003.

14 Q  It's fair to say South Coast's demise or financial losses

15   caused a severe financial impact to Klukwan, correct?

16 A  Yes.

17 Q  Can you describe generally what that impact consisted of?

18 A  Yes.  I'm going to take a minute and just think about the

19   chronological for this.  Basically as -- when I joined

20   there was a problem.  I notified -- and just a problem in

21   general with Klukwan.  I notified their potential bank,

22   which would've been U. S. Bank, that I saw problems.  I

23   notified the board.  U. S. Bank backed out of refinancing

24   what was Bank of America's debt.  KeyBank stepped forward

25   and said we don't have a problem, we'll continue with

1    that.  We -- so the first evidence of problems ended up

2    shaking up our banking relationship in '01.  As '02

3    proceeded it started shaking up the issue that even

4    KeyBank was sitting here going every month you tell us

5    something and the next month you tell us something worse.

6    It got to the point where we were crosswise with KeyBank.

7    By -- well, culminating in May of '02, May 13th, to be

8    exact, we were called for a meeting in Anchorage with

9    KeyBank, at which time they notified us that they had

10   exercised provisions under the security agreement and had

11   liquidated those investments that we had, and at that

12   point it was 13 and change million.  That took all working

13   capital that might've been in the business out.  That

14   continued to escalate so that on May 21st the board

15   terminated Ron Gelbrich, asked me to take over.  I need to

16   back up a minute.  One of the other things that happened

17   in January -- So in October or November KeyBank took over,

18   November and December we brought in Sutor and P&S for

19   subsequent work.  In January we terminated the management

20   of South Coast, not all, but the majority of.  That

21   would've been -- terminated would've been Jan -- excuse

22   me, would've been Jerry Renick, Brad Finney, there's

23   another one right now I forget.  They kept Jan Paulson and

24   Mike Houts because we couldn't figure out how to get rid

25   of everybody that was in charge.  By May, I've already

1      gone into the first thing that happened with KeyBank.

2      Then Ron was terminated.  Then by early June, late May,

3      early June, Travelers stepped forward and took over the

4      bonded jobs.  By middle of June I'm starting to terminate

5      staff at -- at South Coast, started liquidating assets,

6      basically winding down the business.  So I was there less

7      than a year before we were in the process of shutting

8      down.  I would like to take just a moment to get some

9      water.

10 Q   Sure.  Short break or a long break?

11 A   This long a break.

12                      (OFF THE RECORD)

13                      (ON THE RECORD)

14 Q   You were explaining the impact financially on Klukwan of

15     the South Coast losses in 2001 and 2002.  Anything to add?

16 A   Yeah, really what I started with was explaining more the

17     operational impacts.  The financial impacts were that when

18     KeyBank foreclosed, or started the foreclosure process on

19     the investments, that took away the working capital.  At

20     that point it looked doubtful whether Klukwan would be

21     able to go forward.  I ended up with a resolution that if

22     I chose to I could take them into 11.  We worked with

23     Travelers to mitigate the losses, or at least tried to.

24     But overall 2002 was not a good year financially.

25 Q   Well, let me follow up.  First of all, South Coast had by

1 Q    Those were real impacts, nonetheless, correct?

2 A    They were real impacts, yes.

3 Q    Substantial impacts?

4 A    Correct.

5 Q    And you simply haven't quantified them at this point?

6 A    After I hit 32 million and saw that it left a negative net

7      worth on Klukwan's balance sheet, the rest of it was just

8      depressing, I never bothered going there.

9 Q    Back to the status in March, April, May of 2002.  At that

10     point Klukwan considered bankruptcy?

11 A   Yes.

12 Q   And has Klukwan continued to evaluate bankruptcy as an

13     option if it cannot pay or reduce its liabilities?

14 A   If it cannot pay or reduce its liabilities it will

15     reconsider.

16 Q   At this point is Travelers the major creditor of Klukwan?

17 A   Yes.

18 Q   So resolving Klukwan's issues with Travelers is essential

19     to getting Klukwan back on its financial feet without

20     bankruptcy?

21     MR. SPRAKER:  Objection, foundation.

22 A   I believe that's true.

23 Q   Are there any other creditors of even anywhere near the

24     same magnitude as Travelers in regard to Klukwan?

25 A   No.

Page 42

1 Q    And when Klukwan entered the repayment agreement is that

2      what it hoped to accomplish, i.e. resolve its obligations

3      to Travelers without the necessity of bankruptcy?

