UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

TRAVELERS CASUALTY AND              .   Case No. 3:06-CV-00063-TMB
SURETY COMPANY OF AMERICA,          .
a Connecticut corporation,          .
                                    .
          Plaintiff,                .
                                    .
vs.                                 .
                                    .
SOUTH COAST INC., an Alaska.        **DEPOSITION OF THOMAS L. CRANDALL**
corporation, KLUKWAN, INC.,.        **DAY 2**
Alaska Native Village               .
corporation, and CHILKATS' .
PORTAGE COVE DEVELOPMENT             .
COMPANY, an Alaska                   .
corporation,                         .
                                     .
          Defendants.                .
. . . . . . . . . . . . .            .
SOUTH COAST INC., et al,             .
                                     .
     Counterclaim and                .
     Third-Party Plaintiff,.
                                     .
vs.                                  .
                                     .
TRAVELERS CASUALTY AND               .
SURETY COMPANY OF AMERICAN,.
a Connecticut Corporation,  .
STEWART SOKOL & GRAY L.L.C..
and JAN D. SOKOL,                    .
                                     .
     Counterclaim and                .
     Third-Party Defendants.
. . . . . . . . . . . . .

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Travelers                James T. Hopkins, Esq.
Casualty and Surety          Schiffrin Olson Schlemlein
Company of America:           & Hopkins, P.L.L.C.
                             1601 Fifth Avenue, Suite 2500
                             Seattle, Washington 98101

APPEARANCES (Continued):

For South Coast, Inc.,          Gary A. Spraker, Esq.
et al.:                         Christianson & Spraker
                                911 West Eighth Avenue, Suite 201
                                Anchorage, Alaska  99501

For Stewart Sokol &             James D. Gilmore, Esq.
Gray, LLC:                      Clapp, Peterson, Van Flein,
                                 Tiemessen & Thorsness LLC
                                711 H Street, Suite 620
                                Anchorage, Alaska  99501

Also Present:                   Jan D. Sokol

                     *  *  *  *  *

     The deposition of THOMAS L. CRANDALL was continued on

behalf of the Plaintiff and Third-Party Defendant Travelers

Casualty and Surety Company of America before Teresa E. Mielke,

Notary Public in and for the State of Alaska and Reporter for

Gemini Reporting Services, at 943 West Sixth Avenue, Suite 110,

Anchorage, Alaska, on the 31st day of July 2007, commencing at

the hour of 9:05 a.m.

                     *  *  *  *  *

                INDEX TO PROCEEDINGS                PAGES

EXAMINATION BY MR. HOPKINS:                         241-392

                   INDEX TO EXHIBITS              IDENTIFIED

Number:
BY REFERENCE:

  5: 9/29/04 e-mail w/typewritten notes of telephone
     call                                             285

  9: 10/20/04 memorandum to board of directors, board
     update                                           287

                                                              237

INDEX TO EXHIBITS (CONTINUED)        IDENTIFIED

MARKED

64: 4/14/03 letter, C. Langfitt to T. Crandall                242

65: 5/12/03 letter, T. Crandall to C. Langfitt                244

66: 6/2/03 e-mail, T. Crandall to C. Langfitt w/list
    of South Coast and Klukwan officers                       246

67: 6/2/03 C. Langfitt handwritten notes                      248

68: 6/4/03 letter, J. Sokol to Brady & Company                252

69: 12/9/03 letter, J. Sokol to Brady & Company               254

70: 12/8/03 update memo, T. Crandall to Klukwan board         259

71: January 8, 9 & 10, 2004, Time Schedule                    260

72: 5/6/04 Klukwan minutes                                    270

73: 1/8/04 Klukwan minutes                                    264

74: Facsimile, J. Renich to C. Christianson w/attached
    pleadings                                                 279

75: 8/12/04 e-mail, C. Christianson to B. Allen               281

76: 8/12/04 letters, M. Houts, B. Finney and H. Clay
    Keene to C. Christianson                                  284

77: 11/17/04 facsimile, H. Brouillette to C.
    Christianson w/attached Resolution KI-04-17               292

78: 11/17/04 letter, J. Sokol to C. Christianson              294

79: 12/16/04 letter, J. Sokol to C. Christianson              295

80: 6/17/03 e-mail, J. Rosenfeld to T. Crandall               296

81: 10/20/03 letter, T. Crandall to Peterson Sullivan         299

82: 10/10/03 letter, T. Crandall to Peterson Sullivan         300

83: 1/9 and 1/18/2004 e-mails, J. Sokol to C.
    Christianson                                              302

238

INDEX TO EXHIBITS (CONTINUED)    IDENTIFIED

84: 1/21/04 e-mail, J. Sokol to C. Christianson            303

85: 2/2/04 e-mail, J. Sokol to C. Christianson            305

86: 2/9/04 e-mail, J. Sokol to C. Christianson            307

87: 1/23/04 e-mail, J. Sokol to C. Christianson and
    2/10/04 e-mail, C. Christianson to J. Sokol           310

88: 1/23/04, 2/10/04 and 2/13/04 e-mails, J. Sokol and
    C. Christianson                                       316

89: 2/17/04 facsimile, T. Crandall to J. Sokol w/
    attached petition                                     318

90: 5/26/04 e-mail, C. Langfitt to T. Crandall            319

91: 6/29/04 letter, T. Crandall to C. Christianson        321

92: 8/16 and 8/12/04 e-mails, T. Crandall, B. Allen and
    C. Christianson                                       323

93: 1/31/02 letter, R. Gelbrich and T. Crandall to
    Peterson Sullivan                                     326

94: 8/26/04 letter, I. Rowan to L. Katzeek and T.
    Crandall                                              329

95: 9/12/04 Board update                                  333

96: 9/16/04 Notice of Special Meeting, Klukwan, Inc.,
    and agenda                                            340

97: 9/16/04 Klukwan, Inc. Minutes                         342

98: 11/11/04 e-mails, T. Crandall, B. Allen and C.
    Christianson                                          349

99: 11/18/04 e-mail, T. Crandall to K. Taug and
    response                                              354

100: 2/14/05 e-mail, C. Langfitt to T. Crandall           355

101: 3/17/05 e-mails, M. Eckardt and T. Crandall          356

102: 9/20/05 letter, J. Sokol to T. Crandall              358

239

INDEX TO EXHIBITS (CONTINUED)    IDENTIFIED

103: 8/23/05 e-mail, T. Crandall to C. Langfitt    360

104: 9/20/05 letter, J. Sokol to T. Crandall
     (Exhibit 102)    361

105: 10/27/05 e-mail, C. Langfitt to T. Crandall    365

106: 10/27/05 Spreadsheet, Note Payable Travelers Inc.,
     proposed payment schedules    366

107: 11/30/05 e-mail, C. Christianson to C. Langfitt,
     revised workout    371

108: 2/22/06 letter, J. Sokol to T. Crandall    373

109: 3/21/06 letter, C. Christianson to J. Sokol    373

110: 4/6/06 letter, J. Sokol to C. Christianson    379

111: Defendants' Answer and Counterclaim and Third Party
     Complaint, 5/1/06    381

240

Page 280

1 Q    And this fax to Cabot Christianson from Mr. Renich

2      encloses a copy of the complaint filed by Travelers

3      against the former South Coast officers and Peterson

4      Sullivan dated August 2, 2004, correct?

5 A    Yes, correct.

6 Q    And did you receive a copy of this complaint from Cabot

7      Christianson?

8 A    I have seen this, yes.

9 Q    And is that how you first got the complaint, Cabot sent it

10     to you?  Or did you acquire it in some other fashion?

