# Tab B

Deposition Testimony of Cabot Christianson

Declaration of Gary Spraker
Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

Tab B
to Declaration of Gary Spraker
Page 1 of 71

Defendants' Opposition to Motion for Summary Judgment and Cross Motion

Index of Deposition Testimony of Cabot Christianson

| Page # |
|--------|
| 22 |
| 23 |
| 24 |
| 25 |
| 62 |
| 64 |
| 65 |
| 80 |
| 81 |
| 82 |
| 87 |
| 88 |
| 89 |
| 114 |
| 115 |
| 116 |
| 117 |
| 118 |
| 119 |
| 120 |
| 121 |
| 122 |
| 123 |
| 124 |
| 125 |
| 126 |
| 127 |
| 128 |
| 129 |
| 130 |
| 131 |
| 132 |
| 133 |
| 134 |
| 144 |
| 145 |
| 146 |
| 147 |
| 148 |

Defendants' Opposition to Motion for Summary Judgment and Cross Motion

Index of Deposition Testimony of Cabot Christianson

| |
|---|
| 180 |
| 181 |
| 182 |
| 190 |
| 191 |
| 192 |
| 193 |
| 194 |
| 195 |
| 196 |
| 198 |
| 199 |
| 202 |
| 231 |
| 232 |
| 239 |
| 275 |
| 276 |
| 281 |
| 282 |
| 285 |

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

TRAVELERS CASUALTY AND          .    Case No. 3:06-CV-00063-TMB
SURETY COMPANY OF AMERICA,      .
a Connecticut corporation,      .
                                .
        Plaintiff,              .
                                .
vs.                             .
                                .
SOUTH COAST INC., an Alaska.         **DEPOSITION OF CABOT CHRISTIANSON
corporation, KLUKWAN, INC.,.         DAY 1**
Alaska Native Village           .
corporation, and CHILKATS' .
PORTAGE COVE DEVELOPMENT         .
COMPANY, an Alaska              .
corporation,                    .
                                .
        Defendants.             .
 .  .  .  .  .  .  .  .  .  .  .  .
SOUTH COAST INC., et al,        .
                                .
     Counterclaim and           .
     Third-Party Plaintiff,.
                                .
vs.                             .
                                .
TRAVELERS CASUALTY AND          .
SURETY COMPANY OF AMERICAN,.
a Connecticut Corporation,      .
STEWART SOKOL & GRAY L.L.C..
and JAN D. SOKOL,               .
                                .
     Counterclaim and           .
     Third-Party Defendants.
 .  .  .  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Travelers            James T. Hopkins, Esq.
Casualty and Surety      Schiffrin Olson Schlemlein
Company of America:       & Hopkins, P.L.L.C.
                         1601 Fifth Avenue, Suite 2500
                         Seattle, Washington 98101

APPEARANCES (Continued):

For South Coast, Inc.,          Gary A. Spraker, Esq.
et al.:                         Christianson & Spraker
                                911 West Eighth Avenue, Suite 201
                                Anchorage, Alaska  99501

For Stewart Sokol &             James D. Gilmore, Esq.
Gray, LLC:                      Clapp, Peterson, Van Flein,
                                 Tiemessen & Thorsness LLC
                                711 H Street, Suite 620
                                Anchorage, Alaska  99501

Also Present:                   Thomas L. Crandall

                    *  *  *  *  *

    Pursuant to Notice, the deposition of CABOT CHRISTIANSON
was taken on behalf of the Plaintiff and Third-Party Defendant
Travelers Casualty and Surety Company of America before Teresa
E. Mielke, Notary Public in and for the State of Alaska and
Reporter for Gemini Reporting Services, at 943 West Sixth
Avenue, Suite 200, Anchorage, Alaska, on the 27th day of
September, 2007, commencing at the hour of 9:00 a.m.

                    *  *  *  *  *

                INDEX TO PROCEEDINGS                    PAGES

EXAMINATION BY MR. HOPKINS:                             7-238

EXAMINATION BY MR. GILMORE:                           238-270

                    INDEX TO EXHIBITS              IDENTIFIED

Number:
MARKED:

170: Billing records                                     26

171: 9/6/02 letter, C. Christianson to C. Langfitt       77

172: 9/16/02 letter, C. Langfitt to C. Christianson      77

                                                          2

INDEX TO EXHIBITS, CONTINUED          IDENTIFIED

Number:
MARKED

173: 12/6/02 letter, C. Christianson to Travelers                    95

174: Various letters, C. Christianson to KPMG, redacted             105

175: 3/7/05 letter, C. Christianson to T. Crandall                  111

176: 1/21/04 memorandum, G. Spraker to C. Christianson              123

177: 2/6/04 e-mail, C. Christianson to T. Crandall                  132

178: 2/12/04 memorandum, G. Spraker to C. Christianson              135

179: 3/16/04 e-mail, C. Christianson to G. Spraker                  136

180: Handwritten notes                                              145

181: 7/6/04 letter, C. Christianson to KPMG                         150

182: 11/10/05 e-mail, C. Christianson to T. Crandall                167

183: 1/19/07 e-mail exchange, C. Christianson/T. Crandall
     w/attached draft letter                                        173

