1  had in regard to the KeyBank claim, correct?

2 A Well, except I thought that the liability claim against

3  KeyBank was extremely strong.  And, you know, that was --

4  as I say, that was a summary judgment slam dunk, forget --

5  you know, go straight to damages.  Whereas this I thought

6  was a strong liability claim but not as strong.  So to

7  that extent there's a difference.

8 Q Turning back to your billing statements for February

9  2004.....

10 A Uh-huh (affirmative).

11 Q .....apparently after you reviewed Mr. Spraker's January

12  21, 2004, memo you did some of your own research.

13 A Right.

14 Q That's a correct inference from the entries for February 3

15  and February 5, 2004, correct?

16 A Yes, uh-huh.

17 Q And do you recall what you looked at specifically?

18 A No, I don't, I probably looked at the cases that he cited

19  here and did some other research of my own.  I don't think

20  there's any work -- written work product from it, but I

21  spent some time doing my own due diligence, you might say.

22 Q So you did some follow-up research to fill in any gaps

23  that you felt you needed to?

24 A Either filling in gaps or confirming the same conclusions,

25  and, you know, doing -- I guess I thought it was more of a

1       parallel analysis rather than filling in gaps.

2 Q     The next entry in your February 2004 billing statements to

3       Klukwan reflect a conversation between you and Mr.

4       Spraker?

5 A     Yes.

6 Q     Do you recall what you discussed with him at or about that

7       time?

8 A     Yeah, I do.

9 Q     What was that?

10 A    I'm trying to just answer your questions.

11 Q   Good.

12 A   By that time, of course, both Gary and I were pretty tuned

13      up on what the legal principles were and I think Gary's

14      knowledge of the facts derived entirely from what I told

15      him, and my knowledge of the facts derived largely from

16      what Tom had told me and what I had developed as my own

17      knowledge of the case.  And we talked about the liability

18      and the damages issues as well as, you know, other

19      considerations that would get into the issue of filing

20      suit against Peterson Sullivan.

21 Q   Well, can you tell me anything more specifically regarding

22      your conversations with Mr. Spraker on those subject

23      matters?

24 A   I would say that it's -- actually Tom Crandall's

25      deposition, I think, lays it out pretty -- as a pretty

1    good description of what my opinion was.  I don't know if

2    that's because he had the same view as I did or he was

3    just listening to me.  I think that we agreed as a sort of

4    a -- Mr. Spraker and I agreed for discussion purposes that

5    we could show liability but that the damages problem would

6    be a much harder row to hoe.  Could be potentially

7    extremely large damages but proving them would be

8    problematic.

9  Q  By extremely large damages you mean by a claim by Klukwan

10    could've encompassed all of the substantial losses, or a

11    very large portion of them, that Klukwan and South Coast

12    experienced as a result of South Coast's collapse,

13    correct?

14  A  Right, when Klukwan acquired South Coast Klukwan was a

15    financial powerhouse, it was a very solvent, well-financed

16    corporation, and the South Coast debacle brought Klukwan

17    down to here we're essentially on the bring of bankruptcy.

18    There's no other real single cause to Klukwan's problems

19    besides South Coast, so yeah, the damages could be quite

20    large.

21  Q  And those potential damages certainly exceeded the losses

22    Travelers incurred or was likely to incur on the South

23    Coast bonds, correct?

24  A  Well, potentially.  Potentially.  But.....

25  Q  Do you recall ever reviewing the financial statements or

1    tax returns filed by Klukwan, the consolidated returns for

2    2001 and 2002?

3    MR. SPRAKER:  Objection to form, during what period?

4  A  I have looked at them.  I did not look at them in

5    connection with analyzing this issue.

6  Q  Was it generally your -- do you recall that Klukwan's tax

7    returns as opposed to even a broader analysis showed total

8    losses for it and its subsidiaries exceeding $20 million

9    for those two years combined?

10 A  As I say, I didn't look at that -- I did not look at the

11   tax returns for purposes of analyzing this issue.

12 Q  Well, regardless of whether it was for this issue, is that

13   generally accurate, based on your understanding?

14 A  I don't recall the exact number.

15 Q  You recall it was a large number?

16 A  I think so, but you have to understand that the -- in the

17   late -- Well, yes, it was a large number.

18 Q  Anything else you recall specifically regarding your

19   discussions with Mr. Spraker.....

20 A  Well.....

21 Q  .....in February 2004 regarding.....

22 A  Yes, we were.....

23 Q  .....this issue?

24 A  .....contrasting the strength of a claim that Travelers

25   might have, and I guess I should -- let me just back up

```
1       here.  As with so many other parts of this issue, there --
2       practically every issue that we were talking about came up
3       on a number of occasions, so to tie it to a particular
4       conversation and say yes, we talked about this aspect on
5       that day, I can't do.  But it is almost impossible to talk
6       about Klukwan or the Klukwan companies filing an action
7       against Peterson Sullivan without at the same time talking
8       about what Travelers might be doing.
9  Q    Well, Mr. Christianson, I'm going to ask you to focus on
10      the specific time periods and dates.....
11 A    Well, that's what I'm saying.....
12 Q    .....in my questions.
13 A    .....I think we would have had to -- We would've virtually
14      had to have had a conversation at this time about
15      Travelers asserting a claim.....
16 Q    Is that speculation or is that a specific memory?
17 A    Well, that's -- neither.  It's as I piece together
18      everything that was happening at this time.....
19 Q    So that's an inference on your part?
20 A    Fair enough, it's a -- I'm quite confident that.....
21 Q    Well, and at this point in time, February 6, 2004, I think
22      you've already indicated Mr. Spraker had had no prior
23      involvement in the Klukwan matter, so what he understood
24      of the facts had been relayed by you to him, correct?
25 A    Sure.
```

1 Q    Mr. Spraker was hardly in a position at this point in time

2      to conduct a comparison as to Travelers' claims as opposed

3      to Klukwan's, correct?

