# Tab C

## Deposition Testimony of Charles W. Langfitt

Declaration of Gary Spraker
Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

Tab C
to Declaration of Gary Spraker
Page 1 of 50

Defendants' Opposition to Motion for Summary Judgment and Cross Motion

Index of Deposition Testimony of Charles W. Langfitt

| Page # |
|--------|
| 153 |
| 186 |
| 187 |
| 191 |
| 192 |
| 193 |
| 194 |
| 195 |
| 201 |
| 208 |
| 209 |
| 210 |
| 220 |
| 221 |
| 224 |
| 228 |
| 229 |
| 230 |
| 231 |
| 232 |
| 235 |
| 239 |
| 241 |
| 243 |
| 244 |
| 248 |
| 259 |
| 265 |
| 266 |
| 280 |
| 281 |
| 282 |
| 283 |
| 284 |
| 285 |
| 286 |

Tab C
to Declaration of Gary Spraker
Page 2 of 50

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation, ) ) ) ) | |
| Plaintiff, ) ) | |
| vs. ) ) | No. A06-00063 (TMB) |
| SOUTH COAST, INC., an Alaska corporation, KLUKWAN, INC., an Alaska Native Village corporation, and CHILKATS' PORTAGE COVE DEVELOPMENT COMPANY, an Alaska corporation, ) ) ) ) ) ) ) | |
| Defendants. ) ) | |
| SOUTH COAST, INC., an Alaska corporation, KLUKWAN, INC., an Alaska Native Village corporation, ) ) ) | |

Deposition Upon Oral Examination

of

CHARLES W. LANGFITT

Taken at 1601 Fifth Avenue
Seattle, Washington

DATE:   September 10, 2007

REPORTED BY:  Patricia A. Blevins, CCR
CCR NO. 2484

STARKOVICH REPORTING SERVICES

and CHILKATS' PORTAGE COVE                    )
DEVELOPMENT COMPANY, an Alaska                )
corporation,                                 )
                                             )
          Counterclaimants and               )
          Third-Party Plaintiffs,            )
                                             )
     vs.                                     )
                                             )
TRAVELERS CASUALTY AND SURETY                )
COMPANY OF AMERICA, a Connecticut            )
corporation, STEWART, SOKOL &                )
GRAY, LLC, and JAN D. SOKOL,                 )
                                             )
          Counterclaimants and               )
          Third-Party Defendants.            )
_____

STARKOVICH REPORTING SERVICES

(206) 323-0919

Tab C
to Declaration of Gary Spraker
Page 4 of 50

CHARLES W. LANGFITT -- SEPTEMBER 10, 2007

A P P E A R A N C E S

For Travelers Surety:          JAMES T. HOPKINS
                               Schiffrin Olson Schlemlein
                                    & Hopkins, PLLC
                               Westlake Center Office Tower
                               1601 Fifth Avenue
                               Suite 2500
                               Seattle, Washington 98101


For South Coast,               GARY A. SPRAKER
Klukwan & Portage:             Law Office of Christianson
                                    & Spraker
                               911 West 8th Avenue
                               Suite 201
                               Anchorage, Alaska 99501


For Jan D. Sokol:              JAMES D. GILMORE
                               Clapp, Peterson, Van Flein,
                                    Tiemessen & Thorsness, LLC
                               711 H Street
                               Suite 620
                               Anchorage, Alaska 99501


Also Present:                  THOMAS CRANDALL
                               JAN SOKOL


--o0o--

CHARLES W. LANGFITT -- SEPTEMBER 10, 2007

I N D E X

| EXAMINATION BY: | Page |
|---|---|
| Mr. Gilmore............................................... | 7 |
| Mr. Spraker............................................... | 148 |

* * *

EXHIBITS FOR IDENTIFICATION:

| Number | Description | Page |
|---|---|---|
| 115 | Copy of Notice of Deposition of Charles Langfitt. | 7 |
| 116 | Copy of email from Langfitt, to Rosenfeld, 5/16/02. | 37 |
| 117 | Copy of Travelers Bond Contract Surety Large Loss Analysis, 6/5/02. | 46 |
| 118 | Copy of Travelers Bond Contract Surety Large loss Analysis, 10/1/02. | 56 |
| 119 | Copy of email chain from Sokol, to Langfitt, 4/2/03. | 63 |
| 120 | Copy of email chain from Sokol, to Langfitt, 6/3/03. | 67 |
| 121 | Copy of email chain from Langfitt, to Sokol and Rosenfeld, 9/9/03. | 68 |
| 122 | Copy of email from Langfitt, to Sokol, 9/17/03. | 70 |
| 123 | Copy of Minute Order, 4/13/04. | 71 |
| 124 | Copy of email from Sokol, to Langfitt, 4/14/04. | 76 |
| 125 | Copy of email chain, from Langfitt, to Sokol, 6/3/04. | 77 |

STARKOVICH REPORTING SERVICES

Tab 2
to Declaration of Gary Spraker
Page 6 of 50

CHARLES W. LANGFITT -- SEPTEMBER 10, 2007

| Number | Description | Page |
|--------|-------------|------|
| 126 | Copy of email from Rosenfeld, to Sokol, 6/8/04. | 86 |
| 127 | Copy of email from Sokol, to Langfitt, 6/21/04. | 87 |
| 128 | Copy of Complaint (Action for Negligent Misrepresentation), 8/2/04. | 89 |
| 129 | Copy of email chain, from Langfitt, to Sokol, 12/7/04. | 90 |
| 130 | Copy of Answers and Responses to Travelers' First Discovery Requests to Defendant Michael Houts, 6/10/05. | 93 |
| 131 | Copy of Affidavit of Charles W. Langfitt 7/25/05. | 96 |
| 132 | Copy of email chain, from Langfitt, to Hombach, 6/20/02. | 104 |
| 133 | Copy of Affidavit of Charles W. Langfitt, 9/2/05, with attached correspondences. | 112 |
| 134 | Copy of Affidavit of Jordan S. Rosenfeld, 9/2/05. | 117 |
| 135 | Copy of letter to Sokol, from Rosenfeld, with attached expert opinion report ("Sutor Report"), 6/3/05. | 125 |
| 136 | Copy of Klukwan, Inc., Report on South Coast, Inc., 2001 Operations. | 129 |
| 137 | Copy of letter to Dick Ransdell, from Peterson Sullivan, PLLC, 11/22/00. | 143 |
| 138 | Copy of letter to Mike Houts, from Ray Holmdahl, 2/8/01, with attached audited South Coast financial statements year 2000. | 143 |
| 139 | Copy of email chain from Sokol, to Langfitt, 12/10/04. | 144 |
| 140 | Copy of email from Langfitt, to Sokol, 4/2/03. | 162 |

1 happen with this cash analysis.  This is what the balance

2 sheet would look like at the end of the day.  We ended up

3 with some rough drafts of those and then stopped, because it

4 became a moot issue to have one of those.

