James T. Hopkins, Pro *Hac Vice*
Garth A. Schlemlein, ASBA # 8602011
Schiffrin Olson Schlemlein & Hopkins, P.L.L.C.
1601 Fifth Avenue, Suite 2500
Seattle, WA 98101
Telephone: 206-448-8100
Telefax: 206-448-8514
Attorneys for Plaintiff

Richard E. Spoonemore, *Pro Hac Vice*
Sirianni Youtz Meier & Spoonemore
1100 Millennium Tower
719 Second Ave.
Seattle, WA 98104
Telephone: 206-223-0303
Telefax: 206-223-0246
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, A Connecticut corporation,<br><br>　　　　　　　Plaintiff,<br>v.<br><br>SOUTH COAST, INC., an Alaska corporation, KLUKWAN, INC., an Alaska Native Village corporation, and CHILKATS' PORTAGE COVE DEVELOPMENT COMPANY, an Alaska corporation,<br><br>　　　　　　　Defendants.<br><br>SOUTH COAST, INC., an Alaska corporation, KLUKWAN, INC., an Alaska Native Village corporation, and CHILKATS' PORTAGE COVE DEVELOPMENT COMPANY, an Alaska corporation,<br><br>　　　Counterclaim and<br>　　　Third Party Plaintiff | Case No. A06-00063 (TMB) |

Travelers' Reply and Opposition to Cross Motion
Travelers Casualty and Surety v. South Coast, Inc., et al
**Case No. A06-00063 (TMB)**

|   |   |
|---|---|
| 1 | v. |
| 2 | TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation, STEWART SOKOL & GRAY L.L.C., and JAN D. SOKOL, |
| 3 | |
| 4 | |
| 5 | Counterclaim and Third Party Defendants. |
| 6 | |
| 7 | TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, A Connecticut corporation, |
| 8 | Plaintiff and Cross Claim Plaintiff; |
| 9 | |
| 10 | v. |
| 11 | STEWART SOKOL & GRAY L.L.C., and JAN D. SOKOL |
| 12 | Cross Claim Defendants. |

**TRAVELERS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT DISMISSING DEFENDANTS' COUNTERCLAIM AND OPPOSITION TO DEFENDANTS' CROSS MOTION**

Travelers' Reply and Opposition to Cross Motion
Travelers Casualty and Surety v. South Coast, Inc., et al
Case No. A06-00063 (TMB)

SCHIFFRIN OLSON SCHLEMLEIN & HOPKINS, P.L.L.C.
WESTLAKE CENTER OFFICE TOWER • 1601 FIFTH AVENUE, SUITE 2500 • SEATTLE, WASHINGTON 98101
PHONE: (206) 448-8100 • FAX: (206) 448-8514

# TABLES OF CONTENTS

| | | | |
|---|---|---|---|
| I. | Introduction and Summary of the Argument | | 1 |
| II. | Counter Summary of the Facts | | 2 |
| | A. | Third Party Claims by Both Travelers and Defendants, Including Claims Against Peterson Sullivan, Were Discussed and Considered During Negotiation of the *Repayment Agreement*. | 2 |
| | | 1. Tom Crandall Recognized Potential Claims Against Peterson Sullivan in January 2002. | 3 |
| | | 2. Tom Crandall and Chuck Langfitt Specifically Discussed Possible Claims Against Peterson Sullivan in June 2002 at the Outset of Negotiations for the *Repayment Agreement*. | 4 |
| | | 3. Cabot Christianson Understood Both Parties Would Evaluate and Pursue Their Respective Third Party Claims as They Deemed Appropriate. | 7 |
| | | 4. Tom Crandall Understood the Plain Meaning of the *Repayment Agreement*. | 9 |
| | B. | Defendants Repeatedly Informed Travelers They Were Considering Their Own Claim Against Peterson Sullivan and Made No Decision to Forego that Claim Until Sometime After September 29, 2004. | 14 |
| | C. | Defendants Made a De Facto Decision Sometime After September 29, 2004 to Forego Their Own Action Against Peterson Sullivan Based on Their Unilateral and Mistaken Assumptions as to Travelers' Claimed Damages, the Timeliness of Travelers' Action, and Other Considerations Relating to Their Financial Circumstances and the Merits of Their Claim. | 17 |
| | D. | Travelers Was Independently Pursuing Its Own Claim Against Peterson Sullivan. The Parties Were Not Working Together to Obtain a Recovery for Their "Joint Benefit." | 20 |
| | E. | The Defendants' Prior Conduct Is Inconsistent with Its Present Assertion of a Duty on Travelers. | 22 |

iii

Travelers' Reply and Opposition to Cross Motion
Travelers Casualty and Surety v. South Coast, Inc., et al
Case No. A06-00063 (TMB)

