# TAB 1

## Deposition Testimony of Thomas L. Crandall

Attachment to Supplemental Declaration of James T. Hopkins
Travelers Casualty and Surety v. South Coast, Inc.
Case No. A06-00063(TMB)

000001

Travelers' Reply and Opposition to Cross Motion
Index of Deposition Testimony of Thomas Crandall

| Page | Line(s) |
|------|---------|
| 28 | 2-11, 12-25 |
| 29 | 1-25 |
| 30 | 1-9 |
| 42 | 7-16 |
| 77 | 2-25 |
| 78 | 1-2, 22-25 |
| 79 | 1-19 |
| 81 | 2-19 |
| 97 | 17-25 |
| 98 | 1-7 |
| 116 | 15-25 |
| 117 | 1-25 |
| 118 | 1-25 |
| 119 | 1-13 |
| 148 | 25 |
| 149 | 1-25 |
| 150 | 1-25 |
| 151 | 1-7 |
| 169 | 18-25 |
| 170 | 1-11 |
| 174 | 5-25 |
| 175 | 1-6 |
| 270 | 13-17 |
| 272 | 9-14 |
| 275 | 14-25 |
| 276 | 1-21 |
| 291 | 8-17 |
| 319 | 19-25 |
| 320 | 1-13, 18-25 |
| 321 | 1, 3-25 |
| 322 | 1-14 |
| 349 | 10-25 |
| 350 | 1-10 |
| 378 | 8-20 |
| 389 | 2-22 |
| 408 | 19-25 |
| 409 | 1-4 |
| 412 | 24-25 |
| 413 | 1-3 |
| 435 | 11-25 |
| 436 | 1-3 |
| 468 | 3-25 |
| 469 | 1-25 |
| 470 | 1 |
| 473 | 16-24 |
| 481 | 12-13 |
| 483 | 6-15 |
| 488 | 11-25 |
| 489 | 1-25 |
| 490 | 1-25 |
| 499 | 16-25 |

Travelers' Reply and Opposition to Cross Motion
Index of Deposition Testimony of Thomas Crandall

| | |
|---|---|
| 500 | 1-25 |
| 501 | 1-25 |
| 502 | 1-25 |
| 503 | 1-25 |
| 504 | 1-13 |
| 506 | 21-25 |
| 507 | 1-25 |
| 508 | 1-25 |
| 521 | 13-25 |
| 522 | 1-2 |
| 524 | 16-25 |
| 525 | 1-25 |
| 526 | 1 |

000003

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

| | |
|---|---|
| TRAVELERS CASUALTY AND   . | Case No. 3:06-CV-00063-TMB |
| SURETY COMPANY OF AMERICA, . | |
| a Connecticut corporation, . | |
| .            | |
| Plaintiff,       . | |
| .            | |
| vs.                  . | |
| .            | |
| SOUTH COAST INC., an Alaska. | **DEPOSITION OF THOMAS L. CRANDALL** |
| corporation, KLUKWAN, INC.,. | **DAY 1** |
| Alaska Native Village       | |
| corporation, and CHILKATS' . | |
| PORTAGE COVE DEVELOPMENT   . | |
| COMPANY, an Alaska         . | |
| corporation,              . | |
| .            | |
| Defendants.      . | |
| . . . . . . . . . . . . .  . | |
| SOUTH COAST INC., et al,   . | |
| .            | |
| Counterclaim and      . | |
| Third-Party Plaintiff,. | |
| .            | |
| vs.                  . | |
| .            | |
| TRAVELERS CASUALTY AND    . | |
| SURETY COMPANY OF AMERICAN,. | |
| a Connecticut Corporation, . | |
| STEWART SOKOL & GRAY L.L.C.. | |
| and JAN D. SOKOL,          . | |
| .            | |
| Counterclaim and      . | |
| Third-Party Defendants. | |
| . . . . . . . . . . . . .  . | |

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

| | |
|---|---|
| For Travelers | James T. Hopkins, Esq. |
| Casualty and Surety | Schiffrin Olson Schlemlein |
| Company of America: | & Hopkins, P.L.L.C. |
| | 1601 Fifth Avenue, Suite 2500 |
| | Seattle, Washington 98101 |

000004

2    Q    But there was a general perception at that time -- At

3         least prior to August 2001 the perception within Klukwan

4         and its management and board of directors was that South

5         Coast was going to earn a significant profit that year,

6         correct?

