1    A    I don't recall any.

3    Q    Can you identify Exhibit 91 as your letter of June 29,

4         2004, to Cabot Christianson?

5    A    Yes, I can.

6    Q    This letter requested Mr. Christianson to provide a report

7         to Klukwan's auditors regarding certain pending and

8         threatened litigation?

9    A    That's the purpose, yes.

10   Q    Standard audit procedure?

11   A    It should be, from all I know it is.

12   Q    And you prepared and attached to this June 29, 2004,

13        letter to Mr. Christianson an Exhibit A that listed

14        current litigation and potential litigation that you

15        requested he report on, correct?

16   A    To the extent that they were with his firm, yes.

17   Q    So the items under the heading "Handled by Christianson,

18        Boutin & Spraker LLC" were the items you wanted Mr.

19        Christianson to report on, correct?

20   A    Yes, I would not expect him to report on things he wasn't

21        handling.

22   Q    And your purpose in preparing this Exhibit A was to be

23        specific about what you expected from him, correct?

24   A    Yes.

25   Q    And in the potential litigation category on Exhibit A to

1        your June 29, 2004, letter to Mr. Christianson you have an

2        entry that says Travelers and Klukwan, Inc. versus

3        Peterson Sullivan, do you see that?

4   A    I do.

5   Q    That reflected the fact that Klukwan was still considering

6        bringing its own action against Peterson & Sullivan at

7        this point, correct?

8   A    What's the date on this one?  It was reflective of Klukwan

9        bringing their own case.  I'm not sure why at this point I

10      had Travelers and Klukwan now.

11  Q    Well, it reflected the fact Klukwan was still considering

12      whether or not to bring an action against Peterson

13      Sullivan, isn't that correct?

14  A    That's what I just stated, yes.

10  Q     Can you identify Exhibit 98 as a series of e-mails

11        exchanged between you, Brandon Allen and Cabot

12        Christianson between -- on November 11, 2004?

13  A     Yes.

14  Q     And you understood the initial question asked by Brandon

15        Allen in the initial e-mail was how did Travelers come up

16        with the approximate $8 million it was seeking as damages

17        in the law suit against the South Coast officers and

18        Peterson Sullivan, correct?

19  A     Yes, that's my understanding.

20  Q     And that was a question you had in your mind as well,

21        correct?

22  A     That's correct.

23  Q     You didn't understand how that figure was calculated at

24        this time, November 2004, correct?

25  A     That's correct.

Case 3:06-cv-00063-TMB    Document 89-4    Filed 01/21/2008    Page 4 of 36

1   Q     And you'd never discussed with Chuck Langfitt the amount

2          of any likely claim by Travelers or how Travelers would

3          calculate its damages, did you?

4   A     I don't recall having that conversation.

5   Q     So certainly as of November 2004 you were speculating as

6          to how Travelers calculated the amount of its claim,

7          correct?

8   A     I was trying to speculate, yes.

9   Q     And that's what this e-mail, Exhibit 98, reflects, right?

10  A     Just my thoughts.

000038

Case 3:06-cv-00063-TMB    Document 89-4    Filed 01/21/2008    Page 5 of 36

8   Q    Mr. Langfitt never even discussed with you the amount of

9          Travelers' claim against Peterson Sullivan?

10  A    That's correct.

11  Q    Certainly Mr. Langfitt never did or said anything to

12         guarantee any sort of recovery against Peterson Sullivan?

13  A    No guarantee, no.

14  Q    And you understood Travelers was free to settle or resolve

15         its claim against Peterson & Sullivan whenever it wished?

16  A    They were pursuing the claim, yes.

17  Q    And because it was their claim which Travelers was

18         pursuing they could settle or resolve that claim as they

19         wished?

20  A    They could settle the claim if they chose to.

2   Q     I have not found nor seen in any of the records in this

3          proceeding anything in written form from Klukwan that

4          states and tells Travelers that Klukwan was relying

5          exclusively on Travelers' action.  Are you aware of any

6          such document?

