# TAB 2

## Deposition Testimony of Cabot Christianson

Attachment to Supplemental Declaration of James T. Hopkins
Travelers Casualty and Surety v. South Coast, Inc.
Case No. A06-00063(TMB)

Travelers' Reply and Opposition to Cross Motion
Index of Deposition Testimony of Cabot Christianson

| Page | Line(s) |
|------|---------|
| 45 | 10-24 |
| 72 | 18-25 |
| 73 | 1 |
| 86 | 17-25 |
| 87 | 1-7 |
| 89 | 7-13 |
| 113 | 10-23 |
| 134 | 14-25 |
| 135 | 1-6 |
| 136 | 18-25 |
| 137 | 1-14 |
| 138 | 11-25 |
| 139 | 1-25 |
| 140 | 1-25 |
| 141 | 1-21 |
| 143 | 14-25 |
| 144 | 1-7 |
| 157 | 7-25 |
| 158 | 1-7 |
| 177 | 12-13 |
| 182 | 21-25 |
| 183 | 1-8 |
| 204 | 7-25 |
| 281 | 6-25 |
| 282 | 1-19 |
| 324 | 25 |
| 325 | 1-25 |
| 326 | 1-17 |

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

TRAVELERS CASUALTY AND      . Case No. 3:06-CV-00063-TMB
SURETY COMPANY OF AMERICA,  .
a Connecticut corporation,  .
                            .
          Plaintiff,        .
                            .
vs.                         .
                            .
SOUTH COAST INC., an Alaska .    **DEPOSITION OF CABOT CHRISTIANSON**
corporation, KLUKWAN, INC.,.    **DAY 1**
Alaska Native Village       .
corporation, and CHILKATS' .
PORTAGE COVE DEVELOPMENT    .
COMPANY, an Alaska          .
corporation,                .
                            .
          Defendants.       .
 . . . . . . . . . . . . .  .
SOUTH COAST INC., et al,    .
                            .
     Counterclaim and       .
     Third-Party Plaintiff,.
                            .
vs.                         .
                            .
TRAVELERS CASUALTY AND      .
SURETY COMPANY OF AMERICAN,.
a Connecticut Corporation, .
STEWART SOKOL & GRAY L.L.C..
and JAN D. SOKOL,           .
                            .
     Counterclaim and       .
     Third-Party Defendants..
 . . . . . . . . . . . . .  .

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Travelers            James T. Hopkins, Esq.
Casualty and Surety      Schiffrin Olson Schlemlein
Company of America:       & Hopkins, P.L.L.C.
                         1601 Fifth Avenue, Suite 2500
                         Seattle, Washington 98101

```
10   Q    And is it a fair characterization of the discussions and

11        negotiations then that they revolved around working out an

12        agreement to where Klukwan would pay some portion of the

13        Travelers loss as satisfaction of its indemnity

14        obligation?

15   A    Yes.

16   Q    And you were involved in those discussions?

17   A    Yes.

18   Q    Is it also true, though, that Mr. Crandall and Mr.

19        Langfitt were likely having communications and discussions

20        that you were not involve din?

21   A    Yes.

22   Q    That -- as you understood it, that happened on a fairly

23        regular basis?

24   A    Yes.
```

18  Q    Does Exhibit 40, your August 2, 2002, e-mail, refresh your

19       recollection that you prepared the initial draft.....

20  A    Yeah, looks.....

21  Q    .....of the documents?

22  A    Looks fine, it -- it appears that I did, yes.  It does

23       appear that I prepared the documents, I note that the

24       footer at the bottom is the same style that I use in my

25       office.  The note, I've indicated, surprises me, but after

1          five years I'm not surprised of that.

000076

17  Q    Let me refer you to Paragraph 11 of the repayment

18       agreement, which is on Page 5 of Exhibit 42.

19  A    Okay.

20  Q    Would you read out loud the last sentence of Paragraph 11?

21  A    This agreement and the preceding sentences do not impair

22       or release Travelers' claims or causes of action against

23       any person or entity other than . . . Klukwan entities.

