# TAB 3

## Deposition Testimony of Charles W. Langfitt

Attachment to Supplemental Declaration of James T. Hopkins
Travelers Casualty and Surety v. South Coast, Inc.
Case No. A06-00063(TMB)

000104

Travelers' Reply and Opposition to Cross Motion
Index of Deposition Testimony of Charles Langfitt

| Page | Line(s) |
|------|---------|
| 97 | 23-25 |
| 98 | 1-7 |
| 99 | 15-22 |
| 185 | 9-25 |
| 186 | 1-12 |
| 190 | 18-25 |
| 191 | 1-25 |
| 192 | 1-25 |
| 193 | 1-10 |
| 208 | 18-25 |
| 209 | 1-25 |
| 210 | 1-25 |
| 211 | 1-2 |
| 231 | 12-25 |
| 232 | 1-25 |
| 233 | 1-25 |
| 234 | 1-25 |
| 235 | 1-11, 20-25 |
| 236 | 1-3 |
| 251 | 21-25 |
| 252 | 1-22 |
| 262 | 17-25 |
| 263 | 1-16 |
| 267 | 5-25 |
| 268 | 1-25 |
| 269 | 1-25 |
| 270 | 1-25 |
| 271 | 1-11 |
| 277 | 13-22 |

000105

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

TRAVELERS CASUALTY AND          )
SURETY COMPANY OF AMERICA,      )
a Connecticut corporation,      )
                                )
                 Plaintiff,     )
                                )
      vs.                       ) No. A06-00063 (TMB)
                                )
SOUTH COAST, INC., an Alaska    )
corporation, KLUKWAN, INC., an  )
Alaska Native Village corporation, )
and CHILKATS' PORTAGE COVE       )
DEVELOPMENT COMPANY, an Alaska   )
corporation,                     )
                                )
                 Defendants.     )
_____ )
SOUTH COAST, INC., an Alaska     )
corporation, KLUKWAN, INC., an   )
Alaska Native Village corporation, )

Deposition Upon Oral Examination

of

CHARLES W. LANGFITT

Taken at 1601 Fifth Avenue
Seattle, Washington

DATE:  September 10, 2007

REPORTED BY:  Patricia A. Blevins, CCR
              CCR NO. 2484

STARKOVICH REPORTING SERVICES
(206)323-0919

Travelers Casualty vs. South Coast, Inc. Charles W. Langfitt                September 10, 2007



Page 97

```
23        Q.   Okay.  Now, as I understand it, at that time,

24   which would be the forensic review starting May 28 --

25                MR. HOPKINS:  May 28 of 2002, correct?
```

000107

Travelers Casualty vs. South Coast, Inc. Charles W. Langfitt          September 10, 2007

                                                            Page 98

1        Q.   2002.   As of that time, you had received the Sutor

2   report, correct?

3        A.   Yes.

4        Q.   And the Peterson Sullivan report?

5        A.   Yes.

6        Q.   And had reviewed those reports, correct?

7        A.   Yes.

Travelers Casualty vs. South Coast, Inc. Charles W. Langfitt                September 10, 2007



Page 99

15        Q.    Now, we've seen in Mr. Crandall's deposition your

16   handwritten notes of a conversation with Mr. Crandall on

17   June 2 of 2003.  Is that when Mr. Crandall first mentioned

18   that to you?

19        A.    No.  As I testified in my deposition, when we were

20   negotiating the repayment agreement, Tom started making

21   comments about both the CPAs and the officers and directors

22   to me.

Case 3:06-cv-00063-TMB   Document 89-6   Filed 01/21/2008   Page 7 of 33

Travelers Casualty vs. South Coast, Inc.   Charles Langfitt, Vol. 2         September 11, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

TRAVELERS CASUALTY AND          )
SURETY COMPANY OF AMERICA,      )
a Connecticut corporation,      )
                                )
                Plaintiff,      )
                                )
        vs.                     ) No. A06-00063 (TMB)
                                )
SOUTH COAST, INC., an Alaska    )
corporation, KLUKWAN, INC., an  )
Alaska Native Village corporation, )
and CHILKATS' PORTAGE COVE      )
DEVELOPMENT COMPANY, an Alaska  )
corporation,                    )
                                )
                Defendants.     )
_____ )
SOUTH COAST, INC., an Alaska    )
corporation, KLUKWAN, INC., an  )
Alaska Native Village corporation, )

