Gary Spraker, Esq.
CHRISTIANSON & SPRAKER
911 W. 8th Avenue, Suite 201
Anchorage, AK 99501
Telephone: (907) 258-6016
Telefax: (907) 258-2026
Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

TRAVELERS CASUALTY AND SURETY      )
COMPANY OF AMERICA, a Connecticut  )
corporation,                       )
             Plaintiff,        )
      v.                          )
                                    )
SOUTH COAST, INC., et al,          )      **Case No. A06-00063 (TMB)**
                                    )
             Defendants.      )
_____)

### DEFENDANTS' REPLY TO OPPOSITION TO PLAINTIFF'S OPPOSITION TO CROSS MOTION FOR SUMMARY JUDGMENT

       Defendants Klukwan, Inc., South Coast, Inc., and Chilkat's Portage Cove Development Company (collectively, "Klukwan" or "Defendants") submit this reply in response to Travelers Casualty & Surety Company of America's ("Travelers") *Reply and Opposition to Cross Motion.*

### FACTS

       Despite 80 pages of briefing, and 600 pages of exhibits, Travelers has not, and cannot tie the Peterson Sullivan claims to the *Repayment Agreement*. The reason is simple; the claims were never included within the settlement agreement, and never raised within the negotiations. Klukwan entered the *Repayment Agreement* shortly after the collapse of South Coast in the spring of 2002. The purpose of the agreement, evident and plain on its face, was to settle and cap Klukwan's direct liability to Travelers under the *General Agreements of Indemnity.* In doing

so, the parties replaced the *Indemnity Agreements* with a new obligation that settled the indemnity claims.[1]  The *Repayment Agreement* never references the Peterson Sullivan claims specifically, and there are no provisions directed to third party claims.[2]  The closest the *Repayment Agreement* comes to addressing  third party claims is the single sentence within Paragraph 11, *Satisfaction of Liability,* which stated that the release of claims did not inure to the benefit of anyone other than Klukwan.

Travelers points to discussions between Tom Crandall and Chuck Langfitt in which suspicions were raised that Peterson Sullivan's financials had wholly missed the mark of South Coast's financial reality.[3]  Travelers does not say when these discussions occurred or within what context.  Presumably, they occurred soon after Langfitt became involved with South Coast as he explored the situation with Tom Crandall in May 2002.[4]  Crandall and Langfitt had numerous conversations as they attempted to understand and deal with South Coast's collapse.  It was within this context that both Klukwan and Travelers discussed South Coast's downfall and the potential reasons for its collapse. Within these recurring conversations, the parties noted

---

[1]    *Repayment Agreement,* ¶ 11.  The *Repayment Agreement* has previously been produced as Deposition Exhibit 42, attached to the Declaration of Cabot Christianson submitted in support of Klukwan's *Cross Motion*.  Unless otherwise indicated, all deposition exhibits have been previously produced and are attached to the first Christianson Declaration.  *See also* Deposition of Charles Langfitt, taken in *Travelers Casualty and Surety Company of America v. Gelbrich*, Case No. 04-0165 RRB (D. Alaska) (Langfitt Deposition - Peterson Sullivan), p. 178, 1-10.  Copies of the pertinent pages of the Langfitt Deposition taken in the Peterson Sullivan action are attached as Exhibit A to the Spraker Declaration filed in support of this Reply.  To avoid confusion, Klukwan is attaching all the pertinent pages of the depositions regardless of whether they have been previously provided in the briefing.

[2]    Deposition Exhibit 42.

[3]    At his deposition in the present action, Langfitt has testified that he "didn't actually start thinking that I had something or doing something further until, you know, after October." Deposition of Charles Langfitt (Langfitt Deposition), p. 186, 4-12.  Copies of the pertinent pages of the Langfitt Deposition in the present action are attached as Exhibit B of the Spraker Declaration.

[4]    Mr. Crandall has testified that he cannot recall the timing of when he first discussed Peterson Sullivan with Chuck Langfitt.  Deposition of Thomas L. Crandall (Crandall Deposition), pp. 119, 4-25 - 120, 16.

that Peterson Sullivan's financial statements were ripe for investigation given the millions in losses that they were experiencing. As pointed out in Travelers' brief, when asked if he had discussed the Peterson Sullivan claims with Langfitt, Crandall testified: "[j]ust in the general way that I think Peterson Sullivan should be - that there should be an investigation on Peterson Sullivan to see if there was some liability there, had they done their job."[5] Langfitt has similarly testified that "he didn't actually start thinking that I had something or doing something further, until ... after October [2002]."[6]

Such discussions apparently culminated in Langfitt's email exchange with David Hompach on June 19 and 20, 2002. Hompach was the person in Travelers' surety department responsible for the South Coast account. In response to an inquiry from Hompach raising Peterson Sullivan's potential culpability, Langfitt replied that Rosenfeld was "looking at E&O claims against CPA's."[7] Langfitt and Rosenfeld have testified that neither examined Peterson Sullivan's 2000 financial statements before the next year in June 2003.[8]

Langfitt's prior testimony in the Peterson Sullivan action conclusively establishes by omission that the Peterson Sullivan claims were not at issue during the time Klukwan and Travelers were negotiating the *Repayment Agreement.* Langfitt provided sworn testimony in opposition to Peterson Sullivan's motion for sanctions in the underlying case. That motion was filed before the statute of limitations issue was ever raised. Langfitt submitted a nine page

---

[5]     Crandall Dep., pp 469, 3 - 470, 1.

[6]     Langfitt Dep., p. 186, 10-12; *See also* Langfitt's prior affidavits submitted in the Peterson Sullivan action, Deposition Exhibits 131 and 133.

[7]     Deposition Exhibit 132.

