# Exhibit A

Deposition Testimony of Charles W. Langfitt

in the Peterson Sullivan case

Declaration of Gary Spraker
Traelvers Casualty and Surety v. South Coast, Inc., et al.
Case No. Ao6-00063 (TMB)

Defendants' Reply

Index to Deposition Testimony of Charles W. Langfitt in the Peterson Sullivan case

| Page # |
|---|
| 71 |
| 72 |
| 129 |
| 178 |

Travelers Casualty and Surety Company of America    Charles W. Langfitt    February 28, 2005

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA AT ANCHORAGE

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation,<br><br>    Plaintiff,<br><br> vs.<br><br>RONALD GELBRICH; JERALD RENICH; BRAD FINNEY; JAN PAULSON; MICHAEL HOUTS; EDWIN JOHNSON; and PETERSON SULLIVAN, P.L.L.C., a Washington limited liability company,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>) No. A04-0165 CV (RRB)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Videotaped Deposition Upon Oral Examination

of

CHARLES W. LANGFITT

Taken at 1420 Fifth Avenue
Seattle, Washington

DATE: February 28, 2005

REPORTED BY: Patricia A. Blevins, CCR
      CCR NO.: BL-EV-IP-A403LH

STARKOVICH REPORTING SERVICES
(206) 323-0919

Travelers Casualty and Surety Company of America    Charles W. Langfitt    February 28, 2005

Page 71

1  we were at 12 million, then 10. Eventually we ended up
2  negotiating an $8 million repayment arrangement, and it was
3  based on just like we would in a mediation, Will. I mean
4  there was some momentum that could have developed. It was
5  what I was willing to take, and so we cut a deal.
6       And we had met with Kim Strong, who I believe was
7  the chairman of Klukwan, along with Tom Blanton, the
8  in-house counsel, Cabot, Tom, and a couple other folks. And
9  it was Marc and I that met with them, Marc Eckardt, and we
10 ended up negotiating a deal, and then I drew up some of the
11 initial shots, and Cabot and I ended up reaching a deal and
12 structured it. I insisted on certain bankruptcy terms,
13 dollar amounts, collateral. We had some subsequent disputes
14 about that. But that's how that came together.
15      Q.   Did Klukwan have any arguments that it wasn't
16 guarantors on some of these bonds?
17      A.   Not really. I mean the arguments they were making
18 was more economic, CAN'T pay it. You know, there's some
19 assets that we might not be able to reach, like K-Ply, which
20 was their -- is their plywood facility here in Port Angeles.
21 So there were some issues about how the indemnity reached
22 that particular entity or not. But other than that, no.
23           MR. WAGNER: Again a followup, can I get an
24 approximation from you, Chuck, as to when there was a
25 meeting of the minds on the $8 million figure?

Travelers Casualty and Surety Company of America    Charles W. Langfitt    February 28, 2005

Page 72

1  THE WITNESS: Without looking at the file, it
2  was shortly -- You know, we had meetings starting in June.
3  And actually, I think -- you know, we had actually had a
4  poster board up, and we wrote it down, and it was a little
5  bit later, I think, after that. They were looking for a bit
6  longer term. It was either at that meeting or shortly
7  thereafter. It was June.
8      Q.  During the June-July time period?
9      A.  Exactly. We ended up knocking down a number, and
10 then it took a while to get it documented. And there was
11 some foot dragging by Klukwan, and eventually we ended up
12 having to push forth. And I can't remember, but I think it
13 was executed in roughly January is what I want to say, of
14 '03.
15     MR. WAGNER: But as far as the number itself,
16 that was an agreement in principal back into the June-July
17 time period?
18     THE WITNESS: You know, without looking at
19 the file, Jim, it's hard, but that's what I remember. It
20 was shortly -- because what happened was they were trying to
21 push the number down. Kim Strong asked me to give her some
22 more time for the repayment. And at the time, I said, "I
23 will, but you've got to give me my $8 million." And that's
24 what my memory of that particular discussion was.
25     MR. WAGNER: So you had an agreement in

Travelers Casualty and Surety Company of America · Charles W. Langfitt   February 28, 2005

Page 129

1  decision to settle with Klukwan on the basis of the
2  repayment agreement of the $8 million note?
3      A.  Yes.
4      Q.  Was there any discussion with Klukwan at the time
5  of the negotiation of the repayment agreement concerning the
6  manner in which any recovery on either a professional
7  liability claim against Peterson Sullivan or a directors and
8  officers liability claim against any former officers and
9  directors would be handled?  That's a very specific
10 question.
11     A.  No, I know it is, and the reason I'm hesitating is
12 that those two items were not specifically discussed for
13 credit.  However, there is a credit mechanism that would
14 affect them, that is in the document.
15     Q.  Okay, but let's back up.  The issue was not
16 specifically discussed; is that correct?
17     A.  No.  I mean it wasn't like if you get a recovery
18 on those.  However, the crediting as a whole was, yes.  So
19 what I'm saying is did we sit there and say here is the --
20 directors and officers, here is this, you're going to have
21 to put them one way or the other?  It wasn't that specific.
22 Was it if you have a loss that's less than $8 million, then
23 you have to credit us?  The answer is yes, because that's in
24 the agreement.  So we talked about crediting.  We never got
25 down to the components of what the credit --

Travelers Casualty and Surety Company of America   Charles W. Langfitt   February 28, 2005

Page 178

1   the document I kept calling Exhibit 14, it appears that the
2   first regular payment from Klukwan was supposed to be made
3   in September of '04; is that correct?
4       A.   Yes.
5       Q.   And it looks like they were supposed to make
6   payments in September, October and November of last year?
7       A.   Yes.
8       Q.   Have those three payments all been made?
9       A.   Yes.
10      Q.   And then their next payment is not due until May
11  of this year, correct?
12      A.   Yes.
13      Q.   And then they basically make payments in the
14  spring-summer-fall months each year through 2009, and then
15  in 2010 they start paying in May, and they make a
16  $2.9 million balloon payment in August 2010, correct?
17      A.   Yes.
18      Q.   And assuming all these payments are made, that
19  will retire the obligation, correct?
20      A.   Yes.
21      Q.   And as part of the repayment -- well, this payment
22  schedule or a payment schedule like this is the schedule of
23  payments to satisfy the note payable that Travelers obtained
24  as part of the repayment agreement, correct?
25      A.   Yes.