# Exhibit B

Deposition Testimony of Charles W. Langfitt

Declaration of Gary Spraker
Traelvers Casualty and Surety v. South Coast, Inc., et al.
Case No. Ao6-00063 (TMB)

Defendants' Reply

Index to Deposition Testimony of Charles W. Langfitt

| Page # |
|--------|
| 184 |
| 185 |
| 186 |
| 220 |
| 221 |
| 231 |
| 232 |
| 233 |
| 234 |
| 235 |
| 236 |
| 241 |
| 248 |
| 285 |
| 286 |
| 287 |
| 288 |
| 289 |
| 290 |
| 291 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation, | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) No. A06-00063 (TMB) ) |
| SOUTH COAST, INC., an Alaska corporation, KLUKWAN, INC., an Alaska Native Village corporation, and CHILKATS' PORTAGE COVE DEVELOPMENT COMPANY, an Alaska corporation, | ) ) ) ) ) ) ) |
| Defendants. | ) ) |
| SOUTH COAST, INC., an Alaska corporation, KLUKWAN, INC., an Alaska Native Village corporation, | ) ) ) |

Deposition Upon Oral Examination

of

CHARLES W. LANGFITT

VOLUME II

Taken at 1601 Fifth Avenue
Seattle, Washington

DATE:  September 11, 2007

REPORTED BY:  Patricia A. Blevins, CCR
CCR NO. 2484

STARKOVICH REPORTING SERVICES
(206)323-0919

and CHILKATS' PORTAGE COVE               )
DEVELOPMENT COMPANY, an Alaska           )
corporation,                             )
                                         )
          Counterclaimants and           )
          Third-Party Plaintiffs,        )
                                         )
     vs.                                 )
                                         )
TRAVELERS CASUALTY AND SURETY            )
COMPANY OF AMERICA, a Connecticut        )
corporation, STEWART, SOKOL &            )
GRAY, LLC, and JAN D. SOKOL,             )
                                         )
          Counterclaimants and           )
          Third-Party Defendants.        )

---

1    Q.    But if I find a reference, as in here, to a

2 conversation, that wouldn't be unusual?

3    A.    No.

4    Q.    So what did Mr. Crandall tell you about the

5 potential D & O claim?

6    A.    Can you tell me at what time?

7    Q.    April 14, 2003.

8    A.    What I remember was that he believed that they had

9 a right against the officers, that he did later on qualify

10 that he hadn't looked at, and that they couldn't sue

11 themselves, so they weren't going to pursue it, but

12 basically that the officers had not followed the fails

13 management guidelines, that they had not correctly reported

14 the information.

15         He talked about that the Peterson Sullivan report

16 and Sutor reports, basically, when you look back at those,

17 it would appear that the South Coast management had not

18 disclosed financial information that subsequently got

19 reported.

20    Q.    Had you done any examination as to any possible

21 claims against the directors and officers prior to this

22 April 14, 2003?

23    A.    No.  I mean I was looking to see whether there was

24 any coverage or whether it would be worthwhile pursuing.

25    Q.    And we talked yesterday, just briefly, that at

1 some point, when you referred to D & O, it also tended to

2 refer to the Peterson Sullivan claims.  Do you recall if,

3 during this April 14 -- conversation referenced in this

4 April 14, 2003, letter -- did you discuss Peterson Sullivan?

5     A.   I don't remember in this conversation, but that's

6 memorialized in a letter.  But at earlier times, Tom had

7 mentioned concerns about the accountants during the course

8 when we were negotiating the repayment agreement.

9     Q.   Independent of Tom's comments, did you come to

10 have concerns about Peterson and Sullivan's performance?

11     A.   Eventually, yes.

12     Q.   Prior to discussing it with Mr. Crandall, or

13 after?

14     A.   Tom brought it up, and I started looking some more

15 at it, plus I looked at some of the reports.  And then, as

16 I've testified previously, here, going through the re-let

17 process and looking at what type of condition South Coast

18 was, I mean, you tend to have some suspicions there might be

19 a problem.

20     Q.   My understanding, though, and I don't want to

21 incorrectly state you, but my understanding is you do not

22 know exactly when that was first undertaken.

