# Exhibit C

## Deposition Testimony of Thomas L. Crandall

Declaration of Gary Spraker
Traelvers Casualty and Surety v. South Coast, Inc., et al.
Case No. Ao6-00063 (TMB)

Defendants' Reply

Index to Deposition Testimony of Thomas L. Crandall

| Page # |
|--------|
| 119 |
| 120 |
| 125 |
| 126 |
| 137 |
| 138 |
| 139 |
| 140 |
| 144 |
| 145 |
| 146 |
| 147 |
| 151 |
| 152 |
| 176 |
| 177 |
| 227 |
| 228 |
| 376 |
| 377 |
| 389 |
| 453 |
| 454 |
| 455 |
| 456 |
| 469 |
| 470 |
| 471 |
| 472 |
| 474 |
| 475 |
| 477 |
| 482 |
| 484 |
| 485 |
| 486 |
| 487 |
| 488 |
| 489 |
| 490 |
| 491 |
| 492 |
| 493 |
| 516 |
| 569 |
| 570 |

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

TRAVELERS CASUALTY AND          .  Case No. 3:06-CV-00063-TMB
SURETY COMPANY OF AMERICA,      .
a Connecticut corporation,      .
                                .
          Plaintiff,            .
                                .
vs.                             .
                                .
SOUTH COAST INC., an Alaska.    **DEPOSITION OF THOMAS L. CRANDALL**
corporation, KLUKWAN, INC.,.    **DAY 1**
Alaska Native Village           .
corporation, and CHILKATS' .
PORTAGE COVE DEVELOPMENT         .
COMPANY, an Alaska              .
corporation,                    .
                                .
          Defendants.           .
. . . . . . . . . . . . .       .
SOUTH COAST INC., et al,        .
                                .
     Counterclaim and           .
     Third-Party Plaintiff,.
                                .
vs.                             .
                                .
TRAVELERS CASUALTY AND          .
SURETY COMPANY OF AMERICAN,.
a Connecticut Corporation,      .
STEWART SOKOL & GRAY L.L.C..
and JAN D. SOKOL,               .
                                .
     Counterclaim and           .
     Third-Party Defendants.
. . . . . . . . . . . . .

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Travelers              James T. Hopkins, Esq.
Casualty and Surety        Schiffrin Olson Schlemlein
Company of America:          & Hopkins, P.L.L.C.
                           1601 Fifth Avenue, Suite 2500
                           Seattle, Washington 98101

1    Consulting LLC's March 1, 2002, report and Peterson

2    Sullivan PLLC's report and your future business plans

3    given KeyBank's action," end quote, do you see that

4    section?

5 A  I do.

6 Q  Do you understand the reference to the Peterson Sullivan

7    report to be the Peterson Sullivan 2001 operations report

8    that we've previously entered as Exhibit 22?

9 A  I do understand that that's the report referenced.

10 Q  And did you provide those documents to Mr. Langfitt or had

11    he acquired them through Travelers' underwriting office?

12 A  I provided them to, I believe -- or, we provided them, I

13    believe, to the underwriting office.

14 Q  And do you recall at one of your initial meetings with Mr.

15    Langfitt discussing the Peterson Sullivan report?

16 A  Not in detail.

17 Q  Did you discuss it at all?

18 A  Don't recall.

19 Q  So you simply have no recollection one way or the other?

20 A  Just don't have any recollection.

21 Q  Likewise the Sutor report?

22 A  Not -- I know I discussed them with Travelers; who was

23    present, when it was, I have no remembrance.

24 Q  Did you discuss with Travelers that the South Coast

25    collapse had been a sudden event as far as Klukwan's

1    management was concerned?

2 A  I actually don't remember this meeting.

3 Q  At any meeting between May and June of 2002 did you have

4    discussions to that effect?

5 A  I just don't remember.

6 Q  Certainly it would have been logical to discuss that given

7    the history of South Coast's collapse that you've earlier

8    described for me, don't you agree?

9 A  It would be logical, but I just truly don't remember the

10   meeting.

11 Q  Do you agree that part of what the surety was trying to

12   determine at this point, May and June of 2002, was what

13   had happened to South Coast, what its losses were likely

14   to be?

15 A  Again, given what had happened in May I just flat-out

16   don't remember the meeting.

17 Q  Well, what is the first meeting that you had with Chuck

18   Langfitt that you have any recollection of the substance

19   matter of the discussion?

20 A  The first -- It was a teleconference, I was in Ketchikan,

21   it was after Jordan had left doing his internal review,

22   his engagement, and Mr. Langfitt called and said we will

23   be taking over the jobs.

24 Q  All right, anything else?

25 A  That's of substance what I remember.  There may be some

1       was just you didn't have any experience conducting such an

2       exercise, correct?

3  A    That's what I stated, yes.

4  Q    And Klukwan didn't have the resources or wherewithal, or

5       South Coast, to do such an exercise itself, did they?

6  A    I never asked the question, so I don't know.

7  Q    Exhibit 34 refers to a June 11 meeting.  Do you recall

8       attending that meeting?

9  A    Not with specificity, no.  There was a lot going on at the

10      time.

11 Q    Therefore you do not recall any discussions that may have

12      occurred between you and Mr. Langfitt at a meeting on June

13      11th, assuming such a meeting occurred?  June 11, 2002.

14 A    I would need my memory refreshed.

15 Q    And what will refresh it besides this letter, Exhibit 34?

16 A    I don't have anything else that would that I'm aware of.

17 Q    I think you earlier testified you -- it's not your

18      practice to keep detailed notes.  You don't have any notes

19      of this meeting, do you?

20 A    That's correct.

21 Q    Am I correct that the discussions between Travelers and

22      Klukwan that you were involved in in the May, July,

23      August, 2002, time frame focused on the likely total

24      amount of loss the surety was facing on the South Coast

25      bonds, the assets and resources Klukwan or its

1    subsidiaries had to meet their obligations to the surety

2    under the indemnity agreements, and an agreement as to the

3    terms as to how those obligations would be met, is that a

4    fair characterization?

5 A   I wouldn't say May, but definitely by June, July, August

6    we were already into the point of the contracts had been

7    pulled and how do we go -- as Klukwan how do we go

8    forward.

9 Q   And the three topics that I described were the primary

10    focus of discussions?

11 A  What's the repayment under the indemnity, how do we reach

12    that -- how do we make sure that that repayment occurs, if

13    we can, and how do we minimize our loss going forward,

14    primarily by helping with making sure that any bonding

15    claims were valid, i.e. a third party throws in a claim

16    and says they owe us X, trying to confirm that we either

17    agreed or disagreed with that number.

18 Q  And additionally you discussed what assets Klukwan or its

19    subsidiaries would have to either collateralize their

20    agreement, any potential agreement with the surety, or

21    satisfy their obligations to the surety, correct?

22 A  That's what I referred to as needing repayment terms and

23    the ability to make sure that those terms were -- could be

24    exercised or could be lived within.

