# Exhibit E

Deposition Testimony of Cabot C. Christianson

Declaration of Gary Spraker
Traelvers Casualty and Surety v. South Coast, Inc., et al.
Case No. Ao6-00063 (TMB)

Defendants' Reply

Index to Deposition Testimony of Cabot Christianson

| Page # |
|---:|
| 62 |
| 80 |
| 81 |
| 82 |
| 87 |
| 88 |
| 88 |
| 89 |
| 196 |
| 197 |
| 281 |
| 282 |
| 285 |
| 309 |
| 310 |
| 328 |
| 329 |

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>SOUTH COAST INC., an Alaska corporation, KLUKWAN, INC., Alaska Native Village corporation, and CHILKATS' PORTAGE COVE DEVELOPMENT COMPANY, an Alaska corporation,<br><br>    Defendants. | Case No. 3:06-CV-00063-TMB<br><br><br><br><br><br><br>**DEPOSITION OF CABOT CHRISTIANSON<br>DAY 1** |

. . . . . . . . . . .

SOUTH COAST INC., et al,

    Counterclaim and
    Third-Party Plaintiff,

vs.

TRAVELERS CASUALTY AND
SURETY COMPANY OF AMERICAN,
a Connecticut Corporation,
STEWART SOKOL & GRAY L.L.C.
and JAN D. SOKOL,

    Counterclaim and
    Third-Party Defendants.

. . . . . . . . . . .

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

| | |
|---|---|
| For Travelers<br>Casualty and Surety<br>Company of America: | James T. Hopkins, Esq.<br>Schiffrin Olson Schlemlein<br> & Hopkins, P.L.L.C.<br>1601 Fifth Avenue, Suite 2500<br>Seattle, Washington 98101 |

1       about the issue of payments on the note.....

2       MR. SPRAKER: No.

3   A   .....versus the note?

4       MR. SPRAKER: Let -- he's.....

5   A   All right, I'll wait for his question.

6   Q   Well, let me ask you another question, then. You disagree
7       that Klukwan -- well, strike that. If I understand your
8       testimony correctly, it is not your understanding that at
9       the July 17, 2002, meeting a tentative agreement was
10      reached whereby Klukwan would make total payments to
11      Travelers of $8 million over time?

12      MR. SPRAKER: Objection to the form.

13  A   I think it's an inaccurate and incomplete description.

14  Q   Did Klukwan as you recall agree to make payments totaling
15      any amount to Travelers at the July 17, 2002, meeting?

16  A   The parties agreed to a payment.....

17  Q   That isn't my question.

18  A   Okay, yes, I'm answering your question. The parties
19      agreed to a payment schedule which in total called for
20      total payments to Travelers over time of $8 million, that
21      is correct.

22  Q   The other aspects of the agreement between Travelers and
23      Klukwan, such as collateral and the form of the agreement
24      that would memorialize that repayment obligation, remained
25      to be worked out later, correct?

1  A   It looks that way, yes.

2  Q   All right. Focusing on Page 1 under the definitional

3      section?

4  A   Yes.

5  Q   First definition is of the term bonded contract.

6  A   Yeah.

7  Q   Quote, shall mean any contract that is referenced or

8      described in any bond issued on behalf of any Klukwan

9      entity, end quote.

10 A   Uh-huh (affirmative).

11 Q   Now, at the time the repayment agreement was executed a

12     claim against Peterson & Sullivan by either Travelers or

13     Klukwan was certainly not a bonded contract as that term

14     was defined in the agreement, was it?

15 A   The -- the Peterson Sullivan claim and the directors'

16     claim, and for that matter any other claim against any

17     other party, was not at all discussed, as I recall, at the

18     July meeting. There was no -- it now appears, I guess,

19     that it was within the contemplation of Chuck Langfitt in

20     his own mind, perhaps, but it was not part of the

21     discussion. And so the -- the claim against Peterson

22     Sullivan falls without -- outside of the literal

23     definition of bonded contract, I would agree with you, as

24     well as the directors and officers. But.....

