Gary Spraker, Esq.
CHRISTIANSON & SPRAKER
911 W. 8th Avenue, Suite 201
Anchorage, AK 99501
Telephone: (907) 258-6016
Telefax: (907) 258-2026
Attorneys for Defendants

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | | |
|---|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation, | ) ) ) | |
| Plaintiff, | ) | |
| v. | ) ) | |
| SOUTH COAST, INC., et al, | ) ) | **Case No. A06-00063 (TMB)** |
| Defendants. | ) ) | |

**DECLARATION OF CABOT CHRISTIANSON IN
SUPPORT OF DEFENDANTS' REPLY TO TRAVELERS'
OPPOSITION TO CROSS MOTION FOR SUMMARY JUDGMENT**

Cabot Christianson declares and states as follows under penalty of perjury:

1.  I am a partner in Christianson & Spraker, who has represented Defendants South Coast, Inc., Klukwan, Inc., and Chilkats' Portage Cove Development Company (collectively, "Klukwan" or "Defendants") in the underlying matters that are the subject of this litigation. I have personal knowledge of the facts stated herein, am competent to testify to them, and would so testify if called upon to do so.

2. I represented Klukwan in the negotiation of the settlement of Travelers' claims against Klukwan arising from the *General Agreements of Indemnity* that were attached to my prior declaration submitted in support of Klukwan's cross-motion for summary judgment as Deposition Exhibit 32. The *Repayment Agreement* between Klukwan and Travelers, together with the related documents, comprise the settlement of Travelers' indemnity claims against Klukwan.

3. Klukwan entered into settlement negotiations with Travelers shortly after the collapse of South Coast in the spring of 2002 to settle and cap Klukwan's direct liability to Travelers under the *General Agreements of Indemnity*. Klukwan and Travelers exchanged proposals in June, 2002.

4. In the proposals, the parties had previously identified potential assets as collateral for any settlement, including potential claims against Klukwan's lender, Key Bank, for the seizure of its $13 million in investments. Klukwan specifically placed the Key Bank claims on the negotiating table as possible collateral for any settlement. The Key Bank claims were included in the original draft of the *Repayment Agreement* as collateral for the payment obligation, and discussed in a separate paragraph (Deposition Exhibit 40, Paragraph 9). Travelers elected not to take the Key Bank claims as collateral.

5. Also, the parties had specifically identified claims for additional monies owed on the Chinle project. These were construction claims arising from work South Coast had performed on the Chinle project. However, those claims were included within the settlement discussions, and ultimately a separate paragraph in the final *Repayment Agreement* (Deposition Exhibit 42, Paragraph 12).

6. Tom Crandall, Kimberly Strong, Tom Blanton and I met with Charles Langfitt and Marc Eckardt in Juneau on July 17, 2002 to continue settlement negotiations. The meeting lasted most of the day and was dedicated to settlement discussions.

7. At the end of July 17, 2002, the parties emerged with a settlement agreement that required a note in the amount of $5.3 million payable over a term of 8 years, bearing interest at 6% per annum, for a total of $8 million. The terms were set forth in a large poster size piece of paper that parties had been using throughout the day. I understand that Mr. Langfitt took possession of the paper after the meeting, and that it has been marked as Deposition Exhibit 162, a true and accurate copy of which is attached hereto.

8. The next morning, July 18, 2002, Crandall emailed Langfitt the amortization based upon this agreement, thereby concluding the basic terms of the settlement. The email has been marked as Deposition Exhibit 39, a true and accurate copy of which is attached hereto.

9. The July 17, 2002 meeting was the only occasion in which Langfitt, Crandall, and I, engaged in face to face negotiations on the indemnity claims. At no time during the July 17, 2002 meeting did anyone bring up possible claims against Peterson Sullivan, or other potential third party claims, with the exception of possibly using the Key Bank claims as collateral for the settlement obligation or the Chinle claims.

10. After Crandall emailed the amortization table to Langfitt, the remainder of the negotiations occurred between myself and Charles Langfitt, and were largely conducted through emails.

11.     I sent Langfitt a draft of the *Repayment Agreement*, *Promissory Note,* and *Guaranty* on July 30, 2002.  That draft *Repayment Agreement* included the same language contained in Paragraph 9, except that in the original draft it was Paragraph 4.  My original draft *Repayment Agreement*, the note and guaranty, have previously been produced as Deposition Exhibit 40.

12.     Langfitt responded to my draft by emailing his revisions to the documents on August 30, 2002.  Langfitt's revisions have previously been produced as Deposition Exhibit 41.  Langfitt included what would become Paragraphs 9, 11, and 18 in the final document.  Langfitt's explanation for the changes were that they "address issues which have arisen because of the on-going close out of the projects.  These provisions include the release regarding materials and equipment usage, as well as powers of attorney which are necessary to assist us in project close out."  *Id*.

13.     As of August 30, 2002, the parties had agreed to the substantive terms of the settlement, including the settlement payment and terms, as well as the language in Paragraphs 9, 11, and 18 on which Travelers is now relying.

14.     The *Repayment Agreement* satisfied Klukwan's obligations under the *Indemnity Agreements* and replaced it with a new obligation.

15.     The *Repayment Agreement* never references the Peterson Sullivan claims specifically, and there are no provisions directed to third party claims.

