# Exhibit G

Fie Sube F
689687

# REPORT TO KLUKWAN, INC.

## BOARD OF DIRECTORS

## ON SOUTH COAST, INC.

## 2001 OPERATIONS

Prepared by:

PETERSON SULLIVAN P.L.L.C.

# TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| Summary |  |  | 1 - 3 |
| Exhibits | A | Contract Selection | 5 |
|  | B | Summaries of Detail Reviews of Contracts | 7 - 53 |
|  | C | Gross Profit Analyses of Contracts | 55 - 65 |
|  | D | Summary of Scope and Procedures | 67 – 69 |

## SUMMARY

The monthly net income (loss) at South Coast, Inc. for the last six months of 2001 was reported as follows:

| | |
|---|---:|
| July | $   259,657 |
| August | 216,962 |
| September | (20,998) |
| October | (571,298) |
| November | (1,265,865) |
| December | (3,710,290) |

The total loss for the year was $(5,563,398) as reported by management. Further year-end adjustments increased the loss by $2,760,246 for a final audited loss of $8,323,644.

SCI's management kept reporting more and more loss each month in the last quarter of the year. This finally resulted in Klukwan, Inc.'s Board and management losing faith in SCI's management.

How could all this have happened so quickly?

Even though the reported numbers indicate a fast deterioration, many of the factors contributing to the losses were in existence prior to October. The best way to look at this is to divide SCI's operations into distinct geographic regions as follows:

- Ketchikan

- Alaska other than Ketchikan

- Arizona

We reviewed the financial performance for those contracts with revenue of approximately $2.0 million or more and at least 50% complete by December 31, 2001 (Exhibit A). The results of this review are summarized below by region:

Ketchikan

We found for both contracts reviewed that they were administered generally within the guidelines provided in the FMI manuals (Exhibit B) and any actual changes in contract gross profit from that originally estimated were not significant (Exhibit C). However, we did find that the original budgets on these contracts were generally not updated for change orders. This characteristic was common in all three regions.

<u>Alaska Other Than Ketchikan</u>

We were able to document significant problems in this region. We were originally asked to review the Richardson Highway project. We discussed the results of that with the Board in Juneau on January 26, 2002. The detail written report is in Exhibit B. We reviewed two other contracts in the region and found results similar to those discussed with respect to the Richardson Highway contract. In each case the actual gross profits turned out to be negative as of December 31, 2001.

The general reason for the gross profit deterioration on the Richardson Highway project was the lack of compliance with the FMI manuals. This resulted in a breakdown of accurate timely reporting from the field as to actual costs, construction problems and change order cost estimates. The failure of this contract was due to poor administration in the field and in Ketchikan.

Both of the other contracts were originally bid well below that of the next lowest bid, i.e., Sitka Airport at 15.8% and Big Salt at 21.8% below. The bids did not leave much room for contingencies. We understand that there may be an opportunity to increase revenue on the Big Salt project either through currently unapproved change orders or claims. However, this does not mean that these projects were not originally underbid. Difficulties were encountered on these projects but reporting of such difficulties to Ketchikan in order to compute the change in gross profit on a timely basis did not occur.

Part of the problem in Ketchikan was that the percent of completion on projects was based on actual costs reported as compared to original budgeted amounts. So, until budgeted line items were exceeded, Ketchikan accounting remained ignorant of what was going on in the field as to construction problems or change orders. If the FMI procedures had been followed many of these inaccuracies could have been mitigated. Further, a financial executive in Ketchikan should have been constantly in communication with the contracting executives to determine if any of the cost to complete components needed revision.

All of the above factors resulted in poor monthly financial reporting to Klukwan. Therefore, any hope of remedial corrective action during the job was lost and losses were incurred.

<u>Arizona</u>

Generally, the reporting and management in this region was better on the six contracts we reviewed than for the Alaska other than Ketchikan region. However, this did not result in either accurate or timely reporting in all cases.

The quoted bids did not include recognition of state gross receipts tax. On average, this could have amounted to an additional cost of approximately 3.75% of the total contract bid or an approximate gross profit decrease of about 4%. Four of the six Arizona contracts resulted in gross profit percentages in excess of that originally estimated after taking into account the gross profits tax. However, this does not change the fact that until November 2001, gross profits were reported which were too high.

Travelers Casualty and Surety v. South Coast, Inc., et al.                    DECL. OF SPOONEMORE
Case No. A06-00063 (TMB)                                                      Ex. G, p. 4

For the other two contracts we reviewed, Navaho Forest Boundary and Chinle, there were problems beyond not recognizing the gross receipts tax. Simply stated, the Navaho Forest Boundary project suffered from lack of attention from management. At Chinle, the primary construction problem was environmental which, even though known in early 2000, resulted in significant delays. This has resulted in a $2.2 million claim which is currently in litigation. Should the litigation result in a favorable outcome, the Chinle current loss in excess of $1.0 million (Exhibit C) could be greatly reduced.

<u>Fraud</u>

Finally, we performed certain procedures to help detect fraud. Based on those procedures, we found no evidence of significant fraud.

<u>Conclusion</u>

SCI was poorly managed out of Ketchikan in 2001. Actual performance in the three geographic regions was mixed. Performance in the Alaska other than Ketchikan region was by far the worst. The Richardson Highway project was a management disaster. Its management and reporting problems exemplify what generally went wrong outside of home base in Ketchikan.

Klukwan's Board determined that SCI's bad financial performance in 2001 was attributable, in the first instance, to senior management in Ketchikan. Action has already been taken to attempt to correct the management and financial problems at SCI.

Travelers Casualty and Surety v. South Coast, Inc., et al.                    DECL. OF SPOONEMORE
Case No. A06-00063 (TMB)                                                      Ex. G, p. 5

3

EXHIBIT A

CONTRACT SELECTION

t Selection

| Less than 50% complete | Selection | Files Location | Division Manager/VP | Superintendent |
|---|---|---|---|---|
| | 5,330,007 | Ketchikan, AK | Brad Finney | Jeff Wedekind |
| | 9,105,000 | Ketchikan, AK | Brad Finney | John Pool |
| | 4,841,223 | Anchorage, AK | David Filucci | Fox/Hammond |
| | 3,150,796 | Ketchikan, AK | Mark Johnson | Mark Johnson |
| (4,247,353) | - | | - | - |
| (2,614,245) | - | | - | - |
| (6,499,000) | 16,320,659 | Thorne Bay, AK | Brad Finney | Bill Welton |
| | 7,341,916 | Fountain Hills, AZ | Ken Griner | John Leasure |
| | 1,997,920 | Fountain Hills, AZ | Ken Griner | Bob Boozer |
| | 3,444,391 | Fountain Hills, AZ | Ken Griner | Dane Dahlgren |
| | 7,968,676 | Fountain Hills, AZ | Ken Griner | Tim Winsenberg |
| | 8,319,260 | Fountain Hills, AZ | Ken Griner | Dane Dahlgren |
| | 2,156,452 | Fountain Hills, AZ | Ken Griner | Tim Winsenberg |
| (13,360,598) | 69,976,300 | | | |
| (13,360,598) | 81,632,072 | | | |
| | 85.72% | | | |

of December 31, 2001

5

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. G, p. 7

EXHIBIT B

SUMMARIES OF DETAIL REVIEWS OF CONTRACTS

**South Coast, Inc.**
Contract Analysis
December 31, 2001

**Contract name/number**

Ketchikan Transfer Facility Phase I
23029

**Original award amount**

$4,927,660
Change Orders $401,385 approved, $67,226 authorized and waiting approval (approval expected)

**Scope of work**

The scope of the project was to construct a docking bay for the Alaska Marine Highway System inter-island ferry. The contract included dredging a portion of the waterway, filling existing waterway, installation of mooring piling and anchoring, placement and installation of a passenger and vehicle transfer bridge.

Division Manager/VP:     Brad Finney
Project Superintendent:   Jeff Wedekind

**Competing bids**

| Contractor | Actual | Difference from SCI's bid | Percentage difference from SCI's bid |
|---|---|---|---|
| ADOT Engineer's estimate | $ 5,233,680 | $ 306,020 | 6.2% |
| Dawson Construction | $ 5,476,000 | $ 548,340 | 11.1% |
| SECON, Inc. | $ 5,987,190 | $ 1,059,530 | 21.5% |

**Timeline**

- **Date of contract award**

  Awarded January 8, 2001

- **Files established and budget entered into system**

  Approximately same date as above

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)       7       DECL. OF SPOONEMORE
                                     Ex. G, p. 9

**South Coast, Inc.**
Contract Analysis
December 31, 2001

- **Date work started/First costs charged**

  Work commenced in January 2001, first costs entered into system in February 2001 (allocated costs), first hard costs entered into system in March 2001.

- **Percentage of completion at 12/31/2001**

  100% complete at 12/31/01. Contract not officially closed because of outstanding collections.

## General progress of job/issues/resolutions

Job appeared to be conducted generally within in the procedures established by South Coast, Inc. Jeff Wedekind, the project superintendent, spent considerable time reviewing and submitting RFPs for changes in the contract initiated by the state. As a result of this, another on-site superintendent was required to be added to the job to review day-day operations late into the project. This produced an unfavorable variance in the supervision of the project budget. Jeff Wedekind seemed to be aware of procedures that are required by South Coast, Inc.

The job was completed on time and generally within budget considering the numerous amounts of change orders issued. The budget gross profit margin was 10%, the actual profit margin was 9%. This profit margin difference or approximately $53,300 was due to several items being slightly different that budget, but the most noteworthy item was the additional supervision required on the contract due to change orders as previously noted.

Job progressed generally as anticipated with the following exceptions:

ADOT prepared the engineering estimates and plans based on a 200 foot ferry to be used at the new proposed mooring station. However, the actual ferry to be used was 250 feet. Based on this size difference, changes were required.

The change order was successfully completed with no significant profit margin variations.

## General findings/Consistency with prescribed procedures

We generally reviewed the files for procedures specified within the FMI manuals produced for contract administration. During the course of the review, we noted the following:

**South Coast, Inc.**
Contract Analysis
December 31, 2001

PO13 – Job Cost Adjustments – Job Cost adjustments are not always input into the accounting system for estimated amounts based on the timing of the adjustments and needs of the project superintendent. However, alternatively, these costs are accumulated in some manner, such as on a spreadsheet in compilation of an RFP, and tracked outside the accounting system. The Superintendent and other people associated with the contract have access to this report, and are aware of this report as they have to approve change order before submission for approval.

PO22 – Buy in Meeting – The buy in meeting appears to be performed from review of the files. However, a pre-contract memo analysis could not be found, though it was represented to exist. This pre-contract memo was the responsibility of a vice-president or above.

PO26 – Budgets – As noted above, budgets for change orders are not always entered into the accounting system, though they are normally tracked as a defined set of accounting codes (the 190 section) for additional expense. Change order budgets are often tracked separately in Excel and available for Division Managers and other management.

**South Coast, Inc.**
Contract Analysis
December 31, 2001

**Contract name/number**

Ketchikan Tongass Avenue Rehabilitation Viaducts
22924

**Original award amount**

$7,901,185

**Scope of work**

Structural repairs to Tongass Avenue Viaduct including concrete rack injection, concrete piling jackets, cathodic protection system, spray metalizing concrete structures.  Install new sewer force mains.  This was viewed as a labor intensive job.  The work area was accessible by water only and most areas were not accessible by heavy lift equipment.

Division Manager/VP:          Brad Finney
Project Superintendent:       John Pool

**Competing bids**

| Contractor | Actual | Difference from SCI's bid | Percentage difference from SCI's bid |
|---|---|---|---|
| ADOT Engineer's estimate | $ - | $ - | - |
| Red Simon Construction | $ 8,109,452 | $ 208,267 | 2.6% |
| Abbe & Scoboda, Inc. | $ 8,243,210 | $ 342,025 | 4.3% |

**Timeline**

- **Date of contract award**

  Early 2000

- **Files established and budget entered into system**

  2000

- **Date work started/First costs charged**

  April 2000

**South Coast, Inc.**
Contract Analysis
December 31, 2001

- **Percentage of completion at 12/31/2001**

    Completed as of December 31, 2001

**General progress of job/issues/resolutions**

The contract progressed generally as planned spanning over two fiscal years of SCI.

Certain challenges were faced during the course of the work that were fairly routine as in most construction projects. Change orders and quantity changes added approximately $1,000,000 to the original contract amount.

As many as 45 employees were involved during the height of the work.

**Bid information**

The job was reasonably bid in relation to the competition. SCI viewed themselves as having advantages because they had done other work under the viaduct. A disadvantage was that much of the work on the job would require subcontractors.

The profit margin was profited at 18% gross, 10% net. Otherwise, the job was viewed favorably.

**General findings/Consistency with prescribed procedures**

The job appeared to be conducted generally within the procedures established by SCI. John Pool, job superintendent, was familiar with the job. The files appeared to be organized and included documentation that we expected to be included given the documentation requirements. It appeared that the problems that were faced were communicated timely and addressed by the appropriate level of management.

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. G, p. 13

**South Coast Inc.**
Review of Richardson Highway Contract

## Background

In November 2000, the State of Alaska circulated an Invitation for Bids for the Richardson Highway MP 115-129 Rehabilitation project. The state indicated that the project consisted of "reconditioning of the roadway surface and ditches, installation of culverts, french and fin drain systems, signing, placing borrow, subbase, aggregate base course and a two coat surface treatment on the 14 miles of the Richardson Highway near Glennallen." The contract was awarded to SCI as the lowest bidder in the original amount of $4,893,915.30.

