# Exhibit I

RECEIVED

AUG 1 5 2005

STEWART, SOKOL & GRAY

William A. Earnhart, ASBA 9411099
LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone:   907-277-9511
Facsimile:    907-276-2631
Attorneys for Defendant, Peterson Sullivan, P.L.L.C.
a Washington limited liability company

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT ANCHORAGE

TRAVELERS CASUALTY AND SURETY
COMPANY OF AMERICA, a Connecticut
corporation,

         Plaintiff,

v.

RONALD GELBRICH; JERALD RENICH;
BRAD FINNEY; JAN PAULSON; MICHAEL
HOUTS; EDWIN JOHNSON; and PETERSON
SULLIVAN, P.L.L.C., a Washington limited
liability company,

         Defendants.

Case No. A04-0165 CV (RRB)

MOTION FOR SUMMARY JUDGMENT
TO DISMISS COMPLAINT ON STATUTE
OF LIMITATIONS GROUNDS

Defendant Peterson Sullivan, P.L.L.C., by and through counsel, pursuant to FRCP 56 hereby moves the court to dismiss the complaint of plaintiff Travelers Casualty and Surety Company of America ("Travelers") on the grounds that the complaint is barred by the statute of limitations.

## I.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there are no genuine issues of material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  One of the primary purposes of the summary judgment procedure is to "isolate and dispose of factually unsupported claims or

Date _10-3-07_  Exhibit # _270_
Case _Travelers v SCoast_
Deponent _R. Coleman_
Reporter _JANETTE DUKIC_
   Naegeli Reporting Corporation
   (800) 528-3335  FAX (503) 227-7129

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

PEC SPOONEMORE
Ex. I, p. 1

defenses." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). The U.S. Supreme Court has stated:

> . . . the plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Id.,* 477 U.S. at 322.

As the movant, defendant Peterson Sullivan has the initial burden of establishing the absence of a genuine issue of material fact. *Id.,* 477 U.S. at 323. All justifiable inferences of fact are to be drawn in the favor of plaintiff, the non-movant. *E.g. Dufay v. Bank of America N.T. & S.A. of Oregon*, 94 F.3d 561, 564 (9th Cir. 1996). However, once a properly supported motion for summary judgment is made by defendant, the burden shifts to plaintiff to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A mere "scintilla" of evidence will not be sufficient to defeat defendant's motion; instead, plaintiff must introduce some "significant probative evidence" tending to support the complaint. *Id.,* 477 U.S. at 249, 252; *Summers v. A. Teichert & Sons, Inc.,* 127 F.3d 1150, 1152 (9th Cir. 1997). If plaintiff's evidence is merely colorable or not significantly probative, summary judgment should be entered for defendants. *Eisenberg v. Insurance Co. of North America*, 815 F.2d 1285, 1288 (9th Cir. 1987). Moreover, plaintiff's evidence must be admissible in order to defeat summary judgment. *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181-82 (9th Cir. 1988).

An extensive discussion of the background of this dispute can be found in defendant's motion for summary judgment, motion to compel, and motion for sanctions, dockets No. 89, 90, and 94, respectively.

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511 Facsimile 907.276.2631

Motion for Summary Judgment to Dismiss Complaint on Statute of Limitations Grounds
*Travelers Cas. and Sur. Co. of Am. v. Ronald Gelbrich., et al.* (Case No. A04-0165 CV (RRB)

Page 2 of 14

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 2

## II. FACTS

### 1.   Introduction.

This action is brought by Travelers, a construction bond underwriting company.  Plaintiff has individually sued a number of former officers and directors of South Coast, Inc. as well as South Coast's accountants, Peterson Sullivan, P.L.L.C.  South Coast, Inc. is a subsidiary of Klukwan, Inc.

Plaintiff alleges that South Coast, Inc., through its officers and directors, made misrepresentations in its year 2000 financial report.  Plaintiff further alleges that Peterson Sullivan should have known of these misrepresentations.  Plaintiff alleges it relied on the South Coast financial report to underwrite construction performance bonds in 2001.  Payments were made on those bonds when South Coast and its parent company faced a fiscal crisis in 2002.

Plaintiff's claims rely on four premises:  (1) something was wrong with South Coast's financial condition in January 2001 when the 2000 audited financial statements were provided; (2) defendant Peterson Sullivan knew or should have known of these financial problems; (3) these financial problems were misrepresented in the 2000 audited financial report; and (4) Travelers actually relied on that audited financial statement in underwriting performance bonds on behalf of South Coast.  By plaintiff's own testimony, Travelers did not rely on any misrepresentation in the 2000 audited financial reports and  has refused to provide any evidence that South Coast's financial condition was actually misrepresented in those reports.

### 2.   Facts Regarding Travelers' Knowledge In 2002 Of South Coast's Financial Problems.

Klukwan, Inc. retained Sutor Consulting LLC to investigate and report on the problems at South Coast.  The result was Sutor's "Report on Review of Projects and Project Management Procedures,"

*Motion for Summary Judgment to Dismiss Complaint on Statute of Limitations Grounds*
*Travelers Cas. and Sur. Co. of Am. v. Ronald Gelbrich., et al.* (Case No. A04-0165 CV (RRB)          Page 3 of 14

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511 Facsimile 907.276.2631

Travelers Casualty and Surety v. South Coast, Inc., et al.          DECL. OF SPOONEMORE
Case No. A06-00063 (TMB)          Ex. I, p. 3

dated March 1, 2002 ("Sutor Report"). Exhibit A, hereto. The Sutor Report shows on page 2 that South Coast in fact had a loss of over half-a-million dollars on its large projects, which was almost $2 million less than the profit reported by South Coast. The report concludes on page 2: "South Coast has had serious problems in estimated final completion costs and controlling costs on its larger projects."

Klukwan, Inc. also retained Peterson Sullivan to investigate South Coast. Peterson Sullivan prepared its "Report to Klukwan, Inc. Board of Directors on South Coast, Inc. 2001 Operations" ("Peterson Sullivan Report"), which was transmitted to Klukwan, Inc. on April 2, 2002. Exhibit B, hereto. The Peterson Sullivan Report shows at page 1 that South Coast had a loss for 2001 of over $5.5 million.

Charles W. Langfitt is a vice president of Travelers, and was Travelers' Rule 30(b)(6) representative. Exhibit F, deposition of Charles W. Langfitt, p. 7 ln. 25 - p. 8 ln. 4. At Mr. Langfitt's deposition, he testified that as early as May, 2002: (1) Travelers possessed both the Sutor and Peterson Sullivan reports stating that South Coast was in financial trouble; (2) Travelers suspected the numbers in South Coast's 2000 audited financial statements were inaccurate; and (3) that Peterson Sullivan was responsible for the alleged misrepresentations in the audited financial statements:

Q.    You said you were under the impression that there was some knowledge of potential problems at South Coast prior to May 2002. Why do you say that?

A.    Because the management had been removed from South Coast, and there was an indication that they were suffering from losses. And I know at some point in time, the Sutor and the Peterson report were received and obviously indicated that there were some serious problems with the company.

Exhibit F, Langfitt Depo., p. 48 ln. 23 – p. 49 ln. 6.

Q.    .... You're the one who made the decision to file the current lawsuit; is that correct?

A.    Yes.

*Motion for Summary Judgment to Dismiss Complaint on Statute of Limitations Grounds*
*Travelers Cas. and Sur. Co. of Am. v. Ronald Gelbrich., et al.* (Case No. A04-0165 CV (RRB)     Page 4 of 14

Q.     On whom, if anyone, did you rely in deciding to make a -- file a lawsuit against Peterson Sullivan, just for example?

A.     Jordan Rosenfeld is someone that we have to look at to date, *and also based on the Sutor report and the Peterson report.*

Q.     *You're saying you relied on the Peterson Sullivan report as a basis for your suit against Peterson Sullivan?*

A.     *Yes.*

Q.     *What in the Peterson Sullivan report supports a claim against Peterson Sullivan?*

A.     When you look at it, they were pointing out that there were system flaws and other difficulties that had predated even October of the year that they looked at it. So when you looked through the report, the overall flavor of it was such that there were system flaws that existed at South Coast. And if -- And this is what I'm getting for the other part of it is that if the audit had been performed properly, those system flaws would have been revealed during the course of the 2000 audit and not when they came back in with the later report.

Q.     Now, the October you're referring to is October of 2001, correct?

A.     Well, actually, when you go back and you look at the report, the report is 2002, and you're talking about that October of 2001, yes.

Q.     Right. So that doesn't have anything to do with the year-end 2000 financial statements.

A.     Except that they say that it's clear, even though it was a rapid failure, where it, if you'll pardon the expression, tanked relatively quickly. And that's my word, not theirs, but they said it failed relatively rapidly. There was a reference in that that obviously there were problems that preexisted October and some of the other dates in it. So to me that would mean that if they had done what should have been done properly, and again, that's not where I can offer the opinion, but something you look at that they're saying this is not something that just happened in October, this has been a problem for a period of time, time period not stated, that would lead me to believe, as reading it, that obviously these problems reasonably would have predated '01.

Q.     Because of Peterson Sullivan said were deficiencies that they identified in October of '01?

A.     Correct.

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

Motion for Summary Judgment to Dismiss Complaint on Statute of Limitations Grounds
*Travelers Cas. and Sur. Co. of Am. v. Ronald Gelbrich, et al.* (Case No. A04-0165 CV (RRB))                    Page 5 of 14

A.    And what Peterson Sullivan talks about in their report, is it not, are failure by South Coast management to adhere to the fails management project control system that had been developed?

A.    Yes.

Exhibit F, Langfitt Depo., p. 89 ln. 6 – p. 91 ln. 8.

Q.    Now, by the time you had this telephone conversation with Mr. Crandall in June of 2003, you had long been aware of the Peterson and Sullivan and Sutor reports, correct?

A.    Yes.

Q.    You knew about those reports more than a year earlier?

A.    Yes.

Q.    Did you get those reports at your first internal meeting on the subject of Klukwan?

A.    I think so. They may have been in the underwriting file.

Q.    Okay. You got them very early on, in any case?

A.    Yes.

Exhibit F, Langfitt Depo., p. 181 ln. 5-18. The "internal meeting" mentioned in this excerpt was a meeting among Travelers personnel in May, 2002. Exhibit F, Langfitt Depo., p. 46 ln. 15 – p. 48 ln. 22.

Mr. Langfitt's July 25, 2005, affidavit submitted with Travelers' Opposition to Peterson Sullivan's Motion for Sanctions (attached as Exhibit C hereto, without attachments), also demonstrates that by May, 2002, Travelers knew about South Coast's financial problems and suspected the 2000 audited financial statements were inaccurate, based on the Sutor and Peterson Sullivan Reports:

3.  ... *Travelers' Surety Claims Department and I first because aware of South Coast, Inc. as a very serious claims issue in May of 2002*, after Klukwan's bank (Key Bank) announced that Klukwan was in default and started liquidated assets. *At that time, it was clear that South Coast had operating losses in the millions of dollars on projects for which Travelers had posted payment and performance bonds.* Those losses were represented to have occurred in 2001. ....

