South Coast, Inc.
Report on Project Review
March 1, 2002



5) Standardization of cost codes across many jobs for similar work items along with its benefits is no longer possible.

*Recommendation.* We recommend that SCI discontinue the use of the DNA code as part of the job cost phase code. To avoid invalidating the current installed base of job cost phase codes, we would not recommend changing the nine-digit job cost phase code "data mask." On new projects the last three digits could be left blank or the mask setup to set the input default value to zero.

*Additionally, if it is considered necessary to specify a Work Group for report sorting and summarization purposes, we recommend using a separate data field in the Job Phase Code Bid-Tek database.*

F.  Estimating completion costs and job profitability

1.  Existing procedure

The budgeting and costing framework discussed in Section III.E above provides the framework for accurate estimating of completion costs.

As mentioned previously, completion cost estimates are dependent upon a lot of other project controls working effectively. Assuming that these other controls are in place, it is important to develop basic standards in terms of what will be expected of the project manager in terms of updating and reviewing project profit estimates.

A common mistake is to insist that project managers prepare a cost-to-complete analysis on each project every month. Actual cost-to-complete estimates are generally not practical until the project has substantial progress, generally over 50% complete. However, it is essential that the project management require appropriate and timely adjustments to either contract budget and/or contract price when events, circumstances or facts become evident requiring such changes. We noted that neither appropriate nor timely adjustments were made by SCI, even when it became known that major budget busts had taken place. Some of the events that did not prompt any meaningful re-evaluation of the budget were as follows:

a.  Job #22921-Big Salt. When it became apparent that there were significant busts in the budgets for borrow and common embankment not significant changes to the budget where made. The effects of related time delay on the adequacy of the field support budget were also ignored. Same is true for the failure in the mix design being approved and the paving being pushed into 2002. A re-evaluation of the budget didn't take place.

EXHIBIT _A_
PAGE 36 OF 43

Travelers Casualty and Surety v. South Coast, Inc., et al.        DECL. OF SPOONEMORE
Case No. A06-00063 (TMB)                                          Ex. I, p. 51

South Coast, Inc.
Report on Project Review
March 1, 2002



b. Job #23112-Window Rock (Navajo FB). When it became apparent that there were significant problems with field productivity, the budget was no re-evaluated. It was almost treated as unimportant.

c. Job #23108-Borrego Pass. Another example of a significant event occurring and no response being made by SCI to reflect the changed realities in their job budgets.

It is difficult to assess all aspects of the failure of SCI to make appropriate and timely corrections to their job budgets. Although the lack of lack of standardization and consistently set the stage for the lack of detection and reporting, we believe some of this may have been directed by upper management to delay recognition of poor operating results.

It is also important that routine cost tracking procedures and other project management controls discussed previously are in place. These controls are the systems, which are used to identify problems when they arise. It is essential that all these controls get pulled together into a routine that can be followed by the project managers.

2. **Our recommendations**

a. *Monthly Contract Status report*

*We noted that SCI prepares monthly Contract Status reports on some jobs. However, they weren't prepared consistently and varied in quality and content. We recommend that SCI replace the existing Contract Status report and establish guidelines for consistent usage. The monthly Contract Status report should include the following:*

1) *Update summary page of project facts. Scheduled completion date, contract completion date, total cost-to-date versus billing to date (previous and current month)*

2) *Summary of labor productivity on the major labor production items discussed previously under labor tracking.*

3) *Provide analysis of any significant differences between "earned labor" and actual labor costs on the major production labor items discussed previously.*

4) *Prepare a report on any budget gains or losses that have resulted from buyout of subcontractors and major incorporated material suppliers. See Tab 13.*

EXHIBIT __A____
PAGE __37__ OF __4/3__

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 52

South Coast, Inc.
Report on Project Review
March 1, 2002



5) *Submit report showing monthly costs incurred for mobilization, general conditions, allocated equipment and non-incorporated materials by job cost phase. The report should also indicate the total and remaining budget for each job cost phase and the project managers comments regarding the adequacy of the remaining cost provision. The remaining budget would necessary be required to take into account schedule delays to be adequate..*

6) *Comment on any differences between the as-planned and actual equipment schedule.*

7) *Provide a summary of the SCI equipment cost % compared to total labor cost for each of the major production-labor items. Indicate any significant differences between the budget equipment to labor percentage and the actual.*

8) *Have project manager acknowledge that appropriate budget adjustments have been made for any of the previous items that are likely to impact final job profit and loss. Backup estimates, analysis and budget adjustment should be provided for any items requiring adjustment. Minor items should be accumulated until they are material before making budget adjustments. Any of these items minor or otherwise that have no had budget adjustments made should be listed.*

9) *Provide Units & Billings report supporting the "total current contract price" used for job profit analysis. The contract price or underlying budget (resulting from unit changes) should not be changed unless significant changes in units have occurred resulting from excess unit payments, deletion of major portion of work, additions of significant work scope. The contract price and budget adjustments relating to them should not be performed for interim minor items. Provide estimate and budget adjustments for any budget adjustments made resulting from changes in total contract units.*

10) *Provide explanation of any significant project under-billing. A large project under-billing should always be a concern. Any significant project under-billing needs to be investigated and explained by the project manager. The "earned labor" analysis will generally indicate what is behind under-billing.*

11) *At the beginning of the project the project managers should prepare and project cash flow and report on the net under and*

EXHIBIT  *A*
PAGE  38  OF  43

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 53

South Coast, Inc.
Report on Project Review
March 1, 2002



over billings during the life of the project against the base-line cash flow schedule.

b. *Discontinue WIP REPORT*

*Discontinue the WIP REPORT as a tool for estimating final completion costs.*

c. *Implement Unit & Billings worksheet*

*Implement the use of the Units & Billings worksheet (see Tab 6). This worksheet should be used to establish the total current contract (at completion) used for the job profit estimates. This worksheet provides an auditable method for determining the total current contract value. We used this worksheet for our Big Salt analysis. The worksheet has been setup for all four of the Alaska projects we reviewed. A copy of these files is on the CD. The required input from each month-end pay request is as following:*

1) *Total current contract quantities shown in determining the contract value currently shown on the owner' approved pay request.*

2) *Quantity billed to date.*

3) *Quantity billed prior request.*

4) *SCI adjustments to owner's total contract quantities.*

d. *Earnings schedules for subcontractors and major suppliers*

*We recommend that all subcontractors and major suppliers (incorporated materials) require a contract earnings schedule be maintained. This is a standard worksheet used by many contractors (refer to Tab 10 for sample). It indicates each pay item for which the sub or supplier is involved. The unit cost of any items provided for each pay item. The original quantity, and the quantity completed to date and the total anticipated contract quantity from the Units & Billings worksheet (Tab 6). This provides a basis for completion cost estimates and final cost estimates for each sub and supplier that is tied directly into the units used to determine contract value. It will require the assignment of Work Group codes to each pay item and each job cost phase as recommended earlier. There were significant omissions of subcontractor and supplier cost in SCI's previous completion cost estimates. This procedure will put an end to that problem.*

EXHIBIT __ A____
PAGE 39 OF 43

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 54

South Coast, Inc.
Report on Project Review
March 1, 2002



e.  *Implementation of Excel based job cost reporting system*

*This reporting system was implemented and used to analyze the Big Salt and USCG Dock projects. It is a reporting method that we have used in the past to analyze jobs. It is a system our firm has used for cost analysis involving larger long-term construction projects. We have found this reporting system to be far superior for project cost analysis. It involves downloading information from the legacy costing system (Bid-Tek in this case) into an MS Access Database and using the Pivot Table report-generating capabilities of Excel to analyze job cost historical data. Once the job is setup, the updating and maintenance is minimal. The added reporting power is substantial and instant. This reporting system has already been setup for 22921-Big Salt, 23119-USCG Dock and 23117-Toksook. Tom Hicks is now using the system to analyze historical cost data relating to equipment fleet costs and utilization. The updating process is documented and made available on the attached CD. We would encourage you to continue to use it on these three jobs. The job files are on the attached CD.*

f.  *Transition*

*We would recommend that new jobs be setup using the new cost control format for budgeting and job costing recommended by us (outlined under Section III.E.4.b.1)-5). We would recommend implementing the foregoing monthly job profit review procedures (Section III.F.1-5) on 22921-Big Salt, 23117-Toksook, 23119-USCG Dock and 23205-San Carlos. This would get each key project manager in Alaska and the Arizona office involved in the new process on at least one job.*

G.  **File organization and document management.**

During our review we found that the condition of the computer files and directory structure used to store them were in a state of disorganization. There appears to be no standards. There are numerous versions of the same files. All with different numbers and found in a number of different places on the directory. Often files are stored on individual's local drives and are not being backed up, because they are not on the server. Numerous times managers couldn't readily find the file they were looking for or couldn't tell which version they were dealing with. This company-wide lack of standards causes significant inefficiency and represents a significant control risk. Additionally, it makes reviewing other people's work without forcing them to sit down and walk you through the files, difficult even by internal knowledgeable people.

EXHIBIT _A_
PAGE _40_ OF _43_

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 55

South Coast, Inc.
Report on Project Review
March 1, 2002



The hardcopy of reports in physical files weren't much better. We found several copies of different versions. No dates or headings to help identify what version the reports were or even what they were.

*Recommendation:  We recommend that standards for file naming, directory structure and report quality be adopted.  We have provided a proposed directory structure and file-naming scheme.  Refer to the CD List for a copy of the related file.  Also we have included our firms standard Excel blank template that makes generation of worksheets with date, time, file name, tab name stamping already built in as well as many other features.  Refer to the CD List for location of this template.*

## IV  REVIEW OF JOB #23005-CHINLE CLAIM

During our work at the Arizona office we reviewed the claim that SCI has made against the US Department of Interior, Bureau of Indian Affairs.  The facts and issues as we see them are as follows:

On March 27, 2001 SCI filed a claim certified under the Contracts Disputes Act in the amount of $2,703,375.  On September 25, 2001, James Harjo, Contracting Officer issued a Contracting Officer's Decision denying SCI's claim in its entirety.

The two defenses raised in the COD were, (1) the actual completion took place within the contract provided timeframe, as adjusted.  That SCI's construction schedule indicated completion nearly a year before the required completion date and that the early completion risk would be borne by SCI.  And (2), the COD cited that the government could not be held accountable for what the CO considered a "Sovereign Act."  The CO considered the Endangered Species Act fell within the Sovereign Acts Doctrine.

We understand that a complaint has been filed on behalf of SCI in the US Court of Federal Claims.  The claim is being prosecuted by Traeger Machetanz.  Our firm has worked with Traeger before and has found him to be a competent attorney.  We consider SCI to be well represented by Traeger and Oles, Morrison, Rinker and Baker.  Based on our experience we consider the legal route taken by the attorney, that is the US Court of Federal Claim, rather than the Board of Contract Appeals to be a wise choice.

We performed a cursory review of SCI's quantum calculation on this claim.  Although the amount requested in the claim certification was $2,703,375, the claim quantification that we reviewed indicated a total claim value of $2,232,710.  If recovered in its entirety, SCI would recover $1,245,617 net of amounts it would be required to pay out to subcontractors and taxing authorities.  This compares to a total downward swing in job gross profit of approximately $1,112,425.

EXHIBIT ___ *A*
PAGE *41* OF *43*

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 56

South Coast, Inc.
Report on Project Review
March 1, 2002



A summary of our cursory quantum analysis is as follows:

| Description | | Amount |
|---|---|---|
| **Loss per job accounting records:** | | |
| Final contract amount | $ | 7,968,675 |
| Pro-forma cost based on original markup | | (7,310,711) |
| **As-bid margin, before bid errors** | | **657,964** |
| TERRO tax missed in estimate | | (239,060) |
| State Tax missed in estimate | | (306,479) |
| **As-bid margin, after bid errors** | | **112,425** |
| Recovery of actual job loss | | 1,000,000 |
| **Unrecovered loss of as-bid profit** | $ | **1,112,425** |
| | | |
| **Recovery of job loss per claim request:** | | |
| Total cost portion of claim recovery | $ | 1,703,109 |
| Less sub cost not in job cost | | (591,249) |
| **SCI cost recovery portion** | | **1,111,860** |
| SCI markup on total claimed cost | | 204,884 |
| Less sub portion of markup | $ | (71,127) |
| **Net recovery of SCI current job loss** | $ | **1,245,617** |

Based on our analysis it appeared that SCI's quantification of its claim value was reasonable. Although actual amounts recovered will vary, we believe that SCI will be successful in collecting a substantial portion of this claim.

EXHIBIT __ A __
PAGE 42 OF 43
DECL. OF SPOONEMORE
Ex. I, p. 57

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

South Coast, Inc.
Report on Project Review
March 1, 2002



## V  MANAGEMENT

We understand that Klukwan's plans are to find a new Chief Executive Officer and Chief Financial Officer for SCI. We believe these positions are important additions to the existing staff. In other areas we believe SCI has to raise the bar on the existing project management staff. We see the new CEO and CFO as being major players in that effort. We consider it important that the new CFO have strong computer and communication skills. The new CFO could and should take a much more active role than the prior CFO in providing guidance to the project management staff in computer usage, job costing/control and administrative areas. Considering the improvements that are needed in the general management and project management, we would also suggest that the new CEO have adequate knowledge and formal training in project management standards and have proven experience at assessing business risks. The new CEO should not be just another guy with a strong operations and estimating background. From our observation, SCI needs someone who will contribute to the quality of the management mix and not simply add more of what is already there.

*Robert E. Sutor*

Robert E. Sutor
Sutor Consulting, LLC

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

EXHIBIT __ A __
PAGE 43 OF 43
DECL. OF SPOONEMORE
Ex. I, p. 58

4748

# PETERSON SULLIVAN P.L.L.C.

601 UNION STREET SUITE 2300 SEATTLE WA 98101 (206) 382-7777 FAX 382-7700

CERTIFIED PUBLIC ACCOUNTANTS

April 2, 2002

Tom Crandall, CFO
Klukwan, Inc.
2075 Jordan Ave
Juneau AK 99801

Dear Mr. Crandall:

Enclosed are 20 copies of our report on the 2001 operations of South Coast, Inc. This concludes our work on this engagement as we understand it; however, please let us know if we can answer any questions regarding our report or if we can be of any further assistance.

