Case 3:06-cv-00063-TMB   Document 140-4   Filed 06/27/2008   Page 1 of 2

Travelers Casualty vs. South Coast, Inc.　　Charles W. Langfitt　　　　　　　　　　　September 10, 2007

Page 94

1　Q. Am I correct is what he's describing here is what
2　have generally been referred to as the internal controls?
3　　　MR. HOPKINS: Object; lacks foundation, and
4　it's vague and ambiguous.
5　Q. Well, I've seen repeated the assertion that South
6　Coast failed to follow the internal controls recommended to
7　it by fails management. Have you seen that in your review
8　of the records?
9　A. Yes.
10　Q. And what does that mean to you?
11　A. That fails management had established certain
12　procedural internal control systems to make sure that the
13　information that was being reported and captured would be
14　accurate and properly reflect the financial position of the
15　jobs in the company.
16　Q. And the answers that Mr. Houts gave, do those
17　address what was going on, according to Mr. Houts, at South
18　Coast?
19　　　MR. HOPKINS: Objection. I think the
20　question is inherently confusing and deceptive, because it's
21　trying to equate this document and statements in it to the
22　FMI controls.
23　　　MR. GILMORE: Yes. That's exactly what I'm
24　trying to do.
25　Q. You can go ahead and answer that question, if you

Page 95

1　can.
2　　　MR. HOPKINS: Same objection.
3　A. I'm not going to be able to answer the question,
4　because I've never done a comparison to compare a fact
5　against the fails management report.
6　Q. Did you ever discuss these comments with
7　Mr. Rosenfeld?
8　A. No.
9　　　(Exhibit 131 marked for
10　　　identification.)
11　Q. Mr. Langfitt, I'd like to ask you some questions
12　now about the affidavits that were filed in connection with
13　the motions for summary judgment. This is a sort of fast
14　forward about a year in the litigation. And I'll hand you
15　first an affidavit that purports to be your affidavit,
16　signed by you on the 25th day of July. It's a ten-page
17　affidavit, and it's marked Exhibit 131.
18　Have you reviewed that affidavit?
19　A. (Witness peruses document.)
20　Q. Is there a missing page? It's a blank page, but
21　is it numerically a --
22　A. I think it's okay, because it's just a blank page
23　inserted. It looks like it's still a complete document.
24　Five and six follow. I'm just checking to make sure the
25　page wasn't missing.

Page 96

1　Q. Right. Exactly.
2　A. Yes, I recognize it.
3　Q. As I understand it, this is the affidavit that you
4　signed in support of the opposition that was filed to the
5　motion for sanctions. Is that your recall?
6　A. Yes.
7　Q. And I think at the beginning of the deposition you
8　indicated you'd reviewed this affidavit in preparation for
9　your testimony here today.
10　A. Yes.
11　Q. And that it appears to be an accurate statement of
12　your state of mind at the time you signed the affidavit,
13　correct?
14　A. Correct.
15　Q. And that's still your position today, correct?
16　A. Correct.
17　Q. Is this one of the documents you reviewed a couple
18　weeks ago when you met with counsel?
19　　　MR. HOPKINS: Objection; instruct the witness
20　not to answer. These are documents that I provided him.
21　Q. When is the last time you reviewed this document?
22　A. Saturday.
23　Q. A couple of days ago?
24　A. (Witness nods.)
25　Q. Now, paragraph six of that affidavit appears to

Page 97

1　describe the forensic review that you conducted beginning
2　May 28, 2002.
3　A. Yes.
4　Q. And what you say in that paragraph is you say that
5　at that time, which I assume is as of May 28, Travelers had
6　no reason to attempt to discern the accuracy of the South
7　Coast audit of 2000 financial statements and did not, to
8　your knowledge, review documents indicating the audited 2000
9　financial statements contained misstatements, correct?
10　A. I'm not sure that you recited my testimony
11　correctly.
12　Q. Well, let's go to the next -- well, how did I
13　misstate your answer to that interrogatory?
14　A. I was just listening to you, Jim, and I wasn't
15　sure that you got all the words in is all I'm saying.
16　Q. May or may not have --
17　A. Yeah. So I'll just --
18　Q. Okay. Got you. And the next sentence, you say,
19　"Nor was there anything regarding the forensic review at
20　that time that indicated that the audited 2000 financial
21　statements contained misstatements," correct?
22　A. Yes.
23　Q. Okay. Now, as I understand it, at that time,
24　which would be the forensic review starting May 28 --
25　　　MR. HOPKINS: May 28 of 2002, correct?

