# Exhibit C

Deposition Testimony of

Thomas L. Crandall

Declaration of Gary Spraker
Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

# Index to Crandall Deposition

| Page # |
| --- |
| |
| 296 |
| 297 |
| 298 |
| 299 |
| 300 |
| 301 |
| 312 |
| 316 |
| 317 |
| 376 |
| 377 |
| 303 |
| 389 |
| 470 |
| 471 |
| 472 |
| 474 |
| 475 |
| 476 |
| 477 |
| 479 |
| 482 |
| 492 |
| 493 |

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

TRAVELERS CASUALTY AND           .   Case No. 3:06-CV-00063-TMB
SURETY COMPANY OF AMERICA,       .
a Connecticut corporation,       .

      Plaintiff,          .

               .

vs.                              .

SOUTH COAST INC., an Alaska.     **DEPOSITION OF THOMAS L. CRANDALL**
corporation, KLUKWAN, INC.,.     **DAY 2**
Alaska Native Village
corporation, and CHILKATS' .
PORTAGE COVE DEVELOPMENT          .
COMPANY, an Alaska                .
corporation,                      .

      Defendants.        .
. . . . . . . . . . . .          .
SOUTH COAST INC., et al,          .

      Counterclaim and    .
      Third-Party Plaintiff,.

vs.                              .

TRAVELERS CASUALTY AND            .
SURETY COMPANY OF AMERICAN,.
a Connecticut Corporation,        .
STEWART SOKOL & GRAY L.L.C..
and JAN D. SOKOL,                 .

      Counterclaim and     .
      Third-Party Defendants.
. . . . . . . . . . . .

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Travelers              James T. Hopkins, Esq.
Casualty and Surety        Schiffrin Olson Schlemlein
Company of America:          & Hopkins, P.L.L.C.
                           1601 Fifth Avenue, Suite 2500
                           Seattle, Washington 98101

APPEARANCES (Continued):

| | |
|---|---|
| For South Coast, Inc., et al.: | Gary A. Spraker, Esq.<br>Christianson & Spraker<br>911 West Eighth Avenue, Suite 201<br>Anchorage, Alaska  99501 |
| For Stewart Sokol & Gray, LLC: | James D. Gilmore, Esq.<br>Clapp, Peterson, Van Flein,<br> Tiemessen & Thorsness LLC<br>711 H Street, Suite 620<br>Anchorage, Alaska  99501 |
| Also Present: | Jan D. Sokol |

\* \* \* \* \*

The deposition of THOMAS L. CRANDALL was continued on behalf of the Plaintiff and Third-Party Defendant Travelers Casualty and Surety Company of America before Teresa E. Mielke, Notary Public in and for the State of Alaska and Reporter for Gemini Reporting Services, at 943 West Sixth Avenue, Suite 110, Anchorage, Alaska, on the 31st day of July 2007, commencing at the hour of 9:05 a.m.

\* \* \* \* \*

INDEX TO PROCEEDINGS                         PAGES

EXAMINATION BY MR. HOPKINS:                  241-392

INDEX TO EXHIBITS            IDENTIFIED

Number:
BY REFERENCE:

5: 9/29/04 e-mail w/typewritten notes of telephone
   call                                      285

9: 10/20/04 memorandum to board of directors, board
   update                                    287

237

PROCEEDINGS

THOMAS L. CRANDALL

continued to testify as follows:

REPORTER:  We're on record.  Mr. Crandall, I'd like to remind you that you are still under oath.

A    Thank you.

BY MR. HOPKINS (CONTINUED):

Q    Mr. Crandall, we're resuming the second day of your deposition here on July 31st.  Since we adjourned your deposition late yesterday have you reviewed any additional documents in anticipation of your testimony here today?

A    No.

Q    Do you recall having discussions with Chuck Langfitt in April of 2003 regarding possible claims by both Travelers and Klukwan against the former directors and officers of South Coast?

A    I don't recall a date, I recall several discussions with Mr. Langfitt.

Q    Do you recall indicating to Mr. Langfitt at various times in 2003 that Klukwan was considering its own claim against the former South Coast directors and officers?

A    We did consider it, yes.

Q    And you told Mr. Langfitt that?

A    Yes.

Q    Did you provide information to Mr. Langfitt regarding

1       repayment agreement, correct?

2    A  We proposed alternative collateral and revised payment

3       schedules.

