# Exhibit D

Deposition Testimony of

Cabot C. Christianson

Declaration of Gary Spraker
Travelers Casualty and Surety v. South Coast, Inc., et al.
Case No. A06-00063 (TMB)

# Index to Christianson Deposition

| Page # |
|--------|
| 114 |
| 115 |
| 116 |
| 117 |
| 118 |
| 119 |
| 120 |
| 121 |
| 122 |
| 123 |
| 124 |
| 125 |
| 126 |
| 127 |
| 128 |
| 129 |
| 130 |
| 131 |
| 132 |
| 133 |
| 134 |
| 180 |
| 181 |
| 196 |
| 196 |
| 197 |
| 199 |
| 200 |
| 267 |
| 281 |
| 285 |
| 291 |
| 292 |
| 293 |
| 294 |
| 295 |
| 309 |
| 310 |
| 328 |
| 329 |

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

TRAVELERS CASUALTY AND          .   Case No. 3:06-CV-00063-TMB
SURETY COMPANY OF AMERICA,      .
a Connecticut corporation,      .
                                .
        Plaintiff,              .
                                .
vs.                             .
                                .
SOUTH COAST INC., an Alaska.        **DEPOSITION OF CABOT CHRISTIANSON**
corporation, KLUKWAN, INC.,.        **DAY 1**
Alaska Native Village           .
corporation, and CHILKATS' .
PORTAGE COVE DEVELOPMENT         .
COMPANY, an Alaska              .
corporation,                    .
                                .
        Defendants.             .
. . . . . . . . . . . .         .
SOUTH COAST INC., et al,        .
                                .
     Counterclaim and           .
     Third-Party Plaintiff,.
                                .
vs.                             .
                                .
TRAVELERS CASUALTY AND          .
SURETY COMPANY OF AMERICAN,.
a Connecticut Corporation,  .
STEWART SOKOL & GRAY L.L.C..
and JAN D. SOKOL,               .
                                .
     Counterclaim and           .
     Third-Party Defendants.
. . . . . . . . . . . .  .

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Travelers              James T. Hopkins, Esq.
Casualty and Surety        Schiffrin Olson Schlemlein
Company of America:          & Hopkins, P.L.L.C.
                           1601 Fifth Avenue, Suite 2500
                           Seattle, Washington 98101

APPEARANCES (Continued):

For South Coast, Inc.,          Gary A. Spraker, Esq.
et al.:                         Christianson & Spraker
                                911 West Eighth Avenue, Suite 201
                                Anchorage, Alaska  99501

For Stewart Sokol &             James D. Gilmore, Esq.
Gray, LLC:                      Clapp, Peterson, Van Flein,
                                 Tiemessen & Thorsness LLC
                                711 H Street, Suite 620
                                Anchorage, Alaska  99501

Also Present:                   Thomas L. Crandall

                    *  *  *  *  *

Pursuant to Notice, the deposition of CABOT CHRISTIANSON
was taken on behalf of the Plaintiff and Third-Party Defendant
Travelers Casualty and Surety Company of America before Teresa
E. Mielke, Notary Public in and for the State of Alaska and
Reporter for Gemini Reporting Services, at 943 West Sixth
Avenue, Suite 200, Anchorage, Alaska, on the 27th day of
September, 2007, commencing at the hour of 9:00 a.m.

                    *  *  *  *  *

|                    INDEX TO PROCEEDINGS | PAGES |
| --- | --- |
| EXAMINATION BY MR. HOPKINS: | 7-238 |
| EXAMINATION BY MR. GILMORE: | 238-270 |

|                    INDEX TO EXHIBITS | IDENTIFIED |
| --- | --- |

Number:
MARKED:

| 170: Billing records | 26 |
| 171: 9/6/02 letter, C. Christianson to C. Langfitt | 77 |
| 172: 9/16/02 letter, C. Langfitt to C. Christianson | 77 |

2

1   A     What's the Bates stamp page?

2         MR. SPRAKER:  It's in chronological order so.....

3   A     Oh.

4   Q     They are in chronological order.

5   A     Okay.  April.

6   Q     But I can also get you a Bates stamp number, 5677.

7   A     Okay, got it.

8   Q     Now, there's an entry there that says, quote, talk to Tom

9         C about pros and cons of action against Peterson

10        Sullivan.....

11   A     Okay.

12   Q     .....end quote.  You see that?

13   A     Yes, I do.

14   Q     Am I right that at this point in time, April 8, 2003, your

15        firm had not done a complete analysis of those potential

16        claims, is that correct?

17   A     That would be correct.

18   Q     What do you recall of your discussions that are referenced

19        here on or about April 8, 2003?

20   A     I can't tie in the exact pros and cons that I would have

21        identified in that particular conversation.  I've had an

22        opinion as to what the pros and cons were and those pros

23        and cons have remained basically unchanged throughout the

24        entire case.

25   Q     It is true, though, your firm did what could be fairly

1     characterized as a thorough and comprehensive analysis of

2     a possible claim by Klukwan against Peterson Sullivan?

3     MR. SPRAKER:   Objection, form and foundation.

4  A   No, I wouldn't call it a thorough review, I would call it

5     a hard initial look would be probably a more accurate

6     statement.

7  Q   So you performed some analysis and it was something more

8     than a cursory analysis, correct?

9  A   Yes.

10  Q   And did your views as to the pros and cons of a claim by

11     Klukwan against Peterson Sullivan change as a result of

12     that analysis?

13  A   No.

14  Q   So you had an initial gut feel, so to speak, that wasn't

15     modified, is that correct?

16  A   True.

17  Q   And subsequent research or analysis that you or your firm

18     may have performed regarding a possible claim by Klukwan

19     against Peterson & Sullivan simply confirmed your gut

20     feel, is that fair to say?

21  A   Yes.

22  Q   Now turn to your billing entries for May of 2003, it's

23     part of Exhibit 70, Bates number 5673.

24  A   Got it.

25  Q   Exhibit 170, in case I misspoke.   There's a reference in

1    your billing entry that says, quote, then talk to Tom C

2    about possible need to address board on, one, KeyBank

3    claim, two, officer claim, three, Ferris claim, end quote.

4    You see that entry?

5  A    I do.

6  Q    What was the Ferris claim reference?

7  A    That's John Ferris, who's a partner at Peterson Sullivan.

8  Q    So that's the same thing as a claim against Peterson

9    Sullivan, correct?

10  A    True.

11  Q    Just a shorthand notation?

12  A    True.

13  Q    Had you had any conversations with Mr. Ferris as of this

14    date?