4 A    It was -- yes, that was the primary reason.

5 Q    And was that your hope as well?

6 A    At the time that was my hope as well.

7 Q    When Klukwan executed the repayment agreement in

8      approximately mid-December 2002 were you confident Klukwan

9      could meets its obligations to Travelers under the

10     repayment agreement?

11     MR. SPRAKER:  Objection to form and foundation.

12 A   I was not.  I was confident that was the best agreement we

13     could get at the time.

14 Q   And in your view it was in Klukwan's interest to proceed

15     to enter the repayment agreement, correct?

16 A   That is correct.

17 Q   And Klukwan's board preferred doing so over filing

18     bankruptcy, correct?

19 A   Yes, at the time.

20 Q   Was that your preference as well?

21 A   It was.

22 Q   Isn't it true that by mid-2003 on into 2005 you personally

23     recognized that Klukwan would have difficulty meeting its

24     obligations to Travelers under the repayment agreement?

25     MR. SPRAKER:  Objection to foundation.

1      management was concerned?

2 A    I actually don't remember this meeting.

3 Q    At any meeting between May and June of 2002 did you have

4      discussions to that effect?

5 A    I just don't remember.

6 Q    Certainly it would have been logical to discuss that given

7      the history of South Coast's collapse that you've earlier

8      described for me, don't you agree?

9 A    It would be logical, but I just truly don't remember the

10     meeting.

11 Q   Do you agree that part of what the surety was trying to

12     determine at this point, May and June of 2002, was what

13     had happened to South Coast, what its losses were likely

14     to be?

15 A   Again, given what had happened in May I just flat-out

16     don't remember the meeting.

17 Q   Well, what is the first meeting that you had with Chuck

18     Langfitt that you have any recollection of the substance

19     matter of the discussion?

20 A   The first -- It was a teleconference, I was in Ketchikan,

21     it was after Jordan had left doing his internal review,

22     his engagement, and Mr. Langfitt called and said we will

23     be taking over the jobs.

24 Q   All right, anything else?

25 A   That's of substance what I remember.  There may be some

1    other stuff, but that's what hit me.  I think I said

2    something to the effect like we'll cooperate, you know,

3    but we need to, you know, either go into an 11 now or

4    agree that we're going to try to work together and not go

5    into an 11 now.  And his comment to me was something to

6    the effect like we'll work together.

7 Q  Did you review Exhibit 33, Mr. Langfitt's May 17, 2002,

8    letter at or about the time you received it?

9 A  I recall this going on, I don't recall the particular

10   letter.

11 Q  Well, that wasn't my question.  Did you review the letter?

12 A  If I received it I reviewed it.  I just.....

13 Q  Do you.....

14 A  .....don't recall it.

15 Q  You recall ever advising Mr.Langfitt that any of the

16   statements he made in Exhibit 33, his May 17, 2002,

17   letter, were inaccurate?

18 A  What statements did he even make?  (Examines Exhibit 33)

19   I don't see anything that I would -- that is inaccurate in

20   here, so I wouldn't have said that there was anything.

21                          DEPOSITION EXHIBIT 34 MARKED

22   MR. HOPKINS:  You have two copies?

23   REPORTER:  I do.

24 Q  Can you identify Exhibit 34 as Chuck Langfitt's June 10,

25   2002, letter to you?

1    was just you didn't have any experience conducting such an

2    exercise, correct?

3 A    That's what I stated, yes.

4 Q    And Klukwan didn't have the resources or wherewithal, or

5    South Coast, to do such an exercise itself, did they?

6 A    I never asked the question, so I don't know.

7 Q    Exhibit 34 refers to a June 11 meeting.  Do you recall

8    attending that meeting?

9 A    Not with specificity, no.  There was a lot going on at the

10    time.

11 Q    Therefore you do not recall any discussions that may have

12    occurred between you and Mr. Langfitt at a meeting on June

13    11th, assuming such a meeting occurred?  June 11, 2002.

14 A    I would need my memory refreshed.

15 Q    And what will refresh it besides this letter, Exhibit 34?

16 A    I don't have anything else that would that I'm aware of.

17 Q    I think you earlier testified you -- it's not your

18    practice to keep detailed notes.  You don't have any notes

19    of this meeting, do you?

20 A    That's correct.

21 Q    Am I correct that the discussions between Travelers and

22    Klukwan that you were involved in in the May, July,

23    August, 2002, time frame focused on the likely total

24    amount of loss the surety was facing on the South Coast

25    bonds, the assets and resources Klukwan or its

1      subsidiaries had to meet their obligations to the surety

2      under the indemnity agreements, and an agreement as to the

3      terms as to how those obligations would be met, is that a

4      fair characterization?