11 A   I got several phone calls probably from -- I know I got

12     Jan, I got Jerry -- i don't know if Jerry called me, Jerry

13     Renich.  I got Jan Paulson, Brad Finney, I believe Mike

14     Houts, I don't remember if Jerry called me or just went

15     directly to Cabot, and I don't think Ron Gelbrich called

16     me.  So about this time frame I got some information that

17     this was proceeding.  I don't recall how I first got a

18     copy of it.

19 Q   So after Travelers filed the law suit you got calls from

20     the former South Coast directors and officers who were

21     named in the complaint?

22 A   Correct.

23 Q   That's how you learned that the law suit had been filed?

24 A   Specifically, yes.

25 Q   And in those initial telephone calls that you received

Page 281

1     from the former South Coast officers who were named by

2     Travelers in its law suit they raised the issue of

3     indemnification of the claims asserted by Travelers,

4     correct?

5   A   I think they would have said something to the effect like

6     how is Klukwan or South Coast going to deal with this

7     issue.

8   Q   Didn't they specifically request indemnification from

9     Klukwan?

10  A   Jan did, I don't remember the others doing that.  They may

11    have but I only remember Jan specifically.

12                              DEPOSITION EXHIBIT 75 MARKED

13  Q   Can you identify Exhibit 75 as Cabot Christianson's e-mail

14    of August 12, 2004.....

15  A   Excuse me.

16  Q   .....to Brandon Allen on which you received a copy?

17  A   Yes.

18  Q   The subject matter was the law suit recently filed by

19    Travelers, correct?

20  A   Yes, Travelers versus Gelbrich et al.

21  Q   Did you discuss with Mr. Allen at this point in time

22    whether or not there'd been proper notice given to the D&O

23    insurer?

24  A   We had had discussions, I don't recall when.

25  Q   Did you learn anything further at this point in time on

1 Q    Can you identify Exhibit 76 as three letters written by or

2      on behalf of Michael Houts, Brad Finney and Jan Paulson,

3      all requesting indemnification from Klukwan?

4 A    Actually in looking at the Michael Houts letter it does

5      not look like they -- he is triggering indemnification by

6      Klukwan; rather he's attempting to say that it triggers

7      the E&O coverage, the officers' errors and omissions,

8      which I don't think we even had.  We did have directors'

9      and officers', excuse me, I missed a line.  So it looks

10     like he's basically saying that he believes that it

11     triggers the obligation under the insurance policy to

12     provide legal representation on his behalf.  I don't see

13     that he is making a claim of Klukwan to indemnify him on

14     his letter.

15 Q   Actually I think you're correct, and that's true of Mr.

16     Finney's letter as well?

17 A   Yeah, and I'm just making sure that I've read again and

18     understand what these say.  And I think that -- I believe

19     that's also true of Mr. Finney's letter.  On Mr. Paulson's

20     letter, besides the fact that they can't spell my name

21     right.....

22 Q   Look at the last paragraph on that letter.

23 A   And he was making a -- Jan Paulson is making a claim for

24     indemnity.  Actually, indemnity and defense.

25 Q   This subject -- this was the subject matter, meaning the

Page 297

1 A    We did provide that letter.

2 Q    And why did you do so?

3 A    Well, two reasons.  First off, we thought that it was

4      beneficial to our relationship with Travelers, and,

5      second, it was required under the agreement.

6 Q    Meaning the repayment agreement?

7 A    Yes.

8 Q    Now, you did have some concern as to the timing of when

9      that letter would be sent, correct?

10 A    I did.

11 Q    What were those concerns?

12 A    We were in the process of finishing up that year's audit.

13 Q    So you wanted Peterson Sullivan to finish the year-end

14      2002 audit before you hit them with this request?

15 A    Correct.

16 Q    And once they had completed that audit did you send the

17      letter to them requesting they produce the working papers?

18 A    We did send the letter, I don't remember the timing -- the

19      delay between the two dates.

20 Q    And did you have any other discussions regarding Rosenfeld

21      at or about this date of Exhibit 80, June 2003?

22 A    I don't know that I've ever talked to Jordan, I don't

23      recall talking to Jordan.

24 Q    So if you did.....

25 A    I may have once.

1 Q    If you did it was on the subject matter of this letter?

2 A    The -- if we did.  I don't remember a conversation.

3 Q    Do you have an understanding of why Travelers wanted

4      Peterson & Sullivan's working papers?

5 A    I understood from their point of view why they wanted

6      them.  I also disagreed.

7 Q    What did you understand?

8 A    They wanted them because they felt that they needed them

9      to build a case.

10 Q   Build a case against Peterson Sullivan?

11 A   Yes.

12 Q   So you understood that Travelers wanted to review the

13     working papers to verify that it had a valid claim against

14     Peterson Sullivan?

15 A   Again, I disagreed with their assumption, but that's what

16     I -- that's what I was told they wanted.

17 Q   You're an ex-CPA who's been involved in audits.  What are

18     working papers?

19 A   Working papers are the documents of what the auditors did

20     as they completed their due diligence in preparation of

21     issuing an audit report.

22 Q   So it's -- is it fair to describe working papers as the

23     most significant or most germane documents to an audit?

24 A   I don't know that I would go quite that fair.  I think the

25     financial statements themselves are the most germane.  But

1    how they reach the conclusion of what opinion to issue

2    it's most germane to that.

3 Q   So if you wanted to know how the auditors went about doing

4    an audit, that would be the first thing you'd ask for?

5 A   It would be reasonable.

6 Q   Now, you agreed to transmit the letter to Peterson

7    Sullivan requesting the working papers without imposing

8    any conditions or quid pro quo from Travelers, correct?

9 A   There was no conditions attached.

10 Q   And that's for the reasons you've earlier indicated, A,

11    you thought it was ultimately in Klukwan's self interest

12    and, B, you thought you had an obligation to do so anyway,

13    correct?

14 A   Those are two reasons, yes.

15                    DEPOSITION EXHIBIT 81 MARKED

16    MR. HOPKINS:   81?

17    REPORTER:   81.

18 Q   Mr. Crandall, do you recognize Exhibit 81 as your letter

19    of October 20, 2003, to Peterson Sullivan?

20 A   Yes.

21 Q   And this was the letter that Travelers had requested you

22    provide to Peterson Sullivan requesting working papers,

23    correct?

24 A   With some minor modifications that I had run by them.

25 Q   And those modifications were worked out in discussions

1    between Mr. Sokol and Mr. Christianson?

2 A   No, I believe they were worked out between me and -- I

3    probably sent them back to Jordan Rosenfeld, now that I

4    think about it.  For instance, in the final paragraph

5    there had been a section that said -- and I'm paraphrasing

6    here -- you know, we've had a long and beneficial

7    relationships with Peterson Sullivan.  I took that out as

8    it's not germane to this.  There might've been a couple

9    other minor changes, but that was the one that reaches --

10   that I can recall.  To an effect just -- just the facts,

11   we want access.

12 Q  Did you also tell Peterson Sullivan at or about this time

13   you'd be using new auditors?