184: 6/19/03 e-mail exchange                                        177

185: 9/23/03 e-mail, T. Crandall to C. Christianson                 183

186: 10/10/03 e-mail, T. Crandall to C. Christianson                184

187: 10/17/03 facsimile, J. Sokol to C. Christianson
     w/attached 10/8/03  letter, R Holmdahl to J. Sokol             185

188: 10/17/03 e-mail exchange, C. Christianson/
     T. Crandall                                                    186

189: 12/8/03 memorandum, T. Crandall to Klukwan Board               187

190: Klukwan privilege document 406                                 188

191: 1/15/04 e-mail, J. Sokol/C. Christianson/T.
     Crandall                                                       189

192: 1/21/04 e-mail, J. Sokol/Christianson/T. Crandall              191

193: 2/11/04 e-mail, T. Crandall to C. Christianson                 200

INDEX TO EXHIBITS, CONTINUED        IDENTIFIED
Number:
MARKED

194: 4/14/04 e-mail, J. Sokol to C. Christianson w/order    203

195: 3/26/04 e-mail, T. Crandall to C. Christianson    203

196: 11/10/04 letter, C. Christianson to various    210

197: 11/29/04 letter, C. Christianson to J. Sokol    210

198: 11/10/04 e-mail, C. Christianson to B. Allen    211

199: 11/10/04 letter, C. Christianson to C. Langfitt    212

200: 12/6/02 Repayment Agreement (Exhibit 42 w/circles)    219

201: 2/3/05 e-mail, T. Crandall to C. Christianson    232

BY REFERENCE:

  5: 9/29/04 e-mail w/attachment (notes)    160

 15: Privilege log    19

 28: 11/15/05 letter, T. Crandall to J. Ferris
     w/attachments    166

 29: 1/19/06 letter, W. Earnhart to T. Crandall    172

 31: 6/12/02 letter agreement, T. Crandall and C.
     Langfitt w/attached acknowledgement of default    46

 32: Indemnity agreements    229

 34: 6/10/02 letter, C. Langfitt to T. Crandall    41

 35: 6/22/02 letter, T. Crandall to C. Langfitt w/attached
     spreadsheet    47

 36: 7/9/02 e-mail, T. Crandall to R. Mattoon w/attached
     7/2/02 letter, C. Langfitt to T. Crandall    52

 37: 7/12/02 e-mail, M. Stevenson to R. Sparks, T.
     Blanton, T. Crandall w/attached 7/10/02 board update    53

 40: 8/2/02 e-mail, C. Christianson to C. Langfitt
     w/attached agreement, note and guaranty    71

4

<u>INDEX TO EXHIBITS, CONTINUED</u>          <u>IDENTIFIED</u>

Number:
BY REFERENCE:

41: 8/30/02 letter, C. Langfitt to C. Christianson
    w/attached agreement, note and guaranty                74

42: 12/14/02 Repayment Agreement                         79/215

46: 8/30/03 Excerpt from power point presentation for
    Klukwan Inc. & Subsidiaries Annual Meeting             97

49: 11/24/04 e-mail string, T. Crandall to M. Eckardt      98

50: Accounting of note prepared first quarter, 2005        99

57: 8/7/05 e-mails, T. Crandall to (various) w/attached
    slides                                                100

59: 7/18/06 audit request letter to C. Langfitt           109

64: 4/14/03 letter, C. Langfitt to T. Crandall            205

68: 6/4/03 letter, J. Sokol to Brady & Company            205

69: 12/9/03 letter, J. Sokol to Brady & Company           207

78: 11/17/04 letter, J. Sokol to C. Christianson          219

79: 12/16/04 letter, J. Sokol to C. Christianson          231

81: 10/20/03 letter, T. Crandall to Peterson Sullivan     186

82: 10/10/03 letter, T. Crandall to Peterson Sullivan     184

87: 1/23/04 e-mail, J. Sokol to C. Christianson and
    2/10/04 e-mail, C. Christianson to J. Sokol           194

88: 1/23/04, 2/10/04 and 2/13/04 e-mails, J. Sokol and
    C. Christianson                                       201

90: 5/26/04 e-mail, C. Langfitt to T. Crandall           203

91: 6/29/04 letter, T. Crandall to C. Christianson       148

95: 9/12/04 Board update                                 155

98: 11/11/04 e-mails, T. Crandall, B. Allen and C.
    Christianson                                          158

5

INDEX TO EXHIBITS,CONTINUED          IDENTIFIED

Number:
BY REFERENCE

105: 10/27/05 e-mail, C. Langfitt to T. Crandall                234

107: 11/30/05 e-mail, C. Christianson to C. Langfitt,
     revised workout                                        107/235

108: 2/22/06 letter, J. Sokol to T. Crandall                   235

109: 3/21/06 letter, C. Christianson to J. Sokol               237

122: 9/17/03 e-mail, C. Langfitt to J. Sokol                   181

6

1        construction job and pay his subs and that in exchange for

2        that promise to the third party collects a premium from

3        the contractor.  And if the surety is called upon to

4        perform on the bond, then it has a claim against the

5        contractor.