4 A    False.

5 Q    Did Mr. Spraker do a specific separate legal analysis and

6      research of Travelers' claims against Peterson Sullivan?

7 A    No, never.

8 Q    Did you?

9 A    No.

10 Q   Turn to -- well, strike that.  I'll show you another

11     document.

12                 DEPOSITION EXHIBIT 177 MARKED

13 Q   Can you identify Exhibit 177 as your e-mail to Tom

14     Crandall dated February 6, 2004?

15 A   Yes, I see it here.

16 Q   And Mr. Spraker was in fact copied on this, correct?

17 A   Yes, uh-huh.

18 Q   And the first sentence says, Tom, I'm getting into the

19     Peterson Sullivan claim and would like to talk to you

20     Monday about the following issues, end quote.

21 A   True.

22 Q   Does that reflect that fact that you had just reviewed Mr.

23     Spraker's research memo dated January 21?

24 A   Yes, this is the e-mail that's referenced on that same

25     billing that we were looking at.

1 Q    And the purpose of this e-mail was to outline a number of

2      factual issues that you wanted to discuss with Mr.

3      Crandall, correct?

4 A    Uh-huh (affirmative).

5 Q    And looking at the last -- the very last portion of this

6      e-mail, it says, quote, as you can see, these issues group

7      around two basic questions.  One, were the acts complained

8      of within the scope of P&S's work.  Two, what were the

9      damages caused by P&S's negligence.

10 A   Uh-huh (affirmative).

11 Q   I see issue two, dash, causation and damages, as

12     particular problematic.

13 A   Uh-huh (affirmative).

14 Q   Not unlike the cause of action we contemplated once upon a

15     time against KeyBank.....

16 A   Right.

17 Q   .....end quote.  Did that reflect your gut feel regarding

18     the claim?

19 A   Yes.  Yes, it did.

20 Q   Do you recall having discussions with Mr. Crandall after

21     receipt of this e-mail?

22 A   Let me back up.  The.....

23 Q   Let's just have you focus on my question.  Do you recall

24     having discussions with Mr. Crandall.....

25 A   Okay, I was going to correct the answer you just gave me

1      -- the question you just gave me a moment ago.  The -- I

2      do see issue two as particularly problematic.  I think

3      that's an accurate description.  On the liability issue I

4      guess I don't see it -- I don't think the issue is whether

5      it was within the scope of P&S's work necessarily.  That's

6      one way to put it.  That's a little different twist than

7      maybe I might put on it now.

8  Q   Okay, did you subsequently have discussions with Mr.

9      Crandall in response to this e-mail?

10 A   I think we had -- yes, we did, we had a fairly brief

11     discussion that pretty much ended when -- once it became

12     clear that Travelers was pursuing its work papers law

13     suit.

14 Q   Well, will you look at your entry for March 1, 2004.....

15 A   Uh-huh (affirmative).

16 Q   .....in your billing entries?

17 A   Okay.

18 Q   Now, that references a meeting with Tom Crandall?

19 A   Right.

20 Q   Says, quote, meet with Tom Crandall re Peterson Sullivan

21     law suit mainly.

22 A   Right.

23 Q   Two hours?

24 A   Yes.

25 Q   And that reflected a meeting and discussion with Mr.

1 A   I hadn't paid any -- given it any attention whatsoever.

2 Q   And therefore you probably had not had any conversations

3     with either Mr. Sokol or Mr. Langfitt on the subject?

4 A   That's correct.

5 Q   Did you have any discussions with Tom Crandall on that

6     subject?

7 A   Not until the judge's ruling.

8 Q   Once Travelers initiated its law suit against Peterson &

9     Sullivan and the former South Coast officers, am I correct

10    that you had conversations with the attorneys involved in

11    that action and monitored it to some degree?

12 A  At the very beginning of the case there was a lot of

13    activity that involved me because all the defendants were

14    sending me faxes and letters and things demanding that

15    Klukwan indemnify them.  And that was really the focus of

16    my involvement in the early stages of the case.  Then the

17    shareholder side of the case settled down, you might say,

18    and I did not monitor the case, you know, in terms of

19    going on -- going down to the court and checking the

20    docket sheet or that sort of thing, no.

21 Q  You indicated at the initial stages of the case you got

22    telephone calls from the former South Coast officers that

23    were named as defendants, correct?