5      Q.   Okay.  When you say "recasted balance sheet," that

6 would be a recasted balance sheet as of May-June 2002?

7      A.   Jordan would have needed to pick the correct

8 come-out date, and I think he ended up picking an

9 end-of-April date using a -- I think using an internal

10 statement.

11      Q.   But it would not have been going back to year-end

12 2000 at that time?

13      A.   No, I mean, because we're not -- at that point in

14 time, that's history.  What you're looking for is you're

15 looking for comparing it to more recent financial

16 information, and there had already been a draft 2001

17 financial prepared by Peterson Sullivan, which Jordan had.

18      Q.   Well, my guess is at this point in time, you're

19 trying to see how big of a problem you have.

20      A.   Yes.

21      Q.   You're not looking for causes of action at this

22 point in time?

23      A.   Right now what you're doing is you're going into

24 a -- you're not looking for cause of action, because right

25 now you're going into a major fire drill where you're trying

Tab 6
to Declaration of Gary Spraker
Page 8 of 50

1 I'm sorry.

2            MR. HOPKINS:  Where does he need to resume?

3 You need to re-ask the question.

4            THE WITNESS:  Why don't we just call it a

5 day.  That might not be a bad thing, if you don't mind.

6            MR. SPRAKER:  No problem.  I think that's a

7 good place to stop.

8            THE COURT REPORTER:  I'm sorry.

9            MR. SPRAKER:  No problem.  We'll pick it up

10 from there tomorrow.

11                        (Deposition was adjourned at

12                         4:19 p.m.)

13                        (Signature was not waived.)

14

15

16

17

18

19

20

21

22

23

24

25
Tab C
to Declaration of Gary Spraker
Page 9 of 50

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation, )<br>)<br>)<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>SOUTH COAST, INC., an Alaska corporation, KLUKWAN, INC., an Alaska Native Village corporation, )<br>and CHILKATS' PORTAGE COVE DEVELOPMENT COMPANY, an Alaska corporation, )<br>)<br>)<br>Defendants. )<br>_____ )<br>SOUTH COAST, INC., an Alaska corporation, KLUKWAN, INC., an Alaska Native Village corporation, ) | No. A06-00063 (TMB) |

Deposition Upon Oral Examination

of

CHARLES W. LANGFITT

VOLUME II

Taken at 1601 Fifth Avenue
Seattle, Washington

DATE:  September 11, 2007

REPORTED BY:  Patricia A. Blevins, CCR
              CCR NO. 2484

STARKOVICH REPORTING SERVICES

and CHILKATS' PORTAGE COVE                    )
DEVELOPMENT COMPANY, an Alaska                )
corporation,                                  )
                                              )
          Counterclaimants and               )
          Third-Party Plaintiffs,            )
                                              )
     vs.                                      )
                                              )
TRAVELERS CASUALTY AND SURETY                 )
COMPANY OF AMERICA, a Connecticut            )
corporation, STEWART, SOKOL &                 )
GRAY, LLC, and JAN D. SOKOL,                  )
                                              )
          Counterclaimants and               )
          Third-Party Defendants.            )

STARKOVICH REPORTING SERVICES

CHARLES W. LANGFITT -- SEPTEMBER 11, 2007


A P P E A R A N C E S


For Travelers Surety:          JAMES T. HOPKINS
                               Schiffrin Olson Schlemlein
                                   & Hopkins, PLLC
                               Westlake Center Office Tower
                               1601 Fifth Avenue
                               Suite 2500
                               Seattle, Washington 98101


For South Coast,               GARY A. SPRAKER
Klukwan & Portage:             Law Office of Christianson
                                   & Spraker
                               911 West 8th Avenue
                               Suite 201
                               Anchorage, Alaska 99501


For Jan D. Sokol:              JAMES D. GILMORE
                               Clapp, Peterson, Van Flein,
                                   Tiemessen & Thorsness, LLC
                               711 H Street
                               Suite 620
                               Anchorage, Alaska 99501


Also Present:                  THOMAS CRANDALL


                         --o0o--

CHARLES W. LANGFITT -- SEPTEMBER 11, 2007

I N D E X

| EXAMINATION BY: | Page |
|---|---|
| Mr. Spraker........................................ | 179 |
| Mr. Gilmore....................................... | 312 |
| Mr. Spraker........................................ | 329 |

* * *

EXHIBITS FOR IDENTIFICATION:

| Number | Description | Page |
|---|---|---|
| 141 | Copy of letter to Thomas Crandall, from Charles Langfitt, 4/14/03. | 179 |
| 142 | Copy of handwritten memo memorializing a conversation witness had with Tom Crandall, 6/2/03. | 186 |
| 143 | Copy of email chain from Langfitt, to Rosenfeld, 6/18/03. | 200 |
| 144 | Copy of email chain from Langfitt, to Roddick, 5/10/04. | 204 |
| 145 | Copy of email from Rosenfeld, to Langfitt, 7/21/03. | 219 |
| 146 | Copy of email chain from Langfitt, to Sokol, 9/9/03. | 220 |
| 147 | Copy of email from Sokol, to Christianson, 1/9/04. | 224 |
| 148 | Copy of email from Christianson, to Sokol, 2/10/04. | 245 |
| 149 | Copy of email chain from Langfitt, to Lybeck, 5/5/06. | 247 |

STARKOVICH REPORTING SERVICES

Tab 6
to Declaration of Gary Spraker
Page 13 of 50

Page 178

CHARLES W. LANGFITT -- SEPTEMBER 11, 2007

| Number | Description | Page |
|---|---|---|
| 150 | Copy of email chain from Sokol, to Christianson, 2/13/04. | 251 |
| 151 | Copy of email from Langfitt, to Crandall, 5/26/04. | 255 |
| 152 | Copy of notes prepared by Tom Crandall reflecting or purporting to reflect a 9/29/04 conversation with Langfitt and Christianson. | 256 |
| 153 | Copy of email chain from Sokol, to Langfitt, 8/4/05. | 263 |
| 154 | Copy of email from Roddick, to Crandall, 7/2/02, with attached letter regarding Travelers' Counter Proposal. | 276 |
| 155 | Copy of email from Eckardt, to Crandall, 7/16/02, with attached agenda for meeting. | 283 |
| 156 | Copy of email from Crandall, to Langfitt, 7/18/02, with attached South Coast, Inc., Travelers Note Payable. | 289 |
| 157 | Copy of email from Crandall, to Blanton, 7/22/02, with attached South Coast, Inc., Travelers Note Payable. | 292 |
| 158 | Copy of email from Langfitt, to Crandall, 7/22/02. | 294 |
| 159 | Copy of letter to Christianson, from Langfitt, 9/16/02. | 304 |
| 160 | Copy of email from Crandall, to Langfitt, 12/6/02, with attached South Coast, Inc., Travelers Note Payable. | 305 |
| 161 | Copy of witness's handwritten notes written in preparation for deposition in Peterson Sullivan matter, undated. | 310 |
| 162 | Copy of white boarding outlining some of the terms that were talked about in the 7/17/02 meeting. (Exhibit retained by counsel.) | 329 |

1    Q.   The Peterson Sullivan, when you first started

2  investigating or for, as you had stated, having concerns

3  about Peterson Sullivan's performance and financial audit?