SCHIFFRIN OLSON SCHLEMLEIN & HOPKINS, P.L.L.C.
WESTLAKE CENTER OFFICE TOWER • 1601 FIFTH AVENUE, SUITE 2500 • SEATTLE, WASHINGTON 98101
PHONE: (206) 448-8100 • FAX: (206) 448-8514

## TABLES OF CONTENTS
-continued-

| | | | |
|---|---|---|---|
| III. | Argument | | 24 |
| | A. | The Court Should Give Effect to the Plain Meaning of the *Repayment Agreement*. Defendants' Alleged Subjective Intent Is Not Probative. | 24 |
| | B. | *St. Denis* Thoroughly Analyzed Alaska's Jurisprudence on the Economic Loss Rule, Including *Mattingly*. *St. Denis* Requires Defendants' Counterclaim Be Dismissed Because Travelers' Alleged Negligence Did Not Involve Physical Harm or a Risk of Physical Harm. | 26 |
| | C. | Defendants Cannot Distinguish *North Star*. | 31 |
| | D. | The Good Samaritan Cases Relied Upon by Defendants All Involve Physical Harm and Have No Application to This Matter. | 35 |
| | E. | The *D.S.W.* Factor Analysis Has No Application in These Circumstances and Does Not Impose a Duty on Travelers in Any Event. | 36 |
| | F. | The Doctrine of Mitigation Does Not Provide the Defendants a Cause of Action. | 40 |
| | G. | Defendants Have No Mitigation Defense as a Matter of Law. | 41 |
| | | 1. There Is No Duty to Mitigate Where the Written Agreement Between the Parties Negates Any Such Duty. | 42 |
| | | 2. The Rule Applies Only to Damages That Can Be Prevented, Not to Damages Already Incurred. | 45 |
| | | 3. The Rule Does Not Require the Filing of a Lawsuit to Mitigate Damages. | 46 |
| | | 4. The Rule Is Not Applicable Where Both Parties Have an Equal Opportunity to Mitigate. | 47 |
| VIII. | Conclusion | | 48 |

iv

Travelers' Reply and Opposition to Cross Motion
Travelers Casualty and Surety v. South Coast, Inc., et al
Case No. A06-00063 (TMB)

SCHIFFRIN OLSON SCHLEMLEIN & HOPKINS, P.L.L.C.
WESTLAKE CENTER OFFICE TOWER • 1601 FIFTH AVENUE, SUITE 2500 • SEATTLE, WASHINGTON 98101
PHONE: (206) 448-8100 • FAX: (206) 448-8514

Plaintiff Travelers Casualty and Surety Company of America ("Travelers") submits this reply ("*Travelers' Reply*") in support of its motion for summary judgment dismissing Defendants' Counterclaim and in opposition to Defendants' Cross Motion ("*Defendants' Opposition*").

## I.   INTRODUCTION AND SUMMARY OF THE ARGUMENT

The *Defendants' Opposition* asks the Court to ignore the clear and unequivocal provisions of the *Repayment Agreement* regarding third party claims and impose liability on Travelers merely because of its unsuccessful litigation against Peterson Sullivan; thereby allowing the Defendants to further escape liability for what they admit to be a present net loss to Travelers exceeding $11.4 million. Defendants' arguments are neither supported by the factual record nor applicable law for the following primary reasons.

- The parties discussed and were well aware of potential third party claims by Travelers against Peterson Sullivan during negotiation of the *Repayment Agreement*. Defendants alleged subjective intent expressed during this litigation is not probative and Court should give effect to the plain meaning of the *Repayment Agreement*.