7    A    The -- I don't know what the perception was, but the

8         budget showed that they would have a profit.

9    Q    And that picture deteriorated and changed quite rapidly

10        throughout the remainder of 2001, correct?

11   A    Yes.

12   Q    Were you involved in any of the decisions to take specific

13        action to investigate the South Coast status in 2001?

14   A    I was.

15   Q    What was that?

16   A    Specifically we were concerned about a particular job on

17        the Richardson Highway that had continued to show a profit

18        erosion.  We had originally hired P&S to go in and look at

19        -- basically tell us what they could find out as why and

20        specifically if they could determine any fraud had

21        occurred, fraud or theft.  That was expanded eventually to

22        include any job with a -- any contract over a million

23        dollars' worth of performance in '01.  I believe that was

24        originally dealt with in November.  And about that same

25        time through conversations with the underwriting

1    department we made a decision to hire Robert Sutor to do

2    some additional work.  I was unconvinced that South Coast

3    knew what their jobs were going to cost for the remainder

4    of the projects, and construction is about estimates, so

5    we had hired Sutor Consulting to go in and work to re-

6    estimate all jobs that had a remaining balance of over a

7    million as of 12 -- as of the end of the year, 12/31/01.

8  Q    And one of the other assignments given to both Peterson &

9    Sullivan and Sutor Consulting was to evaluate the adequacy

10   of management and financial controls being implemented by

11   South Coast?

12 A    I don't know that that was specifically stated.

13 Q    That's certainly one of the things they did, correct?

14 A    Correct.

15 Q    And they reported back that those controls were not being

16   followed, correct?

17 A    Correct.

18 Q    When did you first learn that?

19 A    Mid-January, if I remember right, of '02.

20 Q    That was based on a meeting with Peterson & Sullivan?

21 A    Believe it was based on phone calls.

22 Q    With who?

23 A    With Peterson Sullivan.

24 Q    Who specifically?

25 A    Would've been John Ferris.  There would've been another

1          person in the room but I don't remember.

2    Q     And South Coast had previously -- strike that.  Klukwan

3          and South Coast management and board had put previously in

4          place a number of management controls and procedures

5          regarding South Coast's operation?

6    A     They had, yes.

7    Q     Those are sometimes referred to as the FMI procedures,

8          yes?

9    A     Yes.

```
 7    Q    When Klukwan executed the repayment agreement in

 8         approximately mid-December 2002 were you confident Klukwan

 9         could meets its obligations to Travelers under the

10         repayment agreement?

11         MR. SPRAKER:  Objection to form and foundation.

12    A    I was not.  I was confident that was the best agreement we

13         could get at the time.

14    Q    And in your view it was in Klukwan's interest to proceed

15         to enter the repayment agreement, correct?

16    A    That is correct.
```

2  Q    Isn't this a formal notice from Peterson Sullivan, Exhibit

3       21, this January 25, 2002, letter, isn't this a formal

4       notice that the auditors have identified a lack of

5       management and financial controls such that they consider

6       it a material weakness in the financial and accounting

7       systems of South Coast?

8  A    That's what it says, yeah.

9  Q    And are auditors required to provide such a notice

10      whenever they make such a determination?

11 A    If they are -- yes, they are.

12 Q    Peterson Sullivan didn't provide any comparable notice,

13      any notice or information comparable to Exhibit 21 in

14      connection with their examination of the December 31,

15      2000, financial statements, do they?

16 A    I haven't found one.

17 Q    When you received Exhibit 21, the January 25, 2002,

18      Peterson Sullivan letter, did the question occur to you

19      whether or not Peterson Sullivan should have discovered

20      the lack of management and internal financial controls by

21      South Coast earlier?

22 A    In looking at -- and approximately a year before they had

23      issued an audit.  One year later, same staff, same

24      policies, same controls, they're issuing a material

25      internal weakness exists, that raised a red flag.