7   A     Not as a document, no.

8   Q     Did you make that statement to Chuck Langfitt?

9   A     I did talk to Chuck Langfitt on more than one occasion

10         that one of the issues out there is Klukwan basically is

11         broke, two, anything we -- that Travelers received as a --

12         on a settlement with P&S or as a direct result of the

13         claim against P&S would benefit Klukwan either to the

14         point of against the note or against the deficiency.

15   Q     Even assuming that statements to have been made, they are

16         not the equivalent of an assertion or statement by you to

17         Mr. Langfitt to the effect that Klukwan's decided not to

18         bring its own action or we're relying exclusively on you.

19         That statement was never made, was it?

20         MR. SPRAKER:  That exact statement?

21         MR. HOPKINS:  Yes.

22   A     That exact statement was never made.

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

| | |
|---|---|
| TRAVELERS CASUALTY AND . <br> SURETY COMPANY OF AMERICA, . <br> a Connecticut corporation, . <br> . <br>       Plaintiff, . <br> . <br> vs. . <br> . <br> SOUTH COAST INC., an Alaska. <br> corporation, KLUKWAN, INC.,. <br> Alaska Native Village <br> corporation, and CHILKATS' . <br> PORTAGE COVE DEVELOPMENT . <br> COMPANY, an Alaska . <br> corporation, . <br> . <br>       Defendants. . <br> . . . . . . . . . . . . . . <br> SOUTH COAST INC., et al, . <br> . <br>     Counterclaim and . <br>     Third-Party Plaintiff,. <br> . <br> vs. . <br> . <br> TRAVELERS CASUALTY AND . <br> SURETY COMPANY OF AMERICAN,. <br> a Connecticut Corporation, . <br> STEWART SOKOL & GRAY L.L.C.. <br> and JAN D. SOKOL, . <br> . <br>     Counterclaim and . <br>     Third-Party Defendants. <br> . . . . . . . . . . . . . . | Case No. 3:06-CV-00063-TMB <br><br><br><br><br><br><br><br> **DEPOSITION OF THOMAS L. CRANDALL** <br> **DAY 3** |

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Travelers                James T. Hopkins, Esq.
Casualty and Surety          Schiffrin Olson Schlemlein
Company of America:           & Hopkins, P.L.L.C.
                             1601 Fifth Avenue, Suite 2500
                             Seattle, Washington 98101

000041

19  Q    When was the final time the decision was made that Klukwan

20        would not join that law suit?

21        MR. SPRAKER:  I'm going to object on foundation.

22  A    Once Travelers had made a decision to go forward and after

23        the September/October time frame of '04, it then turned to

24        just keeping the board updated to what the progress was.

25  Q    So that decision was not made until sometime after

1        September, October of '04?

2    A    Or concurrent therewith.

3    Q    Not before then?

4    A    Correct.

000043

Page 412

```
24   Q    Well, was there any agreement that Klukwan would benefit

25        at all by a recovery that Travelers might make against
```

1        Peterson Sullivan?

2    A    There was no written agreement, but there was some

3         evidence that would support my theory on this.

11  Q    Mr. Crandall, with regard to this when you first in

12       hindsight now think you had a suspicion that the 2000

13       audit may have been improperly prepared by Peterson

14       Sullivan, who was the first person that you voiced that

15       suspicion to?

16  A    Would've either been Cabot or Chuck Langfitt, Cabot

17       Christianson.

18  Q    And what -- and when was that, to your best recollection?

19  A    Believe the first time that I voiced a concern was to Mr.

20       Langfitt in June -- basically when he was -- called and

21       said we're going to take over the jobs and we can either

22       do it voluntarily or involuntarily and -- and I asked him

23       the difference, and at that point, you know, asked if he

24       had reviewed the reports from -- because I knew he had the

25       reports from -- from -- that had been provided them, asked

1      him if he knew about them and paraphrased that basically

2      they both say that there's a -- a internal control issue

3      and that I thought that they should look at that.