24  Q    Did you understand -- well, strike that.  Do you

25       understand or do you recall that that sentence was

```
1        included at the request of Chuck Langfitt?

2    A   I'm not surprised, but that sounds right.

3    Q   Did you understand by that provision Travelers was

4        preserving its claims against third parties?

5    A   I.....

6    Q   Other than the Klukwan entities.

7    A   That's what -- the sentence says what the sentence says.
```

000078

```
 7   Q    Take a look at Paragraph 18 of the repayment agreement.

 8   A    Okay.

 9   Q    You recall that that clause, Paragraph 18, was included in

10        the repayment agreement at the request of Chuck Langfitt?

11   A    I believe that's true.

12   Q    You reviewed it, correct?

13   A    Yes.
```

```
10   Q   Do you recall having discussions with Mr. Crandall

11       regarding a possible claim by Klukwan against Peterson

12       Sullivan?

13   A   Yes.

14   Q   When do you first recall those discussions occurring?

15   A   I can't place an exact date on it, but it would've been

16       fairly early on in the relationship and certainly was a

17       topic of recurring conversation by the end of '02 if not

18       sooner.

19   Q   And it's an issue that continued to come up in your

20       communications and discussions with Mr. Crandall.....

21   A   Yes.

22   Q   .....after '02?

23   A   Yes.
```

14    Q    Well, will you look at your entry for March 1, 2004.....

15    A    Uh-huh (affirmative).

16    Q    .....in your billing entries?

17    A    Okay.

18    Q    Now, that references a meeting with Tom Crandall?

19    A    Right.

20    Q    Says, quote, meet with Tom Crandall re Peterson Sullivan

21         law suit mainly.

22    A    Right.

23    Q    Two hours?

24    A    Yes.

25    Q    And that reflected a meeting and discussion with Mr.

1        Crandall regarding the possible claim against Peterson

2        Sullivan, correct?

3    A   Right.

4    Q   Did you discuss some of the subject matters that are

5        outlined by you in your e-mail, Exhibit 177?

6    A   Yes.

18  Q    We've marked as Exhibit 179 your e-mail to Gary Spraker

19       dated March 16, 2004, subject, quote, Peterson Sullivan

20       statute of limitations, end quote.

21  A    Yes.

22  Q    Did you ask Mr. Spraker to look at this issue?

23  A    I -- yes.

24  Q    Did he produce anything in writing in regard to the

25       statute of limitations?

```
 1   A    No.

 2   Q    Do you understand he researched the statute of

 3        limitations?

 4   A    I don't know if he did or not.  I told him.....

 5   Q    Would you take a look at.....

 6   A    Yeah.

 7   Q    Take a look at your billing statements for March of 2004.

 8   A    Uh-huh, right.

 9   Q    March 17, 2004, entry reflects activity by Mr. Spraker

10        that says, quote, legal research re.....

11   A    Right.

12   Q    .....accrual of cause of action for accountant

13        malpractice, end quote.

14   A    Right.
```

11  Q   Did you yourself ever have any understanding of what the

12      applicable statute of limitation was for a claim by

13      Klukwan against Peterson Sullivan?

14  A   I'm very familiar what the statute of limitations are for

15      professional malpractice in Alaska, and I don't need to

16      have any research done to tell me what the legal standard

17      is.  The work that I would have asked Gary to do would be

18      to apply -- is to relate that standard to the facts, and

19      in particular to see when the cause of action would have

20      accrued.  The law itself I know cold and so I don't need

21      that.  And so I asked him to get into the -- nor would it

22      take him an hour -- 1.4 hours to find the standard.  I

23      think that I was asking him to get into the documents or

24      the facts enough to get an idea of when the cause of

25      action might've accrued, but then I decided that we were

1       so clearly within it that there was no point in pursuing

2       the exercise.

3   Q   What did you understand to be the applicable statute of

4       limitations?

5   A   The standard -- the period of limitations for professional

6       malpractice is generally two years, except that where the

7       claim is for primarily sums in economics damages, it's the

8       breach of contract standard, which at the time and now is

9       three years.  So that would be a -- since we had pure

10      economic damages as opposed to, let's say, you know, a

11      personal injury lawyer missing a statute -- missing a two-

12      year statute on a personal injury case.  But where you

13      have -- here, where you have economic damages, it would be

14      a three-year statute.

15  Q   And what did you understand to be the rule on accrual of a

16      cause of action for professional malpractice?