Deposition Upon Oral Examination

of

CHARLES W. LANGFITT

VOLUME II

Taken at 1601 Fifth Avenue
Seattle, Washington

DATE:  September 11, 2007

REPORTED BY:  Patricia A. Blevins, CCR
              CCR NO. 2484

STARKOVICH REPORTING SERVICES
(206)323-0919

Page 185

```
 9        Q.    Independent of Tom's comments, did you come to

10   have concerns about Peterson and Sullivan's performance?

11        A.    Eventually, yes.

12        Q.    Prior to discussing it with Mr. Crandall, or

13   after?

14        A.    Tom brought it up, and I started looking some more

15   at it, plus I looked at some of the reports.  And then, as

16   I've testified previously, here, going through the re-let

17   process and looking at what type of condition South Coast

18   was, I mean, you tend to have some suspicions there might be

19   a problem.

20        Q.    My understanding, though, and I don't want to

21   incorrectly state you, but my understanding is you do not

22   know exactly when that was first undertaken.

23              MR. HOPKINS:  Objection; vague and ambiguous.

24        A.    I'm not sure under -- what was -- what you're

25   talking about as far as --
```

000111

Travelers Casualty vs. South Coast, Inc.    Charles Langfitt, Vol. 2                    September 11, 2007

Page 186

1          Q.    The Peterson Sullivan, when you first started

2    investigating or for, as you had stated, having concerns

3    about Peterson Sullivan's performance and financial audit?

4                    MR. HOPKINS:   Objection; compound.

5          A.    All I remember is that after I got involved in

6    South Coast, and during the course of re-letting the work

7    and going through that process and having discussions with

8    Tom Crandall during the course of negotiating the repayment

9    agreement, he brought to my attention certain concerns, and

10   I started to have some suspicions.   I didn't actually start

11   thinking that I had something or doing something further

12   until, you know, after October.

000112

Travelers Casualty vs. South Coast, Inc.    Charles Langfitt, Vol. 2                    September 11, 2007

Page 190

18       Q.   The next paragraph on Page 2 of your notes seems

19   to be a discussion about how any proceeds from a directors

20   and officers litigation would be applied by Travelers.   I

21   believe that this is the first time that I have seen,

22   chronologically, any writing regarding application of claims

23   against third parties.

24               MR. HOPKINS:   Objection; vague and ambiguous.

25               MR. SPRAKER:   I'm not done yet.

000113

Page 191

1      Q.    Do you recall having any prior discussions with

2    Mr. Crandall regarding application of third-party claims to

3    the -- what I'm going to call the South Coast liability?

4      A.    There is, in fact, in the repayment agreement, a

5    provision that says that we're free to pursue third parties.

6    So that was part of the negotiation at the time the

7    repayment agreement was executed.

8      Q.    Does the repayment agreement state how those

9    proceeds are supposed to be applied?

10      A.    Which proceeds are we speaking to?

11      Q.    Against the third party.

12      A.    Basically, the third-party proceeds, the only

13    application that's in the repayment agreement is our loss,

14    less the proceeds from the bonding contract, to come up with

15    a number, so far as getting to the credit I think you're

16    trying to speak to.  So consequently, this particular

17    third-party action is not a credit against any sort of

18    obligation or of the repayment agreement.

19      Q.    Well, when you say "this" -- I'm sorry.  I can't

20    remember the exact words.  You said this claim, I'm going to

21    use --

22      A.    Yes.

23      Q.    -- is not a credit.  The repayment agreement

24    doesn't specifically identify any claims against directors

25    and officers, does it?

Travelers Casualty vs. South Coast, Inc.    Charles Langfitt, Vol. 2                September 11, 2007

Page 192

1      A.    No, but it expressly carves out any third-party --

2   claims against third parties.

3      Q.    Midway through that second paragraph, it says, and

4   please, again, if I misread this, let me know, "Tom asked

5   what would happen if money recovered exceeded the," and I

6   can't read that word.

7      A.    "Other loss."

8      Q.    "-- 'other loss,' net payment --" is that "net"

9   payment or "not"?

10      A.    "Not part."

11      Q.    "-- not part of $8 million PN?"  I'm assuming

12   that's "promissory note."

13      A.    Yes.

14      Q.    "Told Tom that"?

15      A.    Yep.

16      Q.    "Told Tom that would have to credit over, but

17   remote chance."  Okay.

18          So as I read that, you're telling Tom that if he

19   recovered a sufficiently large number against the directors

20   and officers, that it would credit over to what I'm going to

21   call the total net loss?