[8]     Langfitt Dep. pp. 184, 25 - 188, 25; 235, 4 - 12; Deposition Exhibits 67 and 268. Rosenfeld's first billable time entered on the Peterson Sullivan matter was in June 2003. Rosenfeld Dep., p. 22, 1 - 23, 10.

affidavit setting forth in considerable detail the chronology of events that lead Travelers to sue

Peterson Sullivan. The affidavit in its entirety accurately reflects South Coast's situation in the

summer of 2002, including the numerous discussions and correspondence between the parties

on a variety of matters in the spring and summer of 2002. The following lengthy excerpt is

especially probative both for what it says, as well as what it omits:

> Travelers' main concern in May of 2002 was to determine the extent of its likely loss from payment and performance bond claims on South Coast's projects, and the extent to which Klukwan, Inc., South Coast's parent company and an indemnitor on the indemnity agreement held by Travelers, would be able financially to support South Coast and to indemnify Travelers.

> 4.     Travelers participated in meetings with South Coast and Klukwan in May and June 2002 to address issues regarding South Coast's and Klukwan's financial condition, payment, and performance claims against bonds posted by Travelers for South Coast, Klukwan's business plan for South Coast, Klukwan's credit arrangements with its banks, the current state of South Coast's construction projects for which Travelers was responsible as payment and performance bond surety, whether Travelers would extend additional surety credit to South Coast in the form of bonds for future projects and/or financing to allow South Coast to complete future projects, whether Klukwan would "wrap up" South Coast as a going concern, and whether and to what extent Klukwan would indemnify Travelers....[9]

Nowhere in the affidavit does Langfitt mention any consideration of the Peterson

Sullivan claims, or any discussions with Crandall on the matter. Only after the Hompach emails

were submitted as part of a motion for summary judgment on the limitations issue did Langfitt

concede any prior conversations regarding the accountants existed. Even after reviewing the

Hompach emails, consideration of the Peterson Sullivan claims was so insubstantial between

June and October 2002, that Langfitt failed to remember them. In Travelers' response to the

summary judgment motion, Langfitt admitted, "I do not have a specific recollection of the

---

[9]     *Affidavit of Charles Langfitt in Support of Travelers' Opposition to Peterson Sullivan's Motion for Sanctions*, ¶¶ 3-5. A copy of the affidavit is attached as Deposition Exhibit 131. This is consistent with Crandall's recollection of the events in the summer of 2002 as well. Crandall Dep., pp. 125, 21 - 126, 24.

exchange or of being on inquiry notice of and starting an inquiry into Peterson Sullivan's negligence in June 2002. To the contrary, my recollection is as stated in my Affidavit on Sanctions. That is, my recollection is that I did not consider those items until after October 1, 2002."[10] In neither affidavit did Langfitt ever state that he engaged in discussions with Klukwan regarding the Peterson Sullivan claims.

The above discussion runs the risk of giving too much credence to Travelers' current arguments because any such discussions that may have existed in 2002 occurred separate and apart from the negotiations that lead to the *Repayment Agreement*. Travelers has not, and cannot, point to any evidence that the Peterson Sullivan claims were included in the *Repayment Agreement* itself, or the negotiations leading up to that point. This is understandable given that the negotiation of the substantive terms of the settlement agreement with Travelers occurred on July 17, 2002.[11] The principals from Klukwan and Travelers met in Juneau, Alaska for a day long negotiations to cap Klukwan's liability to Travelers.[12] At the end of that day, the parties emerged with the basics of their settlement agreement which required total payments of principal and interest of $8 million over an eight year term, to be documented in a promissory note using the net present value computed using a discount (interest) rate of 6% per annum.[13] The next

---

[10]     *Affidavit of Charles W. Langfitt in Support of Travelers Opposition to Peterson Sullivan's Motion for Summary Judgment on Statute of Limitation*, Deposition Ex. 133.

[11]     Langfitt Dep., pp. 235, 20 - 236, 3;

[12]     Langfitt Dep., p. 285, 3 - 287, 22.

[13]     Langfitt Dep., p. 286, 9 - 289, 20; Christianson Dep., p. 62, 14-21; Second Christianson Declaration, ¶ 7; Crandall Dep., pp. 137, 15 - 140, 14; 453, 18 - 454, 16; 453, 18 - 456, 9. At the July 17, 2002 meeting the parties used a big piece of paper to track their notes and agreement. That paper is attached as Deposition Exhibit 162, and confirms the $8 million total principal and interest payments, as well as the 6% interest rate. The notes indicate a seven year term, which Langfitt agreed to revise to eight years at the end of the July 17, 2002 meeting. Langfitt Dep., p. 287, 5- 17.

morning Crandall emailed Langfitt the amortization table for the promissory note, thereby concluding the basic terms of the settlement.[14]

The July 17, 2002 meeting was the only occasion in which Langfitt, Crandall, and Christianson engaged in face to face negotiations on the indemnity claims.[15] After Crandall emailed the amortization table to Langfitt, the remainder of the negotiations occurred between Langfitt and Klukwan's counsel, Cabot Christianson.[16] Christianson sent the original draft *Repayment Agreement,* promissory note and guaranty to Langfitt on July 22, 2002, and Langfitt responded with his revisions, including the language Travelers' now relies upon.[17]

By August 30, 2002, therefore, the parties had exchanged drafts of the *Repayment Agreement*, and agreed upon the substantive terms and sections at issue in this case, including Paragraphs 9, 11, and 18.[18] The parties spent considerable time discussing other sections, including security for the obligations, and particularly the effect of any future bankruptcy.[19] Negotiation on those matters delayed signature of the final document until December 2002.[20]

The parties did not, however, ever discuss claims against Peterson Sullivan, or third party claims in general, with the exceptions of the Key Bank and Chinle claims which were

---

[14]     Crandall Deposition, 144,2 - 147, 5; Deposition Exhibits 38 and 39.