23          MR. HOPKINS:  Objection; vague and ambiguous.

24     A.   I'm not sure under -- what was -- what you're

25 talking about as far as --

1      Q.    The Peterson Sullivan, when you first started

2  investigating or for, as you had stated, having concerns

3  about Peterson Sullivan's performance and financial audit?

4                    MR. HOPKINS:  Objection; compound.

5      A.    All I remember is that after I got involved in

6  South Coast, and during the course of re-letting the work

7  and going through that process and having discussions with

8  Tom Crandall during the course of negotiating the repayment

9  agreement, he brought to my attention certain concerns, and

10 I started to have some suspicions.  I didn't actually start

11 thinking that I had something or doing something further

12 until, you know, after October.

13                              (Exhibit 142 marked for

14                                  identification.)

15                    MR. SPRAKER:  This has been produced

16 previously, Jim, but I don't have the exhibit.

17                    MR. HOPKINS:  Re-mark it, if you want.  I

18 suppose it's actually Prior Exhibit 67.

19     Q.    The document I gave you has been previously used

20 in depositions as Document No. 67.  Can you identify that

21 document for me?

22     A.    Yes.  It's my handwriting.  It memorializes a

23 conversation I had with Tom Crandall.

24     Q.    And you had that conversation on June 2, 2003?

25     A.    Yes.

1                          (Exhibit 146 marked for

2                           identification.)

3      Q.    Document 146 is what appears to be an email from

4 you, to Jan Sokol and Jordan Rosenfeld. Actually, I

5 apologize.  This was previously marked as 121.  We're

6 duplicating, here.  And this is continuing the conversation

7 regarding the work paper.

8           Do you recall if this is the result of a

9 conversation that you had with Mr. Crandall?

10                 MR. HOPKINS:  Objection; vague and ambiguous,

11 foundation.

12     A.    I did have a conversation with Tom.

13     Q.    Do you recall the substance of that conversation?

14     A.    Tom indicated he wanted to pursue Peterson, too,

15 and despite me continuing trying to cut my coattails off, he

16 suggested he wanted to ride them, and I was discouraging him

17 from doing so, saying no.

18     Q.    And the email does state, "Tom advised that they

19 intend to pursue Peterson, too, although I anticipate they

20 will want to ride our coattails."

21           So this is not the first time you've used "ride

22 our coattails."  You are interpreting or meaning "ride our

23 coattails" as having Travelers sue Peterson Sullivan,

24 correct?

25     A.    I don't know what Tom -- what I know is that Tom,

1  in one fashion or another, wanted to have the benefit of

2  whatever we were doing, even though I expressly told him no,

3  that this is not the case.  So I don't know whether he's

4  talking about filing a suit and just trying to get what he

5  can off of what information we've got.  But anything else, I

6  mean, I was very consistent in telling him, Tom, no.  I mean

7  you're not -- this is our piece, not yours.  I'll keep you

8  posted.

9       Q.    Okay.  But it sounds like, when you've given me

10 that answer, you're focusing on the ultimate recovery and

11 application of any proceeds.

12      A.    No.  I mean even the process, because, you see,

13 Tom -- if you look at what I wrote here, Tom advised he

14 intended to pursue Peterson, too, so that means him

15 independently filing their own litigation against Peterson.

16 And I'm saying although I anticipate they want to ride our

17 coattails, okay, experts, a lot of other stuff, you know,

18 I've already got someone looking at it.  So, I mean, riding

19 coattails is I pay for things, they get to use it, and I

20 don't want to have any part of that, and it's not part of

21 the deal.

22      Q.    And when you say "the deal," what do you mean?

23      A.    Repayment agreement.

24      Q.    Okay.  We talked about differences between

25 Travelers' lawsuit against directors and officers versus

1 situation where it's going to be minimizing our exposure

2 under the bonds by virtue of helping us.  So the way I read

3 it is it's this provision.

4     Q.   And you are reading "under the bonds" to include

5 the damages against Peterson and Sullivan?