25                              DEPOSITION EXHIBIT 35 MARKED

1      million and Klukwan proposing total payments of 7.55

2      million, right?

3  A   Those were the latest proposals back and forth, yes.

4  Q   What do you recall specifically of the discussions of the

5      July 17, 2002, meeting?

6  A   Oh, many things, one of which, I hit a white board and

7      said this is where the repayment may come from based on

8      the best of my ability at the time, pointing out that we

9      would prefer it to be as a note with a discount versus --

10     a note with an interest versus a lump sum, because it

11     would allow -- my opinion at the time -- a better

12     reflection on the balance sheet.  Kimberley Strong in

13     tears because it was her company and she was concerned it

14     was going down the tubes.  Those types of things.

15 Q   Anything else?

16 A   I think we walked away with a general understanding of a

17     structure.

18 Q   Well, you referenced a white board.  Did you pencil out on

19     a big sheet of paper numbers and.....

20 A   No, white board, like that.

21 Q   I see.

22 A   When it was done it got erased.

23 Q   And what data did you put on that?

24 A   Oh, it was basically the next five years' worth of

25     operation for Emrick & Hill, best of my knowledge, same

1    with Atlas, same with K-Ply, all the various subs, here's

2    where the equipment sales may come in with, here's where

3    the real estate sales may come in with.  And just

4    basically trying to show that there would be an ability

5    projected at the time to make a repayment.

6 Q  Did Kimberley Strong have discussions with Chuck Langfitt

7    that you did not participate in?

8 A  Not that I'm aware of.

9 Q  Do you recall or no, one way or the other?

10 A  I don't know one way or another.

11 Q  As a result of the July 17, 2002, meeting didn't Klukwan

12   agree to repay the surety total payments of $8 million?

13 A  We agreed to a total payment of eight million based upon

14   certain structure.

15 Q  So what was discussed and tentatively agreed to at the

16   July 17, 2002, meeting was the total payment amount of $8

17   million, correct?

18 A  There was a total payment of eight million.

19 Q  The schedule and amount of payments against that

20   obligation, correct?

21 A  I believe that's correct.

22 Q  But no other details and certainly no document was

23   executed at that point in time, correct?

24 A  There was no document.  There were some other details.

25   For instance, if you look early in some of the

1      correspondence there was some discussion about needing to

2      use the second growth timber rights as collateral, and we

3      ended up basically here's why it can't happen, and that

4      disappeared from the list.  For instance, there was an

5      attempt -- we also talked about K-Ply as collateral, K-Ply

6      stock, and that never ended up in the final agreement.  So

7      there was not just a repayment term but there was also

8      some general discussions of collateral terms.

9  Q   It's fair to say that at the July 17, 2002, meeting

10     certain collateral was agreed to, other collateral was

11     discussed but no specific agreement reached?

12 A   No, I would say that at that -- we walked out of that

13     meeting with a general understanding that the repayment

14     amount, however it was classified, would be eight million,

15     and that the collateral would be the following, and

16     anything that was not in that list was not collateral.

17 Q   And what was that collateral?

18 A   First and seconds and occasional thirds on real estate,

19     basically a second position on South Coast equipment, a

20     position on Emrick & Hill and Atlas stock.  I think that's

21     about it, in general.

22 Q   Did you discuss the Chinle claim?

23 A   I forgot to mention the Chinle claim, that was in some of

24     the other conversations as well.  The Chinle -- any rights

25     that we had to settle Chinle would be assigned to

Page 140

1          Travelers, and collection thereof.

2  Q       And there was discussion regarding a possible claim by

3          Klukwan against KeyBank, correct?

4  A       There was discussion about it.

5  Q       Klukwan was evaluating a potential claim against KeyBank,

6          correct?

7  A       We were.

8  Q       And that was discussed in the time frame of the July 17,

9          2002, meeting, correct?

10 A       That sounds correct.

11 Q       Wasn't Klukwan evaluating during this period of time

12         potential claims it might have against KeyBank or any

13         other third parties?

14 A       Yes, they were evaluating potential claims.

15 Q       And that was part of the fact that Klukwan was in rather

16         dire financial circumstances and was looking for assets or

17         recoveries wherever it could find them, correct?

18 A       I wouldn't couch it that way, no.

19 Q       You certainly had an interest in pursuing any claims that

20         you felt were valid or viable for Klukwan  to recover

21         money, correct?

22 A       We were -- we were -- I got distracted, I apologize.  We

23         were looking at limiting our losses.  To the extent that

24         we had a action against a third party, we were looking at

25         that action.

1 A    I premised that interest and principal, if paid on

2      schedule, would equal eight million.

3 Q    That's not quite my question, and I'll try another

4      approach here.  You didn't come back and renegotiate with

5      Travelers a total repayment obligation after the July 17,

6      2002, meeting, did you?

7 A    Prior to the execution of the agreement no, we did not.

8      We have since.

9 Q    And when you say you have since, you're referring to your

10     earlier testimony that Klukwan sought to renegotiate the

11     terms of the repayment agreement, correct?

12 A   Yes.

13 Q   How long did the July 17, 2002, meeting last?

14 A   I don't know, I believe it lasted about an afternoon, but

15     I don't really recall.

16 Q   The meeting was held in Juneau?

17 A   The July.....

18 Q   17, 2002, meeting.

19 A   .....17th.  Yes, it was held in Juneau.

20                        DEPOSITION EXHIBIT 38 MARKED

21     MR. SPRAKER:  Jim, can you hand me.....

22 Q   Exhibit 38 appears to be an e-mail you sent to yourself on

23     July 18, 2002, at 6:11 a.m., is that.....

24 A   Must've been.....

25 Q   .....an accurate description?

Page 145

1  A    I must've been working from home, yes.

2  Q    So first thing in the morning after your meeting on July

3       17, 2002, you go out and prepare the document that's

4       reflected as Exhibit 38, correct?

5  A    That sounds correct, yes.

6  Q    And your purpose in preparing this amortization schedule

7       -- and that's an accurate description, isn't it, of this

8       document?

9  A    I would call it an amortization schedule.

10 Q    Was to take the agreement that had been reached regarding

11      payment of the $8 million and the specific payment

12      schedule that had been agreed to and convert it into an

13      amortized promissory note with principal and interest,

14      right?

15 A    The day before we'd talked that I would be preparing this

16      and giving it to Chuck and this was my attempt to do that.

17 Q    And you assumed an interest rate of 6% in preparing

18      Exhibit 38, correct?

19 A    That's correct.

20 Q    Exhibit 38 is not what you transmitted to Chuck Langfitt,

21      is it?

22 A    At some point in time I believe it is.  On this particular

23      e-mail it is not.

24                          DEPOSITION EXHIBIT 39 MARKED

25 A    You're going to get a lot of static because I had this on

1        your microphone.

2        REPORTER:  It's okay, as long as nobody's talking I don't

3   care.