25 Q   I think that answers my question.

1  A      Well, it's -- let me finish.....

2         MR. SPRAKER: Let him answer his.....

3         MR. HOPKINS: Well, he's not answering the question, he's
4  providing a speech and I'm going to object to this.....

5  A      Well.....

6         MR. HOPKINS: .....portion of the testimony as
7  nonresponsive.

8  A      Okay, I think it is a -- within the -- absolutely within
9         the spirit of the document that it be covered.  In fact,
10        the document would be nonsensical if you did not include
11        it that way.  Did not -- if you did not interpret the term
12        bonded contracts to include a -- something like a third-
13        party claim against Peterson Sullivan.  It would be.....

14 Q      I just want to -- let's focus on the question, then.  Is
15        it your testimony, then, Mr. Christianson, when you read
16        the definition of bonded contract on the first page of the
17        repayment agreement as executed by the party you believed
18        that definition included a recovery on a claim from
19        Peterson Sullivan?

20 A      That is a distortion of my testimony.

21 Q      Well, tell me.  Just tell me whether that was your belief
22        or not.  If that is not accurate, then say so.

23        MR. SPRAKER: When?  Now, or back then?

24 Q      At the time the repay.....

25        MR. HOPKINS: My question was clear, counsel.

1 Q    At the time the repayment agreement was executed was it
2      your belief that the definition of bonded contract found
3      on the first page of the repayment agreement included a
4      recovery on a claim by Travelers against Peterson
5      Sullivan?
6      MR. SPRAKER: Objection, foundation, assumes facts.
7 Q    Go ahead.
8 A    At the time I looked at this document I did not address
9      myself in any way, shape or form to the specific question
10     of whether a claim against Peterson Sullivan would be --
11     existed and therefore whether it would be inside or
12     outside the bonded contract. It is obvious, as I said,
13     that the document would be nonsensical if you were to not
14     treat it as being within the ambit of the term bonded
15     contract.
16 Q   The first sentence under the definitional section on the
17     repayment agreement, Exhibit 42, defines bonded contract,
18     correct?
19 A   I'm sorry, the first sentence under the -- yes, there is a
20     definition of bonded contracts there, yes.
21 Q   Read that out loud, please.
22 A   Bonded contracts shall mean any contract that is
23     referenced or described in any bond issued on behalf of
24     any Klukwan entity.
25 Q   A claim against Peterson Sullivan was not a contract, was

```
 1      included at the request of Chuck Langfitt?
 2 A    I'm not surprised, but that sounds right.
 3 Q    Did you understand by that provision Travelers was
 4      preserving its claims against third parties?
 5 A    I.....
 6 Q    Other than the Klukwan entities.
 7 A    That's what -- the sentence says what the sentence says.
 8 Q    That was your understanding of the meaning of the
 9      sentence, correct?
10      MR. SPRAKER:  Objection.
11 A    Well, my understanding of the meaning of the sentence, and
12      my understanding of the reason the sentence was put in
13      there, was to reaffirm that in entering into the
14      settlement agreement we were not impairing Travelers'
15      rights to collect, for example, on the bonded contracts or
16      to pursue whatever claims related to the work -- on the
17      work -- the work on the projects that might've been
18      performed, for example, if there was some subcontractor
19      who did a poor job.  There was never any discussion at all
20      that I'm aware of at all in the sense of Travelers having
21      a claim against somebody that's outside of the
22      construction contracts themselves.  And I never had a
23      whiff of an inkling that Travelers had a thought about
24      going after -- pursuing its own claim against Peterson
25      Sullivan or anybody else apart from the direct contract-
```

1      related people.
2  Q   So Mr. Crandall then never relayed to you his discussions
3      with Chuck Langfitt on that subject?
4      MR. SPRAKER:  Objection, assumes facts, form.
5  A   I don't recall any discussion prior to July of '02
6      concerning Chuck Langfitt's intention to file a claim
7      against the -- against Peterson Sullivan, no.
8  Q   Let's focus back on the last sentence of Paragraph 11.
9  A   Okay.
10 Q   Doesn't -- isn't it your understanding that that sentence
11     preserves Travelers' claims against third parties, whoever
12     they may be, with the exception of the Klukwan entities?
13 A   I told you what my understanding of that sentence was.
14 Q   Don't you believe my description is a fair
15     characterization and a reasonable interpretation of that
16     sentence?
17     MR. SPRAKER:  Objection, argumentative.
18 A   You asked me what my understanding was as to why the
19     sentence had been added in there.
20 Q   Was it your belief that Travelers had released any
21     potential claim it might have against Peterson & Sullivan
22     under the repayment agreement?
23 A   As I said, I didn't -- there was no discussion on either
24     side.....
25 Q   That you were involved in?