16.     I understand that Travelers now claims that the parties specifically contemplated claims against Peterson Sullivan within the negotiations for the *Repayment Agreement*.  I never discussed potential claims against Peterson Sullivan, or any other third

party claims in general with Langfitt before or after the July 17, 2002 meeting, with the lone exception of Key Bank. Nor can I recall any communications with anyone regarding the settlement or the *Repayment Agreement*, including Tom Crandall, in which there was any discussion of claims against Peterson Sullivan or any other third party with the exception of the Key Bank and Chinle claims.

17.     I understand that Travelers argues that Paragraphs 9, 11, and 18 of the *Repayment Agreement* somehow establish that Klukwan has waived any and all claims against Travelers, and specifically the claims and defenses for failure to timely file the Peterson Sullivan action. Such a broad and expansive waiver was never discussed in any negotiations regarding the *Repayment Agreement.* The terms contained in the *Repayment Agreement,* and specifically Paragraphs 9, 11, and 18, were limited to the issues at hand, namely the payment obligation of Klukwan in satisfaction of its indemnity obligation and Traveler's administration of the construction projects it had taken over from South Coast. Nor do I understand how Paragraphs 9, 11, or 18, could establish such an all encompassing waiver since we never discussed the Peterson Sullivan claims specifically, or claims against third parties in general. Certainly, there were no such discussions with respect to Paragraphs 9, 11, or 18 because we never discussed the relevant language in those paragraphs upon which Travelers now relies.

18.     Paragraph 9 addresses Klukwan's repayment obligation and limits any such obligation should Travelers' total loss fall under $8 million. This was a major premise of the settlement discussions on July 17, 2002. Klukwan was relying upon Travelers' estimate of its total losses, and wanted to ensure that Klukwan would be liable to pay only those actual,

real losses.  At all times during the negotiations, and afterwards, it was understood by all that if Travelers' total losses fell below $8 million, Klukwan's obligation would be reduced by the difference between $8 million and the actual net loss.

19.     At no time during our negotiations, or after execution of the *Repayment Agreement,* did Travelers ever indicate that the definition of "Bonded Contracts", inserted by Langfitt altered this fundamental premise of the settlement.

20.     Paragraph 11 defines the effect of the settlement agreement, and specifically the satisfaction and release of Klukwan's obligations under the *Indemnity Agreements.*  This section also contained the purported bankruptcy penalty.  There was considerable discussion and exchanges between myself and Langfitt regarding the bankruptcy penalty, including the effectiveness of the provision, as well as the exact terms of the penalty.  A true and accurate copy of my response to Langfitt's August 30, 2002 revisions is attached as Deposition Exhibit 171.  At no time, however, did we ever discuss whether the paragraph was designed to affect the parties pursuit of claims against Peterson Sullivan, or any other third party for that matter, or to exculpate Travelers for its post-settlement actions.  Nowhere in the paragraph is there any discussion of *Klukwan* releasing any party, or taking any action to release claims.

21.     The sentence limiting the release of claims to the Klukwan Entities was added by Langfitt in his August 30, 2002 revisions to Repayment Agreement.  This sentence is a standard limitation of a release.  I viewed this sentence as unremarkable because no one ever contended that the *Repayment Agreement* released, or purported to release, anyone's claims

against Peterson Sullivan, or any other third party other than the Kukwan Entities, or that it constituted a waiver of claims against Travelers.

22.  Paragraph 18 did include a waiver of claims against Travelers for the administration of South Coast's projects. Again, Langfitt proposed the language that was incorporated into the settlement, which in relevant part reads: "No failure or neglect on the part of Travelers to exercise, and no delay in exercising any right, remedy or power hereunder or any other agreement, or any other document executed and delivered to Travelers herewith, shall release or reduce the liability of SCI, Klukwan or CPC to Travelers hereunder, or under the Note or Guaranty, or in any way reduce, condition or limit the obligations of SCI, Klukwan or CPC hereunder to Travelers."

23.  The provision limits exculpation to those rights created within the *Repayment Agreement* and associated documents. Nothing in the *Repayment Agreement*, nor in the related documents makes any mention or provision for the pursuit of third party claims in general, or the Peterson Sullivan claim in particular. Travelers never hinted that it believed the waiver of claims was for more than the construction projections it was administering. Indeed, at this point, no other claims were discussed other than Chinle which was specifically addressed, and the Key Bank claims, which Travelers had decided it did not want.

Dated this 22nd day of February, 2008.

            By: /s/ Cabot Christianson
              Cabot Christianson
              CHRISTIANSON & SPRAKER
              911 West 8th Avenue, Suite 201
              Anchorage, AK 99501
              Phone: (907) 258-6016

        Fax: (907) 258-2026  
        Email: gary@cslawyers.net  
        Alaska Bar No. 7811089  
        Attorneys for Defendants

Undersigned certifies that on February 22, 2008, a true and correct copy of the above document was served on:

James D. Gilmore, Esq.
James T. Hopkins, Esq.
Robert L. Olson, Esq.
Garth A. Schlemlein, Esq.
Richard E. Spoonemore, Esq.

By first class mail, if noted above or by electronic means through the ECF system as indicated on the Notice of Electronic Filing.

By:   /s/ Susan Vanschooten  
      Susan Vanschooten