The original internal pre-bid analysis of the project (prepared on the SCI form "Bid Review Information on Large Projects") was optimistic about the opportunity to bid on the contract citing certain advantages that SCI had over other bidders and showing no comments with respect to SCI disadvantages. It was also noted that this job would be a "very good start up job for this region" for several other reasons. The profit target in that bid review was 10%.

SCI personnel indicate that SCI had not done this kind of road work in this geographic area of the state before. SCI had employed David Filucci in April as a Division Manager for a newly opened Anchorage office to pursue work in the area. SCI assigned Bob Fox as the initial job superintendent and Bob Hammond succeeded Fox as the superintendent.

In preparation for the contract, SCI set up the original file information and entered the budget into the job cost accounting system (Contract # 23106). The budget was prepared given the original scope of the work which was to rehabilitate the road surface with a "chip seal" approach (referred to in the contract as "two coat surface treatment" and on the schedule as "high float"). In the original budget, SCI expected a 10.1% gross profit on the job.

During the early stages of the contract, SCI personnel reportedly became worried about completing the chip seal phase of the contract during the narrow time window that was available (by ADOT policy, chip seal can only be applied through August 15, while the window for paving is potentially longer because it is driven by temperature). Before any actual chip seal work had been started, SCI suggested to the state Project Engineer that the contract should be revised to a re-paving of the 14-miles rather than a chip seal. According to SCI personnel, there were several reasons for the suggested change in scope of the work that made the contract potentially more favorable for SCI. Paving the road was a better result for the state; they agreed to the paving change and authorized Change Order #4 in July 2001. That change order resulted in an increase to the original contract price by $382,600. There had been previous reductions in the contract of approximately $456,454, for a net reduction of $73,854 through Change Order #4; the adjusted contract amount as of the execution of that change order was $4,820,061.95. For job cost

**South Coast, Inc.**
Review of Richardson Highway Contract

accounting purposes, a separate contract number for Richardson Paving was set up (Contract # 23106-1).

As a result of the change in the scope of the project, SCI believed that the gross profit on the job would be enhanced. For July and August 2001, the overall job cost accounting records indicated that the gross profit was expected to be 14.2%. A report from the field on the status of the job as of August 31, 2001, downgraded the gross profit to 9% but the accounting records continued to report 14.2%. For September, the accounting records reported an expected 12.6% profit at 98.2% complete. As more costs came in that were unexpected by accounting, the October reporting showed a gross profit of 3.0% at 98.2% complete. For November, the job was reported at 99.8% completion and basically at breakeven. The contract amount reported as of November was $5,093,915. The latest reporting from the state indicated that the contract amount is $4,841,223, or $252,692 less than as shown in the November reports; which means at that date, the contract was already in a loss position before the consideration of any costs reported after November.

Further, we understand from Hammond that the contract is not yet complete. Hammond indicates that a subcontractor needs to finish placing certain signs and sign posts and add culvert markers posts. This work was not done before the winter freeze and must now be delayed until the ground thaws out enough to allow for digging. We do not have current information as to how much this is expected to cost and we do not know the final loss incurred on the project.

**Scope of our work and sources of information**

**Analysis of required procedures**

We read the two sets of policy manuals which are of particular importance in our evaluation of the Richardson contract: the Project procedure manual and the Administrative procedure manual. For reference purposes, policies in these manuals are numbered sequentially within the manual using the first letter of the manual (Project policy number 1, for example, is "P01"; the first Administrative policy number is "A01").

We reviewed the contract files that were available in the Ketchikan office. These files appeared to be incomplete in consideration of the Procedural Manuals. Mike Houts, SCI Vice President/CFO, was not aware of any other files that were located in the Ketchikan office. We requested access to the field files in the Anchorage office (the job had not yet been closed out, at which time the files are to be consolidated and moved to Ketchikan). Those files were reviewed in the Anchorage office with Bob Hammond in January. We also interviewed Bob Hammond and reviewed his hand-prepared superintendent's notes.

We reviewed the job cost comparison of actual to budgeted costs. Job cost reports clearly indicated that certain budgeted line items had significant variances from the original budget.

**South Coast, Inc.**
Review of Richardson Highway Contract

After becoming generally familiar with the subcontractors and vendors on the job, we reviewed charges to the job by scanning the names and, given the nature of the work, considered the appropriateness of those working on the job.

For those job cost line items that were significant and/or those that indicated a significant unfavorable variance from the budget, we selected a sampling of individual charges to the line item and traced the charges to the vendor actual invoice. We compared the charges recorded in the records to the invoices selected for reasonableness and indications that the goods or services applied to the job.

We scanned payroll charges to the job cost detail for reasonableness of time charges, consistency of personnel names and time schedules; we considered other indications of unusual items or inconsistencies.

We prepared a gain/fade analysis on the contract to determine the timing of the accounting reporting.

We reviewed the accounting records in the Ketchikan office. Inquiries were made of accounting personnel at the Ketchikan offices.

**Findings**

The procedural manuals are supposed to be specific with respect to the conduct of construction contracts. Overall, many of the procedures that were required for this contract were not followed. The original contract documentation was properly set up (including for example, the original bid review and bid document, the original budget, the set of original files for contract documents, work schedule, documentation of a pre-construction meeting, etc). However, once the contract got underway, the files were not maintained as required in many regards. Change Order #4 was executed on behalf of SCI by Mark Johnson, SCI's Paving Manager, who was not a vice president as required pursuant to the policy manuals, dramatically changed the scope of the work. However, the budget was not revised. Existing costs that had been charged to inappropriate phases of the contract were not reclassified. Superintendents were not able to determine the status of the job on a continuing basis by comparing properly categorized actual costs to an appropriately revised budget. Perhaps because of the futility of reporting these costs as budgeted, neither the superintendents nor the division manager complied with the requirement for daily and other periodic reporting. Effective and timely reporting to the SCI office was not possible as a result. A revised work schedule was not found in the files. There was not evidence of much of the required correspondence and continuing periodic reporting. Further, there was not evidence of the expected level of management involvement in the contract in terms of documented regular site visits by the Division Manager or the VP, documented approvals for certain activities and events, and file maintenance was lacking.

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. G, p. 16

**South Coast, Inc.**
Review of Richardson Highway Contract

No budget for Change Order # 4 was developed in writing and, as a result, budgeted amounts were never entered into the job cost system. Further, the original budget that was prepared for the chip seal contract was not revised to eliminate the costs related to the chip seal even though no work was done toward the chip seal. However, the accounting records indicate that charges went into the chip seal budgeted line item (budgeted for: $868,320; actual charges through 10/30/2001: $711,787). The superintendent's notes show several entries throughout the course of the contract indicating the problems job personnel were having in tracking job costs to the budget because there were no amounts entered into the system. Accounting records do not show any budgeted dollar amounts for any line items for the change order. The costs that were charged into the chip seal budgeted line item were not reclassified as of 10/30/2001. There are several references to the difficulties faced by the superintendents with respect to tracking the progress on the job in terms of comparing actual costs to the budget. Also in the superintendent's journal during June, there was an entry where Filucci was requesting a daily reporting on the job but Fox would reportedly not prepare any. The notes indicated that Fox was having a problem reporting because the budget did not fit the work.

Finally, based on our review of the procedures manuals, we found the following specific conditions:

**Procedure No. P01 - Project Type (Category)**

Richardson was defined as a type "E" contract (one that is over $2 million). Type "E" is the highest level of contract. As such, it required the highest level of administration, reporting, and file documentation. The attached "Project Category Schedule" from the manual addresses the basic requirements of an E-category contract. Other provisions in the manual deal with the specifics of contract conduct.

**Procedure No. P02 – Project Document Control**

This procedure deals with incoming and outgoing mail handling. The files that were available in either the Ketchikan or the Anchorage office did not include much of the correspondence that we would expect to be applicable to a contract of this size.

**Procedure No. P03 – Change Orders**

This is the procedure that specifically requires the superintendent to prepare a detailed cost work up for a change order. We do find that Change Order #4 includes revisions to the price to be charged under the contract, but we do not find documentation supporting the new estimate of costs in detail. We did not find copies of much of the communications we would expect for the five change orders for this job. This section requires the Division Manager to establish a budget and give it to accounting as we have noted no such budget was prepared.

South Coast, Inc.
Review of Richardson Highway Contract

**Procedure No. P04 – Request for Information**

**Procedure No. P05 – Speedy Memos**

**Procedure No. P06 – Formal Letters**

These procedures relate to correspondence. Again, the files contained very little evidence of much correspondence.

**Procedure No. P09 – Project Files**

Project files were fairly complete at the outset of the contract with respect to bid documents, contract documents and subcontractors/supplies. The procedures relating to correspondence were not followed. We found very little evidence of the use of RFPs or an RFP log. Pay estimates appear to have been received and accounted for, although not all were located in the files we inspected. (The latest pay estimate on the contract was #15.)

**Procedure No. P10 – Daily Reports**

We found very little evidence that daily reports were prepared on the job or that the reports were faxed to the Division Manager on a daily basis.

**Procedure No. P11 – Time Cards**

Time card records that we inspected appeared complete.

**Procedure No. P13 – Job Cost Adjustments**

There was little evidence that job cost reports were given the required "in depth scrutiny" to discover errors or omissions. We found no evidence of job cost adjustments being submitted to accounting, the most significant of which would have related to Change Order #4. These forms would have required the approval of the Division Manager and an executive officer.

**Procedure No. P14 – Project Information Meetings**

**Procedure No. P15 – Foreman's Huddle**

**Procedure No. P22 – Buy in Meetings**

**South Coast, Inc.**
Review of Richardson Highway Contract

### Procedure No. P24 – Formal Pre-Construction Conference

Beyond the documented attendance sheet for the pre-construction conference on March 22, 2001, we found little evidence of documented regular "project information meetings" or "foreman's huddles."

### Procedure No. P16 – Project Schedule

The files included copies of the original schedule which included the high float phase of the contract. We found no evidence that a revised schedule was prepared in response to Change Order #4.

### Procedure No. P25 – Job Visits

Visits to the jobs are required on a periodic basis for Type D and E contracts. There was little evidence that visits to the job site were made by the Division Manager or executive officers as frequently as would be appropriate, particularly given the problems encountered in this job.

### Procedure No. P26 – Budgets

As discussed above, the budgets for this contract were not appropriately maintained.

### Administration procedure manual

The Administration procedure manual includes many references to the required form, content and timing of reporting and communication between the job personnel and the administration offices: accounting, administrative and Executive Officers of the company. As discussed above, we found that many of these procedures were not followed. A procedure-by-procedure analysis is not presented.

### Accounting records

In our review of the accounting records including the sampling of job costs and inspection of vendor invoices and employee time cards, we did not find direct evidence of inappropriate or unsupported charges to the contract. Also in the course of our work, we did not find direct evidence of fraud or misallocation of costs from other jobs.

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. G, p. 19

**South Coast, Inc.**
Review of Richardson Highway Contract

## Overall

It is our experience with the construction industry that contractors face a myriad of problems in nearly every job that a company undertakes. Timely reporting of critical information to the appropriate levels of management is critical in order for companies to deal effectively with the problems encountered. We believe that if the published manuals had been followed, upper management would have become aware of the issues that were faced on the contract earlier and would have been given an opportunity to address the issues on a more timely basis.

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. G, p. 20

Richardson Highway
Timeline

| Date | Activity |
|------|----------|
| April 2000 | David Filucci hired |
| October 2000 | Bob Fox hired |
| November 2000 | Invitation for bids on Richardson released |
| January 2001 | Bids submitted |
| March 2001 | Letter of Award/Notice to Proceed issued to SCI<br>Administrative files established (Ketchikan)<br>Budget prepared<br>Budget entered into JC system (Job #23106)<br>Staffing determined<br>Division Manager: Filucci; Superintendent: Fox |
| March 22, 2001 | Pre-construction meeting/Start of work<br>(Filucci, Fox and ADOT representatives attend meeting) |
| April 2001 | First pay estimate for start up costs ($20,063 paid by ADOT)<br>First hours charged to job; Hammond assigned to job |
| April 3, 2001 | Request for Proposal (RFP #1) from ADOT<br>SCI responds to ADOT RFP #1 But not until mid-May 2001<br>   (Finney inquires as to why such a long response time) |
| April 25, 2001 | First indication in super notes of fin drain problems (scheduled for 2 weeks;<br>   noted that only 38 feet of drain installed in first two days)<br>Fin drain was to be installed for approximately 1 mile (1460 meters) |
| April 26, 2001. | First indication in superintendent notes of budget coding problems |
| May 2001 | Fin drain problems continue; no resolution obvious; trenches do not hold due<br>   to thaw of seasonal frost (because work delayed into warmer climate)<br>Hammond wanted to declare the fin drain "unconstructable" |
| June 2001 | Problems encountered with grinding materials for sub base<br>Filucci reportedly requests daily reports from field; Fox claims not possible<br>   due to budget problems |
| July 5-10, 2001 | Grinding equipment goes down due to unexpectedly large material size |
| July 2001 | ADOT approached to consider "change of condition" for grinding problems.<br>Because of delays, concern is that the chip seal will not be completed by the<br>ADOT deadline of 8/15/2001. Johnson wants to consider paving option.<br>Johnson and Finney go to Anchorage to discuss paving option with ADOT |

Richardson Highway
Timeline

| Date | Activity |
|------|----------|
| | (ADOT is not receptive to the change at this point) |
| July 20, 2001 | Change order for paving (C/O #4) approved by ADOT and Mark Johnson |
| July 16-31, 2001 | First pay estimate from ADOT that included charges for C/O #4 |
| August 2001 | Contract #23106-1 established (Richardson Paving) for C/O #4<br>First charges recorded on 23106-1 |
| August 19-20, 2001 | Paver and asphalt plant both down (paver rented from SE Road Builders) |
| August 21, 2001 | New paver from MB Construction was rented (from Anchorage)<br>Parts for asphalt plant arrive |
| August 22, 2001 | Started paving; Johnson on job site for 3 weeks during paving<br>Majority of Paving took place over 2 weeks; follow-up 7-10 days<br>Labor problems experienced: plans were to use local union labor (budgeted)<br>problems with inexperienced local labor for first half of paving work;<br>SCI sent up 10-12 of their staff incurring unbudgeted housing costs;<br>high traffic issues; slow downs in sub base preparation in front of paving<br>No documented visits to site during paving from Filucci or Finney |
| September/October | Fox terminated at completion of paving<br>Filucci terminated |
| November/December | Invoices on job continue to be received |

**South Coast, Inc.**
Contract Analysis
December 31, 2001

**Contract name/number**

Sitka Airport
23105

**Original award amount**

$3,387,250

**Scope of work**

Work on Sitka Airport taxiway and an embankment.