Motion for Summary Judgment to Dismiss Complaint on Statute of Limitations Grounds
*Travelers Cas. and Sur. Co. of Am. v. Ronald Gelbrich., et al.* (Case No. A04-0165 CV (RRB))    Page 6 of 14

Travelers Casualty and Surety v. South Coast, Inc., et al.    DECL. OF SPOONEMORE
Case No. A06-00063 (TMB)    Ex. I, p. 6

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

7.      *What first indicated to Travelers that South Coast's audited 2000 financial statements were inaccurate (and thus that salvage from Peterson Sullivan possibly could be appropriate to pursue) was a combination of information regarding South Coast's operations.    That information included:  a report prepared by Sutor Consulting, LLC, entitled "Report on Review of Projects and Project Management Procedures" (the "Sutor Report") ... ; the report prepared by Peterson Sullivan, entitled "Report to Klukwan, Inc. Board of Directors on South Coast, Inc. 2001 Operations" (the "Peterson Sullivan 2001 Operations Report) ...; a "draft" audited 2001 financial statement of South Coast, Inc., and the results of Travelers' investigation into South Coast's current financial status and project progress, including re-letting of South Coast's projects.*

8.      *As I explained in my deposition, upon review of all the information referred to in paragraph 7, I began to suspect that the audited 2000 financial statements were inaccurate.* ... The basis of my suspicion was that the ultimate results of South Coast's projects, based on Travelers' investigation and re-letting of projects during the summer of 2002, was very different than the results reported as anticipated in the audited 2000 financial statements. In fact, the difference appears to be in the tens of millions of dollars. Also, as indicated on page 1 of the *Peterson Sullivan 2001 Operations Report,* the causes of the difference between the results anticipated in the 2000 audited financial statements and those reported later predated October of 2001. As well, the *Sutor Report* identifies significant problems at South Cost in the areas of "Budgeting, costing and tracking" at pages 21-32, and significant problems with "Estimating completion costs and job profitability" at pages 32-36. ....

9.      *One of the specific problems identified in the Sutor Report related to what are known as "underbillings."* ....

10.    During my deposition, I explained the significance to Travelers of "underbillings" reported on financial statement. [sic] ... To summarize, however, on a construction contractor's financial statement, an underbilling is listed as an asset on the presumption that the underbilling eventually will be paid.  However, if the underbilling likely will not be paid, because for example it indicates that work costs more to perform that the contract's budget, the underbilling should be listed on a financial statement as a liability, not as an asset.
(emphasis added)

In addition, Exhibit C to the Langfitt Affidavit (which is attached hereto as Exhibit D for the

convenience of the court) is Travelers' Contract Surety Large Loss Analysis, dated June 5, 2002.  The

Large Loss Analysis shows that Travelers knew in June of 2002 that there was a substantial loss in

Motion for Summary Judgment to Dismiss Complaint on Statute of Limitations Grounds
*Travelers Cas. and Sur. Co. of Am. v. Ronald Gelbrich., et al.* (Case No. A04-0165 CV (RRB))                    Page 7 of 14

Travelers Casualty and Surety v. South Coast, Inc., et al.                    DECL. OF SPOONEMORE
Case No. A06-00063 (TMB)                                                      Ex. I, p. 7

South Coast's operations; the Analysis recommends that Travelers establish a reserve of $7 million to deal with Travelers' potential liability on the bonded projects.

Travelers retained an accountant, Jordan Rosenfeld, to conduct a "forensic review" of South Coast in May 2002. Exhibit C, Langfitt affidavit at ¶¶ 4 and 5, and Exhibit G, Rosenfeld deposition at p. 23. This review lasted until July 17, 2002. Exhibit G, Rosenfeld deposition at p. 27 line 24 – p. 28, line 12. Mr. Rosenfeld informed Langfitt on June 22, 2002, if not before, that South Coast had significant underbilling issues and that projects that were profitable at the end of 2000 were no longer profitable. Exhibit E, e-mail from Jordan Rosenfeld to C. Langfitt and attachment dated 6/22/02.

### III. ARGUMENT

#### Travelers' Cause Of Action Accrued More Than Two Years Before The Complaint.

Travelers has alleged a state law negligent misrepresentation cause of action against Peterson Sullivan. Alaska's statute of limitations applies to that state law cause of action. *See Muldoon v. Tropitone Furniture Co.*, 1 F.3d 964, 966 (9th Cir. 1993); *Nev. Power Co. v. Monsanto Co.*, 955 F.2d 1304, 1306 (9th Cir. 1992). AS 09.10.070(a)(2) provides for a two year statute of limitations for tort actions such as the negligent misrepresentation claim in this case:

> (a) Except as otherwise provided by law, a person may not bring an action (1) for libel, slander, assault, battery, seduction, or false imprisonment, (2) for personal injury or death, or injury to the rights of another not arising on contract and not specifically provided otherwise; (3) for taking, detaining, or injuring personal property, including an action for its specific recovery; (4) upon a statute for a forfeiture or penalty to the state; or (5) upon a liability created by statute, other than a penalty or forfeiture; unless the action is commenced within two years of the accrual of the cause of action.

The complaint was filed on August 4, 2004. Therefore, plaintiff's negligent misrepresentation cause of action against Peterson Sullivan must have accrued on or after August 4, 2002, in order to satisfy the statute of limitations. As a matter of law, the negligent misrepresentation cause of action

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

Motion for Summary Judgment to Dismiss Complaint on Statute of Limitations Grounds
*Travelers Cas. and Sur. Co. of Am. v. Ronald Gelbrich., et al.* (Case No. A04-0165 CV (RRB))                    **Page 8 of 14**

Travelers Casualty and Surety v. South Coast, Inc., et al.                    DECL. OF SPOONEMORE
Case No. A06-00063 (TMB)                                                      Ex. I, p. 8

against Peterson Sullivan accrued well before August 4, 2002, and so is barred by the statute of limitations.

1.    The "Discovery Rule" And Inquiry Notice.

The Alaska Supreme Court has stated the "discovery rule" as to when the statute of limitations begins to run as follows:

> (1)    a cause of action accrues when a person discovers, or reasonably should have discovered, the existence of all elements essential to the cause of action;
>
> (2)    a person reasonably should know of his cause of action when he has sufficient information to prompt an inquiry into the cause of action, if all the essential elements of the cause of action may reasonably be discovered within the statutory period at a point when a reasonable time remains within which to file suit.

*Cameron v. State*, 822 P.2d 1362, 1366 (Alaska 1991). And *see Bauman v. Day*, 892 P.2d 817, 825 (Alaska 1995):

> Where the plaintiff does not actually know of the existence of elements essential to her cause of action . . . the limitations period does not begin to run until 'a reasonable person [in like circumstances would have] enough information to alert that person that he or she has a potential cause of action or should begin an inquiry to protect his or her rights.

Specifically regarding negligence actions, the two-year statute of limitations begins to run on the date a plaintiff has sufficient information such that he ought to begin inquiry as to whether the cause of his injury was the neglect or other actionable act or omission of another. *Yurioff v. American Honda Motor Co., Inc.*, 803 P.2d 386, 388 (Alaska 1990). In other words, Travelers did not have to know the full extent of Peterson Sullivan's alleged negligent misrepresentations before the statute of limitations began to run on its claims against Peterson Sullivan.

The limitations period runs from the inquiry date rather than the date when the inquiry should have produced knowledge of the elements of the cause of action. *Sopko v. Dowell Schlumberger, Inc.*,

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

21 P.3d 1265, 1271 (Alaska 2001); *Waage v. Cutter Biological Div. of Miles Laboratories, Inc.*, 926 P.2d 1145, 1148 (Alaska 1996); *Mine Safety Appliances Co. v. Stiles*, 756 P.2d 288, 292 (Alaska 1988); *Cameron*, 822 P.2d at 1366.

On the date of inquiry when its cause of action accrued, Travelers had the duty and responsibility to investigate and discover, within two years, whether it had any legal claim against Peterson Sullivan (or any other party) and to file suit. *See Preblich v. Zorea*, 996 P.2d 730, 734 (Alaska 2000)

> Under the discovery rule, the cause of action accrues when the plaintiff has information sufficient to alert a reasonable person to the fact that he has a potential cause of action. At that point, he should begin an inquiry to protect his . . . rights and he is "deemed to have notice of all facts which reasonable inquiry would disclose."

*Palmer v. Borg-Warner Corp.*, 818 P.2d 632, 643 (Alaska 1990) (when the fact of the injury is known, the plaintiff "has an affirmative duty to investigate <u>all</u> potential causes of action") (emphasis added).

Further, "the standard for determining when the statute of limitation begins to run is an objective one." *Sharrow v. Archer*, 658 P.2d 1331, 1334 n. 6 (Alaska 1983). As such, when the statute of limitations began to run in this case must be seen from the perspective of a "reasonable" person, and is not based on the individual quirks of Travelers' personnel. *See State, Dept. of Corrections v. Welch*, 805 P.2d 979, 982 (Alaska 1991):

> Critical to the inquiry is whether the person has notice of facts "'sufficient to prompt a person of average prudence to inquire,' and thus [the person] should be deemed to have notice of all facts which reasonable inquiry would disclose.'"

Finally, where "uncontroverted facts" exist "that determine when a reasonable person should have been on inquiry notice," a court can properly resolve the question as a matter of law. *John's Heating Service v. Lamb*, 46 P.3d 1024, 1031 (Alaska 2002).

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511 Facsimile 907.276.2631

2.    **Travelers Was On Inquiry Notice, And Thus Its Cause Of Action Arose, More Than Two Years Before The Complaint.**

The Alaska Supreme Court has set out the elements which establish negligent misrepresentation:

(1) "the party accused of the misrepresentation must have made the statement 'in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest,'" (2) "the representation must supply 'false information,'" (3) "there must be 'justifiable reliance' on the false information supplied," and (4) "the accused party must have failed 'to exercise reasonable care or competence in obtaining or communicating the information.'"

*Reeves v. Alyeska Pipeline Service Co.*, 56 P.3d 660, 670-71 (Alaska 2002). Travelers had actual knowledge, or was on inquiry notice, for each of these elements prior to August 4, 2002, and thus its cause of action against Peterson Sullivan for negligent misrepresentation accrued more than two years prior to the complaint.

Regarding element (1), Travelers had actual knowledge more than two years before the complaint that the alleged misrepresentations in the audit were made by Peterson Sullivan "in the course" of its business.

Regarding element (2) (supplying false information): The Sutor Report and Peterson Sullivan Report were respectively prepared in March and April, 2002. Mr. Langfitt's deposition and his affidavit both show conclusively that Travelers was aware—in May of 2002, much more than two years prior to the complaint—from both the Sutor Report and Peterson Sullivan Report that South Coast was in serious financial trouble with losses in the millions of dollars. The facts set out above show that Travelers also suspected in May of 2002, based on the Sutor Report, that South Coast had problems with underbillings and management procedures. As has been discussed in previous motions by Peterson Sullivan, underbillings are a central issue in this case because Travelers has identified underbillings as one of the items it believes was misrepresented in the audited financial statements.

**Motion for Summary Judgment to Dismiss Complaint on Statute of Limitations Grounds**
*Travelers Cas. and Sur. Co. of Am. v. Ronald Gelbrich., et al.* (Case No. A04-0165 CV (RRB)          Page 11 of 14

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

Travelers' June 5, 2002, Large Loss Analysis also amply demonstrates Travelers' knowledge of the fact that South Coast had lost millions of dollars. Travelers thus had, more than two years before the complaint, concrete information which Travelers alleges was contrary to the information contained in South Coast's 2000 financial statements. From this information, Travelers knew or should have known that the numbers in the audit were inaccurate. All of the facts above are uncontroverted. Therefore, by May 2002 Travelers had at least inquiry notice, if not actual knowledge, that the numbers in the audit may have supplied false information.

Regarding element (3) (justifiable reliance): Travelers has alleged in the complaint and in other pleadings before this court (*see* Travelers' opposition to Peterson Sullivan's motion for summary judgment on the issue of reliance), that it relied on Peterson Sullivan's audit in its decision to bond South Coast. This decision to bond was made in 2001. Therefore, Travelers had actual knowledge of the reliance element much more than two years before the complaint.