Sincerely,

David C. Lee

lll

Enclosure

W:\CLIENT\021474\Report\021202.doc

EXHIBIT _B_
PAGE _1_ OF _5_

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. 1, p. 59

PS005175

REPORT TO KLUKWAN, INC.

BOARD OF DIRECTORS

ON SOUTH COAST, INC.

2001 OPERATIONS

Prepared by:

PETERSON SULLIVAN P.L.L.C.

EXHIBIT _B_

PAGE _2_ OF _5_

W:\CLIENT\0214741\Report\021202.doc

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 60

PS005176

# TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|
| Summary | | | 1 – 3 |
| Exhibits | A | Contract Selection | 5 |
| | B | Summaries of Detail Reviews of Contracts | 7 – 53 |
| | C | Gross Profit Analyses of Contracts | 55 – 65 |
| | D | Summary of Scope and Procedures | 67 – 69 |

W:\CLIENT\02\744\Report\021202.doc

EXHIBIT ___B___
PAGE _3_ OF _5_

Travelers Casualty and Surety v. South Coast, Inc., et al.     DECL. OF SPOONEMORE
Case No. A06-00063 (TMB)     Ex. I, p. 61

DS006177

## SUMMARY

The monthly net income (loss) at South Coast, Inc. for the last six months of 2001 was reported as follows:

| | |
|---|---|
| July | $    259,657 |
| August | 216,962 |
| September | (20,998) |
| October | (571,298) |
| November | (1,265,865) |
| December | (3,710,290) |

The total loss for the year was $(5,563,398) as reported by management. Further year-end adjustments increased the loss by $2,760,246 for a final audited loss of $8,323,644.

SCI's management kept reporting more and more loss each month in the last quarter of the year. This finally resulted in Klukwan, Inc.'s Board and management losing faith in SCI's management.

How could all this have happened so quickly?

Even though the reported numbers indicate a fast deterioration, many of the factors contributing to the losses were in existence prior to October. The best way to look at this is to divide SCI's operations into distinct geographic regions as follows:

- Ketchikan

- Alaska other than Ketchikan

- Arizona

We reviewed the financial performance for those contracts with revenue of approximately $2.0 million or more and at least 50% complete by December 31, 2001 (Exhibit A). The results of this review are summarized below by region:

Ketchikan

We found for both contracts reviewed that they were administered generally within the guidelines provided in the FMI manuals (Exhibit B) and any actual changes in contract gross profit from that originally estimated were not significant (Exhibit C). However, we did find that the original budgets on these contracts were generally not updated for change orders. This characteristic was common in all three regions.

EXHIBIT _B_
PAGE _4_ OF _5_

W:\CLIENT\021474\Report\21201.doc

1

For the other two contracts we reviewed, Navaho Forest Boundary and Chinle, there were problems beyond not recognizing the gross receipts tax. Simply stated, the Navaho Forest Boundary project suffered from lack of attention from management. At Chinle, the primary construction problem was environmental which, even though known in early 2000, resulted in significant delays. This has resulted in a $2.2 million claim which is currently in litigation. Should the litigation result in a favorable outcome, the Chinle current loss in excess of $1.0 million (Exhibit C) could be greatly reduced.

<u>Fraud</u>

Finally, we performed certain procedures to help detect fraud. Based on those procedures, we found no evidence of significant fraud.

<u>Conclusion</u>

SCI was poorly managed out of Ketchikan in 2001. Actual performance in the three geographic regions was mixed. Performance in the Alaska other than Ketchikan region was by far the worst. The Richardson Highway project was a management disaster. Its management and reporting problems exemplify what generally went wrong outside of home base in Ketchikan.

Klukwan's Board determined that SCI's bad financial performance in 2001 was attributable, in the first instance, to senior management in Ketchikan. Action has already been taken to attempt to correct the management and financial problems at SCI.

EXHIBIT    _B_
PAGE    _5_ OF _5_

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE 05180
Ex. I, p. 63

Thomas A. Larkin, ASB #0009055
Jan D. Sokol, *Pro Hac Vice*
STEWART SOKOL & GRAY LLC
2300 SW First Avenue, Suite 200
Portland, Oregon 97201-5047
Telephone:     (503) 221-0699
Fax:           (503) 227-5028
Email:         tlarkin@lawssg.com
               jdsokol@lawssg.com
   Of Attorneys for Plaintiff Travelers Casualty and
Surety Company of America

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA, AT ANCHORAGE

TRAVELERS CASUALTY AND SURETY            )
COMPANY OF AMERICA, a Connecticut        )
corporation,                             )
                                         )
                    Plaintiff,           )     Case No. A04-0165CV (RRB)
                                         )
         v.                              )
                                         )
RONALD GELBRICH; JERALD RENICH;          )
BRAD FINNEY; JAN PAULSON;                 )
MICHAEL HOUTS; EDWIN JOHNSON;            )
and PETERSON SULLIVAN, P.L.L.C., a       )
Washington limited liability company,    )
                                         )
                    Defendants.          )
                                         )
_____)
                                         )
JAN PAULSON,                             )
                                         )
              Third-Party Plaintiff,     )
                                         )
         v.                              )
                                         )
SOUTH COAST, INC.,                       )
                                         )
              Third-Party Defendant.     )

STEWART SOKOL & GRAY llc
ATTORNEYS AT LAW
2300 SW FIRST AVENUE, SUITE 200
PORTLAND, OREGON 97201-5047
(503) 221-0699 FAX (503) 221-5708
www.lawssg.com

AFFIDAVIT OF CHARLES W. LANGFITT – Page 1 of 10
A04-0165CV (RRB)

EXHIBIT
PAGE _1- C_ OF _9_

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 64

## AFFIDAVIT OF CHARLES W. LANGFITT
## IN SUPPORT OF TRAVELERS' OPPOSITION TO
## PETERSON SULLIVAN'S MOTION FOR SANCTIONS

STATE OF Washington      )
                             ) ss.
County of King            )

I, Charles W. Langfitt, being first duly sworn, do depose and say:

1. I am Vice President of Travelers Casualty and Surety Company ("Travelers") – Surety Claims. I make this Affidavit in support of Travelers' Opposition to Defendant Peterson Sullivan, PLLC's Motion for Sanctions under Federal Rule of Civil Procedure 11. I am over the age of 18 and competent to testify. I make this affidavit from personal knowledge, and if asked to testify, would testify consistently with this Affidavit.

2. The purpose of my Affidavit is to describe Travelers' reasonable pre-filing investigation into its claims against Peterson Sullivan in this matter. Because that description requires an understanding of how the Claims Department learned of and handled losses on bonds posted by Travelers, as surety, for South Coast, Inc., as principal, I begin there.

3. I was the person primarily responsible for all South Coast / Klukwan issues once those issues came to the attention of Travelers' Claims Department. Travelers' Surety Claims Department and I first became aware of South Coast, Inc. as a very serious claims issue in May of 2002, after Klukwan's bank (Key Bank) announced that Klukwan was in default and started liquidating assets. At that time, it was clear that South Coast had operating losses in the millions of dollars on projects for which Travelers had posted payment and performance bonds. Those losses were represented to have occurred in 2001. Travelers' main concern in May of 2002 was to determine the extent of its likely loss from

STEWART SOKOL & GRAY LLC
ATTORNEYS AT LAW
2300 SW FIRST AVENUE, SUITE 200
PORTLAND, OREGON 97201-5047
(503) 221-0699 FAX (503) 223-5706
www.lawsg.com

AFFIDAVIT OF CHARLES W. LANGFITT - Page 2 of 10
A04-0165CV (RRB)

EXHIBIT _C_
PAGE _2_ OF _9_

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 65

payment and performance bond claims on South Coast projects, and the extent to which Klukwan, Inc., South Coast's parent company and an indemnitor on the indemnity agreement held by Travelers, would be able financially to support South Coast and to indemnify Travelers.

4. Travelers participated in meetings with South Coast and Klukwan in May and June of 2002 to address issues regarding South Coast's and Klukwan's financial condition, payment and performance claims against bonds posted by Travelers for South Coast, Klukwan's business plan for South Coast, Klukwan's credit arrangement with its banks, the current state of South Coast's construction projects for which Travelers was responsible as payment and performance bond surety, whether Travelers would extend additional surety credit to South Coast in the form of bonds for future projects and/or financing to allow South Coast to complete future projects, whether Klukwan would "wrap up" South Coast as a going concern, and whether and to what extent Klukwan would indemnify Travelers. The substance of the discussions at these meetings and telephone discussions with Klukwan and South Coast is stated in a series internal memoranda (titled "Travelers Bond Contract Surety Large Loss Analysis"), letters to Klukwan/South Coast, and e-mails dated as follows: (A) May 16, 2002 e-mail from me to Jordan Rosenfeld (a CPA hired by Travelers regarding the South Coast issue); (B) a May 17, 2002 letter from me to Tom Crandall of Klukwan and Ron Gelbrich of South Coast; (C) a June 5, 2002 Large Loss Analysis I prepared; (D) a June 10, 2002 letter from me to Tom Crandall of Klukwan; and (E) an October 1, 2002 Large Loss Analysis I prepared. A true and correct copy of each of these documents is attached hereto as Exhibits A-E, in the order just indicated.

///

STEWART SOKOL & GRAY LLC
ATTORNEYS AT LAW
2300 SW FIRST AVENUE, SUITE 200
PORTLAND, OREGON 97201-5047
(503) 221-0699 FAX (503) 221-5706
www.lawssg.com

AFFIDAVIT OF CHARLES W. LANGFITT - Page 3 of 10
A04-0165CV (RRB)

EXHIBIT ___ C ___
PAGE 3 OF 9

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 66

5. As stated above in paragraph 3, Travelers' primary concerns during the May through October 2002 time frame were to determine South Coast and Klukwan's current financial position and the current status of South Coast's projects so that Travelers could minimize the loss on bonded projects consistent with its payment and performance bond obligations to owners, subcontractors, and suppliers, and maximize Travelers' recovery of contract funds from owners and indemnity from South Coast and Klukwan. As part of this effort, Travelers conducted a "forensic review" of South Coast and Klukwan. As stated in my May 17, 2002 letter to Tom Crandall and Ron Gelbrich regarding the purpose of a meeting scheduled for May 28, 2002:

> I advised that we requested the meeting to conduct a forensic review. You asked what I meant by a forensic review. By forensic review, I mean a book and records review with CPAs hired by Travelers, in conjunction with operational/business plan reviews with Travelers personnel. We will want to discuss all aspects and facets of your business including all of your projects, with your employees, as well as others, which may include, but not be limited to, Owners and Architects. A requested list of items to prepare for our review is attached. As I advised, the CPAs we have retained include Jordan Rosenfeld, of the Sutor Group.

**Exhibit B.** The list of items Travelers requested for review is marked "Klukwan/South Coast Items for Review by Travelers," and is attached to **Exhibit B.**

6. As part of the meeting referred to in my May 17, 2002 letter, Travelers conducted a forensic review starting May 28, 2002. That review focused on the current financial status of Klukwan and South Coast, and the current status of South Coast's bonded jobs. It did not focus on the issue of South Coast's financial condition as of December 31, 2000, which was not relevant to the issues at hand: namely, minimizing losses on ongoing bonded projects and maximizing recovery from Klukwan as Travelers' indemnitor, including keeping Klukwan out of bankruptcy. Travelers had no reason to

STEWART SOKOL & GRAY LLC
ATTORNEYS AT LAW
2300 SW FIRST AVENUE, SUITE 200
PORTLAND, OREGON 97201-5047
(503) 221-0699 FAX (503) 223-5706
www.lawssg.com

AFFIDAVIT OF CHARLES W. LANGFITT – Page 4 of 10
A04-0165CV (RRB)

EXHIBIT ___C___
PAGE __4__ OF __9__

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE,
Ex. I, p. 67

attempt to discern the accuracy of South Coast's audited 2000 financial statements at that time, and did not, to my knowledge, review documents indicating that the audited 2000 financial statements contained misstatements. Nor was there anything regarding the forensic review at that time that indicated that the audited 2000 financial statements contained misstatements. By the end of Travelers forensic review, and after South Coast's projects had been re-let to other contractors, I was able to determine that Travelers was likely to incur a loss of approximately $19,000,000 on bonds posted for South Coast. **Exhibit E**, at 1. As indicated on page 4 of **Exhibit E**, as of October 1, I did not anticipate obtaining salvage from anyone other than Klukwan.

7.  What first indicated to Travelers that South Coast's audited 2000 financial statements were inaccurate (and thus that salvage from Peterson Sullivan possibly could be appropriate to pursue) was a combination of information regarding South Coast's operations. That information included: a report prepared by Sutor Consulting, LLC, entitled "Report on Review of Projects and Project Management Procedures" (the "Sutor Report") (a true and correct copy of the Sutor Report is attached hereto as **Exhibit F**); the report prepared by Peterson Sullivan, entitled "Report to Klukwan, Inc. Board of Directors on South Coast, Inc. 2001 Operations" (the "Peterson Sullivan 2001 Operations Report") (a true and correct copy of Peterson Sullivan 2001 Operations Report is attached hereto as **Exhibit G**); a "draft" audited 2001 financial statement of South Coast, Inc., and the results of Travelers' investigation into South Coast's current financial status and project progress, including re-letting of South Coast's projects.