Travelers Casualty vs. South Coast, Inc.
Charles W. Langfitt
September 10, 2007

Page 98

1  Q. 2002. As of that time, you had received the Sutor
2  report, correct?
3  A. Yes.
4  Q. And the Peterson Sullivan report?
5  A. Yes.
6  Q. And had reviewed those reports, correct?
7  A. Yes.
8  Q. And Mr. Rosenfeld had received both of those
9  reports?
10 A. Yes.
11 Q. And had reviewed both of those reports?
12 A. I don't know.
13 Q. Okay. Do you know if, as of that time, you had
14 reviewed the fails management report?
15 A. I don't think so.
16 Q. Do you have in your mind a date when you think you
17 did review that fails management report?
18 A. I've seen it. I can't remember.
19 Q. You continue on. "By the end of Travelers'
20 forensic review, and after South Coast's projects had been
21 relet to other contractors, I was able to determine that
22 Travelers was likely to incur a loss of approximately
23 $19 million on bonds posted for South Coast." Exhibit E on
24 Page 1. And then you continue and say, "As indicated on
25 Page 4 of Exhibit E, as of October 1, I did not anticipate

Page 99

1  obtaining salvage from anyone other than Klukwan."
2  Now, my copy of this didn't contain Exhibit 1, but
3  I think October 1 is the date of your second large loss
4  report.
5  A. Yes.
6  Q. So as of that date, you did not participate in
7  obtaining salvage from anyone other than Klukwan, and I take
8  it from that as of that date you had not begun to look at
9  the possible claim against Peterson Sullivan.
10 A. Yeah. What had happened was I had no certitude
11 that I had anything there, though Tom Crandall had started
12 advising me that he thought that there was problems with the
13 officers and the directors during the course of
14 renegotiating the repayment agreement with him.
15 Q. Now, we've seen in Mr. Crandall's deposition your
16 handwritten notes of a conversation with Mr. Crandall on
17 June 2 of 2003. Is that when Mr. Crandall first mentioned
18 that to you?
19 A. No. As I testified in my deposition, when we were
20 negotiating the repayment agreement, Tom started making
21 comments about both the CPAs and the officers and directors
22 to me.
23 Q. Is that reflected in any of the writing of
24 documents you've reviewed?
25 A. No. I mean I remember it.

Page 100

1  Q. Right.
2  A. I mean it's in the deposition. And what happened
3  was is as we were getting into the process and we started
4  negotiations, then Tom mentions that he thinks there's some
5  issues with it.
6  Q. Right. But that wasn't repeated by you in any of
7  the emails that you've reviewed, that you sent to Jan.
8  MR. HOPKINS: Objection; vague and ambiguous,
9  lacks foundation.
10 A. Not that -- at some point in time I told Jan, but
11 the June '03 one and a couple of the other ones, I was
12 indicating that Tom had told me that it was. I don't know
13 whether I put a time frame in it or not, but I did tell him
14 that Tom was a source for information on the directors and
15 officers and Peterson Sullivan.
16 Q. And you don't recall when that occurred?
17 A. Well, I mean, there's an email in the file that
18 there is one, you know, the one we've referenced before.
19 Q. Right.
20 A. With the D & O coverage and some of the other
21 items that my source for the information was, like, Tom, and
22 then basically then it's the Peterson and Sullivan reports
23 and the rest of it.
24 Q. Well, the first email or written reference I see
25 to that, that was directed to Jan, was that June -- I think

Page 101

1  it's also a June 2 of '03 email that had the concluding
2  paragraph that said you had Jordan Rosenfeld looking at a
3  possible claim against Peterson Sullivan.
4  A. Right. And there's just -- I just remember
5  sending the emails, here, the one where we shipped the
6  reports and referenced the D & O claim and shipped that
7  stuff to Jan.
8  Q. Was that after that June of '03?
9  A. I'd have to go back and look at it. For some
10 reason I thought that was April or May, but it may be right
11 around June, as well. But it was within that same time
12 frame.
13 Q. Within a month or two of that?
14 A. Yes.
15 Q. Okay. The deposition that you gave I think was in
16 '05, is that your recollection when you testified about
17 that?
18 A. Yes.
19 Q. If you could turn to Page 7. At the top there's a
20 quote from, it looks like, the Sutor report, and it says --
21 the last sentence -- the last two sentences say, "Any
22 significant project under-billing needs to be investigated
23 and explained by the project manager. The 'earned labor'
24 analysis will generally indicate what is behind
25 under-billing."

26 (Pages 98 to 101)

STARKOVICH REPORTING SERVICES
206.323.0919

EXHIBIT 2
PAGE 2 OF 2