4    Q  None of Klukwan's proposals in an attempt to renegotiate

5       the repayment agreement asserted any sort of claim or

6       offset of Travel -- against Travelers in connection with

7       its law suit against the directors and officers or

8       Peterson & Sullivan?

9    A  That is correct.

10                              DEPOSITION EXHIBIT 80 MARKED

11   Q  Can you identify Exhibit 80 as an e-mail from Jordan

12      Rosenfeld to you dated June 17, 2003?

13   A  Yes.

14   Q  And this e-mail shortly followed your telephone

15      conversation with Chuck Langfitt on June 2, 2003, in which

16      you and Mr. Langfitt discussed claims by Travelers against

17      Peterson Sullivan and the directors and officers, correct?

18   A  That seems to be correct, yes.

19   Q  And you understood by this e-mail that Travelers through

20      Jordan Rosenfeld was requesting Klukwan to send a letter

21      to Peterson & Sullivan asking it to provide its working

22      papers for the December 31, 2000, audit performed by

23      Peterson Sullivan on South Coast?

24   A  That's my understanding.

25   Q  And did you agree to provide that letter?

1    A    We did provide that letter.

2    Q    And why did you do so?

3    A    Well, two reasons.  First off, we thought that it was

4         beneficial to our relationship with Travelers, and,

5         second, it was required under the agreement.

6    Q    Meaning the repayment agreement?

7    A    Yes.

8    Q    Now, you did have some concern as to the timing of when

9         that letter would be sent, correct?

10   A    I did.

11   Q    What were those concerns?

12   A    We were in the process of finishing up that year's audit.

13   Q    So you wanted Peterson Sullivan to finish the year-end

14        2002 audit before you hit them with this request?

15   A    Correct.

16   Q    And once they had completed that audit did you send the

17        letter to them requesting they produce the working papers?

18   A    We did send the letter, I don't remember the timing -- the

19        delay between the two dates.

20   Q    And did you have any other discussions regarding Rosenfeld

21        at or about this date of Exhibit 80, June 2003?

22   A    I don't know that I've ever talked to Jordan, I don't

23        recall talking to Jordan.

24   Q    So if you did.....

25   A    I may have once.

1  Q  If you did it was on the subject matter of this letter?

2  A  The -- if we did.  I don't remember a conversation.

3  Q  Do you have an understanding of why Travelers wanted

4     Peterson & Sullivan's working papers?

5  A  I understood from their point of view why they wanted

6     them.  I also disagreed.

7  Q  What did you understand?

8  A  They wanted them because they felt that they needed them

9     to build a case.

10 Q  Build a case against Peterson Sullivan?

11 A  Yes.

12 Q  So you understood that Travelers wanted to review the

13    working papers to verify that it had a valid claim against

14    Peterson Sullivan?

15 A  Again, I disagreed with their assumption, but that's what

16    I -- that's what I was told they wanted.

17 Q  You're an ex-CPA who's been involved in audits.  What are

18    working papers?

19 A  Working papers are the documents of what the auditors did

20    as they completed their due diligence in preparation of

21    issuing an audit report.

22 Q  So it's -- is it fair to describe working papers as the

23    most significant or most germane documents to an audit?

24 A  I don't know that I would go quite that fair.  I think the

25    financial statements themselves are the most germane.  But

1    how they reach the conclusion of what opinion to issue

2    it's most germane to that.

3  Q    So if you wanted to know how the auditors went about doing

4    an audit, that would be the first thing you'd ask for?

5  A    It would be reasonable.

6  Q    Now, you agreed to transmit the letter to Peterson

7    Sullivan requesting the working papers without imposing

8    any conditions or quid pro quo from Travelers, correct?

9  A    There was no conditions attached.

10  Q    And that's for the reasons you've earlier indicated, A,

11    you thought it was ultimately in Klukwan's self interest

12    and, B, you thought you had an obligation to do so anyway,

13    correct?

14  A    Those are two reasons, yes.

15                                DEPOSITION EXHIBIT 81 MARKED

16    MR. HOPKINS:    81?

17    REPORTER:    81.

18  Q    Mr. Crandall, do you recognize Exhibit 81 as your letter

19    of October 20, 2003, to Peterson Sullivan?

20  A    Yes.

21  Q    And this was the letter that Travelers had requested you

22    provide to Peterson Sullivan requesting working papers,

23    correct?

24  A    With some minor modifications that I had run by them.

25  Q    And those modifications were worked out in discussions

1          between Mr. Sokol and Mr. Christianson?

2    A    No, I believe they were worked out between me and -- I

3          probably sent them back to Jordan Rosenfeld, now that I

4          think about it.  For instance, in the final paragraph

5          there had been a section that said -- and I'm paraphrasing

6          here -- you know, we've had a long and beneficial

7          relationships with Peterson Sullivan.  I took that out as

8          it's not germane to this.  There might've been a couple

9          other minor changes, but that was the one that reaches --

10         that I can recall.  To an effect just -- just the facts,

11         we want access.