15  A    Not regarding Klukwan.

16  Q    Did you ever have any discussions with him regarding

17    Klukwan?

18  A    I met Mr. Ferris years ago in a number of different

19    circumstances and I knew him from then.  I have never had

20    a conversation with him concerning South Coast or Klukwan.

21  Q    Back to this entry in your bills to Klukwan dated May 16,

22    2003.  That reflects discussion, does it not, on three

23    potential third-party claims by Klukwan.....

24  A    Uh-huh (affirmative).

25  Q    .....true?

1   A   Yes.

2   Q   And all of those were under evaluation at this point in

3       time?

4   A   Well, they were discussed, I wouldn't -- don't know if I'd

5       say that they were under evaluation.

6   Q   But they were claims Klukwan was considering, correct?

7   A   Yes, uh-huh.

8   Q   And you were providing advice as part of that

9       consideration?

10  A   Yes.

11  Q   And included within these third-party claims that were

12      being considered, at least in May of 2003, were claims by

13      Klukwan against the former South Coast officers, correct?

14  A   Correct.

15  Q   And that's what the reference to item Number 2 is on this

16      May 16, 2003, billing entry?

17  A   Correct.

18  Q   Turn to your bills for June 2003, and I'm specifically

19      looking at an entry dated June 26, 2003, part of Exhibit

20      170, Bates number 4803, you see that?

21  A   I do.

22  Q   Again that references another discussion with Mr. Crandall

23      regarding Peterson Sullivan, correct?

24  A   Yes.

25  Q   At some point did you decide to have legal research

| 1 | | performed regarding Klukwan's potential claims against |
| 2 | | Peterson Sullivan? |
| 3 | A | I did. |
| 4 | Q | Is there anything that prompted that specifically? |
| 5 | A | Well, there were a couple things happening.  It was -- I |
| 6 | | think it was a few months after that, although perhaps it |
| 7 | | was this early, that Travelers was expressing an interest |
| 8 | | in pursuing a claim and wanting to access the working |
| 9 | | paper records, that was one factor.  Also Tom Crandall was |
| 10 | | throughout, you know, very interested in the claim.  He |
| 11 | | thought it was a claim definitely that the corporation |
| 12 | | should pursue and was very -- you know, would bring it up |
| 13 | | quite a bit.  I mean, it was a frequent topic of |
| 14 | | discussion.  I think also, you know, the facts had |
| 15 | | unfolded enough that I had a sense of the company.  At |
| 16 | | this time I'd represented the company for about a year and |
| 17 | | I -- you know, you get a feel sometimes after a while for |
| 18 | | what happened.  And so -- and so those factors combined to |
| 19 | | make it something we talked about on a frequent basis |
| 20 | | during this time. |
| 21 | Q | Will you turn to your billing statements for January 2004 |
| 22 | | there in Exhibit 170?  Those start with Bates number 4787. |
| 23 | A | Yes, I see it. |
| 24 | Q | Now, again, this exhibit's in redacted form because that's |
| 25 | | how it's been produced to me, but let's focus first on |

1          that page, it's the first page of your January 2004

2          billing statement, do you see that?

3     A    I do.

4     Q    Now, that has a number of entries reflecting time by you

5          on Klukwan matters.

6     A    Yes.

7     Q    But apparently none of those entries referenced Peterson &

8          Sullivan?

9     A    Apparently not.

10    Q    Do you recall -- and if we turn the next page, to the

11         second page of the January 2004 billing statement, there

12         are two entries in there that reference Peterson Sullivan,

13         but that's it, you see that?

14    A    I do.

15         MR. GILMORE:   Which page are you on?

16         MR. HOPKINS:   We're now on the second page of the January

17    2004 billing statement, Bates number 5667.

18    Q    Do you recall being engaged in some other activities for

19         Klukwan in January of 2004?

20    A    There's quite a bit of other things going on.  There's

21         other litigation matters, it was about this time that

22         there was a sale of one of the subsidiaries, Atlas Alaska,

23         which was a fairly time-consuming deal.  So yes, it's --

24         there were a lot of things going on besides Travelers at

25         this time.  Besides Peterson Sullivan, KeyBank or the

1        officers.

2   Q   Okay, so it makes sense from your perspective that there

3        are only one or two entries in your billing records for

4        January 2004 relating to Peterson Sullivan?

5   A   Yes.

6   Q   However, looking again at the second page of the January

7        2004 statement there are a number of entries reflecting

8        research by Mr. Spraker.....

9   A   Yes.

10   Q   .....is that correct?  And in fact Mr. Spraker's effort in

11        January 2004 required 22 and a half hours?

12        MR. SPRAKER:  Objection, misstates the.....

13   A   I think it's a little bit less than that, but the numbers

14        are what they are.

15   Q   Well, I'm looking at the bottom of the page, I want to

16        make sure I understand your billing statements

17        correctly.....

18   A   Yeah, but you back out the 1.3 and the .5.  I don't

19        think -- it looks like those are other matters.

20   Q   Okay, excluding the 1.3 and the .50, those were matters

21        that related to Klukwan, apparently, because Klukwan was

22        charged for the time, correct?

23   A   Right.

24   Q   But presumably not related to Peterson Sullivan?

25   A   Correct.

1   Q   So excluding those, Mr. Spraker performed at least 20

2       hours of effort analyzing or researching possible claims

3       by Klukwan against Peterson Sullivan in January 2004, is

4       that correct?

5   A   Well, 19.7, but who's counting?  Perhaps I'm wrong.  20.7.

6       Yes, I'll tell you.

7       MR. SPRAKER:  Who's counting?

8   A   Who's counting?

9   Q   Well, I was counting, but you weren't.

10  A   Yes.

11      MR. SPRAKER:  Well, he was counting.

12  Q   Did you sit down with Mr. Spraker and say, look, I want

13      you to research this or that or did you just say generally

14      give me an analysis?  Did you have a specific discussion

15      with him before he engaged in the research effort that's

16      reflected in the January 2004 bill to Klukwan?

17  A   Yeah, I did.  I sat down and described in fairly broad

18      brush strokes what the case was about as I envisioned it.

19      I asked him to give me an account -- a memorandum that was

20      not necessarily geared to those facts in particular, but I

21      wanted to give him a context so he didn't go off on some,

22      you know, completely unrelated tangent.  I found Mr.

23      Spraker to be a -- you know, a great researcher and I like

24      -- Particularly since I'd at this time, to use your term,

25      I think it's accurate, developed a gut opinion, I wanted

1       to get kind of a fresh look as to what the law is and see

2       if there were anything -- any surprises or any issues that

3       perhaps I hadn't factored in.

4   Q   Is any of this background information or discussion with

5       Mr. Spraker regarding his assignment, so to speak, is any

6       of that memorialized in writing anywhere?