5 A    I wouldn't say May, but definitely by June, July, August

6      we were already into the point of the contracts had been

7      pulled and how do we go -- as Klukwan how do we go

8      forward.

9 Q    And the three topics that I described were the primary

10     focus of discussions?

11 A   What's the repayment under the indemnity, how do we reach

12     that -- how do we make sure that that repayment occurs, if

13     we can, and how do we minimize our loss going forward,

14     primarily by helping with making sure that any bonding

15     claims were valid, i.e. a third party throws in a claim

16     and says they owe us X, trying to confirm that we either

17     agreed or disagreed with that number.

18 Q   And additionally you discussed what assets Klukwan or its

19     subsidiaries would have to either collateralize their

20     agreement, any potential agreement with the surety, or

21     satisfy their obligations to the surety, correct?

22 A   That's what I referred to as needing repayment terms and

23     the ability to make sure that those terms were -- could be

24     exercised or could be lived within.

25

DEPOSITION EXHIBIT 35 MARKED

TAB A
to Declaration of Gary Spraker
Page 35 of 46

1       million and Klukwan proposing total payments of 7.55

2       million, right?

3 A     Those were the latest proposals back and forth, yes.

4 Q     What do you recall specifically of the discussions of the

5       July 17, 2002, meeting?

6 A     Oh, many things, one of which, I hit a white board and

7       said this is where the repayment may come from based on

8       the best of my ability at the time, pointing out that we

9       would prefer it to be as a note with a discount versus --

10      a note with an interest versus a lump sum, because it

11      would allow -- my opinion at the time -- a better

12      reflection on the balance sheet.  Kimberley Strong in

13      tears because it was her company and she was concerned it

14      was going down the tubes.  Those types of things.

15 Q    Anything else?

16 A    I think we walked away with a general understanding of a

17      structure.

18 Q    Well, you referenced a white board.  Did you pencil out on

19      a big sheet of paper numbers and.....

20 A    No, white board, like that.

21 Q    I see.

22 A    When it was done it got erased.

23 Q    And what data did you put on that?

24 A    Oh, it was basically the next five years' worth of

25      operation for Emrick & Hill, best of my knowledge, same

```
 1        with Atlas, same with K-Ply, all the various subs, here's
 2        where the equipment sales may come in with, here's where
 3        the real estate sales may come in with.  And just
 4        basically trying to show that there would be an ability
 5        projected at the time to make a repayment.
 6   Q    Did Kimberley Strong have discussions with Chuck Langfitt
 7        that you did not participate in?
 8   A    Not that I'm aware of.
 9   Q    Do you recall or no, one way or the other?
10   A    I don't know one way or another.
11   Q    As a result of the July 17, 2002, meeting didn't Klukwan
12        agree to repay the surety total payments of $8 million?
13   A    We agreed to a total payment of eight million based upon
14        certain structure.
15   Q    So what was discussed and tentatively agreed to at the
16        July 17, 2002, meeting was the total payment amount of $8
17        million, correct?
18   A    There was a total payment of eight million.
19   Q    The schedule and amount of payments against that
20        obligation, correct?
21   A    I believe that's correct.
22   Q    But no other details and certainly no document was
23        executed at that point in time, correct?
24   A    There was no document.  There were some other details.
25        For instance, if you look early in some of the
```

1      correspondence there was some discussion about needing to

2      use the second growth timber rights as collateral, and we

3      ended up basically here's why it can't happen, and that

4      disappeared from the list.  For instance, there was an

5      attempt -- we also talked about K-Ply as collateral, K-Ply

6      stock, and that never ended up in the final agreement.  So

7      there was not just a repayment term but there was also

8      some general discussions of collateral terms.

9  Q   It's fair to say that at the July 17, 2002, meeting

10     certain collateral was agreed to, other collateral was

11     discussed but no specific agreement reached?

12 A   No, I would say that at that -- we walked out of that

13     meeting with a general understanding that the repayment

14     amount, however it was classified, would be eight million,

15     and that the collateral would be the following, and

16     anything that was not in that list was not collateral.

17 Q   And what was that collateral?

18 A   First and seconds and occasional thirds on real estate,

19     basically a second position on South Coast equipment, a

20     position on Emrick & Hill and Atlas stock.  I think that's

21     about it, in general.

22 Q   Did you discuss the Chinle claim?

23 A   I forgot to mention the Chinle claim, that was in some of

24     the other conversations as well.  The Chinle -- any rights

25     that we had to settle Chinle would be assigned to

1        Travelers, and collection thereof.

2 Q     And there was discussion regarding a possible claim by

3        Klukwan against KeyBank, correct?

4 A     There was discussion about it.

5 Q     Klukwan was evaluating a potential claim against KeyBank,

6        correct?