14 A  Sometime right around this time frame, yes.

15                    DEPOSITION EXHIBIT 82 MARKED

16 Q  Is Exhibit 82 another letter from you to Peterson

17   Sullivan?

18 A  Yes, it was.

19 Q  And looking at the lower left-hand corner I see a date of

20   October 10, 2003.

21 A  It's October 2003, my copy has a smudge so I can't tell

22   the date in between.  But it is in October '03 letter.

23 Q  And that's consistent with your recollection of when you

24   sent it?

25 A  Yes, it would've been right about this same time frame.

Page 303

1       REPORTER:   Yes.

2  Q    We've marked as Exhibit 84 an e-mail from Jan Sokol to

3       Cabot Christianson dated January 21, 2004, you see that?

4  A    I do.

5  Q    Do you recall discussing this communication with Cabot

6       Christianson?

7  A    I recall seeing it, I don't recall a discussion on it.

8  Q    You understand Mr. -- did you understand that Mr. Sokol

9       was relaying Travelers' position that it would not agree

10      to apply any sort of credit to Klukwan's note from a

11      recovery against Peterson & Sullivan?

12      MR. SPRAKER:   Objection to form and foundation.

13 A    Actually this e-mail doesn't appear to say that.

14 Q    Did you have any discussions with Mr. Langfitt at this

15      point in time?

16 A    I don't recall.

17 Q    Do you recall any discussions with Mr. Langfitt in January

18      of 2004 regarding a petition to obtain the working papers?

19 A    Can't recall dates, the only discussions I recall having

20      with Chuck on this issue were more of the -- more of the

21      nature of why do you need a suit to recover working

22      papers, I believe you have adequate proof already.

23 Q    Do you recall anything else?

24 A    No.

25 Q    So you don't know whether other discussions occurred or

1 Q    That would've been consistent with your recollection of

2       the procedures between you and Mr. Christianson during

3       this time period, correct?

4 A    Yes.

5 Q    You understood the request from Travelers at this point

6       was for Klukwan to join it in the petition and be one of

7       the parties requesting the working papers, correct?

8 A    Excuse me.  This series of e-mails basically are all the

9       same subject, requesting Klukwan's participation.

10 Q   Did you -- and you understood Travelers believed it would

11      likely have a greater success in obtaining the working

12      papers if Klukwan was also requesting them as well,

13      correct?

14 A   That's what was relayed to me, yes.

15 Q   Do you agree with that?

16 A   I had no basis to know one way or another.

17 Q   That makes sense to you, however?

18 A   It -- it made sense, I just don't know one way or another.

19 Q   You understood Travelers could always proceed on its own

20      with the petition, it didn't have to have Klukwan,

21      correct?

22 A   That's correct.

23 Q   But you did believe that if Travelers proceeded on its by

24      itself to seek the working papers its chance of obtaining

25      them would be diminished?

1       MR. SPRAKER:  Objection, foundation.

2 A     The fact that Peterson Sullivan had been our client -- or,

3       excuse me, we their client and not Travelers would make it

4       more likely that if were part of the request for working

5       papers we would be a more likelihood of success, although

6       in just the request for working papers it had proven

7       unsuccessful.  So we thought it would be more successful

8       but -- than Travelers by themselves, but how successful we

9       didn't know.

10                          DEPOSITION EXHIBIT 86 MARKED

11 Q    Mr. Crandall, we've marked as Exhibit 86 another e-mail

12      from Jan Sokol to Cabot Christianson dated February 9,

13      2004.  You recall receiving a copy of this from Cabot

14      Christianson?

15 A    I don't recall either way.

16 Q    But again this is another request from Mr. Sokol regard --

17      for some response one way or another from Klukwan

18      regarding whether it would join in the petition for the

19      work papers, correct?

20 A    Yes, it was a request on -- for Klukwan's participation,

21      yes or no.

22 Q    And Mr. Sokol indicates in his February 9, 2004, e-mail

23      that Travelers will proceed without Klukwan if it doesn't

24      get a response in the next three days, correct?

25 A    I think the date was 2/12, that sounds right, three days.

Page 317

1 A    The first paragraph says that they will bear the costs and

2      indemnify.

3 Q    That's what you understood it to.....

4 A    That's what I understand it.

5 Q    And the second paragraph, though, rejects Klukwan's

6      condition that the proceeds from any substantive law suit

7      against Klukwan (sic) be applied to the repayment

8      agreement and promissory notes, doesn't it?

9 A    I don't know that it rejects it, it just says that while

10     Travelers understands Klukwan's expectation, it's not

11     consistent with prior agreements between Klukwan and

12     Travelers.  Goes on to say let's just ignore that point

13     and file and go forward.

14 Q   And the prior agreements you understood that were

15     referenced here were the repayment agreement, correct?

16 A   That's correct.

17 Q   And that's -- that was consistent with Travelers' position

18     throughout these discussions, that Klukwan was not

19     entitled to a credit under the repayment agreement for any

20     recovery that Travelers might make on its own claims

21     against Peterson Sullivan?

22 A   That's what's being claimed, yes.

23 Q   And that's what you understood it to mean.

24 A   Prior to this date, yes.

25 Q   That's what you understood them to be saying again right

Page 318

1      here.

2 A    I actually understood it to say let's ignore that and go

3      forward.

4 Q    Well, Mr. Sokol says quite clearly it's not consistent

5      with the prior arrangements, he goes on to say rather than

6      continuing to disagree, let's get the petition.  Doesn't

7      he make clear there's a continuing disagreement?

8 A    Yes.

9 Q    And at that point Klukwan had the option whether or not to

10     proceed with the working paper petition, didn't it?

11 A   It did.

12 Q   Klukwan could've told Mr. Sokol that's not acceptable, I

13     want clear agreement on Travelers' part that you're going

14     to apply the proceeds to the note, couldn't it?

15 A   They could have.

16 Q   Klukwan didn't do that, did it?

17 A   it did not.

18 Q   Klukwan voluntarily proceeded to provide the documents,

19     including your petition on the working papers?

20 A   We did provide the signature.

21                          DEPOSITION EXHIBIT 89 MARKED

22 Q   Can you identify Exhibit 89 as your fax of February 17,

23     2004, to Jan Sokol?

24 A   This is my fax dated 17 February '04.

25 Q   And this contained a signed copy and verification of the

1    petition for the working papers signed and executed by you

2    on behalf of Klukwan, correct?

3  A    Yes, it was signed by me.

4  Q    Did you ultimately learn the court had denied the petition

5    for the working papers?

6  A    The -- who had denied it?

7  Q    The court in Seattle, the Western District federal court

8    in Seattle had denied the petition for the working papers?

9  A    At some point I heard that, yes.

10    MR. HOPKINS:  Let's go off the record.

11                        (OFF THE RECORD)

12                        (ON THE RECORD)

13                        DEPOSITION EXHIBIT 90 MARKED

14  Q    Mr. Crandall, we're resuming your deposition after lunch.

15    And I'd like to show you another document which we've

16    marked as Exhibit.....

17    MR. HOPKINS:  89?

18    REPORTER:  90.

19  Q    .....90, Exhibit 90.   Can you identify this as your e-

20    mail of May 5, 2004, to Chuck Langfitt and his response to

21    you dated May 26, 2004?