6    Q   And the surety earns its revenue through a premium for

7        issuing the bond, is that consistent with your

8        understanding?

9    A   I would say so, yes.

10   Q   That premium's typically paid when the bond is issued?

11   A   Uh-huh, yes.

12   Q   And the surety does not advance or loan funds when it

13       issues a bond, does it?

14   A   No.  The flow of money is the other direction, I think.

15   Q   How about the general business model of a lender?  I

16       imagine that's something you have a understanding of.

17   A   Well, the plan is that a creditor lends money and receives

18       back that money, hopefully, with some interest.

19   Q   So when a lender loans funds it earns its revenue via

20       interest on the loan, correct?

21   A   Yes.

22   Q   And if the lender is repaid the principal amount of its

23       loan it's effectively made whole, is it not?

24       MR. SPRAKER:  I'm going to object to the extent it calls

25   for a legal analysis rather than a factual question.

1  Q    Go ahead.

2  A    Well, as a general proposition, yes, you get the principal

3       and interest back, then it's -- get its principal back,

4       it's made whole, and get its interest back, it's received

5       its.....

6  Q    Profit.

7  A    Its profit, if you will, sure.

8  Q    You agree there's significant differences between the

9       business models of a lender and a surety?

10 A    Sure.

11 Q    Have you ever been a party to a law suit?

12 A    Yes.

13 Q    How often?

14 A    In 1982 I became a partner with an attorney, Robert

15      Buckalew, and he and I were partners for three years.  He

16      had some severe personal problems, as it turned out, which

17      generated a number of suits against him and me as his

18      partner, although I was named as a partner, not as a

19      primary person.  And then I think in the late '80s a

20      client of mine sued me on a claim that I had committed

21      malpractice.

22 Q    Was the initial law suit you described, was that a

23      malpractice action or was that based on some other alleged

24      conduct?

25 A    Well, the first -- I think there were two or three suits,

Page 24

```
 1      but they were based on the fraud of my partner.

 2 Q    And that involved.....

 3 A    It involved dipping into a trust account and forging

 4      documents and whole number of other things that my partner

 5      had done that I was not aware of.

 6 Q    Were you found liable in that action.....

 7 A    No.

 8 Q    .....in any way?

 9 A    No.

10 Q    And the other instance where you were a party was the

11      malpractice action?

12 A    Right.

13 Q    What was the result of that action?

14 A    It was settled for nuisance value.

15 Q    What was the basic allegation?

16 A    The basic allega -- it was a physician who filed Chapter 7

17      and had an obligation to the IRS and was upset afterwards

18      that the IRS obligations survived the bankruptcy.

19      Unfortunately he had failed to tell me that he had the IRS

20      obligation when he filed bankruptcy and so that was my

21      basic position in the case.  And, as I say, it settled for

22      a lot less than defense costs.

23 Q    What bar associations are you a member of?

24 A    Alaska Bar, U. S. Supreme Court, Ninth Circuit, District

25      of Alaska.  I'm not a member of any bars outside the
```

1          state.

2 Q        Have you ever been the subject of disciplinary

3          proceedings?

4 A        No.

5 Q        You were initially engaged by Klukwan in May of 2002?

6 A        I think that's correct, yes.

7 Q        And what I'd like to just get an understanding of was the

8          structure of your firm at that time and how it changed

9          over the course of your representation of Klukwan.

10 A       Let's see if I can get this right.  From -- actually from

11         1992 to November of 2002 the firm was Bundy &

12         Christianson, and at the time my associates were Gary

13         Spraker and Michelle Boutin.  In November of '02 David

14         went off on his own and the firm became Christianson,

15         Boutin & Spraker.  And that continued until July of '05?

16         Some -- sometime around July of '05 Michelle went off on

17         her own -- or, she joined another firm.  Then the firm

18         became Christianson & Spraker.

19 Q       And if I understand you correctly, then you've had a

20         professional relationship with Mr. Spraker since 1991?

21 A       No, that -- David and I became partners in '92, and it was

22         sometime after that that we hired Mr. Spraker as an

23         associate.

24 Q       Did Mr. Bundy have any role in representing Klukwan or its

25         subsidiaries?

1       about the issue of payments on the note.....

2       MR. SPRAKER:  No.

3 A     .....versus the note?

4       MR. SPRAKER:  Let -- he's.....

5 A     All right, I'll wait for his question.

6 Q     Well, let me ask you another question, then.  You disagree

7       that Klukwan -- well, strike that.  If I understand your

8       testimony correctly, it is not your understanding that at

9       the July 17, 2002, meeting a tentative agreement was

10      reached whereby Klukwan would make total payments to

11      Travelers of $8 million over time?

12      MR. SPRAKER:  Objection to the form.

13 A    I think it's an inaccurate and incomplete description.

14 Q    Did Klukwan as you recall agree to make payments totaling

15      any amount to Travelers at the July 17, 2002, meeting?