24 A  Mainly faxes, but, yes.....

25 Q  Faxes.....

1 A      .....very quick communications.

2 Q      Is that how you first learned about the case being filed?

3 A      Yes.

4 Q      And that was roughly in early August 2004?

5 A      I think that's right.

6 Q      And you provided regular litigation status reports to

7        Klukwan and Mr. Crandall, correct?

8 A      Yes.

9 Q      And these provided an update on the status of the various

10       litigation matters you were involved in?

11 A     Yes.

12 Q     And once Travelers' action against Peterson & Sullivan and

13       the South Coast officers was commenced, you began to

14       include a brief discussion on that action in your

15       litigation updates, correct?

16 A     That's correct.

17 Q     And I think as we earlier established you opened a

18       separate billing file for that action, right?

19 A     Yes.

20            DEPOSITION EXHIBIT 180 MARKED

21 Q     I've marked as Exhibit 80 some hand -- a single page of

22       handwritten notes.  Do you recognize that document?

23       REPORTER:   180.

24       MR. HOPKINS:   Excuse me, yes.

25 A     This is my handwriting, and it's been quite a long time

1       since I've seen this.

2  Q    We earlier touched on the fact that your billing

3       statements reflect a.....

4  A    Yes.

5  Q    .....approximately two-hour meeting with Mr. Crandall on

6       or about March 1.....

7  A    Yes.

8  Q    .....2004?

9  A    Yes.

10 Q    Were these notes taken at that meeting?

11 A    That's what they look like, yes.  And I -- like I.....

12 Q    And this was in part to respond to the questions -- or,

13      strike that.  These notes, Exhibit 180, reflected

14      discussions between you and Mr. Crandall on some of the

15      subject matters in your earlier e-mail dated February 6,

16      2004, correct?

17 A    Yes.

18 Q    And this was part of the analysis of the possible claim

19      against Peterson Sullivan?

20 A    Right, this information tracks the questions that are in

21      my e-mail and, that's right, that's the discussion of

22      getting a little more texture to the facts underlying the

23      potential law suit.

24 Q    At the bottom of these notes, can you read those entries

25      for me?

1  A    Tom to look at divergence between actual and estimates.

2       And the second one, of course, says management letter.

3  Q    And what was the reference to the management letter about?

4  A    I don't recall at this time.

5  Q    There's another entry right above, the third to the last

6       entry reads.....

7  A    Oh.

8  Q    .....failure to prepare a management letter, end quote.

9       Do you see that?

10 A    I do.

11 Q    Does that refresh your recollection at all as to the

12      subject matter?

13 A    I would be guessing.  I have a hunch -- I'd be guessing.

14      It looks like there was an issue about management letters

15      and I would assume that that would be a sequence of

16      management letters up until, you know, the 2002 reports.

17 Q    Did Mr. Crandall explain to you that it was typical

18      practice of an outside accounting firm performing an audit

19      of a corporation's financial statements to prepare an

20      engagement letter, also known as a management letter,

21      outlining the scope of the audit and making certain

22      representations on management's part?

23 A    I think -- I don't know if he told me that.  I think that

24      I'm familiar that that's a common practice.  And, as I

25      say, it looks to me like there's some sort of question

1        that we talked about as to whether there was a management

2        letter for previous years or not, and if so what did it

3        say.

4  Q     And the answer to those questions would be part of the

5        analysis of the strengths or weaknesses of a claim by

6        Klukwan against Peterson Sullivan because the terms of

7        such a management letter would affect the question of

8        liability, correct?

9  A     Yes, and damages.  Yes, you bet.

10 Q     Both of those issues?

11 A     Uh-huh (affirmative).

12 Q     So it's something you needed to know to evaluate the

13       claim?

14 A     Or to -- certainly if I was going to pursue it I would

15       need to have that, yes.

16 Q     Did Mr. Crandall ever find or provide you a management

17       letter?

18 A     You know, I don't think we -- no.  The answer is no.  I

19       don't think we had any -- I don't recall any further

20       discussions with him or documents being produced by him

21       related to management letters.

22 Q     I'm going to show you what we've previously marked as

23       Exhibit 91.

24 A     Okay.

25 Q     This is a June 29, 2004, letter from Mr. Crandall to you.

1       methods to obtain the working papers short of a formal law

2       suit?

3 A     No.

4 Q     You understood -- did you understand at or about this

5       time, again the latter part of 2003, that Travelers was

6       considering a claim against the former South Coast

7       officers?

8 A     That sounds right.

9 Q     Did you ever suggest to Travelers or Jan Sokol that they

10      should proceed with their law suit against the South Coast

11      officers and subpoena the working papers?

12 A    No, I never suggested that.

13 Q    That thought ever occur to you?

14 A    No.  If they want the working papers they should sue

15      Peterson Sullivan, that's the way to get it.  I don't

16      understand what all the, you know, messing around is and

17      not just filing the suit.

18 Q    Well, didn't you understand that Travelers believed it

19      needed the working papers to evaluate whether to proceed

20      with a law suit against Peterson Sullivan?

21 A    That's what Jan Sokol said, and I talked to him about that

22      and said Jan, why don't you just file suit, and I got kind

23      of a vague response that really surprised me, but, you

24      know, he's -- it's his case and his client and he knows

25      what -- you know.