4               MR. HOPKINS:  Objection; compound.

5    A.   All I remember is that after I got involved in

6  South Coast, and during the course of re-letting the work

7  and going through that process and having discussions with

8  Tom Crandall during the course of negotiating the repayment

9  agreement, he brought to my attention certain concerns, and

10 I started to have some suspicions.  I didn't actually start

11 thinking that I had something or doing something further

12 until, you know, after October.

13                              (Exhibit 142 marked for

14                                 identification.)

15               MR. SPRAKER:  This has been produced

16 previously, Jim, but I don't have the exhibit.

17               MR. HOPKINS:  Re-mark it, if you want.  I

18 suppose it's actually Prior Exhibit 67.

19   Q.   The document I gave you has been previously used

20 in depositions as Document No. 67.  Can you identify that

21 document for me?

22   A.   Yes.  It's my handwriting.  It memorializes a

23 conversation I had with Tom Crandall.

24   Q.   And you had that conversation on June 2, 2003?

25   A.   Yes.

Tab C
to Declaration of Gary Spraker
Page 15 of 50

1   Q.   It appears that the substance of the conversation

2 is discussing potential D & O claims.

3   A.   Yes.

4   Q.   In between the last exhibit that we looked at,

5 your April 14 letter, and June 2, 2003, do you recall any

6 conversations with Tom Crandall regarding either claims

7 against directors and officers or Peterson and Sullivan?

8   A.   No.

9   Q.   Do you recall any similar -- any conversations

10 with Jordan Rosenfeld regarding the D & O claims with

11 Peterson Sullivan claims?

12   A.   In this time frame, there's an email.  I sent some

13 material to Jordan -- probably was around April or May --

14 with some more financial statements.  Some of it was a

15 re-send of what I'd sent to him previously and had sent

16 information on to Jan, saying, "This is what I'm looking

17 at."  Then Jan said, Okay.  What are the wrongful acts?

18 What are we talking about?

19        And then, you know, in response to that, I went

20 and called Tom Crandall and wanted to get confirmation of

21 what I understood to be the circumstances of what Tom was

22 saying the wrongful acts were.

23   Q.   And that call is the one that's memorialized in

24 this document?

25   A.   Yes.    Tab C
              to Declaration of Gary Spraker
              Page 16 of 50

1    Q.   Do you recall having any prior discussions with

2 Mr. Crandall regarding application of third-party claims to

3 the -- what I'm going to call the South Coast liability?

4    A.   There is, in fact, in the repayment agreement, a

5 provision that says that we're free to pursue third parties.

6 So that was part of the negotiation at the time the

7 repayment agreement was executed.

8    Q.   Does the repayment agreement state how those

9 proceeds are supposed to be applied?

10    A.   Which proceeds are we speaking to?

11    Q.   Against the third party.

12    A.   Basically, the third-party proceeds, the only

13 application that's in the repayment agreement is our loss,

14 less the proceeds from the bonding contract, to come up with

15 a number, so far as getting to the credit I think you're

16 trying to speak to.  So consequently, this particular

17 third-party action is not a credit against any sort of

18 obligation or of the repayment agreement.

19    Q.   Well, when you say "this" -- I'm sorry.  I can't

20 remember the exact words.  You said this claim, I'm going to

21 use --

22    A.   Yes.

23    Q.   -- is not a credit.  The repayment agreement

24 doesn't specifically identify any claims against directors

25 and officers, does it?

Tab C
to Declaration of Gary Spraker
Page 17 of 50

1      A.    No, but it expressly carves out any third-party --

2    claims against third parties.

3      Q.    Midway through that second paragraph, it says, and

4    please, again, if I misread this, let me know, "Tom asked

5    what would happen if money recovered exceeded the," and I

6    can't read that word.

7      A.    "Other loss."

8      Q.    "-- 'other loss,' net payment --" is that "net"

9    payment or "not"?

10     A.    "Not part."

11     Q.    "-- not part of $8 million PN?"  I'm assuming

12   that's "promissory note."

13     A.    Yes.

14     Q.    "Told Tom that"?

15     A.    Yep.

16     Q.    "Told Tom that would have to credit over, but

17   remote chance."  Okay.

18           So as I read that, you're telling Tom that if he

19   recovered a sufficiently large number against the directors

20   and officers, that it would credit over to what I'm going to

21   call the total net loss?

22     A.    What I was telling Tom was that if we got repaid

23   for our total loss on a business basis, since I'm not going

24   to be making a profit on my loss, I would have made a

25   business decision to have the difference available.  So what

1 I'm suggesting is when you look at the numbers, remote

2 chance.  I explained we were out 22 million gross; not sure,

3 net.  So I said, "Net, not sure, but maybe $15 million net.

4 I will send Tom a pay history."

5          So consequently, what I'm saying there is that I'm

6 currently out $15 million.  If I get back more than

7 $15 million and am consequently in a position that I'm

8 showing a profit on a loss, in that event, that was

9 something that, on a business basis, I would have sat there

10 and said, "Tom, I've got to make a business decision here."

11     Q.    So let's assume that you have a $15 million net

12 loss at that time, and let's also assume that you recover

13 $15 million from the directors and officers.  As of this

14 June 2, 2003, time, does Klukwan owe you any additional

15 money?

16     A.    Let's take a step back.  Number one, there's only

17 a $10 million D & O coverage.  So consequently, under the

18 circumstances --

19     Q.    I know that --

20     A.    And I don't think the officers got $5 million,

21 Gary.  God bless them if they did.  So consequently, you're

22 asking me to assume a fact that wouldn't even plug into it.

23     Q.    I understand, but that's why I'm saying I assume.

24 But let's just take that hypothetical, though.  $15 million

25 net loss, and you got a $15 million recovery from directors

Tab 7
to Declaration of Gary Spraker
Page 19 of 50

1 and officers.  Does Klukwan owe you any money?

2     A.    Under the repayment agreement, they would still

3 have an obligation to me, because if you'll look at the

4 repayment agreement, it states very clearly that the credit

5 is, number one, third-party claims are carved out; number

6 two, it's a situation when, if you look at the credit that

7 was negotiated, applies only for loss less contract funds

8 received.  Consequently, that's the basis of the credit.

9 Consequently, a third-party action is not considered part of

10 that credit for recovery.

11     Q.    Okay.  But you would have a net loss, in this

12 assumption and this assumption only, of $15 million, all

13 right?  So you are telling me that you could recover the

14 $15 million from the directors and officers and then recover

15 the amount under the repayment agreement, which, if it all

16 had been paid, would have been $8 million -- correct? --

17 under the repayment agreement?