- *St. Denis* thoroughly analyzed Alaska's jurisprudence on the economic loss rule, including *Mattingly*. *St. Denis* and the economic loss rule requires Defendants' Counterclaim be dismissed because it seeks purely economic losses and Travelers' alleged negligence did not involve physical harm or a risk of physical harm.

Travelers' Reply and Opposition to Cross Motion
Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)                               1

- *Mattingly* and the Good Samaritan cases relied upon by Defendants all involved physical harm or the risk of such harm and are entirely distinguishable from the facts of this case. Such authority does not impose a duty on Travelers.

- Because the question of Travelers' duty is resolved by the *Repayment Agreement* and application of the economic loss rule, a *D.S.W.* multi-factor analysis is inappropriate. Such an analysis would not in any event impose a duty on Travelers.

- The doctrine of mitigation provides no basis for Defendants to assert an affirmative cause of action against Travelers. The *Repayment Agreement* and facts of this case further require Defendants' affirmative mitigation defense be dismissed.

## II.   COUNTER STATEMENT OF FACTS

A.   <u>Third Party Claims by Both Travelers and Defendants, Including Claims Against Peterson Sullivan, Were Discussed and Considered During Negotiation of the *Repayment Agreement*.</u>

Defendants carefully avoid any meaningful discussion of the specific terms of the *Repayment Agreement*, particularly paragraphs 9, 11 and 18. Those paragraphs provide that: (i) Defendants would only receive a credit against their payment obligation where Travelers' total loss "net of all receipts from the Bonded Contracts" was less than $8 million (¶9); (ii) Travelers reserved all claims it might have against third parties (¶11); and (iii) "no failure or neglect" by Travelers in exercising any of its third party claims or rights would, in any manner, reduce or limit the Defendants' obligations under the *Repayment Agreement* and Note (¶18).

Travelers' Reply and Opposition to Cross Motion
Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)                     2

Defendants do not dispute the plain and obvious meaning of these provisions. Instead, they offer a misleading argument, based upon a highly selective and inaccurate recitation of the factual record, that third party claims were "far from their minds" during negotiation of the *Repayment Agreement* and the Court should simply ignore these key provisions of the *Repayment Agreement* based upon the Defendants' alleged subjective intent. However, the record shows the parties were well aware of possible claims against Peterson Sullivan, discussed such claims at the outset of, and during, negotiation of the *Repayment Agreement*, and Defendants well understood the meaning and effect of the *Repayment Agreement* in regard to such third party claims by Travelers.

### 1. Tom Crandall Recognized Potential Claims Against Peterson Sullivan in January 2002.

While initially projecting a profit, South Coast's financial picture deteriorated quite rapidly during the latter half of 2001. Crandall Dep. p.28:2-11.[1] Therefore, in late 2001, Klukwan hired both Peterson Sullivan and the firm of Sutor Consulting to investigate the South Coast projects and operations. Crandall Dep. p. 28:12-30:9; Ex. 26. By mid-January 2002, Peterson Sullivan reported that its investigations revealed South Coast management was failing to follow previously implemented management and financial controls. *Id.* In a January 25, 2002 letter, Peterson Sullivan provided formal notice of such fact. Crandall Dep. p.77:2-78:2; Ex. 21. Notably, Peterson Sullivan had failed to provide any comparable notice or discover any comparable failure to implement proper financial controls in connection with its

---

[1] Deposition testimony and exhibits referenced in *Travelers' Reply* are attached to the *Supplemental Declaration of James T. Hopkins*. For the Court's convenience, all deposition excerpts and exhibits referenced in this Reply are provided with such declaration, even if duplicative of portions of deposition testimony or exhibits previously submitted by the parties.

Travelers' Reply and Opposition to Cross Motion
Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)    3

December 31, 2000 audit. These facts raised a "red flag" in Mr. Crandall's mind regarding the accuracy of the 2000 audit. *Id.*

By April 2, 2002, Crandall had received Peterson Sullivan's full written report regarding its investigations of South Coast's operations ("Peterson Sullivan 2001 Operations Report"). Crandall Dep. p.78:22-79:19. Sutor Consulting's report, dated March 1, 2002, reached essentially the same conclusions regarding South Coast's lack of management and financial controls. Crandall Dep. p.81:2-19.