1    Q    And it raised a red flag certainly by January 2002,

2         correct?

22   Q    Can you identify, Mr. Crandall, Exhibit 22 as a copy of

23        the report to Klukwan, Inc., board of directors on South

24        Coast, Inc., 2001 operations prepared by Peterson

25        Sullivan?

1    A    Yes, it is.

2    Q    Did you see anything in this report you disagreed with?

3         Strike that.  Do you recall -- well, strike that.  Did you

4         review this report, Exhibit 22?

5    A    At the time I did, yes.

6    Q    Do you recall when you reviewed it whether or not you saw

7         anything within Exhibit 22, Peterson Sullivan's 2001

8         operations report, that you disagreed with?

9    A    I don't recall see -- I don't -- didn't disagree with

10        anything that was contained in there.

11   Q    From your perspective it was accurate, correct?

12   A    It was accurate.

13                          DEPOSITION EXHIBIT 23 MARKED

14   A    There's the other guy's name.

15   Q    Do you recognize Exhibit 23 as Peterson Sullivan's letter

16        of April 2, 2002, transmitting to you copies of the

17        Peterson Sullivan 2001 operations report we've previously

18        identified as Exhibit 22?

19   A    I do.

Page 81

2   Q   Do you recall that Sutor Consulting reached essentially

3       the same conclusion as Peterson Sullivan, that adequate

4       management controls and internal financial controls were

5       not being followed?

6   A   That's my recollection, yes.

7                               DEPOSITION EXHIBIT 24 MARKED

8   Q   Can you identify Exhibit 24 as Sutor Consulting's March 1,

9       2002 report?

10  A   Yes, it is.

11  Q   And did you review it at the time?

12  A   I did.

13  Q   And do you recall disagreeing with anything within the

14      Sutor Consulting report at the time you reviewed it?

15  A   I did not at the time.

16  Q   How about now?

17  A   I don't recall anything that I disagreed with in this

18      report.  In general I agree with it.  Put it in a positive

19      instead of a negative.

17  Q    Mr. Crandall, can you identify Exhibit 28 as your letter

18       of November 15, 2005, to John Ferris at Peterson Sullivan?

19  A    Yes, it is.

20  Q    Why'd you write this letter?

21  A    Basically they were dunning as far as collection 122,000.

22       I at this point in time believed that they should not

23       receive it for the points that are made in this letter.

24  Q    And the primary point that's made in this letter is your

25       belief that they negligently prepared the December 31,

1       2000, financial statements, correct?

2   A   It is.

3   Q   And this letters sets forth your belief that Peterson

4       Sullivan should've detected the lack of adequate

5       management procedures and financial controls in

6       conjunction with their year-end 2000 audit, correct?

7   A   Correct.  It does say 2000.

000014

15  Q    Do you recognize Exhibit 33 as Chuck Langfitt's letter of

16       May 17, 2002. to you and Ron Gelbrich?

17  A    I do.

18  Q    Is this one of the initial communications you had with Mr.

19       Langfitt?

20  A    It may be the initial conversation I had -- or referenced

21       in here.

22  Q    The first sentence of Mr. Langfitt's May 17, 2002, letter

23       references a conversation of May 16, 2002, with you.  Is

24       that the first conversation you had with Mr. Langfitt?

25  A    It's the first one I recall.

1   Q   And what do you recall being discussed at or about that
2       time?
3   A   I don't really have any recollection.  This letter is as
4       good as any.
5   Q   This letter confirms a meeting at South Coast's office on
6       May 28, 2002?
7   A   Yes, it does.
8   Q   Did that meeting occur?
9   A   I know that Jordan Rosenfeld was in the office at about
10      then.  I don't remember if we actually had a meeting where
11      myself and Mr. Langfitt and others with Travelers was
12      there.  At that point Ron Gelbrich was no longer with the
13      firm.
14  Q   When did you first meet with Mr. Langfitt in person?
15  A   I don't recall.
16  Q   Was it shortly after this letter?
17  A   I don't recall when I first met him in person.
18  Q   Do you recall a meeting on May 24 that you and Sharron
19      Baker attended with Mr. Langfitt at the surety's branch
20      offices in Seattle?
21  A   Okay, now that you've reminded me, I do recall that.
22  Q   What was Sharron Baker's role for Klukwan at this point in
23      time?
24  A   She was not employed by Klukwan, she was employed by South
25      Coast as comptroller.