3   Q   As to that meeting that we were discussing in July 17,

4       2002, between you and Mr. Langfitt, Mr. Christianson and

5       Ms. Strong, did you have a belief as of that time that

6       there could be claims against Peterson Sullivan for

7       negligent preparation of financial statements?

8   A   At that time I believed there could've been.  Reasoning is

9       is we had received the Sutor and the Peterson Sullivan

10      report, we had received a default and an action by

11      KeyBank, we had received a takeover of the bonded jobs by

12      Travelers; basically South Coast was collapsing, and it

13      had happened in a relatively short time.  And when you

14      take that into account with the information in the

15      Peterson Sullivan and the Sutor report that processes were

16      not being followed or internal controls or the FMI

17      policies were not being followed, it basically led me to

18      wonder what had gone on.  Something -- this was not a

19      normal course of business to have a company that the year

20      before had booked about $800,000 worth of income to the

21      end of 2001 booking a $7.7 million loss on a -- well,

22      Klukwan, on a consolidated basis and South Coast in the

23      period of roughly two years losing about $32 million in

24      value for Klukwan in one way or another.  Just the

25      precipitous nature of the collapse combined with the

1    reports themselves led me to believe that something had

2    been missed by Peterson Sullivan.

3 Q   And as of that meeting in July 17, 2002, had you shared

4     that opinion with Mr. Langfitt?

5 A   When Mr. Langfitt first called when I talked to him in

6     June of that year, in June of 2002, the conversation was

7     they were taking over the jobs and I was concerned that,

8     you know, there had to be -- I wanted to have something

9     left for Klukwan because if there was nothing left Klukwan

10    just as well declare bankruptcy, close its door and be

11    done with it.  And I had reiterated -- and Mr. Langfitt

12    had basically assured me that he -- that there would be

13    something left for Klukwan to go forward on.  And at that

14    point I had reiterated, you know, various things that had

15    caused me concern, the reports from Sutor, the reports

16    from P&S, the -- you know, what happened with KeyBank, the

17    very precipitous drop in value and ability to go forward

18    that South Coast had had, basically from revenues --

19    basically from a company that had good revenues, not so

20    good net income, to a company that was -- had tanked.

21 Q   And in that discussed did you discuss Peterson Sullivan at

22    all?

23 A   Just in the general way that I think Peterson Sullivan

24    should be -- that there should be an investigation on

25    Peterson Sullivan to see if there was some liability

1          there, had they done their job.

16  Q   Were you -- by June 2003 were you looking at cause of

17      action against Peterson & Sullivan?

18  A   We were.

19  Q   And did you advise Mr. Langfitt that you were looking at

20      cause of action against Peterson Sullivan?

21  A   We did.

22  Q   Do you recall his response other than what was

23      memorialized?

24  A   I don't recall anything else at this point.

12        The first is just a realization that we had other things

13        going on and we did not have the financial dollars to do

Page 483

```
 6   Q    Let me set the time frame.  After the denial of the

 7        working paper action to compel the working -- production

 8        of the working paper, did you ever have any discussions

 9        with Mr. Langfitt regarding Klukwan bringing an action

10        against Peterson Sullivan?

11        MR. GILMORE:  Same objection.

12        MR. HOPKINS:  Same objection.

13   A    We continue -- I continued on several occasions to let Mr.

14        Langfitt know that Klukwan was considering its own

15        independent action.
```

11    Q    Thank you.  What happened to that resolution?

12    A    Basically the board -- we went into executive session.  At

13         that point we -- the board discussed -- well, at some

14         point during this meeting the board discussed -- I don't

15         remember it was in executive session, but at some point

16         the board discussed where are we at on Peterson Sullivan.