17  A   When you knew or should've known of the professional

18      malpractice.

19  Q   A discovery rule?

20  A   Yes.

21  Q   And it is your view that those standards apply regardless

22      of whether the claim was asserted by Klukwan or South

23      Coast?  Or did you consider that?

24  A   I don't think it matters.

25  Q   So it's the same standard from your perspective?

Page 140

1  A    Right, because it's a contract -- it's a contract basis

2       and a contract is between Klukwan and the -- and its

3       subsidiaries on the one hand and Peterson Sullivan on the

4       other.

5  Q    It was not a separate contractual arrangement between

6       South Coast and Peterson Sullivan to perform the South

7       Coast financial statements?

8  A    Not necessarily, it could -- it's -- I viewed them --

9       Rightly or wrongly, I viewed them as all one set of

10      financial statements, it's a consolidated financial

11      statement, and so it's a promise between the group of

12      corporations on the one hand and -- it's a contract

13      between the group of corporations on the one hand and the

14      accountants on the other.

15 Q    And that was your belief at this time in March of 2004?

16 A    Yeah.

17 Q    Is that still your belief?

18 A    Yes.

19 Q    Did you ever analyze that in any detail?

20 A    No.

21 Q    Did you make a determine in your own mind when Klukwan's

22      cause of action against Peterson Sullivan accrued?

23 A    It seemed to me that the earliest time that it might've

24      accrued -- which of course that's what i'm looking for.

25      It's not so much when it really accrued but what's the

```
 1          earliest, you know, reasonable time that it might accrue.
 2          I felt that it -- that the earliest time was January of
 3          '02.
 4   Q      The earliest possible day?
 5   A      Right.
 6   Q      Could've accrued later?
 7   A      Yes.  March of '02 would be the other candidate, and
 8          actually seemed to me the better candidate.  But, you
 9          know, for planning purposes I felt it was January of '02.
10   Q      Did you tell Tom Crandall that?
11   A      Yes, I think we've had the discussion that those -- if
12          those -- it's the day of those reports, it's -- that, you
13          know, that's the -- that's when the alarms start to sound.
14   Q      And by those reports you're referring to the Sutor report
15          that was dated March 2002 and the Peterson Sullivan report
16          that came out at or about the same time?
17   A      There's three documents.  There's the two Peterson
18          Sullivan and the one Sutor, and I'm -- by reports I mean
19          all three of those documents.
20   Q      And they were all generated in 2002?
21   A      Right.
```

14    Q    Back to my initial question.  Did you ever analyze or

15         anyone in your firm analyze when a cause of action for

16         Travelers as opposed to Klukwan against Peterson Sullivan

17         might have accrued?

18    A    Up until the time that the -- that judge -- the district

19         court case was thrown out on statute of limitations it

20         never dawned on me to even think about the issue as to

21         when a Travelers cause of action would've accrued.

22    Q    So prior to the Judge Beistline's ruling dismissing

23         Travelers action claim on -- Travelers' claim against

24         Peterson Sullivan on the statute of limitations ground,

25         you hadn't considered it or analyzed the issue?

1  A   I hadn't paid any -- given it any attention whatsoever.

2  Q   And therefore you probably had not had any conversations

3      with either Mr. Sokol or Mr. Langfitt on the subject?

4  A   That's correct.

5  Q   Did you have any discussions with Tom Crandall on that

6      subject?

7  A   Not until the judge's ruling.

7   Q   Do you recall being involved in discussions with Mr.

8       Crandall and Brandon Allen shortly after Travelers' law

9       suit against Peterson Sullivan was filed?

10  A   Yes, I do.

11  Q   Part of those discussions related to the issue of whether

12      Klukwan's D&O insurance carriers had been given timely

13      notice, correct?

14  A   That's right.

15  Q   But you also discussed with Mr. Allen and Mr. Crandall the

16      amount of Travelers' claim as stated in its law suit,

17      correct?

18  A   Believe that's correct also, yeah.

19  Q   And you didn't understand at the time how that claim was

20      calculated, correct?

21  A   Right, I couldn't derive the number no matter what their

22      assumptions were.

23  Q   And in part the reason you couldn't do so is you'd never

24      discussed with Travelers how it might calculate its claim

25      against Peterson Sullivan, had you?