22      A.    What I was telling Tom was that if we got repaid

23   for our total loss on a business basis, since I'm not going

24   to be making a profit on my loss, I would have made a

25   business decision to have the difference available.  So what

000115

Travelers Casualty vs. South Coast, Inc.    Charles Langfitt, Vol. 2                    September 11, 2007

Page 193

1    I'm suggesting is when you look at the numbers, remote

2    chance.  I explained we were out 22 million gross; not sure,

3    net.  So I said, "Net, not sure, but maybe $15 million net.

4    I will send Tom a pay history."

5          So consequently, what I'm saying there is that I'm

6    currently out $15 million.  If I get back more than

7    $15 million and am consequently in a position that I'm

8    showing a profit on a loss, in that event, that was

9    something that, on a business basis, I would have sat there

10   and said, "Tom, I've got to make a business decision here."

000116

18    Q.    The action was actually filed in August of 2004.

19    I'm going to just represent that.  I believe it's one of the

20    exhibits we pulled out.  There's a dispute.

21          Why the delay between the decision in mid-June and

22    the filing in August?

23    A.    Jan was drafting the complaint and trying to tidy

24    up some details.

25    Q.    At that time, in June 2004 to August 2004, did you

Page 209

1    have any conversations with Tom Crandall or anybody in

2    Klukwan regarding filing against Peterson Sullivan?

3         A.   I'm sorry.  When was your start date?

4         Q.   June.  Actually -- let's go in June.

5         A.   I have an email, I think, exchange with Tom, and

6    basically what I said was we were looking at it, and I'd

7    keep him posted.

8         Q.   Did you ever tell him that Travelers had made a

9    decision to go ahead and sue Peterson Sullivan?

10        A.   No, I didn't.

11        Q.   Why not?

12        A.   I'm not really sure.  I just -- you know, I was up

13   doing something else and hadn't gotten back to telling him.

14   I told him we were thinking about it, keep him posted, and I

15   didn't happen to loop back to him.

16        Q.   Did you send a copy of the complaint to Klukwan?

17        A.   No.  I had no obligation to do so.

18        Q.   Is that the time you were aware that Klukwan was

19   still interested in pursuing Peterson Sullivan?

20        A.   You know, Tom had mentioned, off and on, some

21   thoughts about doing that.  But, I mean, that's his

22   situation, not mine.

23        Q.   Did you have any conversations or discussions

24   about wanting Klukwan to sue Peterson Sullivan?

25        A.   No, I didn't have that type of a conversation.  I

000118

Page 210

1   know that Tom wanted to sue them and he expressed an

2   interest of wanting to ride our coattails, and I had told

3   him no.

4       Q.    What do you mean by that?

5       A.    Basically, he wanted us to incur the expense and

6   go ahead and push the litigation against them, and he wanted

7   to try to ride our coattails, just as the term implies, and

8   I had always told him no.

9       Q.    But isn't that really what happened?

10      A.    No.

11      Q.    Why not?

12      A.    Because Tom wanted to and attempted on a couple of

13  occasions to renegotiate the agreement to have whatever is

14  going to come out of these recoveries apply directly against

15  the promissory note, and I told him no.

16      Q.    There's some emails about that, and we'll get to

17  them.

18      A.    Yep.

19      Q.    But you said you wanted him to ride your

20  coattails.

21      A.    I didn't say I wanted him to ride my coattails.

22  I'm saying he wanted to ride my coattails.

23      Q.    Fair enough.

24      A.    And I said, "No thank you."

25      Q.    Understood.

Travelers Casualty vs. South Coast, Inc.     Charles Langfitt, Vol. 2                    September 11, 2007

Page 211

1        A.    Here's a pair of scissors.  I cut the tails off

2    the coat.

Travelers Casualty vs. South Coast, Inc.    Charles Langfitt, Vol. 2                    September 11, 2007

Page 221

12      Q.    Well, you also mentioned that the repayment

13  agreement specifically carved out the third-party claims,

14  correct?

15      A.    They do.

16      Q.    Why don't you find that provision for me.

17      A.    (Witness complies.)  If you look at -- two

18  different areas.  Let's look at Paragraph 11 first.