[15]     Second Declaration of Cabot Christianson in Support of Defendants' Reply to Travelers' Opposition to Cross Motion for Summary Judgment (Second Christianson Declaration), ¶ 9.

[16]     *Id*. at ¶ 10.

[17]     Deposition Exhibits 40 and 41.

[18]     Langfitt Deposition (Peterson Sullivan), pp. 71, 1 - 72, 24.

[19]     Second Christianson Declaration, ¶ 20.

[20]     Langfitt Deposition (Peterson Sullivan), p. 72, 9-14; Deposition Exhibit 42.

specifically addressed in the proposed agreements.[21] Klukwan had previously identified potential claims against its lender, Key Bank, as an asset and had specifically placed such claims on the negotiating table.[22]   The Key Bank claims were even included in the original draft of the *Repayment Agreement* as collateral for the payment obligation.[23]   Interestingly, Langfitt ultimately chose not to include the Key Bank in the *Repayment Agreement* and advised that "... we will have to address that matter outside of this current agreement."[24]

It is inaccurate to even say that there was any negotiation regarding the provisions on which Travelers now relies.[25]  Klukwan accepted those provisions as proposed by Langfitt in his August 30, 2002 revisions without discussion.  The revisions were simply incorporated into what ultimately became the final *Repayment Agreement*.[26]  Klukwan accepted the changes because they were non-substantive and limited to the issues at hand, namely the payment obligation of Klukwan in satisfaction of its indemnity obligation.[27]   Travelers never suggested that any provision within the *Repayment Agreement* applied, or could affect, any claims against Peterson Sullivan.[28]  Indeed, Langfitt explained the revisions as "a number of additional provisions to address issues which have arisen because of the on-going close out of the projects.  These

---

[21]     Second Christianson Declaration, ¶ 16; Langfitt Dep. pp. 231, 12 - 235, 11; 241,2-10, 241, 23 - 242, 19.

[22]     Crandall Dep., 139, 9 - 140, 14.

[23]     Dep. Ex. 40, Crandall Dep., 151, 18 - 152, 14; Dep. Ex. 39, Langfitt Dep. p. 288, 23 - 291, 17.

[24]     Deposition Ex. 41.

[25]     Second Christianson Declaration, ¶ 17.

[26]     *Id*. at ¶¶ 18-23.

[27]     *Id*. at ¶ 17.

[28]     *Id*.; *see also* Exhibit 41; Langfitt Deposition, pp., 231, 12- 234, 7;  241, 5-10; Christianson Deposition, p. 87, 3 - 88,7; 88,20 - 89, 2.

provisions include the release regarding materials and equipment usage, as well as powers of attorney which are necessary to assist us in project close out."[29]

Travelers also spends considerable effort to establish what has always been undisputed: namely that Kluwan was pursuing claims against Peterson Sullivan. Travelers mistakenly believes that Klukwan's pursuit of those claims somehow precludes its present action. Quite to the contrary, it is an indispensable part of its claim.[30] It is exactly because Klukwan held valid claims against Peterson Sullivan that it sought to ensure that Travelers would bring the negligence claims. Such claims reduced the total losses for which they were both liable. Travelers would not, however, commit to bring the action without reviewing the work papers. This required that Klukwan facilitate efforts to obtain the work papers, and be prepared to file suit if Travelers did not. For this reason, Klukwan was always prepared and willing to bring its own claim, *in the event that Travelers elected not to pursue the accountant claims.*[31] Tom Crandall has testified at length that he preferred Travelers pursue the Peterson Sullivan claims for a number of legal and practical matters, not the least of which was that Travelers could better afford to prosecute the case, and would ultimately receive the benefit of any recovery.[32]

---

[29]    Deposition Exhibit 41, p. 2.

[30]    Much, if not all of Travelers' discussions regarding the strengths and merits of Klukwan's claims are irrelevant to the motions presently before the Court as they do not affect Travelers' assumption of the duty to timely bring the action. Klukwan's internal analysis only demonstrates the seriousness of its pursuit of the claims. Klukwan strongly disagrees that the investigation somehow excuses Travelers' failure to timely file the Peterson Sullivan action on which it knew Klukwan was relying. Because Travelers' discussion on this matter is immaterial to the issues of duty and breach, Klukwan will not address those items specifically.

[31]    Christianson Deposition, pp 309, 4 - 310, 12.

[32]    Crandall Deposition, 376, 21 - 377, 16; 389, 2 - 14; 470, 13 - 472,9; 474, 8 - 475, 2; 477, 5 - 13; 482, 12 - 22; 492, 14 - 493, 19; Christianson Deposition, 196, 15 - 197, 1,; 309, 4 - 310, 12; 328, 13 - 329, 18.

Travelers never denies that it knew that Klukwan was relying upon it to timely prosecute the claims against Peterson Sullivan.  Nor does it deny that it assumed the duty to timely bring the Peterson Sullivan action.  The closest Travelers comes is to argue that Klukwan was still considering its participation in the Peterson Sullivan action.  Klukwan certainly does not deny that it considered such an action.  But the salient point is that it chose not to pursue Peterson Sullivan precisely because Travelers had finally done so.  By foregoing its own claims against Peterson Sullivan, Klukwan demonstrated its ultimate reliance upon Travelers' prosecution of the negligence claims against the accountants.[33]

## ARGUMENT

## I.    THE REPAYMENT AGREEMENT DOES NOT PRECLUDE KLUKWAN'S NEGLIGENCE CLAIMS.

Travelers' entire motion and opposition relies upon the faulty premise that the *Repayment Agreement* anticipated, addressed, and governs Travelers' failure to timely file the action against Peterson Sullivan.  There is no provision within the *Repayment Agreement* addressed to the Peterson Sullivan claims specifically, or third party claims generally.  Rather, Travelers argues that when pieced together six years later, Paragraphs 9, 11, and 18, now bar Klukwan's negligence claim for failure to timely file the Peterson Sullivan action.