6          MR. HOPKINS:  Objection; vague and ambiguous.

7     A.   No.  What I'm saying is it's going to minimize our

8 exposure.  So what happens is that if I'm in a situation

9 like this, they're going to help me do whatever is necessary

10 to wrap things up globally and do anything else necessary to

11 help me reduce my loss.

12    Q.   Well, you also mentioned that the repayment

13 agreement specifically carved out the third-party claims,

14 correct?

15    A.   They do.

16    Q.   Why don't you find that provision for me.

17    A.   (Witness complies.)  If you look at -- two

18 different areas.  Let's look at Paragraph 11 first.

19    Q.   Page 5?

20    A.   Yes.  Six, actually.

21    Q.   Six?

22    A.   Yeah, the last sentence.

23          (Reading.)  This agreement and the preceding

24 sentences do not impair or release Travelers' claims or

25 causes of action against any person or entity other than the

1 Klukwan entities.

2     Q.    Okay.  Let's stay with that one first.  I read

3 this, then, as saying this repayment agreement does not

4 impair or release Travelers' claims against any person or

5 entity other than Klukwan entities to mean that this

6 agreement is not affecting any claims that Travelers may

7 have against Peterson Sullivan, correct?

8     A.    Yes.

9     Q.    Or the directors and officers.

10    A.    Yes.

11    Q.    Or even Key Bank.

12    A.    Yes.

13    Q.    Or any third party that is not a party to this

14 repayment agreement.

15    A.    Yes.

16    Q.    Did you understand that Klukwan ever meant to do

17 so?

18              MR. HOPKINS:  Objection; vague and ambiguous.

19 I don't understand the question.

20    Q.    Was that last sentence the result of any specific

21 conversations during the negotiation of the repayment

22 agreement?

23    A.    I'm the one who inserted it and asked for it to be

24 included.

25    Q.    Why did you do that?

1      A.    Because I didn't want to have any third-party

2  rights in a situation where I would have them impaired in

3  any way, shape or form.  Because I remember originally Cabot

4  was looking for a broad release.  This agreement is a

5  satisfaction of the indemnity obligations, and if it's not

6  satisfied, what happens is that satisfaction gets undone,

7  and the recovery is undermined indemnity agreements.

8      Q.    Okay.  So you raise this --

9      A.    I'm the one that put it in.

10     Q.    Okay.  Was there any dispute regarding putting

11 this in?

12     A.    It was accepted.

13     Q.    Okay.  But was there any dispute?

14     A.    It was accepted, and I don't remember any dispute.

15 It was accepted during the course of the negotiation.

16     Q.    Do you recall any specific conversations regarding

17 that last sentence?

18     A.    We had a number of discussions over this

19 particular paragraph, and there was, at first, an effort for

20 a complete, total release being proposed by Cabot, and I

21 rejected it and then put this language back into it.  So it

22 was a product of negotiations.

23     Q.    That was complete, total release of the

24 signatories of the participants to this repayment agreement,

25 not third-party, was it?

1    A.    I'd have to go back and look at the nature of it,

2 but I wanted to make sure that any third-party rights were

3 not affected.

4    Q.    Now, that sentence does not discuss how any

5 proceeds from any third-party recoveries will be applied,

6 does it?

7    A.    No, because you need to look at Paragraph 9.

8    Q.    Let's move to that, then.  Okay.

9    A.    It says:

10    (Reading.)  In the event that Travelers' total

11 loss, net of all receipts from bonded contracts, is less

12 than $8 million, Travelers shall credit the note with the

13 amount of the difference.  "Bonded contracts" is a defined

14 term.

15    So basically, what it is is you look at, Here's

16 our loss.  Here's bonded contracts.  Bonded contracts do not

17 include Peterson Sullivan D & O claims or anything like

18 that.  There's a definition in the first part of the

19 agreement.

20    Q.    I understand that sentence to read in the event

21 that Travelers' total loss, net of all receipts from the

22 bonded contracts, is less than $8 million, Travelers shall

23 credit the note with the amount of the difference.

24    That language does not specifically reference any

25 third-party claims, correct?

1    A.    It excludes them, because those third-party claims

2 are not bonded contracts.

3    Q.    But you're reading that within the definition of

4 bonded contracts.