4  A     Okay.

5  Q     So Exhibit 39 is the version of the amortization schedule

6        you transmitted to Chuck Langfitt a little bit later in

7        the morning of July 18, 2002?

8  A     Yes, although I do need to check.  It appears to be almost

9        the same with -- really about the only difference between

10       the two is the last line under stats on Page 3 of 3.

11 Q     What line is that?  What does it say?

12 A     Total payments as percentage of estimated costs, 67.4.

13 Q     Actually there's one other difference.  On Exhibit 39.....

14 A     Oh, yeah, there is.

15 Q     .....you had a line to say early payment penalties apply

16       so that total payments equal $8 million, see that?

17 A     I did and I missed that.

18 Q     And that's your language and your characterization of the

19       proposed terms, is that correct?

20 A     Yeah, that's my language, yes.

21 Q     But that reflected your understanding that the deal was

22       Travelers would get repaid $8 million, right?

23 A     That if it was paid on terms they would get $8 million.

24 Q     Looking back for a minute at Exhibit 39, the last page of

25       that reflected the final payment of $4.25 million, do you

1       see that?

2 A     Yes, I do.

3 Q     Based on your amortization schedule over $4.2 million of

4       that payment would be repayment of principal, correct?

5 A     Yes.

6 Q     Now, between July 17, 2002, and mid-December 2002 the

7       specific terms of the repayment agreement were negotiated

8       between Travelers and Klukwan, correct?

9 A     That's correct.

10 Q    And various drafts of agreements were exchanged, correct?

11 A    Seemed like that much.

12 Q    By that much you mean quite a bit?

13 A    12 inches.

14 Q    So the negotiations as to the final agreement required an

15      additional several months and were fairly detailed,

16      correct?

17 A    I believe that's true, yeah.

18 Q    You were involved in that process?

19 A    Yes.

20 Q    So was Cabot Christianson, wasn't he?

21 A    Yes.

22 Q    And did Cabot Christianson prepare the initial draft of

23      the agreement, promissory note and guaranty?

24 A    I believe he did.

25                              DEPOSITION EXHIBIT 40 MARKED

1      to repay you wanted a credit?

2 A    Yes.

3 Q    That's the key point, right?

4 A    That's the key point.

5 Q    And anything else from your perspective would not have

6      been satisfactory at that point in time, correct?

7 A    Correct.

8 Q    And the reason the $8 million figure is contained here is

9      that's the amount that had been committed to repay,

10     correct?

11 A   That's the amount of interest and principal that was

12     committed to repay.

13 Q   Now, you qualify that with a reference to interest and

14     principal.  Travelers had not made Klukwan a loan of $5,33

15     million, had it?

16     MR. SPRAKER:  Objection, foundation.

17 Q   Go ahead.

18 A   Klukwan -- Travelers didn't make Klukwan a loan of $8

19     million or of any number.  Not in the traditional sense.

20 Q   Turning to Page 3 of the proposed agreement that's part of

21     Exhibit 40, there's a discussion of the KeyBank claim, do

22     you see that?

23 A   Are you in 5(c)?

24 Q   I'm at Paragraph 9.

25 A   Okay, thank you.

1 Q    Page 4 of the exhibit, Page 3 of the draft agreement.

2 A    Thank you.  I do see it.

3 Q    And that reflected the fact that at this point in time, in

4      any event, Klukwan was planning on asserting a claim

5      against KeyBank, correct?

6 A    They were considering it, yes.

7 Q    Ultimately that language was deleted from the final

8      agreement, do you recall that?

9 A    I believe that's the case, yeah.

10 Q   And do you recall why?

11 A   I believe it was because it was not important to

12     Travelers.

13 Q   Any other reason?

14 A   Not by December of -- not by the final language.

15 Q   Klukwan also made a decision not to proceed with a claim

16     against KeyBank?

17 A   Klukwan did, yes.

18 Q   Why?

19 A   Because KeyBank refinanced Bank of America out of the note

20     position in approximately October.  When you look at from

21     October to November to December to January, Klukwan's --

22     as a result of South Coast's liabilities -- losses got

23     exceedingly worse, an argument is -- is KeyBank stepped in

24     and their counterclaim would've been somehow pointing back

25     to Klukwan that they had defrauded them into stepping into

1 Q    Renfrew.

2 A    Huh?

3 Q    Renfrew.

4 A    Renfrew, Renschew, whatever, or a Scott Miller.  So it

5      sort of depends if my telephone call got through or my --

6      or if I was getting response, too, on how I would proceed.

7 Q    So what do you recall of the initial discussions you had

8      with KPMG regarding the repayment agreement?

9 A    The initial discussions were they said that basically the

10     presentation in the 2002 audit was incorrect, that this

11     was what they referred to as a -- or, what the literature

12     referred to as a troubled debt restructure and that it was

13     incorrectly shown in '02 and needed to be restated as we

14     go into '03.

15 Q   And specifically what KPMG said was you could not take the

16     deferred gain until you had repaid the note in full,

17     correct?

18 A   No, that's not correct.  What they said specifically was

19     as long as there is a contingent in the agreement that

20     would be -- make it so that there could be a different

21     amount than the note, that you could not take deferred

22     gain.  But if there was no contingent in the agreement you

23     could take deferred gain.  So it had nothing to do with

24     the note per se, but the contingency on the bankruptcy

25     provision in the agreement, i.e. no contingent, we

1    could've taken it.

2 Q    And the deferred gain related to the difference between

3    the $8 million total repayment obligation and the full

4    extent of the surety's losses that you would otherwise be

5    liable for under the indemnity agreement, correct?  Isn't

6    that the deferred gain?  That's the deferred gain.

7 A    Actually there were two issues that they claimed, there

8    was the deferred gain and then -- that was the majority of

9    it, which was the difference between the full extent of

10    the losses and eight million, but then there was another

11    piece of it, which was the difference between eight

12    million and 5.4 million.  So basically you could not take

13    the gain between eight and whatever the total was, 13 and

14    a half or whatever, due to the contingency, and you could

15    not take the difference between the eight and the face

16    amount of the note due to another portion of the troubled

17    debt restructure.  The next effect was the total 13 and a

18    half minus any payments that have been received needed to

19    be recorded.

20 Q    So in essence what KPMG told you is you had to show as a

21    long-term liability to Travelers the full extent of the $8

22    million obligation, correct?

23    MR. SPRAKER:  Objection -- objection to the form.  I'm

24 sorry.

25 A    Correct.

1        correct?

2 A      Yes, it looks that way.

3 Q      Did you discuss any aspect of this accounting with Mr.

4        Renfrew?

5 A      Other than I don't like the troubled debt restructure

6        provisions that were -- we have -- how we record it, we

7        had no additional discussion on it.

8 Q      Well, did you have that discussion with him?

9 A      I've had that with him, I've had that with Greg, I've had

10       that with -- Greg French, I've had that with Scott Miller.

11 Q     And did you have that discussion again here on July 12,

12       2006, with Mr. Renfrew?