1  A    That I was involved in that Travelers was contemplating
2       its own claim against Peterson Sullivan.
3  Q    Did you ever assert on behalf of Klukwan that Travelers
4       had released its claims against Peterson & Sullivan by
5       virtue of the repayment agreement?
6  A    I don't believe so.  Against Peterson Sullivan?  No.
7  Q    Take a look at Paragraph 18 of the repayment agreement.
8  A    Okay.
9  Q    You recall that that clause, Paragraph 18, was included in
10      the repayment agreement at the request of Chuck Langfitt?
11 A    I believe that's true.
12 Q    You reviewed it, correct?
13 A    Yes.
14 Q    Was -- strike that.  Was the repayment agreement ever
15      modified or amended, to your knowledge?
16 A    I don't believe so.
17 Q    It's true that Klukwan attempted to renegotiate the terms
18      of the repayment agreement on more than one occasion,
19      correct?
20 A    True.
21 Q    And in fact you even proposed a written first amendment to
22      the repayment agreement, correct?
23 A    That sounds correct.  As I say, I didn't review those -- I
24      did not in preparing for this deposition go back through
25      that series of documents.  But I -- that sounds correct.

1 Q    Rather you state, quote, Klukwan's expectation, end quote,
2      correct?
3      MR. SPRAKER:  Objection, form, document speaks for itself.
4 A    That's what the word -- that's what the document says.
5 Q    Do you agree with me that the term expectation has a
6      considerably different meaning than condition?
7 A    Yes, I do.
8 Q    Looking at the last sentence in the third paragraph of
9      your February 10, 2004, e-mail, Exhibit 87, you stated,
10     quote, also, as you are aware, Klukwan is considering its
11     own action against P&S and has some -- has developed some
12     ideas about how to proceed.  You and I should discuss, end
13     quote.
14 A   Yes.
15 Q   And that reflected the fact Klukwan was continuing to
16     consider its own action against Peterson Sullivan,
17     correct?
18 A   It was, although the real thrust of that was Tom's desire,
19     pretty strong desire, to, you might say, drop the bread
20     crumbs in front of Travelers to lead Travelers to the
21     correct set of facts it would need to develop a case
22     against Peterson Sullivan.  There was also the possibility
23     of us bringing a suit, but I had told Jan that, you know,
24     if he brings a suit there's no real point in us bringing a
25     suit because it's the same dollars that are being chased

1    and he's got a stronger case.

2  Q  Certainly the language of this February 10, 2004, e-mail leads Travelers to believe that Klukwan is continuing to consider its own action against Peterson Sullivan, doesn't it?

6  A  Well, you'll have to ask -- yes, I can see that would be a reading from that. Jan never did call back and discuss to talk about the suit. I mean, he just never -- I never really understood why he didn't take the opportunity to get some good information. And he spent all this time going after the work papers but no -- he just ignored our efforts to provide him with some live information.

13 Q  It's true, as we previously covered in your deposition here today, that after this date of February 10, 2004, your office continued to research regarding a claims against Peterson Sullivan by Klukwan, correct?

17 A  Well, let's put it a different way. The research didn't stop. It dropped off dramatically, once it -- once this.....

20 Q  But that's not MY question.

21 A  Yeah.

22 Q  Your firm continued to perform research after February 10, 2004, regarding a claim by Klukwan against Peterson Sullivan, is that a true fact or not?