Division Manager:         Brad Finney
Project Superintendent:   Mark Johnson

**Competing bids**

| Contractor | Actual | Difference from SCI's bid | Percentage difference from SCI's bid |
|---|---|---|---|
| ADOT Engineer's estimate | $ 2,973,155 | $ (414,095) | 12.2% |
| SECON, Inc. | $ 3,922,770 | $ 535,520 | 15.8% |
| S&S General Contractors | $ 3,984,435 | $ 597,185 | 17.6% |
| Wilder Construction Co. | $ 4,315,395 | $ 928,145 | 27.4% |

**Timeline**

- **Date of contract award**

  Awarded May 31, 2000

- **Files established and budget entered into system**

  Mid-2000

- **Date work started/First costs charged**

  Mid-2000

- **Percentage of completion at 12/31/2001**

  100% complete at December 31, 2001

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. G, p. 23

th Coast, Inc.
tract Analysis
ecember 31, 2001

### General progress of job/issues/resolutions

The job was started in 2000 with the intention of completing the paving in 2000.  SCI discovered that the material that they were to excavate was not adequate to fill the embankment they were required to construct.  As a result, they needed to increase the material quantities purchased.  SCI had to purchase material for the embankment at a greater per unit cost than was provided for by the contract.  Southeast Earthmovers ("SE") was the subcontractor that SCI relied on for timely delivery of excess material.  Because of the delays, the paving phase of the contract was not completed as planned in 2000; it was pushed out to 2001.  The primary cause for the loss on this contract was that additional costs were incurred when the paving was extended into the second year.  We note, however, that the internal accounting records and internally-prepared published interim financial statements showed the contract would have a 3% gross profit (or approximately $100,000).  This 3% profit was reported for each of the months from January through October 2001.  The November statements showed a slight loss and the December statements showed an almost $300,000 loss.  This loss should have been evident much earlier in the year.

SCI has made claims against SE for delays in delivering the material.  Correspondence and documentation to and from ADOT is consistent with the representations from client that SE delayed the progress.  Other claims are outstanding with respect to the excess material quantities.

### Bid information

Contract believed to good profit potential.  Original profit percentage:  7.6%.

Job was bid at a greater than normal amount under the competition (approximately 14% less than the closest bid).  Difficulties were encountered during the job primarily with the required DBE contractors.  SCI personnel represent that McGraw General Sales, Inc. (Southeast Earthmovers) delayed the paving work which extended the job into the following year.

### General findings/Consistency with prescribed procedures

We generally reviewed the files for procedures specified within the FMI manuals produced for contract administration.  During the course of the review, we noted that certain file documentation could not be located.  That could be attributed to the status of the job since SCI personnel are presently using the files to actively pursue claims referred to above.

**South Coast, Inc.**
Contract Analysis
December 31, 2001

**Contract name/number**

Big Salt Lake Road
22921

**Original award amount**

$7,609,240 original contract
$1,401,400 option 1
$4,644,668 option 2

$13,655,398 total original amount

Approximately $115,000 in change orders approved. Additional contract work resulted from increased material at a per-unit price, and other work performed with pending change orders.

**Scope of work**

The scope of the project was to excavate and pave approximately 10 miles of road near Thorne Bay, Alaska. The contract included installing relating signage, culverts, erosion control, drainage, signage, and striping of the paved road.

Division Manager/VP:          Brad Finney
Project Superintendent:       William Welton

**Competing bids**

| Contractor | Actual | Difference from SCI's bid | Percentage difference from SCI's bid |
|---|---|---|---|
| FHA Engineer's estimate | $ 16,381,436 | $ 2,716,038 | 19.9% |
| Goodfellow Construction | $ 16,637,723 | $ 2,982,325 | 21.8% |
| Quality Asphalt | $ 16,973,253 | $ 3,317,855 | 24.3% |

The above bids include options 1 and 2.

**Timeline**

- **Date of contract award**

    Awarded January 15, 1999

**South Coast, Inc.**
Contract Analysis
December 31, 2001

- **Files established and budget entered into system**

  Approximately same date as above

- **Date work started/First costs charged**

  Mobilization began immediately, first expenses charged in December 1999

- **Percentage of completion at 12/31/2001**

  89% complete as of December 31, 2001, based on cost estimates. Approximately
  60% of the asphalt has been crushed, with the main portions of the road excavated
  and building up. Asphalt and striping left. Entire contract is expected to be
  completed in May 2002. The required completion date is October 2002.

**General progress of job/issues/resolutions**

Accounting records and internally-prepared interim financial statements for 2001
consistently indicated that this job would earn approximately $1,000,000 in gross profit
(or 10%). This estimate of gross profit reached as high as $1,301,252 in August 2001.
The November financial statements showed the job at 94.2% complete with a $1,068,653
gross profit. For December, the job was estimated to be only 88.4% complete causing the
contract to be in a loss position. This loss should have been evident earlier in the year.

There have been several changes and additional work related to the Big Salt Lake Road
during the course of the project. These items include:

Amount of material "moved" – the original project bid package included an estimate of
earth and rock to move (excavate) at 1,000,000 cubic meters. However, South Coast's
analysis indicated that the actual number would be closer to 800,000 cubic meters. Based
on this, South Coast lowered the per cubic meter cost of excavating for 1,000,000 cubic
meters relative to their estimate of 800,000 cubic meters. The actual excavating of
material ended up being closer to 1,200,000 cubic meters. This resulted in increased
losses for every cubic meter moved by South Coast for equipment, time, and materials.

Blasting – blasting of rock and material took more time and explosives than was
originally planned. This was related to more excavation of material than planned, and the
need to be cautious around existing utility poles.

Fuel – fuel accounted for approximately $411,000 of additional expense, or roughly
182% more than budgeted at December 31, 2001. This increase was related to additional
work performed, and the fact the diesel and gas prices increased nearly 200% from bid
time to time that the majority of the work has been completed. Bill Welton appealed to

South Coast, Inc.
Contract Analysis
December 31, 2001

the Federal Highway Administration to allow for additional funding for fuel price increases. The FHA declined, citing a 1992 law passage that forbids increases for market conditions related to fuel.

Waste sites – South Coast, Inc. had been allowed certain sites along the Big Salt Lake Road project to discard waste material from the crushing of rock for the project. Since the project moved more material than anticipated, the waste product increased, filling all available sites allowed for the project. To store additional waste, South Coast was required to purchase additional areas for use from Klawock Heenya Corporation at a cost of $80,000. The FHA would not provide additional funding for this as they felt the waste sites provided were more than adequate for the waste that should have been generated.

Erosion control – South Coast, Inc. had determined, and the FHA has agreed, that additional erosion control measuring are required to ensure a long life of the road. These requirements include cutting slopes beside the road at a lower angles, rock blankets, ditches and other items that were not included in the original bid document from FHA. South Coast, Inc. has performed additional work associated with this and has included it in progress billings to the FHA. The FHA has been paying these bills but has not agreed to an all inclusive change order. This change order is expected at the end of the project.

**Bid information**

Bill Welton indicated that he worked on a significant portion of the bid for the project, as did Brad Finney. At the time of the bid, the construction industry was flat, and projects were hard to get and very competitive. Therefore, it was decided by upper management of South Coast, Inc. (excluding Bill Welton) that the project was going to be bid "lean" in order to procure the project. The main way to accomplish this was to scrutinize the materials units required used / provided in the project. Specifically, this was adjusted in the material movement of the contract, which was estimated to be 1,000,000 cubic yards by FHA, and 800,000 by South Coast, Inc. This is further evidenced by the bid schedule, which shows that South Coast, Inc. bid $2,982,325 less than the next higher bidder, and $2,726,038 less that the FHA engineer's estimate.

**General findings/Consistency with prescribed procedures**

We generally reviewed the files for procedures specified within the FMI manuals produced for contract administration. During the course of the review, we noted the following:

Bill Welton is required to prepare and file much more paperwork related to a FHA contract versus a State of Alaska contract. This paperwork includes detail pay requests and daily reports that must be filed with the FHA. All this paperwork appeared to be prepared, filed, and in order.

Travelers Casualty and Surety v. South Coast, Inc., et al.    DECL. OF SPOONEMORE
Case No. A06-00063 (TMB)    Ex. G, p. 27

25

**South Coast, Inc.**
Contract Analysis
December 31, 2001

PO13 – Job Cost Adjustments –Job Cost adjustments are not always input into the accounting system for estimated amounts based on the timing of the adjustments and needs of the project superintendent. However, alternatively, these costs are accumulated in some manner, such as on a spreadsheet in compilation of an RFP, and tracked outside the accounting system. The Superintendent and other people associated with the contract have access to this report, and are aware of this report as they have to approve change order before submission for approval.

PO22 – Buy in Meeting – The buy in meeting appears to be performed from review of the files. However, a pre-contract memo analysis could not be found, though it was represented to exist. This pre-contract memo was the responsibility of a vice-president or above.

PO25 – Job Visits – Bill Welton indicated that Brad Finney visited that site several times. Travel invoices from Promech Air indicated that Brad did travel to Prince of Wales Island at least once a month, where the project was located.

PO26 – Budgets – As noted above, budgets for change orders are not always entered into the accounting system, though they are normally tracked as a defined set of accounting codes (the 190 section) for additional expense. Change order budgets are often tracked separately in Excel and available for Division Managers and other management.

Klukwan Contracting
Contract Analysis
December 31, 2001

## Contract name/number/Description

Project STP-060-1(9)P Tuba City – Windowrock Highway, (Navaho Forest Boundary –
New Mexico State Line)
2000029
Reconstruction of several miles of road including removal of existing road surface, lime
stabilization of clay under layer, building road base and paving, including curbs,
sidewalks and retaining walls.

## Original award amount

$6,806,228

Several small change orders approved authorized and approved have increased the total
to about $6,920,000. Additional modifications of about $50,000 are in process.

NOTE: Adjacent to the project is a housing development (Kerrigan). The AZ DOT
arranged with the BIA for Klukwan to install sidewalks and pave portions of the
development including the entrance between the highway and the development for an
addition $235,000. The cost of this work – other than the costs specifically allocated for
force account work are included in the general job costs of this project. However, no cost
adjustment was made for the additional work in the budget.

## Competing bids

FNF Construction        –    $7,448,410
Fann Construction       –    $7,897,499
B&M Cillessen Const.    –    $8,077,478

## Qualitative analysis from internal bid analysis (including profit estimate)

Formal bid review analysis is at B1.

## Timeline

- **Date of contract award**

  Awarded May 2001

- **Files established and budget entered into system**

  Approximately same date as above

Klukwan Contracting
Contract Analysis
December 31, 2001

- **Date work started/First costs charged**

  Work commenced in 2001.  The project is over 50% complete.  The remaining items consist of completing the retaining wall, paving, sidewalks, signage and electrical work (lights).

- **Significant developments**

  The roadbed had been paved several times.  It was not known or expected at the time of the bid.  The expectation was to remove and reuse (as road aggregate base) approximately 4" of old asphalt.  However, the actual depth of the existing road ranged up to 18".  The additional costs for this work were maintained and billed through a force account.

- **Percentage of completion at 12/31/2001**

  50% to 60%

**General progress of job/issues/resolutions**

See significant developments above and general conduct of the job below.

**General conduct of the job**

The original project manager was John Leisure and the Superintendent was Ron Komak.  John was fired on February 1, 2002, and will be replaced by Dane Dahlgren and trainee Aaron Shelley.

The main failure of this job was created through several circumstances.  Partly this was due to management trying to wrap up four other jobs in the Fall of 2001, less attention was paid to Navajo than turned out to be appropriate.