Finally, regarding element (4) (negligence by the accused party): Based on the uncontroverted facts discussed above regarding element (2), Travelers had, more than two years before the complaint, information which it alleges was contrary to the information contained in South Coast's 2000 audited financial statements. Travelers had both the Sutor Report and Peterson Sullivan Reports by May of 2002, and so knew by that time that the numbers in the audited financial statements were inaccurate. For instance, Mr. Langfitt expressly stated in his deposition that the Peterson Sullivan Report, which Travelers was aware of at least by May of 2002, was the basis for the suit against Peterson Sullivan. Exhibit F, Langfitt Depo., p. 89 ln. 15-17 ("Q. You're saying you relied on the Peterson Sullivan report as a basis for your suit against Peterson Sullivan? A. Yes."). Mr. Langfitt similarly states in his recent affidavit that the Sutor and Peterson Sullivan Reports "first indicated to Travelers that South

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511 Facsimile 907.276.2631

**Motion for Summary Judgment to Dismiss Complaint on Statute of Limitations Grounds**
*Travelers Cas. and Sur. Co. of Am. v. Ronald Gelbrich., et al.* (Case No. A04-0165 CV (RRB))    Page 12 of 14

Coast's audited 2000 financial statements were inaccurate." Exhibit C, Langfitt July 25, 2005, Affidavit, ¶ 7. Travelers knew that the numbers in the audit were not correct, and was thus on inquiry notice to find out why, specifically, whether it was the result of Peterson Sullivan's negligence. Travelers' cause of action against Peterson Sullivan thus accrued on the date of inquiry notice, which was more than two years before the complaint.

## CONCLUSION

The statute of limitations for negligent misrepresentations is two years. Travelers' negligent misrepresentation claim accrued prior to August 4, 2002—that is, more than two years prior to the complaint—and is barred under the statute of limitations. The uncontroverted facts set out above demonstrate that, under Alaska's "discovery rule," the negligent misrepresentation claim accrued outside the limitations period because more than two years before the complaint Travelers either had actual knowledge or was on inquiry notice of each element of its negligent misrepresentation claim. Therefore, the court is respectfully requested to dismiss the complaint against Peterson Sullivan on statute of limitations grounds.

DATED this 12 day of August, 2005.

LANE POWELL LLC
Attorneys for Defendant, Peterson Sullivan,
P.L.L.C., a Washington limited liability
company

By _____
William A. Earnhart, ASBA 9411099

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

**LANE POWELL LLC**
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

**CERTIFICATE OF SERVICE**

I certify that on August _12_, 2005, a copy
of the foregoing was served by mail on:

Thomas A. Larkin, Esq.
Jan D. Sokol, Esq.
Stewart Sokol & Gray LLC
2300 SW First Avenue, Suite 200
Portland, OR 97201-5047
(Attorneys for Plaintiff)

A. Richard Dykstra, Esq.
James P. Wagner, Esq.
Stafford Frey Cooper
601 Union Street, Suite 3100
Seattle, WA 98101-1374
(Attorneys for Jerald Renich)

Henry Clay Keene, Esq.
Keene & Currall
540 Water Street, Suite 302
Ketchikan, AK 99901
(Attorneys for Jan Paulson)

Timothy A. McKeever, Esq.
Holmes, Weddell & Barcott
701 W. 8th Ave., Suite 700
Anchorage, AK 99510
(Attorneys for Michael J. Houts)

William M. Wuestenfeld, Esq.
Sandberg, Wuestenfeld & Corey
701 W. 8th Ave., Ste 1100
Anchorage, AK 99501-3467
(Attorneys for Brad Finney)

*Jean Pree*

019514.0077/149090.1

**Motion for Summary Judgment to Dismiss Complaint on Statute of Limitations Grounds**
*Travelers Cas. and Sur. Co. of Am. v. Ronald Gelbrich., et al.* (Case No. A04-0165 CV (RRB))    Page 14 of 14

# TABLE OF CONTENTS

Sutor Consulting, LLC's Report on Review of Projects and Proposed
Management Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A

Letter to Tom Crandall from David C. Lee dated April 2, 2002 with attachment of
Peterson Sullivan P.L.L.C.'s Report To Klukwan, Inc. Board of Directors on
South Coast, Inc. 2001 Operations (without attachments) . . . . . . . . . . . . . . . . . . . . B

Affidavit of Charles W. Langfitt (without attachments) . . . . . . . . . . . . . . . . . . . . . . . C

Travelers Bond Contract Surety Large Loss Analysis . . . . . . . . . . . . . . . . . . . . . . . D

Email from Jordan Rosenfeld to C. Langfitt and attachment dated 6/22/05 . . . . . . . . . . . E

Deposition of Charles W. Langfitt, pages 7, 8, 15, 48-49, 89-91, 181 . . . . . . . . . . . . . . . F

Deposition of Jordan S. Rosenfeld, CPA, pages 23, 27-28 . . . . . . . . . . . . . . . . . . . . . G

Table of Contents – Motion for Summary Judgment to Dismiss Complaint on Statute of Limitations Grounds
*Travelers Cas. and Sur. Co. of Am. v. Ronald Gelbrich., et al.* (Case No. A04-0165 CV (RRB)
*019514.0077/149590.1*

# South Coast, Inc.

## Report on Review of Projects and Project Management Procedures

March 1, 2002



THE SUTOR GROUP
## SUTOR CONSULTING, LLC

EXHIBIT __A__
PAGE _1_ OF _43_



# South Coast, Inc.

## Report on Review of Projects
## and
## Project Management Procedures

Prepared by Sutor Consulting, LLC

March 1, 2002

EXHIBIT ___A___
PAGE _2_ OF _43_

# Table of Contents
## Report Narrative

I.   EXECUTIVE SUMMARY.................................................................1
   A.   Work Scope..........................................................................1
   B.   Summary of findings and conclusions ...........................2
     1.   Management ..................................................................2
     2.   Systems and procedures .........................................3
     3.   Chinle (Job #23005) Claim Review........................4
     4.   Arizona region job performance .............................5
     5.   Conclusion......................................................................5
     6.   Copyright materials ....................................................5
II.   PROJECT REVIEW FINDINGS........................................................6
   A.   Job #22921-Big Salt Road.................................................6
   B.   Job #23117-Toksook Airport............................................8
   C.   Job #23119-USCG Dock.....................................................9
   D.   Job #23120-Unalaska Airport........................................11
   E.   Job #23108-Borrego Pass.................................................11
   F.   Job #23112-Window Rock (Navajo FB)....................12
   G.   Job #23205-San Carlos ......................................................13
III.   PROCEDURES AND MANAGEMENT PROCESSES...................14
   A.   Review objectives..............................................................14
   B.   The systems we reviewed..............................................14
   C.   Estimating and bidding ...................................................14
     1.   Pre-bid review................................................................14
     2.   Estimate workup and bidding.................................15
       a.   Bid Item Worksheets.........................................15
       b.   Mobilization and indirects...............................15
       c.   Subs and suppliers .............................................16
       d.   Equipment schedule and ownership costs...16
       e.   The BID COSTS sheet..........................................17
       f.   The BID SCHEDULE sheet.................................17
     3.   Project estimate review.............................................18
   D.   Managing the job during construction.......................19

EXHIBIT ___ A ___
PAGE ___ 3 ___ OF 43

Travelers Casualty and Surety v. South Coast, Inc., et al.       DECL. OF SPOONEMORE
Case No. A06-00063 (TMB)       Ex. I, p. 18

# Table of Contents
## Report Narrative



1.  Establishing the field management and key players.................................19
2.  Material and subcontractor purchasing control..................................20
3.  Management of job logistics and scheduling.................................20
4.  Submittals and contractual requirements.................................21
5.  Tracking quantities.................................21
E.  Budgeting, costing and tracking.................................21
1.  Overview.................................21
2.  SCI's existing procedures for tracking project costs.................................22
3.  So why isn't it working?.................................22
4.  Recommended approach.................................24
    a.  A change in approach will be necessary.................................24
    b.  Focusing on managing cost.................................24
    c.  Controlling production-labor costs.................................25
    d.  SCI equipment tracking.................................27
    e.  Rented equipment.................................28
    f.  Subcontractors & incorporated materials.................................29
    g.  General conditions/mobilization costs.................................30
    h.  The job cost coding system (DNA code).................................31
F.  Estimating completion costs and job profitability.................................32
1.  Existing procedure.................................32
2.  Our recommendations.................................33
    a.  Monthly Contract Status report.................................33
    b.  Discontinue WIP REPORT.................................35
    c.  Implement Unit & Billings worksheet.................................35
    d.  Earnings schedules for subcontractors and major suppliers.................................35
    e.  Implementation of Excel based job cost reporting system.................................36
    f.  Transition.................................36
G.  File organization and document management.................................36
IV  REVIEW OF JOB #23005-CHINLE CLAIM.................................37
V  MANAGEMENT.................................39

EXHIBIT ___ A
PAGE 4 OF 43

Travelers Casualty and Surety v. South Coast, Inc., et al.          DECL. OF SPOONEMORE
Case No. A06-00063 (TMB)                                            Ex. I, p. 19

South Coast, Inc.
Report on Project Review
March 1, 2002



# I. EXECUTIVE SUMMARY

## A. Work Scope

Our January 8, 2002 engagement letter with Klukwan, Inc. provided for review of the following areas:

1. "Methods and means used to estimate the cost-to-complete construction contracts in progress, with specific emphasis on jobs where the remaining estimated cost-to-complete and/or revenues to be earned exceed $1,000,000."

2. "Current procedures used to track construction projects from both a cost and schedule standpoint. This would include reviewing job cost setup, budgeting, labor productivity tracking, scheduling techniques, etc. and determining if South Coast, Inc. (SCI) is following established procedures."

In accordance with our engagement letter we have completed our review of the foregoing areas. The projects included in our review were as follows:

- Job #22921-Big Salt (Alaska)
- Job #23117-Toksook Airport (Alaska)
- Job #23119-USCG Dock (Alaska)
- Job #23120-Unalaska Airport (Alaska)
- Job #23108-Borrego Pass (Arizona)
- Job #23112-Window Rock –Navajo FB (Arizona)
- Job #23205-San Carlos (Arizona)

EXHIBIT _A_
PAGE _5_ OF _43_

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 20

South Coast, Inc.
Report on Project Review
March 1, 2002



## B. Summary of findings and conclusions

The following table summarizes our findings based on our review of SCI's cost-to-complete estimates and resulting anticipated job profit or loss estimates:

| Job # | Job Name | SCI Profit (Loss) | Sutor Profit (Loss) | SCI vs Reviewed Profit |
|---|---|---|---|---|
| 22921 | Big Salt Road | $ (188,811) | $ (1,686,335) | $ (1,497,524) |
| 23117 | Toksook Airport | 560,353 | 323,018 | (237,334) |
| 23119 | USCG Dock | 776,300 | 726,300 | (50,000) |
| 23120 | Unalaska Airport | 351,245 | 351,245 | 0 |
| | **Alaska totals** | 1,499,087 | (285,772) | (1,784,859) |
| 23108 | Borrego Pass | 350,431 | 269,030 | (81,401) |
| 23112 | Navajo Forest Boundry | (575,238) | (651,740) | (76,502) |
| 23205 | SCR 103(4) San Carlos | 104,089 | 104,089 | 0 |
| | **Arizona totals** | (120,718) | (278,621) | (157,903) |
| | **All reviewed jobs** | $ 1,378,369 | $ (564,393) | $ (1,942,762) |

### 1. Management

As illustrated in the foregoing chart SCI has had serious problems in estimating final completion costs and controlling costs on its larger projects. Although SCI admittedly has significant problems in these areas, there were a number of areas where we considered SCI to have strong controls and capabilities. These included the detailing of the SCI bid estimate in the BID ITEM sheets, scheduling, operational capability, marine logistics and dedicated personnel. Generally we found SCI to be stronger in areas relating to field operations.