8.  As I explained in my deposition, upon review of all the information referred to in paragraph 7, I began to suspect that the audited 2000 financial statements were

STEWART SOKOL & GRAY LLC
ATTORNEYS AT LAW
2300 SW FIRST AVENUE, SUITE 200
PORTLAND, OREGON 97201-5047
(503) 221-0699 FAX (503) 223-5706
www.lawssg.com

AFFIDAVIT OF CHARLES W. LANGFITT - Page 5 of 10
A04-0165CV (RRB)

EXHIBIT _C_
PAGE _5_ OF _9_

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 68

inaccurate. A true and correct copy of portions of my deposition explaining my thinking

regarding this issue is attached hereto as **Exhibit H**. The basis of my suspicion was that

the ultimate results of South Coast's projects, based on Travelers' investigation and re-

letting of projects during the summer of 2002, was very different than the results reported

as anticipated in the audited 2000 financial statements. In fact, the difference appeared to

be in the tens of millions of dollars. Also, as indicated on page 1 of the Peterson Sullivan

2001 Operations Report, the causes of the difference between the results anticipated in the

2000 audited financial statements and those reported later predated October of 2001. As

well, the Sutor Report identifies significant problems at South Coast in the areas of

"Budgeting, costing and tracking" at pages 21-32, and significant problems with

"Estimating completion costs and job profitability" at pages 32-36. Given the fact that the

causes of the difference between anticipated results and ultimate results were "systematic"

in nature, as opposed to the result of some catastrophe, given the exceedingly large

difference between anticipated and end results, and given that Klukwan had not indicated

that management systems had changed in 2001 from 2000, I formed the belief that the

systematic problems identified in the Sutor and Peterson Sullivan Reports as the causes of

unreported losses predated the audited 2000 financial statements.

   9. One of the specific problems identified in the Sutor Report related to what are

known as "underbillings." Regarding underbillings, the Sutor Report recommended the

following "fix" of South Coast's prior practices:

///

///

///

AFFIDAVIT OF CHARLES W. LANGFITT – Page 6 of 10
A04-0165CV (RRB)

EXHIBIT _C_
PAGE _6_ OF _9_

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 69

STEWART SOKOL & GRAY LLC
ATTORNEYS AT LAW
2300 SW FIRST AVENUE, SUITE 200
PORTLAND, OREGON 97201-5047
(503) 221-0699 FAX (503) 223-5706
www.lawssg.com

10)    Provide explanation of any significant project under-billing [sic].  A large project under-billing should always be a concern.  Any significant project under-billing needs to be investigated and explained by the project manager.  The "earned labor" analysis will generally indicate what is behind under-billing.

**Exhibit F** at 34.

10.  During my deposition, I explained the significance to Travelers of "underbillings" reported on financial statement.  A true and correct copy of pages 189-209 of my deposition transcript is attached hereto as **Exhibit H**, and contains my explanation. To summarize, however, on a construction contractor's financial statement, an underbilling is listed as an asset on the presumption that the underbilling eventually will be paid. However, if the underbilling likely will not be paid, because, for example it indicates that work cost more to perform than the contract's budget, the underbilling should be listed on a financial statement as a liability, not as an asset.

11.  As part of my investigation into whether or not the audited 2000 financial statements contained misrepresentations for which someone would be liable, I enquired of Jordan Rosenfeld, the CPA who had assisted with Travelers' investigation of South Coast's and Klukwan's financial situation during the spring and summer of 2002.  Mr. Rosenfeld explained that financial statements of a construction contractor should properly characterize underbillings as losses instead of assets if that is what they actually are.  As stated in, for example, the Sutor Report, proper accounting procedures are required for underbillings to be properly characterized.  By this time, Travelers did not have ready access to South Coast's project records from the 2000 period, and so could not perform a "re-audit" of the South Coast's year 2000 financial statements.

///

STEWART SOKOL & GRAY LLC
ATTORNEYS AT LAW
2300 SW FIRST AVENUE, SUITE 200
PORTLAND, OREGON 97201-5047
(503) 221-0699 FAX (503) 223-3706
www.lawssg.com

AFFIDAVIT OF CHARLES W. LANGFITT - Page 7 of 10
A04-0165CV (RRB)

EXHIBIT _C_
PAGE _7_ OF _9_

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 70

12. After concluding that the audited 2000 financial statements likely contained misstatements regarding underbillings, I investigated whether or not a properly performed audit should have disclosed the mis-classification of underbillings as assets instead of liabilities. As a part of this investigation, I consulted with Mr. Rosenfeld. Mr. Rosenfeld responded to my inquiry with an e-mail dated June 18, 2003. A true and correct copy of that e-mail is attached hereto as **Exhibit I.** Mr. Rosenfeld's response indicated in part that "[a]s is always the case in reviewing the CPA financial statements for potential errors, what is really needed to determine the [sic] if the CPa [sic] did not meet the industry standard in the performance of the audit is the CPA's work papers." As I responded to Mr. Rosenfeld, I believed that Peterson Sullivan would provide its work papers if requested by Tom Crandall of Klukwan. Peterson Sullivan, however, refused to provide its work papers, despite Klukwan's written request. Accordingly, I authorized Travelers' counsel to attempt to obtain the work papers under Federal Rule of Civil Procedure 27.

13. After the attempt to obtain Peterson Sullivan's work papers failed, Travelers commenced this lawsuit, but only after again asking Mr. Rosenfeld if the information we had was sufficient to form a reasonable belief that Peterson Sullivan had been negligent. Because Peterson Sullivan refused to provide its work papers, Travelers' allegation that Peterson Sullivan's 2000 audit of South Coast's financial statements negligently was performed was based on Mr. Rosenfeld's analysis as indicated **Exhibit I.** Travelers has obtained Peterson Sullivan's work papers in discovery in this case, and Mr. Rosenfeld's analysis thus far indicates that, in his opinion, Peterson Sullivan's audit negligently was performed in many of the respects indicated on **Exhibit I.**

///

AFFIDAVIT OF CHARLES W. LANGFITT - Page 8 of 10
A04-0165CV (RRB)

EXHIBIT ___ C ___
PAGE _8_ OF _9_

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 71

STEWART SOKOL & GRAY LLC
ATTORNEYS AT LAW
2300 SW FIRST AVENUE, SUITE 200
PORTLAND, OREGON 97201-5047
(503) 221-0699 FAX (503) 221-5705
www.lawssg.com



14. To summarize, Travelers' complaint was based on an extensive investigation. Travelers determined that the audited 2000 financial statements contained misstatements regarding underbillings likely caused by systematic management problems that existed in 2000. Travelers determined that a properly performed audit should have disclosed both the systematic management problems and that the underbillings properly should have been reported as losses rather than assets.

Charles W. Langfitt

SUBSCRIBED AND SWORN TO before me this 25ᵗʰ day of July, 2005.

NOTARY PUBLIC FOR WASHINGTON
My Commission Expires: 5-1-09

W:\WORK\Clients\South Coast\D & O Claims\RBC\Pleadings\Langfitt Affidavit Sanctions.wpd





STEWART SOKOL & GRAY LLC
ATTORNEYS AT LAW
2300 SW FIRST AVENUE, SUITE 200
PORTLAND, OREGON 97201-5047
(503) 221-0699 FAX (503) 223-5706
www.lawssg.com

AFFIDAVIT OF CHARLES W. LANGFITT - Page 9 of 10
A04-0165CV (RRB)

EXHIBIT ___C___
PAGE __9__ OF __9__

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 72

# TRAVELERS BOND
## CONTRACT SURETY LARGE LOSS ANALYSIS
### Privileged & Confidential

**DATE:** June 5, 2002

| | | | | |
|---|---|---|---|---|
| Type of Notice: | X | Initial | Supplemental | Final |
| Prepared By: | | Charles W. Langfitt | | |
| Market Segment: | X | Standard Contract | Firemark | |

### ACCOUNT INFO

| | | | |
|---|---|---|---|
| Principal: | South Coast | | |
| Principal City/State: | Ketchikan, Alaska | | |
| Underwriting Office: | Seattle | Contractor Type: | Road/Heavy Highway |
| Agent: | Willis-Corroon | Agent Code: | CP354 |

### BOND PROGRAM

| | | | |
|---|---|---|---|
| In-Force Limits: | $69,016,506 | Bonded WOH: | $16,767,571 |
| Total Program: | $45,000,000 | Total WOH: | $16,767,571 |

### MASTER BOND

| | | | |
|---|---|---|---|
| Bond Number: | 103527563 | | |
| Bond Eff. Date: | 5/24/01 | Bond Exp. Date: | 5/24/03 |

### MASTER CLAIM

| | | | |
|---|---|---|---|
| Claim Number: | 689687 | | |
| Loss Notice Rec'd: | 2/14/02 | Initial Reserve Date: | 5/3/02 |
| Collateral: | N | | |

### REPORTED LOSS

| | Indemnity | Expense | Total |
|---|---|---|---|
| Prior Gross Reserve | 0 | $20,000 | $20,000 |
| Reserve Change | $7,000,000 | $480,000 | $7,480,000 |
| Current Gross Reserve | $7,000,000 | $500,000 | $7,500,000 |
| Net Paid to Date | 0 | $1,072.25 | $1,072.25 |
| Est. Future Net Payments | $7,000,000 | $498,927.75 | $7,498,927.75 |
| Net Salvage Collected to Date | | | 0 |
| Total Reserve Net of Salvage | | | $7,500,000 |

### REINSURANCE

| | Total |
|---|---|
| Pro-Rata: | 0 |
| XOL: | 0 |

1 of 4

EXHIBIT __D__
PAGE __1__ OF __6__

Exhibit 3  Date 2-28-05
Witness Langfitt
Patricia A. Blevins  (206)323-0919

TRAV 051318

EXHIBIT __C__ PAGE __ OF __6__ OF SPOONEMORE
Ex. I, p. 73

# TRAVELERS BOND
## CONTRACT SURETY LARGE LOSS ANALYSIS
### Privileged & Confidential

### LOSS DESCRIPTION

South Coast, Inc. ("South Coast") is a Seattle HUB, Standard Account. Based in Ketchikan, Alaska, South Coast is a subsidiary of Klukwan, Inc. ("Klukwan"). Klukwan is an Alaskan Native Village Corporation. The parent Regional Native Corporation is Sealaska based in Juneau, the second largest Regional Native Corporation in Alaska. Klukwan is owned by approximately 351 shareholders all of Tlingit Indian descent. Klukwan is involved in several industries, including construction, marine services, forest products and tourism.

South Coast is Klukwan's construction subsidiary. South Coast's operations are divided geographically into 3 areas: (1) Ketchikan; (2) Alaska "Other", including the Aleutian Islands, and (3) Arizona. South Coast's backlog in Ketchikan Alaska and Alaska Other consists of everything from paving to airport runways and embankment work. The Alaskan work is time sensitive and subject to severe weather risks. In Arizona, South Coast's backlog consists of paving in remote parts of Arizona including the Four Corners area.

Klukwan/South Coast has been an account since 1991. Based on a draft audited financial statement for the year ending December 31, 2001, Klukwan earned $74,642,872 in revenue. Of that amount, South Coast accounted for $46,722,198, or about 63% of Klukwan's revenue base.

In late 2001, Klukwan recognized South Coast had encountered severe financial difficulties. Klukwan undertook action by hiring its auditors and an outside consultant to review South Coast's operation. The auditors and the consultant discovered systemic control faults. Additional losses were also revealed, with Klukwan, on a consolidated basis, suffering a year end 2001 loss of ($11,796,465).

In January 2002, Klukwan terminated the services of South Coast's President, Vice President and Vice President/Chief Financial Officer. Klukwan's consolidated December 2001 financial reflected an increase in total liabilities by $7,621,193 with equity ending by 35%, which, in dollar terms, represented a $11,838,463 reduction in equity from $33,377,566 in 2000 to $21,539,103 in 2001. The draft December 31, 2001 audit also reflected that Klukwan's liquidity depended upon the outcome of the then current discussions with Klukwan's lenders. In its March 2002 business plan, Klukwan advised that its failure to secure waivers from its four primary creditors would result in reclassification changes to the liabilities and equity section of the balance sheet to show additional current liabilities. In short, having violated the financial covenants of its various credit agreements, Klukwan was no longer liquid.

As of December 31, 2001, Klukwan, on a consolidated basis, also reflected accounts receivable of $3.8 Million, with $9.6 Million in corresponding accounts payable, a ($5.8) Million deficit. A subsequent internal March 31, 2002 financial for South Coast alone revealed a ($6,178,898) deficit of accounts payable over accounts receivable with a deficit working capital position for South Coast on an unanalyzed basis of ($2,087,502). We were subsequently advised that South Coast's work on hand would not generate revenue in excess of South Coast's cost to complete. In short, there are no revenues available to offset the ($6,178,848) shortfall between receivables and payables.

On May 10, 2002, one of Klukwan's lenders, Key Bank, declared Klukwan's loans in default and accelerated all of the outstanding debt. Klukwan's internal March 2002 financial reflected $16,374,860 in outstanding Key Bank debt. Bank of America and CIT followed Key Bank's lead and also declared Klukwan in default. According to Klukwan, Wells Fargo, the last remaining major creditor, has not declared Klukwan in default. As of May 31, 2002, Travelers Bond Claim has received $3,284,291 in

2 of 4

EXHIBIT _____D_____
PAGE ___2___ OF _6_

TRAV 051319

EXHIBIT __C__ PAGE _2_ OF _6_    SPOONEMORE
Ex. I, p. 74

## TRAVELERS BOND
## CONTRACT SURETY LARGE LOSS ANALYSIS
### Privileged & Confidential

payment claims, but we have not received any performance claims.

*CURRENT STATUS*

Travelers Bond Claim met with Klukwan's management in Seattle on May 24, 2002. At that time, Klukwan/South Coast requested financial assistance in the amount of $3,000,000. We advised them that we thought that $3,000,000 was insufficient, at a minimum, and not representative of their financial needs: they would need at least $7,000,000 to just pay their bills, without considering overhead. In addition, when asked about future revenue, South Coast advised that they would request a $20,000,000 bond program, on a going forward basis, based on revenue. Historically, South Coast has earned anywhere from $44,000,000 to $47,000,000 in revenue with greater revenues occasionally earned, with those revenues representing about 63% of Klukwan's revenue base. Even with a $20,000,000 bond program, South Coast's revenue would contract by 43%, with Klukwan's revenue, as a consequence, shrinking by 36%. With shrinking revenue, and high overhead, Klukwan/South Coast face an apparently insurmountable wall.