12   Q    Did you also tell Peterson Sullivan at or about this time

13         you'd be using new auditors?

14   A    Sometime right around this time frame, yes.

15                             DEPOSITION EXHIBIT 82 MARKED

16   Q    Is Exhibit 82 another letter from you to Peterson

17         Sullivan?

18   A    Yes, it was.

19   Q    And looking at the lower left-hand corner I see a date of

20         October 10, 2003.

21   A    It's October 2003, my copy has a smudge so I can't tell

22         the date in between.  But it is in October '03 letter.

23   Q    And that's consistent with your recollection of when you

24         sent it?

25   A    Yes, it would've been right about this same time frame.

1    Q    This is a letter where you told him you're retaining new

2         accountants going forward for year-end 2003, correct?

3    A    Yes.

4    Q    Did Peterson Sullivan respond to this letter with the

5         details that you'd requested?

6    A    No.

7    Q    Did they just ignore it?

8    A    Yes.  And actually, if I could add just one thing, I don't

9         know if it's germane, but KPMG also -- normally when you

10        switch to a new audit the new auditors have access to the

11        work papers in order to make a smooth transition, and

12        Peterson Sullivan refused to allow KPMG access as well.

13   Q    Do you recall that the -- that there were several more

14        communications by Mr. Sokol to Peterson & Sullivan

15        attempting to get the working papers?

16   A    I recall there was communication back and forth, don't

17        know the detail, don't recall the detail.

18   Q    You certainly recall that Peterson Sullivan refused to

19        voluntarily provide the working papers?

20   A    Yes.

21   Q    Did you understand at some point Travelers and Mr. Sokol

22        were suggesting filing a petition or law suit designed to

23        just specifically acquire the working papers?

24   A    I know that they did that.

25   Q    Did you become aware they were considering doing that

```
 1              REPORTER:  Yes.

 2    Q    We've marked as Exhibit 84 an e-mail from Jan Sokol to

 3         Cabot Christianson dated January 21, 2004, you see that?

 4    A    I do.

 5    Q    Do you recall discussing this communication with Cabot

 6         Christianson?

 7    A    I recall seeing it, I don't recall a discussion on it.

 8    Q    You understand Mr. -- did you understand that Mr. Sokol

 9         was relaying Travelers' position that it would not agree

10         to apply any sort of credit to Klukwan's note from a

11         recovery against Peterson & Sullivan?

12              MR. SPRAKER:  Objection to form and foundation.

13    A    Actually this e-mail doesn't appear to say that.

14    Q    Did you have any discussions with Mr. Langfitt at this

15         point in time?

16    A    I don't recall.

17    Q    Do you recall any discussions with Mr. Langfitt in January

18         of 2004 regarding a petition to obtain the working papers?

19    A    Can't recall dates, the only discussions I recall having

20         with Chuck on this issue were more of the -- more of the

21         nature of why do you need a suit to recover working

22         papers, I believe you have adequate proof already.

23    Q    Do you recall anything else?

24    A    No.

25    Q    So you don't know whether other discussions occurred or
```

| | | |
|---|---|---|
| 1 | Q | And Klukwan was making that request again? |
| 2 | A | Yes. |
| 3 | Q | Well, in fact..... |
| 4 | A | I forgot that I can't gesture. |
| 5 | Q | In fact Klukwan wasn't even making a request in this |
| 6 | | February 10, 2004, e-mail to that effect, were they? |
| 7 | | MR. SPRAKER:  Objection, foundation and form. |
| 8 | Q | Do you believe that language reflects a request? |
| 9 | A | I believe that it reflects an expectation. |
| 10 | Q | Do you agree that expectation has a considerably different |
| 11 | | meaning than the word condition under common ordinary |
| 12 | | English language usage? |
| 13 | A | It would make sense. |
| 14 | Q | Is it your testimony here today that this e-mail imposed |
| 15 | | an express condition upon Travelers? |
| 16 | A | I believe it did. |
| 17 | Q | What specific language in your mind imposed that |
| 18 | | condition? |
| 19 | A | The general e-mail was we'll participate but we expect |
| 20 | | something from it, and if you want to go forward with |
| 21 | | that, please do. |
| 22 | Q | Mr. Crandall, I can go buy a lottery ticket and tell the |
| 23 | | agent I expect to win.  Does that mean I'm going to? |
| 24 | A | Might in your head. |
| 25 | Q | Does that mean the lottery agent has guaranteed that I'm |

1    review the written documents and communications exchanged,

2    including the pleadings in the law suit, correct?