7   A   I don't believe so.

8   Q   Do you know whether Mr. Spraker took notes of that

9       discussion with you?

10  A   I don't know.  I don't think so.

11  Q   Had Mr. Spraker had any other prior involvement on behalf

12      of Klukwan prior to the tasks that are reflected in your

13      January 2004 bill?

14  A   Not that I recall.  If you go through the billing

15      statement you may -- there may be some time here and

16      there, but, as we've talked about earlier, I was the

17      primary person on this case.

18  Q   Turn to your bills for February 2004, again part of

19      Exhibit 170, and there's an entry for February 2, 2004.

20      This says review memo re accountant liability, review

21      Sutor and PS reports.  Do you see that?

22  A   Sure.

23  Q   What was the reference to the memo on accountant

24      liability?

25  A   That would be Gary's memo, I'm sure.  Yes.

1   Q    And the Sutor report, what was that?

2   A    That would be the Sutor report that's I think well-known,

3         and the PS reports would be the January '02 letter and the

4         report by Peterson Sullivan a few months after that.

5                  DEPOSITION EXHIBIT 176 MARKED

6         MR. SPRAKER:  Is this 175?

7         REPORTER:  176.

8   Q    Marked as Exhibit 176 is Mr. Spraker's January 21, 2004,

9         memo to you, which the subject matter is described as,

10        quote, claim against Peterson Sullivan for

11        misrepresentation in financial statements of South Coast,

12        Inc., end quote.  Is that the memo that's referenced in

13        the  -- in your billing statements for both January and

14        February 2004?

15  A    Yes.

16  Q    Do I correctly understand this memorandum as analyzing a

17       claim by Klukwan against Peterson Sullivan?

18  A    That was the purpose of the memo, yes, and that's the

19       thrust of the memo.

20  Q    Klukwan was the parent corporation of South Coast,

21       correct?

22  A    Correct.

23  Q    So it would in essence be a action by a shareholder

24       against the auditor who performed an audit of the

25       corporation, correct?

1    A    Well, if the claim were to be asserted it would be filed

2         by the corpora -- by South Coast and by Klukwan, I'm

3         sure.....

4    Q    Well.....

5    A    .....and probably.....

6    Q    .....did this analysis analyze -- And by this I'm

7         referring to Exhibit 176.  I read this as an analysis of

8         the claim by Klukwan, not South Coast.  Am I incorrect in

9         that regard?

10   A    When I use the term Klukwan I usually refer to the -- I

11        guess it depends on context.  This memo appears to --

12        well, the memo says that it is a claim by Klukwan as

13        shareholder of SCI.  That seems to be -- that's the thrust

14        of the memo.  In my mind I envision a little broader suit,

15        but I don't -- for what I was asking for, that was a

16        matter -- that was a distinction that I didn't -- that

17        wasn't significant to me.

18   Q    And did you ever consider that distinction at any point in

19        time?

20   A    Well, not as a -- not really.  Because, as I say, any suit

21        that were to be brought would be brought by everybody.  So

22        the fact.....

23   Q    Don't you believe there would be different legal standards

24        and potentially different practical ramifications of a

25        claim by Klukwan against Peterson & Sullivan as opposed to

1          a claim by South Coast against Peterson & Sullivan?

2     A    Yes.

3     Q    Did you -- and you gave some consideration to those

4          differences, correct?

5     A    I did, but, as I said, in the end those differences

6          wouldn't matter for -- this is what I would call a 30,000

7          foot -- or maybe not 30,000 foot, but a 10,000 foot level

8          at the issue.  The issue really is whether there exists a

9          cause of action at all by anybody, forgetting about

10         standing and forgetting -- or, anyone within the Klukwan

11         family regarding a status whether it's as a shareholder,

12         as a board member or whatever, or by -- perhaps by a

13         related company.  For example, Chilkats Portage might have

14         a claim.  But at this -- this is a -- as I say it was an

15         initial look at the issue, so I wasn't bothering myself

16         with those issues at this point.

17    Q    Did you later evaluate those issues?

18    A    No, I -- no.

19    Q    I read Mr. Spraker's January 21, 2004, memo, Exhibit 176,

20         as essentially addressing four subject matters; whether or

21         not there was a duty by Peterson & Sullivan, the

22         requirements of issues relating to reliance, issues

23         relating to causation and damages and particular rules

24         that might be applicable to a shareholder action.

25         Generally speaking, do you think that's a fair

1      characterization?

2  A    Again, if you can -- that's -- that's fair enough.

3      There's other issues besides that raised here, but the

4      substance is pretty much as you've indicated.

5  Q    Did you view Mr. Spraker's analysis as reflected in his

6      January 21, 2004, memorandum as presenting a difficult or

7      an easy standard for Klukwan to meet on the issue of

8      establishing liability?

9      MR. SPRAKER:  Objection, vague.

10  A    Well, the memo does not attempt, really, to apply the law

11      to the facts, and I think you'd have to do that in order

12      to establish a liability case.  But applying the general

13      legal principles that are set forth here to the facts as I

14      knew them or was assuming for purposes of the analysis, I

15      thought that there was a pretty strong liability case.

16  Q    How about in regard to the issue of damages, do you feel

17      the same in regard to damages?

18  A    I combine causation and damages, I see them as sort of

19      flip side of the same coin, so if you -- using damages as

20      a shorthand to include causation, I did see a problem with

21      causation and damages.

22  Q    Was that consistent with your gut feel from the outset?

23  A    Yes.  Not an insurmountable problem, mind you, but a

24      problem that would need to be looked at carefully.

25  Q    And that was the same kind of high-altitude analysis you

1        had in regard to the KeyBank claim, correct?

2    A    Well, except I thought that the liability claim against

3        KeyBank was extremely strong.  And, you know, that was --

4        as I say, that was a summary judgment slam dunk, forget --

5        you know, go straight to damages.  Whereas this I thought

6        was a strong liability claim but not as strong.  So to

7        that extent there's a difference.

8    Q    Turning back to your billing statements for February

9        2004.....

10   A    Uh-huh (affirmative).

11   Q    .....apparently after you reviewed Mr. Spraker's January

12       21, 2004, memo you did some of your own research.

13   A    Right.

14   Q    That's a correct inference from the entries for February 3

15       and February 5, 2004, correct?

16   A    Yes, uh-huh.

17   Q    And do you recall what you looked at specifically?

18   A    No, I don't, I probably looked at the cases that he cited

19       here and did some other research of my own.  I don't think

20       there's any work -- written work product from it, but I

21       spent some time doing my own due diligence, you might say.

22   Q    So you did some follow-up research to fill in any gaps

23       that you felt you needed to?