7 A     We were.

8 Q     And that was discussed in the time frame of the July 17,

9        2002, meeting, correct?

10 A    That sounds correct.

11 Q    Wasn't Klukwan evaluating during this period of time

12       potential claims it might have against KeyBank or any

13       other third parties?

14 A    Yes, they were evaluating potential claims.

15 Q    And that was part of the fact that Klukwan was in rather

16       dire financial circumstances and was looking for assets or

17       recoveries wherever it could find them, correct?

18 A    I wouldn't couch it that way, no.

19 Q    You certainly had an interest in pursuing any claims that

20       you felt were valid or viable for Klukwan  to recover

21       money, correct?

22 A    We were -- we were -- I got distracted, I apologize.  We

23       were looking at limiting our losses.  To the extent that

24       we had a action against a third party, we were looking at

25       that action.

TAB A
to Declaration of Gary Spraker
Page 39 of 46

Case 3:06-cv-00063-TMB    Document 84-2    Filed 01/04/2008    Page 40 of 46

Page 150

```
 1      Coast to have this particular provision read at some

 2      amount substantially less than what South Coast and

 3      Klukwan had committed to repay, correct?

 4 A    No, actually, if -- if it said Travelers would credit us

 5      the back amount anything over four million, I'd have said

 6      great.  It's the other direction that you -- I would've

 7      said ouch.

 8 Q    So hypothetically speaking it would've been satisfactory

 9      to Klukwan for this clause to say in the event that

10      Travelers' total loss net of all receipts from the bonded

11      contracts is less than five million Travelers shall credit

12      the note with the amount of the difference?

13 A    I would have said fine.

14 Q    So.....

15 A    Because what I was trying to get there was the fact that I

16      didn't want to get stuck paying Travelers more than they

17      had actually paid.  So if they actually paid five, the

18      note would've gone down so that the payments to them

19      would've been five.

20 Q    I don't think you're fixing on the specific language of

21      this provision.

22 A    Well, that's what I think you're asking.

23 Q    The key point from Klukwan's perspective is that if the

24      surety's total loss net of all receipts on the bonded

25      contracts was less than the amount Klukwan had committed
```

TAB A
to Declaration of Gary Spraker
Page 40 of 46

1    to repay you wanted a credit?

2 A   Yes.

3 Q   That's the key point, right?

4 A   That's the key point.

5 Q   And anything else from your perspective would not have

6    been satisfactory at that point in time, correct?

7 A   Correct.

8 Q   And the reason the $8 million figure is contained here is

9    that's the amount that had been committed to repay,

10    correct?

11 A   That's the amount of interest and principal that was

12    committed to repay.

13 Q   Now, you qualify that with a reference to interest and

14    principal.  Travelers had not made Klukwan a loan of $5,33

15    million, had it?

16    MR. SPRAKER:  Objection, foundation.

17 Q   Go ahead.

18 A   Klukwan -- Travelers didn't make Klukwan a loan of $8

19    million or of any number.  Not in the traditional sense.

20 Q   Turning to Page 3 of the proposed agreement that's part of

21    Exhibit 40, there's a discussion of the KeyBank claim, do

22    you see that?

23 A   Are you in 5(c)?

24 Q   I'm at Paragraph 9.

25 A   Okay, thank you.

Page 176

1  Q    Renfrew.

2  A    Huh?

3  Q    Renfrew.

4  A    Renfrew, Renschew, whatever, or a Scott Miller.  So it

5       sort of depends if my telephone call got through or my --

6       or if I was getting response, too, on how I would proceed.

7  Q    So what do you recall of the initial discussions you had

8       with KPMG regarding the repayment agreement?

9  A    The initial discussions were they said that basically the

10      presentation in the 2002 audit was incorrect, that this

11      was what they referred to as a -- or, what the literature

12      referred to as a troubled debt restructure and that it was

13      incorrectly shown in '02 and needed to be restated as we

14      go into '03.

15 Q    And specifically what KPMG said was you could not take the

16      deferred gain until you had repaid the note in full,

17      correct?

18 A    No, that's not correct.  What they said specifically was

19      as long as there is a contingent in the agreement that

20      would be -- make it so that there could be a different

21      amount than the note, that you could not take deferred

22      gain.  But if there was no contingent in the agreement you

23      could take deferred gain.  So it had nothing to do with

24      the note per se, but the contingency on the bankruptcy

25      provision in the agreement, i.e. no contingent, we

1    could've taken it.