22  A    Yes.

23  Q    You recall learning at some point that the petition by

24    Travelers and Klukwan for the working papers had been

25    denied, correct?

Page 320

1  A    Yes.

2  Q    Am I right that your May 5 e-mail to Chuck Langfitt was

3       written to inquire about what Travelers intended to do

4       next?

5  A    That's what it states.

6  Q    You understood at this point in time it was up to

7       Travelers whether it not it proceeded with a law suit

8       against Peterson & Sullivan, correct?

9  A    From their independent point of view, yes.

10 Q    I mean, if they proceeded with their own claim against

11      Peterson Sullivan it was up to them whether they wanted to

12      do it, correct?

13 A    Their claim against Peterson Sullivan was their decision.

14 Q    And Mr. Langfitt in response to your e-mail says we --

15      quote, "we are reviewing filing suit, we will keep you

16      posted," end quote, see that?

17 A    I do.

18 Q    Am I right that the next thing you learned regarding the

19      law suit against Peterson Sullivan was that Travelers had

20      filed a complaint when you heard from the various former

21      South Coast officers?

22 A    I don't recall hearing anything prior to that.

23 Q    So there was no further communications that you recall

24      with Mr. Langfitt after his May 26 e-mail to you which is

25      Exhibit 90?

1 Q    And the subject matter of these e-mails was Travelers'

2      demand for the November payment?

3 A    It was.

4 Q    And you directed Ms. Taug to proceed and make that

5      payment, correct?

6 A    I did.

7 Q    And her response was, quote, "With what?" end quote, you

8      see that?

9 A    I do.

10 Q   And that reflected Klukwan's financial position at the

11     time, correct?

12 A   Correct.

13 Q   Where did Klukwan obtain the funds to make the payment?

14 A   Probably from K-Ply.

15 Q   We've earlier touched on the fact that commencing by early

16     19 -- by early 2005 you had requested Chuck Langfitt on

17     several occasions to revise or renegotiate the repayment

18     agreement, do you recall that?

19 A   I do.

20                          DEPOSITION EXHIBIT 100 MARKED

21 Q   Can you identify Exhibit 100 as Mr. Langfitt's February

22     14, 2005, e-mail to you?

23 A   Yes, I do.

24 Q   And Mr. Langfitt requests certain financial data from you

25     regarding Klukwan, correct?

1  A    He required -- requested 2003 and 2004 financial

2        statements.

3  Q    And you understood this request was in response to your

4        prior communications to him that had scheduled a meeting

5        on February 17, 2005, in which you hoped to discuss

6        renegotiation of the repayment agreement, correct?

7  A    That's my understanding.

8  Q    And you also understood Mr. Langfitt in this February 14,

9        2005, e-mail to emphasize in the second paragraph that

10       there'd been no agreement to modify the repayment

11       agreement and that was the controlling agreement between

12       the parties at this point in time, correct?

13 A    He did have some language in this e-mail.

14 Q    And you didn't write him back and disagree with that

15       proposition, did you?

16 A    I did not.

17                            DEPOSITION EXHIBIT 101 MARKED

18 Q    Can you identify Exhibit 101 as e-mails you exchanged with

19       Marc Eckardt on March 17, 2005?

20 A    I do.

21 Q    And one of the topics here was application of the Chinle

22       claim recovery, correct?

23 A    Correct.

24 Q    And in your response to Mr. Eckardt you outline, quote,

25       "Payments authorized out of proceeds before application to

1      Travelers in the Peterson Sullivan action?

2 A    I did not.

3 Q    Did you ever tell Chuck Langfitt that Mr. Sokol was doing

4      or not doing something that you believed he should've

5      done?

6 A    Other -- other than the fact that I did talk to Chuck

7      Langfitt that I thought it was not necessary to secure

8      working papers, that I thought that there was adequate

9      evidence without same to pursue, and had they pursued at

10     that point there would not have been a statute of

11     limitations issue.

12 Q   When did you have that conversation with Mr. Langfitt?

13 A   Several times during the discussion of why are we going

14     after working papers, why don't we just bypass that step,

15     so it would've been 2003, give or take.  Maybe even

16     early -- late 2002.

17 Q   Did you understand Travelers was relying on Mr. Sokol's

18     advice in pursuing the working papers?

19 A   I don't have -- I believe they did but I don't have any

20     direct knowledge of whose advice they were relying on.

21 Q   If Klukwan was a joint client of Travelers of Mr. Sokol

22     why is Travelers responsible for any of Mr. Sokol's

23     alleged negligence to Klukwan?

24     MR. SPRAKER:  Objection to form, calls for a legal

25 conclusion.

1 A    That's correct.

2 Q    I have not found nor seen in any of the records in this

3      proceeding anything in written form from Klukwan that

4      states and tells Travelers that Klukwan was relying

5      exclusively on Travelers' action.  Are you aware of any

6      such document?

7 A    Not as a document, no.

8 Q    Did you make that statement to Chuck Langfitt?

9 A    I did talk to Chuck Langfitt on more than one occasion

10     that one of the issues out there is Klukwan basically is

11     broke, two, anything we -- that Travelers received as a --

12     on a settlement with P&S or as a direct result of the

13     claim against P&S would benefit Klukwan either to the

14     point of against the note or against the deficiency.

15 Q   Even assuming that statements to have been made, they are

16     not the equivalent of an assertion or statement by you to

17     Mr. Langfitt to the effect that Klukwan's decided not to

18     bring its own action or we're relying exclusively on you.

19     That statement was never made, was it?

20     MR. SPRAKER:  That exact statement?

21     MR. HOPKINS:  Yes.

22 A   That exact statement was never made.

23 Q   Do you understand in interrogatory Number 5, going back to

24     Exhibit 12, Travelers asked Klukwan to identify all

25     documents that Klukwan contended were evidence of the

1 Mr. Crandall's deposition session for today with it to resume

2 tomorrow and Mr. Gilmore will begin with his questioning

3 tomorrow morning, and my follow-up will occur subsequent.

4      MR. SPRAKER:  At some point in time there I might be able

5 to get to ask a question?

6      MR. HOPKINS:  Sure.

7      MR. SPRAKER:  Thank you.

8      MR. GILMORE:  That's not part of the deal.

9      MR. SPRAKER:  A due process thing.

10      MR. HOPKINS:  I assume Mr. Crandall will talk to you at

11 any time, but yes, to ask.....

12      MR. SPRAKER:  I think that.....

13      MR. HOPKINS:  .....Mr. Christianson's question -- excuse

14 me, Mr. Spraker's questions as well.

15      MR. SPRAKER:  I think that'll end the record for the day.

16                    (OFF THE RECORD)

17                    PROCEEDINGS CONTINUED

18                    * * * * *

19

20

21

22

23

24

25

P R O C E E D I N G S

THOMAS L. CRANDALL

continued to testify as follows:

REPORTER:  Mr. Crandall, I'd like to remind you that you
are still under oath.

A    Thank you, I am.

REPORTER:  Thank you.

MR. GILMORE:  Did you want to do your documents now
or.....

MR. HOPKINS:  No, I'll just catch it on my.....

MR. GILMORE:  Oh, on your other go-round.

MR. SPRAKER:  .....follow-up to you.

MR. GILMORE:  Okay.

BY MR. GILMORE:

Q    Mr. Crandall, I wonder if you could tell me a little bit
     about your, quote, litigation experi
     testified in trial before?