16 A    The parties agreed to a payment.....

17 Q    That isn't my question.

18 A    Okay, yes, I'm answering your question.  The parties

19      agreed to a payment schedule which in total called for

20      total payments to Travelers over time of $8 million, that

21      is correct.

22 Q    The other aspects of the agreement between Travelers and

23      Klukwan, such as collateral and the form of the agreement

24      that would memorialize that repayment obligation, remained

25      to be worked out later, correct?

1  A    Well, you could just run through the repayment agreement

2        and.....

3  Q    Well, first tell me what you recall.

4  A    Okay, well, certainly the release of all claims was an

5        important part of the agreement, that this is -- you know,

6        that this payment schedule is in substitute of any other

7        claims that existed of any sort between the parties.  That

8        was an important pat.  The security was a huge, huge

9        issue, and that was important.  The -- I call it the

10       spring-back provision where if there was a bankruptcy

11       filing the obligation would go back was important to

12       Langfitt.  I thought it was pointless, but, I mean, it was

13       important to him.  The stipulation for release of

14       automatic stay that's contained in the repayment agreement

15       was another issue that was important to him, to him, that

16       -- even though I told him it was not enforceable.  The

17       provision that if the -- if Travelers' total loss turn out

18       to be less than $8 million that that -- that Travelers'

19       actual loss was a cap on any payments under the note.

20       That was an important provision.  Those are the main ones

21       that come to mind.  There may be some others that I don't

22       recall right off.

23  Q    What you've described as the spring-back provision, that

24       was a request by Travelers for a term in any agreement

25       that provided the liability of Klukwan and the other

1    indemnitors on any indemnity agreement would be measured

2    by Travelers' total loss rather than the reduced amount of

3    the repayment agreement in the event of bankruptcy,

4    correct?

5 A    That's correct.

6 Q    And later communications have also described that

7    provision as the poisoned pill?

8 A    I think that term has been used, yeah.

9 Q    Aside what you've just related to me, do you recall

10    anything else that you believe was agreed to at the July

11    17, 2002, meeting?

12 A    I'd say I have to go through the repayment agreement to

13    see what else is there, but those are the main terms.

14 Q    Isn't it true that Klukwan specifically requested that its

15    repayment obligation be structured as a promissory note?

16 A    Yes, most definitely.

17 Q    And Klukwan hoped by that fact to improve its balance

18    sheet by only showing the principal amount of the note,

19    correct?

20 A    Well, among other things, it.....

21    Well, let's focus on that question.  Do you.....

22    MR. SPRAKER:  No.....

23 Q    .....agree with me or not?

24 A    Well, among other things, Yes, that was.....

25 Q    Did you understand or get the impression from discussions

1  A      It looks that way, yes.

2  Q      All right.  Focusing on Page 1 under the definitional

3         section?

4  A      Yes.

5  Q      First definition is of the term bonded contract.

6  A      Yeah.

7  Q      Quote, shall mean any contract that is referenced or

8         described in any bond issued on behalf of any Klukwan

9         entity, end quote.

10  A     Uh-huh (affirmative).

11  Q     Now, at the time the repayment agreement was executed a

12        claim against Peterson & Sullivan by either Travelers or

13        Klukwan was certainly not a bonded contract as that term

14        was defined in the agreement, was it?

15  A     The -- the Peterson Sullivan claim and the directors'

16        claim, and for that matter any other claim against any

17        other party, was not at all discussed, as I recall, at the

18        July meeting.  There was no -- it now appears, I guess,

19        that it was within the contemplation of Chuck Langfitt in

20        his own mind, perhaps, but it was not part of the

21        discussion.  And so the -- the claim against Peterson

22        Sullivan falls without -- outside of the literal

23        definition of bonded contract, I would agree with you, as

24        well as the directors and officers.  But.....

25  Q     I think that answers my question.

1  A     Well, it's -- let me finish.....

2        MR. SPRAKER:  Let him answer his.....

3        MR. HOPKINS:  Well, he's not answering the question, he's

4  providing a speech and I'm going to object to this.....

5  A     Well.....

6        MR. HOPKINS:  .....portion of the testimony as

7  nonresponsive.

8  A     Okay, I think it is a -- within the -- absolutely within

9        the spirit of the document that it be covered.  In fact,

10       the document would be nonsensical if you did not include

11       it that way.  Did not -- if you did not interpret the term

12       bonded contracts to include a -- something like a third-

13       party claim against Peterson Sullivan.  It would be.....

14 Q     I just want to -- let's focus on the question, then.  Is

15       it your testimony, then, Mr. Christianson, when you read

16       the definition of bonded contract on the first page of the

17       repayment agreement as executed by the party you believed

18       that definition included a recovery on a claim from

19       Peterson Sullivan?

20 A     That is a distortion of my testimony.

21 Q     Well, tell me.  Just tell me whether that was your belief

22       or not.  If that is not accurate, then say so.