1 Q    When did you have that conversation?

2 A    Well, that -- those conversations would've led up, then,

3      probably in the February '04 time period and probably the

4      -- you know, preceding that where he was asking for our

5      help in the -- in the working papers law suit.  And, you

6      know, I -- again, I can't tie it to a particular date

7      without some sort of documentary reference, but I know

8      that was my opinion for a long -- ever since all this

9      messing around with the working papers thing, it just

10     seemed to me a waste of time.  And, you know, if he really

11     wanted to get it, he knew how to do it.

12 Q   And you expressed that opinion to him at some point in

13     time?

14 A   Yeah.

15 Q   But you don't know precisely when?

16 A   Well, I know for sure it was around February of '04, and

17     may also have been earlier than that.

18 Q   I'm going to show you what's been previously marked as

19     Exhibit 122.  There is an -- And this is an e-mail between

20     Chuck Langfitt and Jan Sokol that Mr. Langfitt was

21     questioned in regard to, and it includes an e-mail from

22     Jordan Rosenfeld to Mr. Langfitt.  And looking at the very

23     last paragraph of the e-mail there's a statement that says

24     Tom stated he thought there was a way to subpoena the work

25     papers without the law suit.  Tom was going to talk to his

Page 182

1       attorney some more.  You see that statement?

2 A     I do.

3 Q     You don't recall any discussions with Mr. Crandall on that

4       subject matter?

5 A     I don't recall Tom saying, Cabot, how can Travelers get

6       the work papers without filing a law suit.  No, I don't

7       recall that.

8 Q     But the broader subject of mechanisms to get the working

9       papers, did you discuss that with Mr. Crandall?

10 A    Well, clearly there's been -- you know, the obvious way is

11      to ask for it and that's -- that path has already been

12      taken, or is being -- you know, is on the table, is

13      discussed.  I don't recall any discussion with Tom as to

14      how we could get it more than just asking for it but short

15      of a -- short of filing suit.

16 Q    The concept of a petition to obtain the working papers,

17      where did that originate?

18 A    That was Jan's -- entirely Jan's brainchild.  I've never

19      seen that done before and I was sort of interested in it

20      as a litigation technique.

21 Q    Certainly you felt obtaining the working papers would be

22      of value in terms of evaluating and pursuing a claim

23      against Peterson Sullivan, correct?

24 A    Certainly in terms of pursuing a claim.  As I said before,

25      I didn't understand what -- how the working papers would

1 A    Apparently so.  Looks like it sat in my mailbox for six

2       days.

3 Q    And what you tell Mr. Crandall in your e-mail of January

4       15, 2004, is, quote, I overlooked this e-mail that came in

5       last week while I was gone.  I assume our answer is hell,

6       yes, end quote.

7 A    Yes.

8 Q    Would I be correct that reflected a certain degree of

9       enthusiasm on your part for participating in the petition

10      to obtain the working papers?

11 A   A better way to say it is that it's a bit of impatience on

12      my side for Travelers to get going on its suit and if this

13      is what Travelers needs to do in order to go down that

14      road, let's get going.

15 Q   Well, you certainly didn't tell Mr. Crandall at this time

16      in this message that this was a complete waste of time and

17      was unnecessary, did you?

18 A   No, not in this e-mail I didn't.  In other words, this

19      working paper suit, that's no my style, that's not how I

20      would've done it, it's not my thing, but if that's how

21      Travelers is going to do it, then let's get going.  That's

22      my general approach.

23 Q   Do you recall having a conversation with Jan Sokol at some

24      point after your January 15, 2004, e-mail to Mr. Crandall

25      on this subject?

1 A    Sure.

2 Q    What do you recall?

3 A    Well, there were, I think, a number of conversations, but

4      the conversation or conversations went along the lines of

5      Jan saying can I sign on behalf of Klukwan and me saying,

6      in effect, why are you going this route, and, as I say,

7      him giving me some vague answer which I never really did

8      understand.  Talking a little bit about the process that

9      he's employed, because, as I said, I'd never seen that

10     before.  We also had some discussions about what would

11     happen if the suit was pursued and successful, how -- as

12     to whether that would be applied to the note and to the

13     claim and you're familiar with that issue, I know.  Also I

14     am sure that we would've talked about Klukwan filing a

15     suit against Peterson Sullivan vis a vis Travelers filing

16     a suit against Peterson Sullivan.

17 Q   Let's focus for a minute on your discussions regarding the

18     possibility of Travelers succeeding and obtaining a

19     recovery from Peterson Sullivan.

20 A   Right.

21 Q   Klukwan asked Travelers at this point how that recovery

22     would be applied, correct?

23 A   That had been a recurring subject of discussion, yes.

24 Q   And Travelers -- and in fact that issue'd come up earlier?

25 A   Oh, yes, that's what I'm saying.

1 Q    Travelers had told Klukwan that the proceeds of their

2      recovery from Peterson Sullivan, if they obtained one,

3      would not go against Klukwan's obligations under the note,

4      correct?

5 A    That's what Travelers was saying, they said that it would

6      be -- it would reduce the claim.....

7 Q    The loss?

8 A    The loss, if you would, obviously, but they were not

9      willing to go further than that.