18     A.    Yes.

19     Q.    Okay.  So Travelers could have, under your

20 scenario, recovered $23 million.

21          MR. HOPKINS:  Objection; mischaracterizes the

22 questions and the assumptions that counsel plugged into the

23 questions.  It's not this witness's scenario.  It's

24 misleading.

25     Q.    No, it's not my assumption.  But under that

1 assumption, you are saying that Travelers would have had the

2 right to collect the $15 million from the directors and

3 officers and the full amount of the repayment agreement.

4          MR. HOPKINS:  Objection.  Again, I think it's

5 misleading, because the whole question is based on a

6 hypothetical posed by counsel, which he's not articulating

7 clearly in his question.

8     Q.   Do you understand the question?

9     A.   Yes.  You asked me whether or not we could recover

10 the $8 million on top of $15 million, presuming we've been

11 paid in full for the $15 million.

12    Q.   Thank you.  Is that your position?

13    A.   That's the agreement that Klukwan cut with us.

14    Q.   That was the agreement.  Well, Klukwan agreed to

15 pay you, over time, $8 million under the repayment

16 agreement, correct?

17    A.   Yes.

18    Q.   And that was based upon a net loss to Travelers at

19 that time, correct?

20          MR. HOPKINS:  Objection; vague and ambiguous.

21    A.   And net loss is defined as our loss less contract

22 funds.  Third-party actions are carved out.  If you look at

23 it, that was expressly negotiated.  Klukwan was represented.

24    Q.   So the answer to the question, then, is yes?

25    A.   The answer is Yes.

1 aware of, that Jordan discussed.

2      A.    No, no.   I responded by email, I mean, actually,

3 because his is the 16th, at the end of the day on a Monday,

4 and I'm back at him on a Wednesday, at 8:45 a.m.   So yeah,

5 no, I asked him to talk to Tom because of my prior

6 conversation with Tom.

7      Q.    And what was that prior conversation?

8      A.    That Tom was interested in pursuing his own

9 action.

10      Q.    Is that the one we just talked about on June 2?

11      A.    I think it was -- was that the 2nd, or was that

12 the 3rd?   Oh, yeah, it was the 2nd.   It was June 2.

13      Q.    Do you recall any intervening conversations with

14 Mr. Crandall between the 2nd and the 18th or the 16th, when

15 these emails are dated?

16      A.    Can I check something?

17      Q.    You certainly may.

18      A.    (Witness peruses document.)   No, I don't.

19      Q.    Looking at Mr. Rosenfeld's email, did you form an

20 opinion regarding whether or not there were actual claims

21 against Peterson Sullivan based upon what Jordan is telling

22 you in that email?

23      A.    I had concerns, based on what he had provided to

24 me, that it was something that we needed to have further

25 investigated, based on I'm looking for the work papers.   But

Page 208

1 went on for days?

2    A.    Yes.

3    Q.    What was Mr. Sokol's concern about Rule 11?

4    A.    Just wanted to make sure that we had enough there

5 that we wouldn't face a Rule 11 sanction, wanted to make

6 sure that it was valid enough to meet the rule.

7    Q.    Did you have any opinion regarding that matter?

8    A.    I wasn't focusing on Rule 11.

9    Q.    Were you participating in the emails going back

10 and forth between Mr. Rosenfeld and Mr. Sokol?

11         MR. HOPKINS:   Asked and answered.

12    A.    I mean I'd have to even look and see if I was

13 cross-copied on them.   I don't have any recollection.

14    Q.    Okay.   So if I understand your testimony, there's

15 a decision that is made in early- to mid-June to go ahead

16 and sue Peterson Sullivan.

17    A.    Yes.

18    Q.    The action was actually filed in August of 2004.

19 I'm going to just represent that.   I believe it's one of the

20 exhibits we pulled out.   There's a dispute.

21         Why the delay between the decision in mid-June and

22 the filing in August?

23    A.    Jan was drafting the complaint and trying to tidy

24 up some details.

25    Q.    At that time in June 2004 to August 2004, did you

Tab 6
to Declaration of Gary Spraker
Page 23 of 50

1 have any conversations with Tom Crandall or anybody in

2 Klukwan regarding filing against Peterson Sullivan?

3    A.    I'm sorry.  When was your start date?

4    Q.    June.  Actually -- let's go in June.

5    A.    I have an email, I think, exchange with Tom, and

6 basically what I said was we were looking at it, and I'd

7 keep him posted.

8    Q.    Did you ever tell him that Travelers had made a

9 decision to go ahead and sue Peterson Sullivan?

10    A.    No, I didn't.

11    Q.    Why not?

12    A.    I'm not really sure.  I just -- you know, I was up

13 doing something else and hadn't gotten back to telling him.

14 I told him we were thinking about it, keep him posted, and I

15 didn't happen to loop back to him.

16    Q.    Did you send a copy of the complaint to Klukwan?

17    A.    No.  I had no obligation to do so.

18    Q.    Is that the time you were aware that Klukwan was

19 still interested in pursuing Peterson Sullivan?

20    A.    You know, Tom had mentioned, off and on, some

21 thoughts about doing that.  But, I mean, that's his

22 situation, not mine.

23    Q.    Did you have any conversations or discussions

24 about wanting Klukwan to sue Peterson Sullivan?

25    A.    No, I didn't have that type of a conversation.  I

1 know that Tom wanted to sue them and he expressed an

2 interest of wanting to ride our coattails, and I had told

3 him no.

4      Q.    What do you mean by that?

5      A.    Basically, he wanted us to incur the expense and

6 go ahead and push the litigation against them, and he wanted

7 to try to ride our coattails, just as the term implies, and

8 I had always told him no.

9      Q.    But isn't that really what happened?

10     A.    No.

11     Q.    Why not?

12     A.    Because Tom wanted to and attempted on a couple of

13 occasions to renegotiate the agreement to have whatever is

14 going to come out of these recoveries apply directly against

15 the promissory note, and I told him no.

16     Q.    There's some emails about that, and we'll get to

17 them.

18     A.    Yep.

19     Q.    But you said you wanted him to ride your

20 coattails.

21     A.    I didn't say I wanted him to ride my coattails.

22 I'm saying he wanted to ride my coattails.

23     Q.    Fair enough.

24     A.    And I said, "No thank you."

25     Q.    Understood.   Tab C
to Declaration of Gary Spraker
Page 25 of 50

1                              (Exhibit 146 marked for

2                              identification.)

3      Q.   Document 146 is what appears to be an email from

4 you, to Jan Sokol and Jordan Rosenfeld.  Actually, I

5 apologize.  This was previously marked as 121.  We're

6 duplicating, here.  And this is continuing the conversation

7 regarding the work paper.

8           Do you recall if this is the result of a

9 conversation that you had with Mr. Crandall?

10           MR. HOPKINS:  Objection; vague and ambiguous,

11 foundation.