In a November 15, 2005 letter written by Mr. Crandall in response to Peterson Sullivan's attempt to collect outstanding fees, Crandall emphasized his view that the information provided in the Peterson Sullivan 2001 Operations Report and the Sutor Consulting Report demonstrated that Peterson Sullivan should have discovered the lack of adequate management controls within South Coast during its year end 2000 audit and that it was negligent in failing to do so. Crandall Dep. p. 97:17-98:7; Ex. 28.

As with Mr. Crandall's recognition of a "red flag," Cabot Christianson likewise understood the Defendants' cause of action against Peterson Sullivan accrued in early 2002 with its receipt of the Peterson Sullivan 2001 Operations Report and Sutor Consulting Report. Christianson Dep. p.140:21-141:21; p.138:11-141:21.

   2.   **Tom Crandall and Chuck Langfitt Specifically Discussed Possible Claims Against Peterson Sullivan in June 2002 at the Outset of Negotiations for the *Repayment Agreement*.**

Chuck Langfitt and Tom Crandall first spoke on May 16, 2002. Crandall Dep. p.116:15-25. Langfitt's May 17, 2002 letter confirming that conversation also confirmed a meeting with Crandall in Seattle the following week and a subsequent meeting to be held on May 28, 2002 at South Coast's offices in Ketchikan. Crandall Dep. p.116:15-119:13; Ex. 33.

Travelers' Reply and Opposition to Cross Motion
Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)                                    4

Mr. Langfitt's May 17, 2002 letter further noted that the parties' discussions in Seattle, and subsequently, would focus on the Sutor Consulting Report and the Peterson Sullivan 2001 Operations Report, among other items. Ex. 33.

Negotiations between Travelers and the Defendants regarding their indemnity obligations then began in earnest with a meeting on June 11, 2002 and continued to essentially the end of that year. Deposition of Charles W. Langfitt ("Langfitt Dep.") p.235:20-236:3; p.277:13-22; Ex. 34. Following their initial meeting in June 2002, the parties exchanged written proposals dated June 22, 2002 and July 2, 2002. Exs. 35 and 36. By June 2002, Tom Crandall began to voice his specific concerns to Chuck Langfitt that Peterson Sullivan may have been negligent in its year end 2000 audit and possible claims against it should be investigated. Crandall Dep. p.435:11-436:3; p.468:3-470:1. Mr. Crandall is clear that as of the July 17, 2002 meeting he believed there were potential claims against Peterson Sullivan and he relayed that belief to Chuck Langfitt commencing in June 2002, emphasizing "there should be an investigation on Peterson Sullivan to see if there was some liability there...." *Id.*, p. 468:3-470:1.

> Q  As to that meeting that we were discussing in July 17, 2002, between you and Mr. Langfitt, Mr. Christianson and Ms. Strong, did you have a belief as of that time that there could be claims against Peterson Sullivan for negligent preparation of financial statements?
> A  At that time I believed there could've been....
>
> Q  And as of that meeting in July 17, 2002, had you shared that opinion with Mr. Langfitt?
> A  When Mr. Langfitt first called **when I talked to him in June of that year, in June of 2002**, the conversation was they were taking over the job...And at that point I had reiterated, you know, various things that had caused me concern, the reports from Sutor, the reports from P&S, the -- you know, what happened with Key Bank, the very precipitous drop in value and ability to go forward that

Travelers' Reply and Opposition to Cross Motion
Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)                                5

> South Coast had had, basically from revenues -- basically from a company that had good revenues, not so good net income, to a company that was -- had tanked.
> Q   And **in that discussed (sic) did you discuss Peterson Sullivan at all?**
> A   Just in the general way that **I think Peterson Sullivan should be -- that there should be an investigation on Peterson Sullivan to see if there was some liability there, had they done their job**.

Crandall Dep. p.469:3-470:1.