1  Q  How long did she remain with South Coast in that position?

2  A  Not -- not substantially after this, I'm thinking about

3     September, but I could be incorrect on that.

4  Q  When had she been hired?

5  A  I'd have to check the personnel records.  It was sometime

6     the -- between Mike Houts being terminated and this

7     meeting.

8  Q  So she had a relatively short stint with South Coast?

9  A  That's correct.

10 Q  Why?

11 A  She chose to leave, you'll have to ask her.

12 Q  Do you know where she lives?

13 A  No.

14 Q  Would Klukwan or South Coast have records for her last

15    known address?

16 A  We would have the records of the last address we know.

17    Something tells me she may be dead, but I'm not positive

18    of that.

19 Q  Returning to Exhibit 33, the May 17, 2002, letter, second

20    page, third paragraph from the bottom references subject

21    matters in an upcoming meeting, do you see that?

22 A  I do.

23 Q  The last sentence in that paragraph says, quote, "our

24    discussions in Seattle and subsequent will focus on" the

25    "Klukwan/South Coast March 2002 business plan, Sutor

1        Consulting LLC's March 1, 2002, report and Peterson

2        Sullivan PLLC's report and your future business plans

3        given KeyBank's action," end quote, do you see that

4        section?

5    A   I do.

6    Q   Do you understand the reference to the Peterson Sullivan

7        report to be the Peterson Sullivan 2001 operations report

8        that we've previously entered as Exhibit 22?

9    A   I do understand that that's the report referenced.

10   Q   And did you provide those documents to Mr. Langfitt or had

11       he acquired them through Travelers' underwriting office?

12   A   I provided them to, I believe -- or, we provided them, I

13       believe, to the underwriting office.

Page 148

25    Q      Looking at the second page of Exhibit 40, the first page

1    of the draft agreement, the bottom of Paragraph 4, the

2    last sentence there says, quote, "In the event that

3    Travelers' total loss net of all receipts from the bonded

4    contracts is less than $8 million, Travelers shall credit

5    the note with the amount of the difference," end quote.

6    You see that language?

7  A  I do.

8  Q  Was that an important term to Klukwan?

9  A  I don't know that it's in the last agreement, so if it

10   wasn't it wasn't.  At the time I can tell you the

11   thinking.

12 Q  Well, what was your thinking at the time?

13 A  I didn't have any way to confirm that a 33% risk factor

14   was reasonable, I didn't want to be held to a note for

15   settlement of the indemnity that ended up having us repay

16   Travelers more than they had actually expended on our

17   behalf.

18 Q  And the reason the proposed figure in this last sentence

19   of Paragraph 4 is $8 million is because that's what

20   Klukwan had committed to repay Travelers, correct?

21   MR. HOPKINS:  Objection, form and foundation.

22 A  It's what South Coast and, I believe, Klukwan as either

23   co-maker or guaranty, committed as the total amount that

24   would be paid under the note.

25 Q  It wouldn't have been satisfactory to Klukwan or South

1        Coast to have this particular provision read at some

2        amount substantially less than what South Coast and

3        Klukwan had committed to repay, correct?

4  A    No, actually, if -- if it said Travelers would credit us

5        the back amount anything over four million, I'd have said

6        great.  It's the other direction that you -- I would've

7        said ouch.

8  Q    So hypothetically speaking it would've been satisfactory

9        to Klukwan for this clause to say in the event that

10       Travelers' total loss net of all receipts from the bonded

11       contracts is less than five million Travelers shall credit

12       the note with the amount of the difference?