17         I went to a white board that's in the conference room in

18         Haines, Alaska, and basically said here's where we're at.

19         We have a case potentially against Peterson Sullivan, I

20         don't like our case as much as I like Travelers has a case

21         against Peterson Sullivan.  Travelers also has a case,

22         that's the first premise.  Second, went through the

23         history, that in general the history was after the

24         collapse of South Coast it was obvious that there was some

25         problems, some reasons it was obvious, that we were

1    working jointly with Travelers.  First there was a request

2    for production of work papers, informal by letter.  Second

3    there was a suit for production of work papers,

4    unsuccessful.  Third, Travelers has filed suit for actual

5    recovery of damages.  I then went in and said there's two

6    ways damages could be applied.  In either case it benefits

7    us.  First way, Travelers has spent approximately -- at

8    that point the balance that they had spent, less recovery

9    that they had received, was approximately 11 to 11.5

10   million.  For the discussion I used, I think, 11.  That

11   they had sued for recovery from Peterson Sullivan of

12   approximately 8.5.  It was actually a little more than

13   that but I'll use 8.5 here.  Actually I used 11.5 as the

14   amount of their expense.  The difference between 8 point -

15   - 11.5, you minus 8.5, assuming they had been completely

16   successful that would've left three million.  What that

17   would have done is that would've wiped out all need for

18   the bankruptcy provision and it would have gone into the

19   note itself.  Because at that point the note with future

20   interest, so not the -- not the face amount or the

21   principal amount of the note, but the total obligation

22   note, accrued interest and unearned interest, was about

23   six million and change, so three million was less six

24   million, so it would've -- some of the note would've been

25   paid off through recovery.  Second option would have been

Page 490

1       it hits the note first, and recognize that Travelers did

2       not agree with that, but if it hit the note first it would

3       wipe out all of the note and there would be some return to

4       Travelers on the -- what I referred to earlier as the

5       delta, the difference between the 11.5 and the current

6       note with interest earned and unearned.  So in either case

7       it was going to benefit Klukwan.  We then continued the

8       discussion and said and we don't know that it's going to

9       be 8.8 million, it might be five million, and we ran

10      through the same numbers, it might be four.  We recognized

11      8.8 was just the balance.  We ended up with a discussion

12      that says let's let Travelers do the heavy lifting here,

13      in other words let's let them pay for the litigation,

14      let's see what happens.  If they're successful, great, we

15      benefit.  And they will have proven our claims against

16      them, and -- against Peterson Sullivan, and if they were

17      unsuccessful, then we probably didn't have a claim to

18      begin with.  Never during that period of time did we

19      discuss any of the statute of limitation issues that might

20      arise.

21   Q  So what happened?  Was the resolution that's attached to

22      Exhibit 97 approved?

23   A  Actually the resolution was never addressed, it was never

24      approve -- it was never brought up for a vote.  It was

25      never approved, it was never denied.

16    Q    You yourself have not memorialized any conversations that

17          you had -- and by memorialized I mean memorialized in

18          writing.  You yourself have not memorialized in writing

19          any conversations that you had with Chuck Langfitt with

20          the exception of the September 29, 2004, conference call?

21    A    I believe that's correct.

22    Q    And you earlier described the fact that you don't keep any

23          sort of calendar, correct?

24    A    I don't keep a calendar.

25    Q    It's not your practice to record notes of telephone calls,

Page 500

1          correct?

2    A     That's correct.

3    Q     You do have a journal but it's very cryptic and may or may

4          not have reference to conversations you may have had,

5          correct?

6          MR. SPRAKER:  Objection, form.

7    Q     Tell me if that's an inaccurate description.

8    A     It's an accurate description.

9    Q     And we don't have copies of your journal prior to 2004, do

10         we?

11   A     I don't recall which dates you have.

12   Q     Do you recall what journals you currently have in your

13         files?  What years?

14   A     I know that -- I recall that the journals that I could

15         locate are not complete, but I do not recall which years.