Page 158

1  A    That's true.

2  Q    Nor had anyone at Travelers ever told you that Travelers

3        expected to recover any particular amount, correct?

4  A    Right, I would assume that the amount in the complaint

5        would be their damage, their total exposure, but maybe

6        that's not a true -- a valid assumption.  So I don't know

7        how they came to their number.

Page 177

```
12   A     Pretty -- the decision to make -- to sue Peterson Sullivan

13         was Travelers' decision and we supported it, but it was --
```

```
 6        know, I -- again, I can't tie it to a particular date
 7        without some sort of documentary reference, but I know
 8        that was my opinion for a long -- ever since all this
 9        messing around with the working papers thing, it just
10        seemed to me a waste of time.  And, you know, if he really
11        wanted to get it, he knew how to do it.
12   Q    And you expressed that opinion to him at some point in
13        time?
14   A    Yeah.
15   Q    But you don't know precisely when?
16   A    Well, I know for sure it was around February of '04, and
17        may also have been earlier than that.
18   Q    I'm going to show you what's been previously marked as
19        Exhibit 122.  There is an -- And this is an e-mail between
20        Chuck Langfitt and Jan Sokol that Mr. Langfitt was
21        questioned in regard to, and it includes an e-mail from
22        Jordan Rosenfeld to Mr. Langfitt.  And looking at the very
23        last paragraph of the e-mail there's a statement that says
24        Tom stated he thought there was a way to subpoena the work
25        papers without the law suit.  Tom was going to talk to his
```

21  Q    Certainly you felt obtaining the working papers would be

22       of value in terms of evaluating and pursuing a claim

23       against Peterson Sullivan, correct?

24  A    Certainly in terms of pursuing a claim.  As I said before,

25       I didn't understand what -- how the working papers would

1          help in deciding whether they had a claim or not.  I mean,

2          they should have all the facts -- To me, the facts that

3          would go to the issue of whether they had a claim would be

4          the nature of their own reliance, which is entirely on --

5          within Travelers' knowledge, and the inaccuracy of the

6          statements, which Peterson Sullivan has basically conceded

7          in their letters.  So to me this whole working papers

8          thing was a waste of time.

```
 7  Q    Do you recall any discussions with Jan Sokol regarding the

 8       P&S litigation after the date of Exhibit 90, May 26, 2004?

 9  A    You know, I don't.  Actually e-mail -- or document 90 and

10       195 are kind of a good illustration that throughout this

11       time Tom Crandall and Charles Langfitt had a kind of a

12       regular on-going communication between them that

13       frequently was more interactive than between Jan and

14       myself.

15       MR. HOPKINS:  Object and move to strike as nonresponsive

16  the witness's last statements after his answer to the question.

17  Q    Am I correct that the next thing you learned about the

18       Peterson Sullivan last suit was the suit had actually been

19       filed when you were contacted by one of the former

20       officers named as a defendant?

21  A    That's correct.  I don't -- despite the we'll keep you

22       posted statement, I don't know of any information from

23       either Mr. Langfitt or Mr. Sokol concerning the progress

24       of the suit until the time it was actually filed.  And we

25       did not hear about it from them, of course.
```

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

TRAVELERS CASUALTY AND          .  Case No. 3:06-CV-00063-TMB
SURETY COMPANY OF AMERICA, .
a Connecticut corporation, .
                                .
        Plaintiff,              .
                                .
vs.                             .
                                .
SOUTH COAST INC., an Alaska.    **DEPOSITION OF CABOT CHRISTIANSON**
corporation, KLUKWAN, INC.,.    **DAY 2**
Alaska Native Village           .
corporation, and CHILKATS' .
PORTAGE COVE DEVELOPMENT         .
COMPANY, an Alaska              .
corporation,                    .
                                .
        Defendants.             .
 . . . . . . . . . . . . .      .
SOUTH COAST INC., et al,        .
                                .
     Counterclaim and           .
     Third-Party Plaintiff,.
                                .
vs.                             .
                                .
TRAVELERS CASUALTY AND          .
SURETY COMPANY OF AMERICAN,.
a Connecticut Corporation, .
STEWART SOKOL & GRAY L.L.C..
and JAN D. SOKOL,               .
                                .
     Counterclaim and           .
     Third-Party Defendants.
 . . . . . . . . . . . . .      .