19      Q.    Page 5?

20      A.    Yes.  Six, actually.

21      Q.    Six?

22      A.    Yeah, the last sentence.

23            (Reading.)  This agreement and the preceding

24  sentences do not impair or release Travelers' claims or

25  causes of action against any person or entity other than the

Travelers Casualty vs. South Coast, Inc.    Charles Langfitt, Vol. 2    September 11, 2007

Page 232

1  Klukwan entities.

2      Q.   Okay.  Let's stay with that one first.  I read

3  this, then, as saying this repayment agreement does not

4  impair or release Travelers' claims against any person or

5  entity other than Klukwan entities to mean that this

6  agreement is not affecting any claims that Travelers may

7  have against Peterson Sullivan, correct?

8      A.   Yes.

9      Q.   Or the directors and officers.

10     A.   Yes.

11     Q.   Or even Key Bank.

12     A.   Yes.

13     Q.   Or any third party that is not a party to this

14 repayment agreement.

15     A.   Yes.

16     Q.   Did you understand that Klukwan ever meant to do

17 so?

18          MR. HOPKINS:  Objection; vague and ambiguous.

19 I don't understand the question.

20     Q.   Was that last sentence the result of any specific

21 conversations during the negotiation of the repayment

22 agreement?

23     A.   I'm the one who inserted it and asked for it to be

24 included.

25     Q.   Why did you do that?

000122

Travelers Casualty vs. South Coast, Inc.    Charles Langfitt, Vol. 2                September 11, 2007

Page 233

 1        A.    Because I didn't want to have any third-party

 2   rights in a situation where I would have them impaired in

 3   any way, shape or form.  Because I remember originally Cabot

 4   was looking for a broad release.  This agreement is a

 5   satisfaction of the indemnity obligations, and if it's not

 6   satisfied, what happens is that satisfaction gets undone,

 7   and the recovery is undermined indemnity agreements.

 8        Q.    Okay.  So you raise this --

 9        A.    I'm the one that put it in.

10        Q.    Okay.  Was there any dispute regarding putting

11   this in?

12        A.    It was accepted.

13        Q.    Okay.  But was there any dispute?

14        A.    It was accepted, and I don't remember any dispute.

15   It was accepted during the course of the negotiation.

16        Q.    Do you recall any specific conversations regarding

17   that last sentence?

18        A.    We had a number of discussions over this

19   particular paragraph, and there was, at first, an effort for

20   a complete, total release being proposed by Cabot, and I

21   rejected it and then put this language back into it.  So it

22   was a product of negotiations.

23        Q.    That was complete, total release of the

24   signatories of the participants to this repayment agreement,

25   not third-party, was it?

Page 234

1          A.    I'd have to go back and look at the nature of it,

2     but I wanted to make sure that any third-party rights were

3     not affected.

4          Q.    Now, that sentence does not discuss how any

5     proceeds from any third-party recoveries will be applied,

6     does it?

7          A.    No, because you need to look at Paragraph 9.

8          Q.    Let's move to that, then.    Okay.

9          A.    It says:

10              (Reading.)  In the event that Travelers' total

11     loss, net of all receipts from bonded contracts, is less

12     than $8 million, Travelers shall credit the note with the

13     amount of the difference.  "Bonded contracts" is a defined

14     term.

15              So basically, what it is is you look at, Here's

16     our loss.  Here's bonded contracts.  Bonded contracts do not

17     include Peterson Sullivan D & O claims or anything like

18     that.  There's a definition in the first part of the

19     agreement.

20          Q.    I understand that sentence to read in the event

21     that Travelers' total loss, net of all receipts from the

22     bonded contracts, is less than $8 million, Travelers shall

23     credit the note with the amount of the difference.

24              That language does not specifically reference any

25     third-party claims, correct?

Travelers Casualty vs. South Coast, Inc.     Charles Langfitt, Vol. 2                September 11, 2007

Page 235

1        A.    It excludes them, because those third-party claims

2    are not bonded contracts.

3        Q.    But you're reading that within the definition of

4    bonded contracts.

5        A.    Which is defined on the first page.

6             (Reading.)   "Bonded contract" shall mean any

7    contract that's referenced or described in any bond issued

8    on behalf of any Klukwan entity.  So it's a defined term,

9    and that was expressly negotiated, and I made it clear when

10   I got asked this, and I insisted that that term be included,

11   and it was accepted.

20        Q.    And it's my understanding the course of

21   negotiation began, as we're going to get to, July 17, '02,

22   to essentially the end of the year of '02.  Is that your

23   understanding of the time for negotiation of the repayment

24   agreement?