Courts interpret settlement agreements, such as the *Repayment Agreement,* like any other contract.  *Leisoni, Inc. v. Stratman*, 956 P.2d 452, 454 (Alaska 1009).  Alaska has instructed that "[i]n determining a contract's meaning, we consider its language as well as relevant extrinsic evidence, including the subsequent conduct of parties." *Id*.  Where the parties disagree about the meaning of a provision, the Court must "inquire into what the parties knew or had reason to

know of each other's position, a party prevails when he or she did not know that the other side interpreted the provision differently, but the other party did know or have reason to know of the disagreement." *Casey v. Semco Energy, Inc.,* 92 P.3d 379, 383 (Alaska 2004). The plain language of the *Repayment Agreement* together with the parties subsequent conduct, and Langfitt's prior testimony, establish that the *Repayemnt Agreement* does not preclude claims for failure to timely file the Peterson Sullivan claims. To the extent that there is any genuine disagreement, Travelers' silence during the negotiations precludes it from raising any such arguments.

Paragraph 9 addresses Klukwan's repayment obligation and limits any such obligation should Travelers' total loss fall under $8 million. Travelers engages in considerable discussion of the defined term "Bonded Contracts," in an effort to show that the *Repayment Agreement* requires that it receive $8 million from Klukwan, notwithstanding its efforts to recover at least $9 million from Peterson Sullivan for the same losses. Klukwan disputes such a myopic interpretation as contrary to the language and intent of the *Repayment Agreement*, as well as the fundamental principle of contract law that parties may not recover more that their compensatory damages.[34] Indeed Langfitt testified in the underlying litigation that any recovery from claims against Peterson Sullivan, or the directors and officers, would reduce Klukwan's obligations to the extent it reduced Travelers' total loss to less than $8 million:

> Q:    Was there any discussions with Klukwan at the time of the negotiation of the repayment agreement concerning the manner in which any recovery on either a professional liability claim against Peterson Sullivan or a directors and officers liability claim against any former officers and directors would be handled? That's a very specific question.

---

[34]    Christianson Deposition, 80, 2 - 82, 15.

A:      No, I know it is, and the reason I'm hesitating is that those two items were not specifically discussed for credit.  However, there is a credit mechanism that would affect them, that is in the document.

Q:      Okay, but let's back up.  The issue was not specifically discussed, is that correct?

A:      No.  I mean it wasn't like if you get a recovery on those.  However, the crediting as a whole was, yes.  So what I'm saying is did we sit there and say here is the - directors and officers, here is this, you're going to have to put them one way or the other?  It wasn't that specific.  Was it if you have a loss that's less than $8 million, then you have to credit us?  The answer is yes, because that's in the agreement.  So we talked about crediting.  We never got down to the components of what the credit -  -.[35]

Any dispute regarding Paragraph 9 and application of any proceeds from the Peterson Sullivan claims is beyond the scope of the instant cross-motions for summary judgment.   It is sufficient for purposes of Klukwan's motion that the plain language of this paragraph does not address third party claims, nor does it waive any tort action for Traveler's negligent conduct in pursing those claims.

Paragraph 11 delineates the effect of the settlement agreement on Klukwan's liabilities, including satisfaction of the obligations under the *Indemnity Agreements.*  This section also contains the purported bankruptcy penalty, under which the entire payment obligation is supposed to snap-back in the event Klukwan should file bankruptcy.[36]  The only language of Paragraph 11 pertinent to Travelers' argument is the last sentence, which provides that, "[t]his Agreement and the preceding sentences do not impair or release Travelers' claims or causes of action against any person or entity other than the Klukwan Entities."  The sentence was added

---

[35]     Langfitt Dep. (Peterson Sullivan), p. 129, 4-25.

[36]     Klukwan does not agree that this provision is enforceable in bankruptcy, and reserves all arguments on that matter.

by Langfitt in his August 30, 2002 revisions to Repayment Agreement and remained unchanged through the final agreement.[37]

This sentence is a standard limitation of the release. Nowhere in the paragraph is there any discussion of *Klukwan* releasing any party, or taking any action. No one contends that the *Repayment Agreement* released, or purported to release, anyone's claims against Peterson Sullivan. Paragraph 11 is not a waiver of any kind, much less the blank check Travelers has cast it as to exculpate it from all future actions. While Paragraph 11 is the only provision that can be said to touch upon third party claims, it simply does not apply to the present action.

Paragraph 18 squarely addresses waiver and exculpation of claims held by Klukwan. It reads in full:

> Each and every right, remedy and power hereby granted to Travelers or allowed it by law or other agreement shall be cumulative and shall not be exclusive of any other right, remedy and power, and may be exercised by Travelers concurrently, consecutively, or separately at any time and from time to time, in Travelers' sole discretion. No failure or neglect on the part of Travelers to exercise, and no delay in exercising any right, remedy or power hereunder or any other agreement, or any other document executed and delivered to Travelers herewith, shall release or reduce the liability of SCI, Klukwan or CPC to Travelers hereunder, or under the Note or Guaranty, or in any way reduce, condition or limit the obligations of SCI, Klukwan or CPC hereunder to Travelers. Neither this Agreement nor any course of conduct of the parties pursuant thereto shall be construed to establish rights of any party not a party to this Agreement.[38]

Within this paragraph, there is only one sentence that discusses waiver or release of claims. The plain and unambiguous language of Paragraph 18 exculpates Travelers only for the "failure or neglect on the part of Travelers to exercise, and no delay in exercising any right, remedy or power **hereunder or any other agreement, or any other document executed and**

---

[37]    Compare Deposition Exhibits 41, ¶ 11 (Langfitt's Revisions), and 42 (final agreement), ¶ 11.