5    A.    Which is defined on the first page.

6        (Reading.)  "Bonded contract" shall mean any

7 contract that's referenced or described in any bond issued

8 on behalf of any Klukwan entity.  So it's a defined term,

9 and that was expressly negotiated, and I made it clear when

10 I got asked this, and I insisted that that term be included,

11 and it was accepted.

12    Q.    All right.  Now you're doing what we complained

13 about yesterday, about using too many concepts in one

14 answer.

15    A.    I apologize.

16    Q.    Okay.  So when you say that you included that

17 because -- at what time?

18    A.    During the course of the negotiation on the

19 repayment agreement.

20    Q.    And it's my understanding the course of

21 negotiation began, as we're going to get to, July 17, '02,

22 to essentially the end of the year of '02.  Is that your

23 understanding of the time for negotiation of the repayment

24 agreement?

25    A.    No.

1    Q.   Okay.  Tell me when.

2    A.   It started, actually, in June.  We had one meeting

3 in June.  We had a subsequent one in July.

4    Q.   Okay.  Now, yesterday we talked about the emails

5 from you, between you and Dave Hombach, stating that you

6 were asking Jordan to pursue claims against the CPA,

7 correct?

8    A.   No.

9    Q.   You didn't have discussions about that?

10    A.   No.  If you look at the email, you said about

11 pursuing.  I was having Jordan look into it.  I wasn't

12 having Jordan look -- pursuing them.

13    Q.   Look into pursuing.

14    A.   Yes.  I apologize.  No.  I just --

15    Q.   You want to be exact.  I understand.

16    A.   I apologize.

17    Q.   All right.  But there's a reference about the CPA

18 claims back in June of 2002.

19    A.   Right.  It's probably, like, June 19.

20    Q.   Okay.  And then the next thing that we have seen

21 involving specifically the CPA claims are your notes of a

22 conversation with Tom Crandall advising that Klukwan is

23 looking at CPA claims, and you are having Jordan Rosenfeld

24 look into those as well.

25              MR. HOPKINS:  Objection; vague and ambiguous.

1                          (Break in the proceedings.)

2      Q.    When we took a break, we were talking about bonded

3 contracts, the terms used in the repayment agreement,

4 looking at Paragraph 9, and let me start with this question:

5           Did you have any specific conversations where you

6 told Mr. Christianson that bonded contracts specifically

7 excluded any monies recovered against or from third parties?

8      A.    No, but it's inherent in the definition.  If he

9 had any questions about it, he could have asked me -- he did

10 not -- because it's right there in the definitions.

11     Q.    Taking a broader look at Paragraph 9, you focused

12 on the last sentence.  Let's look at the first sentence.

13          (Reading.)  In reliance upon Travelers'

14 representation that its total liability under the bonds, net

15 of all receipts from the bonded contracts, will exceed

16 $8 million, SCI shall execute a note in the form attached as

17 Exhibit B in the amount of $5,388,306.48.

18          What was the purpose of that sentence and this

19 paragraph in whole?

20          MR. HOPKINS:  Objection; foundation.  Over

21 broad.  Vague and ambiguous.

22     A.    I'm sorry.  Your question again, please.

23     Q.    What are you trying to do in Paragraph 9?

24          MR. HOPKINS:  Objection.  It's vague and

25 ambiguous, over broad, assumes facts not in evidence.

Page 248

1    A.    Yes.

2    Q.    Okay.  The second line of your response, "We are

3 paying the costs, they are getting a free ride, and it was

4 never part of the deal," I'm interpreting "they are getting

5 a free ride" -- actually, what do you mean, "they are

6 getting a free ride"?

7    A.    Since they were going to be signing the petition,

8 but we're paying for it, whatever we're going to dig up out

9 of it is something that they're going to have access to.  So

10 I'm paying the costs, and that information that gets coughed

11 up out of it, they're going to get access to the

12 information.

13    Q.    Well, it sounds like it actually is applying to

14 any substantive action that is later filed, as well, because

15 the next line reads, "We will have a loss in excess of the

16 note, and we should be able to apply any recovery there, not

17 against the note."