13 A     2006, that's about a year ago, yes, I would have.

14 Q     Well, what amount should, in your view, have KPMG

15       indicated on the audited financial statements?  Would it

16       be the 6.189 figure that was in the general ledger and

17       reflected on Exhibit 59?

18 A     There are two pieces of debt -- of a troubled debt

19       restructure.  One is that if you have a loan that is less

20       than the principal amount that you originally started

21       with, in this case the approximately 12 or 13 million from

22       Travelers, the you do not recognize a -- the interest as

23       paid nor do you recognize an additional debt forgiveness

24       for that when you first come up with a note.  That's the

25       first portion.  Which is why starting with '03 or '04 we

1    ended up reporting the principal and interest together

2    because for reporting it for that FASB we were required

3    to.  The second portion of it has to do with the when do

4    you take the gain on the difference between the 12 million

5    and the eight million, just roughly speaking.  And that --

6    the FASB basically says that you take that gain when

7    there's no further contingencies that would require you to

8    pay more than that.  And the contingency in this case has

9    to do with is the provision for the bankruptcy provision

10   in the repayment agreement sufficient to cause a

11   contingency, and from KPMG's point of view they have

12   decided that they're not going to make that judgment and

13   therefore they're going to basically require us to record

14   that as a deferred gain on the income statement.  So the

15   conversations I would have had at this point had to do

16   with the -- when do we get to record the deferred gain as

17   revenue.

18                          DEPOSITION EXHIBIT 61 MARKED

19 Q  Can you identify Exhibit 61 as KPMG's audit report for the

20   Klukwan and subsidiaries consolidated financial statements

21   for the year ending December 31, 2005, and December 31,

22   2004?

23 A  And this is the audited financial statements with opinion

24   by the auditors for '04 and '05.

25 Q  Paragraph 13 -- excuse me, Page 13 under Paragraph 8,

1 A    Or the benefit of any claim would've been accrued to us,

2      yes.

3 Q    Any other reasons?

4 A    That's the primary ones I can think of right now.

5 Q    Besides yourself and Mr. Christianson who else employed by

6      any of the Klukwan-related entities would have knowledge

7      of facts which support Klukwan's assertion that Mr. Sokol

8      was acting as Klukwan's attorney?

9 A    I don't know who would.

10 Q   You would agree yourself and Mr. Christianson would be the

11     primary individuals in that regard, correct?

12 A   We would be.

13 Q   You were the individuals involved in all the

14     communications relating to the Travelers action against

15     Peterson Sullivan, correct?

16 A   The majority.

17 Q   I am right that this letter of March 21, 2005, Exhibit

18     109, is the first time Klukwan ever made such an assertion

19     against Mr. Sokol?

20 A   I believe that's the case.

21 Q   And it's Klukwan's position that both Travelers and

22     Klukwan were clients of Mr. Sokol, correct?

23 A   Directly or indirectly.

24 Q   And did you ever voice any objection to Chuck Langfitt

25     regarding the fact that Mr. Sokol was representing

1       Travelers in the Peterson Sullivan action?

2 A     I did not.

3 Q     Did you ever tell Chuck Langfitt that Mr. Sokol was doing

4       or not doing something that you believed he should've

5       done?

6 A     Other -- other than the fact that I did talk to Chuck

7       Langfitt that I thought it was not necessary to secure

8       working papers, that I thought that there was adequate

9       evidence without same to pursue, and had they pursued at

10      that point there would not have been a statute of

11      limitations issue.

12 Q    When did you have that conversation with Mr. Langfitt?

13 A    Several times during the discussion of why are we going

14      after working papers, why don't we just bypass that step,

15      so it would've been 2003, give or take.  Maybe even

16      early -- late 2002.

17 Q    Did you understand Travelers was relying on Mr. Sokol's

18      advice in pursuing the working papers?

19 A    I don't have -- I believe they did but I don't have any

20      direct knowledge of whose advice they were relying on.

21 Q    If Klukwan was a joint client of Travelers of Mr. Sokol

22      why is Travelers responsible for any of Mr. Sokol's

23      alleged negligence to Klukwan?

24      MR. SPRAKER:  Objection to form, calls for a legal

25 conclusion.

1 A    That's correct.

2 Q    I have not found nor seen in any of the records in this

3      proceeding anything in written form from Klukwan that

4      states and tells Travelers that Klukwan was relying

5      exclusively on Travelers' action.  Are you aware of any

6      such document?

7 A    Not as a document, no.

8 Q    Did you make that statement to Chuck Langfitt?

9 A    I did talk to Chuck Langfitt on more than one occasion

10     that one of the issues out there is Klukwan basically is

11     broke, two, anything we -- that Travelers received as a --

12     on a settlement with P&S or as a direct result of the

13     claim against P&S would benefit Klukwan either to the

14     point of against the note or against the deficiency.

15 Q   Even assuming that statements to have been made, they are

16     not the equivalent of an assertion or statement by you to

17     Mr. Langfitt to the effect that Klukwan's decided not to

18     bring its own action or we're relying exclusively on you.

19     That statement was never made, was it?

20     MR. SPRAKER:   That exact statement?

21     MR. HOPKINS:   Yes.

22 A   That exact statement was never made.

23 Q   Do you understand in interrogatory Number 5, going back to

24     Exhibit 12, Travelers asked Klukwan to identify all

25     documents that Klukwan contended were evidence of the

1        MR. HOPKINS:  Objection, form.

2  Q    And what was -- What was the result of that meeting?

3  A    The result of that meeting is we walked away with a

4        general understanding of how we could proceed to get a

5        repayment agreement -- repayment agreement with supporting

6        documents.  It basically ended up being three -- three

7        separate agreements.  The first agreement was the

8        repayment agreement that had two purposes.  The first

9        purpose was to settle the indemnity issues, and the second

10       purpose was to provide for a financing mechanism or a

11       mechanism to make any financial payments as a result of

12       settling the indemnity agreement.  The second agreement

13       was the financial instrument itself and that was a note

14       payable.  And the third agreement was a guaranty by two

15       other entities not South Coast, that would've been Klukwan

16       and Chilkats Portage Cove.  That's what ended up being the

17       agreement.

18 Q    Okay, and did you and Travelers came to an understanding

19       as to the material terms as a result of the July 17, 2002,

20       meeting?

21 A    We did.

22 Q    What were those terms as you understood them?

23 A    The first agreement, as I said, the repayment agreement

24       settled the indemnity provisions.  It has some other

25       sections in it, but that was the primary one.  Part of

1    that was a way to make financial payments against that

2    settlement agreement -- or, indemnity settlement.  That

3    agreement was the note payable.  The note payable was

4    designed to show -- to set up a system of payments that

5    would make Travelers whole vis a vis what our agreement

6    was.

7 Q   And did you reach an understanding as to what that

8    agreement was as a result of the July 17, 2002, meeting?