25 A  That's a -- it's a misleading question. Continuing

```
 1 A    Right.
 2 Q    .....of time?  Now.....
 3 A    That's all right.  I very well could've attended, I just
 4      don't have a recollection, so I guess that's as far as I
 5      can go right now.
 6 Q    Now, on February 10 in your e-mail to Jan you say
 7      Travelers -- you say Klukwan is considering its own cause
 8      of action against Peterson Sullivan, has developed some
 9      ideas.  And then I don't see where there's any time that
10      there's another follow-up e-mail or communication with Jan
11      Sokol telling him at what point in time, if ever, Klukwan
12      decided not to pursue its own cause of action.
13 A    That's true.
14 Q    So as far as you know Jan Sokol at least through -- up
15      through September of '04 as far as you know he still
16      assumed that Klukwan was considering bringing its own
17      cause of action or claim against Peterson Sullivan?
18 A    Well, I don't know what he knew.  I did tell him that if
19      he was going to go forward that there was very little
20      chance that we would go forward.  And -- but I -- you
21      know, you're right, I never told him after this e-mail
22      chain Jan, we have affirmatively decided not to go
23      forward.  And to go back to your -- the question you were
24      asking before, I kind of have a memory of participating --
25      and I may -- I don't know if it was this meeting or not.
```

```
 1       But I think the fact that the Travelers suit against
 2       officers and directors and Peterson Sullivan had been
 3       filed kind of reinvigorated, you might say, the issue of
 4       what we were going to do -- what Klukwan was going to do
 5       vis a vis Peterson Sullivan because the directors were
 6       making noises about wanting to have us indemnify and it
 7       looked like there was a fair chance we might be brought
 8       into the suit.  And then the question was, well, we're in
 9       the suit, should we -- you know, should we file a claim
10       against Peterson Sullivan.  It was more -- it was more in
11       the nature of, well, we -- since we're going to be -- it
12       looks like we might be in the suit anyway, should we, you
13       know, take a second look at this issue against Peterson
14       Sullivan.  And of course we never were brought into the
15       suit formally, so that didn't have to happen.  But, you
16       know, I think the client decision was -- was the same as
17       before, which was, you know, if Travelers is going
18       forward, which they obviously are, then there's very
19       little point in us pursuing a parallel action.
20 Q     Well, when the petition was filed for the work papers Jan
21       Sokol was representing both Klukwan and Travelers,
22       correct?
23 A     That's correct.
24 Q     And you were the attorney for Klukwan?
25 A     Well.....
```

1    first page it says, as an attorney representing joint
2    clients you had no authority to choose one client's
3    interest over the other concerning the subject matter of
4    your joint representation. Now, the joint representation
5    was on the petition to obtain the work papers, correct?
6 A  That was part of it.
7 Q  Well, what was the other part of it?
8 A  Well, I think it's pretty clear from the e-mail chain that
9    the end game here was a suit against Travelers (sic) and
10   although there was disagreement as to whether the funds
11   would be applied to the note or to the claim, at the very
12   least it would be applied to the claim and so, I mean,
13   that was really the -- the scope of the work was not just
14   to get the work papers, because that was really a
15   preliminary step. The real important element of what Jan
16   was doing was pursuing the claims for the benefit of both
17   Travelers and Klukwan regardless of how the proceeds are
18   applied.
19 Q  The March 27th letter is the first time I see anything in
20   writing that states that Jan Sokol was representing,
21   beyond the petition for the work papers, both Klukwan and
22   Travelers. Is there anything in writing that tells Jan
23   Sokol or advises him that he is the attorney representing
24   Klukwan after the request for the work papers?
25 A  Well, we've already seen the e-mail chain that establishes

Page 309

1      dollars are your proof.  See what I'm saying?

2 Q    I think so.

3 A    That's how I read that.

4 Q    Did you then discuss with Mr. Spraker -- Did ultimately

5      make a recommendation to Klukwan, to Tom Crandall, not to

6      bring a claim just on its own merits against.....

7 A    Sure, I -- my advice.....

8 Q    .....Peterson Sullivan?

9 A    .....consistently to Tom and to the board was that -- is

10     that Travelers is much better situated to bring its claim.