The DM noted (and per review of the files) that he was receiving weekly reports (summarized from the daily reports).  Although the costs were higher than expected, the PM kept informing the DM that things were OK due to the additional revenue to be received from Kerrigan and the extra excavating work.  (Note that this individual had many years of on-site construction management.)

The DM was not aware of the cost issues until the preparation and analysis of the December project financial analysis and subsequent discussions with operations staff in Ketchikan.  Subsequent to the first week of January 2002, the DM and the chief estimator have analyzed the entire contract in detail.  The following items were noted:

**Klukwan Contracting**
Contract Analysis
December 31, 2001

- A bid error was made in the analysis of the retaining wall. The specifications for the wall required stone back fill of at least 6". The estimator made a mistaken assumption that the native fill would be adequate.
- As noted, the removal of the old road bed was significantly more costly than expected. (Klukwan should be paid for this.)
- As on all the other projects the contract significantly underestimated the hours/units for flagging, quality control and water. (Contract modifications should be received for all these items.)
- As noted on all the other contracts, the State of Arizona gross receipts tax was not budgeted.
- The employee housing expense was significantly over budget. The DM determined that there was a coding error of about $20,000 between this project and Borrego.
- There was a complete lack of management of labor on the job. For example, the specific tasks of laying culvert took significantly longer that the same tasks on Klukwan's other job sites in the area.

Finally, the mainline paving height is to be based on the curbs which were installed first. The graders have a specific target for the road bed. It has been asserted (and assumed verified by usage) that the grade was on target to the edge of the road bed, but dropped off in the distance from there to the edge of the curb. This caused the edge of the curb to be thicker that expected which used significantly more concrete and time that was budgeted.

Note that this problem could be corrected (and never occur) if SCI could find trained, capable operators for its electronically guided grading control system.

The result of these items is that the contract is a net loser.

**General findings/Consistency with prescribed procedures**

The following items were noted during the review of the contract and supervisors notes related to the procedures required by Klukwan Contracting, Inc.:

PO1 – To utilize the project categories as required – This procedure was performed as required.

PO2 – Project Document Control – This procedure was performed as required.

PO3 – Change Orders – This procedure was performed as required except change orders over $50,000 were approved by Ken Griner, DM. The procedures manual requires such changes to be approved by a Vice President. Per Ken Griner, received the authority for such items when he was appointed Division Manager.

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

29.

DECL. OF SPOONEMORE
Ex. G, p. 31

**Klukwan Contracting**
Contract Analysis
December 31, 2001

PO4 – Request for Information
PO5 – Speedy Memos
PO6 – Formal Letters

In general, for all SW jobs, all contacts with owners were documented either with memos or letters. Based on the descriptions of P04, P05 and P06, the communication requirement were complied with.

PO7 – Time and Materials – This procedure was performed as required.

PO8 – Submittals and Shop Drawings – Submittals appeared to be properly handled except no submittals log was maintained as required by the procedures manual.

PO9 – Project Files – This procedure was performed as required. As all projects were shut down due to the winter weather, all files had been relocated to the main Fountain Hills office.

PO10 – Daily Reports – Exception: Although we noted that daily reports were prepared and were informed that the Division Manager ("DM") was in continual contact with the Project Superintendent, there was no evidence that the DM received daily reports as required by the procedures manual. (See general SW discussion for DM's directives to project managers on report submittals.) However, we did note that weekly reports were received by the DM. Daily reports noted the problems with the curb grade trim (not noted in the following weekly report) and the problem with the retaining wall which was raised to a higher issue and recommunicated by a formal letter from AZ DOT.

PO11 – Time Cards – This procedure was performed as required. Exception: (All SW Jobs – not all time cards were initialed by the Project Superintendent.)

PO12 – Project Pictures – This procedure was performed as required.

PO13 – Job Cost Adjustments – See PO26. As the contract changes were done by force account – the budget was not modified. Not considered an exception. However, we would have expected that additional costs be charged to 090 codes some of which was done, but most was not.

PO14 – Project Information Meetings – It was represented to us that continual contact was maintained (at least every other day) between the Super and the DM. The DM noted that such contacts were documented in phone logs. Due to time constraints we did not verify this assertion. Assume performed as required.

Klukwan Contracting
Contract Analysis
December 31, 2001

PO15 – Foreman's Huddle – The procedures manual requires this to be done each morning. The DM noted his belief that it is more useful to conduct each evening. However, in either case, it was represented that such meetings were held. However, the procedures manual requires documentation be kept for the meetings. Exception: No meeting notes were kept.

Note that we did find copies of weekly safety meeting minutes.

PO16 – Project Schedule – This procedure was performed as required. Potential exception: the three week look ahead schedules (which are emailed to the DM) were not saved. Therefore, we could not verify that the procedure was followed.

PO17 – Claims – N/A – No claims in process.

PO18 – Subcontract Procedures – This procedure was performed as required.

PO19 – Quality Control – This procedure was performed as required from review of correspondence in the contract files.

PO22 – Buy in Meeting – Exception: the procedures require that a pre construction checklist be prepared as part of the buy in meeting. The SW DM represented that no such checklists were prepared for any jobs or were meeting minutes kept for any jobs. He did note that as soon as the project managers were identified, they were given all information to start the actual planning process and to give them ample time to voice concerns in advance of the actual start of construction.

PO23 – Close Out Meetings – This procedure has not been performed because the project is not completely closed out.

PO24 – Formal Pre-Construction Conference – This procedure was performed as required.

PO25 – Job Visits – This procedure was performed as required by representation. No documentation was provided.

PO26 – Budgets – This procedure was performed as required. Note that budgets for change orders are not always entered into the accounting system, though they are normally tracked as a defined set of accounting codes (the 190 section) for additional expense. Change order budgets are often tracked separately in Excel and available for Division Managers and other management.

Klukwan Contracting
Contract Analysis
December 31, 2001

## Contract name/number/Description

Project 264, Tuba City – Windowrock Highway (Burnside Junction – Ganado)
2000139 - STP 264-A(2)
Reconstruction of a few miles of road including removal of existing road surface, lime stabilization of clay under layer, building road base and paving.

## Original award amount

$1,841,406

Several change orders have been approved:

- $34,870 for public relations
- $5,208 additional rebar
- $279 – correct guardrail

## Competing bids

FNF Construction            -        $2,233,532

## Timeline

- **Date of contract award**

  Awarded May 22, 2001

- **Files established and budget entered into system**

  Approximately same date as above

- **Date work started/First costs charged**

  Work commenced in 2001 and the project is essentially complete. A few minor items remain which will be completed in 2001.

- **Significant developments**

  The project superintendent was fired five weeks into the job and the chief estimator took over at that point.

**Klukwan Contracting**
Contract Analysis
December 31, 2001

- **Percentage of completion at 12/31/2001**

  About 95%

**General progress of job/issues/resolutions**

As noted above, the project superintendent was changed shortly into the job for lack of progress.

No other issues were noted.

**General conduct of the job**

The project manager was Jose Galindo.  He was replaced after five weeks by Bob Boozer.

The project has generally gone as planned other than the slow start caused by the first Superintendent.

Note that about 50% of the reason for not meeting the preliminary gross profit estimate is a duplicate asphalt plant charge (internal).

**General findings/Consistency with prescribed procedures**

The following items were noted during the review of the contract files related to the procedures required by Klukwan Contracting, Inc.:

PO1 – To utilize the project categories as required – This procedure was performed as required.

PO2 – Project Document Control – This procedure was performed as required.

PO3 – Change Orders - This procedure was performed as required except change orders over $10,000 were approved by Bob Boozer, Project Manager (and primary estimator for the SW Division).  The procedures manual requires such changes to be approved by the Division Manager.  Per Ken Griner, Southwest Division Operations Manager, he passed the authority for such items on this contract to Bob.  See general Southwest Division discussion for implied authority to sign.

**Klukwan Contracting**
Contract Analysis
December 31, 2001

PO4 – Request for Information
PO5 – Speedy Memos
PO6 – Formal Letters

In general, for all SW jobs, all contacts with owners were documented either with memos or letters. Based on the descriptions of P04, P05 and P06, the communication requirement were complied with.

PO7 – Time and Materials – This procedure was performed as required.

PO8 – Submittals and Shop Drawings – Submittals appeared to be properly handled except no submittals log was maintained as required by the procedures manual.

PO9 – Project Files – This procedure was performed as required. As all projects were shut down due to the winter weather, all files had been relocated to the main Fountain Hills office.

PO10 – Daily Reports – Exception: Although we noted that daily reports were prepared and were informed that the Division Manager ("DM") was in continual contact with the Project Superintendent, there was no evidence that the DM received daily reports as required by the procedures manual. (See general SW discussion for DM's directives to project managers on report submittals.)

PO11 – Time Cards – This procedure was performed as required. Exception: (All SW Jobs – not all time cards were initialed by the Project Superintendent.)

PO12 – Project Pictures – This procedure was performed as required.

PO13 – Job Cost Adjustments – Not Applicable.

PO14 – Project Information Meetings – It was represented to us that continual contact was maintained (at least every other day) between the Super and the DM. The DM noted that such contacts were documented in phone logs. Due to time constraints we did not verify this assertion. Assume performed as required.

PO15 – Foreman's Huddle – The procedures manual requires this to be done each morning. The DM noted his belief that it is more useful to conduct each evening. However, in either case, it was represented that such meetings were held. However, the procedures manual requires documentation be kept for the meetings. Exception: No meeting notes were kept.

**Klukwan Contracting**
Contract Analysis
December 31, 2001

PO16 – Project Schedule – This procedure was performed as required. Potential exception: the three week look ahead schedules (which are emailed to the DM) were not saved. Therefore, we could not verify that the procedure was followed.

PO17 – Claims – Not Applicable.

PO18 – Subcontract Procedures – This procedure was performed as required.

PO19 – Quality Control – This procedure was performed as required from review of correspondence in the contract files.

PO22 – Buy in Meeting – Exception: the procedures require that a pre construction checklist be prepared as part of the buy in meeting. The SW DM represented that no such checklists were prepared for any jobs or were meeting minutes kept for any jobs. He did note that as soon as the project managers were identified, they were given all information to start the actual planning process and to give them ample time to voice concerns in advance of the actual start of construction.

PO23 – Close Out Meetings – This procedure has not been performed because the project is not completely closed out.

PO24 – Formal Pre-Construction Conference – This procedure was performed as required.

PO25 – Job Visits – This procedure was performed as required by representation. No documentation was provided.

PO26 – Budgets – This procedure was performed as required. Note that budgets for change orders are not always entered into the accounting system, though they are normally tracked as a defined set of accounting codes (the 190 section) for additional expense. Change order budgets are often tracked separately in Excel and available for Division Managers and other management.

Klukwan Contracting
Contract Analysis
December 31, 2001

**Contract name/number/Description**

Project N48, Borrego Pass, NM
CBN00000301
Reconstruction of about 7 miles of road including removal of existing road surface, lime stabilization of clay under layer, building road base and paving.

**Original award amount**

$3,334,391

No change orders have yet been approved. Klukwan as applied for about $110,000 in modifications for unit overruns on quality control hours and volume of aggregate base needed.

**Competing bids**

| | | |
|---|---|---|
| Silverstate Construction | - | $3,453,282 |
| Souers Construction | - | $3,557,247 |
| B&M Cillessen Const. | - | $3,731,924 |
| Flying Eagle | - | $4,875,588 |

**Qualitative analysis from internal bid analysis (including profit estimate)**

No unusual items noted.

**Timeline**

- **Date of contract award**

  Awarded January 2001

- **Files established and budget entered into system**

  Approximately same date as above

- **Date work started/First costs charged**

  Work commenced in 2001 and the project will be completed in 2002. Klukwan expected to finish the work in 2001 but paving delays caused the final items to be delayed until 2002.

**Klukwan Contracting**
Contract Analysis
December 31, 2001

- **Significant developments**

  Delays caused the completion of the contract to wait until 2002. Major items to complete include paving, rip rap, and signage.

- **Percentage of completion at 12/31/2001**

  50%-60%

### General progress of job/issues/resolutions

General delays caused paving to be rescheduled late in construction season. Inclement weather prevented completion in 2001.

### General conduct of the job

The project manager was Dane Dahlgren assisted by Aaron Shelley – Superintendent Trainee.

The project has generally gone as planned except for the paving as noted above. Except for the rip rap work all remaining work is fixed cost to be done by subcontractors.

The major cause of not meeting gross profit expectations is the unbudgeted AZ gross receipts tax.

### General findings/Consistency with prescribed procedures

The following items were noted during the review of the contract files related to the procedures required by Klukwan Contracting, Inc.:

PO1 – To utilize the project categories as required – This procedure was performed as required.

PO2 – Project Document Control – This procedure was performed as required.

PO3 – Change Orders – N/A – No change orders as yet.

Klukwan Contracting
Contract Analysis
December 31, 2001

PO4 – Request for Information
PO5 – Speedy Memos
PO6 – Formal Letters

In general, for all SW jobs, all contacts with owners were documented either with memos or letters. Based on the descriptions of P04, P05 and P06, the communication requirement were complied with.

PO7 – Time and Materials – N/A.

PO8 – Submittals and Shop Drawings – Submittals appeared to be properly handled EXCEPT no submittals log was maintained as required by the procedures manual.