With few exceptions SCI has demonstrated significant expertise in the area of operations planning and tactical considerations. From our observations, this is a real strength of SCI. They have several people with strong skill sets in key operational areas. We hope this operational strength is not overlooked when assessing the future plan for SCI. We believe this provides a good base for a successful company once upper management is in place and some of the control issues outlined in this report has been resolved.

Although field-operations orientation is essential, a viable company cannot afford to underestimate the importance of other management processes. We believe that overall, SCI has strong project managers who are capable of controlling all aspects of the projects with appropriate direction and

EXHIBIT _A_____
PAGE _6_ OF _43_

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063-(TMB)

DECL. OF SPOONEMORE
Ex. I, p. 21

South Coast, Inc.
Report on Project Review
March 1, 2002



guidance from upper management. The primary responsibility for the development of these systems in a construction organization resides with upper management and not the project managers. If there was a failing in this area it was upper management and not SCI's existing project managers. We found SCI's project managers to be dedicated, well-versed in field operations, intelligent and thorough. However, the project managers were not effective in many areas that fall within their responsibilities. These areas included file management, document control, cost control, budget management, productivity monitoring, and reporting on job profitability. It does not appear that SCI has people on staff that have had formal training in these areas of project management. Nor does it appear that they have picked up these skill sets in prior employment. SCI's project managers understand many aspects relating to these areas but have not pulled it together into a meaningful management routine.

In Section V we make some observations and recommendations with respect to the new management personnel who may be brought into the company.

2.  **Systems and procedures**

Overall we found a lack of standardization and consistency in many areas. There appeared to be very little direction in terms of standardization of procedure. When standard forms were used, their form, content and usage varied widely between individuals. As a result there were a variety of fragmented standalone systems and procedures in place for accomplishing routine tasks. This has created significant control gaps and disorganization in SCI's business practices. This lack of standardization and consistency has significantly reduced the ability of both internal and external managers to accurately assess the status of SCI's business operations and financial status.

In Section III of this report we discuss several aspects of SCI's existing procedures and our recommendations for improvement. During our review we noted several areas from estimating & bidding through project management that require improvement. Some of these areas are as follows:

a.  Estimating and bidding. Improved control over bidding & estimating procedures to provide better visibility over estimating decisions and less risk of oversight and error. This will require changes to some existing procedures. We were particularly concerned about the lack of control over bidding decisions and the disconnect between the bid amounts and the underlying cost estimates supporting the bids. Refer to Section III.C.

EXHIBIT ___A___

PAGE _7_ OF _43_

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 22

South Coast, Inc.
Report on Project Review
March 1, 2002



b.   **Internal and external estimate reviews.** We think it is essential that SCI implement a standard internal and sometimes external estimate review. SCI's existing process does not foster accountability in bidding and estimating. There is no assurance that SCI's past experience with bid errors will not be repeated unless there is a meaningful estimate review. Refer to Section III.C.3.

c.   **Project management.** We have recommended changes in the way SCI manages its projects. Some of these deal with assignment of key field personnel to the projects and others deal with submittal and job buyout controls. Refer to Section III.D.

d.   **Budgeting, costing and tracking.** We have recommended some sweeping changes to SCI's existing procedures. These recommendations call for changes in methodology, affecting the manner in which SCI budgets jobs, sets up the job cost and tracks cost. This will effect accounting as well as project management functions. SCI's existing system is time-consuming and ineffective. The current methodology for cost management is a primary source of many of the profitability reporting. Refer to Section III.E.

e.   **Estimating completion costs and job profitability.** We made recommendations to overhaul the procedures and methodology that project managers follow in estimating and monitoring job profitability. Since we found that present procedures were neither efficient nor reliable, we recommended a complete discarding of SCI's present processes. We believe these improvements are essential to reduce the potential for late or inaccurate reporting of job losses. Based on our observations, we believe that some of the reporting problems resulted from intentional efforts by upper management to delay reporting of poor operating results. The lack of procedures and resulting accountability was a significant contributing factor. Refer to Section III.F.

f.   **Scope and transition.** Although most of our recommendations apply to all jobs, we recommend focusing on the larger jobs where most of the negative fall-out has occurred. We recommended applying many of these recommendations to the major jobs we reviewed and to new larger projects. We would start with the larger jobs and then implement more broadly after going through the learning curve.

3.   **Chinle (Job #23005) Claim Review**

We reviewed the Chinle claim. Based on our review it appeared that SCI will ultimately be successful in collecting a significant portion of its claim amount. We performed a cursory analysis of SCI's claim quantification and found SCI's claim amount to be reasonable. Refer to Section IV.

EXHIBIT _____ _A_
PAGE _8_ OF _43_

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 23

South Coast, Inc.
Report on Project Review
March 1, 2002



4.   **Arizona region job performance**

We prepared an analysis of the profitability on past major jobs for the Arizona office. Refer to Tab 4 for a summary of our findings on a project-by-project basis. Our analysis indicated that after factoring out bid errors for the TERRO fees and State Taxes it appeared that the Arizona office appeared to be able to consistently perform construction work at or below bid levels with the exception of the Window Rock job (23112-Navajo FB) and Chinle (job #23005). As discussed in more detail later in our report, we believe the primary problem on Window Rock was the use of new and untested project management and key field personnel. The loss on the Chinle job is fully accounted for between the $306,000 of taxes omitted from the bid and the impact of the events now being claimed against the owner.

5.   **Conclusion**

In conclusion, we believe that as an owned and independently operated subsidiary, it is essential SCI's management processes are effective and provide a significant degree of management oversight capability. Inherent problems with existing procedures and outright system breakdown in some cases have severely hampered Klukwan's efforts to oversee SCI's operating results and financial condition. It will be necessary that inherent shortcomings in SCI systems and management procedures be changed in order to provide Klukwan adequate information to make well-reasoned decisions about its continued involvement with SCI.

6.   **Copyright materials**

We have included a number of spreadsheet formats and other materials that are the product of years of development and testing by our firm. A significant portion of these materials is protected under copyright laws. Materials covered by the copyright protection are so indicated in footnote disclosure on various documents. We hereby grant SCI and Klukwan, Inc. the right to use, copy and modify the copyrighted materials as required for use within their respective business operations. The copyright protection still applies to all other uses. Therefore, SCI and Klukwan, Inc. will be prohibited from distributing these materials to outside parties other than when the intent of distribution is for the purpose of reporting on aspects of the business of SCI or Klukwan, Inc. Additionally, SCI and Klukwan, Inc. will be prohibited from removing the copyright disclosures.

EXHIBIT __A__
PAGE _9_ OF _43_

Travelers Casualty and Surety v. South Coast, Inc., et al.          DECL. OF SPOONEMORE
Case No. A06-00063 (TMB)                                            Ex. I, p. 24

South Coast, Inc.
Report on Project Review
March 1, 2002



## II. PROJECT REVIEW FINDINGS

### A. Job #22921-Big Salt Road

1. <u>Estimated gross profit</u>. Tab 2 contains a copy of the revised profit estimate on this project based on our review. Our cost and contract price revisions on this project increased SCI's anticipated project loss at completion from $(188,811) to $(1,686,335). This resulted in a total decrease in gross profit of $(1,497,824). Brad Finney who is no longer employed at SCI prepared the original estimates. We reviewed the revised budget, contract price revisions and completion estimate in detail with several members of SCI's management group. Among others this included Jan Paulson, Lyle Lundberg, Ken Owen and Eric Collins. We were unable to interview Bill Welton, the previous project manager, since he is now working for USDOT, the project owner.

We were provided with two different gross profit estimates for this project. Jerry Renich provided the first estimate indicating a project loss of $(188,811) in response to an information request sent to SCI on January 14. A copy of this estimate can be found under Tab 3. The second estimate indicated a gross loss of $963,616 was given to us by Jan Paulson when we were in SCI's Ketchikan. We did not review the backup for the second estimate. Apparently both the first and second estimates were developed during the same period of time in January 2002. After a review of the backup for the first estimate and a cursory review of the second estimate, it became obvious that the estimates were unreliable. Therefore we placed no reliance on them. SCI's cost-to-complete procedures will be discussed in Section III.F of this report.

Our completion estimate did not include provisions for the following pending issues:

a) <u>$(92,832) potential reduction in job profit</u>. This is retention being held by the owner relating to pay request item "Pay item B20401 Roadway Exc.". The owner is currently holding this amount as retention against the quantities previously paid based on load count. It appears that the SCI survey quantity does not support the full load count quantities. Consequently it is expected that all or a portion of the retained amount may not ultimately be released.

b) <u>$95,073 potential increase in job profit</u>. This relates to erosion control work completed by SCI forces. The owner has paid the value of the work under this advance and has indicated that the final change order to support the increase in the contract value will ultimately be issued. Since the cost for doing the work is already in the job and the contract

EXHIBIT __A__
PAGE _10_ OF _43_

Travelers Casualty and Surety v. South Coast, Inc., et al.          DECL. OF SPOONEMORE
Case No. A06-00063 (TMB)                                            Ex. I, p. 25

South Coast, Inc.
Report on Project Review
March 1, 2002



price has not yet been increased, the effect would be to increase our estimate of job profitability.

c) *$33,815 potential increase in job profit.* This relates to 150mm sub-drilling that was erroneously omitted from quantities by the owner. Subsequent to our estimate the owner has indicated that $33,815 will be paid. The amount will be submitted on the next pay request, #26.

d) *$83,218 to $148,807 potential increase in job profit.* Subsequent to our estimate SCI represented to us that the owner would agree to pay SCI $1.31 per cubic yard dump fee plus overhead and profit. The owner agreed to 55,000 cubic yards and SCI has submitted 76,000. The owner indicated it would review the additional yardage and make a determination.

2. Work to complete. The primary components to complete involve crushing of 20,000 cubic meters, 39,000 metric tons of asphalt paving, 10,000 cubic meters of common roadway excavation, project office support and demobilization costs.

3. Bid spread. SCI was $2,982,425 below the second bidder on this job. This represented approximately 22% of SCI's bid price. It appears that SCI had a bad bid on this job. SCI also suffered significantly from some poor project management decisions and processes. In particular the problems surrounding the asphalt mix design approval. SCI circumvented its normal estimating functions and never had a realistic budget or work plan to support its bid price. Due to the lack of controls this fact was allowed to go unnoticed almost a year. It also appears that when management became aware of the problem, there was not appropriate reporting to Klukwan. The management and system implications will be discussed under Section III of this report.

4. Completion schedule. The current contract schedule indicates completion of the project site work in June 2002 and demobilization in July 2002. The required contract completion date, as extended, is October 2, 2002. Liquidated damages provisions in the contract are $2,100 per calendar day. Based on the current completion schedule no liquidated damages are anticipated.

5. Completion management. SCI has put a new management group into place for the completion of this project. Lyle Lundgren will be the senior project manager for completion of this project. William Welton, the previous project manager, is now working for the USDOT, the project owner. The personnel reporting to Mr. Lundgren on this project are as follows:

   a. Ken Owen, office manager/assistant project manager

   b. John Rice, Earthwork superintendent

EXHIBIT    A
PAGE  11  OF  43

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 26

South Coast, Inc.
Report on Project Review
March 1, 2002



   c.   Richard Muehun, Paving superintendent

   d.   Kelly Stuart, Paving Manager

6.  Completion cash flow[1].  A summary of the anticipated cash flow from the date of our review through completion is as follows:

### Completion Cashflow

| | |
|---|---:|
| Remaining contract value to bill | $ . 2,758,305 |
| Scheduled cost-to-complete (CTC) | (3,003,516) |
| Additional CTC adjustments | (110,000) |
| **Net cash gain (loss) from completion of work** | (355,211) |
| Add retentions presently withheld by owner | 395,978 |
| Less contingency for retention | (100,000) |
| Less previous payments for materials on hand | (481,383) |
| Less advance for CM0011 work | (95,073) |
| **Net cash gain (loss) through completion** | $  (635,669) |

B.  **Job #23117-Toksook Airport**

   1.  Estimated gross profit.  We reduced SCI's gross profit estimate for this project by $237,334, from $560,353 to $323,018. We met with the project manager, Jeff Wedekind, to review the proposed work plan, schedule and budget. The bulk of the downward adjustment was the result of an oversight that was made at the time the project was originally bid. The specifications require the contractor (SCI) to preload the runway areas of the project for a specified period of time.  The job was originally bid based on completion in 2002.  The as-bid schedule did not take into account the preloading requirement.  After incorporation of the preloading requirement into the schedule, completion is extended into 2003. This requirement results in significant additional costs.  No significant work had taken place on this project as of the date of our review.