Subsequently, Travelers Bond Claim traveled to South Coast/Ketchikan office on May 28, 2002. Our review is still underway. Nevertheless, from a performance perspective, our greatest exposure is concentrated in seven projects, four in Alaska, and three in Arizona. The four Alaskan jobs are: Toksook Airport; Unalaska Airport; Big Salt Road; and Unalaska/USCG Dock. Based on South Coast's March 31, 2002 work in progress statement, the remaining Alaskan backlog of work consists of $12,193,131 on a cost to complete basis. Of that amount, Toksook accounts for $3,828,114, Unalaska is $1,822,724, Big Salt Road is $2,920,404, and Unalaska/USCG Dock is $3,423,020. According to South Coast, the remaining Arizona backlog of work consists of $5,260,902 in cost to complete. Based on South Coast's March 31, 2002 work in progress statement, the costs to complete are allocated primarily to three projects as follows: Navajo FB/NML $3,240,711; Borrego Pass $1,183,858 and San Carlos $853,166.

The preceding costs to complete are given to provide an order of magnitude basis for our exposure, but given the criticism of South Coast's bidding, record keeping and cost accounting, the foregoing should not be taken as absolutely representative of our exposure. Moreover, based on our preliminary discussions with South Coast management, all of this work must now be prosecuted concurrently, instead of in a more orderly fashion, because of South Coast's financial difficulties. In Alaska, South Coast is racing the clock because of the short construction season. On the other hand, in Arizona, South Coast is facing liquidated damages. A more detailed analysis of our exposure will follow when we have completed our review.

Currently, we are setting a preliminary reserve based on South Coast's accounts payable. Based on our very preliminary review of the accounts payable, we are requesting a reserve of $7,000,000 for the Indemnity Reserve which represents the accounts payable allocated to our bonded projects with a 10% (+/-) contingency. We have applied the contingency because we have determined that South Coast's records for accounts payable are incomplete. We are also setting an Expense Reserve of $500,000, for the costs of defending and prosecuting litigation, and investigating this loss. We have sent hold funds letters to all owners and filed our Indemnity Agreement as a financing statement. We are still evaluating our exposure and will make a determination shortly concerning our completion options.

EXHIBIT ___D___

PAGE __3__ OF _6_

TRAV 051320

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

EXHIBIT C PAGE 3 OF 6 SPOONEMORE
Ex. I, p. 75

### TRAVELERS BOND
## CONTRACT SURETY LARGE LOSS ANALYSIS
### Privileged & Confidential

*SALVAGE POTENTIAL*

We have the indemnity of various Klukwan entities and South Coast. Our salvage opportunities rest primarily in five categories. First, Klukwan has a wholly owned subsidiary called K-Ply located in Port Angeles, Washington. There, K-Ply operates a niche plywood operation. Klukwan's various lenders have prior security interests in K-Ply assets.

Second, South Coast has an affirmative claim for $2,703,375 on one of our bonded projects, Chinle. There may be technical issues concerning our ability to perfect our rights to the Chinle claim. Third, Klukwan is attempting to sell its Atlas subsidiary, which is a blasting company. Again, Klukwan's lenders have a first perfected security interest in Atlas' assets. Fourth, Klukwan/South Coast's Marine fleet of barges and tugs may yield some funds on a net basis, after prior encumbrances. Fifth, Klukwan has timber cutting rights which may have some value. We are investigating all five categories of potential salvage, but our opportunities are limited.

4 of 4

EXHIBIT _D_
PAGE _4_ OF _6_

TRAV 051321

EXHIBIT _C_ PAGE _4_ OF _6_ SPOONEMORE
Ex. I, p. 76.

TRAVELERS BOND
SURETY LARGE LOSS ANALYSIS
EXHIBIT 1- LOSS SUMMARY

Report Date  03/03/02

Principal Name: South Coast, Inc./Culhaven
Master Claim No:    6105037

| | Principal Name | Claim Number | Bond Number | Bond Effective Date | Contract Description | Bond Amount | Net Paid To Date | Incident/Estimated Future Loss Payments | Gross Reserve | Net Paid To Date | Expense Estimated Future Net Expenses | Gross Reserve | Net Paid To Date | TOTAL Estimated Future Net Expenses | Gross Reserve |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | South Coast dba Culhaven | | | | | | | | | | | | | | |

TOTAL

EXHIBIT __D__
PAGE __5__ OF __6__

TRAV 051322

EXHIBIT __ PAGE 5 OF 6 __ ONEMORE
Ex. I, p. 77

## TRAVELERS BOND
## SURETY LARGE LOSS ANALYSIS
### EXHIBIT 2 - REINSURANCE SUMMARY

Report Date 06/05/02

Principal Name- South Coast, Inc./Kluwan
Master Claim No:                6B9867

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex: I, p. 78

EXHIBIT C PAGE 6 OF 6

**Jordan S. Rosenfeld**

| | |
|---|---|
| To: | Charles.W.Langfitt@travelers.com |
| Cc: | Leo L. Longo |
| Subject: | South Coast |

Chuck:

Attached is the first draft of the South Coast reserve reports. I think the deficit is understated for the following:

1)     The underbilling is $3,000,000. I believe the cost to complete some of the projects is grossly understated. Also, I need to check with Leo as to adjustments he made to the contracts based on Ken's representations. Some of that may need to be reclassified as potential recoveries.

2)     LD's - We need to discuss.

I'll be in Anchorage at least through Wednesday – Gaston depositions. My cell # is 206/406-8331 or the Oles # is 907/258-0106.

Jordan


SCI-rep04002.xls

EXHIBIT ___E___
PAGE ___1___ OF __9__

SR 000487

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 79

**TRAVELERS BOND**
**SOUTH COAST, INC.**

EXHIBIT 1
PROJECT SUMMARY AS OF
5/31/2002

| Client # | Bond # | Effective Date of Bond | Obligee | Job # | Project Name | Location | Description | Estimated Completion Date | Bond Past Perf | Pmt | Combo | Gross Reserves Exhibit II | Potential Recoveries Exhibit IV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BONDED** | | | | | | | | | | | | | |
| | 103322515 | 01/15/01 | Alaska DOT | 23029 | ADOT KTN Transfer Facility | Ketchikan, AK | | Complete | 2,463,630 | 2,453,820 | | 70,335 | 0 |
| | 827811055 | 11/23/99 | Alaska DOT | 23274 | ADOT KTN Medical | Ketchikan, AK | | Complete | 3,951,593 | | | 10,690 | 0 |
| | 103327627 | 02/11/01 | Alaska DOT | 23105 | ADOT Robertson Highway | | | Complete | 2,445,953 | 2,446,868 | | 354,882 | 82,833 |
| | 827811072 | 02/11/01 | State of Alaska | 23115 | BIA Fajardo Airport | Sitka, AK | | Complete | | | | 163,169 | 0 |
| | 103319782 | 08/05/01 | Alaska DOT | 23117 | ADOT Toksook Airport | Toksook Bay, AK | | Complete | 2,723,676 | 2,723,676 | | 375,604 | 0 |
| | 103374309 | 08/27/01 | State of Alaska | 23130 | ADOT Unalaska Airport | Unalaska, AK | | 10/31/2002 | 1,391,723 | 1,391,723 | | 491,858 | 0 |
| | 103319761 | 07/24/01 | State of Alaska | 23116 | ADOT Yakutat Gardens | Yakutat, AK | | Complete | 145,980 | 145,980 | | 98,040 | 0 |
| | 827811057 | 01/14/00 | Federal Highway Adm. | 22921 | BIA Big Bell Road | | | 7/31/2002 | 13,658,107 | | | 213,526 | 0 |
| | 103319751 | 09/27/01 | Jacobs Engineering | 23114 | Jacobs – Fort Leonard | | | CO work | 509,616 | 508,616 | | (105,605) | 0 |
| | 103374310 | 03/26/01 | City of Unalaska | 23192 | KTN Vol Dept Rescue Boat | Ketchikan, AK | | Complete | 350,000 | | | (35) | 0 |
| | 103374316 | 10/16/00 | City of Unalaska | 23193 | QIUCK Bal Unit Cargo | Unalaska, AK | | Complete | 114,430 | | | (67,764) | 0 |
| | 103374365 | 09/21/01 | City of Unalaska | 23319 | QIUCK USCG Dock | Unalaska, AK | | 12/31/2002 | 6,490,000 | 6,490,000 | | (285,450) | 0 |
| | 103319763 | 09/24/01 | US Coast Guard | 23318 | USCG Paca Upper Base | | | 9/24/2002 | 87,488 | 48,744 | | (104,194) | 0 |
| | 103374308 | 08/07/01 | Acrea Southwest, Inc. | 23274 | Gazen Estates Subdivision | | | 10/1/2000 | 255,000 | 255,000 | | (137,503) | 0 |
| | 103327964 | 05/24/01 | Athena DOT | 23113 | ADOT Gazeto Burnside | Window Rock, AZ | | 5/14/2002 | 1,987,260 | 1,987,260 | | 223,278 | 0 |
| | 103327963 | 05/24/01 | Athena DOT | 23112 | ADOT Navilo FBKML | Nambi IR, AZ | | 10/1/900 | 6,650,278 | 6,608,223 | | 2,927,629 | 0 |
| | 103327951 | 06/30/01 | Bureau of Indian Affairs | 23108 | BIA Borrego Pass | Borrego Pass, NM | | 10/1/900 | 3,534,332 | 1,333,797 | | 344,468 | 0 |
| | 103327921 | 09/29/99 | Bureau of Indian Affairs | 23100 | BIA Chalka Tasty | Nambi IR, AZ | | Complete | 7,461,531 | 7,461,531 | | (26,524) | 0 |
| | 103421056 | 09/25/00 | Bureau of Indian Affairs | 23018 | BIA Fort Defiance | | | 10/1/900 | 7,437,565 | 2,200,000 | | (45,508) | 0 |
| | 103351111 | 09/14/00 | Bureau of Indian Affairs | 23025 | BIA Newtavee | | | Complete | 426,283 | 214,118 | | 32,228 | 0 |
| | 103000511 | 02/20/01 | Bureau of Indian Affairs | 23020 | BIA Pagago Road | | | Complete | 1,581,684 | 623,343 | | (45,169) | 0 |
| | 103373353 | 01/14/02 | Bureau of Indian Affairs | 23005 | BIA Seo Celica | | | 10/1/900 | 1,042,783 | | | (1,814) | 0 |
| | 103321924 | 02/20/01 | Bureau of Indian Affairs | 23109 | BIA Sbeca | San Carlos IR. | | Complete | 1,913,573 | 417,717 | | 295,157 | 0 |
| **SUBTOTAL BONDED** | | | | | | | | | 65,327,470 | 31,980,812 | 0 | 4,730,150 | 82,833 |
| **UNBONDED** | | | | | | | | | | | | | |
| | N/A | N/A | | | | | | 10/1/900 | | | | 0 | 0 |
| | N/A | N/A | | | | | | 10/1/900 | | | | 0 | 0 |
| | N/A | N/A | | | | | | 10/1/900 | | | | 0 | 0 |
| **SUBTOTAL UNBONDED** | | | | | | | | | 0 | 0 | 0 | 0 | 0 |
| **TOTAL** | | | | | | | | | 65,327,470 | 31,980,812 | 0 | 4,730,150 | 82,833 |