3  A    Yes.

4                              DEPOSITION EXHIBIT 88 MARKED

5  Q    Can you identify Exhibit 88 as Jan Sokol's e-mail to Cabot

6    Christianson on which you were copied dated February 13,

7    2004?

8  A    I can.

9  Q    You understood this e-mail by Mr. Sokol specifically

10    responded to the February 10, 2004, e-mail from Cabot

11    Christianson which is Exhibit 87, correct?

12  A    I do.

13  Q    At this point you have made some comments regarding a

14    proposed petition for the working papers but you've not

15    yet signed it, correct?

16  A    I don't think I've signed it as of the 13th of February.

17  Q    That's what Mr. Sokol says, I don't have it yet, correct?

18  A    That's what he says, yes.

19  Q    Do you understand Mr. Sokol agreed in the first paragraph

20    of this February 13, 2004, e-mail that Travelers would

21    bear the cost of pursuing the working papers petition and

22    would indemnity Klukwan from claims by Peterson Sullivan

23    directly related to the working papers litigation, isn't

24    that what you understood the first paragraph of the

25    February 13, 2004 e-mail to say?

1   A   The first paragraph says that they will bear the costs and

2       indemnify.

3   Q   That's what you understood it to.....

4   A   That's what I understand it.

5   Q   And the second paragraph, though, rejects Klukwan's

6       condition that the proceeds from any substantive law suit

7       against Klukwan (sic) be applied to the repayment

8       agreement and promissory notes, doesn't it?

9   A   I don't know that it rejects it, it just says that while

10      Travelers understands Klukwan's expectation, it's not

11      consistent with prior agreements between Klukwan and

12      Travelers.  Goes on to say let's just ignore that point

13      and file and go forward.

14  Q   And the prior agreements you understood that were

15      referenced here were the repayment agreement, correct?

16  A   That's correct.

17  Q   And that's -- that was consistent with Travelers' position

18      throughout these discussions, that Klukwan was not

19      entitled to a credit under the repayment agreement for any

20      recovery that Travelers might make on its own claims

21      against Peterson Sullivan?

22  A   That's what's being claimed, yes.

23  Q   And that's what you understood it to mean.

24  A   Prior to this date, yes.

25  Q   That's what you understood them to be saying again right

1    A    Or the benefit of any claim would've been accrued to us,

2         yes.

3    Q    Any other reasons?

4    A    That's the primary ones I can think of right now.

5    Q    Besides yourself and Mr. Christianson who else employed by

6         any of the Klukwan-related entities would have knowledge

7         of facts which support Klukwan's assertion that Mr. Sokol

8         was acting as Klukwan's attorney?

9    A    I don't know who would.

10   Q    You would agree yourself and Mr. Christianson would be the

11        primary individuals in that regard, correct?

12   A    We would be.

13   Q    You were the individuals involved in all the

14        communications relating to the Travelers action against

15        Peterson Sullivan, correct?

16   A    The majority.

17   Q    I am right that this letter of March 21, 2005, Exhibit

18        109, is the first time Klukwan ever made such an assertion

19        against Mr. Sokol?

20   A    I believe that's the case.

21   Q    And it's Klukwan's position that both Travelers and

22        Klukwan were clients of Mr. Sokol, correct?

23   A    Directly or indirectly.

24   Q    And did you ever voice any objection to Chuck Langfitt

25        regarding the fact that Mr. Sokol was representing

1          Travelers in the Peterson Sullivan action?

2   A      I did not.

3   Q      Did you ever tell Chuck Langfitt that Mr. Sokol was doing

4          or not doing something that you believed he should've

5          done?

6   A      Other -- other than the fact that I did talk to Chuck

7          Langfitt that I thought it was not necessary to secure

8          working papers, that I thought that there was adequate

9          evidence without same to pursue, and had they pursued at

10         that point there would not have been a statute of

11         limitations issue.

12  Q      When did you have that conversation with Mr. Langfitt?

13  A      Several times during the discussion of why are we going

14         after working papers, why don't we just bypass that step,

15         so it would've been 2003, give or take.  Maybe even

16         early -- late 2002.

17  Q      Did you understand Travelers was relying on Mr. Sokol's

18         advice in pursuing the working papers?

19  A      I don't have -- I believe they did but I don't have any

20         direct knowledge of whose advice they were relying on.

21  Q      If Klukwan was a joint client of Travelers of Mr. Sokol

22         why is Travelers responsible for any of Mr. Sokol's

23         alleged negligence to Klukwan?

24         MR. SPRAKER:  Objection to form, calls for a legal

25  conclusion.