24   A    Either filling in gaps or confirming the same conclusions,

25       and, you know, doing -- I guess I thought it was more of a

Page 128

1    parallel analysis rather than filling in gaps.

2  Q  The next entry in your February 2004 billing statements to

3    Klukwan reflect a conversation between you and Mr.

4    Spraker?

5  A  Yes.

6  Q  Do you recall what you discussed with him at or about that

7    time?

8  A  Yeah, I do.

9  Q  What was that?

10 A  I'm trying to just answer your questions.

11 Q  Good.

12 A  By that time, of course, both Gary and I were pretty tuned

13    up on what the legal principles were and I think Gary's

14    knowledge of the facts derived entirely from what I told

15    him, and my knowledge of the facts derived largely from

16    what Tom had told me and what I had developed as my own

17    knowledge of the case.  And we talked about the liability

18    and the damages issues as well as, you know, other

19    considerations that would get into the issue of filing

20    suit against Peterson Sullivan.

21 Q  Well, can you tell me anything more specifically regarding

22    your conversations with Mr. Spraker on those subject

23    matters?

24 A  I would say that it's -- actually Tom Crandall's

25    deposition, I think, lays it out pretty -- as a pretty

1     good description of what my opinion was.  I don't know if

2     that's because he had the same view as I did or he was

3     just listening to me.  I think that we agreed as a sort of

4     a -- Mr. Spraker and I agreed for discussion purposes that

5     we could show liability but that the damages problem would

6     be a much harder row to hoe.  Could be potentially

7     extremely large damages but proving them would be

8     problematic.

9   Q   By extremely large damages you mean by a claim by Klukwan

10    could've encompassed all of the substantial losses, or a

11    very large portion of them, that Klukwan and South Coast

12    experienced as a result of South Coast's collapse,

13    correct?

14  A   Right, when Klukwan acquired South Coast Klukwan was a

15    financial powerhouse, it was a very solvent, well-financed

16    corporation, and the South Coast debacle brought Klukwan

17    down to here we're essentially on the bring of bankruptcy.

18    There's no other real single cause to Klukwan's problems

19    besides South Coast, so yeah, the damages could be quite

20    large.

21  Q   And those potential damages certainly exceeded the losses

22    Travelers incurred or was likely to incur on the South

23    Coast bonds, correct?

24  A   Well, potentially.  Potentially.  But.....

25  Q   Do you recall ever reviewing the financial statements or

Page 130

1   tax returns filed by Klukwan, the consolidated returns for

2   2001 and 2002?

3   MR. SPRAKER:   Objection to form, during what period?

4  A   I have looked at them.   I did not look at them in

5   connection with analyzing this issue.

6  Q   Was it generally your -- do you recall that Klukwan's tax

7   returns as opposed to even a broader analysis showed total

8   losses for it and its subsidiaries exceeding $20 million

9   for those two years combined?

10  A   As I say, I didn't look at that -- I did not look at the

11   tax returns for purposes of analyzing this issue.

12  Q   Well, regardless of whether it was for this issue, is that

13   generally accurate, based on your understanding?

14  A   I don't recall the exact number.

15  Q   You recall it was a large number?

16  A   I think so, but you have to understand that the -- in the

17   late -- Well, yes, it was a large number.

18  Q   Anything else you recall specifically regarding your

19   discussions with Mr. Spraker.....

20  A   Well.....

21  Q   .....in February 2004 regarding.....

22  A   Yes, we were.....

23  Q   .....this issue?

24  A   .....contrasting the strength of a claim that Travelers

25   might have, and I guess I should -- let me just back up

1    here.  As with so many other parts of this issue, there --

2    practically every issue that we were talking about came up

3    on a number of occasions, so to tie it to a particular

4    conversation and say yes, we talked about this aspect on

5    that day, I can't do.  But it is almost impossible to talk

6    about Klukwan or the Klukwan companies filing an action

7    against Peterson Sullivan without at the same time talking

8    about what Travelers might be doing.

9  Q  Well, Mr. Christianson, I'm going to ask you to focus on

10    the specific time periods and dates.....

11  A  Well, that's what I'm saying.....

12  Q  .....in my questions.

13  A  .....I think we would have had to -- We would've virtually

14    had to have had a conversation at this time about

15    Travelers asserting a claim.....

16  Q  Is that speculation or is that a specific memory?

17  A  Well, that's -- neither.  It's as I piece together

18    everything that was happening at this time.....

19  Q  So that's an inference on your part?

20  A  Fair enough, it's a -- I'm quite confident that.....

21  Q  Well, and at this point in time, February 6, 2004, I think

22    you've already indicated Mr. Spraker had had no prior

23    involvement in the Klukwan matter, so what he understood

24    of the facts had been relayed by you to him, correct?

25  A  Sure.

1   Q   Mr. Spraker was hardly in a position at this point in time

2       to conduct a comparison as to Travelers' claims as opposed

3       to Klukwan's, correct?

4   A   False.

5   Q   Did Mr. Spraker do a specific separate legal analysis and

6       research of Travelers' claims against Peterson Sullivan?

7   A   No, never.

8   Q   Did you?

9   A   No.

10  Q   Turn to -- well, strike that.  I'll show you another

11      document.

12                  DEPOSITION EXHIBIT 177 MARKED

13  Q   Can you identify Exhibit 177 as your e-mail to Tom

14      Crandall dated February 6, 2004?

15  A   Yes, I see it here.

16  Q   And Mr. Spraker was in fact copied on this, correct?

17  A   Yes, uh-huh.

18  Q   And the first sentence says, Tom, I'm getting into the

19      Peterson Sullivan claim and would like to talk to you

20      Monday about the following issues, end quote.

21  A   True.

22  Q   Does that reflect that fact that you had just reviewed Mr.

23      Spraker's research memo dated January 21?

24  A   Yes, this is the e-mail that's referenced on that same

25      billing that we were looking at.

Page 133

```
 1    Q    And the purpose of this e-mail was to outline a number of
 2         factual issues that you wanted to discuss with Mr.
 3         Crandall, correct?
 4    A    Uh-huh (affirmative).
 5    Q    And looking at the last -- the very last portion of this
 6         e-mail, it says, quote, as you can see, these issues group
 7         around two basic questions.  One, were the acts complained
 8         of within the scope of P&S's work.  Two, what were the
 9         damages caused by P&S's negligence.
10    A    Uh-huh (affirmative).
11    Q    I see issue two, dash, causation and damages, as
12         particular problematic.
13    A    Uh-huh (affirmative).
14    Q    Not unlike the cause of action we contemplated once upon a
15         time against KeyBank......
16    A    Right.
17    Q    .....end quote.  Did that reflect your gut feel regarding
18         the claim?
19    A    Yes.  Yes, it did.
20    Q    Do you recall having discussions with Mr. Crandall after
21         receipt of this e-mail?
22    A    Let me back up.  The.....
23    Q    Let's just have you focus on my question.  Do you recall
24         having discussions with Mr. Crandall.....
25    A    Okay, I was going to correct the answer you just gave me
```

1      -- the question you just gave me a moment ago.  The -- I

2      do see issue two as particularly problematic.  I think

3      that's an accurate description.  On the liability issue I

4      guess I don't see it -- I don't think the issue is whether

5      it was within the scope of P&S's work necessarily.  That's

6      one way to put it.  That's a little different twist than

7      maybe I might put on it now.