2 Q    And the deferred gain related to the difference between

3    the $8 million total repayment obligation and the full

4    extent of the surety's losses that you would otherwise be

5    liable for under the indemnity agreement, correct?  Isn't

6    that the deferred gain?  That's the deferred gain.

7 A    Actually there were two issues that they claimed, there

8    was the deferred gain and then -- that was the majority of

9    it, which was the difference between the full extent of

10    the losses and eight million, but then there was another

11    piece of it, which was the difference between eight

12    million and 5.4 million.  So basically you could not take

13    the gain between eight and whatever the total was, 13 and

14    a half or whatever, due to the contingency, and you could

15    not take the difference between the eight and the face

16    amount of the note due to another portion of the troubled

17    debt restructure.  The next effect was the total 13 and a

18    half minus any payments that have been received needed to

19    be recorded.

20 Q    So in essence what KPMG told you is you had to show as a

21    long-term liability to Travelers the full extent of the $8

22    million obligation, correct?

23    MR. SPRAKER:  Objection -- objection to the form.  I'm

24 sorry.

25 A    Correct.

1      correct?

2 A    Yes, it looks that way.

3 Q    Did you discuss any aspect of this accounting with Mr.

4      Renfrew?

5 A    Other than I don't like the troubled debt restructure

6      provisions that were -- we have -- how we record it, we

7      had no additional discussion on it.

8 Q    Well, did you have that discussion with him?

9 A    I've had that with him, I've had that with Greg, I've had

10     that with -- Greg French, I've had that with Scott Miller.

11 Q   And did you have that discussion again here on July 12,

12     2006, with Mr. Renfrew?

13 A   2006, that's about a year ago, yes, I would have.

14 Q   Well, what amount should, in your view, have KPMG

15     indicated on the audited financial statements?  Would it

16     be the 6.189 figure that was in the general ledger and

17     reflected on Exhibit 59?

18 A   There are two pieces of debt -- of a troubled debt

19     restructure.  One is that if you have a loan that is less

20     than the principal amount that you originally started

21     with, in this case the approximately 12 or 13 million from

22     Travelers, the you do not recognize a -- the interest as

23     paid nor do you recognize an additional debt forgiveness

24     for that when you first come up with a note.  That's the

25     first portion.  Which is why starting with '03 or '04 we

1    ended up reporting the principal and interest together

2    because for reporting it for that FASB we were required

3    to.  The second portion of it has to do with the when do

4    you take the gain on the difference between the 12 million

5    and the eight million, just roughly speaking.  And that --

6    the FASB basically says that you take that gain when

7    there's no further contingencies that would require you to

8    pay more than that.  And the contingency in this case has

9    to do with is the provision for the bankruptcy provision

10   in the repayment agreement sufficient to cause a

11   contingency, and from KPMG's point of view they have

12   decided that they're not going to make that judgment and

13   therefore they're going to basically require us to record

14   that as a deferred gain on the income statement.  So the

15   conversations I would have had at this point had to do

16   with the -- when do we get to record the deferred gain as

17   revenue.

18                        DEPOSITION EXHIBIT 61 MARKED

19 Q  Can you identify Exhibit 61 as KPMG's audit report for the

20   Klukwan and subsidiaries consolidated financial statements

21   for the year ending December 31, 2005, and December 31,

22   2004?

23 A  And this is the audited financial statements with opinion

24   by the auditors for '04 and '05.

25 Q  Paragraph 13 -- excuse me, Page 13 under Paragraph 8,

1    identified the litigation expenses Travelers incurred in

2    the Peterson Sullivan actio, correct?

3 A    In fact in both actions -- or, this appears to be in the

4    second action, yes.

5 Q    And that was based upon your review of the detailed data

6    regarding Travelers' loss that's found in Exhibit 62 and

7    Exhibit 58, correct?

8 A    Or one there like them.

9 Q    What was the subject matter of the statement that has been

10    redacted here?

11 A    I don't recall.

12 Q    Why -- Do you have any understanding of why a statement

13    made by you to your accountant is somehow subject to a

14    privilege?

15    MR. SPRAKER:  Objection, form.

16 Q    Go ahead.

17 A    I don't understand why.  I mean, I have no basis to know

18    one way or another.

19 Q    You don't even recall the subject matter so I can't.....

20 A    Don't know.....

21 Q    .....figure that out either.

22 A    Don't even recall the subject matter.

23    MR. HOPKINS:  Let's go off the record.

24                     (OFF THE RECORD)

25                  PROCEEDINGS CONTINUED
                        TAB A
                   to Declaration of Gary Spraker
                   Page 46 of 46