A    I have testified at -- sorry.  I hav
     trial as a expert witness before.

Q    When was that?

A    That would've been in 2000.

Q    And where?

A    Here in Anchorage.

Q    What was the nature of the law suit?

A    It was a sexual harassment case between an individual at a

1    outlined.

2 Q    So Jan Sokol as far as you know -- you have no evidence

3    that would indicate to you that Jan Sokol was

4    participating in that conversation?

5 A    That's correct.

6 Q    Okay.  And after that conversation -- so as of August 6th

7    there had still been no decision made about whether

8    Klukwan was going to bring a law suit against Peterson

9    Sullivan?

10 A    Not as an independent law suit, no.

11 Q    Okay, and then subsequently I think it was on September 19

12    a resolution was prepared for the board of Klukwan that

13    would authorize the filing of a law suit by Klukwan

14    against Peterson Sullivan, correct?

15 A    September 19, 2004?

16 Q    Yes.

17 A    I believe that's correct.

18 Q    And that resolution was rejected?  What was the outcome of

19    that?

20 A    The outcome was that after conversation it was never acted

21    upon.  So it wasn't rejected, it wasn't voted on.  And the

22    reason was is if Travelers took the lead Klukwan would

23    benefit, Klukwan and subsidiaries would benefit either

24    directly as against the note payable or indirectly against

25    the difference between the note payable and the amount of

1    the total that Travelers had expended on settling the

2    claims.  From our point of view either would have -- we

3    preferred it to go against the note, but either was a

4    acceptable outcome because we were also trying to get the

5    bankruptcy clause in the agreements modified.  What we

6    found was the bankruptcy clause created a contingent

7    liability which created the inability to write down on our

8    financial statements the difference between the

9    approximately 11 and a half million and the approximate --

10   the amount of the note payable, plus any accrued interest

11   into the future.  That made it hard to get financing.  So

12   we were looking at both trying to get rid of the

13   bankruptcy clause and anything we could do to reduce our

14   future obligation, and any recovery on Peterson Sullivan

15   by Travelers would benefit us.  In addition, they had a

16   cleaner case, because they were a third party relying on

17   Peterson Sullivan, and they would bear the -- bear the

18   payment schedule.

19 Q  When was the final time the decision was made that Klukwan

20   would not join that law suit?

21   MR. SPRAKER:  I'm going to object on foundation.

22 A  Once Travelers had made a decision to go forward and after

23   the September/October time frame of '04, it then turned to

24   just keeping the board updated to what the progress was.

25 Q  So that decision was not made until sometime after

1 A    Had it gone clear through case to a jury and the jury had

2      said there's no recovery here.....

3 Q    Yes.

4 A    .....we'd have been SOL.  Out of luck, excuse me.  We'd

5      have not recovered.  Part of the reason we had decide that

6      Travelers' claim was the one that should go forward

7      instead of us was if they found that Travelers had no

8      case, or no claim or no recovery, I should say, then we

9      also would have had no recovery because our claim was

10     pretty much mirroring theirs.

11 Q   Well, as I recall the e-mails we reviewed yesterday there

12     was an on-going sort of back and forth about whether any

13     dollars that Travelers might recover would be credited to

14     Klukwan, correct?  Klukwan's obligation.

15 A   Yes, there was.  I understood and intended that to mean

16     against the note payable.

17 Q   And that was never -- it was never -- At least in the

18     evidence we saw yesterday never any agreement to that --

19     with that by Travelers?

20 A   There was never any agreement that would go against the

21     note payable, which meant that it would go against the

22     difference between what they paid and the note payable

23     because that was their non-negotiated loss.

24 Q   Well, was there any agreement that Klukwan would benefit

25     at all by a recovery that Travelers might make against

Page 444

1    anything else to personally investigate the problems that

2    were existent back in 2000 with South Coast?

3  A    No, I -- like I said, I was shutting down the business by

4       then.  Therefore it didn't matter.

5  Q    If one were to look at the best expression of what the

6       problems were back in 2000 in terms of the documents we've

7       seen here, what document would you point us to?  Would it

8       be the Sutor report, for example?

9  A    I don't understand the question.

10 Q    Well, is there any -- Are you aware of any report that's

11      been made about what happened in 2000 at South Coast that

12      was improperly -- that caused what's been alleged to be an

13      improper audit here by Peterson Sullivan?

14      MR. HOPKINS:  Objection, object to form, vague, confusing.

15 Q    Are you aware of any such report?

16 A    The reports I would look at that have been presented that

17      tell me that there was internal controls would be the

18      Sutor report and the Peterson Sullivan report.

19 Q    And those were the reports in '02?  March and April of

20      '02?

21 A    Commissioned in November and December of '01, drafted and

22      final -- in early '02 and finalized first quarter '02.

23 Q    Now, you testified yesterday that it was your opinion that

24      it wasn't necessary to get the working papers in order to

25      file a law suit against Peterson Sullivan?

1  A     I believe that's the case.

2  Q     And who was it that you voiced that opinion to, if anyone?

3  A     I voiced that opinion to Chuck Langfitt.

4  Q     Anybody else?

5  A     Cabot Christianson just as a comment, probably as an open

6        discussion in a board meeting just as a comment, but

7        nobody else other than those.

8  Q     Have you seen any -- in the paperwork here any evidence

9        that we -- that supports your statement that you reported

10       that to Chuck Langfitt or to the board or to Cabot

11       Christianson?

12  A    I don't recall seeing anything.

13  Q    And the basis of that statement is what?  Why do you --

14       why is that your opinion?

15  A    Primarily two reasons.  First off, the 2000 audit was --

16       the year end is 12/31 for South Coast and for Klukwan and

17       the majority of the subsidiaries, maybe all at the time,

18       don't recall.  But at least those two was 12/31.  The

19       South Coast audit for -- for '99 started -- the year end

20       was 12/31, '99 the audit was published by the 19th or

21       21st.  One was -- '99's was published one date, and

22       2000's, same issue, was published either the 19th or the

23       21st.  So there was only two days' difference, plus a

24       year, of those.  When you look at year end you don't have

25       bank statements until a few days after the year end, yes,

1    you can go on line, but '99 and 200 were quite a ways ago.

2    On-line access was not as accessible as it is now.  So you

3    had the year end, you don't have all of your bank

4    statements, this is -- the construction is all estimates,

5    and yet the auditors said -- and issued their opinion

6    within three weeks of year end.  I believe that's not

7    giving adequate time to do the field work.  That -- that's

8    one.  The second one is that you look at the -- both the

9    Sutor report and the P&S report that's a year after,

10    roughly a year after the 12/31/00 audit was published, and

11    it said there's a problem with internal controls.  If

12    there's a problem 12 months later, when did that problem

13    start.  I don't believe, given a short three-week audit

14    period, at most, because they already had the audit

15    opinion out, that they could've adequately done the job

16    even at 12/31/00 for that audit, which is published three

17    weeks later.  I don't believe they had enough time to

18    actually look at were internal controls adequate.  Because

19    Peterson Sullivan was hired in, I believe, November of '01

20    to specifically look for fraud and internal control

21    problems, they didn't have that report published for four

22    months.  So if it took them four months to really look at

23    internal controls, how could they do an audit in three

24    weeks?  So I believed that was sufficient to tell us that

25    the working papers were not needed to make a decision.