23       MR. SPRAKER:  When?  Now, or back then?

24 Q     At the time the repay.....

25       MR. HOPKINS:  My question was clear, counsel.

Page 82

1 Q    At the time the repayment agreement was executed was it

2      your belief that the definition of bonded contract found

3      on the first page of the repayment agreement included a

4      recovery on a claim by Travelers against Peterson

5      Sullivan?

6      MR. SPRAKER:  Objection, foundation, assumes facts.

7 Q    Go ahead.

8 A    At the time I looked at this document I did not address

9      myself in any way, shape or form to the specific question

10     of whether a claim against Peterson Sullivan would be --

11     existed and therefore whether it would be inside or

12     outside the bonded contract.  It is obvious, as I said,

13     that the document would be nonsensical if you were to not

14     treat it as being within the ambit of the term bonded

15     contract.

16 Q   The first sentence under the definitional section on the

17     repayment agreement, Exhibit 42, defines bonded contract,

18     correct?

19 A   I'm sorry, the first sentence under the -- yes, there is a

20     definition of bonded contracts there, yes.

21 Q   Read that out loud, please.

22 A   Bonded contracts shall mean any contract that is

23     referenced or described in any bond issued on behalf of

24     any Klukwan entity.

25 Q   A claim against Peterson Sullivan was not a contract, was

Page 87

```
 1       included at the request of Chuck Langfitt?

 2 A     I'm not surprised, but that sounds right.

 3 Q     Did you understand by that provision Travelers was

 4       preserving its claims against third parties?

 5 A     I.....

 6 Q     Other than the Klukwan entities.

 7 A     That's what -- the sentence says what the sentence says.

 8 Q     That was your understanding of the meaning of the

 9       sentence, correct?

10       MR. SPRAKER:  Objection.

11 A     Well, my understanding of the meaning of the sentence, and

12       my understanding of the reason the sentence was put in

13       there, was to reaffirm that in entering into the

14       settlement agreement we were not impairing Travelers'

15       rights to collect, for example, on the bonded contracts or

16       to pursue whatever claims related to the work -- on the

17       work -- the work on the projects that might've been

18       performed, for example, if there was some subcontractor

19       who did a poor job.  There was never any discussion at all

20       that I'm aware of at all in the sense of Travelers having

21       a claim against somebody that's outside of the

22       construction contracts themselves.  And I never had a

23       whiff of an inkling that Travelers had a thought about

24       going after -- pursuing its own claim against Peterson

25       Sullivan or anybody else apart from the direct contract-
```

1       related people.

2 Q     So Mr. Crandall then never relayed to you his discussions

3       with Chuck Langfitt on that subject?

4       MR. SPRAKER:  Objection, assumes facts, form.

5 A     I don't recall any discussion prior to July of '02

6       concerning Chuck Langfitt's intention to file a claim

7       against the -- against Peterson Sullivan, no.

8 Q     Let's focus back on the last sentence of Paragraph 11.

9 A     Okay.

10 Q    Doesn't -- isn't it your understanding that that sentence

11      preserves Travelers' claims against third parties, whoever

12      they may be, with the exception of the Klukwan entities?

13 A    I told you what my understanding of that sentence was.

14 Q    Don't you believe my description is a fair

15      characterization and a reasonable interpretation of that

16      sentence?

17      MR. SPRAKER:  Objection, argumentative.

18 A    You asked me what my understanding was as to why the

19      sentence had been added in there.

20 Q    Was it your belief that Travelers had released any

21      potential claim it might have against Peterson & Sullivan

22      under the repayment agreement?

23 A    As I said, I didn't -- there was no discussion on either

24      side.....

25 Q    That you were involved in?

1 A    That I was involved in that Travelers was contemplating

2      its own claim against Peterson Sullivan.

3 Q    Did you ever assert on behalf of Klukwan that Travelers

4      had released its claims against Peterson & Sullivan by

5      virtue of the repayment agreement?

6 A    I don't believe so.  Against Peterson Sullivan?  No.

7 Q    Take a look at Paragraph 18 of the repayment agreement.

8 A    Okay.

9 Q    You recall that that clause, Paragraph 18, was included in

10     the repayment agreement at the request of Chuck Langfitt?

11 A   I believe that's true.

12 Q   You reviewed it, correct?

13 A   Yes.

14 Q   Was -- strike that.  Was the repayment agreement ever

15     modified or amended, to your knowledge?

16 A   I don't believe so.

17 Q   It's true that Klukwan attempted to renegotiate the terms

18     of the repayment agreement on more than one occasion,

19     correct?

20 A   True.

21 Q   And in fact you even proposed a written first amendment to

22     the repayment agreement, correct?

23 A   That sounds correct.  As I say, I didn't review those -- I

24     did not in preparing for this deposition go back through

25     that series of documents.  But I -- that sounds correct.