10 Q   Mr. Sokol at or about this time, mid-January 2004,

11     reiterated that position to you, did he not?

12 A   Right, and we had a conversation that went something like,

13     Jan, you're asking us to help out on this law suit, what

14     do we get out of it, and we said -- he says, well, you're

15     required to cooperate under the contract, and I say, well,

16     we're willing to cooperate but we want some cooperation

17     back, I mean, this is something that's not -- you know, if

18     you want our cooperation we should get, you know, some

19     recognition for that, and the recognition would be in the

20     form of reducing our obligation under the note.

21 Q   Travelers never agreed to that proposition?

22 A   They never expressly agreed to it, no.

23                    DEPOSITION EXHIBIT 192 MARKED

24 Q   I've marked as Exhibit 192 your e-mail to Tom Crandall

25     dated January 21, 2004?

1 A    Yes.

2 Q    And this forwards Jan Sokol's e-mail to you, see that?

3 A    Yes, I do.

4 Q    Mr. Sokol's e-mail's dated January 21, 2004, and it

5      references a conversation he had with you prior -- on the

6      previous day, correct?

7 A    Right.

8 Q    And that was a conversation where again Mr. Sokol

9      reiterated Travelers' position that any recovery would not

10     go against the note, correct?

11 A   It would only go against the claim.

12 Q   The loss?

13 A   To me that's the -- the net loss -- yeah, their loss.  The

14     loss on these contracts.

15 Q   And.....

16 A   The number that we've been calling 12 million, or at least

17     that was the working number that we were talking about

18     previously.

19 Q   The gist of the conversation -- the other aspect of the

20     conversation you had with Mr. Sokol that you were relaying

21     to Tom Crandall here was that from Travelers' perspective

22     if Klukwan wanted to modify the repayment agreement it

23     would take some quid pro quo on their part as well?

24 A   Yes.

25 Q   And did Mr. Crandall have those discussions, as far as you

1      knew?

2  A   Probably.

3  Q   But no agreement was reached in that record, correct?

4  A   That's correct.

5  Q   One other aspect where Klukwan wanted to modify the

6      repayment agreement was in regard to the bankruptcy

7      provisions, correct?

8  A   Yes.

9  Q   That request was made as well?

10 A   Yes.

11 Q   And rejected by Travelers?

12 A   Yes.

13 Q   I'm going to show you what we've previously marked as

14     Exhibit 87.  This is your e-mail of February 10, 2004, to

15     Jan Sokol, correct?

16 A   Yes.

17 Q   And among other things you're relying Klukwan's

18     authorization to Mr. Sokol for Klukwan to join as a party

19     in the petition for the working papers, correct?

20     MR. SPRAKER:  Objection, form and foundation.

21 A   The document says what it says.

22 Q   Well, was it your intent to authorize Mr. Sokol to proceed

23     with a petition for the working papers that included

24     Klukwan as a party?

25 A   It was my intent to authorize him to do so on condition

1  Q    Rather you state, quote, Klukwan's expectation, end quote,

2       correct?

3       MR. SPRAKER:  Objection, form, document speaks for itself.

4  A    That's what the word -- that's what the document says.

5  Q    Do you agree with me that the term expectation has a

6       considerably different meaning than condition?

7  A    Yes, I do.

8  Q    Looking at the last sentence in the third paragraph of

9       your February 10, 2004, e-mail, Exhibit 87, you stated,

10      quote, also, as you are aware, Klukwan is considering its

11      own action against P&S and has some -- has developed some

12      ideas about how to proceed.  You and I should discuss, end

13      quote.

14 A    Yes.

15 Q    And that reflected the fact Klukwan was continuing to

16      consider its own action against Peterson Sullivan,

17      correct?

18 A    It was, although the real thrust of that was Tom's desire,

19      pretty strong desire, to, you might say, drop the bread

20      crumbs in front of Travelers to lead Travelers to the

21      correct set of facts it would need to develop a case

22      against Peterson Sullivan.  There was also the possibility

23      of us bringing a suit, but I had told Jan that, you know,

24      if he brings a suit there's no real point in us bringing a

25      suit because it's the same dollars that are being chased

1       implies the same level of activity as before.

2   Q   You certainly performed research after this date?

3   A   We continued at a very reduced level.

4   Q   You met with Mr. Crandall for two hours on March 1 and

5       discussed the facts regarding such a claim, correct?

6   A   Right, I did.

7   Q   You provided an audit response on July 6, 2004, that said

8       Klukwan was still considering a claim against Peterson

9       Sullivan, correct?

10      MR. SPRAKER:  Objection, asked and answered..  We've

11  covered this.

12  A   Yeah, you've been through all this.  I'm here to provide

13      you information, Mr. Hopkins, and I'm happy to do so.  We

14      don't need to argue things that have already been

15      developed.  My firm and my involvement dropped off

16      dramatically once Jan Sokol finally started moving forward

17      and filed the working paper law suit.  And I didn't stop

18      entirely, but all of the momentum stopped because once

19      Travelers had finally gotten going on the case I was

20      convinced that they would proceed and that they would

21      decide they had a cause of action and then would -- were

22      in a better position than we were to pursue it.

23  Q   The petition for the working papers was not a suit for

24      damages, was it?