12      A.   I did have a conversation with Tom.

13      Q.   Do you recall the substance of that conversation?

14      A.   Tom indicated he wanted to pursue Peterson, too,

15 and despite me continuing trying to cut my coattails off, he

16 suggested he wanted to ride them, and I was discouraging him

17 from doing so, saying no.

18      Q.   And the email does state, "Tom advised that they

19 intend to pursue Peterson, too, although I anticipate they

20 will want to ride our coattails."

21           So this is not the first time you've used "ride

22 our coattails."  You are interpreting or meaning "ride our

23 coattails" as having Travelers sue Peterson Sullivan,

24 correct?

25      A.   I don't know what Tom -- what I know is that Tom,

1 in one fashion or another, wanted to have the benefit of

2 whatever we were doing, even though I expressly told him no,

3 that this is not the case. So I don't know whether he's

4 talking about filing a suit and just trying to get what he

5 can off of what information we've got. But anything else, I

6 mean, I was very consistent in telling him, Tom, no. I mean

7 you're not -- this is our piece, not yours. I'll keep you

8 posted.

9      Q.   Okay. But it sounds like, when you've given me

10 that answer, you're focusing on the ultimate recovery and

11 application of any proceeds.

12      A.   No. I mean even the process, because, you see,

13 Tom -- if you look at what I wrote here, Tom advised he

14 intended to pursue Peterson, too, so that means him

15 independently filing their own litigation against Peterson.

16 And I'm saying although I anticipate they want to ride our

17 coattails, okay, experts, a lot of other stuff, you know,

18 I've already got someone looking at it. So, I mean, riding

19 coattails is I pay for things, they get to use it, and I

20 don't want to have any part of that, and it's not part of

21 the deal.

22      Q.   And when you say "the deal," what do you mean?

23      A.   Repayment agreement.

24      Q.   Okay. We talked about differences between

25 Travelers' lawsuit against directors and officers versus

1                          (Exhibit 147 marked for

2                          identification.)

3      Q.    Okay.   This is Document 147.   I'm handing you

4 Document 147, an email from Jan Sokol, to Cabot

5 Christianson, and copied to you, dated Friday, January, 9,

6 2004, regarding Travelers/South Coast/Accountant work

7 papers.   Do you recall this email?

8      A.    Yes.

9      Q.    It states, "I have had no further response to my

10 request for the work papers from either the accounting firm

11 or the lawyer."   That's the subject matter we've just been

12 talking about regarding Jordan conferring with Tom, Tom

13 sending letters; is that correct?

14     A.    Yes.

15     Q.    "I want to proceed with the filing of the petition

16 under Fed. R. Civ. P. 27."   Did you have an understanding

17 what Federal Rules Civil Procedure 27 was?

18     A.    I believe there's some emails where Jan, in

19 response to -- a response to my September 9 email, Jan

20 brought up using this process with Rule 27, and I think he

21 may have recited it off the email.   Again, I can't remember

22 whether I was cross-copied on it or not, but there's an

23 explanation about what it is.

24          And so in response to that email, there is an

25 email from Jan, because I'm saying there I don't know what

1              MR. HOPKINS:  (Counsel complies.)

2      Q.   Why don't you take a look at that and confirm

3 that's the full repayment agreement you're referring to.

4      A.   (Witness complies.)  Yes.

5      Q.   Why don't you point out for me the paragraph

6 regarding cooperation that you're referring to.

7      A.   Paragraph 3.  It's on Page 2.

8           (Reading.)  As and when requested by Travelers,

9 SCI, Klukwan and CPC agree to execute all letters,

10 instruments or agreements necessary to carry out the

11 purposes and intent of this agreement, including but not

12 limited to takeover agreements, assignments, acknowledgement

13 of default, deeds of trust and security agreements.

14     Q.   All right.  Let's get the easy stuff out of the

15 way.  The third-party claims are not contained in the

16 takeover agreements, correct?

17     A.   No.

18     Q.   Or the assignments?

19     A.   No.

20     Q.   Or the acknowledgements of default?

21     A.   Nope.

22     Q.   The deeds of trust or the security agreements?

23     A.   No.

24     Q.   So you are saying that under the first part of

25 that sentence -- let me ask exactly what you are saying.

1          Are you reading that sentence to requiring that

2 they sign the letter or that they participate in the lawsuit

3 under this sentence?

4      A.    They just -- what I'm saying is that letters,

5 instruments or agreements necessary to carry out the

6 purposes and intent of this agreement.  Please keep in mind

7 that their agreement, one of the things we're talking about,

8 is that they're supposed to help us minimize our loss, in

9 order to minimize Travelers' exposure under the bonds.

10     Q.    And the damages against -- the claims against

11 Peterson Sullivan are part of your exposure under the bonds?

12     A.    Correct.

13     Q.    All right.  But participation in a suit seems --

14 which is what this Rule 27 procedure is getting to, correct?

15 It's requiring Klukwan to be party to a lawsuit?

16     A.    Actually, all it is is a petition.  It's not any

17 sort of suit on the merits.  It's trying to get

18 documentation.  So there is a distinction between the two.

19     Q.    But to do it, you have to file it in court,

20 correct?

21     A.    Correct.

22     Q.    All right.  So in that regard, I'm going to call

23 it a lawsuit.  I realize it's different from the merits, but

24 I'm going to call it a lawsuit.  That seems to me to be --

25 isn't that different than executing letters?

1    A.    But you have to look where it says including but

2 not limited to.  You're currently reading that sentence to

3 mean --

4    Q.    I'm actually reading the stuff -- the phrase

5 before.  As and when requested by Travelers, SCI and Klukwan

6 and CPC agree to execute all letters, correct?

7    A.    Correct.

8    Q.    Instruments or agreements?

9    A.    Right.

10    Q.    Necessary to carry out the purposes and intent of

11 this agreement.

12          "This agreement" refers to the repayment

13 agreement, correct?

14    A.    Yes.

15    Q.    And the purpose of the repayment agreement is to

16 set forth the liability and responsibility and obligations

17 of SCI, Klukwan and CPC with regard to Travelers, correct?

18    A.    Yes.

19    Q.    Are there any other operations, other than

20 Paragraph 3, that you believe required Klukwan to

21 participate in this Rule 27 procedure?

22    A.    This is the primary one that I'm relying on, that

23 they're supposed to help us minimize our exposure.  To me,

24 you're talking about the information and documentation,

25 instruments, and that, under the circumstances, it's a

Tab 6
to Declaration of Gary Spraker
Page 31 of 50

1 situation where it's going to be minimizing our exposure

2 under the bonds by virtue of helping us.  So the way I read

3 it is it's this provision.

4     Q.   And you are reading "under the bonds" to include

5 the damages against Peterson and Sullivan?

6          MR. HOPKINS:  Objection; vague and ambiguous.

7     A.   No.  What I'm saying is it's going to minimize our

8 exposure.  So what happens is that if I'm in a situation

9 like this, they're going to help me do whatever is necessary

10 to wrap things up globally and do anything else necessary to

11 help me reduce my loss.