Chuck Langfitt likewise confirms discussions with Crandall regarding potential negligence claims against Peterson Sullivan during negotiation of the *Repayment Agreement*. Langfitt Dep. p.99:15-22; p.185:9-186:12. By May 28, 2002, Travelers had also received and reviewed the Sutor Consulting Report and Peterson Sullivan 2001 Operations Report. Langfitt Dep. p.97:23-98:7; Ex. 33. The precipitous drop in South Coast's financial circumstances in 2001, compared to the relatively rosy picture painted by Peterson Sullivan's December 31, 2000 audit, also raised questions within the surety's organization.

In a June 19, 2002 email to Chuck Langfitt, David Hombach, a Travelers' underwriter, pointed out Peterson Sullivan's possible negligence. Ex. 132. Mr. Langfitt's reply, dated June 20, 2002, reflected his intention to evaluate such a claim. *Id.*[2] While Travelers did not begin meaningful efforts to truly evaluate the Peterson Sullivan claim until after October 2002, and therefore Mr. Langfitt did not specifically reflect any anticipation of recovering salvage from third parties in his October 1, 2002 Large Loss Report, it is nonetheless evident the possibility of such claims and the likely basis for them was specifically discussed between Mr. Crandall

---

[2] Mr. Langfitt did not recall this email exchange during the initial stages of the litigation with Peterson Sullivan. However, its existence and substance are an undisputed fact. In conjunction with the information provided by the Sutor Consulting and Peterson Sullivan 2001 Operations Report, it formed the factual basis for Judge Beistline's ruling that Travelers was on inquiry notice, and the statute of limitations for its claim against Peterson Sullivan had commenced to run, as of June 19-20, 2002. A copy of Judge Beistline's September 27, 2005 decision is attached as Ex. A to the *Supplemental Declaration of James T. Hopkins*.

Travelers' Reply and Opposition to Cross Motion
Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)                                    6

and Mr. Langfitt at the outset of negotiations for the *Repayment Agreement* in June 2002 and Travelers intended to evaluate the viability of such claims. Despite these undeniable facts, the Defendants would have the Court believe that as of July 17, 2002 "the only claims or causes of action against the third parties that had been discussed" were Klukwan's potential claims against Key Bank. *Defendants' Opposition*, p.7-8. The record demonstrates otherwise.

### 3. Cabot Christianson Understood Both Parties Would Evaluate and Pursue Their Respective Third Party Claims as They Deemed Appropriate.

Mr. Christianson acknowledges that it was both logical and natural for Klukwan to evaluate claims or rights it had against third parties, given the extent of the losses it suffered. Christianson Dep. p.326:3-6. Doing so was part of Mr. Christianson's job. *Id*. p.326:7-8. Christianson further acknowledges that between June and December 2002, he specifically considered possible claims Klukwan might assert against both Key Bank and Peterson Sullivan. *Id*. p.325:11-326:2. Indeed, "fairly early" in his relationship with Klukwan and "by the end of 2002, if not sooner," possible claims by Klukwan against Peterson Sullivan had become a "topic of recurring conversation" between Christianson and Crandall. *Id*. p.113:10-23.

Christianson admits that it was similarly logical and natural for Travelers to evaluate its possible third party claims, since it was foregoing recovery from the Defendants of a substantial portion of its likely losses on the bonds. *Id*. p.326:9-17. Christianson also acknowledges the obvious meaning of the last sentence of ¶11 of the *Repayment Agreement* whereby Travelers reserved all of its "claims or causes of action against any person or entity other than the Klukwan Entities." Christianson Dep. p.86:17-87:7 ("...the sentence says what

Travelers' Reply and Opposition to Cross Motion
Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)                        7

the sentence says."). Mr. Christianson also read, and accepted without protest, the provisions of ¶18 of the *Repayment Agreement*. Christianson Dep. p.89:7-13.