13  A   I would have said fine.

14  Q   So.....

15  A   Because what I was trying to get there was the fact that I

16       didn't want to get stuck paying Travelers more than they

17       had actually paid.  So if they actually paid five, the

18       note would've gone down so that the payments to them

19       would've been five.

20  Q   I don't think you're fixing on the specific language of

21       this provision.

22  A   Well, that's what I think you're asking.

23  Q   The key point from Klukwan's perspective is that if the

24       surety's total loss net of all receipts on the bonded

25       contracts was less than the amount Klukwan had committed

1       to repay you wanted a credit?

2   A   Yes.

3   Q   That's the key point, right?

4   A   That's the key point.

5   Q   And anything else from your perspective would not have

6       been satisfactory at that point in time, correct?

7   A   Correct.

18    Q    Looking at Page 6 of the repayment agreement, the very

19         last sentence says "This agreement" -- says it's -- strike

20         that.  The last sentence of Paragraph 11 of the repayment

21         agreement says, quote, "This agreement and the preceding

22         sentences do not impair or release Travelers' claims or

23         causes of action against any person or entity other than

24         the Klukwan Entities," end quote.  You see that?

25    A    I do.

1   Q    And did you understand that was one of the provisions that

2       had been specifically requested by Chuck Langfitt?

3   A    I don't recall where this came from, but it wouldn't

4       surprise me.

5   Q    It was certainly agreed to by Klukwan and South Coast,

6       right?

7   A    It was.

8   Q    Did you understand that by including that provision in the

9       repayment agreement Travelers intended to pursue whatever

10      claims it might have against third parties?

11   A    Against third parties, yes.

5   Q   Did you review Paragraph 18 of the repayment agreement

6       before you signed the document?

7   A   I read through everything on the agreement.

8   Q   Did you understand Paragraph 18 of the repayment agreement

9       was specifically requested by Chuck Langfitt on behalf of

10      Travelers?

11   A   I don't remember where.....

12   Q   Do you recall receiving any legal advice from Cabot

13      Christianson regarding Paragraph 18?

14   A   I don't remember the genesis of Paragraph 18.

15   Q   The first sentence of Paragraph 18 provides, quote, "Each

16      and every right," comma, "remedy and power hereby granted

17      to Travelers or allowed it by law or other agreement shall

18      be cumulative and shall not be exclusive of any other

19      right, remedy and power, and may be exercised by Travelers

20      concurrently, consecutively or separately at any time and

21      from" -- "and from time to time in Travelers' sole

22      discretion," end quote.  See that provision?

23   A   I do.

24   Q   I think we've previously established that you agree

25      Travelers had a legal right to seek damages from Peterson

1          Sullivan, correct?

2    A    Yes.

3    Q    And didn't you understand this provision to say Travelers

4          could exercise or pursue that right or not pursue it in

5          any fashion it wanted to?

6    A    Correct.

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

TRAVELERS CASUALTY AND          . Case No. 3:06-CV-00063-TMB
SURETY COMPANY OF AMERICA, .
a Connecticut corporation, .
                                .
          Plaintiff,            .
                                .
vs.                             .
                                .
SOUTH COAST INC., an Alaska.    **DEPOSITION OF THOMAS L. CRANDALL**
corporation, KLUKWAN, INC.,.    **DAY 2**
Alaska Native Village           .
corporation, and CHILKATS' .
PORTAGE COVE DEVELOPMENT     .
COMPANY, an Alaska              .
corporation,                    .
                                .
          Defendants.           .
 . . . . . . . . . . . . . . .  .
SOUTH COAST INC., et al,        .
                                .
     Counterclaim and           .
     Third-Party Plaintiff,.
                                .
vs.                             .
                                .
TRAVELERS CASUALTY AND          .
SURETY COMPANY OF AMERICAN,.
a Connecticut Corporation, .
STEWART SOKOL & GRAY L.L.C..
and JAN D. SOKOL,               .
                                .
     Counterclaim and           .
     Third-Party Defendants.
 . . . . . . . . . . . . . .