16   Q     And -- but you've given everything you have to Mr.

17         Spraker, correct?

18   A     I've given everything I could locate to Mr. Spraker.

19   Q     So what's been provided to us, and that's reflected in

20         Exhibit 1 of your prior deposition, is 2004, 2005, is that

21         consistent with your recollection?

22   A     That appears to be correct.

23   Q     So -- And you do agree with me your memory is such that

24         you really can't place a particular conversation with Mr.

25         Langfitt at a particular date, correct?

Page 501

1    A    Generally that's true.

2    Q    Well, when you say generally, which specific dates and

3         conversations do you recall?

4    A    Well, I can recall a June 2002 conversation where it was a

5         takeover conversation.  I do recall that one, for

6         instance.

7    Q    Okay, what else?

8    A    Without refreshing with files, that's the one I remember

9         right now.

10   Q    And in that June -- well, strike that.  Mr. Gilmore

11        referred you to your declaration, Exhibit 11, Paragraph

12        30.  Do you see that paragraph of your May 26, 2006,

13        declaration we've marked as Exhibit 11?

14   A    I do.

15   Q    And that paragraph states, quote, "I specifically recall a

16        discussion with Chuck Langfitt on August 6, 2004, on the

17        proposed officer and director action as well as the

18        proposed Peterson Sullivan negligence suit," end quote.

19        See that?

20   A    I do.

21   Q    When you executed this declaration on what basis did you

22        specifically recall that discussion?  Did you review some

23        document that told you that discussion occurred?

24   A    There was a document, yes.

25   Q    What is that document?

Page 502

1  A    Don't recall the specifics.

2  Q    Was it a note to yourself?

3  A    I don't recall the specifics.

4  Q    So you believe you reviewed a document that refreshed your

5       recollection that you had a conversation on August 6,

6       2004, correct?

7  A    That's my belief.

8  Q    And as you sit here today you have no idea what that

9       document was?

10 A    I no longer remember that.

11 Q    Do you recall that after your declaration Travelers

12      submitted extensive discovery requests -- or, strike that.

13      You recall that after this May 26, 2006, declaration was

14      executed by you Travelers submitted written discovery

15      requests to Klukwan and South Coast and the other

16      defendant in the action?

17 A    The other defendant you're referring to is Chilkats

18      Portage Cove?

19 Q    Yes.

20 A    I do recall that.

21 Q    And do you recall verifying and signing responses to that

22      written discovery request?

23 A    I do.

24 Q    And that's the document we've previously identified in

25      this proceeding as Exhibit 12.  Do you recall discussing

24   Q      It is certainly true, based on everything that we've

25          discussed and the documents we've looked at in

1       considerable detail here in deposition, that as of August

2       6, 2004, Klukwan was still considering bringing its own

3       action against Peterson Sullivan, correct?

4   A   We were considering that, yes.

5   Q   And indeed that was the specific substance matter of a

6       board meeting that occurred in mid-September 2004,

7       correct?

8   A   That's correct.

9   Q   So there was certainly no decision made by Klukwan as of

10      August 6, 2004, that it would not assert its own claim

11      against Peterson Sullivan and join in the action with

12      Travelers?

13  A   There was no decision at that point.

21   Q      Yes.   That was your understanding.   In terms of their

22          fundamental conclusions, the Peterson Sullivan

23          investigation which occurred in the fall of 2001 and the

24          Sutor analysis reached the same fundamental conclusions.

25          They may have approached it from different directions but

Page 507

1     you understood them to reach the same conclusion, correct?

2   A   I understood that they reached the same conclusion on that

3       subject.

4   Q   That the internal controls were not being followed by SCI

5       and that included the FMI procedures?

6   A   That's correct.

7   Q   And Peterson Sullivan, Mr. Ferris and Mr. Lee, reported

8       that fact to you orally in mid-January of 2002, correct?