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Travelers          James T. Hopkins, Esq.
Casualty and Surety    Schiffrin Olson Schlemlein
Company of America:     & Hopkins, P.L.L.C.
                       1601 Fifth Avenue, Suite 2500
                       Seattle, Washington 98101

000098

```
 6   Q   Now, on February 10 in your e-mail to Jan you say
 7       Travelers -- you say Klukwan is considering its own cause
 8       of action against Peterson Sullivan, has developed some
 9       ideas.  And then I don't see where there's any time that
10       there's another follow-up e-mail or communication with Jan
11       Sokol telling him at what point in time, if ever, Klukwan
12       decided not to pursue its own cause of action.
13   A   That's true.
14   Q   So as far as you know Jan Sokol at least through -- up
15       through September of '04 as far as you know he still
16       assumed that Klukwan was considering bringing its own
17       cause of action or claim against Peterson Sullivan?
18   A   Well, I don't know what he knew.  I did tell him that if
19       he was going to go forward that there was very little
20       chance that we would go forward.  And -- but I -- you
21       know, you're right, I never told him after this e-mail
22       chain Jan, we have affirmatively decided not to go
23       forward.  And to go back to your -- the question you were
24       asking before, I kind of have a memory of participating --
25       and I may -- I don't know if it was this meeting or not.
```

1        But I think the fact that the Travelers suit against

2        officers and directors and Peterson Sullivan had been

3        filed kind of reinvigorated, you might say, the issue of

4        what we were going to do -- what Klukwan was going to do

5        vis a vis Peterson Sullivan because the directors were

6        making noises about wanting to have us indemnify and it

7        looked like there was a fair chance we might be brought

8        into the suit.  And then the question was, well, we're in

9        the suit, should we -- you know, should we file a claim

10       against Peterson Sullivan.  It was more -- it was more in

11       the nature of, well, we -- since we're going to be -- it

12       looks like we might be in the suit anyway, should we, you

13       know, take a second look at this issue against Peterson

14       Sullivan.  And of course we never were brought into the

15       suit formally, so that didn't have to happen.  But, you

16       know, I think the client decision was -- was the same as

17       before, which was, you know, if Travelers is going

18       forward, which they obviously are, then there's very

19       little point in us pursuing a parallel action.

25    Q    In response to questions by Mr. Gilmore you indicated that

1      to your knowledge at the time the repayment agreement was

2      being prepared there was no discussion of third-party

3      claims by Travelers, correct?

4  A    Correct.

5  Q    And that -- by those answers that you are providing you

6      meant no discussions that you personally were involved in?

7  A    Right.

8  Q    And you can't speak to discussions that occurred directly

9      between Mr. Crandall and Mr. Langfitt, correct?

10  A    That's correct.

11  Q    Let me ask you this question.  Between June and December

12      2002 did you personally ever give any thought to what

13      third-party claims Klukwan might assert to help recover

14      its what we've recognized to be very substantial losses as

15      a result of the South Coast collapse?

16  A    Well, we've already talked about a number, there's the

17      KeyBank claim, there's the Klukwan claim against Peterson

18      Sullivan and possibly against the directors and officers.

19  Q    So you had given thought to those items in that period of

20      time?

21      MR. SPRAKER:  Between June and.....

22  A    Oh, I'm sorry, in that period of time.....

23      MR. SPRAKER:  .....December 2002.

24  A    Certainly the KeyBank claim was during that period of

25      time, and I believe the Peterson Sullivan one -- I guess

```
1          I'm a little -- I think it was during that period of time.
2          Yes, I think so.
3    Q     I mean, it would be logical and natural for Klukwan to
4          evaluate what claims or rights it had against third
5          parties, given the extent of the losses it faced, correct?
6    A     True.
7    Q     And that was part of your job, wasn't it?
8    A     True.
9    Q     And similarly you understood that by entering the
10         repayment agreement Travelers was foregoing recovery from
11         Klukwan of a substantial portion of its likely losses on
12         the bonds, correct?
13   A     Correct.
14   Q     And don't you agree it would be likewise logical and
15         natural for Travelers to evaluate the third-party claims
16         it might have?
17   A     It could, yeah.
```