25        A.    No.

000125

Travelers Casualty vs. South Coast, Inc.    Charles Langfitt, Vol. 2    September 11, 2007

Page 236

1        Q.   Okay.  Tell me when.

2        A.   It started, actually, in June.  We had one meeting

3    in June.  We had a subsequent one in July.

Page 251

21        Q.   The second paragraph in that email reads, "With

22   respect to the third paragraph, I note Chuck and Tom have

23   discussed this.  While Travelers understands Klukwan's

24   expectation, it is not consistent with the prior arrangement

25   between Klukwan and Travelers.  Rather than continuing to

000127

Page 252

1    disagree at this point, let's get the petition filed and

2    review the documents received.  We may be disagreeing about

3    nothing if the documents do not yield viable claims."

4              This does not sound like a categorical note, to

5    me.

6                   MR. HOPKINS:  Objection.  It's a statement,

7    not a question.

8        Q.   Do you believe that that is a categorical note?

9        A.   I categorically told Tom, personally, that I

10   didn't want him to have the benefit of that claim, because

11   that wasn't part of the agreement.

12       Q.   Okay.  But you're not --

13       A.   I mean you asked me.  You're telling me this isn't

14   a categorical note.  But what's happening here is it's a

15   reference where Jan says I know Tom and have talked about

16   it.  So in order for me to answer it, the conversation was

17   consistent with the agreement.  I told Tom no, and you've

18   seen the other emails.

19            So what's happening is Jan is saying Tom and Chuck

20   talked about it.  The answer has been no, categorically, no.

21   While we understand your expectation, we'll just disagree

22   with that.  There is no agreement here.

000128

Page 262

17        Q.    Document 128 is the complaint that was actually

18    filed against Peterson Sullivan and the directors and

19    officers.  In that complaint you alleged a figure as the

20    damages Travelers sustained as $8,876,788.68.  It is in

21    Paragraph 27, on Page 6.

22        A.    Yes.

23        Q.    I was just wondering if you could tell me how you

24    arrived at that, what seems to be a very precise figure.

25        A.    There is an exhibit that outlines what this was.

Page 263

1    It was attached to my deposition that you have a copy of.

2    Basically, it's a series of jobs that were all issued

3    after -- for bonds issued after it's, like, May 17 of 2001,

4    and these are the losses that at that time were attributable

5    to those 12 bonds.

6        Q.    Was it Travelers' position that but for Peterson

7    and Sullivan's negligence, Travelers would not have issued

8    those bonds?

9        A.    Yes.

10        Q.    So as I understand it, you took that point in

11    time, looked at the jobs that were bonded after that point,

12    and that constitutes Travelers' damages.

13        A.    Right.  And the reason why is because we had to --

14    unlike Klukwan, we had to show that we relied on the

15    statement.  And that's the date of a memo by Brent Heilisen

16    reviewing the statement, indicating our reliance on it.

000130

Travelers Casualty vs. South Coast, Inc.    Charles Langfitt, Vol. 2    September 11, 2007

Page 267

```
 5        Q.    Okay.   Thank you.   The document I just handed you,

 6    153, is an email from Jan Sokol, directed to you and

 7    cross-copied to Jordan, forwarding what appears to be

 8    another email.  Do you recall receiving this email?

 9                   MR. GILMORE:   Do you have an extra copy of

10    that?

11                   MR. SPRAKER:   Oh, I thought I shot it down to

12    you.

13                   MR. GILMORE:   What's the date?

14                   MR. SPRAKER:   It's August 4, 2005.

15                   MR. GILMORE:   Okay.   I've got it.

16        A.    Yes.   I'm reading it.   This is the -- I remember

17    seeing this.

18        Q.    Who is Robert Coleman?

19        A.    He works for Jan Sokol.

20        Q.    Is he a lawyer?

21        A.    Yes.

22        Q.    The email that he sends posits an additional

23    possible theory of -- on damages, and he sets it out in the

24    email.  Do you recall having any discussions regarding that

25    alternative theory of damages?
```

Page 268

1       A.    No.

2       Q.    Did you ever instruct Mr. Sokol to investigate

3    Klukwan's financial condition as of May 17, 2001?

4       A.    I'm sorry?

5       Q.    Did you ever have Mr. Sokol or Mr. Rosenfeld

6    investigate Klukwan's financial condition as of May 17,

7    2001?

8       A.    No.

9       Q.    I'm assuming that if there was an alternative

10   theory of damages for more than the amount asserted in your

11   claim, that would be something that you would have wanted to

12   pursue on Travelers' behalf against Peterson Sullivan.