[38]    Exhibit 42.

**delivered to Travelers herewith....**" The provision limits exculpation to those rights created within the *Repayment Agreement* and associated documents.[39] Nothing in the *Repayment Agreement*, nor in the documents executed therewith such as the promissory note, guaranty, or security agreements, makes any mention or provision for the pursuit of third party claims in general, or the Peterson Sullivan claim in particular.

As previously established, the parties never included the Peterson Sullivan claims within the negotiations for the *Repayment Agreement*. Instead, Travelers urges that Klukwan unknowingly and implicitly waived its rights against Travelers for matters outside the scope of the *Repayment Agreement*. Such an expansive reading of an exculpation clause is not permitted under Alaska law which requires that "exculpatory language should be narrowly construed." *Uncles Joe's Inc. v. L.M. Berry & Co.,* 156 P.3d 1113, 1117 (Alaska 2007). While within the commercial setting exculpatory clauses are not prohibited by public policy, they remain disfavored and to be strictly construed. *Id.* The single sentence contained in Paragraph 18 is clearly limited to releasing claims under the *Repayment Agreement* and cannot be expanded to cover Klukwan's current tort claims.

## II.    ALASKA HAS REJECTED THE REQUIREMENT OF PHYSICAL HARM TO SUPPORT NEGLIGENCE ACTIONS.

In *Mattingly v. Sheldon Jackson College*, 743 P,2d 356, (Alaska 1987) the Alaska Supreme Court instructed that, "[i]n adopting a rule permitting recovery for purely economic losses, we emphasize the role of foreseeability as it relates both to the duty owed and to proximate cause." *Id*. at 360. Alaska has not overturned *Mattingly*. Sitting in diversity, a

---

[39]    Christianson Deposition, 87,8 - 88,1; Second Christianson Declaration, ¶¶ 22-23.

federal district court has no discretion to depart from the unambiguous holding of the Alaska Supreme Court. *See Norfolk S. Ry. Co. v. Basell USA Inc.,* 512 F.3d 86 (3rd Cir. 2008).

Travelers does not address *Mattingly* directly. Instead it reads dicta within *St Denis v. Department of Housing and Urban Development,* 900 F.Supp. 1194 (D. Alaska 1995), as impliedly overruling the decision, and limiting *Mattingly* to permit claims for economic loss to only those cases involving a *risk* of physical harm. *See* Travelers' *Opposition to Cross Motion*, p. 30. In particular, Travelers relies upon the statement in *St. Denis* that "[n]ow it is clear that the Alaska Supreme Court would recognize a Good Samaritan cause of action pursuant to Restatement (Second) Tort § 353 (1965) but only if the breach of duty created a risk of personal injury or property damage." *St Denis*, 900 F. Supp. at 1203.

Neither the limitation advanced by Travelers, nor the *St Denis* decision, has ever been acknowledged or recognized by the Alaska Supreme Court. To the contrary, Alaska has continued to apply *Mattingly* for the proposition that negligence claims for pure economic loss remain available in Alaska. In *Mesiar v. State of Alaska, Department of Fish and Game*, 964 P.2d 445 (Alaska 1998), several commercial and subsistence fishermen sued the State of Alaska for negligently counting the returning salmon on the Yukon River, resulting in fishing closures and restrictions. The opinion discloses no allegations of physical or personal injury. Rather, the sole harm alleged was the denial of fishing rights. The Alaska Supreme Court never even considered the application of the economic loss rule.[40] Instead, it examined whether the State owed the fishermen any duty of care. In phrasing the proper inquiry, the Court implicitly confirmed that the plaintiff stated a negligence claim for economic loss:

---

[40] Unlike *St. Denis, North Star,* and other cases dismissing negligence claims for economic losses, *Mesiar* did not involve a contract between the parties.

> In *Mattingly v. Sheldon Jackson College*, 743 P.2d 356, 361 (Alaska 1987), we held that, for purely economic harm, the identifiable class of plaintiffs must be particularly foreseeable in number, type, and economic expectations. ADF&G argues that the harm to Heckman is not foreseeable or certain because the class of plaintiffs is not particularized.

*Id*. at 450.

As instructed in *Mattingly*, the Court scrutinized the foreseeability of harm. After doing so, it concluded that while the plaintiffs were in a foreseeable class, they were far from the only class affected and often the classes held adverse interests. *Id*. Accordingly, the Court held that foreseeability did not dispositively establish a duty of care. After application of the remaining factors set forth in *D.S.W. v. Fairbanks N. Star Borough School District,* 628 P.2d 554, 555 (Alaska 1981), the Court concluded that no duty existed. *See also P.G. v. State of Alaska, Department of Health and Human Services,* 4 P.3d 326, 334 n. 28 (Alaska 2000) ("This court has imposted a more stringent foreseeability requirement in matters of purely economic harm.")

In *C.P. v. Allstate Insurance Company*, 996 P.2d 1216 (Alaska 2000), Judge Singleton certified a question as to Alaska Supreme Court the question whether an insurer's salaried claims adjuster owed tort duties to an insured. *Id*. at 1218. The insurer, Allstate, argued that any claims for negligent adjustment of claims could only be brought against itself. *Id*. at 1220. The Court disagreed, holding, that adjusters owe the insureds a duty of care in tort "*independent of any contractual obligation arising out of the insurance policy, and that breach of this duty is actionable." Id*. at 1221. (Emphasis added).