18    A.    Yep.  It applies to both.

19    Q.    Okay.  And that language seems to be addressing,

20 if you'll turn back to the February 10, 2004, email, the

21 third paragraph from Cabot, which reads, "If Travelers

22 wishes to bring a substantive cause of action against P & S,

23 Klukwan's expectation is that the net litigation proceeds

24 from that suit will be applied first to the Klukwan/SCI note

25 to Travelers.  Also, as you are aware, Klukwan is

1    Q.    Okay.  As of this date, well, July 16, 2002 --

2    A.    October 4, 2004.

3    Q.    Over to the right, please, July 16, 2002.  As of

4 July 16, 2002, there's no agreement between Travelers,

5 Klukwan, South Coast, as for repayment of the obligations

6 under the general indemnity agreement, right?

7    A.    Yes.

8    Q.    And that's why you're having the meeting.

9    A.    Yes.

10    Q.    And did you have the meeting?

11    A.    Yes.

12    Q.    Who attended?

13    A.    Marc Eckardt, myself, Tom Crandall.  I believe Tom

14 Plant [ph] was there, Cabot Christianson and Kim.

15    Q.    Strong?

16    A.    Strong.

17    Q.    Okay.  How long did the meeting last?

18    A.    I thought it was most of the day.

19    Q.    How long of that was discussing, well, the

20 settlement terms?

21    A.    That was pretty much the whole meeting.

22    Q.    Well, I was just wondering, given the agenda

23 that -- the red-line agenda we looked at, it looked like

24 there was potentially other terms, other items.  But I

25 thought it was pretty much the whole day devoted to the

1 payment obligations.

2      A.   We were looking for informational stuff, and no,

3 it was primarily payment.

4      Q.   Can you give me a summary of what happened during

5 that meeting and the order that it happened?  Where did

6 negotiations start?

7      A.   When we opened the door.

8      Q.   Okay.  Who opened the door?

9      A.   It's getting late in the day, Gary.  We had had

10 exchange of email before we set up our positions.  I think

11 we were probably -- I don't know.  I think I may have been

12 at eight and a half, and Klukwan-South Coast may have been

13 at seven and a half or less.  We were arguing about terms

14 and structure.  And at a certain point in time, obviously,

15 Tom and his group were looking for lesser dollar amounts.

16 Kim asked me could I please take $8 million to settle it up.

17          At that point in time, I went out -- Marc Eckardt

18 and I excused ourselves from the meeting, stepped outside

19 the office building and talked about it.  I came back in,

20 and I said, "Kim, for you, I'll do that."  And that's

21 actually no joke.  I mean that's exactly what happened.  I

22 came back.  She was looking for a resolution, and she told

23 me who she was, a director, and she said, Can you please do

24 this, and I said, "I'll do it."

25      Q.   Did you reach agreement on any other terms?

1    A.   We had, basically, you know, an $8 million number,

2 and the structure and everything else was still fluid, and

3 we spent the next five months working through that process,

4 Cabot and I.

5    Q.   Did you discuss the term, the payment term?

6    A.   I think we did.  We came back and said how long it

7 was going to be, how much it was going to be.

8    Q.   Okay.  Did you reach agreement as to how long?

9    A.   I think we said it was, like, seven years or eight

10 years, whatever eventually got plugged into the document, I

11 think, the repayment agreement.

12        I know we were -- at one time Tom and everyone was

13 pushing for a longer period of time.  I think they were

14 looking, like, at 10 or 12 years at one point in time.

15    Q.   All right.  But whatever it was got decided at

16 that meeting?

17    A.   I think so, yeah.

18    Q.   Did you discuss interest rate?

19    A.   I think Tom had asked for -- even though it's

20 $8 million, no matter what, Tom wanted to have this dressed

21 up for balance sheet purposes.  So he wanted to have it

22 structured in that form.

23    Q.   And when you say "for balance sheet purposes,"

24 what do you mean?

25    A.   He wanted the debt to be reflected at the lower

1 dollar amount than what it was.

2       Q.    Did you agree to do that?

3       A.    Tom asked in order to get the deal cinched.  I was

4 getting it vetted by Cabot Christianson, who obviously was

5 giving an opinion in regard to the, you know, agreement

6 terms, and I said yes.  I mean I get $8 million, no matter

7 what.  If you want to categorize it how you want to

8 categorize it and you think that's appropriate for you to do

9 so, that was his decision.