9 A   As a result of that meeting we talked about -- there were

10   two pieces of the discussion, really, on the note at that

11   meeting.  The first piece of the discussion boiled down

12   to, after a lengthy discussion between the parties, that

13   Travelers wanted $8 million repaid.  They didn't care how

14   it was -- how it was characterized.  I wanted to

15   characterize as much of that as a note payable, and the

16   reason for that.....

17 Q   Well, before you get into the reason, can you explain what

18   you mean by a note payable?

19     MR. HOPKINS:  Objection, you should let the witness

20 continue and complete his answer.

21     MR. SPRAKER:  I can conduct my examination.

22 Q   Can you explain what you mean by note payable?

23 A   A note payable is basically a document that states this is

24   the terms of our repayment to Travelers in this case, it

25   basically says here's the principal amount, which within a

1    rounding error was 5.3 million, here's the terms of

2    repayment, which were basically what payments would be

3    made and when and the interest rate.  At the July meeting

4    what we talked about was the total would be eight million,

5    that would be principal and interest, the interest rate I

6    would use would be 6%, and the next morning I would send

7    out an amortization schedule that basically, based upon

8    the payments that we agreed -- we agreed on the payment

9    schedule too, which would be the gross payments, principal

10   and interest.  So we set up the payment schedule.  The

11   first two years were skipped payments and then basically

12   for the next 12 months I believe it was 50,000 a month

13   starting in September, and then it ratcheted up so it was

14   740,000 a year, but only monthly with skipped payments in

15   the winter and in 2010 there would be a balloon.  So we

16   agreed on the gross side.  I then agreed that I would take

17   those numbers with an interest rate of 6% and I would

18   create an amortization table that would get us -- that

19   would calculated what the amount of the note should be.

20   Therefore the note would be 5.3, that's what the

21   calculation eventually prove -- showed.  The note would be

22   5.3, the interest rate would be 6%, and the total over

23   time paid would be eight million.

24 Q  And is that what you did?  Did you prepare the

25   amortization table?

1  A    I prepared the table the next day and forwarded it to

2        myself, left off a couple points that I added, and then

3        later that day I believe I forwarded it to Charles

4        Langfitt.

5  Q    Okay, and would that have been what has previously been

6        marked as Exhibit 39?

7  A    I believe so but I'd like to look just to be positive.

8  Q    Please do.

9  A    Thank you.  That would be marked as Exhibit 39, yes.

10 Q    Okay, and what is the purpose of an amortization table?

11 A    The purpose of an amortization table is to show over time

12       what payments are going to be made, how much of those

13       payments are going to be applied to the face amount of the

14       note, how much of those payments are going to be applied

15       to interest, and over the life of the note how much total

16       is going to be paid as principal, as interest, and added

17       the two together in total.

18 Q    And did you ever hear from Mr. Langfitt regarding the

19       amortization table that you sent on July 18th, which is --

20       2002, which is reflected on Exhibit 39?

21 A    He received it, it's eventually what made its way -- the

22       face amount of what -- 5.3 and change is what made it into

23       the final note payable.

24 Q    Did he ever object to the amortization table that you

25       prepared and sent to him?

1    reports themselves led me to believe that something had

2    been missed by Peterson Sullivan.

3  Q  And as of that meeting in July 17, 2002, had you shared

4    that opinion with Mr. Langfitt?

5  A  When Mr. Langfitt first called when I talked to him in

6    June of that year, in June of 2002, the conversation was

7    they were taking over the jobs and I was concerned that,

8    you know, there had to be -- I wanted to have something

9    left for Klukwan because if there was nothing left Klukwan

10   just as well declare bankruptcy, close its door and be

11   done with it.  And I had reiterated -- and Mr. Langfitt

12   had basically assured me that he -- that there would be

13   something left for Klukwan to go forward on.  And at that

14   point I had reiterated, you know, various things that had

15   caused me concern, the reports from Sutor, the reports

16   from P&S, the -- you know, what happened with KeyBank, the

17   very precipitous drop in value and ability to go forward

18   that South Coast had had, basically from revenues --

19   basically from a company that had good revenues, not so

20   good net income, to a company that was -- had tanked.

21  Q  And in that discussed did you discuss Peterson Sullivan at

22   all?

23  A  Just in the general way that I think Peterson Sullivan

24   should be -- that there should be an investigation on

25   Peterson Sullivan to see if there was some liability

1      there, had they done their job.

2 Q    Do you recall Mr. Langfitt's response?

3 A    Not at that point I don't.

4 Q    Do you recall his response in any subsequent -- well,

5      strike that.  We know based upon what I believe Mr.

6      Gilmore showed you as Exhibit 67 that there was a

7      discussion memorialized by Mr. Langfitt and you on June

8      2nd, 2003.  Between that July 17, 2002, and June 2nd,

9      2003, period would you have had any discussions with Mr.

10     Langfitt or anyone else at Travelers regarding Peterson

11     Sullivan and possible claims against them?

12     MR. GILMORE:   Lack of foundation.

13 A   For that intervening year basically I was focusing on

14     shutting down South Coast, and most of my conversations

15     during that period of time would have been between Marc

16     Eckardt and myself, there would have been occasional

17     conversations with Peterson Sullivan -- excuse me, wrong

18     word.  Would've been occasional conversations with Chuck

19     Langfitt and continued to ask them what they thought about

20     claims -- specifically with Chuck about claims with

21     Peterson Sullivan.  Conversations with Marc more went to

22     Marc, have you thought about this -- this would be Marc

23     Eckardt.  Have you thought about this and he would

24     basically say that's a decision that Chuck Langfitt would

25     have to make.

1 Q    And when you say thought about this what do you mean?

2 A    Had they considered any claims against Peterson Sullivan

3      as the CPA firm.

4 Q    And what was the purpose of you raising these matters to

5      either Mr. Langfitt or Mr. Eckardt during this time

6      period?

7 A    Well, the purpose was -- is I didn't want it to get

8      dropped just as an oversight.  The -- I was trying to shut

9      down South Coast, I'd shut down three locations, several

10     jobs, had worked with Travelers to minimize the losses

11     that Klukwan and that -- well, that Travelers had, but

12     also that South Coast and Klukwan had had as a result, and

13     what I was hoping or expecting would be that Travelers

14     would look at this as an opportunity to recover some of

15     their losses.  Had they recovered or should they recover

16     they would -- that recovery would have benefitted them, of

17     course, but it would've also benefitted Klukwan and

18     entities because it would have either gone against the

19     note, and I know there wasn't an agreement on that but was

20     discussion, but there was also it would've gone at least

21     against the deficiency, the difference between the note

22     and the amount that they paid out, and so either way

23     Klukwan would have had a benefit.

24 Q   Can you recall anything regarding any of the conversations

25     that you may have had with Mr. Langfitt -- or, let me

1   strike that.  Can you recall any of the specifics of any

2   conversations that you may have had with Mr. Langfitt or

3   Mr. Eckardt between July 2002 and June 2003?

4 A   Not specifically.  I can just recall that there were

5   conversations more of a prodding nature, or reminder

6   nature.  But the 2003, June I believe that one memo was,

7   one handwritten note from Mr. Langfitt, it was obvious

8   that they were now looking at it, and I felt that that was

9   a good -- a good thing.