11     It didn't -- it had a -- didn't suffer from the unclean

12     hands defense that we would have, it did not have the

13     damages problem that we would have, and they would be

14     financing the litigation.  And we're chasing the same

15     dollars.  I mean, the Travelers damages are the same as

16     our damages, the same -- or, at least the first let's say

17     12 million or whatever, it's the same claim.  So if

18     Travelers is going to go forward there was no point in us

19     going forward.  And that was my advice pretty much

20     consistently from day one.

21 Q   Wouldn't your advice have been exactly the same if

22     Travelers wasn't even in the picture?  If you were just

23     asked to assess the Klukwan claim.....

24 A   No.  No, because.....

25 Q   .....against Peterson Sullivan?

1  A   .....if -- you know, although there were some -- some
2      damage issues that we've already talked about, it still
3      looked to me like a pretty good claim, and certainly a
4      very large claim.  I think that whenever you're dealing
5      with a claim that, you know, potentially could be in the
6      10 to $20 million range if successful, even a claim that's
7      got some problems with it is worth taking a real hard look
8      at.  And of course the client desires are a big part of
9      it.  Tom was very desirous of moving forward and I know
10     that if Travelers had not moved forward that Tom would
11     have been very desirous of either suing Peterson Sullivan
12     or having a lot of -- a really good reason why not.
13 Q   Just a couple of general questions.  In terms of your
14     litigation experience have you been deposed before?
15 A   Well, Mr. Hopkins deposed me earlier in this case, a
16     documents deposition.  I was trying to think of -- I
17     anticipated that question.
18 Q   Right, right.
19 A   I think that I have but honestly I can't recall if I ever
20     have before.
21 Q   Have you ever testified as an expert witness?
22 A   Yes, I have.
23 Q   When and where and what kind of case?
24 A   Once in State court concerning the -- some issues
25     regarding the mechanics of foreclosing on a note, and once

1   after the September 12, 2004, board update memo because
2   there's simply no entry in your billing statements to
3   reflect you traveled to Haines, correct?
4 A Well, it's more than that. Since we've had a chance to
5   look at, it looks like the meeting happened on September
6   16th, which is a Wednesday, and that the -- I don't have
7   time showing that I attended. The board minutes, which
8   are pretty complete, show that I was not there. If I'd
9   been there it would've been by teleconference for sure.
10  And so that explains why I don't have a very good
11  recollection of what happened at that meeting; because I
12  wasn't there.
13 Q Go back to the series of questions I asked you at the
14  outset regarding your advice to Klukwan regarding its
15  claims against Peterson & Sullivan and essentially your
16  view that if Travelers was going to proceed Klukwan should
17  not.
18 A Right.
19 Q It is true, then, that both you and Mr. Crandall wanted
20  Travelers to initiate an action against Peterson Sullivan?
21 A Yes.
22 Q Because you believed that was preferable to Klukwan
23  undertaking the expense and risk of its own action.
24 A Yes.
25 Q And indeed you've used the term, quote, bread crumbs, end

1        quote?

2  A     Uh-huh (affirmative).

3  Q     And prod or encourage Travelers?

4  A     My testimony is what it's been.

5  Q     The point being both you and Mr. Crandall were continually
6        trying to encourage Travelers to proceed with an action
7        against Peterson Sullivan, isn't that true?

8  A     We wanted Travelers to move forward with the action, yes.

9  Q     And you kept providing, quote, bread crumbs, end quote?

10 A     Well, I think most of the bread crumbs actually happened
11       -- were being provided by Tom Crandall, since it was a
12       factual bread crumb more than a legal bread crumb.

13 Q     And the purpose was to encourage Travelers to bring an
14       action against Peterson Sullivan?

15 A     Right, and to provide assistance to developing the facts
16       like the FMIs that we're talking about that Travelers
17       would have a difficult time developing on its own without
18       some inside help.

19 Q     In response to questions by Mr. Gilmore regarding the
20       repayment agreement you indicated that had you known
21       Travelers contemplated claims against the former South
22       Coast officers at the time the agreement was being
23       prepared you would've included language to effectively
24       prohibit that, correct?

25 A     Right.