PO9 – Project Files – This procedure was performed as required. As all projects were shut down due to the winter weather, all files had been relocated to the main Fountain Hills office.

PO10 – Daily Reports – Exception: Although we noted that daily reports were prepared and were informed that the Division Manager ("DM") was in continual contact with the Project Superintendent, there was no evidence that the DM received daily reports as required by the procedures manual. (See general SW discussion for DM's directives to project managers on report submittals.)

PO11 – Time Cards – This procedure was performed as required. Exception: (All SW Jobs – not all time cards were initialed by the Project Superintendent.)

PO12 – Project Pictures – This procedure was performed as required.

PO13 – Job Cost Adjustments – This procedure was performed as required. See A4.

PO14 – Project Information Meetings – It was represented to us that continual contact was maintained (at least every other day) between the Super and the DM. The DM noted that such contacts were documented in phone logs. Due to time constraints we did not verify this assertion. Assume performed as required.

PO15 – Foreman's Huddle – The procedures manual requires this to be done each morning. The DM noted his belief that it is more useful to conduct each evening. However, in either case, it was represented that such meetings were held. However, the procedures manual requires documentation be kept for the meetings. Exception: No meeting notes were kept.

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

38.

DECL. OF SPOONEMORE
Ex. G, p. 40

**Klukwan Contracting**
Contract Analysis
December 31, 2001

PO16 – Project Schedule – This procedure was performed as required. Potential exception: the three week look ahead schedules (which are emailed to the DM) were not saved by the DM. However, copies were supplied by the Superintendent. Note also that the Superintendent noted that copies were provided weekly to the project owner and the QC contractor at the weekly QC meeting.

PO17 – Claims – One modification applied for. Procedure properly performed.

PO18 – Subcontract Procedures – This procedure was performed as required.

PO19 – Quality Control – This procedure was performed as required from review of correspondence in the contract files.

PO22 – Buy in Meeting – Exception: the procedures require that a pre construction checklist be prepared as part of the buy in meeting. The SW DM represented that no such checklists were prepared for any jobs or were meeting minutes kept for any jobs. He did note that as soon as the project managers were identified, they were given all information to start the actual planning process and to give them ample time to voice concerns in advance of the actual start of construction.

PO23 – Close Out Meetings – This procedure has not been performed because the project is not completely closed out.

PO24 – Formal Pre-Construction Conference – This procedure was performed as required.

PO25 – Job Visits – This procedure was performed as required by representation. No documentation was provided.

PO26 – Budgets – This procedure was performed as required. Note that budgets for change orders are not always entered into the accounting system, though they are normally tracked as a defined set of accounting codes (the 190 section) for additional expense. Change order budgets are often tracked separately in Excel and available for Division Managers and other management.

Klukwan Contracting
Contract Analysis
December 31, 2001

**Contract name/number/Description**

Project N64, Chinle to Tsaile, AZ
CBN00000499
Reconstruction of about 22.59 kilometers of road including removal of existing road surface, lime stabilization of clay under layer, building road base and paving.

**Original award amount**

$7,142,131

Several change orders have been approved: $505,190 to increase lime stabilization depth. Various other changes were made that did not change the total contract amount.

Klukwan has also filed a formal claim for over $2.2 million related to increased costs caused by incorrect information regarding bird nesting limitations (see below). This claim has now become a federal lawsuit.

Competing bids

| | | |
|---|---|---|
| Weeminuche Const. Auth. | - | $7,792,711 |
| Sours Construction | - | $8,733,986 |
| SSCC/MG Joint Venture | - | $8,959,392 |

**Qualitative analysis from internal bid analysis (including profit estimate)**

No unusual items noted.

**Timeline**

- **Date of contract award**

  Awarded September 1999

- **Files established and budget entered into system**

  Approximately same date as above

- **Date work started/First costs charged**

  Work was to commence in early 2000 and be completed by the end of the year. At the pre-construction conference in early 2000, the limitations imposed for bird nesting areas was expanded to include most of the construction season. This caused the

Travelers Casualty and Surety v. South Coast, Inc., et al.          DECL. OF SPOONEMORE
Case No. A06-00063 (TMB)                                                Ex. G, p. 42

40

Klukwan Contracting
Contract Analysis
December 31, 2001

contract to be partly completed in 2000 and carried into 2001. The project is now substantially complete.

- **Significant developments**

  As noted, the bird issue was a significant problem. Klukwan also had major disagreements with the on-site BIA contract officer.

  Also, there was significant amounts of unbudgeted excavation due to the owner representative requesting additional changing of the existing road bed.

  As the paving was not completed by the end of 2000, Klukwan was required to do certain maintenance over the winter consisting of various items such as grading.

  Sub grade Stabilization:
  They encountered significant problems with the lime stabilization process. Their initial subcontractor was not able to perform any services. The reissued subcontract was for a significantly higher amount.

  The contract called for 76mm of stabilized sub grade. As work commenced, it was determined that this would not work. As a result the contract was changed to make (almost) all of the distance 152mm stabilized sub grade or 304mm. The resulting amounts were about 73,000 Metric Tons (MT) of 152mm and 101,000 MT of 304mm.

  The change in subcontractor resulted in Klukwan losing abut $.08/MT on the 152mm and making about $1.62MT on the 304mm. That is in relation only to the subcontract costs and does not include any overhead or direct charges necessary to oversee the work.

- **Percentage of completion at 12/31/2001**

  98% (effectively 100% - except for some minor items)

**General conduct of the job**

The project manager was Tim Weisenberg.

See discussion above for variations from plan.

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. G, p. 43

Klukwan Contracting
Contract Analysis
December 31, 2001

**General findings/Consistency with prescribed procedures**

The following items were noted during the review of the contract files related to the procedures required by Klukwan Contracting, Inc.:

PO1 – To utilize the project categories as required – This procedure was performed as required.

PO2 – Project Document Control – This procedure was performed as required.

PO3 – Change Orders – This procedure was performed as required except change orders over $50,000 were approved by Ken Griner, Southwest Division Operations Manager. The procedures manual requires such changes to be approved by a Vice President. See general Southwest Division discussion for implied authority to sign.

PO4 – Request for Information
PO5 – Speedy Memos
PO6 – Formal Letters

In general, for all SW jobs, all contacts with owners were documented either with memos or letters. Based on the descriptions of P04, P05 and P06, the communication requirement were complied with.

PO7 – Time and Materials – Procedures performed as required.

PO8 – Submittals and Shop Drawings – Submittals appeared to be properly handled except no submittals log was maintained as required by the procedures manual.

PO9 – Project Files – This procedure was performed as required. As all projects were shut down due to the winter weather, all files had been relocated to the main Fountain Hills office.

PO10 – Daily Reports – Exception: Although we noted that daily reports were prepared and were informed that the Division Manager ("DM") was in continual contact with the Project Superintendent, there was no evidence that the DM received daily reports as required by the procedures manual. (See general SW discussion for DM's directives to project managers on report submittals.)

PO11 – Time Cards – This procedure was performed as required. Exception: (All SW Jobs – not all time cards were initialed by the Project Superintendent.)

PO12 – Project Pictures – This procedure was performed as required.

Travelers Casualty and Surety v. South Coast, Inc., et al.        DECL. OF SPOONEMORE
Case No. A06-00063 (TMB)                                          Ex. G, p. 44

42

**Klukwan Contracting**
Contract Analysis
December 31, 2001

PO13 – Job Cost Adjustments – See PO26. This procedure was not performed. However, costs were segregated in code 090.

PO14 – Project Information Meetings – It was represented to us that continual contact was maintained (at least every other day) between the Super and the DM. The DM noted that such contacts were documented in phone logs. Due to time constraints we did not verify this assertion. Assume performed as required.

PO15 – Foreman's Huddle – The procedures manual requires this to be done each morning. The DM noted his belief that it is more useful to conduct each evening. However, in either case, it was represented that such meetings were held. However, the procedures manual requires documentation be kept for the meetings. Exception: No meeting notes were kept.

PO16 – Project Schedule – This procedure was performed as required. Potential exception: the three week look ahead schedules (which are emailed to the DM) were not saved by the DM. However, copies were supplied by the Superintendent. Note also that the Superintendent noted that copies were provided weekly to the project owner and the QC contractor at the weekly QC meeting.

PO17 – Claims above.

PO18 – Subcontract Procedures – This procedure was performed as required.

PO19 – Quality Control – This procedure was performed as required from review of correspondence in the contract files.

PO22 – Buy in Meeting – Exception: the procedures require that a pre construction checklist be prepared as part of the buy in meeting. The SW DM represented that no such checklists were prepared for any jobs or were meeting minutes kept for any jobs. He did note that as soon as the project managers were identified, they were given all information to start the actual planning process and to give them ample time to voice concerns in advance of the actual start of construction.

PO23 – Close Out Meetings – This procedure has not been performed because the project is not completely closed out.

PO24 – Formal Pre-Construction Conference – This procedure was performed as required.

PO25 – Job Visits – This procedure was performed as required by representation. No documentation was provided.

**Klukwan Contracting**
Contract Analysis
December 31, 2001

PO26 -- Budgets -- This procedure was performed as required.  Note that budgets for change orders are not always entered into the accounting system, though they are normally tracked as a defined set of accounting codes (the 190 section) for additional expense.  Change order budgets are often tracked separately in Excel and available for Division Managers and other management.

Travelers Casualty and Surety v. South Coast, Inc., et al.    DECL. OF SPOONEMORE
Case No. A06-00063 (TMB)    Ex. G, p. 46

**44**

**Klukwan Contracting**
Contract Analysis
December 31, 2001

**Contract name/number/Description**

Project N54, Fort Defiance, AZ
CBN00000700
Reconstruction of several miles of road including removal of existing road surface, lime stabilization of clay under layer, building road base and paving.

**Original award amount**

$1,813,573

Change orders approved authorized and approved have increased the total to $8,350,260.

**Competing bids**

| | | |
|---|---|---|
| Souers Construction | - | $7,573,409 |
| Silverstate Construction | - | $7,999,638 |
| B&M Cillessen Const. | - | $8,213,816 |
| Clearwater Environmental | - | $8,283,674 |

**Qualitative analysis from internal bid analysis (including profit estimate)**

The main advantage is that they had several other project in process near the new contract location.

**Timeline**

- **Date of contract award**

  Awarded May 2000

- **Files established and budget entered into system**

  Approximately same date as above

- **Date work started/First costs charged**

  Work commenced in 2000 and the project was restarted in 2001 and was substantially completed at December 31, 2001.

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. G, p. 47

**Klukwan Contracting**
Contract Analysis
December 31, 2001

- **Significant developments**

  Approved change orders to: increase the volume of asphalt used, to increase the man hours for flagging and quality control, to increase volume of aggregate used.

- **Percentage of completion at 12/31/2001**

  Essentially 100%. In final closeout process in January 2002.

**General progress of job/issues/resolutions**

Job progressed generally as anticipated with no major exceptions.

**General conduct of the job**

The original project manager was Lyle Lundberg. He was replaced by Dane Dahlgren (and Aaron Shelley – Superintendent Trainee).

The major cause of not meeting gross profit expectations is the unbudgeted AZ gross receipts tax. (Without that item, they actually will beat the expectation.)

**General findings/Consistency with prescribed procedures**

The following items were noted during the review of the contract files related to the procedures required by Klukwan Contracting, Inc.:

PO1 – To utilize the project categories as required – This procedure was performed as required.

PO2 – Project Document Control – This procedure was performed as required.

PO3 – Change Orders – This procedure was performed as required except change orders over $50,000 were approved by Bob Boozer, Project Manager (and primary estimator for the SW Division). The procedures manual requires such changes to be approved by a Vice President. Per Ken Griner, Southwest Division Operations Manager, he passed the authority for such items on this contract to Bob. See general Southwest Division discussion for implied authority to sign.

**Klukwan Contracting**
Contract Analysis
December 31, 2001

PO4 -- Request for Information
PO5 – Speedy Memos
PO6 – Formal Letters

In general, for all SW jobs, all contacts with owners were documented either with memos or letters. Based on the descriptions of P04, P05 and P06, the communication requirement were complied with.

PO7 – Time and Materials – This procedure was performed as required.

PO8 – Submittals and Shop Drawings – Submittals appeared to be properly handled except no submittals log was maintained as required by the procedures manual.

PO9 – Project Files – This procedure was performed as required. As all projects were shut down due to the winter weather, all files had been relocated to the main Fountain Hills office.

PO10 – Daily Reports – Exception: Although we noted that daily reports were prepared and were informed that the Division Manager ("DM") was in continual contact with the Project Superintendent, there was no evidence that the DM received daily reports as required by the procedures manual. (See general SW discussion for DM's directives to project managers on report submittals.)

PO11 – Time Cards – This procedure was performed as required. Exception: (All SW Jobs – not all time cards were initialed by the Project Superintendent.)

PO12 – Project Pictures – This procedure was performed as required.

PO13 – Job Cost Adjustments – See PO26. As the contract changes were done by force account – the budget was not modified. Not considered an exception. However, we would have expected that additional costs be charged to 090 codes which was not done.

PO14 – Project Information Meetings – It was represented to us that continual contact was maintained (at least every other day) between the Super and the DM. The DM noted that such contacts were documented in phone logs. Due to time constraints we did not verify this assertion. Assume performed as required.