   This project includes a significant amount of barging, which is weather sensitive.  A trip contingency of ½ day per trip ($25,500), plus an additional project barging contingency of $100,000 was added to the cost budget to reflect this risk.

   Crushed rock is a major component in the remaining work.  Of the total job budget of $3,924,334; $1,230,262 relates to the crushed rock.  Crushed rock includes pit development, crushing, barging, stockpiling and placing.  A

---

[1]  The cash flow does not taken into account any potential cash effects of the issues outlined in Section II.A.1.(a)-(d).

EXHIBIT ___ _A_
PAGE _12_ OF _43_

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 27



South Coast, Inc.
Report on Project Review
March 1, 2002

complete copy of the revised project budget can be found on the attached compact disk. Refer to the CD Contents List under the Toksook files.

2.   Work to complete. Only preparatory project management work had been preformed as of the date of our review. All the on-site work remains uncompleted at the present time. As of February 22, 2002 approximately $62,000 of cost had been charged to this job. The primary work components consist of 229,300 cubic meters of roadway/runway embankment, 8,830 cubic meters of crushed which will come from Dutch Harbor and a small storage building. This project does not involve asphalt or other pavements.

3.   Bid spread. SCI's bid on this project of $4,247,353 was $192,389 lower than the second bidder, Tamsher Construction, Inc. The primary differences were $286,000 lower on the mobilization item, $157,000 lower on the embankment item (10%), $536,000 higher on crushed rock (55%) and a net $286,000 lower on the other bid items.

4.   Completion schedule. The revised contract completion schedule anticipates final completion in July 2003. Due to marine ice conditions, access to Toksook is restricted during a significant part of the year. The revised project schedule anticipates mobilization by barge of project equipment in May of 2002. According to the bid proposal the time allowed for contract completion is 300 calendar days, which begin once the Notice to Proceed, has been issued. The NTP has not yet been issued on the project. No contract days are charged from November 1 through April 30 of each year. Accordingly the required contract completion date will be August 24, 2003 (assuming the NTP is issued by April 30, 2002). Liquidated damages are $1,500 per calendar day. Based on completion of the proposed project schedule, no liquidated damages are anticipated.

5.   Completion management. Jeff Wedekind is the project manager for this project.

C. **Job #23119–USCG Dock**

1.   Estimated gross profit. We reviewed the work plan, construction schedule and budget with Jan Paulson and John Pool. We have proposed a reduction in SCI's gross profit on this project by $50,000. This project has been delayed due to the need to permit an alternative rock source. The owner's source specified in the contract would not have been practical to develop due to poor access. The primary effect of the delay was to push the sheet pile driving and borrow embankment work into the January-February period and expose it to weather impacts. Although the effect on borrow embankment work is negligible, the sheet pile work will be impacted. We reviewed the productivity to date on both the borrow embankment and the pile driving with the project manager. The borrow

EXHIBIT ___A___
PAGE _13_ OF _43_

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 28

South Coast, Inc.
Report on Project Review
March 1, 2002



embankment appears to be making production. The to-date productivity on the pile driving appears questionable, although it is still in the early learning curve stage. Due to the probable cost impacts due to delay and sheet pile work, we believe the additional cost provision was prudent. As of February 22, 2002, SCI had incurred approximately $921,000 in cost to date. Approximately $700,000 of this relates to mobilization and material package purchases. It appears that SCI's budget, as adjusted, and work plan for this project are adequate to support its gross profit estimates.

2. <u>Work to complete</u>. The primary components of the project are construction of an embankment-supported dock (66,360 cubic yards of borrow embankment, 1,300 lineal feet of sheet pile) and construction of a pile supported dock. As of the date of our review, SCI had commenced sheet pile driving operations and work on the borrow fill in the embankment supported dock portion of the project.

3. <u>Bid spread</u>. SCI's bid for this project of $6,499,000 was $528,000 under the second bidder. SCI was $550,000 lower on the rock. There were only two bidders on this project. It appears that the second bidder, West Construction, may have submitted a speculative bid based on West's rock source and the potential problems with the owner provided rock source.

4. <u>Completion schedule</u>. The on-site work is scheduled to be complete by mid-September 2002. All site work, including punchlist, is anticipated to be completed in September 2002. Final as-builts and material certifications are scheduled for October 2002. Final required completion under the contract is December 31, 2002 for the main contract work and July 15, 2002 for Alternate #7-Loading Dock.

SCI's current schedule indicates the first week in September 2002 for completion of the Loading Dock. Upon review this appeared to be a scheduling error. The loading dock work lacked correct scheduling logic. The loading dock is isolated and independent work that can be performed concurrently with other work after the 2002 project mobilization. Therefore late completion of the loading dock beyond the July 15, 2002 completion date is not expected. We requested SCI to make appropriate adjustments to their completion schedule. The contract carries a rate of $1,000 per calendar day for liquidated damages. No liquidated damages are anticipated.

5. <u>Completion management</u>. John Pool is the project manager for this project.

Page 10

EXHIBIT ___ A ___
PAGE 14 OF 43

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 29

South Coast, Inc.
Report on Project Review
March 1, 2002



D.  **Job #23120-Unalaska Airport**

1.  Estimated gross profit. We reviewed the budget, work plan and schedule for the project with Jeff Wedekind, project manager. Based on our review it appears that the budget and work plan will support SCI's current gross profit projections on this project.

b.  Work to complete. The project involves the purchase of approximately 960 pre-cast concrete armor units, mobilization of the units to the project site and installation of the units. $1,523,000 of the total project budget of $2,256,000 relates to the purchase, transportation and installation of the armor units. The balance of the work items are minor in nature. SCI has placed a purchase order with Concrete Technologies in Tacoma, Washington for the manufacture of the pre-cast armor units. $238,000 of the $271,000 cost to date on this project relates to the armor units purchased from Concrete Technology.

2.  Bid spread. SCI's bid of $2,614,245 was $249,166 lower than the second bidder. SCI was $128,000 higher on the armor units, but $140,000 lower on the mobilization item and $237,000 lower on the other bid items.

3.  Completion schedule. The notice to proceed was not issued on this project as of the date of our review. The project was scheduled for completion on October 3, 2002. The current contract completion date is October 31, 2002. Liquidated damages outlined in the contract are $1,500 per calendar for late completion. No liquidated damages are anticipated.

4.  Completion management. Jeff Wedekind is the project manager for this project.

E.  **Job #23108-Borrego Pass**

1.  Estimated gross profit. We reviewed the work plan, construction schedule and completion budget with Ken Griner and Dane Dahlgren. Based on our review we reduced SCI's gross profit estimate by $81,401. Refer to the report in Tab 2. Among other cost-to-complete adjustments, we added a $50,000 contingency relating to project delay and impacts due to the asphalt subcontractor's faulty mix design. We also recomputed and corrected the cost provisions for TERRO fees and State Excise Taxes based on the revised current contract price.

2.  Work to complete. The major work item to complete was the asphalt paving which was delayed into 2002 as previously mentioned. Approximately $900,000 of the total $1,263,999 cost-to-complete is attributable to the asphalt paving. SCI does not manufacture the asphalt mix or perform the asphalt lay-down on this project.

EXHIBIT  A ___
PAGE  15  OF  43

Travelers Casualty and Surety v. South Coast, Inc., et al.          DECL. OF SPOONEMORE
Case No. A06-00063 (TMB)                                            Ex. I, p. 30

South Coast, Inc.
Report on Project Review
March 1, 2002



3.   Bid spread.  SCI's bid on this project of $3,334,392 was $208,890 below
     the second bidder.  The bulk of this difference is attributable to a bid error
     that was made.  SCI left $132,000 of State Gross Receipts tax out of the
     original bid.

4    Completion schedule.  SCI's project schedule indicates a completion date
     of July 8, 2002.  The paving is scheduled from mid-May to mid-June 2002.
     The contract requires completion by July 11, 2002.  The liquidated
     damages rate for this project is $1,000 per calendar day.  Based on the
     current completion schedule, no liquidated damages are anticipated on this
     project.

5.   Completion management.  Dane Dahlgren as project manager and Aaron
     Shelly as superintendent are responsible for completion of this project.

F.  Job #23112-Window Rock (Navajo FB)

1.   Estimated gross profit.  We reviewed this project with Ken Griner, Dane
     Dahlgren and Bob Boozer.  Based on our review, we increased SCI's
     estimated gross loss on this job from $(575,238) (loss) to $(651,740) (loss).
     SCI had prepared a very competent cost-to-complete shortly before we
     arrived at the Arizona office.  We performed an independent estimate and
     detailed comparison between our estimate and the SCI estimate.  Refer to
     Tab 2 for a copy of our job profit summary.  Based on our work we believe
     the SCI estimate after our adjustments (primarily contingencies) is
     adequate to complete the project.  Our analysis includes a contingency in
     the amount of $100,000 that relates to the risk associated with the finished
     grade being exposed to the winter season (which may require resetting the
     blue-tops, re-rocking, re-grading) and learning curve relating to new field
     personnel.

2.   Work to complete.  There are two primary work components remaining.
     There is approximately $600,000 of portland concrete work (sidewalks,
     driveways, curbs & gutters) and approximately $1,200,000 of asphalt
     paving (to be performed by SCI).  There is also $253,984 in TERRO fees
     and Gross Receipts Taxes that have not yet been charged to the job.  We
     recomputed all the TERRO fees and GR Taxes based on re-calculated
     contract values (refer to Tab 5 for report).  Total completion costs are
     estimated to be $3,468,702.

3.   Bid spread.  SCI's bid on this project of $6,806,227 was $642,182 lower
     than the second bidder.  It appears that this delta was due to bid errors.  As
     detailed in our analysis, there was $612,381 of identified bid errors on this
     project (refer to this job in the report under Tab 4).  The single largest being
     the omission of $261,771 in GR Taxes.

4.   Completion schedule.  SCI's current schedule indicates completion in May
     2002.  The portland and asphalt paving are scheduled for April and the first

Page 12

EXHIBIT  A
PAGE  16  OF  43

**South Coast, Inc.**
Report on Project Review
March 1, 2002



week in May. The Notice-to-Proceed was issued August 1, 2001 and started the clock running on the 345-calendar day contract time. The required contract completion date is July 10, 2002. The liquidated damages rate on this job is $2,200 per calendar day. Based on the completion schedule not liquidated damages are anticipated.

5    Completion management. Dane Dahlgren is the current designated project manager on this project. John Leasure was the previous project manager and was terminated.

## G. Job #23205-San Carlos

1.    Estimated gross profit. We reviewed the project budget, work plan and schedule with Ken Griner and Bob Boozer. Based on our review we consider the project budget and work plan proposed by SCI to be adequate to complete the project. We verified that SCI bid the appropriate amount for TERRO fees and GR Taxes into this project.

2.    Work to complete. The work on this project had not been started as of the date of our review. The Notice-to-Proceed has not yet been issued. This is a straight-forward job for SCI it involves 5503 cubic meters of roadway excavation, 9815 metric tons of aggregate base, 6685 metric tons of asphalt paving and incidental work (markings, signage, culvert, cattle guards, etc.).