Page 1 of 1

SR 000488

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

EXHIBIT __E__
PAGE __2__ OF __9__
DECL. OF SPOONEMORE
Ex. I, p. 80

**TRAVELERS BOND**
**SOUTH COAST, INC.**

EXHIBIT II
RESERVE SUMMARY AS OF
6/30/2002

| Job # | Project Name | Bond Penalty Bid | Bond Penalty Bond | Combo | Performance Expenditure (Exhibit III) | Payment Expenditure (Exhibit III) | Expense (Exhibit III) | Total | Contract Balance (Exhibit IV) | Performance Reserve | Payment Reserve | Expense Reserve | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BONDED** | | | | | | | | | | | | | |
| 23102 | ADOT (VTI Transit Facil) | 2,453,930 | 2,453,930 | 0 | 0 | 70,335 | 0 | 70,335 | 0 | 0 | 70,335 | 0 | 70,335 |
| 23103 | ADOT VTN Transit | 3,429,553 | | 0 | 0 | 48,860 | 0 | 48,860 | 0 | 2,050 | 46,820 | 0 | 48,880 |
| 23108 | ADOT Richardson Highway | 2,449,555 | 2,449,555 | 0 | 28,032 | 326,560 | 0 | 354,592 | 29,332 | 325,680 | 0 | 354,992 |
| 23110 | ADOT Sitka Airport | | | 0 | 192,050 | 74,431 | 0 | 234,481 | 236,210 | 163,756 | 0 | 163,770 |
| 23115 | ADOT St Michael Airport | | | 0 | 4,692,470 | 119,508 | 0 | 4,812,068 | 4,704,202 | 116,034 | 183,048 | 15,834 |
| 23120 | ADOT Unalaska Airport | 2,123,278 | 2,123,278 | 0 | 1,771,300 | 772,471 | 0 | 2,541,771 | 2,052,003 | 481,668 | 0 | 491,148 |
| 23116 | ADOT Yakutat Seaplane | 145,059 | 1,307,128 | 0 | 145,059 | 100,451 | 0 | 100,451 | 4,395 | 93,645 | 0 | 99,046 |
| 23121 | FHWA Denali | 13,165,307 | 145,059 | 0 | 1,782,450 | 777,580 | 0 | 2,560,030 | 2,349,360 | 217,530 | 0 | 212,530 |
| 23114 | Japuka - Fort Leonard | 303,318 | 13,165,307 | 0 | | 5,671 | 0 | 5,671 | 112,416 | (105,505) | 0 | (105,805) |
| 23122 | KTN Via Duct Sewer Repl | 395,000 | 303,318 | 0 | | 17,768 | 0 | 17,768 | 17,684 | (35) | 0 | (35) |
| 23123 | UNAX Cold Cargo | 114,455 | 395,000 | 0 | 17,768 | 1,763 | 0 | 1,763 | 82,227 | (82,164) | 0 | (82,164) |
| 23118 | UNAX Dock | 6,419,000 | 114,455 | 0 | 3,018,555 | 707,058 | 0 | 3,725,616 | 3,992,073 | (266,459) | 0 | (266,459) |
| 23119 | USCG Pave Upper Base | 97,483 | 6,419,000 | 0 | | 85 | 0 | 85 | 104,239 | (104,154) | 0 | (104,154) |
| 23124 | Kenga Estates Subdivision | 235,000 | 48,744 | 0 | | 1,763 | 0 | 1,763 | 138,726 | (137,053) | 0 | (137,053) |
| 23111 | AZDOT Genesis Emerald | 1,697,320 | 235,000 | 0 | 40,821 | 309,594 | 0 | 349,423 | 126,145 | 223,278 | 0 | 223,278 |
| 23112 | AZDOT Navajo FXNNL | 6,006,228 | 1,697,320 | 0 | 4,130,092 | 1,615,288 | 0 | 5,745,380 | 3,217,441 | 942,851 | 1,515,288 | 2,527,009 |
| 23106 | BIA Betray Pass | 3,334,392 | 6,006,228 | 0 | 1,650,282 | 265,576 | 0 | 1,896,581 | 1,554,370 | 54,912 | 280,576 | 344,468 |
| 23105 | BIA Chloe D Tobith | 7,143,131 | 3,334,392 | 0 | | 303,408 | 0 | 303,408 | 284,002 | 631,804 | 0 | 619,804 |
| 23104 | BIA Del Mora | 7,421,955 | 7,143,131 | 0 | | 200,264 | 0 | 200,264 | 240,734 | (40,480) | 0 | (40,480) |
| 23205 | BIA Newlands | 428,232 | 7,421,955 | 0 | | 41,278 | 0 | 41,278 | 9,000 | 32,226 | 0 | 32,226 |
| 23107 | BIA Potagis Road | 1,881,254 | 428,232 | 0 | 882,530 | 0 | 882,530 | 27,585 | (27,585) | 0 | (27,585) |
| 23117 | BIA Shesta | 1,913,513 | 533,545 | 0 | 340,077 | 0 | 340,077 | 1,022,716 | (679,540) | 0 | (679,540) |
| 23106 | BIA Shesta | | 415,419 | 0 | 25,402 | 0 | 25,402 | 113,322 | 255,157 | 0 | 255,157 |
| **SUBTOTAL, BONDED** | | 65,537,470 | 31,080,412 | 0 | 18,071,779 | 6,712,219 | 0 | 24,783,998 | 20,053,848 | 1,207,513 | 3,432,837 | 4,720,160 |
| **UNBONDED** | | | | | | | | | | | | | |
| | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **SUBTOTAL, UNBONDED** | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **TOTAL** | | 65,537,470 | 31,080,612 | 0 | 18,071,779 | 6,712,219 | 0 | 24,783,998 | 20,053,848 | 1,207,513 | 3,432,837 | 4,720,160 |

Page 1 of 1

SR 000489

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

EXHIBIT  E
PAGE  3  OF  9
DECL. OF SPOONEMORE
Ex. I; p. 81

TRAVELERS BOND,
SOUTH COAST, INC.

6/12/2002

EXHIBIT III
PROSPECTIVE EXPENDITURES SUMMARY FROM
6/24/2024

| Job # | Project Name | PERFORMANCE EXPENDITURES | | | | | | PAYMENT EXPENDITURES | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Costs To Complete (Exhibit III.A) | Subcontract Unbilled Balance (Exhibit III.A) | Delay Related Damages (Exhibit III.E) | Contingency (Exhibit III.C) | Overhead (Note 1) | Total | Vendor Billed And Unpaid Plus Unpaid (Exhibit III.B) | Subcontract Billed And Unpaid Plus Retainage (Exhibit III.D) | Contingency (Exhibit III.C) | Total | Expenses (Exhibit III.F) | Total Prospective Expenditures |
| BONDED | | | | | | | | | | | | | |
| 23029 | ADOT KTN Traveler Facility | 0 | 0 | 0 | 0 | 0 | 0 | 63,535 | 7,000 | 0 | 70,535 | 0 | 70,535 |
| 22824 | ADOT KTN Viaduct | 0 | 0 | 0 | 2,000 | 0 | 2,000 | 18,000 | 0 | 0 | 18,000 | 0 | 18,000 |
| 23109 | ADOT Riordanton Highway | 0 | 28,933 | 0 | 0 | 0 | 28,933 | 172,244 | 153,668 | 0 | 325,980 | 0 | 554,992 |
| 23008 | ADOT Eldoha Airport | 0 | 0 | 0 | 150,000 | 0 | 150,000 | 74,451 | 0 | 0 | 74,451 | 0 | 224,451 |
| 23111 | ADOT Peacock Airport | 0 | 0 | 0 | 0 | 828,400 | 828,400 | 116,505 | 0 | 0 | 116,505 | 0 | |
| 23129 | ADOT Unalutas Airport | 3,890,500 | 0 | 0 | 0 | 324,500 | 1,771,900 | 775,411 | 0 | 0 | 775,411 | 0 | |
| 23116 | ADOT Seldon Structures | 1,446,500 | 0 | 0 | 0 | | | 99,431 | 0 | 0 | 99,431 | 0 | 169,431 |
| 22821 | FHA Dipe Trail Rep | 0 | 601,577 | 0 | 316,000 | | 1,782,850 | 491,047 | 286,012 | 55,000 | 777,059 | 0 | 2,559,954 |
| 23114 | Jacobs - Fort Leonard | 0 | 0 | 0 | 0 | 0 | 0 | 6,671 | 0 | 0 | 6,671 | 0 | 6,671 |
| 23122 | KTN Via Dock Sewer Repl. | 0 | 0 | 0 | 0 | 0 | 0 | 17,765 | 0 | 0 | 17,765 | 0 | 17,765 |
| 23119 | UNAK USGS Dock | 2,299,200 | 252,558 | 0 | 697,490 | | 3,048,658 | 707,159 | 0 | 0 | 707,159 | 0 | 5,724,415 |
| 23116 | USGS Pava Upper Base | 0 | 0 | 0 | 0 | 0 | 0 | 95 | 0 | 0 | 95 | 0 | 95 |
| 23115 | ADOT Ganado Bungola | 0 | 40,827 | 0 | 0 | 40,827 | 717,285 | 91,281 | 0 | 0 | 308,565 | 0 | 349,423 |
| 23112 | AZDOT Navajo FMIMA | 2,450,500 | 1,193,782 | 0 | 645,800 | 4,190,082 | 1,118,220 | 437,043 | 0 | 1,555,263 | 0 | 5,745,370 |
| 23108 | BIA Bompol Pass | 678,454 | 778,428 | 0 | 152,400 | 1,558,282 | 204,405 | 85,171 | 0 | 289,576 | 0 | 1,899,858 |
| 23005 | BIA Cibin to Tuba | 0 | 0 | 0 | 0 | 660,818 | 322,408 | 0 | 983,426 | 0 | 983,426 | | |
| 23018 | BIA Fort Defiance | 0 | 0 | 0 | 0 | 529,910 | 70,976 | 0 | 600,886 | 0 | 600,886 | | |
| 23028 | BIA Neatosa | 0 | 0 | 0 | 0 | 20,635 | 20,535 | 0 | 41,076 | 0 | 41,076 | | |
| 23001 | BIA Rapid Road | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 23008 | BIA San Carlos | 662,615 | 123,553 | 0 | 155,300 | 952,268 | 54,898 | 5,732 | 0 | 60,620 | 0 | 5,022,888 |
| 23109 | BIA Bhonto | 0 | 28,423 | 0 | 0 | 28,422 | 128,637 | 211,160 | 0 | 350,077 | 0 | 318,479 |
| SUBTOTAL, BONDED | | 12,593,842 | 2,490,937 | 0 | 0 | 162,000 | 2,823,000 | 10,071,779 | 4,924,170 | 1,855,049 | 55,000 | 6,712,219 | 0 | 24,783,988 |
| UNBONDED | | | | | | | | | | | | | |
| | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SUBTOTAL, UNBONDED | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | | 12,593,842 | 2,490,937 | 0 | 0 | 162,000 | 2,823,000 | 10,071,779 | 4,924,170 | 1,855,049 | 55,000 | 6,712,219 | 0 | 24,783,988 |

Note 1    Overhead is 15% of costs to complete plus 80% of the unsubjected payable.

Page 1 of 1

SR 000490

EXHIBIT __E__
PAGE __4__ OF __9__

Travelers Casualty and Surety v: South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
-Ex. I, p. 82

SR 000491

**TRAVELERS BOND**
**SOUTH COAST, INC.**

EXHIBIT III A
COSTS TO COMPLETE AS OF
5/28/2002

5/28/2002

| Job # | Project Name | Direct Material | Direct Labor | Equipment Costs | Other Costs | Unit Price | Total | Subcontract Unbilled Balances (Exhibit III F) | Costs To Complete |
|---|---|---|---|---|---|---|---|---|---|
| | **BONDED** | | | | | | | | |
| 23.109 | ADOT KIN Transfer Facility | | | | | | 0 | 0 | 0 |
| 22.024 | ADOT KIN Viaduct | | | | | | 0 | 0 | 0 |
| 22.108 | ADOT Parallana Highway | | | | | | 0 | 0 | 0 |
| 22.015 | ADOT Kika Airport | | | | | | 0 | 28,932 | 28,932 |
| 22.117 | ADOT Peacock Airport | | | | | 3,680,000 | 3,680,000 | 0 | 3,680,000 |
| 23.120 | ADOT Umbrella Airport | 627,600 | 300,000 | 210,000 | 39,690 | 270,200 | 1,446,500 | 0 | 1,446,500 |
| 23.116 | ADOT Yacca Sleptane | | | | | | 0 | 0 | 0 |
| 22.121 | TRA Big Salt Road | 609,573 | 264,500 | 372,500 | | 533,000 | 1,466,673 | 691,177 | 1,465,750 |
| 22.114 | Uhalla – Fort Learned | | | | | | 0 | 0 | 0 |
| 22.122 | KIN Vic Dost Sewer Rest. | | | | | | 0 | 0 | 0 |
| 23.125 | USACE Light Cargo | | | | | | 0 | 0 | 0 |
| 23.119 | USACE Dock | | | | 2,259,300 | | 2,259,300 | 252,956 | 2,512,256 |
| 23.118 | USCG Pave Upper Base | | | | | | 0 | 0 | 0 |
| 23.124 | Acolgah Estates SubDivision | | | | | | 0 | 0 | 0 |
| 23.123 | ADOT Outside Turnside | | | | | | 40,937 | 40,937 | 40,937 |
| 23.112 | ADOT Nando FERNAL | 1,629,700 | 361,600 | 726,400 | 17,500 | | 2,490,960 | 1,153,742 | 2,514,703 |
| 23.110 | BIA Borrego Pass | 540,124 | 73,500 | 54,769 | 10,260 | | 678,454 | 776,426 | 1,419,882 |
| 23.000 | BIA Crete to Trade | | | | | | 0 | 0 | 0 |
| 23.010 | BIA Pot Defiance | | | | | | 0 | 0 | 0 |
| 23.008 | BIA Newlands | | | | | | 0 | 0 | 0 |
| 23.107 | BIA Phrago Road | 491,355 | 100,083 | 161,739 | 16,548 | | 692,265 | 195,351 | 889,664 |
| 23.205 | BIA San Carlos | | | | | | 0 | 28,403 | 28,403 |
| 23.009 | BIA Shanto | | | | | | 0 | 0 | 0 |
| | **SUBTOTAL, BONDED** | 4,055,332 | 1,130,553 | 1,025,819 | 6,010,098 | 433,200 | 12,253,842 | 2,499,897 | 15,583,779 |
| | **UNBONDED** | | | | | | | | |
| | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **SUBTOTAL, UNBONDED** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **TOTAL** | 4,055,332 | 1,130,553 | 1,025,819 | 6,010,098 | 433,200 | 12,253,842 | 2,499,897 | 15,583,779 |

Costs To Complete The Principle's Portion Of The Contract

Page 1 of 1

5/28/2002 11:57 AM

EXHIBIT __E__
PAGE __5__ OF __9__

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 83

SR 000492

TRAVELERS BOND
SOUTH COAST, INC.