1    A    That's correct.

2    Q    I have not found nor seen in any of the records in this

3         proceeding anything in written form from Klukwan that

4         states and tells Travelers that Klukwan was relying

5         exclusively on Travelers' action.  Are you aware of any

6         such document?

7    A    Not as a document, no.

8    Q    Did you make that statement to Chuck Langfitt?

9    A    I did talk to Chuck Langfitt on more than one occasion

10        that one of the issues out there is Klukwan basically is

11        broke, two, anything we -- that Travelers received as a --

12        on a settlement with P&S or as a direct result of the

13        claim against P&S would benefit Klukwan either to the

14        point of against the note or against the deficiency.

15   Q    Even assuming that statements to have been made, they are

16        not the equivalent of an assertion or statement by you to

17        Mr. Langfitt to the effect that Klukwan's decided not to

18        bring its own action or we're relying exclusively on you.

19        That statement was never made, was it?

20        MR. SPRAKER:   That exact statement?

21        MR. HOPKINS:   Yes.

22   A    That exact statement was never made.

23   Q    Do you understand in interrogatory Number 5, going back to

24        Exhibit 12, Travelers asked Klukwan to identify all

25        documents that Klukwan contended were evidence of the

1

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

2

3      TRAVELERS CASUALTY AND          .   Case No. 3:06-CV-00063-TMB
       SURETY COMPANY OF AMERICA, .
4      a Connecticut corporation,  .

5              Plaintiff,           .

6      vs.                          .

7      SOUTH COAST INC., an Alaska. __DEPOSITION OF THOMAS L. CRANDALL__
       corporation, KLUKWAN, INC.,. __DAY 3__
8      Alaska Native Village        .
       corporation, and CHILKATS'   .
9      PORTAGE COVE DEVELOPMENT      .
       COMPANY, an Alaska           .
10     corporation,                 .

11             Defendants.          .

12     . . . . . . . . . . . . . .  .
       SOUTH COAST INC., et al,     .

13         Counterclaim and         .
           Third-Party Plaintiff,.

14     vs.                          .

15     TRAVELERS CASUALTY AND       .
       SURETY COMPANY OF AMERICAN,.
16     a Connecticut Corporation,   .
       STEWART SOKOL & GRAY L.L.C..
17     and JAN D. SOKOL,            .

18         Counterclaim and         .
           Third-Party Defendants.

19     . . . . . . . . . . . . . .  .

20                    TRANSCRIPT OF PROCEEDINGS

21

22     APPEARANCES:

22

       For Travelers               James T. Hopkins, Esq.
23     Casualty and Surety         Schiffrin Olson Schlemlein
       Company of America:          & Hopkins, P.L.L.C.
24                                 1601 Fifth Avenue, Suite 2500
                                   Seattle, Washington 98101
25

1   APPEARANCES (Continued):

2   For South Coast, Inc.,        Gary A. Spraker, Esq.
    et al.:                       Christianson & Spraker
3                                 911 West Eighth Avenue, Suite 201
                                  Anchorage, Alaska  99501
4

5   For Stewart Sokol &           James D. Gilmore, Esq.
    Gray, LLC:                    Clapp, Peterson, Van Flein,
6                                  Tiemessen & Thorsness LLC
                                  711 H Street, Suite 620
7                                 Anchorage, Alaska  99501

8                          *  *  *  *  *

9        The deposition of THOMAS L. CRANDALL was continued on

10  behalf of the Plaintiff and Third-Party Defendant Travelers

11  Casualty and Surety Company of America before Teresa E. Mielke,

12  Notary Public in and for the State of Alaska and Reporter for

13  Gemini Reporting Services, at 943 West Sixth Avenue, Suite 110,

14  Anchorage, Alaska, on the 1st day of August, 2007, commencing

15  at the hour of 9:05 a.m.

16                          *  *  *  *  *

17                  INDEX TO PROCEEDINGS                      PAGES

18  EXAMINATION BY MR. GILMORE:                             398-451

19  EXAMINATION BY MR. SPRAKER:                             452-495

20  EXAMINATION BY MR. HOPKINS:                             495-543

21  EXAMINATION BY MR. GILMORE:                             543-554

22                  INDEX TO EXHIBITS                     IDENTIFIED

23  Number:

24  112:  1/10/05 e-mail w/attached 1/10/05 board update       539

25  113:  Calendar pages August '03 through January '04        540

P R O C E E D I N G S

THOMAS L. CRANDALL

continued to testify as follows:

     REPORTER:  Mr. Crandall, I'd like to remind you that you are still under oath.

A    Thank you, I am.

     REPORTER:  Thank you.