8  Q   Okay, did you subsequently have discussions with Mr.

9      Crandall in response to this e-mail?

10  A   I think we had -- yes, we did, we had a fairly brief

11      discussion that pretty much ended when -- once it became

12      clear that Travelers was pursuing its work papers law

13      suit.

14  Q   Well, will you look at your entry for March 1, 2004.....

15  A   Uh-huh (affirmative).

16  Q   .....in your billing entries?

17  A   Okay.

18  Q   Now, that references a meeting with Tom Crandall?

19  A   Right.

20  Q   Says, quote, meet with Tom Crandall re Peterson Sullivan

21      law suit mainly.

22  A   Right.

23  Q   Two hours?

24  A   Yes.

25  Q   And that reflected a meeting and discussion with Mr.

1          methods to obtain the working papers short of a formal law

2          suit?

3   A   No.

4   Q   You understood -- did you understand at or about this

5          time, again the latter part of 2003, that Travelers was

6          considering a claim against the former South Coast

7          officers?

8   A   That sounds right.

9   Q   Did you ever suggest to Travelers or Jan Sokol that they

10        should proceed with their law suit against the South Coast

11        officers and subpoena the working papers?

12  A   No, I never suggested that.

13  Q   That thought ever occur to you?

14  A   No.  If they want the working papers they should sue

15        Peterson Sullivan, that's the way to get it.  I don't

16        understand what all the, you know, messing around is and

17        not just filing the suit.

18  Q   Well, didn't you understand that Travelers believed it

19        needed the working papers to evaluate whether to proceed

20        with a law suit against Peterson Sullivan?

21  A   That's what Jan Sokol said, and I talked to him about that

22        and said Jan, why don't you just file suit, and I got kind

23        of a vague response that really surprised me, but, you

24        know, he's -- it's his case and his client and he knows

25        what -- you know.

1   Q     When did you have that conversation?

2   A     Well, that -- those conversations would've led up, then,

3          probably in the February '04 time period and probably the

4          -- you know, preceding that where he was asking for our

5          help in the -- in the working papers law suit.  And, you

6          know, I -- again, I can't tie it to a particular date

7          without some sort of documentary reference, but I know

8          that was my opinion for a long -- ever since all this

9          messing around with the working papers thing, it just

10         seemed to me a waste of time.  And, you know, if he really

11         wanted to get it, he knew how to do it.

12  Q     And you expressed that opinion to him at some point in

13         time?

14  A     Yeah.

15  Q     But you don't know precisely when?

16  A     Well, I know for sure it was around February of '04, and

17         may also have been earlier than that.

18  Q     I'm going to show you what's been previously marked as

19         Exhibit 122.  There is an -- And this is an e-mail between

20         Chuck Langfitt and Jan Sokol that Mr. Langfitt was

21         questioned in regard to, and it includes an e-mail from

22         Jordan Rosenfeld to Mr. Langfitt.  And looking at the very

23         last paragraph of the e-mail there's a statement that says

24         Tom stated he thought there was a way to subpoena the work

25         papers without the law suit.  Tom was going to talk to his

1   Q    Rather you state, quote, Klukwan's expectation, end quote,

2        correct?

3        MR. SPRAKER:   Objection, form, document speaks for itself.

4   A    That's what the word -- that's what the document says.

5   Q    Do you agree with me that the term expectation has a

6        considerably different meaning than condition?

7   A    Yes, I do.

8   Q    Looking at the last sentence in the third paragraph of

9        your February 10, 2004, e-mail, Exhibit 87, you stated,

10       quote, also, as you are aware, Klukwan is considering its

11       own action against P&S and has some -- has developed some

12       ideas about how to proceed.  You and I should discuss, end

13       quote.

14  A    Yes.

15  Q    And that reflected the fact Klukwan was continuing to

16       consider its own action against Peterson Sullivan,

17       correct?

18  A    It was, although the real thrust of that was Tom's desire,

19       pretty strong desire, to, you might say, drop the bread

20       crumbs in front of Travelers to lead Travelers to the

21       correct set of facts it would need to develop a case

22       against Peterson Sullivan.  There was also the possibility

23       of us bringing a suit, but I had told Jan that, you know,

24       if he brings a suit there's no real point in us bringing a

25       suit because it's the same dollars that are being chased

1        and he's got a stronger case.

2    Q    Certainly the language of this February 10, 2004, e-mail

3        leads Travelers to believe that Klukwan is continuing to

4        consider its own action against Peterson Sullivan, doesn't

5        it?

6    A    Well, you'll have to ask -- yes, I can see that would be a

7        reading from that.  Jan never did call back and discuss to

8        talk about the suit.  I mean, he just never -- I never

9        really understood why he didn't take the opportunity to

10       get some good information.  And he spent all this time

11       going after the work papers but no -- he just ignored our

12       efforts to provide him with some live information.

13   Q    It's true, as we previously covered in your deposition

14       here today, that after this date of February 10, 2004,

15       your office continued to research regarding a claims

16       against Peterson Sullivan by Klukwan, correct?

17   A    Well, let's put it a different way.  The research didn't

18       stop.  It dropped off dramatically, once it -- once

19       this.....

20   Q    But that's not MY question.

21   A    Yeah.

22   Q    Your firm continued to perform research after February 10,

23       2004, regarding a claim by Klukwan against Peterson

24       Sullivan, is that a true fact or not?

25   A    That's a -- it's a misleading question.  Continuing

1    Q    And you understood Travelers wanted the working papers to

2         evaluate whether or not they had a claim against Peterson

3         Sullivan, correct?

4    A    That's what they said, yes.

5    Q    So you certainly had no assurance that Travelers was

6         proceeding with a substantive law suit as of February 10,

7         2004, did you?

8    A    I did not have an express statement from them that they

9         would do so.  However, I was of the strong opinion that

10        they would do so.

11   Q    That was your unilateral belief based on your own analysis

12        of the potential claim against Peterson Sullivan?