Page 449

1        terminating.....

2 A      Mike -- Michael Hook.

3 Q      Is he an officer of the bank or.....

4 A      Not any longer.

5 Q      And you say the bank was represented by Lydia Black?

6 A      I believe so.

7 Q      And Klukwan was represented by Bob Blasco, primarily?

8 A      Bob was at that meeting, yes.

9 Q      Did you use Bob for those banking issues?  Was he your

10       primary attorney on that -- those issues?

11 A     At that point in time Ron Gelbrich was in charge.  The

12       other person that was there was Tom Blanton, I forgot

13       about that.  At that point in time Ron Gelbrich was still

14       president and Ron had a relationship, professional

15       relationship with Blasco and Blasco was doing work for the

16       firm.

17 Q     There was some testimony, I think, yesterday that

18       Travelers had expressed an interest in participating in or

19       in suing KeyBank?

20 A     There had been some interest in it, yes.

21 Q     And who -- was that Chuck Langfitt that was talking about

22       that?

23 A     It was in the original discussions from July of 2002.

24 Q     And what were the grounds of such a suit?  What had

25       KeyBank done that it shouldn't have done?

1      MR. HOPKINS:  Objection, form.

2 Q    And what was -- What was the result of that meeting?

3 A    The result of that meeting is we walked away with a

4      general understanding of how we could proceed to get a

5      repayment agreement -- repayment agreement with supporting

6      documents.  It basically ended up being three -- three

7      separate agreements.  The first agreement was the

8      repayment agreement that had two purposes.  The first

9      purpose was settle the indemnity issues, and the second

10     purpose was to provide for a financing mechanism or a

11     mechanism to make any financial payments as a result of

12     settling the indemnity agreement.  The second agreement

13     was the financial instrument itself and that was a note

14     payable.  And the third agreement was a guaranty by two

15     other entities not South Coast, that would've been Klukwan

16     and Chilkats Portage Cove.  That's what ended up being the

17     agreement.

18 Q   Okay, and did you and Travelers came to an understanding

19     as to the material terms as a result of the July 17, 2002,

20     meeting?

21 A   We did.

22 Q   What were those terms as you understood them?

23 A   The first agreement, as I said, the repayment agreement

24     settled the indemnity provisions.  It has some other

25     sections in it, but that was the primary one.  Part of

1      that was a way to make financial payments against that

2      settlement agreement -- or, indemnity settlement.  That

3      agreement was the note payable.  The note payable was

4      designed to show -- to set up a system of payments that

5      would make Travelers whole vis a vis what our agreement

6      was.

7  Q   And did you reach an understanding as to what that

8      agreement was as a result of the July 17, 2002, meeting?

9  A   As a result of that meeting we talked about -- there were

10     two pieces of the discussion, really, on the note at that

11     meeting.  The first piece of the discussion boiled down

12     to, after a lengthy discussion between the parties, that

13     Travelers wanted $8 million repaid.  They didn't care how

14     it was -- how it was characterized.  I wanted to

15     characterize as much of that as a note payable, and the

16     reason for that.....

17  Q  Well, before you get into the reason, can you explain what

18     you mean by a note payable?

19     MR. HOPKINS:  Objection, you should let the witness

20  continue and complete his answer.

21     MR. SPRAKER:  I can conduct my examination.

22  Q  Can you explain what you mean by note payable?

23  A  A note payable is basically a document that states this is

24     the terms of our repayment to Travelers in this case, it

25     basically says here's the principal amount, which within a

Page 469

1    reports themselves led me to believe that something had

2    been missed by Peterson Sullivan.

3 Q   And as of that meeting in July 17, 2002, had you shared

4    that opinion with Mr. Langfitt?

5 A   When Mr. Langfitt first called when I talked to him in

6    June of that year, in June of 2002, the conversation was

7    they were taking over the jobs and I was concerned that,

8    you know, there had to be -- I wanted to have something

9    left for Klukwan because if there was nothing left Klukwan

10   just as well declare bankruptcy, close its door and be

11   done with it.  And I had reiterated -- and Mr. Langfitt

12   had basically assured me that he -- that there would be

13   something left for Klukwan to go forward on.  And at that

14   point I had reiterated, you know, various things that had

15   caused me concern, the reports from Sutor, the reports

16   from P&S, the -- you know, what happened with KeyBank, the

17   very precipitous drop in value and ability to go forward

18   that South Coast had had, basically from revenues --

19   basically from a company that had good revenues, not so

20   good net income, to a company that was -- had tanked.

21 Q   And in that discussed did you discuss Peterson Sullivan at

22   all?

23 A   Just in the general way that I think Peterson Sullivan

24   should be -- that there should be an investigation on

25   Peterson Sullivan to see if there was some liability

1       strike that.  Can you recall any of the specifics of any

2       conversations that you may have had with Mr. Langfitt or

3       Mr. Eckardt between July 2002 and June 2003?

4 A     Not specifically.  I can just recall that there were

5       conversations more of a prodding nature, or reminder

6       nature.  But the 2003, June I believe that one memo was,

7       one handwritten note from Mr. Langfitt, it was obvious

8       that they were now looking at it, and I felt that that was

9       a good -- a good thing.

10 Q    in that time frame do you think there was one additional

11      conversation or multiple conversations?

12 A    There were.....

13      MR. HOPKINS:  Objection, form.

14      MR. GILMORE:  Lack of foundation.

15 Q    You can answer.

16 A    There would've been multiple conversations.

17 Q    Do you have any idea as to how many?

18      MR. GILMORE:  Same objection.

19      MR. HOPKINS:  Likewise.

20 A    No, it -- it wasn't every conversation with -- well, most

21      of my conversations with Marc and it was just a remind

22      Chuck that he needs to look at this, but I can't remember

23      if it -- you know, if my total conversations were three or

24      four or more than that.  I just know that they did occur.

25 Q    What was the purpose of -- actually, why don't you pull

Page 480

1    Travelers, including Mr. Langfitt, regarding the substance

2    of any claims against Peterson Sullivan?

3    MR. GILMORE:  Foundation, lack of foundation.

4    MR. HOPKINS:  Same objection.

5 A  Still not sure I understand your question, I'm sorry.

6 Q  All right.  In the beginning of 2004 there's conversations

7    going on between you and Travelers as to whether or not to

8    bring a federal action to compel the production of work

9    papers by Peterson Sullivan, is that.....

10    MR. HOPKINS:  Objection, form and foundation.

11 Q  Is that what was happening?

12 A  That's what was happening, yes.

13 Q  And my understanding is that that action was to compel

14    production of the work papers, it was not an action on

15    negligence claims against Peterson Sullivan, is that a

16    fair understanding of what was going on then?

17 A  That's my understanding of what that action was.

18 Q  Did you have any discussions during that time frame that

19    related to the underlying substantive actions of

20    negligence or any other claims against Peterson & Sullivan

21    with Travelers?

22    MR. GILMORE:  Lack of foundation.

23    MR. HOPKINS:  Same objection.

24 A  I had talked to Mr. Langfitt on -- in that time frame

25    about why are we going forward with the production of

Page 481

1    documents, I believe you have adequate cause to go

2    forward.  Cause to go forward is the Sutor report, the

3    Sullivan report, as well as sort of the sudden collapse of

4    Travelers (sic).  So I expressed my belief that you did

5    not -- that they did not need the production of documents.