1  A    What's the Bates stamp page?

2        MR. SPRAKER:  It's in chronological order so.....

3  A    Oh.

4  Q    They are in chronological order.

5  A    Okay.  April.

6  Q    But I can also get you a Bates stamp number, 5677.

7  A    Okay, got it.

8  Q    Now, there's an entry there that says, quote, talk to Tom

9        C about pros and cons of action against Peterson

10       Sullivan.....

11 A    Okay.

12 Q    .....end quote.  You see that?

13 A    Yes, I do.

14 Q    Am I right that at this point in time, April 8, 2003, your

15       firm had not done a complete analysis of those potential

16       claims, is that correct?

17 A    That would be correct.

18 Q    What do you recall of your discussions that are referenced

19       here on or about April 8, 2003?

20 A    I can't tie in the exact pros and cons that I would have

21       identified in that particular conversation.  I've had an

22       opinion as to what the pros and cons were and those pros

23       and cons have remained basically unchanged throughout the

24       entire case.

25 Q    It is true, though, your firm did what could be fairly

1    characterized as a thorough and comprehensive analysis of

2    a possible claim by Klukwan against Peterson Sullivan?

3    MR. SPRAKER:  Objection, form and foundation.

4 A  No, I wouldn't call it a thorough review, I would call it

5    a hard initial look would be probably a more accurate

6    statement.

7 Q  So you performed some analysis and it was something more

8    than a cursory analysis, correct?

9 A  Yes.

10 Q  And did your views as to the pros and cons of a claim by

11    Klukwan against Peterson Sullivan change as a result of

12    that analysis?

13 A  No.

14 Q  So you had an initial gut feel, so to speak, that wasn't

15    modified, is that correct?

16 A  True.

17 Q  And subsequent research or analysis that you or your firm

18    may have performed regarding a possible claim by Klukwan

19    against Peterson & Sullivan simply confirmed your gut

20    feel, is that fair to say?

21 A  Yes.

22 Q  Now turn to your billing entries for May of 2003, it's

23    part of Exhibit 70, Bates number 5673.

24 A  Got it.

25 Q  Exhibit 170, in case I misspoke.  There's a reference in

1    your billing entry that says, quote, then talk to Tom C

2    about possible need to address board on, one, KeyBank

3    claim, two, officer claim, three, Ferris claim, end quote.

4    You see that entry?

5 A    I do.

6 Q    What was the Ferris claim reference?

7 A    That's John Ferris, who's a partner at Peterson Sullivan.

8 Q    So that's the same thing as a claim against Peterson

9    Sullivan, correct?

10 A    True.

11 Q    Just a shorthand notation?

12 A    True.

13 Q    Had you had any conversations with Mr. Ferris as of this

14    date?

15 A    Not regarding Klukwan.

16 Q    Did you ever have any discussions with him regarding

17    Klukwan?

18 A    I met Mr. Ferris years ago in a number of different

19    circumstances and I knew him from then.  I have never had

20    a conversation with him concerning South Coast or Klukwan.

21 Q    Back to this entry in your bills to Klukwan dated May 16,

22    2003.  That reflects discussion, does it not, on three

23    potential third-party claims by Klukwan.....

24 A    Uh-huh (affirmative).

25 Q    .....true?

1  A    Yes.

2  Q    And all of those were under evaluation at this point in

3        time?

4  A    Well, they were discussed, I wouldn't -- don't know if I'd

5        say that they were under evaluation.

6  Q    But they were claims Klukwan was considering, correct?

7  A    Yes, uh-huh.

8  Q    And you were providing advice as part of that

9        consideration?

10 A    Yes.

11 Q    And included within these third-party claims that were

12       being considered, at least in May of 2003, were claims by

13       Klukwan against the former South Coast officers, correct?

14 A    Correct.

15 Q    And that's what the reference to item Number 2 is on this

16       May 16, 2003, billing entry?

17 A    Correct.

18 Q    Turn to your bills for June 2003, and I'm specifically

19       looking at an entry dated June 26, 2003, part of Exhibit

20       170, Bates number 4803, you see that?

21 A    I do.

22 Q    Again that references another discussion with Mr. Crandall

23       regarding Peterson Sullivan, correct?

24 A    Yes.

25 Q    At some point did you decide to have legal research

1     performed regarding Klukwan's potential claims against

2     Peterson Sullivan?

3  A  I did.

4  Q  Is there anything that prompted that specifically?

5  A  Well, there were a couple things happening.  It was -- I

6     think it was a few months after that, although perhaps it

7     was this early, that Travelers was expressing an interest

8     in pursuing a claim and wanting to access the working

9     paper records, that was one factor.  Also Tom Crandall was

10    throughout, you know, very interested in the claim.  He

11    thought it was a claim definitely that the corporation

12    should pursue and was very -- you know, would bring it up

13    quite a bit.  I mean, it was a frequent topic of

14    discussion.  I think also, you know, the facts had

15    unfolded enough that I had a sense of the company.  At

16    this time I'd represented the company for about a year and

17    I -- you know, you get a feel sometimes after a while for

18    what happened.  And so -- and so those factors combined to

19    make it something we talked about on a frequent basis

20    during this time.