25  A   No, it was not.

Page 199

1 Q    And you understood Travelers wanted the working papers to

2      evaluate whether or not they had a claim against Peterson

3      Sullivan, correct?

4 A    That's what they said, yes.

5 Q    So you certainly had no assurance that Travelers was

6      proceeding with a substantive law suit as of February 10,

7      2004, did you?

8 A    I did not have an express statement from them that they

9      would do so.  However, I was of the strong opinion that

10     they would do so.

11 Q   That was your unilateral belief based on your own analysis

12     of the potential claim against Peterson Sullivan?

13     MR. SPRAKER:  Objection, form and foundation, assumes

14 facts.....

15 A   It's also based on the manner in which Jan Sokol conducts

16     litigation and my experience with Jan in these case have

17     been that he's a very aggressive attorney and takes

18     litigation positions that are in some cases way -- pretty

19     aggressive.  And I believed that if he were to go forward

20     against Peterson Sullivan that -- in other words, he -- if

21     he errs he errs on the side of over-litigating an issue

22     than under-litigating an issue.  And I just couldn't see

23     how he would not conclude that he had a claim against

24     Peterson & Sullivan.  If he had reached that I would have

25     been very interested in hearing him come to that

Tab B
to Declaration of Gary Spraker
Page 59 of 71

1 A     Thank you.

2 Q     At this point did you instruct Mr. Crandall not to execute

3       the petition?

4 A     No.

5 Q     He'd not yet signed it as of February 13, 2004, correct?

6 A     Right, as of the time of this e-mail.

7 Q     Mr. Sokol's e-mail of February 13, 2004, Exhibit 88,

8       rejects the expectation stated in your February 10, 2004,

9       letter, correct?

10      MR. SPRAKER:  Objection, form and foundation.....

11 Q    Isn't that how you understand it?

12      MR. SPRAKER:  .....document speaks for itself.

13      MR. HOPKINS:  Well, I can ask this witness what his

14 understanding of this.....

15      MR. SPRAKER:  You can ask the understanding, you can't

16 characterize it.

17 Q    Didn't you understand Mr. Sokol's February 13, 2004, e-

18      mail, Exhibit 88, to reject the, quote, expectations

19      stated in your February 10, 2004?

20 A    I understood him to be punting it and reserving the issue.

21 Q    Certainly was not acceptance of the expectation, was it?

22 A    It was not.....

23 Q    As you understood.

24 A    It was not acceptance of the condition that -- as I've

25      described it, that's true.

1 Q    You certainly are aware that a common use of the term

2      affiliate is a synonym for a subsidiary?

3 A    Or other related corporation, yes.

4 Q    I'm going to show you what's been previously marked as

5      Exhibit 79, which is Jan Sokol's December 16, 2004, letter

6      to you, which responded in part -- or perhaps more than in

7      part responded to your letter of November 29, 2004.

8 A    Yeah.

9 Q    Do you recall receiving that letter?

10 A   I think I do.

11 Q   Did you review it at the time?

12 A   Yes.

13 Q   Am I right that there was no response to that

14     communication by.....

15 A   I believe that's true.

16 Q   Not response by either you or South Coast or Trav -- or,

17     Klukwan directly, correctly?

18 A   That's true.

19     MR. GILMORE:  What's the number of that exhibit?

20     MR. SPRAKER:  79.

21     MR. GILMORE:  79.

22     MR. HOPKINS:  I've got one last topic, it's not going to

23 take me too long.

24 Q   Did you understand by -- strike that.  Did you ever --

25     strike that.  I believe we earlier touched on the point

1    that Klukwan attempted to renegotiate the terms of the

2    repayment agreement on several occasions.

3 A    Yes.

4 Q    Did you have any understanding as to why Klukwan wanted to

5    do so?

6 A    It was not going to be able to perform under the terms

7    that were agreed to in 2002.

8 Q    As you understood it, Klukwan's financial situation had

9    not improved and they were having difficulty or projecting

10    difficulty in meetings the terms of the repayment

11    agreement, is.....

12 A    Right.

13 Q    .....that fair?

14 A    Yes.

15 Q    And was that fact communicated by you to Jan Sokol?

16 A    Yes.

17                    DEPOSITION EXHIBIT 201 MARKED

18 Q    Can you identify Exhibit 201 as an e-mail from Tom

19    Crandall to you dated February 3, 2005?

20 A    Okay, yes.

21 Q    Do you recall receiving this e-mail?

22 A    Yes.

23 Q    This references an upcoming meeting on February 18 in

24    Seattle?

25 A    Right.

1    apply.  I saw it as a three-year issue.

2 Q  Well, three years from, I think you said, March or so of

3    '02 would've been March of '05, right?

4 A  Right.

5 Q  And at that time did you say anything at all as March of

6    '05 approached?  Did you diary that or.....

7 A  I don't think so, no.  Because, you know, Travelers had

8    filed suit well before then, so, you know, that was --

9    that sort of mooted out the whole question.

10 Q  As I recall from Mr. Spraker's memorandum was there some

11    thought that if Klukwan wanted to sue Peterson Sullivan

12    they could do that in the state of Washington?