12     Q.   Well, you also mentioned that the repayment

13 agreement specifically carved out the third-party claims,

14 correct?

15     A.   They do.

16     Q.   Why don't you find that provision for me.

17     A.   (Witness complies.)  If you look at -- two

18 different areas.  Let's look at Paragraph 11 first.

19     Q.   Page 5?

20     A.   Yes.  Six, actually.

21     Q.   Six?

22     A.   Yeah, the last sentence.

23          (Reading.)  This agreement and the preceding

24 sentences do not impair or release Travelers' claims or

25 causes of action against any person or entity other than the

1 Klukwan entities.

2    Q.    Okay.  Let's stay with that one first.  I read

3 this, then, as saying this repayment agreement does not

4 impair or release Travelers' claims against any person or

5 entity other than Klukwan entities to mean that this

6 agreement is not affecting any claims that Travelers may

7 have against Peterson Sullivan, correct?

8    A.    Yes.

9    Q.    Or the directors and officers.

10    A.    Yes.

11    Q.    Or even Key Bank.

12    A.    Yes.

13    Q.    Or any third party that is not a party to this

14 repayment agreement.

15    A.    Yes.

16    Q.    Did you understand that Klukwan ever meant to do

17 so?

18                MR. HOPKINS:  Objection; vague and ambiguous.

19 I don't understand the question.

20    Q.    Was that last sentence the result of any specific

21 conversations during the negotiation of the repayment

22 agreement?

23    A.    I'm the one who inserted it and asked for it to be

24 included.

25    Q.    Why did you do that?

1    A.    It excludes them, because those third-party claims

2 are not bonded contracts.

3    Q.    But you're reading that within the definition of

4 bonded contracts.

5    A.    Which is defined on the first page.

6         (Reading.)  "Bonded contract" shall mean any

7 contract that's referenced or described in any bond issued

8 on behalf of any Klukwan entity.  So it's a defined term,

9 and that was expressly negotiated, and I made it clear when

10 I got asked this, and I insisted that that term be included,

11 and it was accepted.

12    Q.    All right.  Now you're doing what we complained

13 about yesterday, about using too many concepts in one

14 answer.

15    A.    I apologize.

16    Q.    Okay.  So when you say that you included that

17 because -- at what time?

18    A.    During the course of the negotiation on the

19 repayment agreement.

20    Q.    And it's my understanding the course of

21 negotiation began, as we're going to get to, July 17, '02,

22 to essentially the end of the year of '02.  Is that your

23 understanding of the time for negotiation of the repayment

24 agreement?

25    A.    No.    Tab C
                to Declaration of Gary Spraker
                Page 34 of 50

1                              (Break in the proceedings.)

2       Q.    When we took a break, we were talking about bonded

3  contracts, the terms used in the repayment agreement,

4  looking at Paragraph 9, and let me start with this question:

5             Did you have any specific conversations where you

6  told Mr. Christianson that bonded contracts specifically

7  excluded any monies recovered against or from third parties?

8       A.    No, but it's inherent in the definition.   If he

9  had any questions about it, he could have asked me -- he did

10  not -- because it's right there in the definitions.

11      Q.    Taking a broader look at Paragraph 9, you focused

12  on the last sentence.   Let's look at the first sentence.

13            (Reading.)   In reliance upon Travelers'

14  representation that its total liability under the bonds, net

15  of all receipts from the bonded contracts, will exceed

16  $8 million, SCI shall execute a note in the form attached as

17  Exhibit B in the amount of $5,388,306.48.

18            What was the purpose of that sentence and this

19  paragraph in whole?

20            MR. HOPKINS:   Objection; foundation.   Over

21  broad.   Vague and ambiguous.

22      A.    I'm sorry.   Your question again, please.

23      Q.    What are you trying to do in Paragraph 9?

24            MR. HOPKINS:   Objection.   It's vague and

25  ambiguous, over broad, assumes facts not in evidence.

1    Q.   Jan states:  (Reading.)  I spoke to Chuck

2 concerning our conversation yesterday regarding possible

3 actions against the accountants.  Chuck previously discussed

4 some of these issues with Tom Crandall.

5        Do you recall the conversation which Mr. Sokol

6 apparently is referencing in this email?

7    A.   Yes.

8    Q.   Can you tell me about that conversation?

9    A.   During the course of the performance under the

10 repayment agreement, Tom was looking to renegotiate a number

11 of the terms, because he was concerned about them, and those

12 had popped up on a number of different occasions.  So

13 consequently, this is a discussion that follows that sort of

14 a situation.  That's why it says cash payment to Travelers.

15       So, I mean, during the course of the repayment

16 agreement, Tom, on numerous occasions, wanted to renegotiate

17 the terms, and this is one other instance where that was

18 something that had happened, and what I'm indicating or have

19 indicated to Jan is that I might be interested in doing it,

20 changing the terms of the settlement agreement, but I was

21 going to need cash money to do that.

22    Q.   What terms was Tom interested in changing?

23    A.   I have to go back and look at some of the other

24 emails.  I know he had wanted to change the bankruptcy

25 provision at one point in time.  I can't remember whether it

1 was before or after this.  He wanted to restructure some of

2 the payments.  I know he had been concerned that as he was

3 liquidating assets, that he wasn't affectively reducing the

4 amount that he owed to us.  So he was looking possibly for a

5 restructure for how that was going to be done.

6      Q.    Any other terms that come to mind?

7      A.    Subsequent to this, at a point in time later, he

8 wanted to change the -- he wanted to insert and claim -- it

9 was related to the affiliates issue.  There was an amendment

10 proposed by Cabot that affected the bankruptcy provision as

11 well as the affiliates piece of it.

12     Q.    And what did you tell Mr. Sokol?

13     A.    At what time?

14     Q.    In this conversation that he's referencing on

15 January 21, 2004.

16     A.    Just that Tom was looking for some terms, and if

17 he was looking for that to change some things, then he was

18 going to have to pay us some cash.

19     Q.    Okay.  Did you believe that Klukwan had the cash

20 available to do that at that time?

21     A.    I was of the mind that between K-Ply and some

22 other items, that they would be able to come up with some

23 money as a downstroke to help take care of things.

24     Q.    What other items?

25     A.    Thinking they can cut their overhead.  You know,

Tab 6
to Declaration of Gary Spraker
Page 37 of 50

1     A.    Yes.

2     Q.    Okay.  The second line of your response, "We are

3 paying the costs, they are getting a free ride, and it was

4 never part of the deal," I'm interpreting "they are getting

5 a free ride" -- actually, what do you mean, "they are

6 getting a free ride"?

7     A.    Since they were going to be signing the petition,

8 but we're paying for it, whatever we're going to dig up out

9 of it is something that they're going to have access to.  So

10 I'm paying the costs, and that information that gets coughed

11 up out of it, they're going to get access to the

12 information.

13    Q.    Well, it sounds like it actually is applying to

14 any substantive action that is later filed, as well, because

15 the next line reads, "We will have a loss in excess of the

16 note, and we should be able to apply any recovery there, not

17 against the note."