Despite his involvement in the evaluation of possible third party claims by his client, discussions of such claims with Mr. Crandall in the June to December 2002 timeframe, and his recognition of the plain meaning of ¶¶11 and 18 of the *Repayment Agreement*, Mr. Christianson professes to have had "no whiff of an inkling" during the six month period of negotiation of the *Repayment Agreement* that Travelers might consider pursuing claims against Peterson Sullivan or other third parties. *Defendants' Opposition*, p.11, n.35. Christianson's testimony is also curious since the initial draft of the *Repayment Agreement* prepared by him specifically addressed a third party claim by the Defendants against Key Bank and the "Chinle" claim, an affirmative claim of South Coast on one of the bonded projects. Ex. 40, ¶¶ 8 and 9; Christianson Dep. p.72:18-73:1.[3]

Christianson acknowledges that Crandall and Langfitt were having regular, direct communication and discussions during negotiation of the *Repayment Agreement* and that he cannot speak to such conversations. Christianson Dep. p.45:10-24; p.324:25-325:10. Mr. Christianson has also emphasized that "the whole purpose of the exercise [negotiation of the *Repayment Agreement*] was to reach a global resolution of all Travelers – related issues." Ex. 197. Mr. Christianson's ignorance of the ongoing communications between his client and Chuck Langfitt regarding possible claims against Peterson Sullivan during negotiation of the *Repayment Agreement* and his apparent failure to appreciate the unambiguous language of

---

[3] The Key Bank claim and "Chinle" claims were owned by the Defendants and therefore required special treatment in any agreement with Travelers. In contrast, Travelers' claims against Peterson Sullivan were made in its own right and were not derivative of the Defendants in any fashion. The parties were unable to reach agreement as to Travelers participation in the Key Bank claim and the final, executed *Repayment Agreement* did not address such claim.

Travelers' Reply and Opposition to Cross Motion
Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)                                                8

¶¶11 and 18 of the *Repayment Agreement* provides no basis for the Defendants to evade their clear meaning and effect.

### 4. Tom Crandall Understood the Plain Meaning of the *Repayment Agreement*.

Tom Crandall understood the obvious meaning of the *Repayment Agreement* in regard to third party claims by Travelers and any possible credit to the Defendants. *See, Travelers' Motion*, §IV.H, p.13-17. Thus, by the inclusion of the last sentence of ¶11 of the *Repayment Agreement*, Mr. Crandall understood Travelers was reserving claims against third parties. Crandall Dep. p.169:18-170:11. Mr. Crandall also read ¶18 of the *Repayment Agreement* and understood that paragraph to provide it was within Travelers' sole discretion whether or not to pursue a claim against Peterson Sullivan and how any such claim might be advanced.

```
Q    Did you review Paragraph 18 of the Repayment Agreement
     before you signed the document?
A    I read through everything on the agreement.
          *     *     *
Q    The first sentence of Paragraph 18 provides, quote, "Each
     and every right," comma, "remedy and power hereby granted
     to Travelers or allowed it by law or other agreement shall
     be cumulative and shall not be exclusive of any other
     right, remedy and power, and may be exercised by Travelers
     concurrently, consecutively or separately at any time and
     from" -- "and from time to time in Travelers' sole
     discretion," end quote.  See that provision?
A    I do.
Q    I think we've previously established that you agree
     Travelers had a legal right to seek damages from Peterson
     Sullivan, correct?
A    Yes.
Q    And didn't you understand this provision to say Travelers
     could exercise or pursue that right or not pursue it in
     any fashion it wanted to?
A    Correct.
```

Crandall Dep. p.174:5-175:6(emphasis added).

Travelers' Reply and Opposition to Cross Motion
Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)                                        9

In May 2004, after learning that Travelers' petition to obtain the working papers had been denied, Mr. Crandall continued to understand that whether Travelers proceeded with a lawsuit against Peterson Sullivan was entirely its decision.

> Q .....90, Exhibit 90. Can you identify this as your e-mail of May 5, 2004, to Chuck Langfitt and his response to you dated May 26, 2004?
> A Yes.
> Q You recall learning at some point that the petition by Travelers and Klukwan for the working papers had been denied, correct?
> A Yes.
> Q Am I right that your May 5 e-mail to Chuck Langfitt was written to inquire about what Travelers intended to do next?
> A That's what it states.
> Q **You understood at this point in time it was up to Travelers whether it not it proceeded with a law suit against Peterson & Sullivan, correct?**
> A **From their independent point of view, yes.**
> Q **I mean, if they proceeded with their own claim against Peterson Sullivan it was up to them whether they wanted to do it, correct?**
> A **Their claim against Peterson Sullivan was their decision.**

Crandall Dep. p.319:19-320:13 (emphasis added.).