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Travelers              James T. Hopkins, Esq.
Casualty and Surety        Schiffrin Olson Schlemlein
Company of America:         & Hopkins, P.L.L.C.
                           1601 Fifth Avenue, Suite 2500
                           Seattle, Washington 98101

000027

13   Q    Can you identify Exhibit 72 as minutes of a special board

14        meeting of Klukwan, Inc., held on May 6, 2004?

15   A    I do.

16   Q    This was a meeting you participated in?

17   A    I did.

 9   Q    Well, there's a series of bullet points on these minutes,

10        Exhibit 72, do you see those?

11   A    I do.

12   Q    And this -- these bullet points generally describe the

13        topics of discussions that occurred, correct?

14   A    Correct.

14   Q   The fifth and sixth bullet points under the discussion

15        category on Exhibit 82 reference, quote, "Sutor Consulting

16        information," end quote, and, quote, "John Ferris/internal

17        controls," end quote.  See those?

18   A   I do.

19   Q   What was discussed in regard to those subject matters at

20        this meeting?

21   A   Very briefly, there was two reports that were commissioned

22        in late '01, delivered in early '02, that in essence both

23        reports came to the same conclusion, which was the

24        internal controls or what we sometimes referred to as the

25        FMI procedures were not being followed.

Page 276

1    Q    And why was that subject matter coming up at this point

2         two years later, May 6, 2004?

3    A    Just a general discussion of where we were at with various

4         claims we might have against third parties.

5    Q    So the possibility of a claim against Peterson Sullivan

6         was specifically discussed at this May 6, 2004, meeting,

7         correct?

8    A    The possibility of a claim against Peterson Sullivan may

9         have been discussed, it appears that it was.

10   Q    And that's why there's also a bullet point that's just

11        labeled tort claims, correct?

12   A    At this point I can't tell you what tort claims meant in

13        regards to this report.

14   Q    The next bullet point says losses.  Have any idea what was

15        discussed in regard to that item?

16   A    The history of losses that Klukwan consolidated and South

17        Coast specifically have suffered.

18   Q    And those losses would've been part of damages that

19        Klukwan might assert against KeyBank or Peterson Sullivan,

20        correct?

21   A    That they might assert against a third party.

Case 3:06-cv-00063-TMB    Document 89-3    Filed 01/21/2008    Page 32 of 34

```
 8   Q   You didn't indicate in this telephone conver -- strike

 9       that.  In this telephone conversation of September 29,

10       2004, you emphasized that you had no objection or belief

11       that Travelers had in any way released its claim against

12       Peterson Sullivan, correct?

13   A   No, we didn't believe that Travelers released a claim

14       against P&S.

15   Q   And in fact you told Travelers Klukwan was continuing to

16       discuss and consider joining the case, correct?

17   A   We did.
```

19  Q    .....90, Exhibit 90.  Can you identify this as your e-

20       mail of May 5, 2004, to Chuck Langfitt and his response to

21       you dated May 26, 2004?

22  A    Yes.

23  Q    You recall learning at some point that the petition by

24       Travelers and Klukwan for the working papers had been

25       denied, correct?

1   A   Yes.

2   Q   Am I right that your May 5 e-mail to Chuck Langfitt was

3       written to inquire about what Travelers intended to do

4       next?

5   A   That's what it states.

6   Q   You understood at this point in time it was up to

7       Travelers whether it not it proceeded with a law suit

8       against Peterson & Sullivan, correct?

9   A   From their independent point of view, yes.

10  Q   I mean, if they proceeded with their own claim against

11      Peterson Sullivan it was up to them whether they wanted to

12      do it, correct?

13  A   Their claim against Peterson Sullivan was their decision.

18  Q   Am I right that the next thing you learned regarding the

19      law suit against Peterson Sullivan was that Travelers had

20      filed a complaint when you heard from the various former

21      South Coast officers?

22  A   I don't recall hearing anything prior to that.

23  Q   So there was no further communications that you recall

24      with Mr. Langfitt after his May 26 e-mail to you which is

25      Exhibit 90?