9   A   In January '02, yes.

10  Q   And they reported that at the board meeting, again, on

11      January 26, 2002, correct?

12  A   Correct.

13  Q   And if you look at Exhibit 21, that's the January 25,

14      2002, letter from Peterson Sullivan that reports in a

15      formal fashion that the management -- internal controls

16      and the management procedures are not properly being

17      followed, correct?

18  A   That's the way I read it, yes.

19  Q   Now, from your perspective, and I think you used the term,

20      South Coast collapsed, correct?

21  A   That's what I used, yes.

22  Q   And they went from what was indicated to be a $2 million

23      gross profit based on the year-end 2000 financial

24      statements to what was determined to be a loss of seven

25      and a half to eight million in the year 2001, correct?

Page 508

1  A    Correct.

2  Q    That's a very precipitous decline, you agree?

3  A    That is not a good way to go.

4  Q    And certainly from your perspective that fact, coupled

5       with the recognition that the internal controls were not

6       being followed, raised a question in your mind as to

7       whether the Peterson Sullivan prior year audit for the

8       year 2000 had been properly performed?

9  A    Yeah, correct, I -- I believed there was a totality of

10      information that would have given me that conclusion.

11 Q    And the other thing you pointed out was the relatively

12      short period of time, on the order of three weeks or so,

13      in which Peterson Sullivan accomplished its year-end 2000

14      audit?

15 A    That's correct.

16 Q    And you had all of that information available to you as of

17      the date of Exhibit 21, January 25, 2002, isn't that true?

18 A    Yes, that's true.

19 Q    And based on what you've testified here over the two and a

20      half days of your deposition, as far as you were concerned

21      that was sufficient basis to initiate a law suit against

22      Peterson Sullivan at that specific point in time, correct?

23      MR. SPRAKER:  Objection, form and foundation.

24 A    i believe that this is one of several points in time that

25      there was enough information to go forward.

13    Q    And any law suit that Klukwan might've pursued against

14         Peterson Sullivan would seek damages incurred by Klukwan,

15         correct?

16    A    That's correct.

17    Q    And any law suit by Klukwan against Peterson Sullivan

18         would be seeking to recover any and all damages that would

19         have arguably been attributable to Peterson Sullivan's

20         failure to provide an accurate audit in the year 2000 or

21         conceivably earlier, correct?

22    A    I would not use the word accurate.  I would say an audit

23         performed with due diligent.

24    Q    Klukwan would've sought all damages that it could arguably

25         asserted were attributable to Peterson Sullivan's failure

1        to perform a proper audit?

2   A    Yes.

16  Q    Let me ask you this question perhaps in a more simplified

17       format.  In response to questions by Mr. Spraker you

18       described the considerations and discussions that occurred

19       in the mid-September 2004 meeting regarding whether

20       Klukwan should proceed with its own action, do you recall

21       that testimony?

22  A    I do.

23  Q    Did that testimony recount all the factors that were

24       considered at that meeting at that time?

25  A    I believe it did.

1    Q    And the upshot of that meeting is Klukwan decided to table

2         the issue and didn't make a formal decision one way or the

3         other whether it should proceed with its own action?

4    A    That's correct.

5    Q    You -- Earlier you testified also that on at least one

6         occasion you told Chuck Langfitt that in your opinion

7         Travelers did not need the working papers to proceed with

8         an action against Peterson Sullivan?

9    A    That's correct.

10   Q    I assume you agree if Travelers didn't need those working

11        papers neither did Klukwan?

12   A    That's correct.

13   Q    The dates and the substance of those conversations are not

14        memorialized in any document that you're aware of,

15        correct?

16   A    Not that I'm aware of.

17   Q    You also testified you became concerned at some point as

18        to the delay and amount of time that it was taking to

19        pursue the working papers?

20   A    That's correct.

21   Q    But despite that concern Klukwan did not proceed with its

22        own action against P&S, did it?

23   A    No, they did not.

24   Q    And there was no reason they couldn't have filed a law

25        suit against P&S whenever it wasn't to, was there?

1   A    They could've filed.