13      A.    Can I ask you a question?

14      Q.    Certainly.

15      A.    Thank you.  I realize Rob is speculating here, but

16   I don't know of any cause of action that would back up this

17   particular speculation, other than the ones that we posited.

18   Either it's an accounting issue that they would come look at

19   the controls and would have told you would have been

20   revealed on the financial statement to us, or the directors

21   and officers weren't properly supporting it.  If you have

22   another idea, that would be interesting.  But I don't see --

23      Q.    But I think we --

24      A.    This is just Rob speculating about --

25      Q.    A potential theory of damages.

000132

Travelers Casualty vs. South Coast, Inc.    Charles Langfitt, Vol. 2                September 11, 2007

Page 269

1      A.   Right.

2      Q.   My understanding is that Travelers asserted that

3   P & S was negligent.

4      A.   Yes.

5      Q.   And if they had properly prepared the 2001

6   financial statement, Travelers would not have issued bonds

7   beginning on May 17, 2001, correct?

8      A.   Yes.  But the May date is we have to prove

9   reliance, unlike Klukwan.  So what that means is that's the

10   first date we looked at it.  If the financials had been

11   prepared correctly and we'd reviewed it the same day, then

12   we would have looked at it and said this financial statement

13   would not support --

14      Q.   Correct.  But if you proved your case, it would

15   establish that there was -- P & S was negligent, Travelers

16   wouldn't have issued bonds as of a certain date, which you

17   picked as May 17.

18      A.   Right.

19      Q.   Things would have happened apart from you not

20   issuing the bonds, though, at that point in time.  Things

21   with Klukwan would have also happened, correct?  They

22   wouldn't have had any bonding from Travelers, right?

23          MR. HOPKINS:  Objection; Vague and ambiguous,

24   compound, nonsensical.

25          You can answer it if you understand it.

Page 270

```
 1      A.    I don't understand it.

 2      Q.    Okay.  Under your scenario, Travelers is not

 3   bonding Klukwan as of May 2001, correct?

 4            MR. HOPKINS:  The question is still vague and

 5   ambiguous and quasi incoherent.  Sorry, Counsel.

 6      A.    That approaches that as of May 17, the date of

 7   reliance and the account review, we would have no longer

 8   provided bonds to South Coast-Klukwan.

 9      Q.    So South Coast -- if I said "Klukwan," I

10   apologize, because you're giving bonds to South Coast.

11            So South Coast doesn't have the ability to get

12   bonds from Travelers, under your theory.

13      A.    Yes.

14      Q.    So it either has to find bonds elsewhere --

15   correct?

16            MR. HOPKINS:  I'm going to object.  The

17   question is based on a series of hypotheticals, and it is

18   improperly mixing concepts and, for that reason, is quite

19   misleading, not to mention nearly impossible to answer in a

20   rational fashion.

21      Q.    Well, do you want to take a try at it anyway?

22      A.    What you're telling me is they would go out and

23   look for bonds someplace else.  They certainly could try.

24      Q.    What you're telling me is you're not willing to

25   speculate what Klukwan -- what would have happened to
```

000134

Travelers Casualty vs. South Coast, Inc.   Charles Langfitt, Vol. 2                September 11, 2007

Page 271

1   Klukwan in any way, shape or form, after Travelers cut off

2   or decided not to bond on May 17 to '01.

3           MR. HOPKINS:  Object to the extent it calls

4   for speculation.  I caution the witness against speculating.

5       A.   The thing is is that I -- what I'm thinking about

6   is at that point in time we stopped bonding, and that way we

7   don't have the loss on the bonds that are listed.  At that

8   point in time --

9       Q.   What do you think would have happened --

10      A.   -- who knows what's going to happen with

11  Klukwan-South Coast.

000135

Travelers Casualty vs. South Coast, Inc.    Charles Langfitt, Vol. 2                September 11, 2007

Page 277

13      Q.   The June 22 letter contains -- the second page is

14   what Mr. Crandall calls our counter, and to the left of that

15   column contains a column called Travelers Proposal.

16           Did Travelers make what I would refer to as a

17   settlement proposal to South Coast regarding payments of

18   obligations under the indemnity?

19      A.   We actually had a meeting in June, and we had some

20   preliminary discussions in regard to resolution of their

21   obligation to us for what they owed us under the indemnity

22   agreement.

000136