The Court proceeded to note that the certification order suggested that Restatement (Second) of Torts § 766C applied. Section 766C was significant in part because it "bars recovery for nonphysical harm resulting from interference with contract." *Id*. at 1222. The Court chose not to address the matter at length because the parties had not briefed the Restatement

issue.  Yet, it did note "that we have rejected the distinction between physical and economic losses which seems to underlie § 766C.  *See Mattingly v. Sheldon Jackson College*, 743 P.2d 356, 360 (Alaska 1987)."  *Id.* at 1222 n. 32.

No Alaska Supreme Court case has ever cited *St. Denis.*  Accordingly, *Mattingly*, remains the law of Alaska.  It unambiguously holds that negligence actions for purely economic losses are not barred as a matter of law.  Travelers continues to ignore not only *Mattingly,* but the controlling precedent issued after *St. Denis*.  Travelers incorrectly states that there has not been a case involving purely economic loss apart from physical or personal injury.  *Mesiar* involved damages for purely economic loss, and was dismissed on the merits of the substantive duty analysis after expressly recognizing *Mattingly*'s application.  *C.P.* is also highly probative because it clearly signals the Alaska Supreme Court's continuing rejection of any requirements for physical losses in tort actions, including those found in the Restatement.

## III.     NORTH STAR DOES NOT PRECLUDE THE NEGLIGENCE CLAIMS.

Travelers spends considerable time attempting to bring the instant case within the holding of this Court in *North Star Terminal & Stevedore Co. v. Nugget Constr., Inc. et al.,* 445 F. Supp. 2d 1063 (D. Alaska 2006).  In doing so, it implicitly concedes, that *North Star* stands for the proposition that plaintiffs may not recast contract claims as tort where the "relationships between the parties are governed, at bottom, by contract." *Id.* at 1076.  To bring Klukwan within this rule, Travelers baldly states that Klukwan and Travelers "discussed and contemplated possible claims against Peterson Sullivan during the negotiation of the *Repayment Agreement.*" *Cross Motion*, p. 31.  Again, Travelers does not establish when such discussions occurred other

than between June 2002 and December 2002. More importantly, there is absolutely nothing in the record that ties any such discussions with negotiations on the *Repayment Agreement.* Any discussions occurred separate and apart from the settlement negotiations. That is because there were no discussions on the terms upon which Travelers relies, and those provisions were agreed upon by August 30, 2002.

Nor is Travelers' discussion of the gravaman test applied to the professional malpractice claims applicable to Kluwkan's negligence claims. Travelers would have the Court deny all negligence claims where there was *any* contract between the parties. *North Star* and *St. Denis* establish only that where the claims asserted arise from the subject matter of the contract itself, claims for negligent performance of those contractual obligations are barred. *See generally Town of Alma v. Azco Constr., Inc*., 10 P.3d 1256, 1264 (Colo. 2000). But, where a party to a contract breaches a duty of care imposed by law, as opposed to the contract, claims for negligence are appropriate. *See Kirby v. NMC/Continue Care*, 993 P.2d 951, 954 (Wyo. 1999); *Boise Cascade Corp. v. First Security Bank of Anaconda*, 600 P.2d 173, 181-82 (Mont. 1979). This is the holding of *Jarvis v. Ensminger*, 134 P.3d 353, 363 (Alaska). It is also exactly why in *Mattingly,* plaintiff, who had that contracted with Sheldon Jackson College to clean a drain pipe, was able to maintain a claim for negligence for lost business income. The independent duty to provide a safe work environment was independent of the contract to clean the pipe. Similarly, in *C.P. v. Allstate Insurance Company*, 996 P.2d 1216, 1221 (Alaska 2000), insurers and their adjusters were held liable in negligence for failure to adequately investigate a claim where a duty of care in tort arose "independent of any contractual obligation arising out of the insurance policy, and that breach of this duty is actionable."

The *Repayment Agreement* does not govern Travelers' or Klukwan's rights or obligations with regard to the Peterson Sullivan claims. Rather, Travelers' duty to timely file the action arose only upon its undertaking of that task as demonstrated by jointly seeking the work papers, discussing the allocation of proceeds to be recovered from Peterson Sullivan, and the overall coordination of the action, all of which arose *after* the parties had negotiated the *Repayment Agreement*. As a result, the economic loss rule set out in *North Star* does not apply because the duty is imposed by law rather than contract.

**IV.    THE ASSUMPTION OF THE DUTY OF CARE DOES NOT DEPEND UPON PHYSICAL HARM.**

Travelers recasts its physical harm argument in an attempt to limit the well recognized principal that 'one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully." Based upon the inclusion of such an element within Restatement (Second) of Torts, § 323, Travelers contends that the law imposes such a duty only where such actions result in physical harm.[41]

The cases cited by Travelers discussing undertakings to act, do indeed involve physical harm. As explained above, however, Alaska does not require physical harm to assert negligence claims under *Mattingly*. Travelers is sure to point out that *Mattingly* did not discuss § 324A. But this is the significance *C.P. v. Allstate Insurance Company*, 996 P.2d 1216, 1222 n. 32 (Alaska 2000), in which the Alaska Supreme Court rejected a similar requirement of physical harm contained in the Restatement (Second) of Torts § 766C. Having read *Mattingly* to exclude

---

[41]    Travelers cites *Trapp v. State, Office of Public Advocacy,* 112 P.3d 668 (Alaska 2005) in support of the proposition that the assumption of a duty to act applies only where there is resulting physical harm. *Trapp* merely quotes Restatement § 323. *Trapp* did not analyze the requirement for physical harm. Rather, the Court discussed whether the defendant's actions constituted an undertaking, and never reached the issue of physical harm.

the requirement of physical harm in § 766C, it necessarily follows that Alaska would not require physical harm under §§ 323 or 324A.