10      Q.    So did you actually discuss an interest rate to be

11 applied?

12      A.    I think Tom backed into it, to see what it was

13 going to be, because basically you've got $8 million that

14 was owed under any circumstances, and I think he backed into

15 it.

16      Q.    Any other agreements that you reached at that

17 July 17 meeting?  Any other terms that were agreed to?

18      A.    I'd have to go back and look at whatever followup

19 correspondence there was.  And when we didn't -- we had a

20 number of terms that we agreed to, but we needed to get it

21 all cinched up.  We had a continuing debate about -- I sent

22 an email after the meeting, saying, We're all acting with

23 the assumption that all contract funds come to us.  We have

24 to have that provision.

25            Then Cabot was pushing me on the bankruptcy terms

1 and are there other ones.  I wrote him a letter in

2 September, saying, "Your client is getting paid less -- or

3 paying me back less than what I'm owed.  So I want these

4 terms if I'm agreeing to get paid only $8 million."

5          There's a whole series of --

6     Q.    Right.

7     A.    There's continuing terms that we had to plug in to

8 pull the deal together.

9     Q.    And I see those in emails after that.  But I'm

10 asking:  As of the 17th, were there any terms that you

11 believe were set at that time?

12     A.    Really, what we had set was the dollar amount and

13 a very rough concept of the structure and -- you know, and

14 there was collateral that was being discussed, that was kind

15 of moving around a little bit on it.  But you could see from

16 the letters that they would be moving back and forth.  I

17 would pull it from Tom's column, Tom would pull it back into

18 his column, and we were kind of going back and forth.  We

19 had certain agreements on some collateral, but others, not,

20 primarily K-Ply.

21                          (Exhibit 156 marked for

22                           identification.)

23     Q.    Do you recognize that document, the document

24 that's been handed to you as Exhibit 156?

25               MR. HOPKINS:  For the record, this is also

1 Exhibit 39.

2      A.    I think you've got a mistake.

3      Q.    Okay.  Tell me why.

4      A.    The email is July 18, 2002.  The attachment

5 indicates it's prepared on October 4, 2006.

6      Q.    Okay.  I will tell you and represent that that is

7 because that is the date that it was printed.  Are you

8 telling me that you do not recall this email?

9      A.    I got a schedule.  I just don't know whether it's

10 the same one, because Tom sent a couple of these.

11     Q.    Do you recall the actual email and not the

12 attachment?

13     A.    I do recall the email.

14     Q.    Okay.  Do you recall if there was an attachment to

15 that email?

16     A.    There was.

17     Q.    What was that attachment?

18     A.    It was a schedule.

19     Q.    The amortization schedule?

20     A.    Yes.

21     Q.    Do you understand what an amortization schedule

22 is?

23     A.    In this context it was how Tom wanted to treatment

24 the payments, although we had specifically how the payments

25 were going to be handled in the payment agreement.

1    Q.   Okay.  But this seems to be consistent with your

2 prior statement that Tom wanted -- well, why is Tom sending

3 you an amortization schedule the day after your July 17,

4 2002, meeting?

5    A.   Because it was in furtherance of his thoughts that

6 he wanted to structure our transaction in this fashion.  And

7 he's saying so far as an amortization schedule is concerned,

8 this is how it was going to be done.

9    Q.   Was that consistent with your understanding of

10 what had been discussed and agreed to at that July 17

11 meeting?

12    A.   My understanding was I'd get $8 million, no matter

13 what, and that Tom wanted to structure it as a note with an

14 amount that would be less than $8 million on it but I would

15 get $8 million.  Period.

16    Q.   But you were agreeable to that structure?

17    A.   Yes.

18    Q.   Okay.  Do you recall if the amortization schedule

19 that you reviewed had an amount for a note balance of

20 roughly $5.3 million?

21    A.   I know it had a note balance, but I do not know

22 whether it matches exactly what's in this document.

23    Q.   Do you recall agreeing to using an interest rate

24 of 6 percent?

25    A.   You'd have to look at the repayment agreement and