10 Q  in that time frame do you think there was one additional

11   conversation or multiple conversations?

12 A  There were.....

13   MR. HOPKINS:  Objection, form.

14   MR. GILMORE:  Lack of foundation.

15 Q  You can answer.

16 A  There would've been multiple conversations.

17 Q  Do you have any idea as to how many?

18   MR. GILMORE:  Same objection.

19   MR. HOPKINS:  Likewise.

20 A  No, it -- it wasn't every conversation with -- well, most

21   of my conversations with Marc and it was just a remind

22   Chuck that he needs to look at this, but I can't remember

23   if it -- you know, if my total conversations were three or

24   four or more than that.  I just know that they did occur.

25 Q  What was the purpose of -- actually, why don't you pull

Page 474

1    you were looking at Peterson Sullivan for possible claims?

2 A    The reason that I brought it up at this point and others

3    was trying to keep them looking at it.  I basically felt

4    that we had -- Klukwan had some weaknesses in their case

5    against Peterson Sullivan that Travelers did not have, and

6    so I was trying to remind them to keep looking at it

7    because if they were successful we benefitted.

8 Q    Did you ever tell Mr. Langfitt what you perceived to be

9    the weaknesses in your case?

10 A    I did.

11 Q    Do you recall when you would have had that discussion?

12 A    Not specifically, no.

13 Q    What did you tell him?

14 A    Basically that if we sued Peterson Sullivan they would

15    come back and say they relied on management of South Coast

16    and management of Klukwan in preparing their financial

17    statements, but that if that suit came from Travelers, or

18    a third party but Travelers in this case, that they would

19    not have that same -- some issue.  I don't believe that

20    issue was -- meant that our case couldn't be fought and

21    maybe fought successfully, but having Travelers fight it

22    would be -- would get us to the same end result, we would

23    benefit, and they didn't have the weaknesses we had.

24 Q    What was the purpose of telling this to Mr. Langfitt?

25 A    To encourage him to take action.

Page 475

1 Q     Did he -- do you recall the response of Mr. Langfitt?

2 A     Eventually they took action.

3 Q     Travelers asked that Klukwan make demand -- or, actually

4       let me rephrase it.  Did Travelers ask Klukwan to make a

5       demand upon Peterson Sullivan for production of its

6       working papers?

7 A     Yes, they did.

8 Q     Why were they asking that Klukwan make that demand?

9       MR. HOPKINS:  Objection, foundation, form, calls for

10 speculation.

11      MR. SPRAKER:  Anything else?

12      MR. HOPKINS:  No.

13 Q     You can answer.

14 A     It is my belief that they asked for that because we --

15      Klukwan had hired P&S -- Peterson Sullivan to do the work

16      and therefore it was a work product of Klukwan's

17      engagement and that they believed that we would have a

18      much better opportunity or likelihood of success than they

19      would.

20 Q     Did Mr. Langfitt or anyone at Travelers tell you why they

21      wanted the work papers?

22 A     I was told that they wanted the work papers because they

23      wanted to find out if they had a cause of action against

24      Peterson Sullivan.

25 Q     And how did you respond?

1    audit work papers.  I then asked Mr. Langfitt what they

2    were going to do next, and at some point in time they made

3    a decision to file suit to require production of those

4    documents.

5  Q    Let me jump back a little -- a little bit.  Why hadn't

6    Klukwan asked for the work papers prior to the request

7    from Travelers?

8  A    Basically because I did not think they were -- were

9    necessary to build a claim, that's the first reason.  And

10    second, once Travelers was -- had asked for them it became

11    moot because we were working jointly with Travelers at

12    that point for production, anything they received we would

13    also receive as well.

14  Q    So what was -- Were there any actions taken in regard to

15    Peterson Sullivan after the denial for the voluntary

16    production of the work papers by Peterson Sullivan?

17    MR. HOPKINS:  Objection, vague, confusing.

18    MR. SPRAKER:  That was kind of vague and confusing.

19    MR. HOPKINS:  Leading.

20    MR. SPRAKER:  I didn't think it was leading, but I thought

21  it was vague and confusing.

22    MR. GILMORE:  It's a deposition.

23  Q    What did Klukwan do with regards to Peterson Sullivan

24    after they refused to produce the work papers?

25  A    I talked to Mr. Langfitt at some point, they basically

1       MR. HOPKINS:  Objection, lacks foundation.

2 Q     Did Travelers agree to.....

3       MR. HOPKINS:  Form.

4 Q     .....to join in -- actually let me go back and set the

5       foundation.  Did Travelers request that Klukwan join in an

6       action to compel Peterson Sullivan to produce its working

7       papers?

8 A     Yes, we ended up joining that action, yes.

9 Q     What was the result of that action?

10 A    They were basically denied the working papers at that

11      point in time.

12 Q    When did you become aware that -- that the action to

13      compel the working papers had been denied?

14 A    I believe that would've been early '04.

15 Q    Did Klukwan decide to sue Peterson Sullivan for negligence

16      in preparing financial statements at that time?

17 A    No, at that point we continued to -- I continued to ask

18      Chuck Langfitt what they were going to do because this had

19      obviously not worked, and was continually assured that

20      they were still looking at their own claim on what to do

21      next.  But that they had not dropped it, they were

22      planning to still go forward with it.

23      MR. GILMORE:  Move to strike that answer as nonresponsive.

24      MR. HOPKINS:  I agree.

25 Q    Did you.....

1      response.

2 Q    Can you pull Exhibit 90, please?

3      MR. HOPKINS:  Go off the record just a second.

4                      (OFF THE RECORD)

5                      (ON THE RECORD)

6 Q    And looking at Exhibit 90, this is an e-mail that I want

7      you to look at the bottom e-mail.  Can you identify that?

8 A    Well, this is an e-mail from me to Charles Langfitt.

9 Q    Okay, and what was the purpose of this e-mail?

10 A   The purpose of this e-mail was to inform Mr. Langfitt that

11     we had -- that I had seen that we were unsuccessful in

12     getting access to the work papers and asking him what

13     Travelers planned to do next.

14 Q   Now, why did you want to know what Travelers was going to

15     do?

16 A   Because if Travelers was going to cease going forward then

17     we would go forward, but if they continued to go forward

18     then we had our options open.

19 Q   Were you able to get a response -- Were you able to talk

20     to Mr. Langfitt about those concerns?

21     MR. HOPKINS:  Objection, vague, ambiguous, form.

22 Q   During this time frame -- in May of 2004 did you have any

23     conversations with Mr. Langfitt?

24 A   I don't recall any specifically.

25 Q   But he did respond to your e-mail on May 26, 2004?

1  A    Yes, he did.

2  Q    And that's what's contained at the top of Exhibit 90?

3  A    Yes, it is.

4  Q    And it reads "We are reviewing filing suit.  We will keep

5       you posted," is that correct?