PO15 – Foreman's Huddle – The procedures manual requires this to be done each morning. The DM noted his belief that it is more useful to conduct each evening. However, in either case, it was represented that such meetings were held. However, the procedures manual requires documentation be kept for the meetings. Exception: No meeting notes were kept.

Klukwan Contracting
Contract Analysis
December 31, 2001

PO16 – Project Schedule – This procedure was performed as required. Potential exception: the three week look ahead schedules (which are emailed to the DM) were not saved. Therefore, we could not verify that the procedure was followed.

PO17 – Claims – N/A – No claims in process.

PO18 – Subcontract Procedures – This procedure was performed as required.

PO19 – Quality Control – This procedure was performed as required from review of correspondence in the contract files.

PO22 – Buy in Meeting – Exception: the procedures require that a pre construction checklist be prepared as part of the buy in meeting. The SW DM represented that no such checklists were prepared for any jobs or were meeting minutes kept for any jobs. He did note that as soon as the project managers were identified, they were given all information to start the actual planning process and to give them ample time to voice concerns in advance of the actual start of construction.

PO23 – Close Out Meetings – This procedure has not been performed because the project is not completely closed out.

PO24 – Formal Pre-Construction Conference – This procedure was performed as required (for both construction seasons 2000 and 2001).

PO25 – Job Visits – This procedure was performed as required by representation. No documentation was provided.

PO26 – Budgets – This procedure was performed as required. Note that budgets for change orders are not always entered into the accounting system, though they are normally tracked as a defined set of accounting codes (the 190 section) for additional expense. Change order budgets are often tracked separately in Excel and available for Division Managers and other management.

**Klukwan Contracting**
Contract Analysis
December 31, 2001

### Contract name/number/Description

Project N221, Shonto, AZ
CBN00000401
Construction of 1.085 miles of road including a small box beam bridge.

### Original award amount

$1,813,573

Change orders approved authorized and approved have increased the total to $1,923,073.
Client expects to receive approval for an addition $300,000 due to increased material,
quality control, and safety flagging units used to complete the contract.

### Competing bids

N/A – Klukwan was the only bidder (both times).  (The BIA rebid the project after
Klukwan was the only bidder. Klukwan was awarded the bid as the sole bidder on the
second bid.)

### Qualitative analysis from internal bid analysis (including profit estimate)

No formal bid review was done (or required) as the initial contract was originally valued
below $2,000,000.

### Timeline

- **Date of contract award**

  Awarded January 2001

- **Files established and budget entered into system**

  Approximately same date as above

- **Date work started/First costs charged**

  Work commenced and was substantially completed in 2001.  Remaining work
  consists of a curb under a guardrail and other miscellaneous small items.

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. G, p. 51

Klukwan Contracting
Contract Analysis
December 31, 2001

- **Significant developments**

    Approved change orders to:  increase the number of man hours for flagging, increase
    the amount of units of water for compaction and dust remediation, increase the
    number of man hours for quality control.

- **Percentage of completion at 12/31/2001**

    93% complete at 12/31/01.  Remaining work at 21/31/01 consisted of a curb, and
    grinding of section borders to smooth out the final grade.

**General progress of job/issues/resolutions**

Job progressed generally as anticipated with the following exceptions:

The superintendent had a test strip of paving laid under adverse conditions.  The paving
failed and had to be pulled up and the road bed fixed.  This delayed the entire paving
project.

The paving site was about 2 hours from the asphalt plant.  Klukwan bid the job and
received a commitment from its trucking contractor to provide 55 trucks to haul asphalt
during paving.  This would provide a continuous supply of asphalt to the job site and
would have left no variations between paved segments.  The maximum number of trucks
used at any time was 38.  This resulted in uneven bumps between segments that had to be
ground out.  Also, this resulted in the paving days being extended by several hours.

The pile driving contractor delayed the project due to equipment problems.  This delay
threw off the entire schedule and resulted in the project not being completed by
December 31 as expected.

One job requirement was to lay a curb under the guardrail on the edge of the road.  The
available equipment did not properly lay the curb (it was away from the guardrail towards
the road), but the superintendent had the curb laid anyway.  The curb was removed and
new equipment will be rented to properly lay the curb (expected cost $5,000).

**General conduct of the job**

The original project manager was Tim Weisenberg.  He subsequently was moved to the
Chinle job and Mike Winkler took over.  Mike turned out to be under qualified.
Specifically, he did not handle the variations in scheduling in an efficient manner.

Klukwan Contracting
Contract Analysis
December 31, 2001

The current estimated result is that Shonto will produce about $145,000 in gross profit instead of the original expected amount of $220,000 (difference of $75,000). Note that about $50,000 of the difference is due to Klukwan not knowing it was required to pay Arizona (and probably New Mexico) gross receipts tax and not including that tax in its original budget.

**General findings/Consistency with prescribed procedures**

The following items were noted during the review of the contract files related to the procedures required by Klukwan Contracting, Inc.:

PO1 – To utilize the project categories as required – This procedure was performed as required.

PO2 – Project Document Control – This procedure was performed as required.

PO3 – Change Orders – This procedure was performed as required except change orders over $50,000 were approved by Ken Griner, Southwest Division Operations Manager. The procedures manual requires such changes to be approved by a Vice President. See general Southwest Division discussion for implied authority to sign.

PO4 – Request for Information
PO5 – Speedy Memos
PO6 – Formal Letters

In general, for all SW jobs, all contacts with owners were documented either with memos or letters. Based on the descriptions of P04, P05 and P06, the communication requirement were complied with.

PO7 – Time and Materials – Not applicable.

PO8 – Submittals and Shop Drawings – Submittals appeared to be properly handled except no submittals log was maintained as required by the procedures manual.

PO9 – Project Files – This procedure was performed as required. As all projects were shut down due to the winter weather, all files had been relocated to the main Fountain Hills office.

PO10 – Daily Reports – Exception: Although we noted that daily reports were prepared and were informed that the Division Manager ("DM") was in continual contact with the Project Superintendent, there was no evidence that the DM received daily reports as required by the procedures manual. (See general SW discussion for DM's directives to project managers on report submittals.)

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. G, p. 53

Klukwan Contracting
Contract Analysis
December 31, 2001

PO11 – Time Cards – This procedure was performed as required. Exception: (All SW Jobs – not all time cards were initialed by the Project Superintendent.)

PO12 – Project Pictures – This procedure was performed as required.

PO13 – Job Cost Adjustments – This procedure was performed as required.

PO14 – Project Information Meetings – It was represented to us that continual contact was maintained (at least every other day) between the Super and the DM. The DM noted that such contacts were documented in phone logs. Due to time constraints we did not verify this assertion. Assume performed as required.

PO15 – Foreman's Huddle – The procedures manual requires this to be done each morning. The DM noted his belief that it is more useful to conduct each evening. However, in either case, it was represented that such meetings were held. However, the procedures manual requires documentation be kept for the meetings. Exception: No meeting notes were kept.

PO16 – Project Schedule – This procedure was performed as required. Potential exception: the three week look ahead schedules (which are emailed to the DM) were not saved. Therefore, we could not verify that the procedure was followed.

PO17 – Claims – This procedure was performed as required. There are outstanding claims/modifications on the contract as noted in "original contract amount" above.

PO18 – Subcontract Procedures – This procedure was performed as required.

PO19 – Quality Control – This procedure was performed as required from review of correspondence in the contract files.

PO22 – Buy in Meeting – Exception: the procedures require that a pre construction checklist be prepared as part of the buy in meeting. The SW DM represented that no such checklists were prepared for any jobs or were meeting minutes kept for any jobs. He did note that as soon as the project managers were identified, they were given all information to start the actual planning process and to give them ample time to voice concerns in advance of the actual start of construction.

PO23 – Close Out Meetings – This procedure has not been performed because the project is not completely closed out.

PO24 – Formal Pre-Construction Conference – This procedure was performed as required.

**Klukwan Contracting**
Contract Analysis
December 31, 2001

PO25 – Job Visits – This procedure was performed as required by representation.  No documentation was provided.

PO26 – Budgets – This procedure was performed as required.  Note that budgets for change orders are not always entered into the accounting system, though they are normally tracked as a defined set of accounting codes (the 190 section) for additional expense.  Change order budgets are often tracked separately in Excel and available for Division Managers and other management.

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. G, p. 55

EXHIBIT C

GROSS PROFIT ANALYSES OF CONTRACTS

| | | | Actual cumulative contract results-KTN Transfer facility | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Contract revenues | Earned revenues | Costs to date | Gross profit | GP% | % Completion | Cumulative Gain/(Fade) | Cumulative Gain/(Fade) |
| Original estimate | 4,927,660 | | 4,435,000 | 492,660 | 10.0% | | | 4,000 |
| As adjusted (to date) | 5,272,215 | | 4,826,625 | 445,590 | 8.5% | | | (3,926) |
| Jan | 4,927,660 | 32,523 | 29,245 | 3,278 | 10.1% | 0.7% | 0.1% | 4,000 |
| Feb | 4,927,660 | 46,813 | 42,170 | 4,643 | 9.9% | 1.0% | -0.1% | (3,926) |
| Mar | 4,927,660 | 147,337 | 132,568 | 14,769 | 10.0% | 3.0% | 0.0% | 1,287 |
| Apr | 4,927,660 | 1,153,565 | 1,038,247 | 115,318 | 10.0% | 23.4% | 0.0% | (58) |
| May | 4,927,660 | 1,910,454 | 1,719,390 | 191,064 | 10.0% | 38.8% | 0.0% | 154 |
| Jun | 4,927,660 | 2,304,667 | 2,074,172 | 230,495 | 10.0% | 46.8% | 0.0% | 167 |
| Jul | 5,117,600 | 3,360,216 | 3,008,397 | 351,819 | 10.5% | 65.7% | 0.5% | 24,169 |
| Aug | 5,117,600 | 4,070,539 | 3,644,305 | 426,234 | 10.5% | 79.5% | 0.5% | 24,224 |
| Sep | 5,117,600 | 4,510,141 | 4,038,261 | 471,880 | 10.5% | 88.1% | 0.5% | 23,786 |
| Oct | 5,272,215 | 5,199,458 | 4,730,626 | 468,832 | 9.0% | 98.6% | -1.0% | (51,716) |
| Nov | 5,272,215 | 5,252,181 | 4,808,384 | 443,797 | 8.4% | 99.6% | -1.5% | (81,618) |
| Dec | 5,330,007 | 5,322,545 | 4,843,844 | 478,701 | 9.0% | 99.9% | -1.0% | (53,514) |

Note: Although the GP% changes with change orders, Gain/Fade is computed to give effect to the variance from the original expected GP%.

55

| | Actual cumulative contract results-KTN Viaduct | | | | | | |
| | Contract revenues | Earned revenues | Costs to date | Gross profit | GP% | % Completion | Cumulative Gain/(Fade) | Cumulative Gain/(Fade) |
|---|---|---|---|---|---|---|---|---|
| Original estimate | 7,901,185 | | 6,660,000 | 1,241,185 | 15.7% | | | |
| As adjusted (to date) | 9,125,118 | | 7,756,250 | 1,368,868 | 15.0% | | | |
| Jan | 8,031,185 | 5,670,820 | 4,621,132 | 1,049,688 | 18.5% | 70.6% | 2.8% | 224,993 |
| Feb | 8,031,485 | 6,122,975 | 4,959,828 | 1,163,147 | 19.0% | 76.2% | 3.3% | 264,042 |
| Mar | 8,031,185 | 6,580,753 | 5,362,839 | 1,217,914 | 18.5% | 81.9% | 2.8% | 224,742 |
| Apr | 8,840,960 | 7,191,237 | 5,824,698 | 1,366,539 | 19.0% | 81.3% | 3.3% | 291,220 |
| May | 8,840,960 | 7,688,099 | 6,227,384 | 1,460,715 | 19.0% | 87.0% | 3.3% | 290,942 |
| Jun | 8,840,960 | 8,154,902 | 6,605,628 | 1,549,274 | 19.0% | 92.2% | 3.3% | 290,799 |
| Jul | 8,990,000 | 8,668,158 | 6,908,658 | 1,759,500 | 20.3% | 96.4% | 4.6% | 412,604 |
| Aug | 9,004,000 | 8,883,346 | 7,190,091 | 1,693,255 | 19.1% | 98.7% | 3.4% | 301,828 |
| Sep | 9,191,014 | 9,020,980 | 7,416,026 | 1,604,954 | 17.8% | 98.1% | 2.1% | 191,403 |
| Oct | 9,191,014 | 9,171,713 | 7,580,129 | 1,591,584 | 17.4% | 99.8% | 1.6% | 151,131 |
| Nov | 9,125,118 | 9,083,143 | 7,720,646 | 1,362,497 | 15.0% | 99.5% | -0.7% | (64,657) |
| Dec | 9,105,000 | 9,102,269 | 7,771,830 | 1,330,439 | 14.6% | 100.0% | -1.1% | (99,452) |

56

Note: Although the GP% changes with change orders, Gain/Fade is computed to give effect to the variance from the original expected GP%.