3.    Bid spread. SCI bid $1,042,791, which was $45,208 lower than the second bidder.

4.    Completion schedule. SCI's completion schedule for this project indicates completion in June 2002. The contract provides for 150 calendar days from the NTP for completion. The NTP is expected Friday, March 8, 2002. Assuming this NTP date, August 5, 2002 would be the required contract completion date. The contract provides a liquidated damages rate of $1,000 per calendar day. Based on the completion schedule, no liquidated damages are anticipated.

5.    Completion management. Bob Boozer will be the project manager in charge of completion of this project.

EXHIBIT _A_
PAGE _17_ OF _43_

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 32

South Coast, Inc.
Report on Project Review
March 1, 2002



## III. PROCEDURES AND MANAGEMENT PROCESSES

### A. Review objectives

Our primary review objectives with respect to the estimating, bidding and project management functions was to focus on the underlying systems and management overview problems that contributed to the failure of SCI to report job profitability timely and accurately.

### B. The systems we reviewed

- **Estimating and bidding**
  - o Pre-bid review
  - o Estimate workup and bidding
  - o Estimate review
- **Managing the job during construction**
  - o Establishing the field management and key players
  - o Material and subcontractor purchasing control
  - o Management of job logistics and scheduling
  - o Submittals and contractual requirements
  - o Tracking field quantities
- **Budgeting, costing & tracking**
- **Estimating completion costs and job profitability**
- **File organization and document management**

### C. Estimating and bidding

1. Pre-bid review.

SCI's current procedure is to hold a pre-bid meeting to determine whether or not to bid a project. To determine a order-of-magnitude pro-forma bid for the project, a preliminary "BID SCHEDULE" worksheet is prepared using "PLUG" numbers for the various bid items based on previous bids or rough estimates. Key members of SCI management and Klukwan representatives attend the pre-bid meetings. Factors taken into consideration are schedule, work scope, risk factors, cash flow and markups. We consider this an important control feature and would not recommend any changes.

EXHIBIT _A_
PAGE _18_ OF _43_

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 33

South Coast, Inc.
Report on Project Review
March 1, 2002



2.  **Estimate workup and bidding**

SCI's current procedure for developing the cost estimates underlying their bids is as follows:

a.  **Bid Item Worksheets**

SCI current procedure is to prepare BID ITEM worksheet for each contract bid item[1] detailing the estimates for each cost component (labor, equipment, material, sub, etc.) required to complete the scope of work. Their sheets also contain all the estimating parameters necessary to compute quantity of required resources (i.e. Computed haul trip times, truck capacity, CY/load, etc.). We found the BID ITEM worksheets to be thorough and well organized. This workup provides a good basis for the unit cost estimates, as well as, follow-on project management. We believe that SCI's procedures in this area are well within industry standards. We recommend no changes to the BID ITEM worksheet process. Samples of the SCI BID ITEM worksheet can be found under Tab 17.

b.  **Mobilization and indirects**

SCI prepares detailed bid worksheets for various indirect items, such as

1)  Mobilization and demobilization (including barging)

2)  Project field support costs (housing, travel, project management labor, superintendents, office costs, pickups, etc.)

3)  Freight (if not included in BID ITEM worksheets).

These worksheets appeared to be adequate in most cases and tied into the pre-bid project schedule. We did notice that the quality of the analysis varied widely from job to job. Also there was a lack of consistency in format and content.

*Recommendation:* *We recommend that a standardized format is agreed upon and followed for all jobs. We also recommend that these standardized formats and sheets be included into a standard estimating template that would contain all the standard sheets that are required on most of SCI's estimates. Any sheet not relevant to any particular project could easily be deleted. Standardization would improve the efficiency of management oversight functions.*

---

1.  The BID ITEM worksheets are not used for mobilization, general conditions and other indirect costs. An Excel spreadsheet is used to summarize cost estimates for these cost categories.

Page 15

EXHIBIT _A____
PAGE _19_ OF _43_

Travelers Casualty and Surety v. South Coast, Inc., et al.    DECL. OF SPOONEMORE
Case No. A06-00063 (TMB)    Ex. I, p. 34

South Coast, Inc.
Report on Project Review
March 1, 2002



c.   Subs and suppliers

Occasionally, SCI will prepare separate spreadsheets to summarize
subcontractor and supplier quotes. This relates to such items as piling,
steel, pipe, dock components, etc. Again this is a good procedure,
however, it is not followed consistently from job to job (not even
between similar jobs).

*Recommendation: Again, a standardized format should be agreed upon and
put in a standard estimating template.*

d.   Equipment schedule and ownership costs.

This is a problematic area for SCI. We consider SCI's estimating to be
deficient in this area. We also noticed that whatever efforts were
expended were inconsistent and with few exceptions, ineffective. We
will discuss this issue both here in the estimating process and also at
the time the job cost budget is established.

This is a difficult area for any heavy/civil contractor. The issue is
recovery of the fixed costs of equipment ownership. As with most
contractors, SCI bids its equipment into each work item (BID ITEM
worksheets) based on the hours or days of operation that will be
required to complete each work item. However, equipment cost is not
only a function of usage (variable operating costs), it is a function of
time (fixed ownership costs). SCI recognizes this and has developed
standard procedures for charging projects when actual hours of usage
during the peak season fall below 40 hours per week (SCI typically
works a 50 hour work week during peak season). To cover its fixed
equipment costs, SCI sets its rates assuming 165 hours per month of
usage during the seven-month peak season for most equipment (peak
season is April through October, inclusive). Due to the remoteness of
many of SCI's larger jobs, a particular piece of equipment idled
between work phases is unavailable for other jobs. The jobs will be
charged for these periods of equipment downtime. This has been a
major cost driver on jobs, like #22921-Big Salt. However, the cost
exposure to this additional allocation of equipment cost is not properly
evaluated in SCI's current estimating or job budgeting phases.

*Recommendation: We have included a standard analysis (built around
SCI's costing methodology) that SCI could use for both estimating and
budgeting projects. The analysis involves completion of two
worksheets (see Equip Budget and Equip Schedule tabs within the
Excel file) in the standard Budget.xls file for each project. Refer to
Tab11 for a hardcopy of the Equipment Budget worksheet and Tab 12
for a copy of the Equipment Schedule worksheet. We recommend that*

EXHIBIT   A

PAGE   20   OF   43

South Coast, Inc.
Report on Project Review
March 1, 2002



*SCI require completion of this analysis, or an equivalent analysis, as part of its standard estimating and budgeting procedures. These worksheets should be made part of SCI's standard estimating template.*

e.    **The BID COSTS sheet**

Once SCI has completed its estimate workup, SCI posts the total estimated cost for each bid item to its BID COSTS worksheet (see example under Tab 18). The BID COSTS sheet summarizes the estimated cost for each bid item for each of the job cost types. The job cost types are labor, SCI equipment, rented equipment, fuel & oil, materials & supplies, subcontractors and allocated equipment.

*__Recommendation:__ SCI's BID COST is a necessary part of the estimating controls. However, for reasons cited in the discussion following relating to the SCI BID SCHEDULE, we recommend integrating the BID COSTS worksheet with the BID SCHEDULE to improve estimating and bidding control.*

f.    **The BID SCHEDULE sheet**

The BID SCHEDULE worksheet is used by SCI for two functions. First, to perform the pre-estimate review (see item Section III.C.1 for discussion on pre-bid review) and secondly in the bidding process to make bid day modifications and check the math for the bid form. The application of the BID SCHEDULE by SCI is very inconsistent and undefined. When asked about the details in how the BID SCHEDULE was to be used we got as many versions as people we asked. The primary problem with the manner in which this worksheet is used is the almost complete disconnect between the BID COSTS worksheet and the BID SCHEDULE. We consider this a major weakness in the ability to perform a meaningful review between what happened from the cost estimate phase to the final bid. Furthermore, this creates an information void regarding "bid day" modification. We attempted to use the BID SCHEDULE to review front-loading and bid-day adjustments, it did not prove to be useful or reliable. Its only control function is to serve as a bid day calculator.

*__Recommendation:__ We recommend SCI make the following changes regarding both the BID COST and BID SCHEDULE worksheets:*

*1)    Discontinue the use of both the BID COST and BID SCHEDULE worksheets and replace them with an integrated worksheet that tracks from the BID ITEM sheets all the way through the bidding process to the final bid. Showing the margin movement (front-loading) and the "bid day" cut and add modifications*

EXHIBIT ___ A
PAGE 21 OF 43

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 36

South Coast, Inc.
Report on Project Review
March 1, 2002



   2)  *Adopt a policy of posting late modifications on "bid day" (no more than two hours before bid) to a separate column without going back into the costing breakdown immediately before bid time. This procedure will reduce the likelihood of last minute errors.*

   3)  *The other aspect of SCI's markup system used for bidding is that it ignores the higher risk associated with labor. SCI is bidding like a general contractor rather than a specialty contractor. Profit markups should vary based on the cost type (most importantly labor).*

   4)  *We have formatted a bidding template for SCI that contains a worksheet (Bid Item Cost Breakdown) that accomplishes these goals. A copy of this worksheet format in provided under Tab 8 (a copy of the file is on the attached CD, refer to the CD Contents List). We recommend that SCI either adopt this worksheet as part of their bidding template or adopt a worksheet with equivalent control features.*

**3.   Project estimate review**

During our review of the projects it did not appear that SCI had a standardized process for reviewing job estimates before the bid is delivered. To the extent there may be a formalized review estimate process, it was either inadequate or not followed. During our project review there were several significant examples of bid errors that would have typically been disclosed in an estimate review process. We noted that most of the errors related not to cost estimating but to lack of understanding of the specification requirements or related project risks. Examples of some of the errors we noted in our review were as follows:

a.   <u>Job #23117-Toksook Airport</u>. The job was bid to be completed in a single season due to lack of understanding of the runway pre-loading requirements in the specifications.

b.   <u>Job #23119-USCG Dock</u>. The owner specified borrow source was not workable. This type of problem is usually identified by a job site/ borrow source visitation by a knowledgeable person. An estimate review would include a quiz on the location, configuration, site visitation and permitting relating to all material sources. This is very elemental to SCI's type of work. This error shows a failure in good estimating practices, as well as, a lack of an estimate review.

c.   <u>Job #22921-Big Salt</u>. Although we view Big Salt as more of an isolated case rather than being representative of SCI's normal processes, we will use it as an example in the bidding process. The fact that this bid got out the door is strong evidence of the lack of an adequate bid review process. It is also a classic example of what can happen when there is lack of consistency, there are significant control gaps and there is lack of standardization in the estimating and bidding process. The

EXHIBIT ___ A___

PAGE _22_ OF _43_

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 37

South Coast, Inc.
Report on Project Review
March 1, 2002



estimating and bidding for this project apparently did not follow even the rudimentary standards that SCI typically implements. It is inexplicable to us how the bid errors on this project were not exposed after it was known that SCI's left $3 million on the table.

*Recommendation: SCI needs to implement some meaningful internal bid review, as well as, an independent external review process on larger projects. By independent, we mean, a person knowledgeable in the type of construction and geographic area that is not employed or has personal or business connections with SCI. An example of the types of problems that would typically be disclosed with an independent external bid review would be the problems in the omission of GR Taxes and TERRO fees on the Arizona projects. Arizona was a new region and the estimating staff was not knowledgeable of local requirements and the possibility of a tax assessment subsequent to bid. These types of State and local tax issues are usually well known by local contractor agencies. External bid reviews are a common practice at some of the more successful mid-sized and large heavy contractors, such as Peter Kiewit. However, the larger companies have internal resource people that are independent of the project and associated people.*

**D.  Managing the job during construction**

    **1.  Establishing the field management and key players.**

Having access to adequate personnel is the most basic and important threshold in deciding whether to take on a job. An example of where this didn't happen was Job #23112-Window Rock (Navajo FB). Based on our discussions with Ken Griner, the field team was virtually untested by SCI. This included the project manager, the superintendent and the finish grader operator. It is very risky to put a concentration of new key players all on one job. It is not advisable to put a new superintendent with a new project manger. Particularly with a new finish grader operator with the sub-grade finishes required on this project. Couple this with a project in a new region and the risk is off the chart. We discussed this with Arizona management and we believe that it is highly unlikely that the Arizona office will repeat this oversight. However it is useful in other areas from a lessons learned standpoint. The availability of adequate experienced staff should be carefully evaluated during the pre-bid review.