EXHIBIT B B
DELAY RELATED DAMAGES AS OF
5/22/2002

6/22/2002

| Job # | Project Name | Contract Completion Date | Projected Completion Date | Description of Progress | Days Delayed | Damages Per Day | Damages Accrued | Potential Assessment | Total Delay Related Damages |
|---|---|---|---|---|---|---|---|---|---|
| **BONDED** | | | | | | | | | |
| 22029 | ADOT KN Traveler Facility | 03/2001 | Complete | Cal Days | | $ 1,500 | | | 0 |
| 22024 | ADOT KN Visitor | | Complete | Cal Days | | | | | 0 |
| 23108 | ADOT Robinson Highway | 07/15/02 | Complete | Cal Days | | $ 1,500 | | | 0 |
| 22015 | ADOT Silos Airport | 02/01/02 | Complete | Cal Days | 27 | $ 1,500 | | | 0 |
| 22117 | ADOT Topock Airport | 08/24/03 | Complete | Cal Days | | $ 1,500 | | | 0 |
| 22107 | ADOT (various) Airport | 10/31/02 | Complete | Cal Days | | $ 5,000 | | | 0 |
| 23118 | ADOT Valdal Sedation | 12/15/01 | Complete | Cal Days | | $ 650 | | | 0 |
| 22221 | FHA Bri Sol Road | 11/07/02 | 07/31/02 | Cal Days | | $ 2,100 | | | 0 |
| 22114 | Hoshi Port Laumund | | Go Work | | | | | | 0 |
| 22172 | KN Vis Dist Sewer Rehb | | Complete | | 4 | | | | 0 |
| 22123 | UNAX Bat Upst Chrgo | | Complete | | | | | | 0 |
| 22124 | UNAX McDol Dock | 12/31/02 | 12/31/02 | | | $ 3,000 | | | 0 |
| 22119 | USDA Pres Upsr Base | | Complete | | | | | | 0 |
| 22124 | Morgan Estates Substation | | 05/02/02 | | | | | | 0 |
| 23113 | ADOT (various) Barricade | | 05/14/02 | | | | | | 0 |
| 23112 | ADOT NWHS RENAL | | | Work Ma | | $ 2,100 | | | 0 |
| 22108 | BIA Birthrg Pass | 07/16/02 | 07/17/02 | Cal Days | | $ 7,000 | | | 0 |
| 22300 | BIA Chitto Trsdle | 01/25/02 | Complete | | | | | | 0 |
| 22318 | BIA Def Ceter Crse | 01/03/02 | Complete | | | | | | 0 |
| 22028 | BIA NWhunds | 03/10/01 | Complete | | | | | | 0 |
| 22107 | BIA Passge Road | 08/31/01 | Complete | | | $ 1,000 | | | 0 |
| 22026 | BIA Ben Crdns | 03/20/02 | | | | $ 650 | | | 0 |
| 22100 | BIA Stonlo | | Complete | | | | | | 0 |
| **SUBTOTAL, BONDED** | | | | | | | | 0 | 0 |
| **UNBONDED** | | | | | | | | | |
| 0 | | 0 | | | | | | | 0 |
| 0 | | 0 | | | | | | | 0 |
| 0 | | 0 | | | | | | | 0 |
| **SUBTOTAL, UNBONDED** | | | | | | | | 0 | 0 |
| **TOTAL** | | | | | | | | 0 | 0 |

NOTE 1: Liquidated damages
NOTE 2: Direct damages
NOTE 3: Indirect damages
NOTE 4: Other (explain)

THE VALUES PRESENTED (AND INCLUDED IN THE RESERVE COMPUTATION) REFLECT A MATHEMATICAL COMPUTATION FOR WHICH LIABILITY HAS NOT YET BEEN DETERMINED.

Page 1 of 1

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 84

EXHIBIT E
PAGE 6 OF 9

**TRAVELERS BOND**
**SOUTH COAST, INC.**

EXHIBIT III F
SUBCONTRACTOR SUMMARY AS OF
6/28/2002

6/28/2002

SR 000493

| Job # | Project Name | Reference | Original Subcontract Amount | Adj. & Approved Change Orders | Revised Subcontract Amount | Billings To Date | % Billed | Payments Made To Date | Subcontractor Balances — Billed And Unpaid | Retainage | Billed And Unpaid Plus Retainage | Unbilled Balance | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BONDED** | | | | | | | | | | | | | |
| 23020 | ADOT KTN Transfer Facility | Exhibit III F1 | 333,272 | 81,938 | 415,210 | 415,210 | 100.0% | 407,510 | 7,700 | 0 | 7,700 | 0 | 7,700 |
| 23224 | ADOT KTN Viaduct | | | | | | | | | | | | |
| 23108 | ADOT Richardson Highway | Exhibit III F2 | 1,030,851 | (24,175) | 1,006,408 | 977,476 | 97.03% | 823,810 | 153,666 | 0 | 153,666 | 24,832 | 182,498 |
| 23016 | ADOT Sitka Airport | | | | | | | | | | | | |
| 23017 | ADOT Tok Cutoff Airport | | | | | | | | | | | | |
| 23120 | ADOT Unalaska Airport | | | | | | | | | | | | |
| 23116 | ADOT Yakutat Seaplane | | | | | | | | | | | | |
| 23021 | FHA Big Bell Road | Exhibit III F3 | 404,331 | 342,678 | 748,009 | 688,732 | 91.60% | 399,820 | 261,622 | 28,290 | 289,912 | 65,177 | 347,089 |
| 23114 | Jacobs Ft Leonard | | | | | | | | | | | | |
| 23122 | KTN Via Dust Street Regd. | | | | | | | | | | | | |
| 23123 | UNAK Bell Hall Geop. | | | | | | | | | | | | |
| 23119 | UNAK USCG Dock | Exhibit III F4 | 300,000 | 0 | 300,000 | 47,144 | 15.50% | 47,144 | 0 | 0 | 0 | 252,856 | 252,856 |
| 23118 | USCG Para Upper Base | | | | | | | | | | | | |
| 23124 | Kargun Bottieu SCQ/Wolom | | | | | | | | | | | | |
| 23113 | AZDOT Gensco Biomate | Exhibit III F5 | 461,104 | 133,935 | 851,035 | 640,162 | 80.00% | 448,991 | 91,281 | 0 | 91,281 | 40,857 | 132,118 |
| 23112 | AZDOT Navajo FMRMA | Exhibit III F6 | 2,228,740 | 85,260 | 2,324,420 | 1,140,685 | 49.10% | 713,698 | 427,008 | 0 | 427,008 | 1,183,742 | 1,635,826 |
| 23103 | BIA Bonito Pass | Exhibit III F7 | 1,285,134 | 149,767 | 1,434,931 | 659,693 | 45.90% | 574,592 | 85,171 | 0 | 85,171 | 775,426 | 813,839 |
| 23105 | BIA Chinke Street Trans | Exhibit III F8 | 2,120,867 | 259,235 | 2,379,092 | 2,379,092 | 100.0% | 2,055,284 | 322,808 | 0 | 322,808 | 0 | 322,808 |
| 23106 | BIA Fort Defiance | Exhibit III F9 | 1,639,407 | 49,924 | 1,689,331 | 1,689,331 | 100.0% | 1,487,333 | 70,978 | 0 | 70,978 | 0 | 70,978 |
| 23026 | BIA Newlands | Exhibit III F10 | 328,762 | 13,579 | 340,071 | 340,071 | 100.0% | 319,433 | 20,638 | 0 | 20,638 | 0 | 20,638 |
| 23027 | BIA Pappio Road | Exhibit III F11 | 1,151,911 | (69,512) | 1,092,399 | 1,092,399 | 100.0% | 1,092,399 | 0 | 0 | 0 | 0 | 0 |
| 23025 | BIA Ruff 2 | Exhibit III F12 | 76,053 | 56,232 | 132,285 | 132,285 | 100.0% | 125,553 | 6,732 | 0 | 6,732 | 126,553 | 133,285 |
| 23109 | BIA Shonto | Exhibit III F13 | 691,232 | 263,362 | 954,694 | 954,694 | 81.20% | 814,692 | 211,160 | 0 | 211,160 | 28,402 | 239,562 |
| | **SUBTOTAL, BONDED** | | 11,930,476 | 1,335,203 | 13,265,679 | 10,765,742 | 81.20% | 9,082,864 | 1,657,959 | 25,090 | 1,683,049 | 2,499,937 | 4,107,986 |
| | **UNBONDED** | | | | | | | | | | | | |
| 0 | | | 0 | | | | | | | | | | |
| 0 | | | 0 | | | | | | | | | | |
| 0 | | | 0 | | | | | | | | | | |
| 0 | | | | | | | | | | | | | |
| 0 | | | | | | | | | | | | | |
| 0 | | | | | | | | | | | | | |
| | **SUBTOTAL, UNBONDED** | | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 |
| | **TOTAL** | | 11,930,476 | 1,335,203 | 13,265,679 | 10,765,742 | 81.20% | 9,082,864 | 1,657,959 | 25,090 | 1,683,049 | 2,499,937 | 4,107,986 |

Page 1 of 1

6/28/2002 10:01 AM

EXIIIF SCI4p043202

EXHIBIT E
PAGE 7 OF 9

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 85

**TRAVELERS BOND**
**SOUTH COAST, INC.**

EXHIBIT IV
CONTRACT BALANCE AND BILLINGS AS OF
6/28/2002

6/22/2002

| Job # | Project Name | Original Contract Amount | Approved Change Orders | Revised Contract Amount | Billings To Date | % Billed | Payments Received To Date | Billed And Unbilled | Retainage | Unbilled Balance | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **BONDED** | | | | | | | | | | | |
| 23029 | ADOT KTN Transfer Facility | 4,927,680 | 397,370 | 6,295,030 | 5,295,030 | 100.00% | 5,295,137 | 0 | | 0 | 0 |
| 23024 | ADOT KTN Viaduct | 7,891,185 | 1,023,952 | 8,925,137 | 8,925,137 | 100.00% | 8,925,137 | 0 | | 0 | 0 |
| 23016 | ADOT Cumberland Highway | 4,993,915 | (119,435) | 4,774,479 | 4,774,479 | 100.00% | 4,774,479 | 0 | | 0 | 0 |
| 23015 | ADOT Slika Airport | 3,357,250 | (24,700) | 3,332,551 | 3,332,551 | 88.45% | 2,974,041 | 0 | | 0 | 0 |
| 23117 | ADOT Toksook Airport | 4,247,382 | 0 | 4,247,382 | 0 | 0.00% | 0 | 0 | | 388,210 | 388,210 |
| 23120 | ADOT Unalaska Airport | 2,614,246 | 314,246 | 2,814,246 | 681,440 | 24.49% | 681,440 | 0 | | 4,247,352 | 4,247,352 |
| 23118 | ADOT Yakutat Seaplane | 291,659 | 291,659 | 291,980 | 287,676 | 98.69% | 287,676 | 0 | | 20,732,806 | 20,732,806 |
| 23121 | FHA Big Bill Road | 7,609,240 | 6,229,622 | 15,839,762 | 14,155,411 | 89.37% | 13,490,682 | 664,729 | | 4,385 | 4,385 |
| 23123a | Lincoln - Fort Leonard | 303,816 | 294,013 | 602,831 | 490,355 | 81.34% | 490,355 | 0 | | 1,683,351 | 2,349,080 |
| 23122 | KTN Via Duct Sewer Repl. | 305,000 | 51,600 | 446,600 | 448,600 | 100.00% | 448,600 | 0 | | 112,476 | 112,476 |
| 23133 | UNAK Spit Light Cargo | 114,450 | 0 | 114,450 | 57,246 | 50.02% | 57,246 | 17,604 | | 57,202 | 17,604 |
| 23119 | UNAK USCG Dock | 6,499,030 | 142,660 | 6,641,690 | 3,682,391 | 55.44% | 2,549,017 | 684,505 | 5,725 | 2,989,309 | 67,202 |
| 23124 | USCG Pave Upper Base | 97,488 | 6,801 | 104,289 | 104,289 | 100.00% | 104,289 | 0 | 388,231 | 104,289 | 3,922,073 |
| 23124 | Kayhan Estates Subdivision | 235,000 | 0 | 235,000 | 141,009 | 60.00% | 65,274 | 46,726 | | 84,000 | 104,269 |
| 23113 | AZDOT Granada Bumside | 1,997,200 | 62,721 | 2,059,941 | 2,028,709 | 98.83% | 1,924,486 | 868 | 101,306 | 23,611 | 139,726 |
| 23112 | AZDOT Navajo FBNNII | 6,600,228 | 330,611 | 7,430,839 | 4,125,882 | 67.61% | 3,919,393 | 0 | 208,284 | 3,011,167 | 128,145 |
| 23108 | BIA Borrego Pass | 3,334,382 | 210,051 | 3,550,433 | 1,990,053 | 56.22% | 1,986,053 | 0 | | 1,654,370 | 3,217,444 |
| 23108 | BIA Fort Defiance | 7,142,131 | 773,697 | 7,915,818 | 7,651,196 | 96.65% | 7,651,190 | 0 | | 264,622 | 1,654,270 |
| 23028 | BIA Newlands | 7,437,538 | 23,427 | 8,520,741 | 8,274,457 | 97.11% | 8,274,457 | 0 | | 245,284 | 264,622 |
| 23107 | BIA Parsgug Road | 428,232 | (88,397) | 1,404,727 | 442,890 | 68.13% | 442,890 | 0 | | 9,060 | 245,284 |
| 23205 | BIA San Carlos | 1,581,834 | 0 | 1,122,882 | 1,488,842 | 68.13% | 1,488,842 | 0 | | 2,252,602 | 9,060 |
| 23207 | BIA Shonto | 1,042,892 | 60,000 | 2,044,744 | 99,590 | 8.7834% | 88,390 | 0 | | 1,024,602 | 2,252,602 |
| | | 1,813,673 | 231,471 | 2,044,744 | 1,931,422 | 94.48% | 1,931,422 | 0 | | 113,322 | 1,024,602 |
| | | | | | | | | | | | 113,322 |
| **SUBTOTAL BONDED** | | 75,105,559 | 12,675,610 | 87,782,599 | 69,803,986 | | 67,728,722 | 1,395,683 | 681,583 | 17,978,681 | 20,033,846 |
| **UNBONDED** | | | | | | | | | | | |
| 0 | | 0 | | 0 | 0 | 0.00% | 0 | 0 | | 0 | 0 |
| 0 | | 0 | | 0 | 0 | 0.00% | 0 | 0 | | 0 | 0 |
| 0 | | 0 | | 0 | 0 | 0.00% | 0 | 0 | | 0 | 0 |
| **SUBTOTAL UNBONDED** | | 0 | 0 | 0 | 0 | | 0 | 0 | | 0 | 0 |
| **TOTAL** | | 75,105,559 | 12,675,610 | 87,782,563 | 69,803,986 | | 67,728,722 | 1,395,683 | 681,583 | 17,978,681 | 20,033,846 |