     MR. GILMORE:  Did you want to do your documents now or.....

     MR. HOPKINS:  No, I'll just catch it on my.....

     MR. GILMORE:  Oh, on your other go-round.

     MR. SPRAKER:  .....follow-up to you.

     MR. GILMORE:  Okay.

BY MR. GILMORE:

Q    Mr. Crandall, I wonder if you could tell me a little bit about your, quote, litigation experience.  Have you testified in trial before?

A    I have testified at -- sorry.  I have testified once in trial as a expert witness before.

Q    When was that?

A    That would've been in 2000.

Q    And where?

A    Here in Anchorage.

Q    What was the nature of the law suit?

A    It was a sexual harassment case between an individual at a

1          there, had they done their job.

2     Q    Do you recall Mr. Langfitt's response?

3     A    Not at that point I don't.

4     Q    Do you recall his response in any subsequent -- well,

5          strike that.  We know based upon what I believe Mr.

6          Gilmore showed you as Exhibit 67 that there was a

7          discussion memorialized by Mr. Langfitt and you on June

8          2nd, 2003.  Between that July 17, 2002, and June 2nd,

9          2003, period would you have had any discussions with Mr.

10         Langfitt or anyone else at Travelers regarding Peterson

11         Sullivan and possible claims against them?

12         MR. GILMORE:  Lack of foundation.

13    A    For that intervening year basically I was focusing on

14         shutting down South Coast, and most of my conversations

15         during that period of time would have been between Marc

16         Eckardt and myself, there would have been occasional

17         conversations with Peterson Sullivan -- excuse me, wrong

18         word.  Would've been occasional conversations with Chuck

19         Langfitt and continued to ask them what they thought about

20         claims -- specifically with Chuck about claims with

21         Peterson Sullivan.  Conversations with Marc more went to

22         Marc, have you thought about this -- this would be Marc

23         Eckardt.  Have you thought about this and he would

24         basically say that's a decision that Chuck Langfitt would

25         have to make.

1    Q    And when you say thought about this what do you mean?

2    A    Had they considered any claims against Peterson Sullivan

3         as the CPA firm.

4    Q    And what was the purpose of you raising these matters to

5         either Mr. Langfitt or Mr. Eckardt during this time

6         period?

7    A    Well, the purpose was -- is I didn't want it to get

8         dropped just as an oversight.  The -- I was trying to shut

9         down South Coast, I'd shut down three locations, several

10        jobs, had worked with Travelers to minimize the losses

11        that Klukwan and that -- well, that Travelers had, but

12        also that South Coast and Klukwan had had as a result, and

13        what I was hoping or expecting would be that Travelers

14        would look at this as an opportunity to recover some of

15        their losses.  Had they recovered or should they recover

16        they would -- that recovery would have benefitted them, of

17        course, but it would've also benefitted Klukwan and

18        entities because it would have either gone against the

19        note, and I know there wasn't an agreement on that but was

20        discussion, but there was also it would've gone at least

21        against the deficiency, the difference between the note

22        and the amount that they paid out, and so either way

23        Klukwan would have had a benefit.

24    Q   Can you recall anything regarding any of the conversations

25        that you may have had with Mr. Langfitt -- or, let me

Page 472

```
 1        strike that.  Can you recall any of the specifics of any
 2        conversations that you may have had with Mr. Langfitt or
 3        Mr. Eckardt between July 2002 and June 2003?
 4   A    Not specifically.  I can just recall that there were
 5        conversations more of a prodding nature, or reminder
 6        nature.  But the 2003, June I believe that one memo was,
 7        one handwritten note from Mr. Langfitt, it was obvious
 8        that they were now looking at it, and I felt that that was
 9        a good -- a good thing.
10   Q    in that time frame do you think there was one additional
11        conversation or multiple conversations?
12   A    There were.....
13        MR. HOPKINS:  Objection, form.
14        MR. GILMORE:  Lack of foundation.
15   Q    You can answer.
16   A    There would've been multiple conversations.
17   Q    Do you have any idea as to how many?
18        MR. GILMORE:  Same objection.
19        MR. HOPKINS:  Likewise.
20   A    No, it -- it wasn't every conversation with -- well, most
21        of my conversations with Marc and it was just a remind
22        Chuck that he needs to look at this, but I can't remember
23        if it -- you know, if my total conversations were three or
24        four or more than that.  I just know that they did occur.
25   Q    What was the purpose of -- actually, why don't you pull
```

1         you were looking at Peterson Sullivan for possible claims?