13        MR. SPRAKER:  Objection, form and foundation, assumes

14   facts.....

15   A    It's also based on the manner in which Jan Sokol conducts

16        litigation and my experience with Jan in these case have

17        been that he's a very aggressive attorney and takes

18        litigation positions that are in some cases way -- pretty

19        aggressive.  And I believed that if he were to go forward

20        against Peterson Sullivan that -- in other words, he -- if

21        he errs he errs on the side of over-litigating an issue

22        than under-litigating an issue.  And I just couldn't see

23        how he would not conclude that he had a claim against

24        Peterson & Sullivan.  If he had reached that I would have

25        been very interested in hearing him come to that

Page 200

1      conclusion and tell me why.

2                     DEPOSITION EXHIBIT 193 MARKED

3      REPORTER:  193.

4  Q   Exhibit 193 is an e-mail to you from Tom Crandall that's

5      also sent to Jan Sokol, correct?

6  A   True.

7  Q   And it reflects Mr. Crandall's request to Jan Sokol to

8      correct his name on the working paper petitions, correct?

9  A   Yes.

10 Q   Did you have a discussion with Mr. Sokol regarding that

11     request?

12 A   I don't recall a discussion with him on that, no.

13 Q   This e-mail reflects the fact that Klukwan was not waiting

14     for any response from Travel -- by Travelers or Mr. Sokol

15     to your February 10, 2004, e-mail, correct?

16 A   Correct.

17 Q   You were prepared to execute -- or, Klukwan was prepared

18     to execute the petition promptly, correct?

19     MR. SPRAKER:  Objection, form and foundation, assumes

20 facts.

21 A   The document says what the document says.  You've asked

22     Tom Crandall about the same question and his testimony is

23     what the testimony is.

24 Q   Well, certainly that was your understanding, was it?

25 A   That what?

Page 267

1    A    Right.

2    Q    No letters, right?

3    A    That's true.

4    Q    You never picked up the phone and said why are you messing

5         around, why do you continue to mess around with this

6         stuff?

7    A    Well.....

8         MR. SPRAKER:   Objection, foundation.

9    A    .....I did.   I mean, I -- we did have that conversation.

10   Q    That one conversation that you're talking about?

11   A    Well, as I -- I can't remember if it's one or more than

12        one.   But -- because this work papers effort was a -- you

13        know, it -- well, it started in -- it had started six

14        months or eight months prior, June of '03 I think was the

15        beginning of the exercise.   It just seemed like if you

16        want to get the work papers, you know, do it, but by the

17        -- by -- I mean, it started in June of '03 deciding I need

18        the work papers to decide, okay.   And it -- I thought it

19        took him a long time to get the point of saying this is

20        the way I want to litigate.   And then after he got the

21        case dismissed he filed the suit anyway.

22   Q    Well, I understand what you think today.....

23   A    I don't know all the facts.

24   Q    .....Mr. Christianson -- yeah, well, I know, but my -- the

25        question -- I know what you think.

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

TRAVELERS CASUALTY AND          .   Case No. 3:06-CV-00063-TMB
SURETY COMPANY OF AMERICA,      .
a Connecticut corporation,      .
                                .
          Plaintiff,            .
                                .
vs.                             .
                                .
SOUTH COAST INC., an Alaska.        **DEPOSITION OF CABOT CHRISTIANSON**
corporation, KLUKWAN, INC.,.        **DAY 2**
Alaska Native Village           .
corporation, and CHILKATS' .
PORTAGE COVE DEVELOPMENT         .
COMPANY, an Alaska               .
corporation,                     .
                                .
          Defendants.           .
. . . . . . . . . . . .
SOUTH COAST INC., et al,        .
                                .
     Counterclaim and           .
     Third-Party Plaintiff,.
                                .
vs.                             .
                                .
TRAVELERS CASUALTY AND          .
SURETY COMPANY OF AMERICAN,.
a Connecticut Corporation,      .
STEWART SOKOL & GRAY L.L.C..
and JAN D. SOKOL,               .
                                .
     Counterclaim and           .
     Third-Party Defendants.
. . . . . . . . . . . .

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Travelers              James T. Hopkins, Esq.
Casualty and Surety        Schiffrin Olson Schlemlein
Company of America:          & Hopkins, P.L.L.C.
                           1601 Fifth Avenue, Suite 2500
                           Seattle, Washington 98101

APPEARANCES (Continued):

For South Coast, Inc.,          Gary A. Spraker, Esq.
et al.:                         Christianson & Spraker
                                911 West Eighth Avenue, Suite 201
                                Anchorage, Alaska  99501

For Stewart Sokol &             James D. Gilmore, Esq.
Gray, LLC:                      Clapp, Peterson, Van Flein,
                                Tiemessen & Thorsness LLC
                                711 H Street, Suite 620
                                Anchorage, Alaska  99501

* * * * *

    Pursuant to Notice, the deposition of CABOT CHRISTIANSON
was continued on behalf of the Plaintiff and Third-Party
Defendant Travelers Casualty and Surety Company of America
before Teresa E. Mielke, Notary Public in and for the State of
Alaska and Reporter for Gemini Reporting Services, at 943 West
Sixth Avenue, Suite 200, Anchorage, Alaska, on the 28th day of
September, 2007, commencing at the hour of 8:13 a.m.

* * * * *

|                 INDEX TO PROCEEDINGS | PAGES |
|---|---|
| EXAMINATION BY MR. GILMORE: | 273-311 |
| EXAMINATION BY MR. HOPKINS: | 313-343 |

|                 INDEX TO EXHIBITS | MARKED |
|---|---|
| Number: | |
| 202: 3/27/06 letter, C. Christianson to J. Sokol | 284 |
| 203: 4/6/06 letter, J. Sokol to C. Christianson | 290 |

272

PROCEEDINGS

CABOT CHRISTIANSON

previously sworn, testified as follows:

REPORTER:  We're on record.  I'd like to remind the witness that he's still under oath.

A.    Okay.

BY MR. GILMORE (Continued):

Q     Good morning, Mr. Christianson, you have in front of you Exhibit 193, correct?

A     Yes.

Q     And that's your February 10, '04, e-mail to Jan Sokol regarding the matters that are stated therein, correct?

A     That's correct.

Q     And in that e-mail it's my understanding that you state, at least, in the second paragraph, it says if Travelers wishes to bring a substantive cause of action.  And just so we're perfectly clear on that, the substantive cause of action is a different cause of action than the cause of action that was being filed in Seattle in an effort to get the work papers, correct?

A     Right.