6    And furthermore, at trial or -- or if they brought a

7    recovery suit against them, against Peterson Sullivan,

8    that they would end up with those working papers anyway as

9    part of discovery.

10 Q    Why didn't Klukwan sue Peterson Sullivan at that time?

11 A    Again, there was -- by then it was really two reasons.

12    The first is just a realization that we had other things

13    going on and we did not have the financial dollars to do

14    so, but more importantly Travelers was moving forward.

15    They were -- you know, they had tried to -- we had jointly

16    asked for production, we had asked for production, that'd

17    been turned down, they had sued, that had been turned down

18    at that point, but we were still working cooperatively for

19    the common good, and that would benefit Klukwan.  It would

20    either eliminate or reduce the need for a bankruptcy

21    provision in the repayment agreement or it would apply to

22    the repayment agreement itself, and possibly both,

23    depending on the amount.

24 Q    And did Travelers agree to bring that action?

25 A    Which action?

TAB A
to Declaration of Gary Spraker
Page 84 of 97

1  A    Yes, he did.

2  Q    And that's what's contained at the top of Exhibit 90?

3  A    Yes, it is.

4  Q    And it reads "We are reviewing filing suit.  We will keep

5       you posted," is that correct?

6  A    That's correct.

7  Q    What did you take that to mean?

8  A    It meant that they were still looking at going forward,

9       that they had not determined that they were going to drop

10      the case or not go forward, so basically that continued to

11      mean that we were working jointly, they were -- I was

12      asking what they were doing, I was informing them that we

13      basically believed we had a case, in the past I had

14      informed them that I thought that the case was weak --

15      weaker than theirs, not weak but not as good as theirs.

16      And that -- so it was just an on-going what is Travelers

17      doing.  And this was another one of those responses

18      typical, which was we're still -- we're still going

19      forward, we're still going to file -- well, at least

20      thinking about filing suit.

21 Q    Did you have any concerns as of this time, May 2004, that

22      an action had not yet been filed against Peterson Sullivan

23      for negligence or otherwise seeking damages for their

24      financial statements?

25      MR. HOPKINS:   Objection, vague, ambiguous, confusing.

1    claim against Peterson Sullivan to be applied to Klukwan's

2    obligations under the repayment agreement and note,

3    correctly?

4 A  You use both the repayment agreement and note, I'm not

5    sure I know the distinction that you're trying to make.

6 Q  There's no provision in the repayment agreement as

7    ultimately executed by the parties that requires any

8    recovery by Travelers on Travelers' claims against

9    Peterson Sullivan to be applied to the obligations of

10   South Coast and ultimately Klukwan on the note, correct?

11 A I think there is one provision in the repayment agreement,

12   and to paraphrase it says if Travelers' total losses end

13   up being less than eight million then the note will be

14   reduced.

15 Q Okay, other than that provision are you aware of anything

16   else that you believe would require a recovery by

17   Travelers on Travelers' claims against Peterson Sullivan

18   to be a credit against the note?

19   MR. SPRAKER:  Under the repayment agreement?

20   MR. HOPKINS:  Under the repayment.

21 A Other than that I don't recall any.

22 Q And the clause you just referred to is found in Paragraph

23   9 of Exhibit 42, I believe.  I'd like you to take a look

24   at  Exhibit 24.

25 A Thank you.

1      MR. SPRAKER:  Objection to the form, calls for a legal

2  conclusion.

3  Q    Go ahead.

4  A    It's my belief that Peterson Sullivan is not a bonded

5       contract.

6  Q    You testified regarding the discussions that took place

7       among Klukwan's board at the mid-September 2004 meeting

8       regarding whether Klukwan should pursue its own claim

9       against Peterson Sullivan in response to questions by Mr.

10      Spraker, do you recall that topic generally?

11 A    I do.

12 Q    I think the term you used is you went up on a white board?

13 A    Yes.

14 Q    And you outlined various scenarios, correct?

15 A    That's correct.

16 Q    And those scenarios projected various different possible

17      recoveries by Travelers, correct?

18 A    That's correct.

19 Q    And you certainly recognized at the time there was no

20      certainty as to what recovery Travelers might obtain from

21      Peterson Sullivan, correct?

22 A    That's correct.

23 Q    And indeed the scenarios that you outlined ranged from a

24      $4 million recovery to an $8 million recovery?

25 A    I think those are what I used in described how I went

1 Q    And the upshot of that meeting is Klukwan decided to table

2      the issue and didn't make a formal decision one way or the

3      other whether it should proceed with its own action?

4 A    That's correct.

5 Q    You -- Earlier you testified also that on at least one

6      occasion you told Chuck Langfitt that in your opinion

7      Travelers did not need the working papers to proceed with

8      an action against Peterson Sullivan?

9 A    That's correct.

10 Q   I assume you agree if Travelers didn't need those working

11     papers neither did Klukwan?

12 A   That's correct.

13 Q   The dates and the substance of those conversations are not

14     memorialized in any document that you're aware of,

15     correct?

16 A   Not that I'm aware of.

17 Q   You also testified you became concerned at some point as

18     to the delay and amount of time that it was taking to

19     pursue the working papers?

20 A   That's correct.

21 Q   But despite that concern Klukwan did not proceed with its

22     own action against P&S, did it?

23 A   No, they did not.

24 Q   And there was no reason they couldn't have filed a law

25     suit against P&S whenever it wasn't to, was there?

Page 526

1  A     They could've filed.

2  Q     And you also testified at some point you became

3        specifically concerned about the statute of limitations in

4        regard to a law suit against Peterson Sullivan?

5  A     I did.

6  Q     But even when that concern arose Klukwan did not take any

7        action by proceeding immediately with its own law suit

8        against Peterson Sullivan, did it?

9  A     It did not.

10 Q     Nor did you communicate your concerns in any sort of

11       written fashion to Mr. Langfitt?

12 A     I did not.

13 Q     There was a reference to something I think described as

14       the TERRO tax problem.

15 A     Yes.

16 Q     You recall that?

17 A     I do.

18 Q     What was that?

19 A     In either '99 or 2000 -- and I'm doing this from memory, I

20       was not present at the time.  But either in '99 or 2000

21       South Coast Arizona operations bid a job in Arizona that

22       was partially or maybe completely on the Navajo

23       reservation.  As part of that job -- or, that bid they had

24       failed to include a particular tax, it's a TERRO tax, I

25       forget what TERRO stands for.  And as a result of that

Page 555

1          MR. SPRAKER:   That ends it.

2                         (OFF THE RECORD

3                    END OF PROCEEDINGS

4                      *  *  *  *  *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

TRAVELERS CASUALTY AND           .  Case No. 3:06-CV-00063-TMB
SURETY COMPANY OF AMERICA,       .
a Connecticut corporation,       .
                                 .
        Plaintiff,               .
                                 .
vs.                              .
                                 .
SOUTH COAST INC., an Alaska.     **DEPOSITION OF THOMAS L. CRANDALL**
corporation, KLUKWAN, INC.,.     **DAY 4**
Alaska Native Village            .
corporation, and CHILKATS'  .
PORTAGE COVE DEVELOPMENT          .
COMPANY, an Alaska               .
corporation,                     .
                                 .
        Defendants.              .
  . . . . . . . . . . . .        .
SOUTH COAST INC., et al,         .
                                 .
    Counterclaim and             .
    Third-Party Plaintiff,.
                                 .
vs.                              .
                                 .
TRAVELERS CASUALTY AND           .
SURETY COMPANY OF AMERICAN,.
a Connecticut Corporation,  .
STEWART SOKOL & GRAY L.L.C..
and JAN D. SOKOL,                .
                                 .
    Counterclaim and             .
    Third-Party Defendants.
  . . . . . . . . . . . . .