21 Q  Will you turn to your billing statements for January 2004

22    there in Exhibit 170?  Those start with Bates number 4787.

23 A  Yes, I see it.

24 Q  Now, again, this exhibit's in redacted form because that's

25    how it's been produced to me, but let's focus first on

1       that page, it's the first page of your January 2004

2       billing statement, do you see that?

3 A     I do.

4 Q     Now, that has a number of entries reflecting time by you

5       on Klukwan matters.

6 A     Yes.

7 Q     But apparently none of those entries referenced Peterson &

8       Sullivan?

9 A     Apparently not.

10 Q    Do you recall -- and if we turn the next page, to the

11      second page of the January 2004 billing statement, there

12      are two entries in there that reference Peterson Sullivan,

13      but that's it, you see that?

14 A    I do.

15      MR. GILMORE:  Which page are you on?

16      MR. HOPKINS:  We're now on the second page of the January

17 2004 billing statement, Bates number 5667.

18 Q    Do you recall being engaged in some other activities for

19      Klukwan in January of 2004?

20 A    There's quite a bit of other things going on.  There's

21      other litigation matters, it was about this time that

22      there was a sale of one of the subsidiaries, Atlas Alaska,

23      which was a fairly time-consuming deal.  So yes, it's --

24      there were a lot of things going on besides Travelers at

25      this time.  Besides Peterson Sullivan, KeyBank or the

Tab B
to Declaration of Gary Spraker
Page 28 of 71

1    officers.

2 Q  Okay, so it makes sense from your perspective that there

3    are only one or two entries in your billing records for

4    January 2004 relating to Peterson Sullivan?

5 A  Yes.

6 Q  However, looking again at the second page of the January

7    2004 statement there are a number of entries reflecting

8    research by Mr. Spraker.....

9 A  Yes.

10 Q  .....is that correct?  And in fact Mr. Spraker's effort in

11   January 2004 required 22 and a half hours?

12   MR. SPRAKER:  Objection, misstates the.....

13 A  I think it's a little bit less than that, but the numbers

14   are what they are.

15 Q  Well, I'm looking at the bottom of the page, I want to

16   make sure I understand your billing statements

17   correctly.....

18 A  Yeah, but you back out the 1.3 and the .5.  I don't

19   think -- it looks like those are other matters.

20 Q  Okay, excluding the 1.3 and the .50, those were matters

21   that related to Klukwan, apparently, because Klukwan was

22   charged for the time, correct?

23 A  Right.

24 Q  But presumably not related to Peterson Sullivan?

25 A  Correct.

1 Q    So excluding those, Mr. Spraker performed at least 20

2      hours of effort analyzing or researching possible claims

3      by Klukwan against Peterson Sullivan in January 2004, is

4      that correct?

5 A    Well, 19.7, but who's counting?  Perhaps I'm wrong.  20.7.

6      Yes, I'll tell you.

7      MR. SPRAKER:  Who's counting?

8 A    Who's counting?

9 Q    Well, I was counting, but you weren't.

10 A   Yes.

11     MR. SPRAKER:  Well, he was counting.

12 Q   Did you sit down with Mr. Spraker and say, look, I want

13     you to research this or that or did you just say generally

14     give me an analysis?  Did you have a specific discussion

15     with him before he engaged in the research effort that's

16     reflected in the January 2004 bill to Klukwan?

17 A   Yeah, I did.  I sat down and described in fairly broad

18     brush strokes what the case was about as I envisioned it.

19     I asked him to give me an account -- a memorandum that was

20     not necessarily geared to those facts in particular, but I

21     wanted to give him a context so he didn't go off on some,

22     you know, completely unrelated tangent.  I found Mr.

23     Spraker to be a -- you know, a great researcher and I like

24     -- Particularly since I'd at this time, to use your term,

25     I think it's accurate, developed a gut opinion, I wanted

1    to get kind of a fresh look as to what the law is and see

2    if there were anything -- any surprises or any issues that

3    perhaps I hadn't factored in.

4 Q    Is any of this background information or discussion with

5    Mr. Spraker regarding his assignment, so to speak, is any

6    of that memorialized in writing anywhere?

7 A    I don't believe so.

8 Q    Do you know whether Mr. Spraker took notes of that

9    discussion with you?

10 A    I don't know.  I don't think so.

11 Q    Had Mr. Spraker had any other prior involvement on behalf

12    of Klukwan prior to the tasks that are reflected in your

13    January 2004 bill?

14 A    Not that I recall.  If you go through the billing

15    statement you may -- there may be some time here and

16    there, but, as we've talked about earlier, I was the

17    primary person on this case.

18 Q    Turn to your bills for February 2004, again part of

19    Exhibit 170, and there's an entry for February 2, 2004.

20    This says review memo re accountant liability, review

21    Sutor and PS reports.  Do you see that?

22 A    Sure.

23 Q    What was the reference to the memo on accountant

24    liability?