13    MR. SPRAKER:  Objection as to form and foundation.

14 A  His memo references the issue of which state but I -- you

15    know, I think clearly it would be an Alaskan suit, so I --

16    we never considered -- or, at least I never considered

17    going to Washington.

18 Q  Never thought about the Washington statute for contract

19    claims?

20 A  No, uh-uh.

21    MR. GILMORE:  Why don't we call it for now and I can go

22 through and I may not have very much more, then, in the morning.

23 Right now I'd have to go look at my notes anyway, so.....

24    MR. SPRAKER:  10 'til 6:00.

25         (OFF THE RECORD)

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

TRAVELERS CASUALTY AND          .   Case No. 3:06-CV-00063-TMB
SURETY COMPANY OF AMERICA,      .
a Connecticut corporation,      .
                                .
        Plaintiff,              .
                                .
vs.                             .
                                .
SOUTH COAST INC., an Alaska.    **DEPOSITION OF CABOT CHRISTIANSON**
corporation, KLUKWAN, INC.,.    **DAY 2**
Alaska Native Village           .
corporation, and CHILKATS'      .
PORTAGE COVE DEVELOPMENT         .
COMPANY, an Alaska              .
corporation,                    .
                                .
        Defendants.             .
. . . . . . . . . . . . .       .
SOUTH COAST INC., et al,        .
                                .
    Counterclaim and            .
    Third-Party Plaintiff,.
                                .
vs.                             .
                                .
TRAVELERS CASUALTY AND          .
SURETY COMPANY OF AMERICAN,.
a Connecticut Corporation,      .
STEWART SOKOL & GRAY L.L.C..
and JAN D. SOKOL,               .
                                .
    Counterclaim and            .
    Third-Party Defendants.
. . . . . . . . . . . . .

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Travelers              James T. Hopkins, Esq.
Casualty and Surety        Schiffrin Olson Schlemlein
Company of America:          & Hopkins, P.L.L.C.
                           1601 Fifth Avenue, Suite 2500
                           Seattle, Washington 98101

APPEARANCES (Continued):

For South Coast, Inc.,          Gary A. Spraker, Esq.
et al.:                         Christianson & Spraker
                                911 West Eighth Avenue, Suite 201
                                Anchorage, Alaska  99501

For Stewart Sokol &             James D. Gilmore, Esq.
Gray, LLC:                      Clapp, Peterson, Van Flein,
                                 Tiemessen & Thorsness LLC
                                711 H Street, Suite 620
                                Anchorage, Alaska  99501

                        *  *  *  *  *

        Pursuant to Notice, the deposition of CABOT CHRISTIANSON

was continued on behalf of the Plaintiff and Third-Party

Defendant Travelers Casualty and Surety Company of America

before Teresa E. Mielke, Notary Public in and for the State of

Alaska and Reporter for Gemini Reporting Services, at 943 West

Sixth Avenue, Suite 200, Anchorage, Alaska, on the 28th day of

September, 2007, commencing at the hour of 8:13 a.m.

                        *  *  *  *  *

                    INDEX TO PROCEEDINGS                 PAGES

EXAMINATION BY MR. GILMORE:                            273-311

EXAMINATION BY MR. HOPKINS:                            313-343

                    INDEX TO EXHIBITS                   MARKED

Number:

202: 3/27/06 letter, C. Christianson to J. Sokol         284

203: 4/6/06 letter, J. Sokol to C. Christianson          290

                                                          272

1      they were important for him to have?

2  A   Well, I think I told him in a telephone conversation the

3      general thing, that Tom was anxious to provide

4      information.  After this e-mail I don't think we had a

5      follow-up conversation on the subject.

6  Q   Okay, so you don't recall a follow-up conversation with

7      Jan on that subject, correct?

8  A   Correct.

9  Q   And did Tom ever say anything to you about, you know, why

10     -- we've got these ideas, why don't we call Jan and tell

11     him about them?

12 A   Well, I think there's -- I think there's a follow-up from

13     Tom that we've already looked at saying, you know, what's

14     going on.  I think the idea was for Peterson Sullivan --

15     excuse me, for Travelers to get the documents that it felt

16     that it needed, if it could, and then at that point that

17     would be the time to -- you know, to take the next step in

18     terms of developing a case.

19 Q   To your knowledge did Tom Crandall ever call either Jan

20     Sokol or Chuck Langfitt and share these ideas about how to

21     develop the case?

22 A   Certainly not with Jan Sokol, I don't think -- as far as I

23     know Tom never had a direct conversation with Jan without

24     me around.  But, again, I think we've already seen the e-

25     mail chain with Chuck Langfitt where Chuck says we'll get

1    back to you on this.  Or we'll keep you posted I think was
2    what he said.
3 Q  Okay, but as far as you know neither you nor Tom ever
4    followed up, at least with Jan Sokol, with, quote, sharing
5    these ideas beyond what you've just testified to?
6 A  There's -- not beyond the e-mails that we've talked about.
7    But I think those e-mails were pretty clear, indicating
8    that -- in conveying the message that the ball was in
9    Travelers' court to get back to us on the issue of what's
10   going to happen with Peterson & Sullivan.
11 Q  Well, but then beyond what may be in those e-mails, as you
12   sit here today is there any important piece of information
13   that was not shared?
14 A  No.
15 Q  Okay, so as far as you know Travelers had all the
16   information you guys had to offer with regard to
17   developing the case against.....
18 A  No.  No, no.
19   MR. HOPKINS:  Objection, lacks foundation.
20   MR. SPRAKER:  Object, same objection.
21 A  No, that's -- that's not.....
22   MR. HOPKINS:  Speculation.
23 A  That's not what i'm saying.  I'm saying that.....
24   MR. SPRAKER:  Too many.....
25   MR. GILMORE:  I thought it was kind of an innocuous