18    A.    Yep.  It applies to both.

19    Q.    Okay.  And that language seems to be addressing,

20 if you'll turn back to the February 10, 2004, email, the

21 third paragraph from Cabot, which reads, "If Travelers

22 wishes to bring a substantive cause of action against P & S,

23 Klukwan's expectation is that the net litigation proceeds

24 from that suit will be applied first to the Klukwan/SCI note

25 to Travelers.  Also, as you are aware, Klukwan is

Tab C
to Declaration of Gary Spraker
Page 38 of 50

1 talk to Tom and Cabot about, but they raised for the first

2 time this affiliate defense and had suggested that they were

3 going to notify all the officers that they were, in fact,

4 releases.

5          I took that pretty much as a threat, because it

6 was a situation where this argument about the affiliates had

7 been raised for the first time, and I didn't see it.  I told

8 him I would look at it and get back to him.  We ended up

9 having a series of exchanges by email, and eventually we

10 ended up having a meeting.

11     Q.    Okay.  So at the September 29 conversation or

12 telephone call, you talked about the assignment of the --

13 potential assignment of a claim against the broker for

14 essentially letting the policy lapse?

15     A.    There was an argument about whether or not it had

16 been presented timely.  It's a claims-made policy.  So that

17 was the argument.  And so we were looking for an assignment

18 of that right from Klukwan-South Coast.

19     Q.    And what did Klukwan or South Coast say when you

20 asked for the assignment of that claim?

21     A.    I thought all you insurance guys stuck together,

22 and I didn't think you'd want to sue them.

23     Q.    And what did you take that to mean?

24     A.    I didn't think they were overly interested about

25 providing that assignment to me.  But that's what Cabot had

1    Q.   Never had a need to?

2             MR. HOPKINS:  Objection; foundation,

3 speculation.

4    A.   Our situation is different.  I mean Klukwan had

5 privity with the accountants.  We were in a situation where

6 we had to prove reliance.  Our situation was different.

7 They're looking at different damages than us.  Our situation

8 was different, and no, I don't -- I'd have to go back and

9 look, but I have no present recollection of asking Tom for

10 an affidavit in the Peterson Sullivan matter.

11    Q.   After September 29, 2004, would you characterize

12 Travelers' relationship with Klukwan as adversarial?

13            MR. HOPKINS:  Objection; foundation, vague

14 and ambiguous.

15    A.   I don't know whether "adversarial" is quite the

16 correct word.  Unfortunately, we were having to start to

17 send default notices.  Payments weren't being made.

18 Cooperation that we thought we were entitled to we weren't

19 receiving.  The affiliates' defense was, in our mind,

20 created out of whole cloth and was unsupportable and was

21 created because Klukwan found itself in a situation where it

22 was going to have to defend the officers that had suggested

23 to us that they were going to pursue but for having the

24 legal opinion that they got and that we should take a look

25 at pursuing.  Now, all of a sudden, there is this defense

1  that's created, not legitimately, and then published to all

2  the officers in an overt attempt to prevent us from going

3  forward on that particular piece of litigation.

4         So I would not say adversarial, but it was a

5  situation where clearly Klukwan was not cooperating and was

6  not performing its obligations under the agreement.

7      Q.   Prior to that, do you believe that Klukwan had

8  been performing its obligations under the agreement?

9         MR. HOPKINS:  Objection; vague as to time.

10     A.   I had expressed concerns periodically about that,

11 and when I thought it was sufficient that I needed to act

12 under the agreement, then we would send a notice.

13     Q.   So is that a yes or no?

14     A.   It was in between.  There's some issues where I

15 thought that they were not honoring the agreement.  When it

16 became sufficiently material that I thought it was something

17 that I needed to act on, I went ahead and did it.

18     Q.   Okay.  Up until that September 29 time frame,

19 after you took whatever action you did, did they generally

20 perform, or were there instances where there was a clear

21 breach, in your mind?

22     A.   Nonpayment.  As I've testified about, we had a

23 series of late payments or nonpayments.  Obviously, I think

24 the affiliates issue --

25     Q.   That's why I divided it.

1 33-percent risk factor to the $18 million-plus.

2    A.    Thank you.  You "sped-read" faster than me.

3    Q.    That's what you're referring to?

4    A.    Yes, it is what I'm referring to.

5    Q.    For the record, I agree with Mr. Hopkins that it

6 appears that the first page on that document that I gave him

7 is not -- but for purposes of this discussion, I'm referring

8 to Deposition Exhibit No. 4, which is a June 10, 2002,

9 letter from Mr. Langfitt, to Mr. Crandall.

10          Is that your letter dated June 10, 2002?

11   A.    Yes.

12   Q.    All right.  So I have the chronology, on June 10

13 you write the letter.  It looks like you've set up a meeting

14 for the next day, a June 11 agenda for a June 11, 2002,

15 meeting.

16   A.    Yes.

17   Q.    And then is this document that is Document

18 Number 34 coming out of that meeting?

19   A.    You mean 35?

20   Q.    35.  Yes.

21   A.    Yes.

22   Q.    And Exhibit 34, on the front page, there's a

23 reference to you, meaning Tom, mentioned bankruptcy, filing

24 Chapter 11.  Were you advised that that was a possibility

25 that Klukwan was considering at that time?

1    A.    At some point in time, Tom told me he'd been

2 authorized to do that.  I think he may have quibbled with me

3 about how that was authorized or not, but I knew that that

4 was in the background, that they might do that.

5    Q.    Did you care if Klukwan and/or South Coast went

6 into Chapter 11 or any bankruptcy?

7    A.    I did, and that's why it ended up having a term

8 put into the payment agreement.

9    Q.    All right.  So back to Exhibit 34, after looking

10 at --

11    A.    35.  Sorry.

12    Q.    All right.  I meant to say after looking at 34, to

13 refresh your recollection, and then, hopefully, looking at

14 the characterization of proposals in Document 35, do you --

15    A.    I might want to check my notes, but Tom recited

16 these as a proposal.  He had his counter in there, and

17 obviously the $12 million number Mike was referring to

18 really was driven by my June 10 letter on what I was seeing

19 the exposure as.  And so that's why you end up with that

20 number.

21        He sends this to me.  I then write back, come up

22 with my other letter suggesting an alternative with a rising

23 cap built into it, and we end up having a discussion on that

24 ultimately and come back.  It's July 2.  I used his format

25 so pretty much adopted what he has.  I have a rising cap,

1 and ultimately we went into the meeting and got this

2 resolved.  So I think there was another exchange sometime

3 shortly in there.

4         Cabot had asked me, during a conversation with

5 him, to -- he says, Why make it that complicated.  Why not

6 make it simpler.  And so we adopted a simpler as opposed to

7 a more complicated formula.

8     Q.   Okay.  Was that before or after the July 17

9 meeting with --

10    A.   I want to say, for some reason, it preceded it.

11 It may have been either right at the meeting or slightly

12 preceded it in an email exchange.