Crandall likewise understood that if Travelers did elect to sue Peterson Sullivan, it was free to settle or resolve the claim on any terms it wished.

> Q Mr. Langfitt never even discussed with you the amount of Travelers' claim against Peterson Sullivan?
> A That's correct.
> Q Certainly Mr. Langfitt never did or said anything to guarantee any sort of recovery against Peterson Sullivan?
> A No guarantee, no.
> Q And you understood Travelers was free to settle or resolve its claim against Peterson & Sullivan whenever it wished?
> A They were pursuing the claim, yes.
> Q And because it was their claim which Travelers was pursuing they could settle or resolve that claim as they wished?
> A They could settle the claim if they chose to.

Travelers' Reply and Opposition to Cross Motion
Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)                    10

Crandall Dep. p.378:8-20.

Paragraph 18 of the *Repayment Agreement* and Mr. Crandall's understanding of its meaning is fatal to Defendants' Counterclaim and argument. Therefore, Defendants attempt to evade the issue and divert the Court's attention. The *Defendants' Opposition* only selectively quotes a portion of ¶18, avoids any meaningful discussion or analysis of it, and then simply concludes that its meaning is otherwise. *Defendants' Opposition*, p.10-11. Their argument ignores the several discussions between Tom Crandall and Chuck Langfitt commencing in June 2002 regarding possible claims against Peterson Sullivan, Mr. Langfitt's plain intention to evaluate and potentially pursue such claims, the unambiguous language of ¶¶ 11 and 18 of the *Repayment Agreement*, and Mr. Crandall's understanding of their obvious meaning.

The Defendants also profess surprise at Travelers' interpretation of ¶9 of the *Repayment Agreement* which allowed the Defendants a credit against their $8 million obligation, but only to the extent Travelers' total loss, "net of all receipts from the Bonded Contracts," was less than $8 million. Again, Mr. Crandall's understanding of the meaning of this paragraph is consistent with that of Travelers.

Crandall recognized the projected losses of $12 million on the South Coast bonds was an estimate at the time the *Repayment Agreement* was negotiated and the final, actual amount Travelers would have to pay to satisfy its obligations under the bonds had not yet been determined. Crandall Dep. p. 148:25-151:7.[4] Therefore, Mr. Crandall "didn't want to be held to a Note for settlement of the indemnity that ended up having us repay Travelers more than they had actually expended on our behalf" and "did not want to get stuck paying Travelers

---

[4] This testimony addresses ¶ 4 of Ex. 40, the initial draft of the *Repayment Agreement* prepared by Cabot Christianson. ¶ 4 of Ex. 40 became ¶9 of the final *Repayment Agreement* without modification except for the inclusion in the agreement of a specific definition for the term "Bonded Contract." Ex. 42

Travelers' Reply and Opposition to Cross Motion
Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)                                        11

more than they had actually paid." *Id.* p.149:14-17; p.150:16-17.[5]

What Travelers would ultimately "pay" were claims on the South Coast bonds and its "net loss" is appropriately measured by its expenditures to satisfy its obligations under the bonds, net of receipts from those Bonded Contracts. The *Repayment Agreement* therefore appropriately limits any credit to the Defendants against their $8 million repayment obligation to the extent Travelers' total loss, as described and calculated under ¶9, was less than $8 million. The specific credit provision of ¶9, coupled with the reservation solely to Travelers of any of its third party claims, make clear the Defendants had no right to any credit against their obligations to the extent Travelers' losses were reduced by recoveries Travelers might later achieve from third parties. Again, Mr. Crandall understood the *Repayment Agreement* to so provide. When asked whether there was any agreement that Defendants would benefit "at all" from a recovery Travelers might obtain from Peterson Sullivan, Mr. Crandall acknowledged that "there was no written agreement" to such effect. Crandall Dep. p.412:24-413:3.