## V.    THE DSW FACTORS COMPEL A FINDING THAT TRAVELERS OWED KLUWKAN A DUTY OF CARE.

Travelers undertook to timely sue Peterson Sullivan, and having done so owed Klukwan a duty of care despite the absence of physical harm.  For the same reasons that Alaska courts have long held that parties that undertake to act owe a legal duty to do so reasonably, application of the *D.S.W.* factors compels a finding that Travelers owed Klukwan to timely file its action. *See City of Seward v. Afognak Logging,* 31 P.3d 780 (Alaska 2001).

Travelers now argues that it was not foreseeable that failure to timely file the Peterson Sullivan action would damage Klukwan.  Travelers reaches this conclusion because, (1) there was only a remote chance that there would be any benefit to Klukwan, (2) Klukwan had broader claims, and (3) Klukwan told Travelers it continued to consider its own claims.  Such argument ignores the reality that Travelers and Klukwan shared the same loss, jointly pursued the claims by seeking the accountant's work papers, and discussed the application of the proceeds from any substantive claim on more than one occasion.  Moreover, Travelers sued Peterson Sullivan for roughly $9 million.  Even a 50% recovery of that amount would have reduced Travelers' total loss to below $8 million.  This would have directly benefitted Klukwan by reducing the amounts it was required to pay.  The removal of any potential liability for the total loss would also inure to its benefit by removing that contingent liability from its books, and mooting litigation in any bankruptcy filed by Klukwan.[42]

---

[42]    Crandall Dep., pp. 176, 7 - 177, 19; 227, 14- 228,17; 516, 7-17; 569, 25 - 570, 8.

The scope and pursuit of Klukwan's claims against Peterson Sullivan are similarly immaterial. These arguments do not controvert the undisputed facts that Langfitt and Travelers were well aware that Klukwan was actively looking for Travelers to bring the Peterson Sullivan claims so Klukwan would not have to incur the costs while still reducing the total loss incurred.[43] Travelers' private complaints to its counsel about Klukwan "riding our coattails," and getting a "free ride" establish its knowledge that Klukwan was relying upon it to pursue Peterson Sullivan.[44] It does not deny this fact. Moreover, from the very first substantive discussion that referenced potential claims against Peterson Sullivan, Klukwan sought to apply any recovery by Travelers to its indebtedness.[45] Travelers disagreed with the proposed application, but acknowledged that any recovery must be applied to the total loss.[46]

Travelers also takes an excessively narrow view of the second and third *D.S.W.* factors, the degree of certainty plaintiff was injured, and the connection between defendant's conduct and the injury. Klukwan had indicated for over a year that if Travelers filed its claims against Peterson Sullivan, it would forebear from its own action in reliance upon Travelers' action.[47] Both Klukwan and Travelers viewed the Peterson Sullivan claims as a valuable asset to reduce the total loss. As previously stated, if Travelers did not pursue Peterson Sullivan, Klukwan

---

[43]     Christianson told Sokol "that if he [Travelers] was going to go forward that there was very little chance that we [Kluwkan] would go forward." Christianson Dep., p. 281, 14 - 282, 19; 285, 4-18.

[44]     Deposition Exhibits 121 and 149. *See also* Langfitt Dep., pp. 220, 3 - 221, 21; 248, 2-18.

[45]     Deposition Exhibit 67.

[46]     *Id.*

[47]     Crandall Deposition, 376, 21 - 377, 16; 389, 2 - 14; 470, 13 - 472,9; 474, 8 - 475, 2; 477, 5 - 13; 482, 12 - 22; 492, 14 - 493, 19; Christianson Deposition, 196, 15 - 197, 1.

would have.  Travelers does not deny these facts, or the benefits accruing to Klukwan from Travelers taking the lead in pursuing Peterson Sullivan.

Once Travelers filed its action, Klukwan convened one last time to consider its action and chose to rely upon Travelers to recover on the claims and reduce the total losses.  While it was only Travelers' claims that were dismissed, the certainty of and connection with the injury suffered from the dismissal for failure to timely file the action is direct and significant since Klukwan did not bring its action exactly because Travelers had.  By the time Klukwan discovered the dismissal of Traveler's claims as untimely, the limitations period for Klukwan had also run.  As a result, Klukwan lost valid claims against Peterson Sullivan, and the opportunity to reduce the total loss and its liability under the promissory note.

Similarly, Travelers' efforts to cast the policy implications and consequences of Travelers' undertaking as burdensome run contrary to common sense.  It was obviously in Travelers' self interest and control to timely file the Peterson Sullivan action.  There was no burden to it acting within its self-interest.  Moreover, the rule of avoidable consequences already imposes obligations upon parties such as Travelers having suffered a loss to minimize those losses.

Travelers even refuses to concede that insurance exists to protect against the risk involved.  Travelers did not sue Peterson Sullivan directly.  Rather, it proceeded through an agent, Jan Sokol.  It was Sokol's responsibility as counsel to timely bring the action.  As an attorney, professional insurance was readily available to insure against negligence including failure to timely file an action.  Sokol had insurance. Travelers is now pursuing Sokol and his insurance policy in this action for the very claims Klukwan also asserts.

## V.    THE DOCTRINE OF AVOIDABLE CONSEQUENCES REQUIRES THAT ANY LIABILITY BE REDUCED BY TRAVELERS' FAILURE TO TIMELY FILE THE PETERSON SULLIVAN ACTION.

Travelers does not deny that Alaska recognizes the avoidable consequences doctrine as a cardinal rule of damages. *See Anchorage Independent School District v. Stephens,* 370 P.2d 531, 533 (Alaska 1962).  Rather, it challenges the application of this rule as a matter of law based upon the underlying surety relationship between the parties.  It does so without citation to a single Alaska case.