6  A    That's correct.

7  Q    What did you take that to mean?

8  A    It meant that they were still looking at going forward,

9       that they had not determined that they were going to drop

10      the case or not go forward, so basically that continued to

11      mean that we were working jointly, they were -- I was

12      asking what they were doing, I was informing them that we

13      basically believed we had a case, in the past I had

14      informed them that I thought that the case was weak --

15      weaker than theirs, not weak but not as good as theirs.

16      And that -- so it was just an on-going what is Travelers

17      doing.  And this was another one of those responses

18      typical, which was we're still -- we're still going

19      forward, we're still going to file -- well, at least

20      thinking about filing suit.

21 Q    Did you have any concerns as of this time, May 2004, that

22      an action had not yet been filed against Peterson Sullivan

23      for negligence or otherwise seeking damages for their

24      financial statements?

25      MR. HOPKINS:  Objection, vague, ambiguous, confusing.

1 Q    Do you understand the question?

2 A    Did I have any concerns about the time frame it was taking

3      Travelers to make up their mind?

4 Q    Correct.

5 A    At this point, you know, as it got later in the game I got

6      more and more concerned, but it looked like they were

7      still proceeding.  I actually did not think that they

8      would let a statute of limitation pass, so I never -- it

9      never concerned me at that point.  But it was just

10     concerning that it's taking longer and longer and I was

11     trying to, through basically constantly asking are you

12     going, we think there's a case here, was to get them

13     moving.

14 Q    Did you ever have any conversations with Mr. Langfitt

15     regarding the timeliness of their action against Peterson

16     Sullivan?

17 A    At some point.....

18     MR. GILMORE:  I wonder -- my objection is foundation.

19 When you say with Mr. Langfitt, I mean, it's my understanding

20 these conversations are all just between you and Mr. Langfitt,

21 that Mr. Sokol is not involved in these conversations?

22     MR. SPRAKER:  That is correct.

23     MR. GILMORE:  Okay.

24 A    You know, at some point, and I don't remember when, but I

25     did express a concern to Mr. Langfitt that, you know, we

1       needed to -- or, they needed to be timely in filing or

2       else their rights would go away.

3 Q     Do you believe that conversation would have been before or

4       after the denial of the action to compel production of the

5       work papers of Peterson Sullivan?

6 A     If I remember right, it would've been before because I

7       didn't think producing the work papers mattered in the

8       course of the events, that the only thing it did was have

9       a tendency to draw out the action, and that they would end

10      up being in the same place where they ultimately ended up,

11      which was we have to file a case.

12 Q    Do you recall any response from Mr. Langfitt?

13 A    Mr. Langfitt's response was we're reviewing our options,

14      we believe that we need those work papers.

15 Q    And just to be clear for Mr. Gilmore's point, was anyone

16      else involved in that conversation?

17 A    No.

18 Q    After Peterson Sullivan -- I mean, after Travelers sued

19      Peterson Sullivan you discussed at length that there was a

20      board resolution drafted authorizing an action by Klukwan

21      against Peterson & Sullivan.  Do you recall that

22      testimony?

23 A    I do.

24 Q    And I believe -- you probably should pull out Exhibit 97

25      just so that we can confirm that that is the document

Page 488

1    we've been talking about.  And can you look at the back of

2    Exhibit 97.  Is that the resolution that we've been

3    talking about, draft resolution authorizing the initiation

4    of a law suit against Peterson Sullivan?

5    MR. HOPKINS:  Objection, vague.

6    MR. SPRAKER:  I'm trying to speed this along.  If you want

7 to.....

8 Q    Is that the draft resolution that you prepared?

9 A    This is a draft resolution that I prepared for a September

10    16, 2004, board meeting.

11 Q    Thank you.  What happened to that resolution?

12 A    Basically the board -- we went into executive session.  At

13    that point we -- the board discussed -- well, at some

14    point during this meeting the board discussed -- I don't

15    remember it was in executive session, but at some point

16    the board discussed where are we at on Peterson Sullivan.

17    I went to a white board that's in the conference room in

18    Haines, Alaska, and basically said here's where we're at.

19    We have a case potentially against Peterson Sullivan, I

20    don't like our case as much as I like Travelers has a case

21    against Peterson Sullivan.  Travelers also has a case,

22    that's the first premise.  Second, went through the

23    history, that in general the history was after the

24    collapse of South Coast it was obvious that there was some

25    problems, some reasons it was obvious, that we were

1    working jointly with Travelers.  First there was a request

2    for production of work papers, informal by letter.  Second

3    there was a suit for production of work papers,

4    unsuccessful.  Third, Travelers has filed suit for actual

5    recovery of damages.  I then went in and said there's two

6    ways damages could be applied.  In either case it benefits

7    us.  First way, Travelers has spent approximately -- at

8    that point the balance that they had spent, less recovery

9    that they had received, was approximately 11 to 11.5

10   million.  For the discussion I used, I think, 11.  That

11   they had sued for recovery from Peterson Sullivan of

12   approximately 8.5.  It was actually a little more than

13   that but I'll use 8.5 here.  Actually I used 11.5 as the

14   amount of their expense.  The difference between 8 point -

15   - 11.5, you minus 8.5, assuming they had been completely

16   successful that would've left three million.  What that

17   would have done is that would've wiped out all need for

18   the bankruptcy provision and it would have gone into the

19   note itself.  Because at that point the note with future

20   interest, so not the -- not the face amount or the

21   principal amount of the note, but the total obligation

22   note, accrued interest and unearned interest, was about

23   six million and change, so three million was less six

24   million, so it would've -- some of the note would've been

25   paid off through recovery.  Second option would have been

1     it hits the note first, and recognize that Travelers did

2     not agree with that, but if it hit the note first it would

3     wipe out all of the note and there would be some return to

4     Travelers on the -- what I referred to earlier as the

5     delta, the difference between the 11.5 and the current

6     note with interest earned and unearned.  So in either case

7     it was going to benefit Klukwan.  We then continued the

8     discussion and said and we don't know that it's going to

9     be 8.8 million, it might be five million, and we ran

10    through the same numbers, it might be four.  We recognized

11    8.8 was just the balance.  We ended up with a discussion

12    that says let's let Travelers do the heavy lifting here,

13    in other words let's let them pay for the litigation,

14    let's see what happens.  If they're successful, great, we

15    benefit.  And they will have proven our claims against

16    them, and -- against Peterson Sullivan, and if they were

17    unsuccessful, then we probably didn't have a claim to

18    begin with.  Never during that period of time did we

19    discuss any of the statute of limitation issues that might

20    arise.

21 Q  So what happened?  Was the resolution that's attached to

22    Exhibit 97 approved?

23 A  Actually the resolution was never addressed, it was never

24    approve -- it was never brought up for a vote.  It was

25    never approved, it was never denied.