| | | Actual cumulative contract results-Richardson Highway | | | | | Cumulative | Cumulative |
| | Contract revenues | Earned revenues | Costs to date | Gross profit | GP% | % Completion | Gain/(Fade) | Gain/(Fade) |
|---|---|---|---|---|---|---|---|---|
| Original estimate | 4,893,915 | | 4,400,000 | 493,915 | 10.1% | | | |
| As adjusted (to date) | 5,093,915 | | 5,093,050 | 865 | 0.0% | | | |
| | | | | | | | | |
| Jan | 4,893,915 | | | | 0.0% | 0.0% | -10.1% | (493,915) |
| Feb | 4,893,915 | 24,470 | 21,796 | 2,674 | 10.9% | 0.5% | 0.8% | 40,876 |
| Mar | 4,893,915 | 24,959 | 22,525 | 2,434 | 9.8% | 0.5% | -0.3% | (16,661) |
| Apr | 4,893,915 | 571,609 | 513,910 | 57,699 | 10.1% | 11.7% | 0.0% | 84 |
| May | 4,893,915 | 951,866 | 855,809 | 96,057 | 10.1% | 19.4% | 0.0% | (48) |
| Jun | 4,893,915 | 1,613,524 | 1,450,794 | 162,730 | 10.1% | 33.0% | 0.0% | (345) |
| Jul | 4,700,000 | 2,891,440 | 2,480,548 | 410,892 | 14.2% | 61.5% | 4.1% | 193,556 |
| Aug | 4,700,000 | 4,520,930 | 3,878,534 | 642,396 | 14.2% | 96.2% | 4.1% | 193,496 |
| Sep | 4,893,915 | 4,808,271 | 4,200,050 | 608,221 | 12.6% | 98.2% | 2.6% | 125,140 |
| Oct | 5,093,915 | 5,010,884 | 4,862,278 | 148,606 | 3.0% | 98.4% | -7.1% | (363,031) |
| Nov | 5,093,915 | 5,082,708 | 5,081,901 | 807 | 0.0% | 99.8% | -10.1% | (513,291) |
| Dec | 4,841,223 | 4,841,223 | 5,287,571 | (446,348) | -9.2% | 100.0% | -19.3% | (934,945) |

Note: Although the GP% changes with change orders, Gain/Fade is computed to give effect to the variance from the original expected GP%.

57

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. G, p. 59

| | Contract revenues | Earned revenues | Actual cumulative contract results-Sitka Airport | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Costs to date | Gross profit | GP% | % Completion | Cumulative Gain/(Fade) | Cumulative Gain/(Fade) |
| Original estimate | 3,387,250 | | 3,130,000 | 257,250 | 7.6% | | | |
| As adjusted (to date) | 3,387,250 | | 3,435,888 | (48,638) | -1.4% | | | |
| Jan | 3,387,250 | 2,941,488 | 2,852,772 | 88,716 | 3.0% | 86.8% | -4.6% | (155,090) |
| Feb | 3,387,250 | 2,941,488 | 2,852,772 | 88,716 | 3.0% | 86.8% | -4.6% | (155,090) |
| Mar | 3,387,250 | 2,941,488 | 2,852,772 | 88,716 | 3.0% | 86.8% | -4.6% | (155,090) |
| Apr | 3,387,250 | 2,979,425 | 2,889,484 | 89,941 | 3.0% | 88.0% | -4.6% | (154,998) |
| May | 3,387,250 | 3,224,662 | 3,127,280 | 97,382 | 3.0% | 95.2% | -4.6% | (154,958) |
| Jun | 3,387,250 | 3,301,214 | 3,201,508 | 99,706 | 3.0% | 97.5% | -4.6% | (154,945) |
| Jul | 3,387,250 | 3,363,539 | 3,261,938 | 101,601 | 3.0% | 99.3% | -4.6% | (154,933) |
| Aug | 3,387,250 | 3,369,636 | 3,267,790 | 101,846 | 3.0% | 99.5% | -4.6% | (154,872) |
| Sep | 3,387,250 | 3,387,250 | 3,285,888 | 101,362 | 3.0% | 100.0% | -4.6% | (155,888) |
| Oct | 3,387,250 | 3,385,895 | 3,284,653 | 101,242 | 3.0% | 100.0% | -4.6% | (155,967) |
| Nov | 3,387,250 | 3,385,556 | 3,434,027 | (48,471) | -1.4% | 99.9% | -9.0% | (305,745) |
| Dec | 3,150,796 | 3,150,796 | 3,443,941 | (293,145) | -9.3% | 100.0% | -16.9% | (532,437) |

Note: Although the GP% changes with change orders, Gain/Fade is computed to give effect to the variance from the original expected GP%.

58

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. G, p. 60

| | Contract revenues | Earned revenues | Costs to date | Gross profit | GP% | % Completion | Cumulative Gain/(Fade) | Cumulative Gain/(Fade) |
|---|---|---|---|---|---|---|---|---|
| Original estimate | 13,655,307 | | 12,081,000 | 1,574,307 | 11.5% | | | |
| As adjusted (to date) | 16,334,470 | | 15,200,000 | 1,134,470 | 6.9% | | | |
| | | | | | | | | |
| Jan | 13,754,471 | 8,866,883 | 7,915,609 | 953,274 | 10.7% | 64.5% | -0.8% | (107,337) |
| Feb | 13,754,471 | 9,148,099 | 8,230,983 | 917,116 | 10.0% | 66.5% | -1.5% | (206,825) |
| Mar | 13,788,941 | 9,912,870 | 8,897,635 | 1,015,235 | 10.2% | 71.9% | -1.3% | (177,507) |
| Apr | 13,788,941 | 10,821,561 | 9,712,495 | 1,109,066 | 10.2% | 78.5% | -1.3% | (176,531) |
| May | 13,788,941 | 11,607,531 | 10,417,729 | 1,189,802 | 10.3% | 84.2% | -1.3% | (176,311) |
| Jun | 13,788,941 | 12,247,337 | 10,992,145 | 1,255,192 | 10.2% | 88.8% | -1.3% | (176,527) |
| Jul | 14,959,470 | 13,126,935 | 11,852,154 | 1,274,781 | 9.7% | 87.8% | -1.8% | (271,921) |
| Aug | 14,959,470 | 13,871,917 | 12,570,665 | 1,301,252 | 9.4% | 92.7% | -2.1% | (321,393) |
| Sep | 15,268,470 | 14,094,325 | 12,965,483 | 1,128,842 | 8.0% | 92.3% | -3.5% | (537,405) |
| Oct | 15,468,470 | 14,746,092 | 13,508,104 | 1,237,988 | 8.4% | 95.3% | -3.1% | (484,711) |
| Nov | 16,334,470 | 15,380,537 | 14,311,884 | 1,068,653 | 6.9% | 94.2% | -4.6% | (748,252) |
| Dec | 16,320,659 | 14,428,266 | 14,582,607 | (154,341) | -1.1% | 88.4% | -12.6% | (2,056,177) |
| | | | | | | | | |
| As adjusted for year ended 2001 | 16,134,797 | 13,203,104 | 14,889,439 | (1,686,335) | -12.8% | 81.8% | -24.3% | (3,920,943) |

Actual cumulative contract results–Big Salt Road

Note: Although the GP% changes with change orders, Gain/Fade is computed to give effect to the variance from the original expected GP%.

59

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. G, p. 61

| | Actual cumulative contract results-Navajo FB | | | | | | | |
| | Contract revenues | Earned revenues | Costs to date | Gross profit | GP% | % Completion | Cumulative Gain/(Fade) | Cumulative Gain/(Fade) |
|---|---|---|---|---|---|---|---|---|
| Original estimate | 6,125,000 | | 6,125,000 | 681,227 | 10.0% | | | |
| As adjusted (to date) | 6,806,227 | - | 6,206,165 | 600,062 | 8.8% | | | |
| Jan | - | - | - | - | 0.0% | 0.0% | -10.0% | - |
| Feb | - | - | - | - | 0.0% | 0.0% | -10.0% | - |
| Mar | - | - | - | - | 0.0% | 0.0% | -10.0% | - |
| Apr | - | - | - | - | 0.0% | 0.0% | -10.0% | - |
| May | 6,806,228 | 32,670 | 29,697 | 2,973 | 9.1% | 0.5% | -0.9% | (61,854) |
| Jun | 6,806,228 | 43,560 | 39,312 | 4,248 | 9.8% | 0.6% | -0.3% | (17,479) |
| Jul | 6,806,228 | 159,266 | 143,304 | 15,962 | 10.0% | 2.3% | 0.0% | 909 |
| Aug | 6,806,228 | 482,562 | 434,558 | 48,004 | 9.9% | 7.1% | -0.1% | (4,161) |
| Sep | 6,806,228 | 1,174,755 | 1,057,291 | 117,464 | 10.0% | 17.3% | 0.0% | (671) |
| Oct | 6,806,228 | 2,693,905 | 2,424,275 | 269,630 | 10.0% | 39.6% | 0.0% | 1 |
| Nov | 6,806,227 | 4,062,637 | 3,704,528 | 358,109 | 8.8% | 59.7% | -1.2% | (81,279) |
| Dec | 7,341,916 | 4,057,720 | 4,437,536 | (379,816) | -9.4% | 55.3% | -19.4% | (1,422,071) |
| As adjusted for year ended 2001 | 7,386,648 | 4,077,430 | 4,729,170 | (651,740) | -16.0% | 55.2% | -26.0% | (1,920,009) |

Note: Although the GP% changes with change orders, Gain/Fade is computed to give effect to the variance from the original expected GP%.

60

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. G, p. 62

| | Actual cumulative contract results–Ganado Burnside | | | | | | | |
| | Contract revenues | Earned revenues | Costs to date | Gross profit | GP% | % Completion | Cumulative Gain/(Fade) | Cumulative Gain/(Fade) |
|---|---|---|---|---|---|---|---|---|
| Original estimate | 1,997,920 | | 1,798,347 | 199,573 | 10.0% | | | |
| Jan | - | - | - | - | N/A | N/A | N/A | N/A |
| Feb | - | - | - | - | N/A | N/A | N/A | N/A |
| Mar | - | - | - | - | N/A | N/A | N/A | N/A |
| Apr | - | - | - | - | N/A | N/A | N/A | N/A |
| May | 1,997,920 | 11,588 | 10,491 | 1,097 | 9.5% | 0.6% | -0.5% | (10,436) |
| Jun | 1,997,920 | 17,981 | 16,085 | 1,896 | 10.5% | 0.9% | 0.6% | 11,097 |
| Jul | 1,997,920 | 67,130 | 60,391 | 6,739 | 10.0% | 3.4% | 0.0% | 993 |
| Aug | 1,997,920 | 201,390 | 181,226 | 20,164 | 10.0% | 10.1% | 0.0% | 467 |
| Sep | 1,997,920 | 365,420 | 328,662 | 36,758 | 10.1% | 18.3% | 0.1% | 1,400 |
| Oct | 1,997,920 | 1,177,374 | 1,059,006 | 118,368 | 10.1% | 58.9% | 0.1% | 1,289 |
| Nov | 1,997,920 | 1,952,967 | 1,735,247 | 217,720 | 11.1% | 97.8% | 1.2% | 23,158 |
| Dec | 1,997,920 | 1,905,616 | 1,756,200 | 149,416 | 7.8% | 95.4% | -2.1% | (42,920) |

Note: Although the GP% changes with change orders, Gain/Fade is computed to give effect to the variance from the original expected GP%.

61

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. G, p. 63

| | Contract revenues | Earned revenues | Costs to date | Gross profit | GP% | % Completion | Cumulative Gain/(Fade) | Cumulative Gain/(Fade) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

**Actual cumulative contract results-Borrego Pass**

| | Contract revenues | Earned revenues | Costs to date | Gross profit | GP% | % Completion | Cumulative Gain/(Fade) | Cumulative Gain/(Fade) |
|---|---|---|---|---|---|---|---|---|
| Original estimate | 3,334,392 | | 2,932,960 | 401,432 | 12.0% | | | |
| Jan | 3,334,392 | | | | N/A | N/A | N/A | N/A |
| Feb | 3,334,392 | 18,006 | 16,296 | 1,710 | 9.5% | 0.5% | -2.5% | (84,770) |
| Mar | 3,334,392 | 18,673 | 16,707 | 1,966 | 10.5% | 0.6% | -1.5% | (50,368) |
| Apr | 3,334,392 | 30,343 | 27,267 | 3,076 | 10.1% | 0.9% | -1.9% | (63,410) |
| May | 3,334,392 | 30,343 | 27,267 | 3,076 | 10.1% | 0.9% | -1.9% | (63,410) |
| Jun | 3,334,392 | 30,343 | 27,267 | 3,076 | 10.1% | 0.9% | -1.9% | (63,410) |
| Jul | 3,334,392 | 32,010 | 28,851 | 3,159 | 9.9% | 1.0% | -2.2% | (72,368) |
| Aug | 3,334,392 | 38,679 | 34,653 | 4,026 | 10.4% | 1.2% | -1.6% | (54,364) |
| Sep | 3,334,392 | 199,063 | 178,975 | 20,088 | 10.1% | 6.0% | -1.9% | (64,949) |
| Oct | 3,334,392 | 1,315,418 | 1,183,546 | 131,872 | 10.0% | 39.5% | -2.0% | (67,156) |
| Nov | 3,444,391 | 1,842,060 | 1,654,708 | 187,352 | 10.2% | 53.5% | -1.9% | (64,353) |
| Dec | 3,444,391 | 1,876,849 | 1,685,771 | 191,078 | 10.2% | 54.5% | -1.9% | (64,009) |

Note: Although the GP% changes with change orders, Gain/Fade is computed to give effect to the variance from the original expected GP%.