One more observation with respect to the selection and establishment of the field team. As we all know, there were a number of bad decisions on 22921-Big Salt that went well beyond the problem with the bid. Chief among these is the management of the paving aspects of the project. One of the most important lessons learned that we see coming out of this project is the manner in which the project management structure was established. We believe that it had a lot to do with why many of the project problems remained unresolved and managed to fester. It is our understanding that the crushing manager and paving manager did not report directly to the

EXHIBIT ___A___
PAGE _23_ OF _43_

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 38

South Coast, Inc.
Report on Project Review
March 1, 2002



project manager, Bill Welton. Regardless of the pecking order of the personnel in the organizational chart, the project manager must have full authority over management of the on-site activities. If this did happen, it was the equivalent of making a subcontractor a co-project manager on a project. We noted that the current project management plans for the completion work on the project does not appear to contain the same flaw. We would like to bring this to management's attention and hope that it will be considered a lesson learned for future projects.

2. **Material and subcontractor purchasing control.**

SCI uses a purchase order system tied into their Bid-Tek accounting system for purchase order control. At the present time it appears the primary function of the purchase order system is to provide a list of issued project purchase orders.

During our review of the projects it was very difficult to determine whether the subcontractor and particularly supplier purchases for any of the projects were coming in within budget. In a lot of cases the project managers couldn't tell us where they stood, other than their general belief was that they were within budget. The project managers do not prepare any kind of summary or buyout analysis that demonstrates the status of major project purchases to date against related budget provisions. This presents significant control risks on some projects. Cost overruns can go unnoticed and review of the project manager's actual purchases compared to budget is very difficult to assess. Some jobs, such as Toksook, have very limited major supplier and subcontractor purchases required. Therefore this job would present minimal additional control risk due to lack of a buyout. Other jobs like 23119-USCG Dock have significant purchases and the lack of a buyout analysis for this project should be a concern.

*Recommendation: We recommend that SCI establish standards for when a project buyout control will be required. Additionally, we recommend that SCI adopt a standard format to be used when buyouts are required. We have provided a sample project buyout format; refer to the CD Contents List. Refer to Tab 13 for a hardcopy of the format.*

3. Management of job logistics and scheduling

   a. Job logistics and operational planning. With few exceptions SCI has demonstrated significant expertise in the area of operations planning and tactical considerations. From our observations, this is a real strength of SCI. They have several people with strong skill sets in key operational areas.

   b. Scheduling. SCI uses Microsoft Project for project scheduling. Although we would not consider SCI strong schedulers, based on our

Page 20

EXHIBIT _A___
PAGE _24_ OF _43_

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 39

South Coast, Inc.
Report on Project Review
March 1, 2002



analysis of several job schedules, SCI's project scheduling efforts were within industry standards for heavy/civil type work. We noticed that most of the schedules did not have full implementation of CPM scheduling logic. However, on the crucial work activities, they typically had applied correct CPM scheduling logic. Therefore, even though most schedules we reviewed were a CPM/Bar chart blend, we believe they were adequate for the task at hand. We would not propose any changes to scheduling efforts.

4.   **Submittals and contractual requirements.**

   a:   <u>Submittal control</u>. During our project review we noted that SCI did not appear to have a standardized process for dealing with project submittals. We did not spend a significant amount of time reviewing this area. For the jobs reviewed, we did not notice submittal logs on most jobs. Due to the fairly minimal volumes on some of SCI's projects this may not necessarily create a significant control risk.

   *<u>Recommendation:</u> However from an efficiency and management overview perspective, we recommend that SCI decide on some <u>consistent</u> way of controlling submittals on the larger projects.*

   b.   <u>Contractual requirements</u>. Due to time constraints, we did not have an opportunity to review this aspect of SCI's project management. This area of review deals with the project managers understanding of the primary legal requirements in the contract. Such as notice requirements for the Differing Site Conditions clause, the Changes Clause, etc.

5.   **Tracking quantities.**

   Most of the procedures set up at the field level for tracking of major contract quantities appeared to be adequate. However, we didn't spend significant time reviewing this area. This is an important duty for on-site management and SCI seems have it under control, but again, there appeared to be no standardization.

E.   **Budgeting, costing and tracking**

   1.   Overview.

   This is a very problematic area for SCI. SCI has struggled in the past and continues to struggle with its ability to make accurate and timely assessments of project cost and profit status. There are several factors behind this. First, effective cost control does not exist in a financial vacuum. A significant part is directly impacted by estimating & bidding and project management controls. In addition to these controls, the manner in which job costing is setup, managed and tracked is essential.

EXHIBIT ___A___
PAGE _25_ OF _43_

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)
DECL. OF SPOONEMORE
Ex. I, p. 40

South Coast, Inc.
Report on Project Review
March 1, 2002



2.  SCI's existing procedures for tracking project costs.

SCI's existing cost control procedure starts with the development of a TOP
SHEET and BUDGET for the project. The TOP SHEET summarizes the
entire estimate by breaking down major mobilization, labor, and material,
etc. components. The project BUDGET is used to establish baseline input
into the Bid-Tek job cost system (refer to Tab 18 for examples of SCI's TOP
SHEET and BUDGET worksheets).

Once the budget is completed and input into Bid-Tek, it is used by SCI to
track and evaluate costs. Field units are tracked and input into the Bid-Tek
cost system and used to evaluate cost per unit of work completed to date
for comparison with the budgeted cost per unit. This comparison is
accomplished on what is referred to as a WIP REPORT. Refer to Tab 19
for an example of a WIP REPORT.

The WIP REPORT computes a final projected cost at completion based on
the actual cost to date, the units to date and the total anticipated units. This
analysis is applied to all cost codes and all cost types (labor, material, etc.).

3.  So why isn't it working?

SCI expends a lot of time and effort in the care and feeding of this system.
If it is failing, it is not from lack of effort on SCI's part. But the fact is, it has
failed and will continue to fail until changed. So the question is, why isn't it
working? Although applied in a similar fashion by many contractors, this
system has a history of failing when it is needed the most, on the larger
jobs that are in trouble.

Some of the problems are the lack of adequate controls discussed
previously that are creating surprises or information voids. However, even
after the other controls are addressed, the system will not work on larger
jobs without changes being made.

The reality is that on closer inspection, the WIP REPORT analysis contains
several inherent fatal flaws, the most critical of which are as follows:

a.  Doesn't work on several cost types. The WIP REPORT assumes this
approach is valid or useful for all cost types. This is not an effective
approach for managing material costs, fuel costs, time-related costs
(job management salaries, field overhead, etc.), barging costs,
allocated equipment ownership costs; and the list goes on from here.
Most of these are not unit driven costs. Therefore the "one shoe fits
all" approach used in the WIP REPORT doesn't work. Consequently
the primary information output of this report, the "Project Final" column
is no longer used or useful. Although we noted several examples of
this problem in our job reviews, the Big Salt January 7, 2002 WIP

EXHIBIT ___A_____
PAGE _26_ OF _43_
DECL. OF SPOONEMORE
Ex. I, p. 41

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

South Coast, Inc.
Report on Project Review
March 1, 2002



REPORT is probably as clear an example of this as any (refer to Tab 19).

b. Projection based on incorrect total estimated units. The WIP REPORT uses the estimated units in the budget for projecting completion costs. Although the actual units to date on the larger production items are updated frequently, the "estimated units" in the budget are not. Therefore the final cost projections based on the budgeted units is often significantly in error on the larger production items.

Even more problematic is the fact that the budgeted units in the WIP REPORT typically bear little or no relationship to the unit quantities used as a base for the "current contract price." Consequently, whatever cost projections would be produced would be matched with the revenue side. Again looking at the Big Salt estimate of final contract units and the units on the WIP REPORT to the extent they are traceable are significantly different.

c. WIP REPORT isn't effective for estimating subcontractor completion costs. Since subcontract payment is based on pay units, it is easy to draw a logical conclusion that the WIP REPORT should work for subcontractor costs. Unfortunately, it doesn't work for subcontractor costs either. We could take any number of jobs but since we have the backup documents for Big Salt in the appendix we can use these to illustrate the point. Acme Fence, the guardrail subcontractor on this project, is performing the guardrail work relating to fourteen different pay items. If you look at the job cost for guardrail on Big Salt there are only two job cost codes that are being used to cost out and track Acme's guardrail work[1]. It is important to remember the WIP REPORT consists of job cost codes and not pay items. Since Acme is paid based on the fourteen pay items and not the two job cost code quantities, it is not possible to predict costs for Acme using the two job cost codes. Therefore, total subcontractor earnings to date and total anticipated cost must be based on the related pay items that are used to determine final contract price at completion. Accordingly the WIP REPORT analysis fails.

d. Disconnect between the pay estimate information and the WIP REPORT analysis. There is no linkage between the WIP REPORT analysis and the pay estimate information. The fact that project managers are using the WIP REPORT analysis without any meaningful comparison to unit billing status and total contract units

_____

[1] The two cost codes are 606-010-019 and 190-210-019. The vast majority of the Acme costs have been charged to 606-010-019.

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

South Coast, Inc.
Report on Project Review
March 1, 2002



used to determine the total contract price is probably the most
significant failing of the WIP REPORT analysis.

It is interesting to note that the only accurate cost-to-complete estimate that
we saw during our review, did not use the WIP REPORT. The Arizona
management prepared an analysis on the Window Rock (23112) project
shortly before our arrival in January 2002. They called this report a "Margin
Analysis." It compared pay request items directly to job cost phases on a
work group category basis. Although the techniques used were very time
consuming, the conceptual approach was effective. The WIP REPORT
analysis, which was prepared by the same people a month earlier,
indicated a job gross profit of $600,062. A month later the Margin Analysis
disclosed the accurate anticipated job loss at completion of $575,232. This
is a swing of $1,175,294.

Before we get into discussing needed corrections, we wanted to point out
that although the WIP REPORT analysis is not useful for estimating
completion costs, the underlying data is useful as a meaningful part of the
overall cost control and completion estimating function. We will discuss
how and when this data should be used in later discussion.

4.  Recommended approach

   a.  **A change in approach will be necessary.**

      There is a tendency by most construction managers with heavy
      backgrounds in estimating and operations, to want to control costs
      in a format that is similar to estimating. Following this classic
      approach, an attempt is made to identify all costs back to specific
      work items. Again the shear gravity of the logic behind this
      approach is extremely hard to resist. To suggest anything else, at
      least on the surface, seems absolutely counter-intuitive. This
      classic estimating approach seems to be "dripping" with common
      sense and logic. Unfortunately, SCI follows this classic
      estimating/operational approach. What we are about to
      recommend will be counter-intuitive at first, but it has proven itself
      time and time again when it does matter; that is on jobs that were
      heading into or were already in serious financial trouble. It is an
      approach that has been used consistently by larger successful
      contractors.

   b.  **Focusing on managing cost**

      If "cost control" were about managing work activities, it would
      probably be called "operations control." It's called "cost control"
      because it's about managing "costs." To manage costs you need
      to focus on the different types of cost and their primary underlying

Page 24

EXHIBIT ___ _A_

PAGE _28_ OF _43_

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 43

South Coast, Inc.
Report on Project Review
March 1, 2002



"drivers" to best determine the approach to cost control. We would like SCI to consider the following approach to project cost control:

c.   **Controlling production-labor costs.**

There are two categories of labor cost. Time-related labor, which is driven by time and production-related labor, which is driven by work activities.