SR 000494

EX/VSGrpt/2002

Page 1 of 1

6/22/2002 10:20 AM

EXHIBIT ___E___
PAGE __8__ OF __9__

DECL. OF SPOONEMORE
Ex. I, p. 86

SR 000495

**TRAVELERS BOND**
**SOUTH COAST, INC.**

EXHIBIT VII
WORK IN PROGRESS SCHEDULE AS OF
6/22/2002

| Job # | Project Name | Revised Contract Amount | Total Estimated Costs | Total Gross Profit | Gross Profit % | Costs Incurred To Date | % Complete Cost To Date | Estimated Earnings | Billings To Date | Underbilling | Overbilling | Unbilled Contract Balance | Costs To Complete |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **BONDED** | | | | | | | | | | | | |
| 23023 | ADOT KTN Traveler Facility | 5,325,000 | 4,896,163 | 8.10% | 4,896,163 | 100.00% | 428,837 | 5,325,000 | | | | 0 | 0 |
| 23024 | ADOT KTN Vehicle | 2,702,961 | 2,351,100 | 12.99% | 2,775,100 | 100.00% | 1,150,007 | 8,625,157 | | | | 0 | 0 |
| 23100 | ADOT Richardson Highway | 4,774,479 | 4,193,450 | 12.16% | 4,154,916 | 99.91% | 575,563 | 4,774,479 | | | | 0 | 29,532 |
| 23016 | ADOT Eilse Airport | 3,302,351 | 3,423,677 | -3.66% | 3,416,277 | 100.00% | (119,026) | 3,050 | | 92,906 | | 0 | 0 |
| 23120 | ADOT Unalakla Airport | 4,247,352 | 4,219,760 | 0.65% | 630,700 | 12.78% | 3,265 | 2,974,041 | 389,210 | | 398,210 | 3,683,000 | 3,683,000 |
| 23120 | ADOT Unalakla Airport | 2,816,245 | 2,523,511 | 10.40% | 359,691 | 16.73% | 14,832 | 0 | 543,319 | | 4,247,382 | 4,247,382 | |
| 23016 | ADOT Yakutat Services | 231,000 | 163,103 | 37.06% | 163,103 | 100.00% | 108,254 | 681,140 | 413,043 | | 2,052,405 | 1,448,600 | 1,448,600 |
| 23037 | PBA Big Salt Road | 18,833,702 | 18,543,746 | 1.56% | (10,994) | 0.06% | (10,994) | 387,078 | 4,585 | | 2,052,405 | 1,448,600 | |
| 23121 | Sandlake - Fort Leonard | 652,851 | 534,472 | 18.13% | 218,333 | 40.47% | (10,934) | 14,195,411 | 216,601 | | 1,883,361 | 1,448,760 | 1,448,760 |
| 23122 | KTN Via Dud Sewer Rehb. | 446,500 | 377,480 | 14.47% | 954,492 | 100.00% | 228,333 | 400,553 | 446,300 | | 112,476 | 112,476 | |
| 23123 | UNK SBH Unit Cargo | 514,450 | 485,186 | 24.74% | 377,460 | 100.00% | 69,040 | 446,300 | | | 0 | 0 |
| 23118 | UNK SBH CG Dock | 9,541,680 | 9,303,543 | 4.16% | 39,193 | 100.00% | 169,577 | 9,240 | 97,202 | | 67,202 | 2,612,154 | 2,612,154 |
| 23119 | USCG Pena Upper Base | 404,288 | 336,308 | 83.77% | 3,950,987 | 0.52% | 16,577 | 3,632,361 | 337,183 | | 2,959,308 | 2,612,154 | |
| 23124 | Kechen Finishes Sabatatiat | 235,000 | 163,336 | -5.64% | 16,333 | 100.00% | 24,514 | 0 | 104,289 | | 104,289 | 0 | 0 |
| 23112 | ADOT Newtok Sch Renov. | 2,030,041 | 8,078,409 | 72.853 | 1,537,001 | 64.71% | 219,982 | 141,000 | 34,000 | 18,414 | 23,911 | 40,827 | 40,827 |
| 23112 | ADOT Newtok Services | 1,539,536 | 798,705 | 32.73% | 4,147,704 | 64.71% | 77,005 | 2,226,760 | 660,105 | 623,195 | 1,554,370 | 3,914,242 | 3,914,242 |
| 23105 | BIA Bridge Pass | 3,559,423 | 3,204,641 | 9.40% | 333,832 | 9.40% | (4,923,197) | 4,125,052 | 850,750 | | 3,011,167 | 3,914,242 | |
| 23104 | BIA Cabin to Trails | 7,916,618 | 9,142,704 | -15.60% | 9,142,704 | 100.00% | (1,228,088) | 7,651,185 | 284,522 | | 1,554,370 | 1,435,930 | 1,435,930 |
| 23103 | BIA Cabin Outhouse | 2,172,311 | 7,051,123 | 18.47% | 7,061,123 | 100.00% | (8,374,467) | 8,374,467 | 245,034 | | 354,622 | 1,435,930 | |
| 23029 | BIA Neelaisk | 451,039 | 372,104 | 17.24% | 77,883 | 17.24% | 164,216 | 1,453,342 | 77,883 | | 246,034 | 0 | 0 |
| 23028 | BIA Pelage Road | 1,434,727 | 1,333,609 | 10.96% | 184,218 | 10.96% | 104,216 | 1,453,342 | 27,855 | | 27,855 | 0 | 0 |
| 23025 | BIA Cabin Outhouse | 2,272,672 | 2,272,672 | -2.54% | 1,030,609 | 79.10% | 72,877 | 93,980 | 191,658 | | 1,024,502 | 650,016 | 650,016 |
| 23100 | BIA Blazio | 2,024,744 | 2,089,517 | (54,673) | 2,071,377 | 100.00% | 24,663 | 1,938,572 | 9,060 | | 103,322 | 29,022 | 29,022 |
| | **SUBTOTAL, BONDED** | 87,772,809 | 85,749,889 | 2,022,979 | | 70,855,911 | | 1,435,017 | 69,903,916 | 3,005,183 | 709,163 | 17,073,491 | 16,031,779 |
| | **UNBONDED** | | | | | | | | | | | | |
| | | 0 | 0 | 0 | | 0 | | 0 | 0 | 0 | 0 | 0 | 0 |
| | | 0 | 0 | 0 | | 0 | | 0 | 0 | 0 | 0 | 0 | 0 |
| | | 0 | 0 | 0 | | 0 | | 0 | 0 | 0 | 0 | 0 | 0 |
| | **SUBTOTAL, UNBONDED** | 0 | 0 | 0 | | 0 | | 0 | 0 | 0 | 0 | 0 | 0 |
| | **TOTAL** | 87,772,809 | 85,749,889 | 2,022,979 | | 70,855,911 | | 1,435,017 | 69,903,916 | 3,005,183 | 709,163 | 17,073,491 | 16,031,779 |

Page 1 of 1

EXHIBIT ____E____
PAGE ___9___ OF ___9___

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 87

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA AT ANCHORAGE

TRAVELERS CASUALTY AND SURETY )
COMPANY OF AMERICA, a Connecticut )
corporation, )
                              )
            Plaintiff, )
                              )
      vs. ) No. A04-0165 CV (RRB)
                              )
RONALD GELBRICH; JERALD RENICH; )
BRAD FINNEY; JAN PAULSON; MICHAEL )
HOUTS; EDWIN JOHNSON; and )
PETERSON SULLIVAN, P.L.L.C., a )
Washington limited liability )
company, )
                              )
            Defendants. )

Videotaped Deposition Upon Oral Examination

of

CHARLES W. LANGFITT

Taken at 1420 Fifth Avenue
Seattle, Washington

DATE:  February 28, 2005

REPORTED BY:  Patricia A. Blevins, CCR
              CCR NO.: BL-EV-IP-A403LH

STARKOVICH REPORTING SERVICES
(206)323-0919

EXHIBIT  E
PAGE  1  OF  12

9bcc33f8-b7de-45e8-859c-8a7d5c96994f

Travelers Casualty and Surety v. South Coast, Inc., et al.        DECL. OF SPOONEMORE
Case No. A06-00063 (TMB)                                          Ex. I, p. 88

Travelers Casualty and Surety Company of America    Charles W. Langfitt    February 28, 2005

Page 2

CHARLES W. LANGFITT -- FEBRUARY 28, 2005

A P P E A R A N C E S

For the Plaintiff:            JAN D. SOKOL
                              Stewart Sokol & Gray, LLC
                              2300 Southwest First Avenue
                              Suite 200
                              Portland, Oregon 97201-5047

For Defendant                WILLIAM A. EARNHART
Peterson Sullivan:           Lane Powell Spears Lubersky, LLP
                             301 Northern Lights Boulevard
                             Suite 301
                             Anchorage, Alaska 99503-2631

For Defendant Gelbrich:      DAVID F. JURCA
                             Helsell Fetterman, LLP
                             1001 Fourth Avenue
                             Suite 4200
                             Seattle, Washington 98111-3846

For Defendant Renich:        JAMES P. WAGNER
                             Stafford Frey Cooper
                             601 Union Street
                             Suite 3100
                             Seattle, Washington 98101-1374

Also Present:                ROB DEMKO
                             Videographer

                      --oOo--

            STARKOVICH REPORTING SERVICES
                   (206)323-0919

STARKOVICH REPORTING SERVICES
       206 323-0919

EXHIBIT    F
PAGE  2  OF  12

9bcc33f8-b7de-45e8-859c-8a7d5c96994f

Travelers Casualty and Surety v. South Coast, Inc., et al.    DECL. OF SPOONEMORE
Case No. A06-00063 (TMB)                                      Ex. I, p. 89

Travelers Casualty and Surety Company of America    Charles W. Langfitt                February 28, 2005

Page 7

1      Q.    Okay.  "Person Most Knowledgeable" is what you --

2      A.    Correct.

3            MR. SOKOL:  Can I interrupt you for a moment?

4            MR. EARNHART:  Sure.

5            MR. SOKOL:  I'm going to lay an objection

6      here, and I'll just leave it at that.  This was noticed as a

7      regular deposition, not a videotaped deposition, and I think

8      you're required by the rules to notice it as a videotaped

9      deposition.  Because we're here, we're going to proceed, but

10     I need to lay that objection.  So go ahead.

11           MR. EARNHART:  Okay.  I apologize for that.

12     Q.    So you understand you're here as a representative

13     of Travelers Insurance Company, and your answers are on

14     behalf of Travelers and not necessarily of your own personal

15     knowledge; do you understand that?

16     A.    I understand what you're telling me, yes.

17     Q.    It's a subtle distinction.

18     A.    No, I understand what you're telling me.

19     Q.    Okay.  Just briefly, what is your educational

20     background?

21     A.    I have an undergraduate degree in history from the

22     University of Oregon, 1977, graduated from law school in

23     1980, passed the bar.  I'm a member of the Washington State

24     Bar Association.

25     Q.    Professionally, starting here, today, what is your

STARKOVICH REPORTING SERVICES
206 323-0919

EXHIBIT    E
PAGE   3   OF  12

9bcc33f8-b7de-45e8-859c-8a7d5c96994f
DECL. OF SPOONEMORE
Ex. I, p. 90

Travelers Casualty and Surety Company of America    Charles N. Langfitt                February 28, 2005

Page 8

1    official title at this point?

2        A.    Vice president.

3        Q.    And that's of what company?

4        A.    It's Traveler's Casualty and Surety Company, and

5    we were recently -- the holding companies were acquired with

6    the St. Paul Travelers organization, but the company remains

7    the same.

8        Q.    Okay.  And if you could, just take us back just

9    quickly over the last ten years, what positions you've held

10   or what companies you've worked for.

11       A.    Let's see.  I originally started with Reliance

12   Insurance Company back a number of years ago.  So when you

13   go back to 1995, I was working for them in Philadelphia.  I

14   had returned to the west coast in 1996, roughly August.  I

15   was -- originally started out here back in about '84, for

16   Reliance Insurance Company, in their surety operation.  The

17   title at the time was assistant vice president, and I --

18       Q.    That's in '95?

19       A.    Correct.  And the timing of everything is I became

20   an assistant vice president.  It would have been roughly, I

21   think, at the end of '94.  Previous to that date, I was what

22   was called an assistant secretary, and I had various

23   management positions prior to that time.  I've been

24   effectively in the surety business for about 21 years now.

25            So the time that I came back, it was assistant

STARKOVICH REPORTING SERVICES
206 323-0919

EXHIBIT    F
PAGE  4  OF  12

9bcc33f8-b7dc-45a8-859c-8a7d5c96994f

Travelers Casualty and Surety v. South Coast, Inc., et al.          DECL. OF SPOONEMORE
Case No. A06-00063 (TMB)                                             Ex. I, p. 91

Travelers Casualty and Surety Company of America    Charles W. Langfitt    February 28, 2005

Page 46

1  we're going to have to sit down and walk it through with

2  them.  So the question is it's going to be equipment being

3  used on a number of different jobs.  So it's a little hard

4  to get your arms around that specifically.

5      Q.    Do you believe there may or may not be an addition

6  to the claim against the defendants in this lawsuit because

7  of CIT's claim?

8      A.    Will, I'd have to go back and analyze it.  I mean,

9  obviously, I'm hopeful that we won't pay anything, but we

10 are paying expenses to continue to defend it, and I have to

11 go back and have to take a look at it.

12     Q.    At some point Travelers took over management of

13 these projects for South Coast or became active in the

14 management.  How did that come about?

15     A.    We became aware that South Coast was -- by "we,"

16 I'll talk about the claim department -- that they were in

17 serious trouble in May of 2000.  During a course of a series

18 of meetings, discussions, and reviews of books and records,

19 we subsequently determined that the best thing to do was to

20 put a bunch of the work out to bid, have someone else finish

21 it, have South Coast kind of keep the projects moving along

22 until we could bring in some new contractors to finish it.

23 And so we had a series of letters of default and the

24 acknowledgement of default executed by South Coast in June

25 of '02.

STARKOVICH REPORTING SERVICES
206 323-0919

EXHIBIT ___F___
PAGE __5__ OF _12_

9bcc33f8-b7de-45e8-859c-8a7d5c96994f

Travelers Casualty and Surety v. South Coast, Inc., et al.    DECL. OF SPOONEMORE
Case No. A06-00063 (TMB)    Ex. I, p. 92

Travelers Casualty and Surety Company of America    Charles W. Langfitt                February 28, 2005

Page 47

1      Q.    Prior to May of 2002, had Travelers received any

2   notice that South Coast might be in trouble or was in

3   trouble?