2   A   The reason that I brought it up at this point and others

3         was trying to keep them looking at it.  I basically felt

4         that we had -- Klukwan had some weaknesses in their case

5         against Peterson Sullivan that Travelers did not have, and

6         so I was trying to remind them to keep looking at it

7         because if they were successful we benefitted.

8   Q   Did you ever tell Mr. Langfitt what you perceived to be

9         the weaknesses in your case?

10   A   I did.

11   Q   Do you recall when you would have had that discussion?

12   A   Not specifically, no.

13   Q   What did you tell him?

14   A   Basically that if we sued Peterson Sullivan they would

15         come back and say they relied on management of South Coast

16         and management of Klukwan in preparing their financial

17         statements, but that if that suit came from Travelers, or

18         a third party but Travelers in this case, that they would

19         not have that same -- some issue.  I don't believe that

20         issue was -- meant that our case couldn't be fought and

21         maybe fought successfully, but having Travelers fight it

22         would be -- would get us to the same end result, we would

23         benefit, and they didn't have the weaknesses we had.

24   Q   What was the purpose of telling this to Mr. Langfitt?

25   A   To encourage him to take action.

Page 475

1    Q    Did he -- do you recall the response of Mr. Langfitt?

2    A    Eventually they took action.

3    Q    Travelers asked that Klukwan make demand -- or, actually

4         let me rephrase it.  Did Travelers ask Klukwan to make a

5         demand upon Peterson Sullivan for production of its

6         working papers?

7    A    Yes, they did.

8    Q    Why were they asking that Klukwan make that demand?

9         MR. HOPKINS:  Objection, foundation, form, calls for

10   speculation.

11        MR. SPRAKER:  Anything else?

12        MR. HOPKINS:  No.

13   Q    You can answer.

14   A    It is my belief that they asked for that because we --

15        Klukwan had hired P&S -- Peterson Sullivan to do the work

16        and therefore it was a work product of Klukwan's

17        engagement and that they believed that we would have a

18        much better opportunity or likelihood of success than they

19        would.

20   Q    Did Mr. Langfitt or anyone at Travelers tell you why they

21        wanted the work papers?

22   A    I was told that they wanted the work papers because they

23        wanted to find out if they had a cause of action against

24        Peterson Sullivan.

25   Q    And how did you respond?

1   A   Responded that I basically believed that they did not need

2       that because if you just looked at the Sutor report and

3       the earlier special report from Peterson Sullivan they

4       both reached somewhat the same conclusion, which was

5       policies and procedures were not adequate or not being

6       followed.

7   Q   With that did you agree -- did Klukwan agree to request

8       the papers?

9   A   Originally we asked them to hold off for a short period of

10      time so we could have our audit finished.  Once that was

11      finished we terminated Peterson Sullivan as our auditors

12      and we then executed the -- a letter asking them to turn

13      over the work papers.

14   Q   And what was the response, then, to your -- and you did

15      send a request -- Klukwan sent a request, excuse me, for

16      those work papers?

17   A   We did.

18   Q   What was the response?

19   A   Basically got no response and no work papers.

20   Q   Did you talk to anyone about that response -- anyone at

21      Travelers about that response?

22   A   At some point after we had submitted it it became obvious

23      that they were not responding......

24   Q   They being who?

25   A   They being Peterson Sullivan was not forthcoming with the

1          audit work papers.  I then asked Mr. Langfitt what they

2          were going to do next, and at some point in time they made

3          a decision to file suit to require production of those

4          documents.

5     Q    Let me jump back a little -- a little bit.  Why hadn't

6          Klukwan asked for the work papers prior to the request

7          from Travelers?

8     A    Basically because I did not think they were -- were

9          necessary to build a claim, that's the first reason.  And

10         second, once Travelers was -- had asked for them it became

11         moot because we were working jointly with Travelers at

12         that point for production, anything they received we would

13         also receive as well.

14    Q    So what was -- Were there any actions taken in regard to

15         Peterson Sullivan after the denial for the voluntary

16         production of the work papers by Peterson Sullivan?

17         MR. HOPKINS:  Objection, vague, confusing.

18         MR. SPRAKER:  That was kind of vague and confusing.

19         MR. HOPKINS:  Leading.

20         MR. SPRAKER:  I didn't think it was leading, but I thought

21    it was vague and confusing.

22         MR. GILMORE:  It's a deposition.

23    Q    What did Klukwan do with regards to Peterson Sullivan

24         after they refused to produce the work papers?

25    A    I talked to Mr. Langfitt at some point, they basically

Page 479

1    forward.

2    Q    As you've been stating -- talking about conversations, was

3         there every anything that you put into writing to

4         memorialize these conversations?