Q     and then I think the last sentence of that paragraph you say as you are aware, Klukwan is considering its own action against P&S and developed some ideas about how to proceed.  You and I should discuss.  By considering its

Page 281

1  A    Right.

2  Q    .....of time?   Now.....

3  A    That's all right.   I very well could've attended, I just

4       don't have a recollection, so I guess that's as far as I

5       can go right now.

6  Q    Now, on February 10 in your e-mail to Jan you say

7       Travelers -- you say Klukwan is considering its own cause

8       of action against Peterson Sullivan, has developed some

9       ideas.   And then I don't see where there's any time that

10      there's another follow-up e-mail or communication with Jan

11      Sokol telling him at what point in time, if ever, Klukwan

12      decided not to pursue its own cause of action.

13 A    That's true.

14 Q    So as far as you know Jan Sokol at least through -- up

15      through September of '04 as far as you know he still

16      assumed that Klukwan was considering bringing its own

17      cause of action or claim against Peterson Sullivan?

18 A    Well, I don't know what he knew.   I did tell him that if

19      he was going to go forward that there was very little

20      chance that we would go forward.   And -- but I -- you

21      know, you're right, I never told him after this e-mail

22      chain Jan, we have affirmatively decided not to go

23      forward.   And to go back to your -- the question you were

24      asking before, I kind of have a memory of participating --

25      and I may -- I don't know if it was this meeting or not.

1          first page it says, as an attorney representing joint

2          clients you had no authority to choose one client's

3          interest over the other concerning the subject matter of

4          your joint representation.  Now, the joint representation

5          was on the petition to obtain the work papers, correct?

6     A    That was part of it.

7     Q    Well, what was the other part of it?

8     A    Well, I think it's pretty clear from the e-mail chain that

9          the end game here was a suit against Travelers (sic) and

10         although there was disagreement as to whether the funds

11         would be applied to the note or to the claim, at the very

12         least it would be applied to the claim and so, I mean,

13         that was really the -- the scope of the work was not just

14         to get the work papers, because that was really a

15         preliminary step.  The real important element of what Jan

16         was doing was pursuing the claims for the benefit of both

17         Travelers and Klukwan regardless of how the proceeds are

18         applied.

19    Q    The March 27th letter is the first time I see anything in

20         writing that states that Jan Sokol was representing,

21         beyond the petition for the work papers, both Klukwan and

22         Travelers.  Is there anything in writing that tells Jan

23         Sokol or advises him that he is the attorney representing

24         Klukwan after the request for the work papers?

25    A    Well, we've already seen the e-mail chain that establishes

1          MR. HOPKINS:   This is Exhibit 202?

2          MR. GILMORE:   202 is what we just marked.

3          MR. SPRAKER:   This'll be.....

4          MR. HOPKINS:   I know, I'd like to take a minute to take a

5     quick look at it.  Let's go off record for a second.

6                         (OFF THE RECORD)

7                         (ON THE RECORD)

8     A    This for me to look at?

9     Q    Let me just point your attention.....

10         MR. GILMORE:   What's been marked now Exhibit 203, as I

11    mentioned, is a letter -- or purports to be a letter dated April

12    6, 2006, from Jan Sokol to Mr. Christianson responding to his

13    letter of March 27, '06, which has been marked Exhibit 202.

14    Q    And in this letter, and I'd like to direct your attention

15         to the second and third paragraphs, which are factual

16         recitations by Jan Sokol, and I'd like you to read to

17         yourself those two paragraphs and just tell me if there's

18         any factual assertion in there that you disagree with.

19         That isn't true or correct.

20    A    These first two paragraphs?

21    Q    I think the second and third paragraphs.

22    A    Yes, there are parts of it that I disagree with.

23    Q    Could you identify those parts and tell me what your

24         disagreement is?

25    A    The bottom of the first page: I suggested and you agreed

1      that by filing the Washington action with Klukwan,

2      Peterson Sullivan's client, as a party we had a greater

3      likelihood of success in obtaining the work papers.

4      That's his idea and I.....

5   Q  That's a true statement, isn't it?

6   A  Well, greater than what I thought that the -- greater than

7      doing nothing, perhaps, but, as I've testified earlier, I

8      -- I didn't really think that was a particularly good way

9      to get the work papers.  He doesn't say greater -- well,

10     certainly greater than nothing, but if he really wanted

11     the papers he should've filed suit.

12  Q  Well, you would -- Klukwan is the client of Peterson

13     Sullivan, correct?

14  A  Yes.

15  Q  Travelers was not the client of Peterson Sullivan,

16     correct?

17  A  Oh, there's -- I did agree that he had a greater chance of

18     success if.....

19  Q  The client's requesting.....

20  A  .....the client was a party to the suit.  I guess I'm not

21     quite sure what he -- I interpret that to be whether the

22     suit itself is the way to go.  As you and Crandall were

23     aware, I was representing Klukwan in the action only as an

24     accommodation and only with respect to that action.  I

25     don't agree with that at all.  As I said, as I've already

7b1f7bdb-fb2a-4bed-89d0-a02ff3fe2797

```
1        testified, I think the scope of the work was broader than

2        that.  Accordingly, your suggestion that Klukwan

3        authorized this action to be filed conditioned upon the

4        express condition that proceeds from that litigation would

5        be applied to the obligation owed by Klukwan and South

6        Coast to Travelers makes no sense because there was no

7        claim for monetary damages, et cetera.  I think that's an

8        intentional -- or, well, maybe it's intentional, but it's

9        an obvious misreading of what the intent of that was.  The

10       obvious intent of that is that when I talk about proceeds

11       from the litigation it's the litigation against --

12       substantive litigation against Peterson Sullivan because,

13       actually he's right, this statement would make no sense

14       whatsoever if I was referring just to the work papers, and

15       sort of illustrates, and pretty clearly, I think, that I

16       saw the work papers was simply a prelude to the main

17       action, not a stand-alone suit that was brought.

18   Q   But it is true that there -- no monetary damages were

19       sought in the Seattle federal court action?

20   A   Sure.  So obviously when I talk about proceeds from that

21       litigation, that litigation refers to the substantive

22       action.  You know, and that's the -- yeah, well.  And --

23       When you and your client were provided with a copy of that

24       order and that ended both my firm and my representation as

25       an accommodation.  Well, I don't -- I think that's belied
```

1    by the e-mails and it's -- the suit was not brought as an

2    accommodation to us, it was brought -- I mean, he wasn't

3    doing an accom -- providing us an accommodation.  We were

4    working together.....

5  Q  The suit being the Seattle.....

6  A  The work papers suit.

7  Q  Yeah.

8  A  We were working together to pursue a substantive claim

9    again Peterson Sullivan.  So there's quite a bit in here

10    that I don't agree.....