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Travelers                James T. Hopkins, Esq.
Casualty and Surety          Schiffrin Olson Schlemlein
Company of America:           & Hopkins, P.L.L.C.
                             1601 Fifth Avenue, Suite 2500
                             Seattle, Washington 98101

APPEARANCES (Continued):

For South Coast, Inc.,        Gary A. Spraker, Esq.
et al.:                       Christianson & Spraker
                              911 West Eighth Avenue, Suite 201
                              Anchorage, Alaska  99501

For Stewart Sokol &           James D. Gilmore, Esq.
Gray, LLC:                    Clapp, Peterson, Van Flein,
                               Tiemessen & Thorsness LLC
                              711 H Street, Suite 620
                              Anchorage, Alaska  99501

* * * * *

The deposition of THOMAS L. CRANDALL was continued on
behalf of the Plaintiff and Third-Party Defendant Travelers
Casualty and Surety Company of America before Teresa E. Mielke,
Notary Public in and for the State of Alaska and Reporter for
Gemini Reporting Services, at 943 West Sixth Avenue, Suite 200,
Anchorage, Alaska, on the 28th day of September, 2007,
commencing at the hour of 10:45 a.m.

* * * * *

| INDEX TO PROCEEDINGS | PAGES |
|---|---|
| EXAMINATION BY MR. HOPKINS: | 560-600 |
| EXAMINATION BY MR. GILMORE: | 600-616 |
| EXAMINATION BY MR. SPRAKER: | 617 |
| EXAMINATION BY MR. GILMORE: | 618 |
| EXAMINATION BY MR. HOPKINS: | 618-620 |

INDEX TO EXHIBITS                                    IDENTIFIED

Number:

204: Excel spreadsheet schedules                        561

205: 12/16/05 e-mail, H. Brouillette to various, w/
     attached 12/16/05 memorandum                       571

206: Klukwan, Inc. Board of Directors Meeting, February
     25 & 26, 2006, power point presentations           575

558

<u>INDEX TO EXHIBITS (CONTINUED</u>    <u>IDENTIFIED</u>

Number:

207: Handwritten notes, T. Crandall                                577

BY REFERENCE:

29: 1/19/06 letter, W. Earnhart to T. Crandall                     587

51: 12/31/03 and 2002, Klukwan, Inc. and Subsidiaries
    Consolidated Financial Statements and Supplementary
    Information                                                     566

59: 7/18/06 audit request letter to C. Langfitt                    577

81: 10/20/03 letter, T. Crandall to Peterson Sullivan              600

82: 10/10/03 letter, T. Crandall to Peterson Sullivan              600

108: 2/22/06 letter, J. Sokol to T. Crandall                       574

175: 3/7/05 letter, C. Christianson to T. Crandall                 562

176: 1/21/04 memorandum, G. Spraker to C. Christianson             580

177: 2/6/04 e-mail, C. Christianson to T. Crandall                 578

178: 2/12/04 memorandum, G. Spraker to C. Christianson             580

183: 1/19/07 e-mail exchange, C. Christianson/T. Crandall
     w/attached draft letter                                       588

191: 1/15/04 e-mail, J. Sokol/C. Christianson/T.
Crandall                                                           596

201: 2/3/05 e-mail, T. Crandall to C. Christianson                 594

559

Page 560

P R O C E E D I N G S

(Oath administered)

MR. CRANDALL:  I do.

THOMAS L. CRANDALL

testified as follows:

REPORTER:  And please state your name for the record.

A    Thomas L. Crandall.

REPORTER:  And has anything changed since the last time we took your deposition in terms of your address?

A    No, no changes.

REPORTER:  Thank you.  Mr. Hopkins?

BY MR. HOPKINS:

Q    Mr. Crandall, I'm Jim Hopkins, I represent Travelers. We're resuming your deposition after the production of certain additional documents by Klukwan in this litigation and that's largely going to be the focus of my questioning.  My first -- and I assume you recall the procedures and rules we previously discussed regarding the deposition?

A    I do.

Q    And it's true that since I last took your testimony you have, in conjunction with your counsel, Mr. Spraker, identified and provided certain additional documents to Travelers?

A    There have been additional documents provided, yes.

Page 569

1      agreement?

2 A    Since KPMG is not an attorney, they're an auditor, I

3      believe that having an opinion of our audit -- of our

4      account -- excuse me.  Of our attorney would carry more --

5      carry some weight.

6 Q    You're not focusing on my question.  My question is.....

7 A    Then please restate.

8 Q    Did you have any understanding of whether this opinion,

9      the opinion expression by Mr. Christianson in the March 7,

10     2005, letter that we've marked as Exhibit 175, did you

11     have any understanding as to how that might affect KPMG's

12     view as to when Klukwan could recognize the gain that it

13     had negotiated as a result of the repayment agreement, the

14     gain being the difference between Travelers' total loss

15     and Klukwan's repayment obligations under the repayment?

16 A   An understanding with whom?  I don't know who the

17     understanding may be with.

18 Q   Within your own mind, between your own two ears.  Did you

19     have any understanding of that issue?  I'm just trying to

20     find out if you have an understanding.  If you don't, I'll

21     ask Mr. French.

22 A   I believe that it was germane to the discussion, I had no

23     understanding of what the outcome would be of that

24     discussion.

25 Q   Did you hope -- or, strike that.  Would it have been to

Page 570

1    Klukwan's benefit if it could have recognized in its 2004

2    financial statements the gain between Travelers' total

3    loss and the amount of Klukwan's obligation under the

4    repayment agreement?

5    MR. SPRAKER:   Objection, vague, lack of foundation.

6 A   I believe that it would have improved the appearance of

7    Klukwan's balance sheet, and to the extent that it

8    improved it it may have a benefit.

9 Q   And, all things being equal, you would've liked to have

10    recognized that gain?

11 A   All things being equal, my job is to put a reasonably good

12    foot forward as long as I have a basis for putting that

13    foot forward.

14 Q   And did you have discussions with the KPMG auditors on

15    that subject?

16 A   Yes.

17 Q   And did those discussions at least in part prompt you to

18    ask for this opinion from Mr. Christianson which is his

19    March 7, 2005, letter, Exhibit 175?

20 A   I think that's what I've said earlier, yes.

21 Q   Did you ever go back to KPMG after transmittal to them of

22    Mr. Christianson's March 7, 2005, letter, Exhibit 175, did

23    you ever go back to KPMG and tell them that there were

24    errors in Mr. Christianson's letter?

25 A   No.

Page 620

1    factor in the decision-making process as to whether or not

2    to pursue the claim, correct?

3 A    Correct.

4    MR. HOPKINS:  I don't have anything further.

5    MR. SPRAKER:  Looks like you can make your plane.

6                    (OFF THE RECORD)

7                    END OF PROCEEDINGS

8                    *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25