25 A    That would be Gary's memo, I'm sure.  Yes.

Page 123

1  Q    And the Sutor report, what was that?

2  A    That would be the Sutor report that's I think well-known,

3       and the PS reports would be the January '02 letter and the

4       report by Peterson Sullivan a few months after that.

5                 DEPOSITION EXHIBIT 176 MARKED

6       MR. SPRAKER:  Is this 175?

7       REPORTER:  176.

8  Q    Marked as Exhibit 176 is Mr. Spraker's January 21, 2004,

9       memo to you, which the subject matter is described as,

10      quote, claim against Peterson Sullivan for

11      misrepresentation in financial statements of South Coast,

12      Inc., end quote.  Is that the memo that's referenced in

13      the  -- in your billing statements for both January and

14      February 2004?

15  A    Yes.

16  Q    Do I correctly understand this memorandum as analyzing a

17      claim by Klukwan against Peterson Sullivan?

18  A    That was the purpose of the memo, yes, and that's the

19      thrust of the memo.

20  Q    Klukwan was the parent corporation of South Coast,

21      correct?

22  A    Correct.

23  Q    So it would in essence be a action by a shareholder

24      against the auditor who performed an audit of the

25      corporation, correct?

1  A      Well, if the claim were to be asserted it would be filed

2         by the corpora -- by South Coast and by Klukwan, I'm

3         sure.....

4  Q      Well.....

5  A      .....and probably.....

6  Q      .....did this analysis analyze -- And by this I'm

7         referring to Exhibit 176.  I read this as an analysis of

8         the claim by Klukwan, not South Coast.  Am I incorrect in

9         that regard?

10 A      When I use the term Klukwan I usually refer to the -- I

11        guess it depends on context.  This memo appears to --

12        well, the memo says that it is a claim by Klukwan as

13        shareholder of SCI.  That seems to be -- that's the thrust

14        of the memo.  In my mind I envision a little broader suit,

15        but I don't -- for what I was asking for, that was a

16        matter -- that was a distinction that I didn't -- that

17        wasn't significant to me.

18 Q      And did you ever consider that distinction at any point in

19        time?

20 A      Well, not as a -- not really.  Because, as I say, any suit

21        that were to be brought would be brought by everybody.  So

22        the fact.....

23 Q      Don't you believe there would be different legal standards

24        and potentially different practical ramifications of a

25        claim by Klukwan against Peterson & Sullivan as opposed to

1       a claim by South Coast against Peterson & Sullivan?

2  A    Yes.

3  Q    Did you -- and you gave some consideration to those

4       differences, correct?

5  A    I did, but, as I said, in the end those differences

6       wouldn't matter for -- this is what I would call a 30,000

7       foot -- or maybe not 30,000 foot, but a 10,000 foot level

8       at the issue.  The issue really is whether there exists a

9       cause of action at all by anybody, forgetting about

10      standing and forgetting -- or, anyone within the Klukwan

11      family regarding a status whether it's as a shareholder,

12      as a board member or whatever, or by -- perhaps by a

13      related company.  For example, Chilkats Portage might have

14      a claim.  But at this -- this is a -- as I say it was an

15      initial look at the issue, so I wasn't bothering myself

16      with those issues at this point.

17 Q    Did you later evaluate those issues?

18 A    No, I -- no.

19 Q    I read Mr. Spraker's January 21, 2004, memo, Exhibit 176,

20      as essentially addressing four subject matters; whether or

21      not there was a duty by Peterson & Sullivan, the

22      requirements of issues relating to reliance, issues

23      relating to causation and damages and particular rules

24      that might be applicable to a shareholder action.

25      Generally speaking, do you think that's a fair

Page 126

1      characterization?

2  A   Again, if you can -- that's -- that's fair enough.

3      There's other issues besides that raised here, but the

4      substance is pretty much as you've indicated.

5  Q   Did you view Mr. Spraker's analysis as reflected in his

6      January 21, 2004, memorandum as presenting a difficult or

7      an easy standard for Klukwan to meet on the issue of

8      establishing liability?

9      MR. SPRAKER:  Objection, vague.

10 A   Well, the memo does not attempt, really, to apply the law

11     to the facts, and I think you'd have to do that in order

12     to establish a liability case.  But applying the general

13     legal principles that are set forth here to the facts as I

14     knew them or was assuming for purposes of the analysis, I

15     thought that there was a pretty strong liability case.

16 Q   How about in regard to the issue of damages, do you feel

17     the same in regard to damages?

18 A   I combine causation and damages, I see them as sort of

19     flip side of the same coin, so if you -- using damages as

20     a shorthand to include causation, I did see a problem with

21     causation and damages.

22 Q   Was that consistent with your gut feel from the outset?

23 A   Yes.  Not an insurmountable problem, mind you, but a

24     problem that would need to be looked at carefully.

25 Q   And that was the same kind of high-altitude analysis you