Page 281

1 A    Right.

2 Q    .....of time?   Now.....

3 A    That's all right.  I very well could've attended, I just

4      don't have a recollection, so I guess that's as far as I

5      can go right now.

6 Q    Now, on February 10 in your e-mail to Jan you say

7      Travelers -- you say Klukwan is considering its own cause

8      of action against Peterson Sullivan, has developed some

9      ideas.  And then I don't see where there's any time that

10     there's another follow-up e-mail or communication with Jan

11     Sokol telling him at what point in time, if ever, Klukwan

12     decided not to pursue its own cause of action.

13 A   That's true.

14 Q   So as far as you know Jan Sokol at least through -- up

15     through September of '04 as far as you know he still

16     assumed that Klukwan was considering bringing its own

17     cause of action or claim against Peterson Sullivan?

18 A   Well, I don't know what he knew.  I did tell him that if

19     he was going to go forward that there was very little

20     chance that we would go forward.  And -- but I -- you

21     know, you're right, I never told him after this e-mail

22     chain Jan, we have affirmatively decided not to go

23     forward.  And to go back to your -- the question you were

24     asking before, I kind of have a memory of participating --

25     and I may -- I don't know if it was this meeting or not.

Page 282

1    But I think the fact that the Travelers suit against

2    officers and directors and Peterson Sullivan had been

3    filed kind of reinvigorated, you might say, the issue of

4    what we were going to do -- what Klukwan was going to do

5    vis a vis Peterson Sullivan because the directors were

6    making noises about wanting to have us indemnify and it

7    looked like there was a fair chance we might be brought

8    into the suit.  And then the question was, well, we're in

9    the suit, should we -- you know, should we file a claim

10   against Peterson Sullivan.  It was more -- it was more in

11   the nature of, well, we -- since we're going to be -- it

12   looks like we might be in the suit anyway, should we, you

13   know, take a second look at this issue against Peterson

14   Sullivan.  And of course we never were brought into the

15   suit formally, so that didn't have to happen.  But, you

16   know, I think the client decision was -- was the same as

17   before, which was, you know, if Travelers is going

18   forward, which they obviously are, then there's very

19   little point in us pursuing a parallel action.

20 Q  Well, when the petition was filed for the work papers Jan

21   Sokol was representing both Klukwan and Travelers,

22   correct?

23 A  That's correct.

24 Q  And you were the attorney for Klukwan?

25 A  Well.....

1    first page it says, as an attorney representing joint

2    clients you had no authority to choose one client's

3    interest over the other concerning the subject matter of

4    your joint representation.  Now, the joint representation

5    was on the petition to obtain the work papers, correct?

6 A    That was part of it.

7 Q    Well, what was the other part of it?

8 A    Well, I think it's pretty clear from the e-mail chain that

9    the end game here was a suit against Travelers (sic) and

10    although there was disagreement as to whether the funds

11    would be applied to the note or to the claim, at the very

12    least it would be applied to the claim and so, I mean,

13    that was really the -- the scope of the work was not just

14    to get the work papers, because that was really a

15    preliminary step.  The real important element of what Jan

16    was doing was pursuing the claims for the benefit of both

17    Travelers and Klukwan regardless of how the proceeds are

18    applied.

19 Q    The March 27th letter is the first time I see anything in

20    writing that states that Jan Sokol was representing,

21    beyond the petition for the work papers, both Klukwan and

22    Travelers.  Is there anything in writing that tells Jan

23    Sokol or advises him that he is the attorney representing

24    Klukwan after the request for the work papers?

25 A    Well, we've already seen the e-mail chain that establishes

Page 343

1  Q       .....and I don't see any entry in the February 2004 time

2          frame after your e-mail dated February 6 that would

3          reflect a discussion with Mr. Crandall on these issues,

4          rather I see you had a meeting with him on March 1 for two

5          hours primarily relating to P&S, and I am correct that

6          these notes on Exhibit 80 (sic) were taken at that

7          meeting.

8  A       I believe that's correct.

9          MR. HOPKINS:  I have nothing further subject to my prior

10 reservations.

11         MR. SPRAKER:  Let's go off record for a quick minute.

12                          (OFF THE RECORD)

13                          (ON THE RECORD)

14         MR. SPRAKER:  Back on record and I have no further

15 questions.

16         MR. GILMORE:  I don't have any questions.

17         MR. HOPKINS:  Nor I.

18 A       Thank you.

19                          (OFF THE RECORD)

20                        END OF PROCEEDINGS

21                          *  *  *  *  *

22

23

24

25

Tab B
to Declaration of Gary Spraker
Page 71 of 71