13    Q.   Okay.  Let's work through this.  Look at the

14 July 2 letter, and the second paragraph says, "I also note

15 that you proposed a structure with a South Coast Promissory

16 note and a parental guarantee."

17         Is that what you're referring to?

18    A.   No, actually not.  It was the way the payment

19 structure was.  I mean he actually said -- he looked at it

20 and said Chuck, this is too complicated.  Why don't we go

21 with something simpler than this.  And I said, "Okay.  What

22 have you got in mind?"

23    Q.   Okay.  So the second page of that letter

24 references setting up a meeting for the 17th, 18th or 19th.

25 And that's ultimately what happened was that there was a

1 meeting set up for July 17?

2    A.    Yes, that's what I remember.    There's an agenda

3 that was sent out right before, that confirms here's our

4 agenda for the meeting.    I believe the meeting was the 17th,

5 probably.

6    Q.    Okay.    At the end of that, there's a "cc" to Marc

7 Eckardt and to Jan Sokol.    Do you recall why this was being

8 sent to Jan?

9    A.    Yes.    I was keeping him apprised of what was going

10 on with the negotiations, because ultimately, if they

11 failed, then I was going to commence suit against South

12 Coast.

13    Q.    Assuming they didn't go into bankruptcy.

14    A.    They still need help.

15    Q.    Okay.    But he was not being asked to advise on the

16 structure or terms of those negotiations.

17    A.    No.

18                            (Exhibit 155 marked for

19                             identification.)

20    Q.    Take a look at that and tell me if that's the

21 agenda that you were referring to.

22    A.    It's a red-line of it.    I think there was another

23 one that was actually the final.

24    Q.    I saw one that was much shorter than this, that I

25 believe, in my memory, so I could well be wrong, that it was

Tab 6
to Declaration of Gary Spraker
Page 45 of 50

Page 284

1 prior to this.  Do you know if the actual agenda was shorter

2 or longer or the same?

3    A.    Obviously, this is missing Item 1.

4    Q.    Well, because it was deleted.

5    A.    Exactly.  But what I remember seeing was a

6 nonred-line version that went out.

7    Q.    Was it this detailed, or was it --

8    A.    I think it was shorter.

9    Q.    Okay.  As you understand it, what were the topics

10 to be addressed on the July 17 meeting?

11    A.    A number of these different items that were here.

12 I had just taken a more simplistic, larger category approach

13 with what we did.  So I suppose the listing on the jobs may

14 have just said major projects, stands for minor jobs.  You

15 know, it says, "Balance sheet from Gordon."  I don't

16 remember that being on whatever the last one was.

17    Q.    Do you know who Gordon is?

18    A.    Not currently.

19    Q.    That balance sheet from Gordon, would that --

20    A.    It may have been a typo and meant "Jordan."  So I

21 don't know.  I mean I'm guessing it might be Jordan.

22    Q.    Okay.  Do you dictate?

23    A.    This wasn't me.  I didn't draft this.

24    Q.    Does Marc dictate?

25    A.    I don't know

Tab C
to Declaration of Gary Spraker
Page 46 of 50

1    Q.    Okay.  As of this date, well, July 16, 2002 --

2    A.    October 4, 2004.

3    Q.    Over to the right, please, July 16, 2002.  As of

4 July 16, 2002, there's no agreement between Travelers,

5 Klukwan, South Coast, as for repayment of the obligations

6 under the general indemnity agreement, right?

7    A.    Yes.

8    Q.    And that's why you're having the meeting.

9    A.    Yes.

10   Q.    And did you have the meeting?

11   A.    Yes.

12   Q.    Who attended?

13   A.    Marc Eckardt, myself, Tom Crandall.  I believe Tom

14 Plant [ph] was there, Cabot Christianson and Kim.

15   Q.    Strong?

16   A.    Strong.

17   Q.    Okay.  How long did the meeting last?

18   A.    I thought it was most of the day.

19   Q.    How long of that was discussing, well, the

20 settlement terms?

21   A.    That was pretty much the whole meeting.

22   Q.    Well, I was just wondering, given the agenda

23 that -- the red-line agenda we looked at, it looked like

24 there was potentially other terms, other items.  But I

25 thought it was pretty much the whole day devoted to the

Page 286

1 payment obligations.

2    A.    We were looking for informational stuff, and no,

3 it was primarily payment.

4    Q.    Can you give me a summary of what happened during

5 that meeting and the order that it happened?  Where did

6 negotiations start?

7    A.    When we opened the door.

8    Q.    Okay.  Who opened the door?

9    A.    It's getting late in the day, Gary.  We had had

10 exchange of email before we set up our positions.  I think

11 we were probably -- I don't know.  I think I may have been

12 at eight and a half, and Klukwan-South Coast may have been

13 at seven and a half or less.  We were arguing about terms

14 and structure.  And at a certain point in time, obviously,

15 Tom and his group were looking for lesser dollar amounts.

16 Kim asked me could I please take $8 million to settle it up.

17         At that point in time, I went out -- Marc Eckardt

18 and I excused ourselves from the meeting, stepped outside

19 the office building and talked about it.  I came back in,

20 and I said, "Kim, for you, I'll do that."  And that's

21 actually no joke.  I mean that's exactly what happened.  I

22 came back.  She was looking for a resolution, and she told

23 me who she was, a director, and she said, Can you please do

24 this, and I said, "I'll do it."

25    Q.    Did you reach agreement on any other terms?

1 because there is a flurry of privileged stuff going back and

2 forth on both sides.  I have not worked my way through all

3 the privileged materials.  In the event that there is a

4 dispute about privilege that is a result -- that results in

5 the production of additional privileges, there may be a need

6 for additional.  I do not currently anticipate that, but I'm

7 making that reservation as well.

8              MR. HOPKINS:  I'm not agreeing to anything in

9 the way of re-upping Mr. Langfitt's deposition, but I

10 understand everybody is reserving positions.

11             MR. SPRAKER:  Fair enough.  Are we done?

12             MR. GILMORE:  And just for everybody's

13 information, I'm not going to attend tomorrow's.  It's my

14 understanding that Eckardt really had nothing to do with the

15 Peterson Sullivan side of the case.

16             MR. SPRAKER:  That's outside the scope of the

17 questions.  That's what he testified to.

18             MR. HOPKINS:  That's a statement by

19 Mr. Gilmore, and that's not a question.

20             MR. GILMORE:  It was a quote in the earlier

21 testimony of the witness.  Anyway, that won't be an issue, I

22 don't think.  But for your information, I won't be here

23 tomorrow.

24             MR. HOPKINS:  Off the record.

25 ////

Tab C
to Declaration of Gary Spraker
Page 49 of 50

Page 335

1                    (Deposition was adjourned at

2                     3:45 p.m.)

3                    (Signature was not waived.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
Tab C
to Declaration of Gary Spraker
Page 50 of 50