Nothing about this bargain is unfair or unreasonable. Travelers agreed to relieve the Defendants of $4 million or more of their indemnity obligation and further allow repayment of their $8 million commitment over an extended period of time. In return, Travelers required, and received, the unfettered right to pursue, or not pursue, its third party claims and recover on such claims in any fashion it deemed appropriate, all without effect on the Defendants' obligations under the *Repayment Agreement*. Moreover, the Defendants remained fully free to

---

[5] As reflected in Travelers' responses to Defendants' discovery requests, Travelers' total loss on the SCI bonds, net of receipts on such Bonded Contracts and expenses incurred in obtaining such receipts was $13,516,118.86. Travelers received a net recovery of $1,419,829 on the "Chinle" claim. Applying that recovery as a "receipt on a Bonded Contract" yields a total loss, net of all receipts on Bonded Contracts, of $12,069,289.86. The accounting found in the *Defendants' Opposition*, p.5, n.9, attempts to factor in credits that were not receipts on the Bonded Contracts and constituted recoveries from third parties or payments made by Klukwan under the *Repayment Agreement*.

Travelers' Reply and Opposition to Cross Motion
Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)                                                      12

pursue their own claims against third parties with no obligation to pay Travelers in excess of their $8 million commitment under the *Repayment Agreement* in the event the Defendants achieved a recovery exceeding such sum.

This is precisely the agreement intended by Chuck Langfitt and the reason for revisions requested by him in connection to the definition of "Bonded Contracts" and ¶¶11 and 18 of the *Repayment Agreement*. Langfitt Dep. p.231:12-235:11. As discussed above, Tom Crandall's understanding of the meaning and effect of these terms was no different. These provisions were in fact a small price to pay for Travelers' forgiveness of over $4 million of the Defendants' indemnity obligations and Mr. Crandall concluded the *Repayment Agreement*, as executed, was in the Defendants' best interest. Crandall Dep. p.42:7-16.

When Langfitt and Crandall discussed potential claims by Travelers against the former South Coast directors and officers in a June 2, 2003 telephone conversation, Mr. Langfitt therefore emphasized that any recovery on such a claim by Travelers would be applied to its "other loss;" i.e., "-not part of the $8 million ….." Langfitt Dep. p.190:18-193:10; Ex. 67. Only in the "remote chance" Travelers was made entirely whole through such a third party claim would it voluntarily provide a credit to the Defendants. *Id*. As explained by Mr. Langfitt, in such an unlikely scenario, Travelers, as a matter of business ethics, would not seek to "make a profit from its loss." Langfitt Dep. p.192:16-193:10. Mr. Langfitt's expression of his likely intention to voluntarily allow the Defendants some relief in the "remote chance" Travelers was made whole by a third party action provides the Defendants absolutely no basis to rewrite the *Repayment Agreement*, revise their bargained for allocation of rights, duties and risks, or impose some new "duty" on Travelers.

Travelers' Reply and Opposition to Cross Motion
Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)                    13

B.  <u>Defendants Repeatedly Informed Travelers They Were Considering Their Own Claim Against Peterson Sullivan and Made No Decision to Forego that Claim Until Sometime After September 29, 2004.</u>

Defendants argue that Travelers "undertook to prosecute the claims against Peterson Sullivan" while "knowing Klukwan was forbearing from bringing its own action based upon Travelers' action." *Defendants' Opposition*, p.34. This broad assertion is not supported by the actual record. Rather, that record reveals Klukwan regularly informed Travelers, through September 29, 2004, that it was considering its own action against Peterson Sullivan. The record also demonstrates the Defendants had made no decision in regard to their own claim as of September 29, 2004. Logic dictates that if the Defendants themselves had made no decision, Travelers could hardly know or understand Defendants were not going to pursue their own claim. The undisputed evidence in this regard is as follows:

- In June 2002, Crandall pointed out to Langfitt Peterson Sullivan's possible negligence and indicated there should be an "investigation on Peterson Sullivan to see if there is some liability there." Crandall Dep. p.469:3-470:1.

- In June 2003 Crandall informed Langfitt the Defendants were considering their own claim against Peterson Sullivan. Crandall Dep. p.473:16-24.

- Extensive legal analysis of claims against Peterson Sullivan was performed by Defendants' attorneys in January-March 2004. *See, Travelers' Motion* §IV.L, p.21-25.

- In his February 10, 2004 email to Jan Sokol, Cabot Christianson again advised the Defendants were considering their own action against Peterson Sullivan. Ex. 87.

Travelers' Reply and Opposition to Cross Motion
Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)                                    14