Travelers argues that mitigation is not available in commercial indemnification actions. It does not, however, cite any cases from Alaska.  As explained in *Four Seasons Environmental, Inc. v. Westfield Companies,* 638 N.E.2d 91, 93  (Ohio App. 1991), sureties holding a right of indemnification are not excluded from the avoidable consequences doctrine as a matter of law.[48] *See also Town Pump, Inc. v. Diteman* 622 P.2d 212, 216 (Mont. 1981). Importantly, Travelers' cases involve defenses asserted against indemnification claims made pursuant to a comprehensive indemnity agreement.  The *Indemnity Agreements* were satisfied and replaced by the *Repayment Agreement* which provides a much narrower scope of liability, and specifically provides for a reduction in liability based upon Travelers' total losses.  Paragraph 18 of the *Repayment Agreement*, therefore, is the sole basis for Travelers' argument that the avoidable consequences doctrine does not apply.  As stated throughout the *Cross-Motion* and this reply, Paragraph 18 is expressly limited to the provisions of the *Repayment Agreement* and

---

[48]    Having decided that the surety remained under a duty to mitigate its damages, the court examined the contract.  Travelers reads this discussion to contractually exclude any and all duties to mitigate as a matter of law. The court, however, said only that "[t]here is nothing in the contract that indicates that [the surety] had the duty to pursue Weldcraft's setoff claims against Dyer." Id.  The court then proceeded to affirmatively state that the failure to pursue a claim for $5,000 "is not the type of indemnitee/surety action that other courts have found to be unreasonable."  Id.

the job contracts assumed by Travelers. Nothing in it, or in Paragraph 18, waives the application

of the avoidable consequences rule for its failure to timely file the claims against Peterson

Sullivan.        Travelers would also bar the defense because it claims the damages had already

been sustained under the bonds. The principles embodied in the avoidable consequences

doctrine are not so limited and rigid. As explained in *Schiffer v. Board of Education of

Gibraltar School District*, 224 N.W. 2d 255 (Mich. 1974), the avoidable consequences doctrine

is an equitable defense based upon the sum of the specific facts and circumstances of the case:

> The principle of mitigation is a thread permeating the entire jurisprudence. It is
> not solely a "breach of contract" or "commercial" doctrine; it is part of the much
> broader principle of "avoidable consequences."
>
> Professor McCormick's statement of the general principle of avoidable
> consequences is unqualified in its application: "Where one person has committed
> a *tort*, breach of contract, or other *legal wrong* against another, it is incumbent
> upon the latter to use such means as are reasonable under the circumstances to
> avoid or minimize the damages. The person wronged cannot recover for any
> item of damage which could thus have been avoided.

*Id.* at 258 (Emphasis in original). *See also generally Pack v. Case,* 30 P.3d 436, 442 (Utah App.

2001) ("Under the doctrine of avoidable consequences the nonbreaching party has an active duty

to mitigate his damages, and 'he may not, either by action or inaction, aggravate the injury

occasioned by the breach."); *Cobb v. Snohomish County*, 935 P.2d 1384, 1389-90 (Wash. App.

1997).

Similarly, Travelers points to cases holding that a mitigation does not require a party to

initiate litigation and that the defense is unavailable where both parties have the opportunity to

take the mitigating action. Admittedly, these cases state general rules. But these cases cannot

be applied mechanically to frustrate the purpose of the avoidable consequences doctrine.

The Alaska Supreme Court has instructed that "[w]hat is a reasonable effort is a question of fact as is undue risk or expense." *West v. Whitney-Fidalgo Seafoods, Inc.,* 628 P.2d 10, 18 (Alaska 1981).  In this unique case, Travelers *chose* to bring the lawsuit to reduce the loss and knowing that Klukwan was relying upon it to prosecute those claims for their mutual benefit. Klukwan chose not to take the mitigating act precisely because Travelers had done so.  By Traveler's own admission, the failure to timely bring the lawsuit was unreasonable and has increased the total loss by at least the roughly $9 million they would have recovered from Peterson Sullivan.  There was no additional expense or cost to Travelers to bring the action timely.  The doctrine of avoidable consequences as set forth in Alaska does not allow Travelers to profit from its admittedly unreasonable actions.

## CONCLUSION

There is no *genuine* dispute of *material* fact that Travelers assumed a duty to timely file the Peterson Sullivan action and unreasonably failed to do so.  Whether measured in tort as a negligence claim, or in contract as an affirmative defense, summary judgment is appropriate to establish that Travelers failed to meet its obligation, and any amounts owed by Klukwan must be reduced in an amount yet to be determined.

Respectfully submitted in Anchorage, Alaska, this 22ND day of February, 2008.

CHRISTIANSON & SPRAKER
Counsel for Defendants Klukwan, Inc., South Coast, Inc.
and Chilkat's Portage Cove Development Company

By: /s/ Gary Spraker
    Gary Spraker
    CHRISTIANSON & SPRAKER
    911 West 8th Avenue, Suite 201
    Anchorage, AK 99501
    Phone: (907) 258-6016

Fax: (907) 258-2026
Email: gary@cslawyers.net
Alaska Bar No. 9107066
Attorneys for Defendants

Undersigned certifies that on February 22, 2008, a true and correct copy of the above document was served on:

James D. Gilmore, Esq.        James T. Hopkins, Esq.        Robert L. Olson, Esq.
Garth A. Schlemlein, Esq.     Richard E. Spoonemore, Esq.

By first class mail, if noted above or by electronic means through the ECF system as indicated on the Notice of Electronic Filing.

By:   /s/ Susan Vanschooten
        Susan Vanschooten