1 Q    Was it ever brought up again?

2 A    At that point the discussions at future board meetings

3      turned to keeping the board informed of the progress that

4      had been made just as a status report; this is where we

5      believe the case is today.  Since we were not actively

6      part of the case, mostly the -- would've been a

7      reiteration of this is what's going to happen should they

8      be successful, and a white board exercise again.

9 Q    After the filing of the suit in your opinion was there any

10     reason for Klukwan to bring its own action against

11     Peterson Sullivan?

12 A   At the time I knew of no reason for Klukwan to bring its

13     own action because we would be benefitted as well.

14 Q   Were you ever -- were you served the pleadings in the

15     Peterson Sullivan action?  And by Peterson Sullivan action

16     I'm talking about the second action, the substantive

17     action brought by Travelers.

18     MR. HOPKINS:  Objection, vague, confusing.

19 A   I.....

20     MR. HOPKINS:  Lacks foundation.

21 A   I don't remember -- we were not party of that suit, I was

22     never called to provide testimony, deposition, evidence,

23     information.  I knew the suit had been filed, we had made

24     at least one offer to be -- to join it, it never went

25     anywhere prior to September.  Basically we were not in the

1       loop at that point.

2   Q   Did you ever receive an engagement letter from Jan Sokol?

3   A   I did not.

4   Q   And I believe it's your testimony with Mr. Gilmore is that

5       you never had any discussions with Mr. Sokol regarding

6       representation of Klukwan in any matter?

7   A   I did not, other than the one case for production of

8       documents.  In that case he jointly represented the two

9       companies, but other than that no.

10  Q   Did he ever tell you that -- did he ever send any

11      communication that his representation of Klukwan had

12      ended?

13  A   He did not.

14  Q   Do you believe Mr. Sokol was aware of Klukwan's interest

15      in suing Peterson Sullivan for malpractice?

16      MR. GILMORE:  Objection, lack of foundation.

17  A   I believe Mr. Sokol knew that Klukwan was interested in

18      Peterson Sullivan being sued and that we were relying on

19      either Travelers -- well, we were relying on Travelers to

20      carry the water on that.

21  Q   And what was the basis of that understanding?

22  A   He had been around the Klukwan/Travelers as an entity --

23      as a agreement for three or four years by -- three and a

24      half years by this time.  You know, we were fairly

25      consistent in we believe there's a case here, we believe

1    you should go forward, we believe we can go forward.  We

2    basically did not waver on that.  And in fact if you look

3    at the series of actions that were taken, you know, the

4    first action, concrete action that was taken besides

5    conversations was please write the letter.  We wrote the

6    letter at their behalf.  Travelers knew.  Second concrete

7    action, the letter didn't work, please join the suit for

8    production.  Jan was part of -- Jan Sokol was part of that

9    suit for production.  We did that.  It was unsuccessful.

10   From there we continued to ask Travelers what's going on.

11   Travelers eventually filed suit.  We found that out.  We

12   were not part of that subsequent suit for damages, but

13   because of conversations I believe that Travelers through

14   Chuck Langfitt knew that we, one, encouraged them to go

15   that direction, and, two, felt that we would be benefitted

16   from it because any recovery against the losses that they

17   had suffered would accrue directly against the note or

18   indirectly against the difference between the note payable

19   and the total costs that they expended.

20 Q  Can you pull out Exhibit 63 real quick?  And I only have

21   two questions left to discuss.  Exhibit 63 is an e-mail

22   from Tom Crandall to Greg French.  Can you identify that

23   document real quick for the record, please?

24 A  This is a portion of an e-mail sent by myself to Greg

25   French.  Greg was with KPMG, who was the subsequent

1    MR. SPRAKER:  Objection to the form, calls for a legal

2 conclusion.

3 Q    Go ahead.

4 A    It's my belief that Peterson Sullivan is not a bonded

5      contract.

6 Q    You testified regarding the discussions that took place

7      among Klukwan's board at the mid-September 2004 meeting

8      regarding whether Klukwan should pursue its own claim

9      against Peterson Sullivan in response to questions by Mr.

10     Spraker, do you recall that topic generally?

11 A   I do.

12 Q   I think the term you used is you went up on a white board?

13 A   Yes.

14 Q   And you outlined various scenarios, correct?

15 A   That's correct.

16 Q   And those scenarios projected various different possible

17     recoveries by Travelers, correct?

18 A   That's correct.

19 Q   And you certainly recognized at the time there was no

20     certainty as to what recovery Travelers might obtain from

21     Peterson Sullivan, correct?

22 A   That's correct.

23 Q   And indeed the scenarios that you outlined ranged from a

24     $4 million recovery to an $8 million recovery?

25 A   I think those are what I used in described how I went

1          agreement?

2  A       Since KPMG is not an attorney, they're an auditor, I

3          believe that having an opinion of our audit -- of our

4          account -- excuse me.  Of our attorney would carry more --

5          carry some weight.

6  Q       You're not focusing on my question.  My question is.....

7  A       Then please restate.

8  Q       Did you have any understanding of whether this opinion,

9          the opinion expression by Mr. Christianson in the March 7,

10         2005, letter that we've marked as Exhibit 175, did you

11         have any understanding as to how that might affect KPMG's

12         view as to when Klukwan could recognize the gain that it

13         had negotiated as a result of the repayment agreement, the

14         gain being the difference between Travelers' total loss

15         and Klukwan's repayment obligations under the repayment?

16 A       An understanding with whom?  I don't know who the

17         understanding may be with.

18 Q       Within your own mind, between your own two ears.  Did you

19         have any understanding of that issue?  I'm just trying to

20         find out if you have an understanding.  If you don't, I'll

21         ask Mr. French.

22 A       I believe that it was germane to the discussion, I had no

23         understanding of what the outcome would be of that

24         discussion.

25 Q       Did you hope -- or, strike that.  Would it have been to

1    Klukwan's benefit if it could have recognized in its 2004

2    financial statements the gain between Travelers' total

3    loss and the amount of Klukwan's obligation under the

4    repayment agreement?

5    MR. SPRAKER:  Objection, vague, lack of foundation.

6 A  I believe that it would have improved the appearance of

7    Klukwan's balance sheet, and to the extent that it

8    improved it it may have a benefit.

9 Q  And, all things being equal, you would've liked to have

10   recognized that gain?

11 A  All things being equal, my job is to put a reasonably good

12   foot forward as long as I have a basis for putting that

13   foot forward.

14 Q  And did you have discussions with the KPMG auditors on

15   that subject?

16 A  Yes.

17 Q  And did those discussions at least in part prompt you to

18   ask for this opinion from Mr. Christianson which is his

19   March 7, 2005, letter, Exhibit 175?

20 A  I think that's what I've said earlier, yes.

21 Q  Did you ever go back to KPMG after transmittal to them of

22   Mr. Christianson's March 7, 2005, letter, Exhibit 175, did

23   you ever go back to KPMG and tell them that there were

24   errors in Mr. Christianson's letter?

25 A  No.