62

Travelers Casualty and Surety v. South Coast, Inc., et al.          DECL. OF SPOONEMORE
Case No. A06-00063 (TMB)                                            Ex. G, p. 64

| | Contract revenues | Earned revenues | Costs to date | Gross profit | GP% | % Completion | Cumulative Gain/(Fade) | Cumulative Gain/(Fade) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| Original estimate | 7,142,000 | | 6,581,000 | 561,000 | 7.9% | | | |
| As adjusted (to date) | 7,968,676 | | 8,525,599 | (556,923) | -7.0% | | | |
| | | | | | | | | |
| Jan | 7,840,000 | 6,101,872 | 5,547,798 | 554,074 | 9.1% | 77.8% | 1.2% | 96,075 |
| Feb | 7,840,000 | 6,225,744 | 5,660,621 | 565,123 | 9.1% | 79.4% | 1.2% | 95,825 |
| Mar | 7,840,000 | 6,235,936 | 5,669,967 | 565,969 | 9.1% | 79.5% | 1.2% | 95,725 |
| Apr | 7,840,000 | 6,235,152 | 5,668,731 | 566,421 | 9.1% | 79.5% | 1.2% | 96,383 |
| May | 7,840,000 | 6,328,448 | 5,753,764 | 574,684 | 9.1% | 80.7% | 1.2% | 96,120 |
| Jun | 7,840,000 | 6,370,000 | 5,791,217 | 578,783 | 9.1% | 81.3% | 1.2% | 96,521 |
| Jul | 7,840,000 | 6,332,368 | 5,838,329 | 494,039 | 7.8% | 80.8% | -0.1% | (4,166) |
| Aug | 7,840,000 | 6,453,888 | 5,949,822 | 504,066 | 7.8% | 82.3% | 0.0% | (3,502) |
| Sep | 7,840,000 | 7,341,376 | 6,768,416 | 572,960 | 7.8% | 93.6% | -0.1% | (3,952) |
| Oct | 7,840,000 | 7,825,104 | 7,655,913 | 169,191 | 2.2% | 99.8% | -5.7% | (446,314) |
| Nov | 7,963,676 | 7,963,098 | 8,519,875 | (556,777) | -7.0% | 100.0% | -14.8% | (1,182,360) |
| Dec | 7,968,676 | 7,784,062 | 8,891,652 | (1,107,590) | -14.2% | 97.7% | -22.1% | (1,759,794) |
| | | | | | | | | |
| As adjusted for year ended 2001 | 7,968,676 | 7,525,618 | 8,633,208 | (1,107,590) | -14.7% | 94.4% | -22.6% | (1,798,732) |

*Actual cumulative contract results–Chinle to Tsaile*

Note: Although the GP% changes with change orders, Gain/Fade is computed to give effect to the variance from the original expected GP%.

63

| | Contract revenues | Earned revenues | Actual cumulative contract results | | | Delta | | Gain |
|---|---|---|---|---|---|---|---|---|
| | | | Costs to date | Gross profit | GP% | % Comp | | |
| Original estimate | 7,437,564 | | 6,693,000 | 744,564 | 10.0% | | | |
| As adjusted (to date) | 8,200,000 | | 7,707,945 | 492,055 | 6.0% | | | |
| Jan | 7,837,000 | 2,358,937 | 2,122,723 | 236,214 | 10.0% | 10.0% | 30.1% | 0.0% | 213 |
| Feb | 7,837,000 | 2,673,201 | 2,406,080 | 267,121 | 10.0% | 10.0% | 34.1% | 0.0% | (1,435) |
| Mar | 7,837,000 | 2,699,847 | 2,430,035 | 269,812 | 10.0% | 10.0% | 34.5% | 0.0% | (1,352) |
| Apr | 7,837,000 | 2,883,232 | 2,594,712 | 288,520 | 10.0% | 10.0% | 36.8% | 0.0% | (316) |
| May | 7,837,000 | 3,380,098 | 3,042,041 | 338,057 | 10.0% | 10.0% | 43.1% | 0.0% | (742) |
| Jun | 7,837,000 | 3,967,873 | 3,571,103 | 396,770 | 10.0% | 10.0% | 50.6% | 0.0% | (865) |
| Jul | 7,837,000 | 4,678,689 | 4,210,753 | 467,936 | 10.0% | 10.0% | 59.7% | 0.0% | (739) |
| Aug | 7,838,700 | 7,002,360 | 6,301,707 | 700,653 | 10.0% | 10.0% | 89.4% | 0.0% | (384) |
| Sep | 7,838,700 | 7,328,379 | 6,595,428 | 732,951 | 10.0% | 10.0% | 93.5% | 0.0% | (730) |
| Oct | 8,179,130 | 8,095,703 | 6,990,851 | 1,104,852 | 13.6% | 13.6% | 99.0% | 3.6% | 297,436 |
| Nov | 8,200,000 | 8,049,940 | 7,566,780 | 483,160 | 6.0% | 6.0% | 98.2% | -4.0% | (328,724) |
| Dec | 8,319,260 | 8,317,596 | 7,667,135 | 650,461 | 7.8% | 7.8% | 100.0% | -2.2% | (182,238) |

64

Note: Although the GP% changes with change orders, Gain/Fade is computed to give effect to the variance from the original expected GP%.

| | Actual cumulative contract results-Shonto | | | | | | |
| | Contract revenues | Earned revenues | Costs to date | Gross profit | GP% | % Completion | Cumulative Gain/(Fade) | Cumulative Gain/(Fade) |
|---|---|---|---|---|---|---|---|---|
| Original estimate | 1,812,000 | - | 1,630,000 | 182,000 | 10.0% | | | |
| As adjusted (to date) | 2,156,452 | | 1,999,707 | 156,745 | 7.3% | | | |
| Jan | 1,812,000 | - | - | - | 0.0% | 0.0% | -10.0% | (182,000) |
| Feb | 1,812,000 | 906 | 778 | 128 | 14.1% | 0.1% | 4.1% | 74,000 |
| Mar | 1,812,000 | 34,428 | 30,892 | 3,536 | 10.3% | 1.9% | 0.2% | 4,105 |
| Apr | 1,812,000 | 142,242 | 127,918 | 14,324 | 10.1% | 7.9% | 0.0% | 471 |
| May | 1,812,000 | 428,719 | 385,622 | 43,097 | 10.1% | 23.7% | 0.0% | 151 |
| Jun | 1,812,000 | 704,687 | 633,855 | 70,832 | 10.1% | 38.9% | 0.0% | 134 |
| Jul | 1,812,000 | 1,018,344 | 916,042 | 102,302 | 10.0% | 56.2% | 0.0% | 32 |
| Aug | 1,812,000 | 1,225,999 | 1,102,937 | 123,062 | 10.0% | 67.7% | 0.0% | (117) |
| Sep | 1,812,000 | 1,804,752 | 1,623,529 | 181,223 | 10.0% | 99.6% | 0.0% | (49) |
| Oct | 2,156,452 | 1,983,289 | 1,770,370 | 212,919 | 10.7% | 92.0% | 0.7% | 14,912 |
| Nov | 2,156,482 | 2,005,716 | 1,859,974 | 145,742 | 7.3% | 93.0% | -2.8% | (59,903) |
| Dec | 2,156,452 | 2,013,911 | 1,879,767 | 134,144 | 6.7% | 93.4% | -3.4% | (72,959) |

Note: Although the GP% changes with change orders, Gain/Fade is computed to give effect to the variance from the original expected GP%.

65

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. G, p. 67

EXHIBIT D

SUMMARY OF SCOPE AND PROCEDURES

## SCOPE OF OUR WORK

We performed the following procedures designed to provide a basis for drawing conclusions about the construction activities of South Coast, Inc. Our procedures generally included gaining an understanding of the internal controls in place at the Company over construction contracts and then selecting specific contracts for detail testing of compliance with the internal controls. We also performed certain additional procedures as described below with respect to business aspects of the contracts.

For purposes of our detailed testing, we selected "E" category contracts (defined as those that are over $2,000,000 in contract revenues) and that were over 50% complete as of December 31, 2001.

## PROCEDURES WE PERFORMED

We evaluated internal controls over the conduct of contracts and the related accounting and reporting. That included interviewing management personnel and reading the two sets of policy manuals which are of particular importance in our evaluation of the conduct of construction contracts and internal controls over those contracts: the Project procedure manual and the Administrative procedure manual.

We became familiar with each contract selected for testing by collecting contract information including bid worksheet, contract award letter, contract document, original budget, scheduling information, personnel assignments, the planned subcontractors and major vendors, and the categories of significant costs.

We reviewed the contract file documentation that was available in the appropriate offices. We interviewed personnel assigned to the job whom were at least at the superintendent level to gain insight as to the conduct of the job. To review contract files and interview job personnel, we visited the Ketchikan office, the Anchorage office, the Prince of Wales office, and the office in Fountain Hills, Arizona.

We reviewed the job cost comparison of actual to budgeted costs for significant variances from the budgeted amounts. For those job costs that were significant and for those that were significantly over or under budget, we extended our work by considering the individual charges in those categories. For those costs, we selected a sampling of individual charges to the line item and traced the charges to the original vendor invoice or other supporting documentation. We compared the charges recorded in the records to the invoices selected for reasonableness and indications that the goods or services applied to the job.

After becoming generally familiar with the subcontractors and major vendors on the job, we reviewed charges to the job by scanning the names and, given the nature of the work, considered the appropriateness of those working on the job.

Travelers Casualty and Surety v. South Coast, Inc., et al.          DECL. OF SPOONEMORE
Case No. A06-00063 (TMB)                                            Ex. G, p. 69

67

roll charges to the job cost detail for reasonableness of time charges,
ro personnel names and time schedules; we considered other indications of
rr or inconsistencies.

ar a gain/fade analysis on the contract to determine the timing of the
ir reporting. Our analysis was based on internally-prepared financial statements
through December 31, 2001.

ewed the accounting records in the Ketchikan and Arizona offices. Related
es were made of accounting and administrative personnel at the Ketchikan and
riz na offices.

w scanned overall detail charges for indication of unusual amounts, frequencies,
v usual or unexpected subcontractors and vendors, and unexpected employees. We
investigated charges that we identified as such.

Procedures performed for payroll costs incurred included reasonableness and verification
of employees who reportedly worked on SCI jobs. We selected a sample of 10 SCI
employees from a listing of all employees receiving an Internal Revenue Service form
W-2 for 2001. We selected the sample to ensure representation of all geographic areas
covered by SCI contracts. Through independent and internal records, we acquired phone
numbers for all selected employees and called them to inquire as to the job(s) on which
they worked, skills they provided, and other information that only employees actually
assigned to a job would be privy to. Results: All employees we contacted were able to
confirm to us information consistent with our understanding of the job to which they
were assigned.

We reviewed job cost reports and internal budget analysis to select a sample of
subcontractors and vendors used for each contract tested. Procedures performed relating
to these subcontractors and vendors included review of invoices and payments made on
those invoices, reasonableness in relation to the bid documents outlining subcontractors
and vendors as required, and inquiries of management of the subcontractors as to time,
cost, and location of work performed for SCI. We selected 11 subcontractors for written
confirmation of information regarding their work. We sent a letter requesting each
contractor to confirm directly to us, the services they performed, the amount of their
billings to SCI, and the approximate time frame of their work. We compared the
information they confirmed to us to the accounting records and the original budgeted use
of that contractor. Results: Ten out of the eleven contractors to which we sent requests
for information responded to us in writing. We were able to reconcile the information
that they confirmed to us with the information recorded in SCI's books. One contractor
(Southeast Earth Movers, formerly known as McGraw Gravel Sales) failed to respond to
our three written requests and several phone calls. We were able to reconcile the
amounts paid to that contractor by referring to their invoices and comparing them to the
costs charged in SCI's books. At this point, we do not expect that we will receive a
response from them.

We paid particular attention to the rental of construction equipment. We reviewed charges to rental expense and for those charges that were large or unusual, we inquired of management as to the nature of the charges. For rental amounts, we identified for consideration, we reviewed underlying accounting records to determine the appropriateness of those charges. Based on these procedures, we found no material instance of unusual or unsupported charges for equipment rental. Note: We found that in certain circumstances in Arizona, when employees have been asked to use their own vehicles, they are paid a nominal daily amount.

69

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. G, p. 71

**Exhibit H**

**From:** Gaggett,Charles W
**Sent:** Wednesday, April 02, 2003 11:01 AM
**To:** 'Jan D Sokol'
**Cc:** Eckardt,Marc A.
**Subject:** D&O Claim South Coast

Our first meeting about South Coast as claims was May 17, 2002 in Seattle with the agent and our underwriters. We, as claims, had our first meeting with South Coast on May 24th 2002, in Seattle. South Coast had sacked the prior management in January 02 based on the reports that I am overnighting to you. We have not received a copy of the policy. We should this week. Please review and advise.

============================================================================

This communication, together with any attachments hereto or links contained herein,

============================================================================

The St. Paul Travelers e-mail system made this annotation on 06/01/06, 13:23:33.

6/1/2006

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. H, p. 1