1)   Job cost setup and budgeting. We would not recommend changing the manner in which SCI currently budgets and costs labor. Currently the work labor is spread out over the related work cost codes and the time-related labor is included in general conditions/mobilization section of the job cost.

2)   Labor tracking. **We consider labor as the key barometer in terms of getting a reading on the health of any job. In terms of job productivity, labor is the first item impacted. Labor is also the item, which is almost always impacted the most. Labor is the bell-weather for any job and should receive special management focus.** From a cost control standpoint labor turns South before anything else (schedule delay, equipment impact, materials, etc.) It has more downside cost risk than most other items. For instance, labor on Big Salt overran $2,322,000 or 44% and equipment overran $934,000 or 31%. Another example, labor on Window Rock overran $669,000 or 267% and equipment overran $169,000. All other overruns on these two jobs were relatively insignificant by comparison except the TERRO and GR Taxes left out of the Window Rock bid.

In terms of labor cost tracking for production-related labor there are two fundamental controls:

a)   Daily tracking of labor productivity on the largest labor productivity items on the project. On even very large heavy/civil jobs this usually includes only a half-a-dozen items. For instance on 23119-USCG Dock there is three production-labor intensive items. They would be the borrow embankment, pile driving and the concrete work. If the productivity of these three areas is kept under control it is highly probable the job will come in on budget and on schedule. The project managers need to

EXHIBIT _____ A

PAGE _29_ OF _43_

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 44

South Coast, Inc.
Report on Project Review
March 1, 2002



familiarize themselves on the budgeted productivity assumptions and use that as the baseline.

*Recommendation: We recommend that SCI identify the major labor items on each project and track the units of actual production and against the man-hours on a spreadsheet. This is already being done in some cases, but it is inconsistent and isn't given enough attention.*

b)   Another labor control that is highly critical is to develop an earned labor analysis at the end of every month. This is a common industry cost control procedure. It does not appear that an earned labor analysis has been done on any of the projects we reviewed and apparently is not part of SCI's present cost control procedures. This analysis involves multiplying the unit cost labor rate for each bid item by the total quantity completed to date from the pay request. The amount of "earned labor" based on the completed or billed units to date within a given work group (such as all the pay items relating to borrow-excavation) would be compared to the actual labor cost incurred in the labor job cost codes in the same work group (borrow-excavation). The cost items may include such cost codes as drill & shoot, load, haul, place, etc. As part of a monthly job status report, the project manager must provide written justification for any variance between "earned" and "actual" labor costs. There will be many reasons for normal variations, such as all the drill & shoot has been done but the material doesn't get billed until it is placed, etc. You will know when productivity problems show up, the explanations cease to become obvious.

*Recommendation: We recommend that SCI implement a monthly "earned labor analysis" process for all major project work. We have included a template for developing the "earned labor" from pay request information. It can be found in the Pay Request Template File.xls under the "Units & Billings" sheet (see columns 35 through 40). Refer to Tab 14. As mentioned the project managers should be held accountable for justification of any significant variances between "earned" and "actual" labor. This process should validate the results of the daily tracking of major job*

EXHIBIT ___*A*___
PAGE _30_ OF _43_

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 45

*labor items discussed previously. This is where the unit cost-to-date information generated by the WIP REPORT for "production" items will be useful and should be reviewed. The WIP REPORT data would be the primary tool in detailing why there is a difference between "earned" and "actual" labor. "Work Group" categories will need to be assigned to each job cost phase and each pay request item for all major uncompleted construction projects. This has already been completed for all the projects we reviewed.*

**d. SCI equipment tracking**

1) Job cost setup and budgeting-Equipment operating cost. Currently the estimated cost of operated equipment is spread to cost codes for the work items or to general conditions/mobilization categories for support and miscellaneous equipment. The equipment operation is reported on the daily time cards and input into the same cost code that the operator's time is charged to in Bid-Tek. We don't recommend any changes to the existing procedure in this area.

2) Job cost setup and budgeting-Equipment ownership cost. These are charges from Ketchikan for under-utilization of equipment. On most jobs we reviewed this item wasn't either evaluated or estimated.

*Recommendation: As previously discussed under Section III.C.2.d, we recommend that SCI incorporate an evaluation of project equipment utilization and potential under-utilization charges allocated by Ketchikan. As mentioned previously we have provided a template for accomplishing this and should be made part of both the standard estimating template and the standard budgeting template (refer to Tab 11 and Tab 12). If the analysis was completed as part of the estimating process, it will only require updating for any changes in work plan or schedule identified during the budgeting process.*

3.) Equipment tracking and cost control. Since labor is "driving" the equipment cost, labor should be the primary focus. However equipment is a very significant cost and requires attention as well.



EXHIBIT A
PAGE 31 OF 43

South Coast, Inc.
Report on Project Review
March 1, 2002



*Recommendation:* Our recommendations regarding equipment cost tracking are as follows::

    a)    As a part of the monthly project manager job review, any changes in the equipment plan outlined in the "Equipment Schedule" used in the budgeting phase needs to be discussed. For instance, actual type or size of equipment mobilized to the job was different than indicated in budget schedule, or equipment was rented instead of using owned equipment, etc.

    b)    Project manager should verify that the ratio of equipment dollars to labor dollars on major work items remains consistent with budget. This could indicate equipment usage is not being reported accurately or that there has been a change in the equipment mix. Any significant variances, higher or lower, should be investigated.

    c)    Any additional ownership charges allocated to the project for underutilization needs to be compared against budget expectations.

**e.** **Rented equipment.**

It appears that SCI's costing for rented equipment is somewhat mixed. Usually one of the following three alternatives are used:

**1)** *Treat similar to owned.* If a piece of equipment is going to be rented for the duration of a job or for a longer period of time, it is given an equipment number similar to an owned piece of equipment. A rate is established for the equipment and it is charged out in the same fashion as owned equipment. Any invoice cost not pickup by the job under utilization is charged out as an allocation of under utilization cost to the job.

**2)** *Use a single cost code.* A single cost code is setup for the equipment rental under general conditions.

**3)** *Assign cost to multiple job cost phases.* The rental invoice is allocated to the work item that it worked on when entered into accounts payable. This often involves splitting the invoice cost over several job cost codes. This determination is typically made by review of the project personnel.

EXHIBIT _A_____
PAGE _32_ OF _43_

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 47

South Coast, Inc.
Report on Project Review
March 1, 2002



*Recommendation: Since option #3 is error prone, time-consuming and represents a decrease in cost control over options #1 and #2, we recommend it be discontinued. Again this is a classic example of the "estimator" mentality.*

f.    Subcontractors & incorporated materials.

   1)    Job cost setup and budgeting

      SCI presently budgets and costs expenses relating to subcontractors and suppliers of incorporated job materials to the various job cost work phases that they will be incorporated into (installed). This often requires substantial effort by accounts payable to distribute invoice cost and requires extra time for project managers to code invoices to sometimes several cost codes. More importantly this approach fragments the costs in the job cost system and makes review of the status of job costing for any particular purchase or vendor more complex.

      *Recommendation: Setup single cost codes for each subcontractor and major supplier of incorporated material.*

   2)    Cost tracking. By cost tracking we are not referring to the normal purchase order controls, checking received materials, reviewing invoices for appropriateness of charges, etc. We are referring to the ability to determine whether the budget is intact or busted. The primary control here is the "buyout analysis." The buyout analysis was mentioned previously in Section III.D.2.

      The "buyout" is the process of purchasing the job materials and subcontractor services. Unless you have a bad subcontractor, have an omission in the purchase order or subcontractor scope, usually the only other way you lose money on subcontractors or major suppliers is the job buyout. That is a bust between what was provided in the bid or budget and what you ultimately paid. If this is the case then the project manager needs to make sure he is aware of it and adds provisions to the total cost in the total anticipated final job cost.

      After the buyout, budget/cost control is maintained by monitoring the adequacy of the amount included in the total projected final cost for each subcontractor and supplier. This task involves verifying that the amount provided for in the total projected job cost is adequate to cover the major supplier or subcontractor costs. The total costs for each subcontractor or

EXHIBIT _ *A* _
PAGE _33_ OF _43_

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 48

South Coast, Inc.
Report on Project Review
March 1, 2002



supplier must be computed using the same contract quantity used to determine "total current contract amount" (at completion).

Relying on a review of costs charged to various work items is not reliable for these types of cost. This approach, which is presently followed by SCI, adds a variety of unnecessary variables. Spreading these costs out over several different cost codes and mixing different suppliers in the same cost code is not better control. It would still be necessary to compile the incurred costs in every one of these job cost phases, as well as, the budget information which will also be spread out over the same cost phases. Not to mention greater complexity when major suppliers or subcontractors get mixed in the same cost codes. The SCI incurred cost approach only complicates what should be a simple task. Under this incurred cost method, cutoff now becomes a real problem. For instance, the unit cost may appear reasonable but a major supplier invoice is not in the job cost yet.

*__Recommendation:__ We recommend that SCI discontinue relying on incurred cost review for control of subcontractor and incorporated materials costs. Instead, we recommend that SCI follow the cost control/tracking procedures outline in this section.*

g.   **General conditions/mobilization costs.**

This would include such items as non-incorporated materials, supplies, time-related costs, project support labor, freight, travel, bonds, housing, mobilization, barging etc.

1)   Job setup and budgeting

a)   Current procedure. Under existing procedures SCI budgets and costs these items to general conditions/mobilization job cost categories. We recommend no changes to this procedure.

b)   Cost tracking. These costs are driven by a number of different variables, some by job schedule, some by other work items, some by project man-days, etc. To control these costs the cost to date information should be monitored in detail on a monthly basis and compared to budget expectations and the current job schedule when relevant.

EXHIBIT ___A___
PAGE __34__ OF __43__

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I; p. 49

South Coast, Inc.
Report on Project Review
March 1, 2002



> *Recommendation: We recommend that as part of their normal project management cost control functions that the project managers review the transaction level detail on these accounts at least one a month. It is also helpful to compare several months of history when performing this review.*

**h.    The job cost coding system (DNA code).**

SCI's current job cost phase code consists of a nine digit cost code separated with dashes (i.e. 603-010-007). The last three digits of this cost code are referred to internally by SCI as the "DNA" code. We understand that the original concept was to create a linkage between each job cost phase and each pay item. Presently it appears that this DNA code is used to associate the job cost phases with a general work group, but is not used for association with pay request items. Although we believe that association of each job cost phase with a more general work group is a appropriate concept[1] the present use of the DNA code as part of the job cost phase number presents a cost control weakness.

We consider incorporation of the DNA code in the job cost phase code creates the following problems:

1)    It creates extremely complex cost code matrix. This makes virtually every code on every job unique. The list of cost codes in use becomes astronomical. All cost codes are now non-standardized.

2)    The complexities of the cost codes make memorization of the cost codes substantially more difficult and requires numerous references to cost code lists to perform a number of project functions in both accounting and project management.

3)    Numerous cost coding errors are created by the complex coding system. We noted many cost coding errors during our review that resulted in using invalid cost codes, not to mention the incorrect valid coding that is not nearly as obvious.

4)    This is an unnecessary complication since the Work Group could be assigned to the Job Cost Phase Code at the time of job cost setup by using a separate data field.

---

[1]    As described under Section III.F. we recommend associating each job cost phase to a Work Group, as well as, association of each pay item with the same Work Group codes.

EXHIBIT ___A___
PAGE _35_ OF _53_