4      A.    My understanding is there were some discussions

5   before where there was some indication that there was going

6   to be some trouble because the management had been removed,

7   and that there was some other signs of potential trouble.

8   So it was probably early of '02 there were some issues.

9      Q.    Was that something that was forwarded to the

10  claims department, or what's your understanding of where

11  those discussions may have taken place?

12     A.    The first time, early May of 2000, it was brought

13  to my attention.  Our Seattle hub gave me a call, wanted to

14  meet with the agent and just our underwriters.  So we went

15  up to visit -- it was an internal meeting -- saying, This

16  account is having some serious trouble.  These are some

17  issues that are coming up.  We want you to know about it,

18  Chuck, because this may be something that will drop in your

19  lap.  What do you think we should do?  Should we go up and

20  make a visit?

21          We had a followup meeting a little bit later on

22  that occurred.  And then between the first meeting and the

23  second meeting, Klukwan's bank had realized on the

24  collateral that it had, which was a chunk of the liquidity

25  of the company, but they'd realized on it, and at that

EXHIBIT ___F___
PAGE _6_ OF _12_

9bcc33f8-b7de-45e8-859c-8a7d5c96994f

Travelers Casualty and Surety v. South Coast, Inc., et al.          DECL. OF SPOONEMORE
Case No. A06-00063 (TMB)                                            Ex. I, p. 93

Travelers Casualty and Surety Company of America    Charles W. Langfitt    February 28, 2005

Page 48

1    particular point in time, the contractor was in, obviously,

2    very serious trouble.  So I got phone numbers and

3    information on who to contact, and we set up meetings and

4    had a chance to go out and take a look at the contractor's

5    operation.

6         MR. SOKOL:  Mr. Langfitt, can I interrupt

7    you?  You keep saying May 2000.  Is that the day you're

8    talking about, or May 2002?

9         THE WITNESS:  2002.  I'm sorry.  I just

10   turned 50, so occasionally I have that happen to me.  Thank

11   you.

12        Q.   In regard to May 2002, this first meeting where

13   you first became aware of the problem, who was present at

14   that meeting?

15        A.   Marc Eckardt, myself, John Beckerleg, who was the

16   vice president in charge of the Seattle hub, Whit Campbell,

17   who was involved with the Pacific branch, Brent Heilesen,

18   who was handling the account, also an underwriter, Dave

19   Hombach, and then two people from the agency, John Claeys,

20   and I can't remember the other man's name right now.  He

21   wasn't a regular surety person from that particular

22   brokerage.  I think it was Willis.

23        Q.   You said you were under the impression that there

24   was some knowledge of potential problems at South Coast

25   prior to May 2002.  Why do you say that?

EXHIBIT _____F_____
PAGE __7__ OF _12_

9bcc33f8-b7de-45e8-859c-8a7d5c96994f

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 94

Travelers Casualty and Surety Company of America     Charles N. Langfitt                     February 28, 2005

Page 49

1      A.   Because the management had been removed from South

2   Coast, and there was an indication that they were suffering

3   from losses.  And I know at some point in time, the Sutor

4   and the Peterson report were received and obviously

5   indicated that there were some serious problems with the

6   company.

7      Q.   And that was from this meeting you got that

8   impression?

9      A.   Correct.

10          MR. WAGNER:  Could I just clarify?  I'm

11   sorry.  I hope you don't mind.  This keeps me from having to

12   go back and reinvent the wheel later.

13          Is what you're testifying to, Chuck, is that the

14   first you became aware of the South Coast issue was at this

15   May meeting or shortly before that meeting?

16          THE WITNESS:  Yes.

17          MR. WAGNER:  When you were told to come to

18   this meeting or told to set up this meeting?

19          THE WITNESS:  Yes.

20          MR. WAGNER:  Okay.

21      Q.   That's when you personally became aware, but the

22   underwriting department may have had information before

23   that?

24      A.   Yes.

25      Q.   To your knowledge, has anything been done to check

STARKOVICH REPORTING SERVICES
206 323-0919

EXHIBIT _____ F
PAGE _8_ OF _12_

9bcc33f8-b7de-45e8-869c-8a7d5c96994f

Travelers Casualty and Surety Company of America      Charles W. Langfitt                                      February 28, 2005

Page 89

1          Q.    So you don't have any professional opinion one way

2    or another about the quality of the work papers or work that

3    were done by Peterson Sullivan with respect to the year-end

4    2000 audit?

5          A.    No.

6          Q.    You do not.  Okay.  You're the one who made the

7    decision to file the current lawsuit; is that correct?

8          A.    Yes.

9          Q.    On whom, if anyone, did you rely in deciding to

10   make a -- file a lawsuit against Peterson Sullivan, just for

11   example?

12         A.    Jordan Rosenfeld is someone that we have to look

13   at to date, and also based on the Sutor report and the

14   Peterson report.

15         Q.    You're saying you relied on the Peterson Sullivan

16   report as a basis for your suit against Peterson Sullivan?

17         A.    Yes.

18         Q.    What in the Peterson Sullivan report supports a

19   claim against Peterson Sullivan?

20         A.    When you look at it, they were pointing out that

21   there were system flaws and other difficulties that had

22   predated even October of the year that they looked at it.

23   So when you looked through the report, the overall flavor of

24   it was such that there were system flaws that existed at

25   South Coast.  And if -- And this is what I'm getting for the

STARKOVICH REPORTING SERVICES
206 323-0919

EXHIBIT _____ F

PAGE _9_ OF _12_

9bcc33f8-b7de-45e8-859c-8a7d5c96994f

Travelers Casualty and Surety v. South Coast, Inc., et al.                    DECL. OF SPOONEMORE
Case No. A06-00063 (TMB)                                                      Ex. I, p. 96

Travelers Casualty and Surety Company of America    Charles W. Langfitt                February 28, 2005

Page 90

1    other part of it is that if the audit had been performed

2    properly, those system flaws would have been revealed during

3    the course of the 2000 audit and not when they came back in

4    with the later report.

5        Q.    Now, the October you're referring to is October of

6    2001, correct?

7        A.    Well, actually, when you go back and you look at

8    the report, the report is 2002, and you're talking about

9    that October of 2001, yes.

10       Q.    Right.  So that doesn't have anything to do with

11   the year-end 2000 financial statements.

12       A.    Except that they say that it's clear, even though

13   it was a rapid failure, where it, if you'll pardon the

14   expression, tanked relatively quickly.  And that's my word,

15   not theirs, but they said it failed relatively rapidly.

16           There was a reference in that that obviously there

17   were problems that preexisted October and some of the other

18   dates in it.  So to me that would mean that if they had done

19   what should have been done properly, and again, that's not

20   where I can offer the opinion, but something you look at

21   that they're saying this is not something that just happened

22   in October, this has been a problem for a period of time,

23   time period not stated, that would lead me to believe, as

24   reading it, that obviously these problems reasonably would

25   have predated '01.

STARKOVICH REPORTING SERVICES
206 323-0919

EXHIBIT ___F__
PAGE _10_ OF _12_

9bcc33f8-b7de-45o8-859c-8a7d5c96994f

Travelers Casualty and Surety Company of America    Charles W. Langfitt    February 28, 2005

Page 91

1      Q.   Because of what Peterson Sullivan said were

2  deficiencies that they identified in October of '01?

3      A.   Correct.

4      Q.   And what Peterson Sullivan talks about in their

5  report, is it not, are failures by South Coast management to

6  adhere to the fails management project control system that

7  had been developed?

8      A.   Yes.

9      Q.   And they were specifically referring to one

10 project on the Richardson Highway, correct?

11     A.   They looked at a number of other ones, but that

12 was offered as the example.

13     Q.   They didn't state, with respect to any of the

14 other projects that they examined, that there was this

15 problem, did they, in their report?

16     A.   Actually, what they did is -- and again, the

17 report is there, so we can pull it out and look at it.  But

18 my memory of what it says is that there were problems

19 throughout their organization.  And what is symptomatic of

20 them was Richardson, and they offered that up as an example

21 but symptomatic with the problem, and they looked at three

22 different geographical regions for what the problems were.

23     Q.   And the other two geographical regions being

24 Ketchikan and Arizona, they didn't note those problems,

25 correct, with respect to the projects that they looked at?

STARKOVICH REPORTING SERVICES
206 323-0919

EXHIBIT _____F_____
PAGE _11_ OF _12_

9bcc33f8-b7de-45e8-859c-8a7d5c96994f

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 98

Page 181

1    separately.  He would bring it up at different times.  He

2    would bring it up when we would meet face-to-face as

3    something that should be pursued, and on the phone

4    occasionally.

5        Q.    Now, by the time you had this telephone

6    conversation with Mr. Crandall in June of 2003, you had long

7    been aware of the Peterson and Sullivan and Sutor reports,

8    correct?

9        A.    Yes.

10       Q.    You knew about those reports more than a year

11   earlier?

12       A.    Yes.

13       Q.    Did you get those reports at your first internal

14   meeting on the subject of Klukwan?

15       A.    I think so.  They may have been in the

16   underwriting file.

17       Q.    Okay.  You got them very early on, in any case?

18       A.    Yes.

19       Q.    So there was certainly nothing -- those weren't

20   new information at the time you had this conversation with

21   Mr. Crandall?

22       A.    No.

23       Q.    Okay.  There's the mention of an attorney in the

24   bottom -- second to last paragraph here on the first page,

25   Mike Gofler.  Can you read that?

EXHIBIT _F_

PAGE _12_ OF _12_

9bcc33f8-b7de-45e8-859c-8a7d5c96994f

DECL. OF SPOONEMORE
Ex. I, p. 99

*TRAVELERS v. GELBRICH, et al.*          DEPOSITION OF JORDAN ROSENFELD, CPA

```
 1        engagement.  And we'll make sure we have those down before
 2        we depart today, but that's just for the record for now,
 3        okay?
 4   A    Okay.
 5   Q    Now, can you tell me before we finish, when was Sutor &
 6        Rosenfeld engaged by Travelers with respect to the work
 7        that's the subject of Exhibits 7 through 14?
 8   A    It would be in or around May of 2002.
 9   Q    And do you have a specific recollection of being engaged
10        for this project?  Did someone call you?
11   A    I can't recall.
12   Q    And what was the scope of your work on this engagement?
13   A    The scope of our work in general was to prepare the usual
14        schedules we prepare for sureties to analyze each of the
15        bonded and possibly unbonded projects on a job-by-job basis
16        as far as the cash flow.
17   Q    And with respect to your engagement, were you only asked to
18        review and work on construction projects that were still in
19        progress at the time of your engagement?
20   A    It wouldn't necessarily be just jobs still in progress.  It
21        could be uncompleted jobs as well.
22   Q    With respect to completed jobs, your engagement would be to
23        review cash flow, claims, subcontractor claims and that
24        type of thing?
25   A    Yes, payables.
```

23

EXHIBIT  6
PAGE  1  OF  3

*TRAVELERS v. GELBRICH, et al.*        DEPOSITION OF JORDAN ROSENFELD, CPA

```
1        because -- and maybe all you need to do is explain how your
2        process works here, Jordan, because what I'm looking at
3        here is a document that's -- down in the bottom left-hand
4        corner it appears that the document was generated on July
5        17, 2002, at 11:59 a.m.  And it's entitled, "Exhibit 2,
6        Reserve Summary as of 5/28/2002."  And then there's a list
7        of job numbers in the left-hand -- on the left-hand side of
8        the page, and then project names, and then it appears bond
9        amounts and then some further contract financial
10       information.  Is that a fair over-generalization of what
11       the document is?
12  A    Yes.
13  Q    On a project-by-project basis, and then it's summarized at
14       the bottom.  And can we assume that this particular
15       schedule would have been generated on July 17 at 11:59
16       a.m.?
17  A    That's when it would have been printed.
18  Q    Is it likely that there were versions of this schedule that
19       were printed subsequent to July 17, 2002?  Because that
20       strikes me as being fairly early on in your engagement.
21  A    I wouldn't think so.  You said subsequent to that?
22  Q    Yes.
23  A    You know, without looking through it, I don't know.
24  Q    So is it your best recollection that your engagement for
25       Travelers was completed by about July of 2002?
```

                                27

EXHIBIT  G
PAGE  2  OF  3

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex: I, p. 101

*TRAVELERS v. GELBRICH, et al.*          *DEPOSITION OF JORDAN ROSENFELD, CPA*

```
 1  A    I'd have to look at the billing records.

 2  Q    Well, as best you can recall right now, did your work

 3       continue into 2003, or was it a shorter term engagement?

 4  A    I don't think it would have gone into 2003.

 5  Q    Was it a matter of just a couple of months' engagement or

 6       was it a longer term engagement than just a couple of

 7       months?

 8  A    I think this one was just a couple of months.  We did not

 9       go -- unlike other times when we'd go back out, I think

10       this was just, we went there once, and that was it.  After

11       that, they shut down their offices, as I recall, so there

12       wasn't anyplace to go back to.

13  Q    Maybe we should just -- just again, and I'm not trying to

14       get into a substantive deposition here.  I'm just trying to

15       understand the scope of the work so I can understand the

16       documents when I review them.  Maybe you can summarize for

17       us, you know, just tell me who worked on these engagements,

18       and I guess what -- where did you go, who did you talk to,

19       that kind of thing.

20  A    Okay.  For doing the surety investigation, I would have

21       headed up the team that would have included, besides

22       myself, Leo Longo, L-O-N-G-O, and Doug Payne, P-A-Y-N-E, and I

23       think that's it.  I was wondering -- I can't recall if Eric

24       Krystad, K-R-Y-S-T-A-D, worked on this engagement or not.

25       I don't believe he did.
```

28

Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

DECL. OF SPOONEMORE
Ex. I, p. 102