5    A    No, generally I did not memorialize conversations in

6         memos.  Occasionally I would send an e-mail as a follow-

7         up.  I don't know that I did in this case because the --

8         the case was moving forward -- or the process was moving

9         forward again.  They'd asked for our support in asking for

10        work papers, we had.  They had decided to sue, asked for

11        our inclusion, we had.  So we were still working in effect

12        with them to go forward.

13   Q    Did you have any discussions regarding the merits of the

14        claims against Peterson & Sullivan with Travelers, Mr.

15        Langfitt or anyone else at Travelers, during this time

16        frame where they are asking that Klukwan join in a federal

17        action for the production of the papers?

18        MR. HOPKINS:  It's vague and ambiguous as to the precise

19   time frame you're talking.

20   Q    Do you understand the time frame I'm talking about?

21   A    Would you repeat?

22   Q    During the time frame after Peterson Sullivan had refused

23        to voluntarily produce the papers and Travelers is asking

24        that Klukwan join a federal action to compel the

25        production, did you have any discussions with anyone at

1           MR. HOPKINS:  Objection, lacks foundation.

2   Q   Did Travelers agree to.....

3           MR. HOPKINS:  Form.

4   Q   .....to join in -- actually let me go back and set the

5       foundation.  Did Travelers request that Klukwan join in an

6       action to compel Peterson Sullivan to produce its working

7       papers?

8   A   Yes, we ended up joining that action, yes.

9   Q   What was the result of that action?

10  A   They were basically denied the working papers at that

11      point in time.

12  Q   When did you become aware that -- that the action to

13      compel the working papers had been denied?

14  A   I believe that would've been early '04.

15  Q   Did Klukwan decide to sue Peterson Sullivan for negligence

16      in preparing financial statements at that time?

17  A   No, at that point we continued to -- I continued to ask

18      Chuck Langfitt what they were going to do because this had

19      obviously not worked, and was continually assured that

20      they were still looking at their own claim on what to do

21      next.  But that they had not dropped it, they were

22      planning to still go forward with it.

23      MR. GILMORE:  Move to strike that answer as nonresponsive.

24      MR. HOPKINS:  I agree.

25  Q   Did you.....

Page 492

1      loop at that point.

2   Q   Did you ever receive an engagement letter from Jan Sokol?

3   A   I did not.

4   Q   And I believe it's your testimony with Mr. Gilmore is that

5      you never had any discussions with Mr. Sokol regarding

6      representation of Klukwan in any matter?

7   A   I did not, other than the one case for production of

8      documents.  In that case he jointly represented the two

9      companies, but other than that no.

10  Q   Did he ever tell you that -- did he ever send any

11     communication that his representation of Klukwan had

12     ended?

13  A   He did not.

14  Q   Do you believe Mr. Sokol was aware of Klukwan's interest

15     in suing Peterson Sullivan for malpractice?

16     MR. GILMORE:  Objection, lack of foundation.

17  A   I believe Mr. Sokol knew that Klukwan was interested in

18     Peterson Sullivan being sued and that we were relying on

19     either Travelers -- well, we were relying on Travelers to

20     carry the water on that.

21  Q   And what was the basis of that understanding?

22  A   He had been around the Klukwan/Travelers as an entity --

23     as a agreement for three or four years by -- three and a

24     half years by this time.  You know, we were fairly

25     consistent in we believe there's a case here, we believe

1          you should go forward, we believe we can go forward.  We

2          basically did not waver on that.  And in fact if you look

3          at the series of actions that were taken, you know, the

4          first action, concrete action that was taken besides

5          conversations was please write the letter.  We wrote the

6          letter at their behalf.  Travelers knew.  Second concrete

7          action, the letter didn't work, please join the suit for

8          production.  Jan was part of -- Jan Sokol was part of that

9          suit for production.  We did that.  It was unsuccessful.

10         From there we continued to ask Travelers what's going on.

11         Travelers eventually filed suit.  We found that out.  We

12         were not part of that subsequent suit for damages, but

13         because of conversations I believe that Travelers through

14         Chuck Langfitt knew that we, one, encouraged them to go

15         that direction, and, two, felt that we would be benefitted

16         from it because any recovery against the losses that they

17         had suffered would accrue directly against the note or

18         indirectly against the difference between the note payable

19         and the total costs that they expended.

20    Q    Can you pull out Exhibit 63 real quick?  And I only have

21         two questions left to discuss.  Exhibit 63 is an e-mail

22         from Tom Crandall to Greg French.  Can you identify that

23         document real quick for the record, please?

24    A    This is a portion of an e-mail sent by myself to Greg

25         French.  Greg was with KPMG, who was the subsequent