11  Q  Did you ever respond to that letter?

12  A  I don't think so.  You know, you get to a point where

13    lawyers writing letters back and forth is just a waste of

14    time.

15  Q  I think you said there's others and I do want to get all

16    the other comments.....

17  A  Well, you mentioned.....

18  Q  .....you have about that.

19  A  You just asked about those two paragraphs.

20  Q  Right.

21  A  I think I disagree with just about every sentence in the

22    paragraph starting with "As you are well aware".  Not

23    quite, but I think we've covered my areas of disagreement.

24    I guess I can't see how the work that he did, the work

25    papers suit, could possibly be deemed an accommodation if

1    the benefit was to end upon the termination of the

2    representation because under the view of the world that

3    his work and scope of work terminates on the completion of

4    the work papers law suit, we get no benefit, good or bad,

5    from the work papers themselves.  The idea of an

6    accommodation would only make sense if there are dollars

7    that flow later from it.

8        MR. HOPKINS:  I object and move to strike that last

9    testimony by the witness, there was no question pending, we had

10   a pause of several minutes while Mr. Gilmore framed his next

11   question.

12       MR. SPRAKER:  For the record, I'm going to oppose that

13   objection and state that it was -- it appears to be an addendum

14   to supplement the answer that he gave and was responsible to the

15   question asked by Mr. Gilmore.

16       MR. GILMORE:  Mr. Gilmore's still reading with his lips

17   and so he doesn't participate in this colloquy between counsel.

18       MR. SPRAKER:  I think he just did.

19       MR. HOPKINS:  Why don't we take just a quick break?

20                    (OFF THE RECORD)

21                    (ON THE RECORD)

22   Q   In this law suit there were some requests for production

23       and interrogatories that Travelers propounded to South

24       Coast and they were answered in -- the 7th of February,

25       signed by Thomas Crandall, of 2007.  Did you ever see

Page 309

```
 1          dollars are your proof.  See what I'm saying?
 2    Q     I think so.
 3    A     That's how I read that.
 4    Q     Did you then discuss with Mr. Spraker -- Did ultimately
 5          make a recommendation to Klukwan, to Tom Crandall, not to
 6          bring a claim just on its own merits against.....
 7    A     Sure, I -- my advice.....
 8    Q     .....Peterson Sullivan?
 9    A     .....consistently to Tom and to the board was that -- is
10          that Travelers is much better situated to bring its claim.
11          It didn't -- it had a -- didn't suffer from the unclean
12          hands defense that we would have, it did not have the
13          damages problem that we would have, and they would be
14          financing the litigation.  And we're chasing the same
15          dollars.  I mean, the Travelers damages are the same as
16          our damages, the same -- or, at least the first let's say
17          12 million or whatever, it's the same claim.  So if
18          Travelers is going to go forward there was no point in us
19          going forward.  And that was my advice pretty much
20          consistently from day one.
21    Q     Wouldn't your advice have been exactly the same if
22          Travelers wasn't even in the picture?  If you were just
23          asked to assess the Klukwan claim.....
24    A     No.  No, because.....
25    Q     .....against Peterson Sullivan?
```

1    A    .....if -- you know, although there were some -- some

2         damage issues that we've already talked about, it still

3         looked to me like a pretty good claim, and certainly a

4         very large claim.  I think that whenever you're dealing

5         with a claim that, you know, potentially could be in the

6         10 to $20 million range if successful, even a claim that's

7         got some problems with it is worth taking a real hard look

8         at.  And of course the client desires are a big part of

9         it.  Tom was very desirous of moving forward and I know

10        that if Travelers had not moved forward that Tom would

11        have been very desirous of either suing Peterson Sullivan

12        or having a lot of -- a really good reason why not.

13   Q    Just a couple of general questions.  In terms of your

14        litigation experience have you been deposed before?

15   A    Well, Mr. Hopkins deposed me earlier in this case, a

16        documents deposition.  I was trying to think of -- I

17        anticipated that question.

18   Q    Right, right.

19   A    I think that I have but honestly I can't recall if I ever

20        have before.

21   Q    Have you ever testified as an expert witness?

22   A    Yes, I have.

23   Q    When and where and what kind of case?

24   A    Once in State court concerning the -- some issues

25        regarding the mechanics of foreclosing on a note, and once

1    after the September 12, 2004, board update memo because

2    there's simply no entry in your billing statements to

3    reflect you traveled to Haines, correct?

4  A    Well, it's more than that.  Since we've had a chance to

5    look at, it looks like the meeting happened on September

6    16th, which is a Wednesday, and that the -- I don't have

7    time showing that I attended.  The board minutes, which

8    are pretty complete, show that I was not there.  If I'd

9    been there it would've been by teleconference for sure.

10    And so that explains why I don't have a very good

11    recollection of what happened at that meeting; because I

12    wasn't there.

13  Q    Go back to the series of questions I asked you at the

14    outset regarding your advice to Klukwan regarding its

15    claims against Peterson & Sullivan and essentially your

16    view that if Travelers was going to proceed Klukwan should

17    not.

18  A    Right.

19  Q    It is true, then, that both you and Mr. Crandall wanted

20    Travelers to initiate an action against Peterson Sullivan?

21  A    Yes.

22  Q    Because you believed that was preferable to Klukwan

23    undertaking the expense and risk of its own action.

24  A    Yes.

25  Q    And indeed you've used the term, quote, bread crumbs, end

7b1f7bdb-fb2a-4bed-89d0-a02f3fe2797

```
 1          quote?

 2   A      Uh-huh (affirmative).

 3   Q      And prod or encourage Travelers?

 4   A      My testimony is what it's been.

 5   Q      The point being both you and Mr. Crandall were continually

 6          trying to encourage Travelers to proceed with an action

 7          against Peterson Sullivan, isn't that true?

 8   A      We wanted Travelers to move forward with the action, yes.

 9   Q      And you kept providing, quote, bread crumbs, end quote?

10   A      Well, I think most of the bread crumbs actually happened

11          -- were being provided by Tom Crandall, since it was a

12          factual bread crumb more than a legal bread crumb.

13   Q      And the purpose was to encourage Travelers to bring an

14          action against Peterson Sullivan?

15   A      Right, and to provide assistance to developing the facts

16          like the FMIs that we're talking about that Travelers

17          would have a difficult time developing on its own without

18          some inside help.

19   Q      In response to questions by Mr. Gilmore regarding the

20          repayment agreement you indicated that had you known

21          Travelers contemplated claims against the former South

22          Coast officers at the time the agreement was being

23          prepared you would've included language to effectively

24          prohibit that, correct?

25   A      Right.
```

7b1f7bdb-fb2a-4bed-89d0-a02ff3fe2797